# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

|  |  |  |
|---|---|---|
| _____ | : | |
| ROBERT BOLDEN, Sr., | : | |
| | : | No. 4:10-cv-2288 |
| Movant, | : | |
| | : | Judge Jackson |
| v. | : | |
| | : | CAPITAL CASE |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent. | : | |
| _____ | : | |

**AMENDED MOTION TO VACATE, SET ASIDE OR CORRECT THE JUDGMENT AND SENTENCE PURSUANT TO 28 U.S.C. § 2255 AND MEMORANDUM IN SUPPORT**

ANNE L. SAUNDERS, ESQUIRE
Asst. Federal Public Defender
Attorney ID #PA 48458
KELLY MILLER, ESQUIRE
Research & Writing Specialist
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
Tel. No. (717) 782-3843
Fax No. (717) 782-3966
(anne_saunders@fd.org)

JENNIFER MERRIGAN
MO Bar #56733
Death Penalty Litigation Clinic
6155 Oak Street, Suite C
Kansas City, MO  64113
Tel. No. 816-363-2795
Fax No. 816-363-2799
(jmerrigan@dplclinic.net)

Counsel for Mr. Bolden

Dated: August 10, 2011

# TABLE OF CONTENTS

THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PRIOR COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

GROUNDS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      THE FAILURE TO PRESERVE PETITIONER'S VIENNA CONVENTION RIGHTS AND HIS RIGHTS
        TO CONSULAR ASSISTANCE VIOLATED THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH
        AMENDMENTS AND ARTICLE VI OF THE CONSTITUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     THE DECISIONS TO FEDERALLY AND CAPITALLY PROSECUTE PETITIONER VIOLATED THE
        FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS . . . . . . . . . . . . . . . . . . . . . . . . . 15

III.    THE PROSECUTION'S DISCRIMINATORY USE OF PEREMPTORY STRIKES VIOLATED THE
        FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. COUNSEL WAS INEFFECTIVE . . 25

IV.     THE DECISION TO FEDERALLY PROSECUTE PETITIONER DEPRIVED PETITIONER OF A JURY
        POOL CONSISTING OF A FAIR CROSS SECTION OF THE COMMUNITY IN VIOLATION OF THE
        FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS . . . . . . . . . . . . . . . . . . . . . . . . . 31

VI.     PETITIONER WAS DENIED HIS FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT
        RIGHTS DURING JURY SELECTION. COUNSEL WERE INEFFECTIVE . . . . . . . . . . . . . . . . . . 36

VII.    AS A RESULT OF COUNSEL'S INEFFECTIVENESS, PROSECUTORIAL MISCONDUCT AND LEGAL
        ERROR, THE JURY DID NOT HEAR SUBSTANTIAL EVIDENCE CONTESTING THE
        GOVERNMENT'S CASE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH
        AMENDMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

VIII.   AS A RESULT OF COUNSEL'S INEFFECTIVENESS AND PROSECUTORIAL MISCONDUCT, THE
        RELIABILITY OF THE PRETRIAL PROCEEDINGS WAS COMPROMISED IN VIOLATION OF THE
        FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS . . . . . . . . . . . . . . . . . . . . . . . . . 81

IX.     COUNSEL'S FAILURE TO INVESTIGATE, DEVELOP, AND PRESENT MITIGATING EVIDENCE,
        VIOLATED MR. BOLDEN'S FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS . . . . . . . . . . 90

X.      THE PROSECUTOR'S INTRODUCTION OF IMPERMISSIBLE VICTIM IMPACT EVIDENCE;
        COUNSEL'S INEFFECTIVENESS; AND THE EIGHTH CIRCUIT'S MISAPPREHENSION OF THE
        CONTROLLING LAW VIOLATED THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS . . . . . . . . 133

XI.     THE JURY'S CONSIDERATION OF THE INAPPLICABLE, DUPLICATIVE, AND INVALID
        PECUNIARY GAIN AGGRAVATING CIRCUMSTANCE VIOLATED MR. BOLDEN'S FIFTH, SIXTH,
        AND EIGHTH AMENDMENT RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

XII.    The Jury Instructions Violated Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment Rights. Counsel Was Ineffective. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

XIII.   Numerous Instances of Prosecutorial Misconduct, Individually and Collectively Violated the Fifth, Sixth, Eighth, and Fourteenth Amendments.150

XV.     As a Result of Court Error and Ineffective Assistance of Counsel, Petitioner Was Denied His Right to Meaningful Appellate Review in Violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

XVII.   Petitioner Is Entitled to Relief Because of the Cumulative Effect of the Errors Described in this Motion... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

Request for Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

## THE PARTIES

1.      Robert Bolden is incarcerated by the Federal Bureau of Prisons and is currently confined at USP-Terre Haute, under a sentence of death.

2.      Respondent is the United States of America.

## PROCEDURAL HISTORY

3.      On May 11, 2006, a jury convicted Petitioner of murder with a firearm during an attempted bank robbery, conspiracy to commit bank robbery, and being a felon-in-possession of a firearm. On May 23, 2006, he was sentenced to death. On August 25, 2006, the District Court sentenced him to five and ten years, respectively, on the conspiracy and felon-in-possession counts. On November 4, 2008, the Eighth Circuit affirmed Mr. Bolden's convictions and sentences. United States v. Bolden, 545 F.3d 609 (8th Cir. 2008) ("Bolden"). Mr. Bolden's Petition for a Writ of Certiorari was denied on December 7, 2009. Bolden v. United States, 130 S.Ct. 796 (2009).

4.      On the same date, counsel filed a *Motion for Appointment of Counsel to Pursue Post-Conviction Remedies*, pursuant to McFarland v. Scott, 512 U.S. 849 (1994), and 18 U.S.C. § 3599(a)(2). United States v. Bolden, No. 4:02-cr-00557 ("Bolden-1"),  Doc. 542. On December 16, 2009, this Court granted Petitioner's *Motion* and appointed undersigned. Id. Doc. 544.

5.      On December 6, 2010, Petitioner filed his *Motion to Vacate, Set Aside or Correct the Judgment and Sentence Pursuant to 28 U.S.C. § 2255 and Memorandum of Support*, ("*2255 Motion*"). Doc. 2.

## PRIOR COUNSEL

6.      Petitioner's trial counsel were Kevin Curran, Esquire, David Hemingway, Esquire, and Christopher McGraugh, Esquire. Mr. Curran, Mr. Hemingway, and Jennifer Herndon, Esquire were appellate counsel.

**GROUNDS FOR RELIEF**

7.      By this *Revised Amended Motion to Vacate, Set Aside or Correct the Judgment and Sentence Under 28 U.S.C. § 2255*, Petitioner submits that his conviction(s) and sentence(s) violate the  Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Robert Bolden's capital trial was marked by a weak and incomplete defense in the face of a far overreaching prosecution. At all stages of his trial, from the Department of Justice authorization to seek the death penalty, through the voir dire to the penalty phase, the government set out to limit what the defense and the jury knew while injecting improper and offensive considerations to the jury. At the same time, from very early on in the case, the defense narrowed its investigation to match a premature and uninformed strategy. The outcome was an imbalanced, unjust trial, resulting in a sentence of death for Robert Bolden and constituted a fundamental miscarriage of justice requiring relief. .

**I.      THE FAILURE TO PRESERVE PETITIONER'S VIENNA CONVENTION RIGHTS AND HIS RIGHTS TO CONSULAR ASSISTANCE VIOLATED THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AND ARTICLE VI OF THE CONSTITUTION.**

8.      The claims, factual and legal allegations, and supporting exhibits set forth in the *2255 Motion*, (Doc. 2 at ¶¶ 8-10), and those set forth elsewhere in this *Revised Amended Motion* are incorporated herein as if fully stated. <u>See</u> Fed.R.Civ.P. 10(c); Fed.R.Civ.P. 15(a), *Commentary*, ("If a party filing an amendment wishes to preserve some portions of the original pleading, the party should incorporate those portions by specific reference in the amended pleading"). Mr. Bolden alleges the following facts and reserves the right to supplement/amend following full discovery, approval to travel to Canada, access to this Court's subpoena power, and an evidentiary hearing:

9.      Petitioner is a Canadian citizen. His mother was Canadian, he lived in Canada during his early years, and the Canadian Consulate has deemed that he meets the criteria for Consular assistance for Canadian citizens charged with criminal offenses abroad. Although it was well-aware of Petitioner's status as a Canadian citizen, prior to, or at a minimum, shortly after his arrest and

2

certainly long before it authorized a capital prosecution, (see Exhs 25, 55, 58 and 66), the government did not notify Petitioner of his rights under the Vienna Convention on Consular Relations ("Convention"), nor did the government contact the Canadian Consulate as required under federal and international law in violation of Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights. Although they were well-aware of Petitioner's citizenship status, from both records provided by the government as well as their own investigation, counsel failed to notify Petitioner of his Convention rights, failed to contact the Canadian Consulate, and failed to raise or litigate the constitutional violations arising from the government's failure to honor Petitioner's Convention rights. Counsel's prejudicially deficient performance violated the Fifth, Sixth, Eighth and Fourteenth Amendments.

### A.    The Law

10.    The Convention is an international treaty containing 79 Articles "regulating various aspects of consular activities." Sanchez-Llamas v. Oregon, 548 U.S. 331, 337 (2006). Article 36 "addresses communication between an individual and his consular officers when the individual is detained by authorities in a foreign country." Id. The United States ratified the Convention in 1969. Id. See also 21 U.S.T. 77 (Dec. 14, 1969). Thus, it was binding on the government at the time of Mr. Bolden's prosecution. U.S. CONST. Art. VI, cl. 2.

11.    The Convention "imposes three separate obligations on a detaining authority: (1) inform the consulate of a foreign national's arrest or detention without delay; (2) forward communications from a detained national to the consulate without delay; and (3) inform a detained foreign national of 'his rights' under Article 36 without delay." Osagiede v. United States, 543 F.3d 399, 402 ( 7th Cir. 2008); see also Medellin v. Texas, 552 U.S. 491, 499 (2008); Faulder v. Johnson, 81 F.3d 515, 520 (5th Cir. 1996); Baires v. U.S., 707 F. Supp. 2d. 656 (E.D. Va. 2010); MANUAL OF CONSULAR INSTRUCTIONS (1993), Doc. 4-4 at 8.

12.     The government also promulgated rules to ensure compliance with these duties. <u>See</u> 28 C.F.R. § 50.5 (requiring arresting officers with the Department of Justice to "inform the foreign national that his consul will be advised of his arrest" in every instance in which a foreign national is arrested). These rules require that "[i]n every case in which a foreign national is arrested the arresting officer shall inform the foreign national that his consul will be advised of his arrest unless he does not wish such notification to be given." <u>Id</u>. § 50.5(a). <u>See also</u> <u>U.S. v. Cardoso-Lopez</u>, 2009 WL 3198658, at *2 (7th Cir. 2009) (holding that "[th]e obligation to inform thus lies solely with the government"). Additionally, "the local office of the Federal Bureau of Investigation or the local Marshal's office, as the case may be, shall inform the nearest U.S. Attorney of the arrest and of the arrested person's wishes regarding consular notification," and then the U.S. Attorney will notify the consulate if appropriate. <u>Id</u>. In addition, the government and the Consulate had promulgated guidelines and directives to protect foreign nationals' right to consular assistance.[1]

13.     Issues surrounding the failure to comply with the Convention in capital cases were well-established years before Mr. Bolden's arrest, in the years leading up to Mr. Bolden's arrest and trial, and at the time of Mr. Bolden's trial. There were "hundreds of cases in which courts had addressed [Article 36] rights, even in a criminal setting." <u>Osagiede</u>, 543 F.3d at 411. In 1998, the Supreme Court noted that the Convention "arguably confers on an individual the right to consular assistance following arrest." <u>Breard v. Greene</u>, 523 U.S. 371, 375-77 (1998). In 2001, the International Court of Justice ("ICJ"), issued a decision finding that the United States had violated its obligations under Article 36 arising from the capital prosecutions, and executions, of Karl and Walter LaGrand. <u>LaGrand Case</u>, 2001 I.C.J. 466 ¶ 128(3)-(7). In 2004, the ICJ decided <u>Case Concerning Avena and Other Mexican Nationals</u>, holding that the Convention created individual

---

[1] <u>See</u> <u>Osagiede</u>, 543 F.3d at 402; <u>Faulder v. Johnson</u>, 81 F.3d 515, 520 (1996).

rights, that the United States had violated these rights, and that the United States must "provide, by means of its own choosing, review and reconsideration of the convictions and sentences of the [convicted] Mexican nationals" to determine whether the violations "caused actual prejudice," without allowing procedural default rules to bar such review. 2004 I.C.J. 12 ¶¶ 121-122, 153(9). In 2005, the Supreme Court dismissed a certiorari petition as improvidently granted in Medellin v. Dretke, a case involving a Mexican citizen on death row, but discussed the issues of asserting a Convention claim in federal habeas corpus proceedings and recognized the Avena and LaGrand ICJ. decision 544 U.S. 660 (2005). These cases made headlines across the country and in St. Louis.

14.     Simultaneously there was a well-developed body of materials discussing the Convention right to consular notification and the significance of Consular assistance in capital cases, including articles in lawyers' periodicals and law reviews. See, e.g.,Foster & Dogett, Vienna Convention:  New Tool for Representing Foreign Nationals in the Criminal Justice System, THE CHAMPION, March 1997; Robert F. Brooks & William H. Wright Jr., States Deny Treaty Rights to Foreign Defendants, NAT'L L.J., Nov. 4, 1996, at B8.

15.     Despite the government's own policies and procedures set in place to preserve the Convention rights, and despite the well-established and highly publicized litigation and press surrounding the denial of Convention rights, neither the government nor Mr. Bolden's counsel took any steps to preserve Mr. Bolden's Convention rights.

**B.     The Substantial Assistance the Canadian Consulate Would Have Provided.**

16.     The Consulate plays a unique and pivotal role in assisting foreign nationals charged with criminal offenses that is distinct from the assistance provided by local counsel. See, e.g., Osagiede, 543 F.3d at 402-403; United States v. Rangel-Gonzales, 617 F.2d 529, 532-33 (9th Cir. 1980); Ledezma v. State, 626 N.W.2d 134, 152 (Iowa 2001).

17.     This assistance is central to the consulate's ability to protect its citizens. See

5

Osagiede, 543 F.3d at 403 ("Article 36 furthers an essential consular function: 'protecting . . . the interests of the sending State and of its nationals . . . [which is] one of the most important functions performed by a consulate.'") (*citing* Lee, CONSULAR LAW AND PRACTICE 125-188); Exh. 1 at 2-6 ("The rights of consular officials to visit their citizens in prison are basic to their protective functions."). "The consulate can provide critical resources for legal representation" and "can conduct its own investigations, file amicus briefs and even intervene directly in a proceeding if it deems that necessary." Osagiede, 543 F.3d at 403. See also Exh.1 at 2-6.

18.     The Canadian Consulate has a long history of successful intervention, including assistance in obtaining qualified local counsel, advocating Convention claims, negotiating pleas, obtaining documentation from Canada and maintaining the foreign national's contact with family and friends. Exh. 3 at ¶14. Mr. Henry Garfield Pardy, Director General of Consular Services from 1995 to 2003 in Ottawa, Canada, describes the significant assistance that Canada has previously provided to its citizens and the type of assistance the Consulate could have provided Mr. Bolden. See Exh. 3. From 1992 to 2003, (including the time of Mr. Bolden's arrest and the DOJ authorizations), the Consulate had a policy to automatically intervene "in any case where a Canadian was facing the death penalty." Id. ¶8. As late as October 26, 2007, it was "the policy of the Canadian government to seek clemency . . . for Canadians sentenced to death in foreign countries." Id.; see also Faulder v. Johnson, 81 F.3d at 520.

19.     Since 1992, the Consulate provided assistance in ten cases in which Canadian citizens faced the death penalty. Id. ¶13. This assistance included "ensuring that the appropriate legal assistance was available, including identifying appropriate local counsel and, if necessary, coordinating with family and friends appropriate financial arrangements." Id. ¶14(a). The Consulate has also "cooperat[ed] with defence attorneys in carrying out activities that were mutually agreed upon and the coordination of strategy, including submitting affidavits and amicus briefs, identifying

6

mitigation evidence and penalty phase strategy, making available official Canadian records, and coordinating with local counsel to collect information in Canada that is germane to the case." Id. ¶14(b); see also Exh. 1 at 2-7 ("Having determined entitlement to protection the consular officers should investigate the circumstances of the arrest or detention.").

20.     The Consulate has also provided:  "diplomatic representations to the appropriate government and legal authorities seeking support and intervention for clemency;" "consular visits to sentenced Canadian and the provision of personal amenities and assistance in maintaining contact with family and friends in Canada;" and, "legal submissions (amicus) to foreign courts in support of clemency requests and other associated legal issues (consular rights)," among other activities. Id. ¶14(c), (d), (i); see also Exh. 1 at 2-7 ("The consular officer should ensure that the accused has access to the services of legal counsel, that he or she is in touch with relatives or friends (if desired), or has assistance in obtaining bail."). The Consulate also supports "Canadian police in providing information to foreign governments as appropriate," including in one case coordinating with foreign government investigators to provide evidence demonstrating the citizen's innocence. Id. ¶14(h). Consulate assistance has obtained significant results. As Mr. Pardy notes, as a direct result of the Consulate's intervention, of the ten cases in which he was involved between 1992 and 2003, only two Canadians were executed. Id. ¶16.

21.     The Consulate was willing and able to provide similar assistance to Mr. Bolden, particularly in light of its policy of automatically intervening in capital prosecutions of Canadian citizens. Exh. 3 at ¶8. The Consulate could have provided a range of assistance tailored to Mr. Bolden specifically, such as "legal advocacy, including assistance in pleas and negotiations;" educating both defense and government attorneys about Mr. Bolden's rights as a Canadian citizen; "assistance in initiating legal submissions regarding consular rights, including seeking a remedy for the government's failure to inform Mr. Bolden of his right to consular notification;" "assistance

7

obtaining social history records and . . . locating and contacting Mr. Bolden's family members still residing in Newfoundland, Canada;" and "medical advocacy." Id. ¶19; see also Exh. 1 at 2-6, 2-7. This assistance would have provided counsel with significant evidence supporting their deauthorization presentation, their pretrial motions and claims, and, their case for life during the penalty hearing. This assistance is unique to the Consulate was crucial to Mr. Bolden's defense.

     **C.**    **The Government's Convention Violations Violated International Law, the Fifth, Sixth, Eighth, Fourteenth Amendments and Article VI.**

22.    As noted, controlling precedent recognizes that the Convention charges the government with a duty to inform the consulate of a foreign national's arrest; inform the foreign national of his Article 36 rights; and, facilitate communications from a foreign national to the consular. To this day, the government has not fulfilled its obligations under the Convention and federal law. In fact, the Canadian Consulate did not become involved in this case until habeas counsel contacted them—nearly 8 years after Mr. Bolden's arrest and conviction. Exh. 2 at ¶1. The government failed on all counts to discharge its treaty-based international duties in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments and Article VI.

23.    "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935). Although it was well-aware of Mr. Bolden's citizenship status, at no time did the government inform Mr. Bolden of his Article 36 rights, despite international and federal law requiring notice. Similarly, the government arrested Mr. Bolden, authorized a federal prosecution, and then authorized a capital prosecution without providing any notice to the Canadian Consulate or discharging any of its other duties under the Convention.

8

24.     As noted previously, the Consulate was willing and able to provide substantial assistance to Mr. Bolden had it received proper notification. The Consulate would have provided trial-specific assistance, from retaining qualified local counsel, to conducting investigation, to developing mitigation strategy, and to seeking a remedy for the government's Convention violation. Exh. 3, ¶ 14. The Consulate was also in the unique position of easily navigating Canadian institutions to assist with investigation and document collection and provide legal advocacy specializing in international law. The Consulate's assistance would have been critical to Mr. Bolden's defense, particularly given counsel's ineffectiveness, failure to seek a remedy for the government's Convention violations, and failure to conduct any mitigation investigation or evidence regarding Mr. Bolden's Canadian personal and family social history. Thus, the government's violations undermined every stage of Mr. Bolden's prosecution – from arrest, to federal and capital authorization, to pretrial, to trial, to the penalty phase and sentencing and directly impacted Mr. Bolden's Fifth and Sixth Amendment rights to due process and a fair trial.

25.     The Constitution guarantees  an accused "a meaningful opportunity to present a complete defense."  California v. Trombetta, 467 U. S. 479, 485 (1984)[2]. As a result of the government's abject failure to discharge its Convention duties, Mr. Bolden was denied the specialized assistance that only the Consulate could have provided; specific and meritorious claims arising from the government's violation of international law were never raised at trial or on direct appeal; and, the jury never heard significant and compelling mitigation arising from Mr. Bolden's early life history in Canada and his Canadian family history and background. Given the extent of ineffectiveness of counsel, the lack of mitigation evidence, and general systemic failure of Mr.

---

[2]See also Chambers v. Mississippi, 410 U.S. 284, 294 (1973); Strickland v. Washington, 466 U.S. 668, 684-685 (1984); Crane v. Kentucky, 476 U.S. 683, 690 (1986); Rock v. Arkansas, 483 U.S. 44, 51 (1987).

Bolden's trial process, described elsewhere in this *Revised Amended Motion*, consular assistance was critical. These errors violated Mr. Bolden's trial rights arising from the Fifth and Sixth Amendments, undermined the reliability of the jury's verdict and sentencing determination, and resulted in a miscarriage of justice.

26.     In addition, the government's failure to fulfill its Convention obligations also violated specific Fifth, Sixth, Eighth and Fourteenth Amendment rights. A capital defendant has a constitutional right to present relevant mitigation evidence. Williams v. Taylor, 529 U.S. 362, 393 (2000). Because of the "qualitative difference" between a sentence of death and any other punishment, the Fifth, Eighth and Fourteenth Amendments require heightened reliability. Woodson v. North Carolina, 428 U.S. 280, 305 (1976); Gregg v. Georgia, 428 U.S. 153, 189 (1976); Ring v. Arizona, 536 U.S. 584, 605–06 (2002). Precluding the jury from considering, or giving full effect to, relevant mitigation evidence violates the heightened standards required by the Eighth and Fourteenth Amendments. Mills v. Maryland, 486 U.S. 367, 374-75 (1988) (citing Eddings v. Oklahoma, 455 U.S. 104 (1982); Lockett v. Ohio, 438 U.S. 586 (1978). Nor is there any question that capital defendants have an absolute Sixth Amendment right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 687 (1984). Effective counsel is constitutionally required to investigate, develop and present all relevant mitigation evidence, including evidence regarding the defendant's multi-generational family history. Williams v. Taylor, 529 U.S. at 396.

27.     Had the government fulfilled its Convention obligations, the Consulate would have intervened in Mr. Bolden's case and assisted Mr. Bolden in developing and coordinating mitigation strategy, obtaining official Canadian documents and locating and contacting witnesses, and jprovided legal assistance on the international law violations. Exh. 3 at ¶19. As described more fully elsewhere, (see Claim IX), there was a wealth of multi-generational family, medical, and social mitigation history available in Canada, but not presented to the jury. Mr. Bolden's mother was a Canadian

citizen, he was born and lived in Newfoundland for three years and has maternal relatives still living in Canada. Consular assistance also would have been indispensable in locating medical records regarding Petitioner's diabetic history as a child and his mother's alcoholism.

28.     By failing to honor its Convention obligations, the government essentially shut the door on Mr. Bolden's ability to develop and present compelling mitigation evidence and rendered counsel constitutionally ineffective. The government's failure to notify the Consulate or Mr. Bolden violated the Fifth, Sixth, Eighth and Fourteenth Amendments.

29.     Courts have recognized that the denial of the unique assistance attendant with consular involvement results in prejudice and undermines the reliability of the verdict in non-capital cases, see Osagiede, 543 F.3d at 412-13; and in particular with regard to capital cases in light of the specialized mitigation assistance the foreign state can provide. Valdez v. State, 46 P.3d at 710; Torres v. State, 120 P.3d 1184, 1189-90 (Okla. Crim. App. 2005); Marquez-Burrola v. State, 157 P.3d 749, 763 (Okla. Crim. App. 2007).

30.     The government's failure to inform Mr. Bolden of his right to consular assistance or notify the Consulate of Mr. Bolden's arrest and detention deprived Mr. Bolden of vital consular assistance, resulting in prejudice. As noted previously, Consular assistance would have been critical to, and directly impacted, all aspects of this capital prosecution. The Consular would have been able: to assist in the investigation and developing critical mitigation evidence surrounding Mr. Bolden's Canadian family; provide assistance to counsel in developing the pretrial presentation to the DOJ in support of forgoing a capital prosecution; provide specialized litigation assistance with regard to Convention violations; and, pursue adequate medical and dietary care and treatment for Mr. Bolden. Absent Consular assistance, Mr. Bolden was unable to present the compelling Canadian family mitigation evidence either to the DOJ during the authorization process or to the jury during the penalty hearing. There is more than a reasonable probability that this evidence would have impacted

either or both processes.

31.     Absent Consular assistance, Mr. Bolden was subjected to onerous conditions of confinement that included an abject failure to provide him adequate medical and dietary care in light of his chronic diabetes and counsel was forced to expend time and resources to seek proper treatment that would have been more effectively spent preparing for Mr. Bolden's capital trial. Absent Consular assistance, Mr. Bolden was denied specialized legal assistance to raise and litigate the constitutional claims arising from the Convention violations on direct appeal. As described above, the impact and prejudice arising from denying Mr. Bolden his right to Consular assistance is further demonstrated by the successes the Consulate has had in other cases. See Exh. 3 at ¶16. In short, the government's Convention and constitutional violations directly impacted and prejudiced all aspects of the proceedings, undermined the reliability of the jury's verdict, the sentencing determination and the direct appeal proceedings.

**D.     Counsel's Ineffectiveness.**

32.     As described above, counsel was well-aware of Petitioner's citizenship status yet counsel failed to:  notify Petitioner of his rights under the Convention; contact the Consulate; request Consulate assistance; or raise and litigate the government's violations under federal, constitutional and international law. Sixth Amendment ineffective assistance of counsel claims are demonstrated where the petitioner demonstrates that counsel's deficient performance resulted in prejudice. Strickland v. Washington, 466 U.S. 668, 688; 694 (1984). Petitioner has met the standard.

33.     The adequacy of counsel's performance is "measured against an 'objective standard of reasonableness,' [Strickland v. Washington, 466 U.S. 668, 688 (1984)], 'under prevailing professional norms.' *Ibid.*; Wiggins v. Smith, [539 U.S. 510, 521 (2003)]." Rompilla v. Beard, 545 U.S. 374, 380 (2005). Controlling precedent, the ABA STANDARDS and the GUIDELINES, charged counsel with a duty to preserve, protect and litigate Mr. Bolden's Convention rights. See ABA

STANDARDS 4-3.6; 4-4.1; GUIDELINE 10.6 (Consular duties); see also GUIDELINE 10.11, Commentary (noting that "an understanding of the client's extended, multi-generational history is often needed for an understanding of his functioning, construction of the [mitigation] narrative normally requires evidence that sets forth and explains the client's complete social history from before conception to the present"); See also Kadish, 27 MICH. J. INT'L L. at 1218.

34.     Courts have similarly charged effective counsel with a duty to know the relevant law arising from representation of a foreign national. Osagiede, 543 F.3d at 409 ("[t]he law was on the books; the [Convention] violation was clear. Simple computer research would have turned it up"); Murphy v. Netherland, 116 F.3d 97, 100 (4th Cir. 1997); Ledezma v. State, 626 N.W.2d 134, 152 (Iowa 2001). Likewise, courts have acknowledged counsel's specific obligations to discover his client's nationality, inform him of his right to consular notification and assistance, and seek a remedy for the government's Article 36 violations. E.g., Osagiede, 543 F.3d at 411; Valdez, 46 P.3d at 710; Ledezma, 626 N.W.2d at 152. See also Kadish, 27 MICH. J. INT'L L. at 1218.

35.     Counsel was well-aware that Mr. Bolden was born in Canada. Yet, counsel failed notify Mr. Bolden of his consular rights, seek consular assistance throughout Mr. Bolden's trial, or litigate the Convention and constitutional violations. Indeed, if there were any question of Mr. Bolden's status, counsel was obliged to contact Canada to determine his status. Had they done so, they would have learned that Mr. Bolden was a Canadian citizen, eligible for Consular protections.

36.     Nor did counsel conduct any investigation into Petitioner's background and history as a Canadian citizen. Discovering Mr. Bolden's birthplace and early childhood history should have been a central factor in the initial defense investigation into Mr. Bolden's social and family history. Wiggins, 539 U.S. at 524 (finding the investigation was inadequate because "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources"); see also GUIDELINE 10.11, Commentary; Williams v.

13

Taylor, 529 U.S. at 396. Here, a cursory investigation revealed that Mr. Bolden spent the first three years of his life in Canada and had a number of maternal relatives still residing in the country. Yet Mr. Bolden's counsel failed to conduct any of this critical mitigation investigation See also Claim IX. Nor did counsel seek Consular assistance in investigating, developing and presenting this evidence. As noted previously, had counsel sought that assistance, Canada would have provided it. Counsel's failure to discharge any of their legal, professional and ethical duties arising from Mr. Bolden's Canadian citizenship constituted deficient performance.

37.     Prejudice is demonstrated when "there is a *reasonable* probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; Williams, 529 U.S. at 371; Wiggins, 539 U.S. at 534; Rompilla, 545 U.S. at 390. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id.; see also Strickland, 466 U.S. at 693.

38.     As described above and in the exhibits, Consular assistance would have provided Mr. Bolden with compelling evidence supporting the pretrial defense argument against capital authorization, provided pretrial, at trial and post-trial bases (and support) for raising and litigating the government's Convention violations, and, provided Mr. Bolden with substantial and compelling mitigation evidence surrounding his early life in Canada and his Canadian maternal family. Prejudice is demonstrated because there is a reasonable probability that, had counsel acted effectively, the results of the authorization process and the pretrial proceedings would have been different. Likewise, prejudice is demonstrated because there is a reasonable probability that, had the jury heard the substantial and compelling mitigation evidence regarding Mr. Bolden's multi-generational Canadian family and social history it would have found additional mitigation, applied greater weight to the mitigation evidence presented, and rejected death. As counsel's ineffectiveness undermined the

14

reliability of the verdict and sentencing determination, relief is required.

II.    **THE DECISIONS TO FEDERALLY AND CAPITALLY PROSECUTE PETITIONER VIOLATED THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

39.    The claims, factual and legal allegations and exhibits set forth in the *2255 Motion*, (including Doc. 2 at ¶¶64-106), and those contained throughout this *Revised Amended Motion*, are incorporated herein as if fully stated. See Fed.R.Civ.P. 10(c); Fed.R.Civ.P. 15(a).

40.    The government's determinations to federally and capitally prosecute Petitioner were improper and violated the Fifth Sixth, Eighth and Fourteenth Amendments for three distinct reasons: (1) conflicts of interest arising from the prosecutor's close relationship with the victim's family and the prosecutor's position on the DOJ Capital Crimes Committee; (2) the apparent discriminatory intent; and (3) the government's failure to follow its own policies and procedures.

A.    **The Law**

41.    Having elected to establish certain procedures for determining whether or not to federally and capitally prosecute an accused, the government is required to apply those procedures in conformance with due process. See Evitts v. Lucey, 469 U.S. 387, 393 (1985) (due process interest in state created right to direct appeal); see also Hicks v. Oklahoma, 447 U.S. 343, 346 (1980) (liberty interest in state-created capital sentencing procedures); Ford v. Wainwright, 447 U.S. 399, 427-31 (1986) (O'Connor, J., concurring); Ohio Adult Parole Authority v. Woodard, 523 U.S. 272, 289 (1998) (O'Connor, J, with Souter, Ginsburg & Breyer, JJ., concurring); id. at 290-91 (Stevens, J., concurring). Likewise, both Due Process and Equal Protection preclude the government from reaching determinations on the basis of race, bias or any conflict of interest. J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 142 n.13 (1994); Snyder v. Louisiana, 128 S. Ct. 1203, 1208 (2008) (collecting cases); Batson v. Kentucky, 476 U.S. 79 (1986); Young v. U.S. ex rel. Vuitton et Fils S.A., 481 U.S. 787 (1987). Moreover, heightened standards for reliability are required in capital

cases. <u>Woodson v. North Carolina</u>, 428 U.S. 280, 305 (1976). The government's determinations to federally and capitally charge Petitioner violated each of these fundamental principles.

### B.    Conflicts of Interest Impacting the Decisions

42.    As noted previously, the United States Attorney is obliged to act impartially and its interest in criminal prosecutions is to seek justice rather than win a case. <u>Berger,</u> 295 U.S. at 88. "Because of this unique responsibility, federal prosecutors are prohibited from representing the Government in any matter in which they, their family, or their business associates have any interest." <u>Young</u>, 481 U.S. at 803 (citing 18 U.S.C. §208(2)); ABA GUIDELINES, PROSECUTORIAL FUNCTION, § 3-1.3(a) (prosecution must "avoid a conflict of interest"); <u>id.</u> § 3-1.3(f).

43.    Assistant United States Attorney Holtshouser was operating under two distinct conflicts of interest that skewed the decisions to federally and capitally prosecute Petitioner. First, Mr. Holtshouser appears to have had an actual conflict of interest, arising from his pre-existing relationship with the victim's family. He was a prosecutor and the victim's father worked for the Saint Louis Police Department[3]. He graduated from the same high school as the victim's father, grew up in the same neighborhood as the victim's family, and may have attended the same church. If, as Petitioner expects to prove after full discovery and a hearing, Mr. Holtshouser was close with the family, full disclosure and recusal from all aspects of Mr. Bolden's prosecution was required and the failure to do so violated the Fifth, Sixth, Eighth and Fourteenth Amendments.

44.    Mr. Holtshouser also served as a member of the DOJ Capital Case Review Committee, ("Committee"), the division charged with determining whether or not to seek death. His participation on the Committee while at the same time serving as a lead prosecutor in the case created, at a minimum, an appearance of impropriety. The dual roles created an unreasonable risk

---

[3] <u>See e.g.</u>, Exh. 23 (facsimile from Mr. Thomas Ley to Mr. Holtshouser and Mr. Reilly, indicating familiarity).

of undue influence on the Committee and constituted a breakdown in the process. Permitting the clear appearance, and likely actual, conflict arising from Mr. Hotshouser's dual roles violates fundamental due process. His membership on the Committee and personal conflicts also skewed the reliability of the determination to federally prosecute Petitioner. Mr. Holtshouser's involvement in these critical processes, while laboring under multiple conflicts of interest violated the Fifth, Sixth Eighth and Fourteenth Amendments. Individually or collectively, these conflicts require relief.

### C.   Discriminatory Intent in Charging Determination

45.   Though prosecutors have discretion in choosing which cases to charge federally versus at the state level, that discretion is not unchecked. Powers v. Ohio, 499 U.S. 400, 415 (1991) (prosecutor's discretion bound by Equal Protection clause prohibition on racial discrimination "from all acts and proceedings of the State."). Facially nondiscriminatory procedures that are applied in a discriminatory manner violate Equal Protection. Yick Wo v. Hopkins, 118 U.S. 356, 373 (1886).

46.   A defendant may establish a prima facie case of purposeful discrimination, "by showing the totality of the relevant fact gives rise to an inference of discriminatory purpose." Batson, 476 U.S. at 94; Village of Arlington Heights v. Metropolitan Division Corporation, 429 U.S. 252 (1977). The analysis "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," (Arlington Hghts, 429 U.S. at 266),  both because perpetrators do not often publicly announce discriminatory intent and because those responsible for key decisions may have "[m]ore subtle, less consciously held racial attitudes."  Turner v. Murray, 476 U.S. 28, 31 (1986). These considerations are especially problematic when those responsible for the decision have broad discretion, as in the decision to federally and capitally prosecute. Id. at 35.

47.   The government's federal charging determination was designed to alter the venire's

composition[4]. There are eight federal districts that have a large, majority-black, urban area that sits within a federal district with a large, white-majority population. Cohen & Smith, The Racial Geography of the Federal Death Penalty, 85 Wash.L.Rev. 425, 436-37. These districts have produced almost half of the inmates on federal death row, meaning that 50% of the federal death sentences arise from 8.5% of the federal districts. Id. The rest of the federal districts do not have such a racial disparity between the county and urban areas. The disparities are emblematic of a systemic approach prosecutors take to preclude African-Americans from juror pools.[5]

48.     The Eastern District of Missouri is one of these eight federal district courts. The Eastern District along with another one of the eight – the Western District – have put more individuals on federal death row than New York, California, Florida and thirty-seven other federal district courts combined[6]. Id. at 436. This is not because of differing community standards. The Eastern District – and the Western District – have drastically different racial compositions between the state jurisdiction that would prosecute crimes arising from the urban areas (St. Louis City and Kansas City) and the federal district. Id. at 450. The outlying counties of the metropolitan areas are largely suburban and rural with densely-white populations. Id. Imposition of the death penalty is much more likely outside St. Louis City. St. Louis City, where there is a dense African-American population, has sentenced only four of the forty-nine people currently on Missouri's death row. St. Louis County, which is 73.1% white, 21.9% black, has sentenced nineteen. Id.

_____

[4]Statistics demonstrate racial disparity in decisions to federally and capitally prosecute throughout the country.  Lacey & Bonner, Reno Troubled by Death Penalty Statistics, N.Y. Times at 17 (Sept. 13, 2000).

[5]White juries are more prone to levy death sentences than juries with minorities. Cohen, 85 Wash. L. Rev. at 469-71. In fact, all-white juries give the death penalty 71.9% of the time. Id. One African-American on the jury drops the likelihood of a death penalty to 42.9%. Id. Prosecutors are aware of these statistics. Id.

[6]The Eastern District has three capital inmates and the Western District has four.

49.     Petitioner expects to demonstrate at an evidentiary hearing that the Eastern District United States Attorney's charging determinations demonstrate discriminatory intent. That office typically brings federal charges against defendants who commit crimes in St. Louis City[7]. Only once has a non-City crime been charged federally and then authorized for the death penalty[8]. All of the other federal charges that were later authorized for the death penalty occurred in the City[9]. All but one charging determination and later authorization was brought when the victim was white[10]. Ultimately, all three defendants subsequently sentenced to death from the Eastern District are black defendants who were convicted of killing white victims in the City.

50.     An examination of similarly situated defendants also shows discriminatory intent.

i.     **Similarly-situated Defendants in St. Louis City**

51.     There are only sixty current inmates on federal death row despite over 150,000 murders since the re-institution of the federal death penalty in 1988. Cohen id. at 431. However, there are a myriad of ways to charge a person federally with murder. Any crime of violence committed with a gun that turns into a homicide can be charged federally. 18 U.S.C. § 924(i).

---

[7]There is no statistical evidence available regarding charging determinations at the federal level despite the protestations of members of both the judiciary and executive branch.  Petitioner has requested disclosure of information regarding charging determinations in order to fully develop these facts.  For now, Petitioner discusses the issue in the context of death penalty authorizations as evidence of selective prosecution and thus a denial of Mr. Bolden's right to a jury pool representing a fair cross-section of his community, because it is the only  available statistical evidence.  See, e.g., 2006, Race and the Decision to Seek the Death Penalty in Federal Cases, www.rand.org/pubs/technical_reports/TR389 and 2006 The Investigation and Prosecution of Homicide Cases in the U.S.: The Process of Federal Involvement by the National Opinion Research Center at the University of Chicago, www.ncjrs.gov/pdffiles1/nij/grants/214753.pdf.

[8]U.S. v. Tyrese Hyles and Amesheo Cannon, 1:01-cr-00073-HEA.

[9]U.S. v. Norris Holder, 4:97-mj-06025-TCM; U.S. v. Billie Allen, 4:05-cv-02229-CAS; Bonds and Bolden.

[10]This is also the Hyles &  Cannon case.  With the 15.1-17.9% minority population of EDMO or the St. Louis Division, this case also featured a lower African-American concentration as it was moved from Pemsicot County, which is currently 24.6% African-American.

19

52.     From 1998-2004, there were seven robbery-homicides in St. Louis City. Five defendants were charged in the City. See Exh.90[11]. None of those five were sentenced to death. Four pled guilty to second-degree murder. The three defendants charged federally were sentenced to death. Counsel's data indicates that all of the victims in the cases prosecuted by the City were minorities while the victims in this, and the other federal cases, were white.

53.     These disparities demonstrate, at a minimum, a prima facie case that race was a factor in the government's decision to federally and capitally charge defendants. These circumstances are even more compelling in light of the absence of any evidence demonstrating that the federal interest in the prosecutions was more substantial than the interests of the state or the locality. See Exh. 4 (U.S. Attorney Manual, Capital Crimes ("Protocols") Chapter 9-10.070) ("When concurrent jurisdiction exists with a State or local government, a Federal indictment for an offense subject to the death penalty generally should be obtained only when the Federal interest in the prosecution is more substantial than the interests of the State or local authorities").

        ii.     **Similarly-situated Defendants in St. Louis County**

54.     St. Louis County's ("County") demographics are similar to the Eastern District's. Not federally charging similarly-situated defendants from the County indicates not only a discriminatory effect in the selective prosecution of individuals, but also shows a discriminatory purpose in the choice of who to prosecute federally based on racial demographics of prospective venires.

55.     The data counsel have collected indicates that there has never been a similarly-situated, African American defendant from the County who was charged federally. Nor has there

---

[11] Petitioner has requested disclosure of additional information in an effort to further develop the facts and provide a more expansive review of similarly situated defendants. Petitioner has identified three additional cases that were not federally prosecuted, two prior to 1998 and one in 2010, all of whom were prosecuted in St. Louis City and received life imprisonment.

been a similarly-situated defendant from the County who killed a minority victim that was charged

federally. The only two similarly-situated defendants were tried by the County, which has white-

majority venires. See  Lhotka, Man gets Life Sentence, Plus 20 Years, in Killing, St. Louis Post-

Dispatch, Mar. 19, 2005 at A14; Law & Order, St. Louis Post-Dispatch, Mar. 23, 2002 at A21.

###   iii.    Similarly-situated Defendants Federally Charged

56.    A white defendant has never faced a capital trial in the Eastern District. "Statistics are

not, of course, the whole answer, but nothing is as emphatic as zero." United States v. Hinds County

School Bd., 417 F.2d 852, 858 (5th Cir. 1969). Of the six federal authorizations in the Eastern

District, only one was for the killing of a non-white victim[12]. There were two crimes far more

aggravated than the crimes here that were committed by white defendants who were either allowed

to plead guilty or never faced the death penalty.[17]

57.    The discriminatory effect of the Eastern District's authorization procedures also

strongly suggests that race is a factor in the decision-making. The statistical and anecdotal evidence

stand alone, and the sample size is large enough, to put the onus on the government to explain how

these decisions are not racially motivated, because they are certainly racially discriminatory in their

effect, both in the aggregate and individually.

58.    The prosecutor's discriminatory purpose is demonstrated through its venue selection

---

[12]Only the Hyles/Cannon crime involved a black victim.

[17]Henry Rehmert, Sr., who is white, and the rest of the "Rohrer Group" were permitted to
plead guilty to federal racketeering charges after terrorizing Missouri for ten years, killing two
people and cutting the bodies into pieces and dumping them into the Missouri river. Metropolitan
Area Digest, St. Louis Post-Dispatch, Oct. 19, 2004 at C2. David Ray Martin, also white, posed
as a doctor in a Bosnia-centric area of St. Louis, and molested children. After he killed, raped,
and drowned one Bosnian child, he was charged federally. Capital authorization was granted. Mr.
Holtshouser, the prosecutor in this case, allowed Mr. Martin to plead guilty and be sentenced to
life, despite the fact that Mr. Martin had been habitually molesting young girls and had a lengthy
record as a career criminal. See Bryant, Man Pleads Guilty to Kidnapping and Killing 11-Year-
Old Bosnian Girl, St. Louis Post-Dispatch, Nov. 24, 1999 at B4.

of the Eastern District, because of its dilutive effects on African-American representation in the resulting venire panel. This discriminatory intent is revealed through the institutional racism in federal authorization procedures, the systematic removal of African-Americans for hardship/cause during Mr. Bolden's voir dire, and the unconstitutional <u>Batson</u> preemptory challenges during Mr. Bolden's voir dire. <u>See</u> Claim III.

### iv.    National Decisions to Seek Death in 2003 Signify a Discriminatory Trend

59.    In 2003, the year Mr. Bolden's authorization took place, authorizations throughout the United States took a decidedly discriminatory turn. For instance, in cases with white victims, the death penalty was sought twice as many time as cases with black victims. Exh. 5 at Appendix A, *30. The Protocols require that the U. S. Attorney's request for authorization be reviewed by the Committee and then the Attorney General. Exh. 4 (Protocol 9-10.020).

60.    Of the fifteen cases where authorization was sought, only one case was not authorized. Exh. 5 at Appendix A, *38-39. That case involved a white defendant. <u>Id</u>. Later, the Attorney General withdrew prior authorization in five of the remaining fourteen cases involving white victims, four of which involved white defendants. <u>Id</u>. at Appendix A, *43. Cases in which the U.S. Attorneys choose not to seek the death penalty are also reviewed by the Committee. <u>Id</u>. (Protocol 9-10.055). Of those cases where death was not sought, thirty-two cases involved white victims, whereas forty-one involved black victims.

### D.    The Government's Failure to Follow Its Own Guidelines

61.    Section 9-10.010 of the 2001 Protocols (effective at the time of Mr. Bolden's authorization), sets forth the process for seeking a death penalty prosecution at the federal level. "The authorization process is designed to promote consistency and fairness." Exh. 4. In Mr. Bolden's case, this process was not followed.

62.    Whenever the government sets up specific processes and procedures for reaching

determinations, like a determination to federally or capitally prosecute an accused, the process and procedure must conform with due process. See Evitts v. Lucey, 469 U.S. at 393. In the decision to authorize death in Mr. Bolden's case, the process was disregarded in three distinct ways: 1) the Committee improperly ignored the requirement that the interest in prosecuting the crime federally outweigh the state interest; 2) the Committee improperly considered the status of the victim's family as law enforcement; and 3) the Committee improperly disregarded evidence of discriminatory application of the death penalty throughout the country and in the Eastern District of Missouri.

     **1.**    **The federal interest was not "more substantial" than the state's.**

    63.    The Protocols mandated that a "Substantial Federal Interest" exist in order to authorize a case federally and capitally. Exh. 4 (Protocol 9-10.070). In making that determination the government considers three factors: "the relative strength of the State's interest in prosecution" (including the nature of the offense, the identity of the victim, what jurisdiction conducted the investigation, or whether the prosecution will lead to disclosure of violations that are peculiarly within the jurisdiction of either federal or state authorities or will assist an ongoing investigation); "the extent to which the criminal activity reached beyond the local jurisdiction"); and "the relative ability and willingness of the State to prosecute effectively." Id.

    64.    The federal interest was weak. The crime did not reach beyond state lines and the State of Missouri was able, willing and had an interest in prosecuting effectively. Indeed, the state had filed charges. Moreover, it was the St. Louis police that first responded to the scene, conducted key witness interviews, and apprehended the three co-defendants, not federal authorities or investigators. See Exhibit 24. While the nature of the crime, a bank robbery, may provide a federal interest, that in itself is weak in light of the extensive investigation and involvement by the state, the state's willingness to prosecute, and the fact that none of the perpetrators even entered the bank. The government's failure to adequately consider these factors in reaching its decision violated Mr.

Bolden's due process rights.

### 2.      The government considered improper factors regarding the victim's family

65.      The Protocols provided specific requirements regarding what may or may be considered regarding the victim and victim impact in reaching the determination. While those Protocols permit consideration of the views of the victim's family and the impact of the death on the victim's family, (Exh. 4 (Protocol 9-10.060)), it does not permit consideration of the status or identity of the victim's family.

66.      In Mr. Bolden's case, however, the Committee considered the victim's father's employment status. During the Committee Review, at least one member of the Committee indicated that death was appropriate because the victim's father was a member of law enforcement. Although counsel argued that was not a permissible consideration under the Protocols, there is nothing to indicate that the Committee agreed with that view or disregarded this improper consideration.

67.      The Committee member's comment is particularly concerning in light of the apparent connection between Mr. Holtshouser and the victim's family. As both the prosecutor seeking death against Mr. Bolden and a member of the Committee, Mr. Holtshouser has a great deal of influence over the critical decisions in this case, including the capital authorization. Absent disclosure of the US Attorney's submission to the Committee, it is impossible to determine the extent that this influence was tainted and prejudiced by this connection.

68.      Even absent disclosure , however, Mr. Bolden has demonstrated that the Committee considered an improper factor under its own protocols in violation of Mr. Bolden's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

### 3.      The Committee failed to consider "any evidence of racial bias."

69.      The Protocols required the Committee to consider issues of race and racial bias, "including evidence that the Department has engaged in a pattern or practice of racial discrimination"

24

in reaching its authorization determination. Exh. 4 (Protocol 9-10.050).

70.     Mr. Bolden's counsel presented the Committee with compelling evidence of racial bias in federal prosecutions and capital authorizations, including statistics generated by the Department of Justice demonstrating that African Americans were more likely to be prosecuted capitally at the federal level both in the country at large as well as in Missouri. Exh. 24 at 10. These statistics demonstrate that, of the 682 defendants reviewed under the DOJ authorization procedures, 134 were Caucasian, while 324 were African American. Id. Of the 40 defendants who had faced the death penalty from Missouri, 26 were African American, while 13 were white. Id.

71.     These statistics show a significant racial bias in who Attorneys General are choosing to prosecute under the federal death penalty. Yet, the Committee disregarded these statistics in violation of Mr. Bolden's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

72.     Individually or collectively, these errors violated Mr. Bolden's Fifth, Sixth,  Eighth and Fourteenth Amendment rights. Relief is required.

## III.    THE PROSECUTION'S DISCRIMINATORY USE OF PEREMPTORY STRIKES VIOLATED THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. COUNSEL WAS INEFFECTIVE.

73.     The claims, factual and legal allegations and exhibits set forth in the *2255 Motion*, (including Doc. 2 at ¶¶107-139), and those contained throughout this *Revised Amended Motion*, are incorporated herein as if fully stated. See Fed.R.Civ.P. 10(c); Fed.R.Civ.P. 15(a). Mr. Bolden alleges the following facts, among others to be presented after full discovery, approval to travel to Canada, access to this Court's subpoena power, and an evidentiary hearing.

### A.    Introduction.

74.     Equal Protection and Due Process guarantee an accused the right to be tried by a jury whose members are selected in a non-discriminatory manner and potential jurors have an enforceable Equal Protection right to non-discriminatory jury selection procedures. Batson, 476 U.S. at 85-86;

J.E.B., 511 U.S. at 128; see also Powers, 499 U.S. at 409. Prosecutors cannot strike potential jurors on the basis of race or gender. Such discrimination violates the defendant's right to equal protection, it harms the excluded juror and it taints the integrity of the entire judicial process.

75.   Batson sets forth a three-part test. First, Petitioner must establish a prima facie case of discrimination. Batson, 476 U.S. at 96-98 ; J.E.B., 511 U.S. at 144-5. The government's pattern of strikes against black jurors and pervasive racial bias constitutes a prima facie case. See, e.g., Devose v. Norris, 53 F.3d 201, 204-05 (8th Cir. 1995) (prosecutor struck two black panelists, leaving one black juror). Second, the prosecutor must supply a race-neutral reason for excluding each prospective juror. Batson, 476 U.S. at 98; J.E.B., 511 U.S. at 145. Third, the court must determine whether the offered reasons are race/gender-neutral as opposed to pretextual. If the prosecution fails to meet its burden *even as to one juror*, relief is required. Batson, 476 U.S. at 97-98.

76.   Pretext can be established by comparing the prosecution's conduct with its treatment of similarly situated white prospective jurors. This includes a comparison of the government's strikes against similarly situated white jurors[18] as well as the nature and extent of the government's questioning of those prospective jurors. Miller-El, 545 U.S. 231, 240-66 (2005). While "race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention)," it "mak[es] the trial court's first-hand observations of even greater importance." Snyder v. Louisiana, 552 U.S. 472, 477 (2008). Heightened scrutiny is required where the government relies on "demeanor" bases for strikes that involve racial stereotypes[19]. While discriminatory intent may be

---

[18]Miller-El v. Dretke, 545 U.S. 231, 241 (2005); Davidson v. Harris, 30 F.3d 963, 965-66 (8th Cir.1994); United States v. Jones, 245 F.3d 990, 992 (8th Cir. 2001).

[19] See Peffley, Hurwitz, Sniderman, Racial Stereotypes and Whites' Political Views of Blacks in the Context of Welfare and Crime, AMERICAN JOURNAL OF POLITICAL SCIENCE, Vol. 41, No. 1 at 3 (Jan. 1997); Reyna, Lazy, Dumb, or Industrious: When Stereotypes Convey Attribution Information in the Classroom, EDUCATIONAL PSYCHOLOGY REVIEW, Vol. 12, No. 1, 2000.

demonstrated by "the four corners of a given case, sometimes a court may not be sure unless it looks beyond the case at hand." Miller-El, 545 U.S. at 240. For that reason, all relevant circumstances must be considered and counsel is entitled to present any and all relevant evidence rebutting the government's claim of no discriminatory intent. Id.

77.     In the Eastern Division of the Eastern District of Missouri ("St. Louis Division"), blacks comprise almost 17.9% percent of the population. The original jury pool of 250 people in this case included only 33 black panelists, constituting only approximately 13.5% of the jury pool.

78.     The final fifty-two panelists, after cause and hardship excusals, included only seven African Americans. The government struck five of those seven individuals. Tr. 1841-45. This Court found the presence of a prima facie case, but also found that the government met its burden of demonstrating a race-neutral reason for the strikes. As described more fully below, the "four corners" of this case as well as other evidence of discriminatory intent demonstrates that the reasons provided by the government were pretextual, the strikes were based on race, and the government violated Mr. Bolden's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

79.      Although counsel objected at trial, they failed to argue in this Court or the Eighth Circuit the pattern of discrimination demonstrated by the government's charging and capital authorization decisions as indicia of pretext; failed to present to this Court or the Eighth Circuit the obvious indicia of pretext extant in the record; and, failed to argue each of the government's discriminatory strikes on appeal. Counsel's failure to fully and adequately argue the government's discrimination during jury selection  constituted prejudicially deficient performance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

**B.     The Government's Exclusion of Five of Seven African American Potential Jurors Violated the Fifth, Sixth, Eighth and Fourteenth Amendments.**

80.     This Court correctly found that the defense made a prima facie showing of racially

discriminatory strikes arising from the government's striking five of the only seven African American panelists. Tr. 1880. See, e.g., Devose v. Norris, 53 F.3d 201, 204-05 (8th Cir. 1995) (prosecutor struck two black panelists, leaving one black juror). Thus, the burden shifted to the government to provide race-neutral reasons for the strikes. The government's purported reasons fail for a number of reasons. First, a side-by-side comparison demonstrates that the reasons were pretextual. Second, the government's unsubstantiated "demeanor" explanations that involved racial stereotypes demonstrates that the reasons were pretextural. Third, the statistical data and evidence of the government's discriminatory intent surrounding the government's decisions to federally and capitally charge Petitioner demonstrates the government's discriminatory intent during jury selection. Thus, all factors demonstrate discrimination rather than any race-neutral basis for any of the strikes.

81.     The government repeatedly used "demeanor" bases that were not observed by either the Court or defense counsel. Each of these bases also involved racial stereotypes. For example, the government contended that one reason it struck Juror 40, was because he took "offense" and had a "negative attitude" when asked to speak up by the court reporter, (Tr. at 1853); no one else observed this. The prosecutor claimed he struck Juror 44 because he had a "concern" that Mr. Reilly "may have offended her" when he called her by the wrong name. Tr. 1854. Neither counsel nor the Court saw any such reaction on the part of this juror, nor did the prosecutor call any purported reaction to the Court's attention at the time it occurred. Id. at 1870. Mr. Holtshouser also claimed to have seen Juror 136 sleeping "on a number of occasions," and further contended that he "recorded the dates and the times" but never brought this to the Court's attention and never produced his purported notes. Tr. 1858. Again, no one, including the Court observed this behavior. Id. at 1878. Finally, the government moved to strike Juror 126 based upon demeanor related evidence, arguing that she suffered from depression and gave conflicting answers. Tr. 1857. The prosecution never explained how her depression would affect the outcome of the trial, as required by Batson, and the Court

acknowledged that it "did not see some of the behaviors they relied on" with regards to Juror 126. 476 U.S. at 89. In addition to being unsupported in the record, these purported demeanor explanations involve racial stereotypes that demonstrate discriminatory intent.

82.     A side-by-side comparison of the government's other reasons also demonstrate discriminatory intent. For example, the government moved to strike Juror 60 because she was a nurse and "her work as a nurse gives her knowledge of medical issues." Tr. 1856[20]. However, they did not move to strike Juror 218, a similarly situated white prisoner who was also nurse. Tr. 1872. The government struck Juror 136 alleging that she had racial bias, because she said that said "the criminal justice system is biased against minorities, minorities are punished more severely, that people with money are treated differently." Tr. at 1858. However, the government made no such challenge, and even fought to keep, Juror 98, a similarly situated white juror, who viewed bias in the criminal system and who explicitly "said he had racial bias and everyone did." Tr. 1874. Where Juror 136 stated that any bias she had "would not impair her ability," and affirmed that she could "follow instructions." (Id. at 1873) Juror 98, on the other hand, admitted that his views "might impact" his decision making process. Tr. 517.

83.     The government struck Juror 44 based upon paralegal training, alleging that the training was "unique" and her "greater knowledge" than the average juror. Tr. 1855. Yet, the government retained Juror 176, a similarly situated white court clerk with years of experience working in the court system. Tr. at 1273. It should be noted here that Juror 44 had never even worked in a law firm. The government also moved to strike Juror 40 on the basis that he was an insulin dependent diabetic. However, the government did not move to strike similarly situated white Jurors

---

[20] The government's second purported reason of Juror 60's mother's schizophrenia should also be disregarded. Schizophrenia was not an issue in Mr. Bolden's trial, which the government knew since they claimed that "we ourselves have investigated and obtained numerous medical histories of Mr. Bolden." Id. at 1856.

32 and 85 who had a diabetic aunt and mother, respectively. Tr. 1868.

84.   As noted previously, <u>Batson</u> requires the Court to consider "all relevant circumstances." <u>Batson</u>, 476 U.S. at 96. Here, the totality of the record of the voir dire proceedings demonstrates discriminatory intent. The government's inadequate, pretextual reasons combined with its strike-rate indicating discriminatory intent and its successful preclusion of all but two African Americans from sitting on Mr. Bolden's jury demonstrates unlawful discrimination. The government's conduct during voir dire itself, however, cannot be considered in a vacuum. <u>Miller-El</u>, 545 U.S. at 240. As described elsewhere, other evidence and data further corroborates and demonstrates the government's racial bias during jury selection. The government's determination to federally charge Mr. Bolden was tainted by racial bias. <u>See</u> Claim II. The government's determination to capitally prosecute Mr. Bolden was tainted by racial bias. <u>Id</u>. By electing to federally prosecute, the government successfully deprived Mr. Bolden of a fair cross-section of his community in the jury venire. <u>See</u> Claim IV. And, as Petitioner expects to prove following discovery, access to this Court's subpoena power and an evidentiary hearing, the prosecutors involved in Mr. Bolden's case were directly or indirectly involved in a pattern and practice of excluding minorities from the jury. Thus, the totality of the circumstances demonstrates discriminatory intent in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

### C.   Counsel were Ineffective

85.   To the extent that defense counsel did not object to the trial court's ruling on <u>Batson</u> claims, Mr. Bolden alleges ineffective assistance of counsel. Although appellate counsel focused on the government's strike of Juror 44, they explicitly did not concede that race did not motivate the exclusion of the other black jurors. <u>See</u> <u>United States v. Bolden</u>, Appeal No. 06-3264 (*Brief of Appellant* at 62). Counsel's failure to properly and fully brief the above-described claims and counsel's failure to develop the systemic evidence of the government's bad-faith and racial biases

providing further proof of the government's discriminatory intent constitutes prejudicially deficient

performance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. Relief is required.

IV.   **THE DECISION TO FEDERALLY PROSECUTE PETITIONER DEPRIVED PETITIONER OF A JURY POOL CONSISTING OF A FAIR CROSS SECTION OF THE COMMUNITY IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

86.     The claims, factual and legal allegations and exhibits set forth in the *2255 Motion*,

(including Doc. 2 at ¶¶140-152), and those contained throughout this *Revised Amended Motion*, are

incorporated herein as if fully stated. See Fed.R.Civ.P. 10(c); Fed.R.Civ.P. 15(a). Mr. Bolden alleges

the following facts, among others to be presented after full discovery, approval to travel to Canada,

access to this Court's subpoena power, and an evidentiary hearing.

87.     The government's determination to prosecute Petitioner federally violated the Sixth

Amendment right to a jury pool consisting of a fair cross section of the community. Moreover, the

combined impact of the result (denial of a fair cross-section), and the evidence described elsewhere

demonstrating the decision to federally and capitally charge Petitioner was based on improper factors

cumulatively demonstrates the denial of Petitioner's right to a fair cross-section.

A.     **St. Louis City v. the Eastern District of Missouri**

88.     The decision to prosecute Petitioner federally resulted in a vast under-representation

of the "distinctive" group – African-Americans. Under-representation is demonstrated by comparing

the "community" demographics to the jury wheel or venire composition, not the actual jury's

composition. Taylor v. Louisiana 419 U.S. 522, 538 (1975). Mr. Bolden's community, discussed in

greater detail *infra*, is the City of St. Louis, not the Eastern District of Missouri. A comparison of the

demographics of the two demonstrates an unreasonable under-representation.

89.     The City has a population of 356,587, roughly half of which is black (48.9%) and half

is white (47.2%)[21]. Cohen 85 Wash. L. Rev. at 436-37. The Eastern District has jurisdiction over federally prosecuted crimes committed in St. Louis. Its population is 2,910,039. In stark contrast to the City, the Eastern District is 81.8% white and 15.5% black. Id. The Eastern Division (hereinafter "St. Louis Division") of the Eastern District, which handles the cases arising out of the City, draws jurors from fifteen counties. Its population is 2,330,358 with 78.4% white and 17.9% black. Thus, the effect on criminal defendants who commit crimes in the City that are federally charged is dramatic:   African-American panelists are reduced from 48.9% to 17.9%. The charging determination, therefore, has an incredible impact on potential jury composition.

90.     In Mr. Bolden's case, between 33 and 34 African-Americans were in the 250-person venire panel. Thus, African-Americans composed between 13.2-13.6% of the venire panel. The City, on the other hand, is 48.9% black. Thus, Mr. Bolden's venire did not constitute a fair cross section of his community. See Duren v. Missouri, 439 U.S. 357, 364-66 (1979) (Finding the 50% v. 15% divergence a "gross discrepancy").

91.     Mr. Bolden's venire was also unreasonably underrepresented under commonly-used statistical testing. The absolute disparity shows African-Americans were underrepresented in Mr. Bolden's cross-section by 35.3-35.7%. That is extremely high. The comparative disparity shows African-Americans were underrepresented by 72-73%. Thus, under either formula, African-Americans were grossly underrepresented compared to the racial makeup of the City:  Mr. Bolden's community and the situs of the crime. See Duren, 439 U.S. at 366.

**B.     The Underrepresentation Was a Direct Result of the Charging Decision**

92.     In Mr. Bolden's case, the systematic underrepresentation of African-Americans on the venire was caused by the government's decision to prosecute his case federally. Systematic

---

[21]The City of St. Louis is its own county for jurisdictional purposes in Missouri.

underrepresentation is proven by an inherent flaw in the process. <u>Duren</u>, 439 U.S. at 366. Here, the flaw arises from the stark differences between the percentage of African Americans in Mr. Bolden's community and those in the Eastern District. Even absent discriminatory intent, these stark differences demonstrate a systemic flaw. Petitioner expects to further demonstrate the systemic flaws once he is provided the requested disclosure, access to the Court's subpoena powers and an evidentiary hearing.

### C. The Circumstances Surrounding the Government's Decision to Federally and Capitally Charge Mr. Bolden Provide Strong Indicia of Discriminatory Intent.

93.    Though he need not prove intent in order to prevail on a fair cross-section claim, as described elsewhere, the improprieties surrounding the government's decisions to federally and capitally charge Mr. Bolden provides strong indicia of discriminatory intent. As described elsewhere, the prosecutor was laboring under multiple conflicts of interest, yet remained on this case throughout the pretrial, trial, sentencing and appellate proceedings, and remains on this case even now. <u>See</u> Claim II. The data and statistical evidence regarding similarly situated crimes demonstrating that racial bias played a part in the prosecution's decision to federally prosecute Mr. Bolden provides strong indicia of discriminatory intent. <u>See</u> Claim II. The Committee's election to consider and give effect to improper factors in reaching its decision to capitally authorize Mr. Bolden's provides strong evidence of discriminatory intent. <u>See</u> Claim II. The prosecution's intentional preclusion of jurors on the basis of racial bias during jury selection provides further indicia of discriminatory intent. <u>See</u> Claim III. Individually and collectively, these circumstances demonstrate that the results of the decision to federally prosecute Mr. Bolden – the denial of a fair cross-section – was no accident. Instead, it was a deliberate attempt to deny Mr. Bolden of his right to a fair trial, a fair cross-section and due process in violation of Mr. Bolden's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

### D. Conclusion

94.    The government's decision to charge Mr. Bolden federally changed his potential jury pool from the 48 % African American population reflected in his community to 17% reflected in the Eastern District. When considered in light of the other indicia of discriminatory intent, Petitioner has demonstrated the denial of his right to a fair cross-section under the Sixth Amendment as well as the denial of his rights to a fair trial and due process under the Fifth and Sixth Amendments and the heightened reliability required in capital cases under the Eighth and Fourteenth Amendments.

**E.    Counsel were ineffective.**

95.    Despite their full-awareness of the racial disparities arising from the government's determinations to federally and capitally charge Mr. Bolden, counsel failed to raise or litigate these claims demonstrating that the government's decisions violated Mr. Bolden's right to a fair cross-section. Counsel's failure to raise and litigate these claims pretrial, at trial and on direct appeal constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments. For this reason as well, relief is required.

**V.    COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP, AND PRESENT EVIDENCE CHALLENGING A CAPITAL AUTHORIZATION**

96.    The claims, factual and legal allegations and exhibits set forth in the *2255 Motion*, (including Doc. 2 at ¶¶153-164), and those contained throughout this *Revised Amended Motion*, are incorporated herein as if fully stated. See Fed.R.Civ.P. 10(c); Fed.R.Civ.P. 15(a). Mr. Bolden alleges the following facts, among others to be presented after full discovery, approval to travel to Canada, access to this Court's subpoena power, and an evidentiary hearing.

97.    The government's own protocols require that the Committee consider and give effect to all relevant considerations in determining whether or not to authorize a capital case, including the potential for racial bias and mitigating factors. Exh. 4 (Protocol 9-10.080). Counsel's failure to investigate or develop compelling evidence challenging the propriety of a capital prosecution

constituted prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments. Strickland, 466 U.S. at 687.

**A.    Deficient Performance.**

98.    As the protocols reflect, the Committee had broad discretion to consider any relevant evidence or circumstances in determining whether or not to authorize a capital prosecution. Although the Committee review was early on in the proceedings, there was a wealth of information that counsel knew or should have known – had counsel conducted a rudimentary investigation – that bore against a capital prosecution.

99.    As described elsewhere, there existed compelling statistical data and other evidence demonstrating that the government's decision to federally and capitally prosecute Mr. Bolden was the product of, and resulted in, racial bias. See Claims II, III, IV. Although they argued that federal capital punishment, in general, is plagued by racial bias and cited the DOJ study, see Exh. 24 at 8-11, counsel failed to marshal the racial bias evidence specific to the Eastern District. See Claim II. Nor did counsel provide the Committee with the data demonstrating the disparate difference between the potential pool of African American jurors within the City (48.9%), versus the Eastern District, (17.9%).   See Claim IV. Nor did counsel present to the Committee the data and evidence demonstrating the disparities between federal capital prosecutions in the Eastern (and Western) Districts of Missouri and the rest of the country. See Claim II. Nor did counsel raise the multiple conflicts of interest in which the prosecutor labored that directly impacted the determinations to seek federal and capital prosecutions. See Claim II. Nor did counsel raise the government's failure to honor Mr. Bolden's Convention rights in their Committee presentation. See Claim I. All of this evidence and data was readily available at the time of the Committee review, yet counsel failed to present it in their submission.

100.    Similarly, counsel failed to provide any evidence of statutory or non-statutory

mitigating factors other than to argue that the defense "will be able to establish numerous mitigating factors," and that counsel will provide further mitigation evidence at a later date, counsel provided no mitigation information to the Committee. Exh. 24. Counsel did not supplement their submission with any additional mitigation evidence. Thus, the Committee was left with nothing more than general allegations that the defense expected to present unspecified mitigation.

101.    Even absent a thorough investigation, there was a great deal known to counsel by the time of its submission that fell well-within the purview of mitigation. First, counsel was aware that Mr. Bolden was a Canadian citizen drawing in special considerations under the Vienna Convention. Second, counsel was aware that Mr. Bolden suffered from Type-1, insulin dependent diabetes. Third, counsel was aware that Mr. Bolden was a father. Yet, counsel failed to offer any of these mitigating factors, despite the protocol requirement that the Committee presume mitigation is proven in light of the timing of the review. See Exh. 4 (Protocol 9-10.080).

102.    A reasonably competent attorney would have investigated and presented the above-described information. Counsel's failure to do so constitutes deficient performance.

**B.    Prejudice.**

103.    The protocol requires that the Committee weigh all of the above-described evidence in reaching its authorization determination. Although it was readily available, counsel failed to present that evidence in their submission. Counsel's deficient performance skewed the Committee review and resulted in prejudice. Indeed, even if counsel's failure to present the evidence described above calling into question the propriety of proceeding federally and capitally against Mr. Bolden did not prejudice the Committee's review, and it did, there is no question that counsel's failure to offer *any* mitigation evidence that the Committee was required to accept as true did. Absent any mitigation evidence, the scales were clearly tipped in favor of death. Prejudice is demonstrated.

**VI.    PETITIONER WAS DENIED HIS FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT**

RIGHTS DURING JURY SELECTION. COUNSEL WERE INEFFECTIVE.

104.    The claims, factual and legal allegations and exhibits set forth in the *2255 Motion*, (including Doc. 2 at ¶¶165-249), and those contained throughout this *Revised Amended Motion*, are incorporated herein as if fully stated. See Fed.R.Civ.P. 10(c); Fed.R.Civ.P. 15(a). Mr. Bolden alleges the following facts, among others to be presented after full discovery, approval to travel to Canada, access to this Court's subpoena power, and an evidentiary hearing.

105.    The Sixth and Fourteenth Amendments "guarantee a defendant on trial for his life the right to an impartial jury." Ross v. Oklahoma, 487 U.S. 81, 85 (1988); Irvin v. Dowd, 366 U.S. 717, 722 (1961). This right is violated when a jury is empaneled that is "uncommonly willing to condemn a man to die." Witherspoon v. Illinois, 391 U.S. 510, 521 (1968). Thus, jurors whose beliefs in favor of capital punishment substantially impair their ability to follow the law and the court's instructions are ineligible to serve. Morgan v. Illinois, 504 U.S. 719, 729 (1992).

106.    Axiomatic to preserving the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." Morgan, 504 U.S. at 730; Dennis v. United States, 339 U.S. 162, 171-172 (1950); Morford v. United States, 339 U.S. 258, 259 (1950)). Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981) ("Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled"). It is not enough simply to ask the jurors if they could be fair and follow the law. Morgan, 504 U.S. at 734-36. The defendant must be able to ascertain whether the panelists find mitigating evidence irrelevant or not worth their consideration. Id. at 735.

107.    Multiple errors in this case effectively precluded Petitioner from:  ascertaining whether or not prospective jurors could give the constitutionally required consideration of mitigation; determining whether or not prospective jurors would automatically vote to impose the death penalty; or, impose death based on the circumstances of a case without considering and giving effect to

relevant mitigating evidence. Moreover, throughout the jury selection process, the government misrepresented the legal standards for the jury's sentencing consideration and then reiterated those illegal and unconstitutional standards through objections. Several unqualified jurors were actually seated. Each of these errors violated the Fifth, Sixth, Eighth and Fourteenth Amendments. Counsel's failure to adequately raise and litigate these issues at trial, post-trial and on appeal constitutes prejudicially deficient performance.

**A.     Restricting Voir Dire on Jurors' Ability to Consider and Give Effect to Mitigation Evidence.**

108.    At the government's urging, the Court adopted a two-part test for the jury's mitigation determination. First, the jury would have to decide whether to believe the mitigation fact as true and, next, the juror would have to decide whether or not that fact was indeed mitigating. Thus, the Court precluded the defense from asking jurors whether or not they could or would *consider* mitigation, and instead, required that counsel ask "whether any member of this jury is willing or unwilling to listen to evidence of mitigation and aggravation before making a punishment decision." Tr. 786-87.

109.    But "the Constitution requires that 'the sentencer in capital cases must be permitted to *consider* any relevant mitigating factor.'" Porter v. McCollum, 130 S. Ct. 447, 454-55 (2009) (quoting Eddings, 455 U.S. at 112); Abdul-Kabir v. Quarterman, 550 U.S. 233, 259 (2007) ("[t]he jury must have a 'meaningful basis to consider the relevant mitigating qualities' of the defendant's proffered evidence."). It is also axiomatic that the jury must be provided a mechanism to give it meaningful mitigating effect. Tennard v. Dretke, 542 U.S. 274 (2004).

110.    The Supreme Court has been unwavering and unequivocal in this regard. Abdul-Kabir, 550 U.S. at 260 ("[T]he jury must be permitted to "consider fully" such mitigating evidence and . . . such consideration "would be meaningless" unless the jury not only had such evidence available to it, but also was permitted to give that evidence meaningful, mitigating effect"); Penry

v. Lynaugh, 492 U.S. 302, 319 (1989); Smith v. Texas, 543 U.S. 37, 46 (2004) (*Smith I*); Brewer v. Quarterman, 550 U.S. 286, 289 (2007); Smith v. Texas, 550 U.S. 297, 301 (2007) (*Smith II*); Penry v. Johnson, 532 U.S. 782, 798 (2001). By substituting "consider" with "listen to," the Court diminished the jury's constitutional responsibility to give full effect to mitigation evidence in violation of "[the Supreme Court's] entire line of cases establishing the importance of allowing juries to give meaningful effect to any mitigating evidence providing a basis for a sentence of life rather than death." Abdul-Kabir, 530 U.S. at 259.

111.     The government compounded the error by repeatedly telling the jurors that they could simply disregard mitigating evidence if they so desired. Tr. 780-81; Tr. 782 (The offense "may be all of it."); Tr. 1554. As the controlling precedent described above demonstrates, the government's contentions were wrong and the jury must give full effect to any and all relevant mitigation evidence. Eddings, 455 U.S. at 113-15; Penry v. Lynaugh, 492 U.S. at 318; Abdul-Kabir, 550 U.S. at 259 n.21. The prosecution's uncorrected statement that the offense "may be all of it" was constitutionally erroneous for another reason. Controlling precedent requires that the jury give effect to mitigation evidence "*notwithstanding the severity of his crime* or his potential to commit similar offenses in the future." Abdul-Kabir, 550 U.S. at 246. Any suggestion that a juror may disregard mitigation based on the facts of the homicide or the presence of a particular aggravating circumstance results in a mandatory death sentence in violation of the Eighth Amendment. See Woodson, 428 U.S. at 303-04*;* Roberts (Stanislaus) v. Louisiana, 428 U.S. 325 (1976); Roberts (Harry) v. Louisiana, 431 U.S. 633 (1977); Sumner v. Shuman, 483 U.S. 66 (1987). Likewise, any "'screening test' for determining the 'constitutional relevance' of mitigating evidence" that requires a causal connection to the offense "ha[s] 'no foundation in the decisions of this Court'" and violates the Eighth Amendment. Abdul-Kabir, 530 U.S. at 245 (quoting Tennard, 542 U.S. at 284); Smith I, 543 U.S. at 45.

112.     Though the defense attempted to present the proper standard – that the jurors must

be able to consider mitigating evidence – those attempts were thwarted by the Court's ruling. The difference is not one of semantics. A willingness to listen while the evidence is being presented is a far cry from the constitutional mandate that the juror must be willing to consider and give full effect to mitigation evidence. Relief is required.

**B.      Precluding the Defense From Asking Whether or Not Jurors Would Have Been Predisposed to Find Death.**

113.    In addition to restricting counsel's inquiry to whether the jurors would "hear" mitigation evidence as opposed to consider that evidence and give it effect, the Court precluded counsel from asking questions to determine whether or not jurors held any prejudicial views that would have substantially impaired their ability to give effect to mitigation evidence. Prior to jury selection, counsel filed a request to voir dire on these issues. See Doc. 353, The requested questions – permitted by Morgan – involved whether the jurors' views about potential aggravating facts present in this case evidenced "a bias or opinion . . . that would cause him or her to impose a sentence of death without regard to any other evidence that may be adduced at trial."  See Doc. 353 at 1-2 (seeking to ask about:  individuals who have killed a bank guard or law enforcement officer; drug usage; the fact that defendant may have two prior convictions; and a defendant who kills a bank guard in order to receive something of value).

114.    The defense also sought to identify jurors who had substantial impairments in considering particular mitigation evidence. See id. at 5 ("Can you consider the conditions of someone's upbringing as a mitigating factor?"); id. ("Can you consider someone's health problems as a mitigating factor?"). The defense wanted  to question whether jurors held views about elements of murder *simpliciter* and aggravating circumstances present in the case that would prevent them from considering relevant mitigation. See id. at 4 ("If you heard that the person just convicted of a premeditated and deliberate murder had prior felony convictions, would you automatically vote for

the death penalty?")  Id. at 4. The Court precluded these questions.

### 1.    Precluding the Requested Voir Dire Violated Controlling Precedent

115.    The defense questions asked nothing about how the jurors would perform their duties once they were capable of considering the relevant facts. They were permitted only to ask general, hyper technical questions about whether the jurors were capable of appropriately considering general categories of mitigating evidence at all, and whether the general types of aggravating facts would prevent the jurors from performing their statutorily and constitutionally mandated duty. Precluding voir dire to discover penalty-phase bias against the defense denied Petitioner an impartial sentencing jury and prevented the jury from considering and giving full effect to relevant mitigation, in violation of Morgan and Lockett.

116.    While it contended that fact-specific questioning was permissible to identify jurors whose beliefs against the death penalty biased them against the prosecution,[22] the government argued that the similar questioning regarding bias against the defense was improper, relying on United States v. McVeigh, 153 F.3rd 1166 (10th Cir. 1998). Doc. 348. McVeigh does not, and it can not, stand for the proposition that counsel is precluded from inquiring into whether or not a juror's beliefs with regard to specific factors would result in the juror either automatically imposing death or refusing to consider and give effect to relevant mitigation.

117.    Determining whether or not a jurors' beliefs would substantially impair his or her ability to follow the law and apply the court's instructions is not new, nor is it distinct to capital cases. That is all that the proposed questions sought to accomplish. It has been long-held that individuals who are "in favor of nothing less than capital punishment in cases of conviction for murder in the first degree" are unqualified to serve in a capital case. Stroud v. United States, 251 U.S.

---

[22] See Doc. 348 ("Jurors have also been properly excused when they deem the death penalty appropriate or inappropriate for specific categories of murder." ) .

15, 20-21 (1919). From <u>Stroud</u> to <u>Witherspoon</u>, to <u>Adams v. Texas</u>, 448 U.S. 38 (1980); <u>Wainwright v. Witt</u>, (409 U.S. 412 (1984)), and <u>Ross</u> the Supreme Court has unequivocally held that jurors predisposed to reject life and automatically impose a death sentence are unqualified to serve because "the juror's views would 'substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" <u>Witt</u>, 409 U.S. at 423.

118.    In <u>Morgan</u>, 504 U.S. 719 (1992), the Court explained that the reason "[a]ny juror who states that he or she will automatically vote for the death penalty without regard to the mitigating evidence" is biased is because that juror has expressed "an intention not to follow the instructions to consider the mitigating evidence and to decide if it is sufficient to preclude imposition of the death penalty." 504 U.S. at 738. "[S]uch a juror will not give mitigating evidence the consideration that the statute contemplates." <u>Id</u>. <u>See also</u> <u>id</u>. at 738-39 (a factfinder who would "impose the death penalty without regard to the nature or extent of mitigating evidence . . . is refusing in advance to follow the statutory direction to consider that evidence"). The Court further held that "[a]ny juror to whom mitigating factors are . . . irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the merits of the case without basis in the evidence developed at trial." <u>Id</u>. at 739. Accordingly, any substantial impairment in the juror's ability to properly consider the evidence of aggravating and mitigating circumstances as the instructions and the law requires mandates that the juror be excused for cause.

119.    The question of excludable pro-death bias applies at each step in the decision-making process that implicates the juror's willingness and ability to consider and give effect to constitutionally relevant mitigating evidence. <u>E.g.</u>, <u>Eddings</u>, 455 U.S. at 114-15. The steps involved in fairly considering a life sentence reveal that the federal sentencing process produces at least *five* distinct types of life-impaired jurors who must be excused under controlling precedent: (1) jurors who would automatically vote for death (or, have substantial difficulty ever considering a life

42

sentence) for any homicide; (2) jurors who would automatically vote for death (or, have substantial difficulty ever considering a life sentence) for particular classes of death-eligible homicide; (3) jurors who, while holding open the possibility of imposing a life sentence, would shift the burden of persuasion from the government to the defense; (4) jurors who have substantial impairments in their ability to consider and give effect to constitutionally relevant mitigating evidence; and (5) jurors who would put an inappropriate thumb on the scales of death by considering impermissible aggravating factors as a basis to impose a death penalty.

120.     The Court limited life-qualifying questions to the first category of life-impaired jurors – those who would automatically vote for death upon conviction for *any* murder. This was wholly inadequate to detect those jurors not willing or able to give meaningful consideration to a sentence less than death for first degree murder. Jurors are lay people who do have specialized knowledge. When inadequately questioned – as in this case – they may honestly answer the question they are actually asked while simultaneously entertaining beliefs that are completely inconsistent with their responsibilities as a juror. See Morgan, at 735-36 & n.9 ("That certain prospective jurors maintain such inconsistent beliefs – that they can follow the law, but that they will always vote to impose death for conviction of a capital offense – has been demonstrated, even in this case."). The limitations on the life-qualifying questions in this case, created the very risk foreseen in Morgan, and prevented the defense from discovering jurors whose views in favor of the death penalty would make them ineligible to serve as jurors.

121.     Although McVeigh makes clear that case-specific questions on death qualification are not constitutionally required in every single case, expanding McVeigh to forbid case-specific questions on death-qualification would violate the constitutional prohibition on seating jurors who are unable to follow the law and perform their duties impartially in the case before them.

122.     There is no clearer principle in modern death penalty law than that the sentencer in

43

a capital case is required to "consider" all classes of relevant mitigating evidence and to be able to "give effect" to that evidence. E.g., Penry v. Johnson, 532 U.S. at 796; Abdul-Kabir, 550 U.S. at 246. A juror already committed to a death sentence based upon the circumstances of the offense before hearing any mitigation can neither meaningfully "consider" nor "give effect to" mitigating evidence, and cannot fashion an individualized sentence. The same is true for jurors pre-committed to death based upon the presence of particular classes of aggravating circumstances. Such biases must be probed or they will go undetected. Thus, certain limited case-specific questions are necessary and appropriate in empaneling a fair jury. See Turner v. Murray, 476 U.S. 28, 36-37 (1986) (defendant entitled to ask about racial bias in cross-racial murder case); State v. Jackson, 836 N.E.2d 1173, 1190-92 (Ohio 2005).

123.    Morgan's holding is compelled by Supreme Court cases establishing the unconstitutionality of mandatory death sentences, (e.g. Woodson), and requiring that jurors in every capital case consider and be permitted to give effect to mitigating factors relating to the individual defendant, (e.g., Lockett). What the United States or any state cannot do by statute, a biased juror may not do by fiat. Morgan and the life-qualification process are simply the mechanism to ensure that Woodson and Lockett are given practical effect. Defendants are entitled to exclude jurors who (as in Woodson) would automatically impose death on the facts of a given case and who (as in Lockett) are impaired in their ability to consider and give effect to relevant mitigating evidence.

124.    This is not to say that the court may impose no limits on case-related voir dire. The types of questions properly prohibited by McVeigh fall in the category of what have come to be known as "stake out" questions.  "True 'stake out' questions 'ask a juror to speculate or recommit to how that juror might vote based on any particular facts.'"  United States v. Johnson, 366 F. Supp. 2d 822, 841 (N.D. Iowa 2005) (quoting McVeigh,153 F.3d at 1207).

125.    Counsel here did not attempt to "stake out" any jurors, but, merely sought to discover

whether jurors could follow their obligations under the law and fairly consider a life sentence if the prosecution proved its case for murder and its reasons for death. Counsel did not in any manner seek how the jurors would tend to vote based upon any particular fact or set of facts. "There is a crucial difference between questions that seek to discover how a juror might vote and those that ask whether a juror will be able to fairly consider potential aggravating and mitigating evidence." United States v. Fell, 372 F. Supp. 2d 766,771 (D. Vt. 2005); Johnson, 366 F. Supp. 2d at 843.

126.    The government is estopped from arguing that all case specific-questions are improper. Or, at a minimum, their opposition to fact-specific inquiry to determine bias against the defense is hollow given their support for fact-specific questions to determine bias against the prosecution. As the Supreme Court made clear in Witherspoon, Adams, Ross, Witt, and Morgan, there is no difference in the standard for determining jury partiality based on views about guilt or views for or against the death penalty. Jurors may be asked if they are more likely to believe a police officer – that is a fact-specific guilt-stage inquiry into juror bias. They may equally be asked relevant fact-specific questions concerning penalty.

127.    The government's pre-voir dire motion admits as much. In that motion, the government cites to several cases in which "jurors have been properly excused when they deem the death penalty appropriate or inappropriate for specific categories of murders." Doc. 248 at 13 (listing cases where jurors would only impose death in specific cases). The government inserted specifics about the case into their argument and questions to the jury when it served their purpose. Every juror heard that "Nathan Ley was a 25 year old security guard."  They repeatedly discussed the fact that Mr. Ley was a law enforcement officer. In one instance, the government told a juror that Mr. Ley did not have children or a wife, in order to rehabilitate her. Tr. 607. Thus, the government seems to acknowledge that when it comes to detecting jurors who are biased *against* the death penalty, factually specific questions are necessary and appropriate.  Such a position is untenable and violates

45

due process. E.g. Witherspoon, 391 U.S. at 522 n.20 (quoting Bounds and citing Stroud) (noting with approval the Fourth Circuit's reversal of a North Carolina death sentence in Crawford v. Bounds, 395 F.2d 297, 303-04 (4th Cir. 1968), after concluding that permitting "a juror who felt it his 'duty' to sentence every convicted murderer to death . . . to serve . . . 'while those who admitted to scruples against capital punishment were dismissed without further interrogation'" was a "'double standard' [that] 'inevitably resulted in [the] denial of due process'").

128.     The Court's preclusion of relevant and necessary questioning in order to determine whether or not jurors held beliefs that would result in their automatically imposing a death sentence or failing to consider and give full effect to mitigation evidence violated the Fifth, Sixth, Eighth and Fourteenth Amendments.

### 2.     Precluding the Proposed Voir Dire Confused Prospective Jurors and Resulted in Seating Jurors Predisposed to Find Death.

129.     The Court's blanket prohibition of "specific" questions in this case lead to ambiguous and technical questioning that confused the jury and resulted in seating jurors who were unqualified. The jurors were never adequately informed on what mitigation or aggravation was, but were asked whether or not they would consider mitigation and aggravation in reaching their sentencing determination. The most that they were told was that a mitigator was anything that would support a life sentence and an aggravator, anything that would support a death sentence. Tr. 1433. The prosecution and the Court noted that the jurors were likely confused. See  Tr. 1428; Tr. 1105.

130.     The result was a litany of lengthy, vague questions that neither clarified the question of what aggravation and mitigation actual was nor adequately determined whether or not jurors either understood the concepts or acknowledged that they were able to follow the law. E.g. Tr. 282-83; Tr. 1434-35. When the defense attempted to ask questions to detect jurors who would always impose death or be substantially impaired in imposing life in a very specific way, the Court precluded those

46

questions. For example, the Court precluded the defense from going into the issue of whether jurors would always impose death in the case of a premeditated murder, or in the course of a bank robbery. Id. Thus, when jurors stated that they would impose death in cases of premeditated murder, malicious murder, or a killing that was not accidental, the defense were precluded from probing the juror's beliefs and determining whether they were, in fact, an automatic death juror. See Tr. 760-65 (seated juror 118 expressed the belief that premeditated murder warranted the death penalty. Defense counsel were precluded from ascertaining what that actually meant.), Tr. 793 (Seated juror 131 expressed the belief that the decision to impose the death penalty should be based upon the level of "maliciousness."), Tr. 1354 (Alt. Juror 177 would malicious killings warranted the death penalty, and that malicious meant premeditated or heinous, whereas accidental did not mean malicious.).

131.   The government was able to use the charges in this case as a shield, to confuse the jurors and derail efforts by the defense to detect automatic death jurors. See Tr. 759-62.

132.   The most explicit example involves Alternate Juror 178, who approached the bench in tears indicating her concerns that defense counsel mentioned "several times that the guard got shot twice." Tr. 1787-88. Though Mr. Bolden was indeed accused of shooting the victim twice, and the government knew that they intended to prove that he shot Mr. Ley twice, the government repeatedly instructed the juror that Mr. Bolden was ***not*** charged with shooting Mr. Ley twice. The Court told the juror that she misunderstood counsel and said that Mr. Bolden had "been accused of being involved in an attempted armed robbery at the bank in which Mr. Ley was killed during the course of a robbery" and that the victim "was shot twice" but that it could provide no further information. Tr. 1787-1789. The juror indicated her relief that Mr. Bolden was not charged with shooting Mr. Ley twice and that she would be upset if he had. Tr. 1790-91. Despite this juror's insistence that shooting the victim twice was a problem for her, the Court and the government mislead her, instead of being honest and finding out whether or not she could be fair.

47

133.     The highly vague questions asked of Mr. Bolden's jurors were not adequate under Morgan to reveal jurors who could not give consideration to a life sentence or to mitigation in his case. Irrespective of whether Morgan requires specific questions in every case, see, McVeigh, it clearly did so here. In this case the questioning became so vague as to confuse and even trick the jurors. Specificity was necessary to give effect to the Supreme Court's mandates that jurors not impose mandatory death sentences and give consideration and effect to mitigation.

### 3.     Inadequate voir dire resulted seating jurors who were substantially impaired in their ability to give meaningful consideration to mitigation

134.     Throughout the defense voir dire of Seated Juror 78, the government objected to questions posed to determine whether or not the juror would automatically impose death. Tr. 587-88. When counsel asked the juror (over government objection) whether she thought there was only one appropriate punishment and whether there were "things that[she] would want to hear," the juror indicated that she had no thoughts and did not know "[w]hat the story is."  Tr. 590. When counsel tried to follow-up with specific questioning that indicated that one mitigating factor could be sufficient to find life, the government again objected. Tr. 592. Counsel moved on to another juror and never learned whether that juror would be able to give effect to mitigation. Thus, the government effectively precluded defense counsel from learning whether or not Juror 78 could give meaningful consideration to mitigating evidence, in violation of Mr. Bolden's constitutional rights. Alternatively, counsel was ineffective for failing to further inquire.

135.     Seated Juror 31 wrote in her questionnaire that she was in favor of the death penalty in cases where there was "overwhelming evidence of guilt." Tr. 177.  There was no follow up about this. A juror that finds death on the basis of the "overwhelming evidence of guilt" regardless of the existence of mitigation evidence is unqualified to serve. Whether the result of the Court's limitations on voir dire or counsel's ineffectiveness, seating this juror without a proper inquiry violated the Fifth,

Sixth, Eighth and Fourteenth Amendments.

136.    Seated Juror 41 wrote that the punishment would depend upon "the crime and if found guilty." Tr. 327. When asked by the defense to explain, Juror 41 said that "Some things like, you know, people butcher people. Now, after I heard everything, I would think they probably deserve the death penalty. I mean we're talking about severity. Something that's, you know, way beyond the normal thing. Not that other things are normal." Tr. 328. Juror 41's answer does not indicate what types of killings he considered "normal" enough to impose a life sentence, and what might be "severe" enough to require death. However, his answers indicated that in that latter set of cases, he was not capable of considering mitigating evidence. Worse, however, his answers indicated that his sentencing determination would focus solely on the crime. The juror's offense focus violated the Eighth Amendment, Tennard, and demonstrated a substantial impairment in his ability to follow the law. Whether the result of the restrictions on voir dire or counsel's ineffectiveness, counsel failed to followup on this question. Moreover, because the juror's answer indicated an offense-focus, counsel was ineffective for failing to challenge for cause on the basis of the answer provided.

137.    Seated Juror 58 reported that he was "generally opposed" to the death penalty, "but this is a point where you do have to step forward and do things." Tr. 302. He further stated that there would be "circumstances that might be presented to me that could convince that a verdict of death would be appropriate." Id. Juror 58 said little else and the defense asked him no questions. It is unknown, therefore, whether or not these "circumstances" include an intentional murder or the murder of a law enforcement officer. Absent any further information, there is a reasonable probability that this juror was incapable of giving meaningful consideration to mitigation evidence. Whether the result of the Court's restrictions on voir dire or counsel's ineffectiveness, the failure to inquire and/or strike violated the Fifth, Sixth, Eighth and Fourteenth Amendments. .

49

## C.      Unqualified Jurors Sat on the Jury.

138.     Even with the restricted voir dire, the record demonstrates that several demonstrably unqualified jurors were actually seated.

139.     Juror 118 was an automatic death juror. In his questionnaire, he listed certain offenses that he felt warranted the death penalty, including murder of a law enforcement officer and "premeditated murder . . . because the crime has been planned and the criminal has full knowledge of what he's doing." Tr. 679. The government successfully blocked all of the defense's attempts to question this juror about this pro-death bias. Tr. 759-63. Nevertheless, although the juror stated that he "could conceive of a situation where a person carried a weapon with them with no intent to use lethal force," he would not answer the question of whether that "situation" would include this crime. Tr. 767. Further, he expressed the belief that life in prison "was a waste of time for repeat offenders. . . . However, I believe life in prison is appropriate for situations; crimes that may have been committed. You know, a crime of passion or something like that." He stated: "if a person was a repeat offender of violent crimes, I would not see the benefit of life in prison." Tr. 770. Such a belief substantially impairs a juror from considering mitigating evidence for a defendant, such as Mr. Bolden, who had prior convictions.

140.     Juror 118's  expressed belief that a death sentence was warranted for premeditated murder and that life in prison without the possibility of parole was a waste of time demonstrated that his ability to consider or giving effect to mitigation was substantially impaired. Even under the restrictive voir dire, the record demonstrates this juror should have been struck for cause.

141.     As discussed above, Alt. Juror 178 expressed her concerns (five times) about her ability to be impartial if the government's case was that Mr. Bolden had shot the victim twice.  Also as described above, everyone but the juror knew that the government would present forensic evidence indicating that the victim had been shot twice and that the government would contend that

50

it was Mr. Bolden that fired the shots. In light of the juror's clear expressions of her inability to be impartial, the defense challenged her for cause. Tr. 1836. The court denied that challenge. Although she was an alternate, there is no way to determine whether or how her views tainted the jury's ultimate determination. The court should permit jury interviews to determine this.

142.    Alternate juror 186 also appears to have been an automatic death juror. This juror wrote that "If the person is found guilty of capital murder, they should be punished by the death penalty if found guilty by the jury." Tr. 1370. When questioned by counsel she repeatedlly affirmed her position, and made clear that she would require the defense to put on evidence in the penalty phase. Thus, the juror shifted the burden from the prosecution to the defense in violation of the Fifth, Sixth and Eighth Amendments. The defense moved to strike Juror 186 for cause, but that challenge was denied. Because the defense had only one peremptory strike to exercise on alternates, Juror 186 was sat as an alternate. Thus, there is a risk that she could have infected the jury. The court should allow juror interviews to determine whether or not that occurred.

### D.    Conclusion

143.    In Mr. Bolden's case jurors were not properly voir dired to determine whether they could consider "any relevant mitigating evidence." Eddings, 455 U.S. 104 (1982). Instead, the Court limited the defense to inquiry regarding whether or not the jurors *would listen* to such evidence. It is not enough "simply to allow the defendant to present mitigating evidence to the sentencer," rather there must not be *any impediment* -- through evidentiary rules, Green v. Georgia, 442 U.S. 95 (1979), jury instructions, Hitchcock v. Dugger, 481 U.S. 393 (1987)), or prosecutorial argument  – to the sentencer's full consideration and ability to give effect to mitigating evidence. Penry v. Lynaugh, 492 U.S. at 327-28. The limitation on voir dire denied Mr. Bolden an impartial jury and violated the Fifth, Sixth, Eighth and Fourteenth Amendments.

144.    Counsel's failure to adequately, fully and properly litigate these claims at trial, post-

trial and on appeal constituted prejudicially deficient performance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. Relief is required.

VII.  **AS A RESULT OF COUNSEL'S INEFFECTIVENESS, PROSECUTORIAL MISCONDUCT AND LEGAL ERROR, THE JURY DID NOT HEAR SUBSTANTIAL EVIDENCE CONTESTING THE GOVERNMENT'S CASE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

145.   The claims, factual and legal allegations and exhibits set forth in the *2255 Motion*, (including Doc. 2 at ¶¶250-338), and those contained throughout this *Revised Amended Motion*, are incorporated herein as if fully stated. See Fed.R.Civ.P. 10(c); Fed.R.Civ.P. 15(a). Mr. Bolden alleges the following facts, among others to be presented after full discovery, approval to travel to Canada, access to this Court's subpoena power, and an evidentiary hearing.

146.   Petitioner was convicted and sentenced to death arising from the shooting of Nathan Ley, a security guard for the Bank of America, during an unsuccessful robbery attempt . It was the government's theory that Petitioner, a "crackhead" according to the government's witnesses, was the masterminded behind a daylight bank robbery. According to the government, Petitioner purportedly coerced Mr. Edwards and Mr. Price into participating in this daylight robbery and then threatened Mr. Price and Mr. Edwards afterwards. According to the government's theory, Mr. Price participated in this robbery completely unarmed and, instead, allowed the "crackhead" to carry the only weapon among the three participants. Finally, it was the government's theory that Petitioner, and Petitioner alone, fired the two shots that killed Mr. Ley.

147.   The government supported its theory that Petitioner was solely responsible for the death of Nathan Ley through the testimony of Dominick Price (a convicted weapons offender and thief, and an admitted drug dealer who used Petitioner's home for the purpose of selling drugs in exchange for providing Petitioner with crack cocaine); contradictory eyewitness testimony; and, unreliable, embellished forensic expert testimony. Though the eyewitness testimony was plagued

with internal and external contradictions and inconsistencies, the prosecution successfully clouded those flaws by repeatedly injecting emotion, passion and prejudice and by improperly bolstering their reliability with exaggerations and misrepresentations regarding their experience and backgrounds. While the physical evidence provided little support for the government's theory, the prosecution masked the flaws in the forensics through embellished, scientifically flawed expert testimony.

148.    Defense counsel, on the other hand, offered little or nothing to dispute the prosecution's embellished and improperly bolstered eyewitness evidence and essentially failed to marshal any cohesive theory of defense on Petitioner's behalf. Nothing in counsel's opening statement during the guilt-phase provided the jury with any idea of what counsel's theory of defense was or why the jury should find Petitioner either not guilty or guilty of lesser offenses. Counsel's examination of the government's witnesses failed to provide the jury with any clearer picture, alternating between questions designed to show misidentification, an inadvertent shooting, and/or that Mr. Price, not Petitioner, was more likely to have committed the murder. Nothing in counsel's closing argument clarified or articulated where the government had failed to meet its burden or why the jury should not convict Petitioner. Finally, if, as they stated in their opening in the penalty hearing, it was counsel's theory not to contest guilt but, instead, provide the jury with mitigation arising from the circumstances of the offense in order to save Mr. Bolden's life, that theory was not conveyed to the jury during the guilt phase, nor was it properly developed or presented during the penalty hearing (see Claim IX). The combination of the government's over-zealous presentation and counsel's apparent lack of any viable theory was in a word, lethal, and rendered Petitioner's trial little more than an exercise waiting for the guilty verdict.

149.    Federal Due Process requires that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof – defined as evidence necessary to convince a trier

of fact beyond reasonable doubt of the existence of every element of the offense."[23]

150.   It is well-settled that an accused has a constitutional right to "a meaningful opportunity to present a complete defense." Trombetta, 467 U.S. at 485. That right is grounded in the Due Process, Compulsory Process, and Confrontation Clauses. Chambers, 410 U.S. at 294. Furthermore, the Eighth Amendment requires that the defendant's rights to be heard and present a defense be given even greater protection in a capital case. See, e.g., Beck v. Alabama, 447 U.S. 625 (1980); Ake v. Oklahoma, 470 U.S. 68 (1985); Lockett, 438 U.S. at 604; Hitchcock, 481 U.S. at 394.

151.   Similarly, "It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Berger, 295 U.S. at 88. Likewise, the use of false, inaccurate or misleading prosecutorial testimony deprives a defendant of a fair trial if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." Napue v. Illinois, 360 U.S. 264, 271 (1959).

152.   The Due Process Clause requires a prosecutor to disclose favorable evidence to the accused that is material to either guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963); Giglio, 405 U.S. at 153-56; United States v. Bagley, 473 U.S. 667, 676 (1985); Kyles v. Whitley, 514 U.S. 419, 437 (1995). A prosecutor's duty to disclose is especially important in a capital case. Kyles, 514 U.S. at 422 (the prosecution's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case"). The duty to disclose continues past a defendant's arrest, conviction and sentencing. Imbler v. Pachtman, 424 U.S. 409, 427 n.25 (1976). 'Favorable evidence' under Brady includes evidence that impeaches the prosecution's theory or witnesses.

---

[23] Jackson v. Virginia, 443 U.S. 307, 316 (1979). See also In re Winship, 397 U.S. 358, 364 (1970); Juan H. v. Allen, 408 F.3d 1262, 1279 (9th Cir. 2005) (as amended) ("Speculation and conjecture cannot take the place of reasonable inferences ..."); Piaskowski v. Bett, 256 F.3d 687, 693 (7th Cir. 2001) ("Although a jury may infer facts from other facts that are established by inference, each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation").

Bagley, 473 U.S. at 676; Napue, 360 U.S. at 269.

153.    Moreover, longstanding Sixth Amendment law requires that an accused in a criminal case is entitled to effective assistance of counsel. Strickland, 466 U.S. at 688; 694. Counsel has "a duty to bring to bear such skill and knowledge as will render the [proceeding] a reliable adversarial testing process." Strickland, 466 U.S. at 688. This can be done only if counsel actually investigates, id. at 691;  ABA STANDARDS, 4-4.1(a) (3d ed. 1993). The duty to investigate is especially exacting in a capital case, where "counsel's duty to investigate all reasonable lines of defense is strictly observed." Williamson v. Ward, 110 F.3d 1508, 1514 (10th Cir. 1997). See also GUIDELINE 10.7.

154.    As described more fully below, the constitutional errors arising from counsel's ineffectiveness, prosecutorial misconduct and Court error compromised the reliability of the jury's verdict in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. Relief is required.

A.    The Unreliable Eyewitness Testimony.

155.    The government relied on the identification by three witnesses in addition to the testimony of co-defendant Dominick Price as support for its contention that Petitioner shot and killed Mr. Ley. Those witnesses were: Henry Wines, (Tr. 2394), Jeanne Coser, (Tr. 2995), and Erica Ruffin (Tr. 2537). It was the government's theory that these witnesses corroborated Mr. Price's testimony that Petitioner alone committed the murder. See Tr. 3086.

156.    Each witness's description of the incident and the perpetrator(s) was internally and externally contradictory. Of the three, only Ms. Ruffin indicated a second individual was involved in the incident, (Tr. 2589), although Mr. Price readily acknowledged that he was there and that he was near the shooter. Tr. 2237. Each disagreed regarding where the shooter went after the shooting. Mr. Wines said the shooter went right in front of his truck. Tr. 2405. Ms. Coser said the shooter fled through the street section of the parking lot. Tr. 3015. Ms. Ruffin claimed that the shooter stopped at the corner of the C & W Restaurant just by the sign, (Tr. 2542), while neither Mr. Wines nor Ms.

Coser indicated that he stopped before disappearing behind the restaurant. Tr. 2405; 3015.

157.    Each gave different descriptions of the clothing the shooter was wearing. Mr. Wines said he was wearing a green sweatshirt (Tr. 2416), Ms. Coser said it was a dark colored hooded sweatshirt (Tr. 3034), and Ms. Ruffin said it was a medium blue sweatshirt with a logo/writing in the front (Tr. 2586). Mr. Wines testified that the shooter had "twisted" hair, (Tr. 2416), Ms. Ruffin claimed his hair was brushed back (Tr. 2585). Ms. Coser said the shooter was medium complected (Tr. 3038), while Ms. Ruffin described him as light complected (Tr. 2585). There was even disagreement regarding the individual's age. Mr. Wines described him as 20-25 years old (Tr. 2415), Ms. Ruffin claimed he was 35 to 40 years old (Tr. 2585). Although the police report indicated that her initial description of the shooter was 20-25 years old, Ms. Coser testified that she told the police that he was in his middle thirties to forty (Tr. 3038).

158.    While some inconsistencies and contradictions did arise during trial, as set forth more fully below, as a result of prosecutorial misconduct and ineffective assistance of counsel, the jury never appreciated the impact of these contradictions nor did the jury hear substantial evidence directly impacting the reliability of these witnesses' testimony. Instead, the jury was bombarded with irrelevant and emotionally charged testimony designed to mask the contradictory and unreliable identification testimony and encourage the jury to find Petitioner guilty on the basis of passion and prejudice rather than the presence or absence of reliable evidence. In addition to the below, Petitioner also expects to present neighborhood witnesses demonstrating that, contrary to the eyewitnesses' and Mr. Price's testimony, Petitioner was in a completely different location.

159.    **Erica Ruffin** testified that she was picking her nephew up from school and parked her car in the C&W Restaurant parking lot facing a dumpster and also facing the school. Tr. 2575. According to Ms. Ruffin, as she was at her car returning with her nephew, she heard a gunshot and looked in the direction of the bank and made certain specific observations. Tr. 2540.

56

160.    First, Ms. Ruffin claimed that she observed the perpetrator holding a gun pointed at Mr. Ley's head. Id. Second, she claimed that she observed the perpetrator fire the gun at Mr. Ley. Id. Third, Ms. Ruffin claimed that the perpetrator ran across the street, stood by the sign for the restaurant for "a second," and then run to the other side of the building where she lost sight of him. Tr. 2542. Fourth, Ms. Ruffin testified that she got into her car, started it and drove to the rear entrance of the restaurant where she claimed to have seen the perpetrator in a black Toyota Celica. Tr. 2543-44. Ms. Ruffin further claimed that she saw the perpetrator get into his car. Id. at 2544.

161.    Although the car was on the other side of the building and she acknowledged she lost sight of the perpetrator because the building blocked her view, Ms. Ruffin claimed that the perpetrator was still just getting into the Toyota by the time she had:  gotten herself and her nephew into her car; started her car; and driven out the rear entrance far enough so that the building no longer blocked her view. Tr. 2543-44. Ms. Ruffin claimed that there were no obstructions between her and the location of the shooting, between her and the individual as he crossed Goodfellow Boulevard, or between her and the point that the individual stopped at the sign for the restaurant. Tr. 2555-56.

162.    After observing these events, Ms. Ruffin drove her nephew to her mother's home, went shopping and did not contact the police until 5:02 pm, two hours after the murder. Exh. 6. She claimed that she contacted the police because she saw the news report about the murder. Id. During the call, the dispatcher provided Ms. Ruffin with the phone number for the homicide bureau. Ms. Ruffin hung up and the dispatcher apparently conducted a caller-id search and determined that the call came from a number attributed to the Ruffin family at a home within the same neighborhood as the scene of the murder. Exh. 7. Following a conversation between Detective Pappas and the dispatch supervisor, Detective Pappas informed the dispatch supervisor that he would contact Ms. Ruffin and

57

that dispatch should not put the caller's information out. Id[24]. Detective Pappas did ultimately report the contents of Ms. Ruffin's report to police, but failed to indicate that the dispatch supervisor knew her identity prior to his volunteering to contact her. See Exh. 8.

163.    Although the government contended that Detectives Stone and Carroll conducted the in-person interview of Ms. Ruffin, rather than Detective Pappas, (see Tr. 2436; id. at 2611), that was not what Ms. Ruffin said. Ms. Ruffin's testimony clearly indicated that she spoke with Pappas both on the phone and in person. Tr. 2593. Nevertheless, Ms. Ruffin further testified that some time after speaking with the police, she was transported to a location for the purpose of identifying a car. Tr. 2548. The vehicle she identified belonged to Petitioner. Tr. 2617. Although Ms. Ruffin claimed that there was no one near the car at the time she made her identification, (Tr. 2540), Detective Stone testified that Robert Bolden Jr., walked up just after the identification, (Tr. 2614), and the police report indicated that he walked up as the identification was occurring, Exh. 8.

164.    As a result of prosecutorial misconduct, ineffective assistance of counsel and Court error, the jury did not hear a number of bases to question the reliability and credibility of Ms. Ruffin's testimony in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. Petitioner describes below the facts known to Petitioner at this time directly disputing Ms. Ruffin's reliability and credibility. Petitioner has filed a motion requesting disclosure of further evidence and reserves the right to amend once the discovery requested is received.

165.    Although Ms. Ruffin claimed to be able to see considerable detail from her position across the bank lot, a busy four lane highway and across another parking lot, Petitioner will demonstrate at an evidentiary hearing that, even providing Ms. Ruffin had perfect vision, it was

---

[24]Notably, the section of the police report provided during discovery attributed to Detective Pappas indicated that dispatch identified the caller as unknown.  Exh. 8.  As the transcript of the conversation indicates, that was not the case.

impossible for her to observe the details she claimed to have observed, including: objects such as the gun, facial features, (such as whether or not the perpetrator was clean-shaven), and other specific details. And, although Ms. Ruffin claimed to have seen particular details and features of the perpetrator as he purportedly stopped at the restaurant sign, Petitioner will demonstrate at an evidentiary hearing that, as a result of the distance, her testimony regarding those observations was also an exaggeration and unreliable.

166.    Counsel will present a forensic expert who examined the crime-scene and measured the distances from the point that Ms. Ruffin testified that she was standing and each critical point in which Ms. Ruffin claimed to have observed the individuals involved. That forensic expert found that the distance from the point where Ms. Ruffin was standing and the location where the shooting occurred is three-quarters of a football field's length. The forensic expert evidence will demonstrate that there is no way that anyone could have seen the details Ms. Ruffin claimed to have seen with normal vision. Counsel will also present video evidence demonstrating that, absent the use of a zoom lens, none of the details that Ms. Ruffin claimed to have seen at the door of the bank, in the parking lot, or at the corner of the restaurant, were visible from where Ms. Ruffin was standing.

167.    Counsel cross-examined Ms. Ruffin extensively regarding her position and ability to observe. Tr. 2573-2580. Nevertheless, counsel failed to investigate, develop and present readily available evidence directly disputing Ms. Ruffin's testimony regarding what she was able to see. There is more than a reasonable probability that, had the jury learned of these significant flaws in Ms. Ruffin's claimed observations, it would have rejected Ms. Ruffin's testimony. Counsel's failure to present evidence supporting the theory of defense chosen by counsel constitutes prejudicially deficient performance.

168.    Throughout the trial, the government presented false and/or misleading evidence purporting to bolster Ms. Ruffin's credibility and reliability as an identification witness and minimize

her heroin addiction. For example, the government elicited testimony from Ms. Ruffin that she was employed by Pinkerton as a security guard. Tr. 2537. The government relied on her position as a security guard, and the training and expertise that accompanies that type of employment, as a basis for finding Ms. Ruffin's observations reliable. Tr. 2562; 3103. While she did not provide specific dates for her employment with Pinkerton, the testimony was clearly intended to infer that it had been for a significant period of time. Ms. Ruffin claimed that her employment ended when Pinkerton lost the contract with the Saint Louis airport. Tr. 2538.

169.   Contrary to Ms. Ruffin's testimony, and the government's argument, counsel has learned that Ms. Ruffin's employment with Pinkerton was brief, lasting from August, 2002 until December 7, 2002, when she was terminated. Counsel will present testimony at an evidentiary hearing demonstrating that, although she may have engaged in some training, it was not as extensive as she and the government led the jury to believe, nor was her work with Pinkerton as stellar as she and the government contended. Had the jury known that the quality and quantity of her work with Pinkerton was far less than that claimed by the government, there is a reasonable probability that the jury would have rejected Ms. Ruffin's testimony.

170.   Counsel was clearly on notice that the government would elicit this testimony and argue that her purportedly vast experience as a security guard bolstered her credibility and reliability as an identification witness because that is precisely what the government did during the pretrial motions. See Tr 11/10/03 at 144-45. Counsel's failure to obtain Ms. Ruffin's employment information from Pinkerton constituted prejudicially deficient performance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. Moreover, to the extent the government knew or should have known that Ms. Ruffin's testimony was false or, at a minimum, misleading, the government's presentation of that testimony and reliance on that testimony in argument also violated Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights. See Napue, 360 U.S. at 271. To the extent

that it possessed records or other materials, particularly employment records, contradicting Ms. Ruffin's trial testimony and the prosecution's argument, the government's failure to disclose that exculpatory evidence violated the Fifth, Sixth, Eighth and Fourteenth Amendments[25].

171.    Similarly, the government elicited testimony from Ms. Ruffin regarding her heroin addiction, but was careful to include testimony that she was purportedly not using drugs on the date of the offense. Ms. Ruffin specifically testified that she was not using drugs on the date of the murder and did not begin using drugs until one to two months later. Tr. 2562. On cross-examination, Ms. Ruffin contended that she had been clean for six months on October 7, 2002. Tr. 2567. The government attempted to bolster this contention by asking if she was subjected to a drug test before being hired by Pinkerton. Tr. 2561. As noted above, however, Ms. Ruffin was hired by Pinkerton in August, 2002. Whether or not she passed a drug test in August, 2002 had little or no relevance to whether or not she was using drugs in October. The jury did not hear that, however, as a result of counsel's ineffectiveness and prosecutorial misconduct.

172.    Moreover, counsel had further evidence in their possession directly contradicting the government and Ms. Ruffin's contentions that she was clean in October, 2002. Counsel obtained treatment records from Mr. Ruffin's commitment during May, 2003. Those records include her own description of her addiction and demonstrate that, contrary to Ms. Ruffin's (and the government's) characterization, her addiction was longstanding and chronic. Exh. 33 (Assessment Report Dr. Sistrunk-Cowan, 5/2/03). Based on her own report, Ms. Ruffin began using heroin when she was 18 years old and her longest period of sobriety lasted three to four months, usually over the summer months. Id. Thus, Ms. Ruffin's claim that she had been clean for six months prior to October 7, 2002 was directly contradicted by her own words, as was her contention that she was not using heroin on

---

[25]The government's duty to disclose continues past conviction.  Petitioner has also specifically requested these materials.

October 7, 2002. In addition, Mr. Ruffin reported that she was in the DART treatment program for two weeks in December, 2002, making her claim that she did not begin using drugs until one to two months after October 7, 2002, even more suspect. Although they were well-aware of these facts, counsel failed to confront Ms. Ruffin with the contradictions, nor did counsel explain to the jury how those contradictions impacted her reliability.

173.    Similarly, although counsel did subpoena the May, 2003 treatment records, they did not subpoena the DART records from her December, 2002 treatment, although they were well-aware of their existence before trial. The lengthy cross-examination demonstrates that it was important to counsel's defense theory to attack Ms. Ruffin's claims that she was clean on the date of the offense. See Tr. 2565-70. Counsel also knew or should have known that Ms. Ruffin made statements during her May, 2003, treatment that directly contradicted her expected trial testimony. It was (and is) reasonably likely that the treatment records from DART also contain contradictory statements disputing Ms. Ruffin's claim that she was clean on October 7.

174.    To the extent that the government possessed any or all of the DART records or other materials contradicting Ms. Ruffin's trial testimony and the government's argument, those records or other materials constituted exculpatory evidence that the government was required to disclose and its failure to do so violated the Fifth, Sixth, Eighth and Fourteenth Amendments[26]. To the extent the government knew or should have known that Ms. Ruffin's characterization of her drug addiction was materially misleading, the government's presentation of that testimony and reliance on that testimony during argument also violated the Fifth, Sixth, Eighth and Fourteenth Amendments.

175.    Nor did the jury hear other evidence directly impacting Ms. Ruffin's credibility and reliability. For example, Ms. Ruffin did acknowledge that the government paid for her to stay in a

---

[26]The government's duty to disclose continues past conviction.  Petitioner has also requested the records in his discovery motion.

hotel while she was waiting to get into a treatment program (with the assistance of the government). She did not, however, disclose that, during her stay in that hotel, she chose to continue the lifestyle she had engaged in along with her drug addiction. Petitioner will demonstrate at an evidentiary hearing that, while at the hotel, Ms. Ruffin called one of her prostitution "customers."  This individual has informed counsel that Ms. Ruffin had, on multiple occasions, provided sexual favors in exchange for money and that the only reason that she would have called him in 2006 would have been to set up an encounter for that purpose. Certainly, had the jury learned that Ms. Ruffin felt free to continue to engage in illegal activities while staying in a hotel at the government's expense, there is more than a reasonable probability that the jury would have rejected her testimony.

176.    The government's failure to disclose that Ms. Ruffin was engaging in illegal conduct while staying in a hotel at government expense violated the Fifth, Sixth, Eighth and Fourteenth Amendments. To the extent counsel could have discovered this evidence, counsel's failure to develop and present that evidence constitutes prejudicially deficient performance.

177.    Similarly, counsel has been told by at least one witness who has known Ms. Ruffin for a number of years that, at the time of Petitioner's trial, Ms. Ruffin had obtained various favors from the police. Petitioner has requested any and all police and/or prosecutorial records regarding Ms. Ruffin and any instances of providing her with assistance. As noted previously, the circumstances of the call between Detective Pappas and the dispatch supervisor appear to indicate that Pappas was familiar with Ms. Ruffin, or at least her household, and that he had reason to speak with her before dispatch placed the information about her call over the police wires. See Exh. 6. At a minimum, Petitioner has demonstrated a reasonable likelihood that Ms. Ruffin was known to various members of the Saint Louis police and that she enjoyed certain benefits as a result. Had the jury heard this, there is a reasonable probability that they would have rejected her testimony.

178.    The government was working closely with the Saint Louis police department from

the beginning of Petitioner's prosecution. As the agencies were working in tandem, the government was obliged to obtain any and all exculpatory from that agency. Kyles, 514 U.S. at 437 (government obliged to obtain exculpatory evidence "known to others acting on the government's behalf"). The government's failure to disclose any and all records or other materials regarding Ms. Ruffin's relationship with law enforcement and benefits received as a result violated the Fifth, Sixth, Eighth and Fourteenth Amendments. To the extent they could have discovered this evidence, counsel's failure to develop and present that evidence constitutes prejudicially deficient performance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

179.    Finally, in light of the above-described clear discrepancies contained in Ms. Ruffin's testimony, Petitioner submits that the testimony surrounding her purpose in being at the location near the murder is also suspect. Petitioner avers and expects to present evidence during an evidentiary hearing that the school records for Ms. Ruffin's nephew do not substantiate her claim that she was there for the purpose of picking up her nephew from school.

180.    **Henry Wines** testified that he saw both Mr. Ley and the individual who later shot Mr. Ley as he was leaving the bank. Tr. 2402, 2405. As he was approaching his truck, he saw a man in a "scream" mask. Tr. 2400-01. Mr. Wines heard someone saying "give it up," turned, heard a shot and saw Mr. Ley start to fall and then a second shot was fired. Tr. 2403. The two were "like a hand to hand," and they were close to one another at the time he saw them. Tr. 2404. Mr. Ley and the shooter were arms length at the time of the second shot. Tr. 2423. Mr. Wines acknowledged that he had previously testified that he saw Mr. Ley and the individual in an exchange that involved one person reaching for something while the other tried to stop him. Tr. 2420. He was 60 to 75 feet from the incident at the time he witnessed the shooting. Tr. 2422. Mr. Wines also acknowledged that he had described the individual involved in the shooting as 20-25 years of age, from 5'5" to 5'10" tall, with black twisted hair wearing a green sweatshirt and blue jeans. Tr. 2415-16. Nevertheless, he

64

identified Petitioner as the individual who shot Mr. Ley. Tr. 2414.

181.    As with Ms. Ruffin, the government sought to bolster Mr. Wines' credibility and reliability through his former employment. The government elicited testimony that he had previously worked as a corrections officer at the Medium Security Institution and subsequently as a security guard for a short time and relied on that as support for his reliability. Tr. 2395-96; 3097. As with Ms. Ruffin, counsel was clearly on notice that the government would elicit this testimony from the pretrial motions. Tr 11/10/03 at 89-92. As with Ms. Ruffin, counsel failed to obtain any records regarding Mr. Wines' employment. Petitioner expects to prove at an evidentiary hearing that the contents of those records contradict the prosecution's at-trial argument that Mr. Wines' employment as a corrections officer and security guard somehow provided him with special skills in identification. As there is a reasonable likelihood that the jury accepted the government's invitation to credit Mr. Wines because of his prior employment, counsel's failure to present evidence contradicting the government's notion that Mr. Wines' employment made him a reliable identification witness constitutes prejudicially deficient performance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. The government's knowing presentation of misleading testimony regarding Mr. Wines' employment and its impact on his reliability as an identification witness also violated Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights. Moreover, the government's failure to disclose any and all records and materials disputing the prosecution contention that Mr. Wines' employment somehow enhanced his reliability as an identification witness also violated Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

182.    **Jeanne Coser** wasin her car waiting for her mother to conduct business in the bank. During the pretrial motions hearing, Ms. Coser indicated that her car was parked in the bank lot one space away from the white pickup driven by Mr. Wines. Tr 11/10/03 at 19; Tr 11/10/03 at 94. At trial, Ms. Coser testified that she reclined her seat to smoke a cigarette and when she looked up, she

65

saw Mr. Ley and another man "struggling and holding onto each other" and then noticed that the other man had a gun and that Mr. Ley was trying to get the gun. Tr. 3006. The gun was in the man's left hand. Tr. 3009. Ms. Coser observed a "constant struggle" while Mr. Ley was shaking the hand of the other man "trying to get him to drop [the gun]" and at that point Ms. Coser heard a gunshot. Tr. 3006. Mr. Ley continued to struggle for the gun, the man broke away and it is at that point that he was shot a second time. Id. At the time of the second shot, the two were about a foot from each other. Tr. 3013. Ms. Coser testified that she was 20-25 feet away from Mr. Ley at the time of the struggle, (Tr. 3032), while Mr. Wines testified that the distance was 60-75 feet. Tr. 2422. 1 8 3 .

As with Mr. Wines and Ms. Ruffin, the government sought to bolster Ms. Coser's identification through testimony about her employment at UPS. The government elicited testimony that, at the time of the offense, Ms. Coser was a packer and sorter and, as a result, she was required to take "sort tests" to ensure that she could recall zip codes for the various cities and towns. Tr. 2997. Although counsel did finally object to the government's line of questioning regarding the theory that employment makes a witness a credible identification witness, he did not object until after the critical question and answer had already been elicited. Id. The government indicated that it would not be asking any further questions in that area. Id. Having belatedly objected, counsel requested that the testimony be stricken. That request was denied.

184.   As with Mr. Wines and Ms. Ruffin, counsel was clearly on notice from the pretrial motions hearing that the government would attempt to bolster Ms. Coser's identification through irrelevant and superfluous testimony about her employment. See Tr 11/10/03 at 7-9. As with Mr. Wines and Ms. Ruffin, counsel failed to obtain Ms. Coser's employment records to develop evidence disputing the government's theory that Ms. Coser's employment rendered her a better identification witness. Counsel's failure to develop this evidence directly contradicting the government's attempts to bolster Ms. Coser's reliability and credibility constitutes prejudicially deficient performance in

66

violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. The government's knowing presentation of misleading testimony regarding Ms. Coser's employment and its impact on her reliability as an identification witness also violated the Fifth, Sixth, Eighth and Fourteenth Amendments. Moreover, the government's failure to disclose any and all records and materials disputing the prosecution contention that Ms. Coser's employment somehow enhanced her reliability as an identification witness also violated the Fifth, Sixth, Eighth and Fourteenth Amendments.

185.    As noted above, Ms. Coser testified that the shooter had the gun in his left hand. Petitioner is right handed. Although counsel knew or should have know that Petitioner is right handed, counsel failed to present that evidence. Counsel's failure to develop this evidence constitutes prejudicially deficient performance.

186.    Moreover, Ms. Coser testified that the sun was not in her eyes and did not have any impact on her ability to view the shooting. Tr. 3009. During the pretrial hearing, Ms. Coser claimed that the sun was coming from behind her toward the right side of her car. Tr 11/10/03 at 26. Petitioner will demonstrate at an evidentiary hearing that, in fact, the sun was coming from the opposite side, towards the left side of her car and that, as a result, the sun could have "impacted" her ability to view the incident. Counsel was well-aware that Ms. Coser contended that the sun was behind her before trial. Nevertheless, counsel did nothing to develop evidence demonstrating that this aspect of her recollection of the events was false. Had the jury learned that the sun was coming from a completely different point than Ms. Coser recalled, there is a reasonable probability that it would have disregarded her testimony. Counsel's failure to develop and present evidence challenging Ms. Coser's claim constitutes prejudicially deficient performance.

187.    Similarly, during his direct examination, the prosecutor elicited irrelevant, prejudicial testimony from Ms. Coser designed to prey on the jury's sympathy. For example, the prosecutor elicited testimony regarding Ms. Coser's experience attending to Mr. Ley while waiting for the

medical personnel, (Tr 3017-19), testimony that Ms. Coser's clothes and arms were covered in blood, (Tr. 3020), testimony describing how she cried in her husband's arms when she arrived home (id.), and he attempted to elicit testimony that Ms. Coser attended a memorial service (Tr.3025).

188.   None of this emotionally charged testimony was relevant to the jury's determination of whether or not Petitioner committed the murder. Nevertheless, the jury was permitted, indeed, instructed by the prosecutor during his closing argument, to consider this emotionally charged testimony in reaching its guilt determination. The prosecutor's intentional presentation of irrelevant, prejudicial, emotionally charged evidence and his reliance on that testimony in arguing that the jury should find Petitioner guilty violated the Fifth, Sixth, Eighth and Fourteenth Amendments. Counsel was clearly on notice that the prosecutor may seek to introduce this evidence as he did so during the pretrial motions hearing. Tr 11/10/03 at 39-43. Counsel's failure to move pretrial to preclude this testimony or object once the prosecution began eliciting this emotionally charged testimony constituted prejudicially deficient performance.

189.   Counsel remained silent as the prosecutor asked a question clearly designed to elicit testimony about Ms. Coser's attendance at the memorial service and continued to remain silent as Ms. Coser testified that she did, indeed, attend that service at the bank. Tr. 3025. It was not until the prosecutor asked her why she attended that service that counsel objected. Although the Court sustained counsel's objection, (Tr. 3025-26), by that point the proverbial cat was out of the bag. The jury heard that there was a memorial service for Mr. Ley and that Ms. Coser attended, but did not hear the full story that demonstrates Ms. Coser's clear bias that impacted her reliability.

190.   As the testimony from the pretrial motion demonstrates, not only did Ms. Coser attend the service, she also met and spoke with Mr. Ley's fellow employees and friend. Tr 11/10/03 at 58. Ms. Coser also attended the wake for Mr. Ley where she met Mr. Ley's family, particularly his

parents. Tr 11/10/03 at 58-59[27]. Confronted with this evidence, there is a reasonable probability that the jury would find that Ms. Coser's testimony was tainted by the obvious bias that arose as a result of her involvement with the grieving friends, colleagues and family of Mr. Ley. Counsel's failure to develop this bias evidence, particularly where the government had already been able to elicit testimony that she attended the memorial service, constitutes prejudicially deficient performance.

### B.      Counsel's Failure to Present Readily Available Expert Testimony

191.      As set forth above, counsel's cross-examination of the eyewitnesses sought to present the contradictions and inconsistencies arising from the three identifying eyewitnesses. Prior to trial, counsel retained a psychologist, Dr. Lieppe, with an expertise in eyewitness identification. Dr. Lieppe provided a report demonstrating that a number of factors render eyewitness identification unreliable, including: the impact of the startling nature of the event on the witness's memory as well as the impact of suggestive identification procedures. During the pretrial proceedings, the government filed a motion to preclude Dr. Lieppe from testifying during the hearing on the motion to suppress identification testimony. This Court found that he could testify during the motion and held open the question of whether or not he could testify at trial. The government essentially objected to Dr. Lieppe's reliance on "mock" criminal events as support for the fallibility of identification testimony and Dr. Lieppe's opinions regarding the pretrial identification procedures that were, in the government's view, not based on science. See Doc. 130.      .

192.      Both Ms. Coser and Mr. Wines testified about the emotional impact of witnessing the shooting. Each were clearly traumatized by what they saw and each experienced after-effects of that trauma. For example, Mr. Wines stated he "had never witnessed such tragic incident" that he was in a  "panic stage," and that he was concerned that the individual would attack him. Tr. 2404. As noted

---

[27]Indeed, by the time of trial, Ms. Coser felt comfortable referring to Mr. Ley by his first name, although she did not know him before the shooting.  See Tr. 3041; 3042; 3046.

previously, Ms. Coser described being covered in blood and the emotional impact of both witnessing the shooting as well as the chaotic aftermath. Tr. 3017-19. During the pretrial motions hearing, Ms. Coser described experiencing loss of sleep and nightmares and that she suffered the impact of re-experiencing the trauma when asked to appear in court. Tr 11/10/03 at 44.

193.    It is well-accepted in the psychological community that experiencing a traumatic event adversely impacts an individual's ability to accurately relate and recall the details of that event. Petitioner will present expert testimony demonstrating that the reaction and emotional responses described by both Mr. Wines and Ms. Coser involve classic symptomotology of the effects of trauma. Expert testimony will further demonstrate that experiencing the emotional impact to the degree that both described directly impacts memory and recollection.

194.    The government relied on this testimony regarding the trauma experienced by Mr. Wines and Ms. Coser as evidence *supporting and corroborating* their reliability. Tr. 3100. In fact, the opposite is true. Expert testimony informing the jury of the true impact of trauma on a witness's ability to accurately relate and recall the details of a traumatic event was both material and relevant to Petitioner's case and proper expert testimony in response to the government's evidence and argument. Although they were well-aware of this testimony prior to trial, counsel failed to develop and present this expert evidence. Counsel's failures constitute prejudicially deficient performance.

C.    **The government's Unreliable Forensic Testimony**.

195.    Dr. Turner, the government pathologist, testified regarding the extent, nature and path of the two bullet wounds suffered by Mr. Ley. Prior to trial, Dr. Turner did not indicate in her report the existence of any stippling near the two entry wounds. Tr. 2743-44. Prior to trial, counsel retained Dr. DiMaio, a forensic pathologist. Dr. DiMaio concluded that there were indications of stippling around the entry wound to the face indicating that the shot was fired from close-range. Id. at 135. Although the government challenged other opinions presented by Dr. DiMaio, the Court found, and

the government acknowledged and conceded, that this testimony was proper expert evidence that the defense could admit at trial. Id. at 139-40; 146.

196.    At trial, Dr. Turner testified that while preparing for her testimony she noticed red marks around the entry wound for the face wound that could have been stippling. Tr. 2743. Dr. Turner also acknowledged that the presence of stippling indicated that the weapon was fired from close-range. Id. However, Dr. Turner did not conclude that the marks she discovered during her preparation were, in fact, stippling. Tr. 2744. Despite Dr. Turner's qualified testimony, and despite the Court's ruling – and the government's concession – that testimony regarding whether or not stippling was present was admissible expert testimony, counsel did not call Dr. DiMaio to testify.

197.    As counsel cross-examined Dr. Turner extensively on what stippling was, what it meant and whether or not there was stippling, it was clear that one goal of counsel was to demonstrate that at least one of the wounds was fired close-range (consistent with being fired in the course of a struggle)[28]. Counsel's failure to present readily available expert evidence consistent with their own theory constitutes prejudicially deficient performance.

198.    The government also presented false and exaggerated "scientific" evidence and argument that DNA evidence in this case matched Petitioner and argued falsely to the jury that "the odds of another person on earth having the same DNA are 1 in 260 quadrillion." It compounded that error by falsely stating that "[t]he use of those statistics [for this type of probabilistic match] are accepted worldwide in the scientific and the forensic community." In fact, these statistics cannot be used to match DNA to an individual person and the assertion that the odds that another person on earth would have the same DNA was not "1 in 260 quadrillion" nor was the use of such testimony

_____

[28]While the Court concluded that Dr. DiMaio could not testify that the presence of stippling was consistent with the gun being fired in the course of a struggle, the Court did note that counsel could present evidence of that stippling and then argue the obvious inference based on the testimony presented through other witnesses.  Tr 4/18/06 at 139-40.

accepted worldwide or otherwise in the scientific or forensic community. See NATIONAL RESEARCH COUNCIL COMMITTEE ON DNA FORENSIC SCIENCE, THE EVALUATION OF FORENSIC DNA EVIDENCE (1996). This false and exaggerated "scientific" testimony and argument violated Petitioner's Fifth Amendment right to due process and the Eighth Amendment.

199.    The prosecution presented expert testimony at trial of the supposed probability of a DNA match to Petitioner in this case. Tr. 2954  In its closing, the prosecution repeatedly (and erroneously) stressed that this DNA identified Mr. Bolden as the perpetrator, exaggerated the statistical likelihood that the DNA identified Petitioner, and falsely stated that the use of this exaggerated statistical evidence was scientifically accepted and reliable.

200.    The prosecution first argued that "this man's DNA is found on this cap at the crime scene, (indicating), which also contains [the decedent] Nathan Ley's blood and also is lying just a foot from where Nathan Ley's body fell." Tr. 3087; id. at 3108; id. at 3112. It followed that up with the assertion that "you've heard that the odds of another person on earth having the same DNA are 1 in 260 quadrillion," id. at 3108, "to suggest there is reasonable doubts is laughable," id.

201.    The defense attempted to attack the methodology employed by the Saint Louis Police Department witness in individuating the DNA statistics to Mr. Bolden, arguing that "[n]othing says you have to take that as fact." Tr. 3113. In its rebuttal, however, the prosecution falsely informed the jury that this improper and exaggerated use of statistics to identify an individual person as the source of DNA was reliable and scientifically accepted. Tr. 3146.

202.    The prosecution's evidence and argument committed several critical errors. First, it falsely equated a **random match** probability with a **source probability**. The random match probability is the probability that a randomly chosen person unrelated to Petitioner would, like Petitioner, match the DNA profile found in the cap. The prosecution's expert estimated the chances of such a random match to be 1 in 260 quadrillion. Based on that estimate, the expert went on to

testify about the source probability – i.e., the probability that Petitioner was the source of the DNA. The expert testimony told the jury, in essence, that there is only one chance in 260 quadrillion that the DNA came from someone other than Mr. Bolden and therefore the likelihood that Mr. Bolden was not the source of the DNA was infinitesimal. This testimony about source probability was scientifically groundless, and misleading. It rested on a logical error that is so frequent in criminal proceedings and widely recognized in both the scientific and legal literature that it has become known as "prosecutor's fallacy,"[29] the "source probability error,"[30] and the "transposition fallacy."[31]

203.    Even apart from the prosecutor's fallacy, however, the expert testimony and argument is grossly erroneous on its face, for it is impossible that "the odds of another person on earth having the same DNA are 1 in 260 quadrillion."  The reason for this is obvious:  in the history of the human species on planet earth, considering all persons who have ever lived from prehistoric times through the present, there have never been 260 quadrillion humans. The estimate is false on its face and its use in evidence was junk science, plain and simple.

204.    When DNA evidence is used in a criminal trial to identify the defendant as a possible source of a biological sample, the jury must assess the *source probability – i.e.*, the probability that the defendant was the source of the DNA sample discovered in evidence. The science is clear:  DNA evidence cannot, by itself, establish the *source probability*. It can show only that the defendant possesses a set of genetic characteristics that were also found in the sample, and then provide information about the rarity of those characteristics. Unless the characteristics are unique, the DNA

---

[29]See, e.g., McDaniel v. Brown, 130 S.Ct. 665, 670-71 (2010); United States v. Morrow, 374 F. Supp.2d 51, 66 (D.D.C. 2005); United States v. Shea, 957 F. Supp. 331, 345 (D.N.H. 1997); United States v. Chischilly, 30 F.3d 1144, 1156-57 (9th Cir. 1994).

[30]Koehler, *Error and Exaggeration in the Presentation of DNA Evidence at Trial*, 34 Jurimetrics J. 21, 27, 32 (1993).

[31]McDaniel v. Brown, No. 08-559, 2009 WL 2247124, *13 n.8 (U.S. July 24, 2009) (*Brief of 20 Scholars of Forensic Evidence as Amici Curiae Supporting Respondents*).

test cannot establish that defendant *was* the source. At best, all it can show is that he is one of a group of people who *could have been* the source.

205.    To help jurors assess the strength of DNA evidence, experts typically offer statistics on the frequency (or rarity) of the matching DNA characteristics in various reference populations. These statistics are often called *random match probabilities* because they reflect the probability that a randomly chosen person would have the matching characteristics. However, the *random match probabilities* provided by DNA experts are ***not*** equivalent to source probabilities. *Forensic Scholars' Brief*, 2009 WL 2247124, at 12. As the scholars note, "this mistake has been roundly condemned, including by the Federal Judicial Manual, the 1996 National Research Council report on DNA, and by courts in the United States and abroad."[32] Id. at 13-14. .

206.    The misuse of the DNA evidence through false and misleading expert testimony and prosecution argument constituted numerous constitutional violations. First, the prosecution's presentation of expert testimony as evidence of "source probability" – and its argument that there was a DNA match – constituted misleading and unreliable identification testimony and argument. The Supreme Court has long held that "reliability is the linchpin in determining" whether an identification may be admissible. Manson v. Brathwaite, 432 U.S. 98, 114 (1977). If the DNA testimony is not scientifically reliable, then by definition it is unreliable identification testimony and argument for purposes of due process. The DNA testimony in this case was thus "unnecessarily suggestive" and unreliable, in violation of Braithwaite.

207.    In addition, as this scientific evidence was reasonably available to the defense, counsel was ineffective for failing to use the available science to suppress, exclude, or limit the DNA

---

[32]See also Nuffield Council on Bioethics, *The Forensic Use of BioInformation: Ethical Issues* 68-72 (2007) (condemning the prosecutor's fallacy), *available at* http:// www.nuffieldbioethics.org/go/ourwork/bioinformationuse/publication_ 441.html.

identification testimony and argument presented by the prosecution. Moreover, at the time the prosecution presented this testimony, it knew that its "expert" DNA identification testimony was false and materially misleading. Because there was a reasonable likelihood that the false testimony could have affected the judgment of the jury, its presentation violated Napue, and Miller v. Pate, 386 U.S. 1, 5 (1967). The prosecution here, however, went a step further. It not only failed to disclose the material defects in its false and misleading DNA conclusions, it successfully moved to bar the defense from presenting accurate expert testimony that would  have exposed the defects and from cross examining its experts on the false and exaggerated testimony. This impairment of cross-examination and the presentation of defense evidence violated Petitioner's Sixth Amendment right to confrontation and his Fifth and Sixth Amendment rights to present a defense.

208.    Even if the prosecution had not intentionally elicited false and misleading testimony, once such testimony was offered, the prosecution's failure to correct it violated due process. Giglio. Rather than correct the error, the prosecution compounded the violation by affirmatively arguing it. Tr. 3108; id. at 3146. This ratification and expansion of the false and misleading inferences from the already misleading false scientific testimony constituted an additional and independent due process violation. See Napue, Miller, Giglio, see also United States v. Agurs, 427 U.S. 97 (1976).

209.    The record clearly shows that this evidence was presented and repeatedly stressed to the jury. There can be little doubt that the jury relied on it as material to its guilt and penalty verdicts. However, the evidence and argument was incontestably false and misleading and a conviction or sentence that is based upon inaccurate information that was material to the jury's decision itself violates due process. Townsend v. Burke, 334 U.S. 736, 741 (1948).

210.    In a capital case such as this, the presentation of such false, inaccurate, and unreliable evidence and argument also violates the Eighth Amendment. The Eighth Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in

a specific case." Woodson, 428 U.S. at 305. This heightened need for reliability requires the provision of "accurate sentencing information [as] an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die." Gregg, 428 U.S. at 190; Johnson v. Mississippi, 486 U.S. 578, 590 (1988). Because the prosecution's DNA identification testimony lacked scientific accuracy and reliability, it should not have been admitted under Daubert. But, apart from that, if that testimony and argument lacks even the basic level of scientific reliability required by Daubert, it cannot satisfy the *heightened* reliability that the Eighth Amendment requires.

211.    Counsel also failed to present expert evidence challenging the government's expert DNA evidence and explaining the inherent flaws in the testimony and inferences drawn from that testimony. Where, as here, the government relied on the purported DNA results as a basis for finding Petitioner guilty, counsel's failure to marshal all evidence disputing the results and the government's improper use of those results constitutes prejudicially deficient performance.

212.    The government also provided unreliable ballistics evidence. Prior to trial, the government provided two reports. The first, generated prior to the discovery of the .22 caliber weapon in January, 2003, indicated that the bullets removed from Mr. Ley were too mutilated to compare them to each other. The second, generated after the seizure of the .22 caliber weapon, indicated that one bullet was fired from the seized weapon. Trial counsel filed a motion to exclude the ballistics expert testimony relying on the change in the conclusions regarding the status of the bullets. See Doc. 313. Ultimately the government was able to present that testimony.

213.    Mr. Stubits testified that, after comparing the bullet identified as QF1, he concluded that the "bullet was definitely fired" from the weapon seized in January, 2003. Tr. 2841. This is the bullet that penetrated Mr. Ley's face and ended in the spinal area. Tr. 2843. With regard to QF2, the bullet that penetrated Mr. Ley's head, Mr. Stubits stated that the bullet was "severely mutilated;" that the "striational pattern is not there" and that he "cannot exclude it from being fired from this firearm,

but [] cannot say that it was definitely fired from this firearm."  Tr. 2843.

214.    There are a number of problems with these conclusions, all of which compromise the reliability of the expert testimony and the jury's reliance on that testimony in reaching its guilt determination. As reflected in the report of the National Research Council of the National Academy of Science, expert testimony regarding toolmark identification suffers from significant limitations, such as variations in tools and guns and lack of repeated, reliable studies. STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD, National Research Council of the National Academies (2009) at 5-21. The Academy also found problems with the absence of precise protocols. Id.

215.    In light of these limitations, Mr. Stubits' conclusion that the bullet QF1 was "definitely fired" from the questioned weapon – that is to the exclusion of all other guns – was a reach and exceeded the bounds of what the "science" of ballistics comparison can conclude. See e.g., United States v. Green, 405 F. Supp.2d 104, 124 (D. Mass. 2005).

216.    Similarly, Mr. Stubits' conclusion as to the other bullet was similarly embellished and scientifically flawed. As Mr. Stubits indicated, there were not sufficient striations, even under the flawed method utilized by this expert, to conclude that the bullet was fired from the questioned gun. Absent those markings, Mr. Stubits was precluded from even suggesting that the bullet was fired from the gun. Nevertheless, Mr. Stubits testified that he "could not exclude it" as being fired from the weapon but also could not say that it was definitely fired by that weapon. In other words, Mr. Stubits essentially told the jury "I, the expert, think it was fired by that weapon, but because of all these requirements, I can't tell you that."  The reality, however, is that Mr. Stubits can say no more than "maybe it is, maybe it isn't."  That type of "evidence" is clearly not proper expert evidence as contemplated by the rules or Daubert.

217.    By permitting Mr. Stubits to make the leap he made about this bullet, there is a

reasonable probability that the jury also speculated that the bullet came from that weapon, despite the absence of any scientific basis for reaching that conclusion, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. Counsel's failure to object to the expert testimony on these bases constitutes prejudicially deficient performance. The government's presentation of forensically flawed and materially false testimony violated the Fifth, Sixth, Eighth and Fourteenth Amendments.

218.    In addition to failing to challenge the government's ballistics expert testimony, counsel failed to develop and present forensics expert testimony either disputing the government ballistics testimony or supporting the defense. Prior to trial, the government objected to the defense ballistics expert, John Cayton, and moved to preclude his testimony. See Tr. 4/18/06. While the Court did agree that some of the evidence was beyond that permissible for an expert to discuss, it did not preclude all of Mr. Cayton's testimony, and noted that what evidence Mr. Cayton could provide would be dependent on the testimony that was presented at trial. Id. at 129-130. Nevertheless, counsel never attempted to present Mr. Cayton's testimony. Thus, while the jury learned the government's perspective of the weapon and it's trigger mechanism, it did not hear Mr. Cayton's testimony regarding that weapon. Testimony demonstrating that it would not have required a great deal of pressure to fire the weapon and other aspects of the weapon and the circumstances leading up to the shooting would have supported a theory of an inadvertent, rather than intentional shooting, even under the Court's rulings. Counsel's failure to develop and present this evidence constituted prejudicially deficient performance.

### D.    The Failure to Develop Evidence Challenging Dominick Price's Testimony

219.    As noted previously, Price was the government's key witness against Petitioner. According to Price, it was Petitioner – a 'crackhead' in Price's words – who masterminded the daylight robbery. Although Price acknowledged that he was the drug dealer in the neighborhood and he was using Petitioner's home as a home-base for his drug dealing, Price contended that only

Petitioner was armed at the time of the incident. Counsel cross-examined Mr. Price extensively on his prior record, including his weapons offense, his theft conviction and his drug dealing. Although they argued that it was ludicrous for anyone to believe that Price was either coerced into committing the robbery or that Price went to that robbery unarmed, counsel failed to present readily available evidence supporting the defense theory.

220.    For example, James Crawford, who lived near the bank, told the police that he observed a black male that he subsequently identified as Price fleeing near his home, carrying what he believed to be a weapon. Yet, counsel ineffectively failed to present this testimony. Audrey Brown told the police that she observed a young male dressed in dark clothing running from the area of the bank hunched over as if he was carrying something. Each of these witness would have supported counsel's theory that Price was armed. Moreover, counsel failed to obtain the telephone records that would have directly disputed Price's contentions regarding purported phone calls between himself, allegedly Mr. Bolden and Mr. Edwards. Counsel's failure to develop and present this evidence at trial constitutes prejudicially deficient performance.

221.    As noted previously, counsel failed to effectively challenge the broad and unreliable ballistics conclusions presented by the government. Had counsel done so, they would have had further evidence supporting their theory that Price was armed at the time of the shooting. Moreover, even with the ultimate conclusions of the government's ballistics expert, the unreliability notwithstanding, counsel had evidence supporting a viable theory that, even if the jury concluded that the first shot – the close-range shot entering into Mr. Ley's face – did come from the gun purportedly found at Petitioner's home, there is a reasonable likelihood that the second shot was fired by Price. Although Mr. Stubits attempted to infer that the second bullet was consistent with the gun seized at Petitioner's home, his testimony was hampered by the absence of any other weapon with which to compare that bullet fragment.

222.    Armed with this evidence, even if the jury chose to believe the inherently unreliable eyewitness evidence and Price's incredible version, there was nevertheless a reasonable probability that the jury would have concluded that the first shot was inadvertent as a result of the struggle and the second shot was fired by Price. Had it heard this viable theory, there is a reasonable likelihood that the jury would have acquitted Petitioner or found him guilty of lesser offenses. At a minimum, armed with this evidence, there is a reasonable likelihood that the jury would have rejected death. Counsel's failure to marshal readily available evidence that held a high probability of convincing the jury to acquit, convict of lesser offense or reject a death sentence constitutes prejudicially deficient performance.

223.    Similarly, the government elicited testimony from Price indicating that:

(1) Petitioner allegedly coerced Price and Edwards into participating in the robbery; and, (2) that following the shooting, Petitioner purportedly threatened them. Tr. 2202; 2261-62. Edwards, on the other hand, tells a different version. According to him, Petitioner did not threaten him and he (Edwards) was never in fear of Petitioner. Thus, Price's testimony was false. Had the jury learned that Price's testimony about this important part of the government's argument was false (Tr. 3093;3126), there is a reasonable probability that the jury would have acquitted Petitioner; found him guilty of a lesser offense; or, at a minimum, rejected death.

224.    As the government was engaged in proffer and other discussions with Edwards, there is a reasonable likelihood that the government knew or should have known that Price's testimony regarding threats was false or, at a minimum, misleading. The government's knowing presentation of this false/misleading testimony and the government's reliance on that false/misleading testimony in argument, and the government's failure to disclose this exculpatory evidence violated the Fifth, Sixth, Eighth and Fourteenth Amendments. To the extent that counsel should have discovered that Edwards would directly contradict Price on critical points, counsel's failure to investigate, develop

80

and present that testimony constituted prejudicially deficient performance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

**E.   Counsel's Failure to Present the Jury with Any Coherent Theory to Either Acquit or Find Petitioner Guilty of a Lesser Count, or Mitigate the Circumstances of the Shooting**

225.    Effective advocacy includes presenting a coherent, viable theory to the jury and articulating that theory to the jury in argument. See GUIDELINE 10.10.1; see also GUIDELINE 10.10.1 *Commentary* ( it is "critical" that counsel "formulate an integrated defense theory" well before trial).

226.    Counsel closed by asking the jury to return "the appropriate verdict."  Tr. 3146. If counsel believed the "appropriate verdict" was acquittal or conviction of lesser counts, he certainly did not relay that message to the jury. If, as it appears from counsel's opening during the penalty hearing, it was counsel's theory to mitigate the circumstances of the offense in preparation for the penalty presentation, that message was not relayed to the jury. Without any meaningful guidance, the jury had nothing but the government's pleas for justice and retribution, hardly a good position to be in for a penalty hearing. Under these circumstances, Petitioner was effectively denied the advocacy to which he was entitled under the Sixth Amendment. See United States v. Cronic, 466 U.S. 648, 656 (1984); Strickland, 466 U.S. at 684-685.

**E.   All Prior Counsel Were Ineffective.**

227.    To the extent that counsel should have and could have raised the above-described claims at trial, post-trial or on direct appeal under controlling precedent and procedure, counsel's failure to do so constitutes ineffective assistance of counsel in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. Counsel can have no reasonable basis for failing to present a meritorious issue on direct appeal. The failure to raise or litigate meritorious claims on appeal, like those presented here, constitutes prejudicially deficient performance. A defendant establishes prejudice from appellate counsel's ineffectiveness where he shows that, but for counsel's error, there

81

was a reasonable probability that the outcome of the appeal would have been different. Since he would have won the appeal had counsel properly raised these issues Petitioner has proven prejudice. These errors, individually and cumulatively, require relief.

**VIII.  AS A RESULT OF COUNSEL'S INEFFECTIVENESS AND PROSECUTORIAL MISCONDUCT, THE RELIABILITY OF THE PRETRIAL PROCEEDINGS WAS COMPROMISED IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

228.    The claims, factual and legal allegations and exhibits set forth in the *2255 Motion*, (including Doc. 2 at ¶¶339-384), and those contained throughout this *Revised Amended Motion*, are incorporated herein as if fully stated. See Fed.R.Civ.P. 10(c); Fed.R.Civ.P. 15(a). Mr. Bolden alleges the following facts, among others to be presented after full discovery, approval to travel to Canada, access to this Court's subpoena power, and an evidentiary hearing.

229.    As set forth below, as with the rest of Petitioner's capital proceedings, these pretrial proceedings were compromised as a result of counsel's ineffectiveness and prosecutorial misconduct in violation of Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights. Relief is required.

**A.    The Motions to Suppress**

230.    Counsel moved to suppress the identification testimony of three eyewitnesses: Erica Ruffin, Henry Wines, and Jeanne Coser. Counsel also moved to suppress pretrial statements and physical evidence. The statements involved two custodial interrogations, one on the evening of October 7 and the second on October 8. As a result of the second interrogation, the police obtained a consent to search Petitioner's home where they seized various items including bullets and other physical evidence. Similarly, counsel challenged the January, 2003 search of Petitioner's home that resulted in the seizure of a gun that the government contended was the murder weapon.

231.    Although counsel litigated these motions pretrial, including filing objections to the Magistrate Judge's Report and Recommendations, counsel limited their challenge on appeal to only one issue:  the January, 2003, search of Petitioner's home. Counsel's failure to raise all aspects of

82

the pretrial motions to suppress evidence on appeal constituted prejudicially deficient performance. Counsel also failed to adequately investigate and present evidence supporting the claims raised by Petitioner in the pretrial motions and directly disputing the reliability and credibility of critical prosecution witnesses. In addition, the prosecution presented materially misleading and/or false testimony designed to bolster the credibility of government witnesses, particularly the identification witnesses. Each of these constitutional errors skewed the evidence before this Court and compromised the reliability of this Court's ultimate determination in violation of Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

### 1.    Motion to Suppress Identification Evidence.

232.    Clearly established federal due process law precludes the admission of identification testimony that arises out of identification procedures which are unnecessarily suggestive and create a substantial likelihood of irreparable misidentification. Manson, 432 U.S. at 106; Stovall v. Denno, 338 U.S. 293, 301-302 (1967); United States v. Wade, 388 U.S. 218, 228 (1967). The Wade Court noted a "major factor" of mistaken identification "has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses" and further noted that suggestivity can be intentional or unintentional "in many subtle ways." Id. The Court also concluded that, once a witness, exposed to a suggestive identification procedure identifies the accused, "'he is not likely to go back on his word later on.'"   Wade, 388 U.S. at 229 (quoting Williams & Hammelmann, Identification Parades, Part I, (1963) Crim.L.Rev. 479, 482)

233.    Determining the existence of a 'substantial likelihood of irreparable misidentification,' is a totality of the circumstances test. Braithwaite, 432 U.S. at 106; Neil v. Biggers, 409 U.S. 188, 199 (1972). Factors to consider include the witness' opportunity to view the perpetrator; the "witness' degree of attention, the accuracy of the witness' prior description," the "level of certainty demonstrated by the witness at the confrontation" and, the length of time between

the crime and the confrontation. Biggers, 409 U.S. at 199-200. See Braithwaite, 432 U.S. at 114.

234.    During the hearing on the motion to suppress identification, the government presented the testimony of the identification witnesses and, in an obvious attempt to bolster their reliability, elicited lengthy histories of their employment and training. A great deal of this testimony was materially misleading and, in some cases, false. Likewise, the government knew or should have known of a plethora of evidence directly disputing the reliability of these witnesses but failed to disclose that evidence to Petitioner or the court. Counsel ineffectively failed to marshal a wealth of evidence disputing the reliability and credibility of the identification witnesses and failed to present that evidence during the motions hearing. As there is a reasonable likelihood that the results would have been different, these constitutional errors prejudiced Petitioner and relief is required.

235.    As discussed *supra*, Claim VII, the government used false and exaggerated accounts of employment history and status to improperly bolster the testimony of Ruffin (Tr 11/10/03 at 144, 155), Wines (Tr 11/10/03 at 88-92.), and Coser (. Tr 11/10/03 at 7-9).  Further, as discussed *supra*, Claim VII, petitioner will demonstrate that neither Ruffin, due to proximity, nor Coster (TR 11/10/03 at 26.), due to sun, could have seen what they testified to seeing.   The Court, in making its credibility determination relied upon this false and misleading information.  The government's failure to correct that materially misleading testimony; and the government's reliance on that testimony as support for denying Petitioner's motion violated the Fifth, Sixth, Eighth and Fourteenth Amendments.  To the extent counsel could have discovered that Ruffin's testimony was materially misleading and/or false, counsel's failure to present that evidence during the motions hearing constituted prejudicially deficient performance.

236.    Also as described in Claim VII.A.1, Ruffin suffered from a longstanding and chronic heroin addiction that directly impacted her reliability and credibility at the time of the shooting, at the time of the motions hearing, and at the time of trial. See Claim VII.A.1; Doc. 2 at ¶¶ 266-286;

348-57. At the time of the motions hearing, the government had not disclosed any evidence surrounding Ruffin's drug addiction. It was not until May 5, 2006, that the government disclosed facts surrounding Ms. Ruffin's addiction and at no time did the government disclose her history, any treatment records in their possession, or the likelihood that she was using drugs on the date of the shooting and/or the motions hearing.

237.    Clearly, had this Court been aware that Ms. Ruffin was likely addicted to heroin at the time of the shooting and/or *at the time she testified*, the results of the motion would have been different.

238.    Similarly, as described in Claim VII, counsel has learned that Ms. Ruffin had been receiving benefits from Saint Louis police prior to and at the time of Petitioner's pretrial proceedings. See Claim VII.A.1; Doc. 2 at ¶¶ 266-286; 348-57. Ruffin's arrangements with the police were clearly relevant to her credibility and reliability. As the government was working in tandem with the Saint Louis police in this prosecution, it was obliged to obtain any and all exculpatory evidence from that agency. The government's failure to disclose any and all records or other materials regarding Ruffin's relationship with law enforcement and benefits received as a result violated Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights. To the extent they could have discovered this evidence, counsel's failure to develop and present that evidence constitutes prejudicially deficient performance.

c.    *Counsel's Failure to Present Readily Available Expert Testimony*

239.    As it did during trial, the government elicited testimony regarding the highly emotional nature of the aftermath of the shooting. This included testimony by Ms. Coser regarding her attempts to provide aid to Mr. Ley, observing blood coming out of Mr. Ley's mouth, her holding him in her arms until the medical personnel arrived, and her being covered in blood. Tr 11/10/03 at 39-42. Ms. Coser also testified about the emotional impact once she left the bank, including crying and trying to pull herself together. Id. at 42-43. She indicated that during the incident she felt

threatened and afraid and that after the shooting she experienced nightmares and difficulty sleeping. Id. at 43-44. While the nightmares subsided, they resumed when she was contacted about testifying in the motions hearing. Id. at 44. While Mr. Wines indicated that he was capable of handling stressful situations, Tr 11/10/03 at 111, he noted that when he had difficulties getting through to 911, he became upset, aggressive and was "hollering." Id. at 112. At trial, he described his "panic," the highly emotional experience, and his fears that the shooter would attack him. Tr. 2404.

240.    As noted previously, the reaction and emotional responses described by both Mr. Wines and Ms. Coser involve classic symptomotology of the effects of trauma. Expert testimony will demonstrate that experiencing trauma such as that described by Mr. Wines and Ms. Coser directly impacts an individual's memory and ability to accurately recall and relate the details of the traumatic event. Claim VII.A.4. See also Doc. 2 at ¶¶ 298-301; 363-65.

241.    Although the government contended this trauma supported their reliability, the science demonstrates that the opposite is true. Expert testimony demonstrating the true impact of trauma on a witness' ability to accurately relate and recall the details of a traumatic event was both material and relevant to Petitioner's motion and proper expert testimony in response to the government's evidence and argument. Nevertheless, counsel failed to develop and present this expert testimony. Counsel's failures constitute prejudicially deficient performance.

d.    *Counsel's Failure to Argue Factors Demonstrating Suggestivity*

242.    Essentially, counsel argued that the lineup was unduly suggestive as a result of statements made by the police at the time of the lineup and because the lineup consisted of only four individuals. See Doc. 178. Although these are very strong bases, there were more that counsel failed to present to the Court. Indeed, an even more striking problem with the lineup was the problem indicated in Simmons: presenting the accused's image in a manner that unduly emphasizes him. Petitioner was the only individual in the lineup dressed in light colors. It's not just a matter of a light

86

colored shirt. He's in all light while the rest are in all dark clothes.  He stands out like a sore thumb.

243.    Similarly, and contrary to the detective's own policy of finding fillers who look like the suspect, all of the other individuals in the lineup had closely cut short hair while Petitioner was the sole individual with medium length hair. Each of the witnesses described an individual with hair much longer than any of the "fillers."  Ms. Coser indicated that the shooter had a "medium length afro" sticking out from the hat. Tr 11/10/03 at 49. Mr. Wines indicated that the shooter's hair was in braids, something that would have been impossible for any of the "fillers."  Tr 11/10/03 at 116. Ms. Ruffin indicated that the individual's hair was combed back, Tr 11/10/04 at 164, once again, something that would have been impossible for any of the "fillers."  In short, the way that the lineup was designed, Mr. Bolden might as well have had bells and balloons with arrows pointing to him. Yet, counsel failed to argue any of these obvious constitutional flaws.

244.    Nor can the government rely on the detective's contention that he was essentially "stuck" with whomever was in the holding cell to avoid these unmistakable factors demonstrating suggestivity. There were viable alternatives. He could have used police officers or other employees in the police station that better met his standard: i.e., a filler who is close to Petitioner's appearance. He could have done a photo array. And, even if there were no other alternatives, and the record disputes that contention, the constitutional prohibition against subjecting witnesses to suggestive identification procedures has no "unavailable filler"exception.

245.    The new evidence directly disputing the witnesses' reliability and the additional compelling factors demonstrating suggestivity, when combined with the evidence presented during the pretrial hearing establishes that suppression was warranted. Counsel's failure to marshal this evidence in support of suppression constitutes prejudicially deficient performance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. Counsel's failure to raise and litigate these issues post-trial and on appeal also constitutes prejudicially deficient performance. Relief is required.

### 2. Motion to Suppress Statements and Physical Evidence Arising from the October 8, 2002 Interrogation

246.    On October 8, 2002, after Petitioner had been arrested, the detectives brought Petitioner out for further interrogation and to obtain a consent to search his home. Tr 3/6/03 at 147. After having obtained that consent, the police searched Petitioner's home and obtained physical evidence admitted against Petitioner at trial, including .22 caliber bullets. Petitioner also made various statements during his encounter with these detectives that the government admitted at trial.

247.    By the time the police arrived to obtain Petitioner's consent, at 12:30 pm on October 8, Petitioner had been in police custody for over sixteen hours. Petitioner suffers from Type-1 diabetes and must have regular insulin in order to control that disease. He did not receive any insulin while in the holding cell. Indeed, he did not receive any insulin until he was transported to the prison on October 9. Exh. 54.

248.    Although the detective did not notice any signs of poor health, he did acknowledge that Petitioner requested food. Id. at 149. Persons with diabetes often attempt to use food in order to stabilize blood sugar difficulties. Petitioner will present evidence demonstrating that the denial of insulin impacted Petitioner's comprehension, concentration and cognitive functioning and, as a result, he lacked the capacity to knowingly, intelligently and voluntarily waive his rights.

249.    Counsel was well-aware that Petitioner suffered from diabetes and only had to review the prison records to realize that Petitioner had not received the much needed insulin to stabilize his health. Nevertheless, counsel failed to investigate, develop and present this evidence supporting counsel's motion to suppress Petitioner's statements and the physical evidence seized as a result of the invalid consent. Counsel's failures constitute prejudicially deficient performance.

### B. Counsel's Failure to Move to Preclude Improper Expert Testimony

#### 1. The Expert Ballistics Evidence

250.     As described above and in the *Motion*, two inconsistent ballistics reports were disclosed pretrial. See Claim VII.B.3; Doc. 2 at ¶¶ 318-324; 375-81. Although they moved to exclude the testimony on the sole basis of the inconsistency, counsel ultimately withdrew that motion. Doc. 321. There existed additional bases to challenge the ballistics expert opinions and counsel's failure to move to preclude the testimony constitutes prejudicially deficient performance.        2 5 1 .

Two problems existed in Mr. Stubits' report that counsel could have, and should have challenged. First, Mr. Stubits indicated that QF1 was fired from the questioned weapon to the exclusion of all other weapons. As noted in Claim VII.B.3., this conclusion is not supported in science. Second, after indicating that he did not have sufficient striations to conclude that QF2 was fired from the questioned weapon, Mr. Stubits concluded that the comparison was "inconclusive." As noted above, by the time of trial, "inconclusive" became "I think it came from the gun." See Claim VII.B.3; Doc. 2 at ¶¶ 318-324; 375-81. Also as described above, the absence of sufficient number of similar striations – even under the questioned methodology applied by Mr. Stubits – means that there is no match. Id.

252.     Moreover, the method used by Mr. Stubits was the very same methodology that the National Academy of Science found suffered from significant limitations. See Claim VII.B.3; Doc. 2 at ¶¶ 318-324; 375-81. Nevertheless, counsel failed to challenge Mr. Stubits' methodology or his exaggerated and unscientific conclusions. Although the NAS report was not published until 2009, questions regarding the validity of ballistics testing existed prior to its publication. See United States v. Green, 405 F. Supp.2d 104 (D. Mass. 2005); United States v. Glynn, 578 F. Supp.2d 567, 569 (S. D. N.Y. 2008). Before and after Petitioner's trial, other District Courts concluded that, even if the ballistics testimony was admissible under Daubert, the Courts were required to restrict the extent and nature of the ballistician's "opinion." See e.g. Green, 405 F. Supp.2d at 124; United States v. Monteiro, 407 F. Supp. 2d 351, 375 (D. Mass. 2006); United States v. Diaz, 2007 WL 485967 at *

14 (N.D. Cal. 2007); <u>United States v. Glynn</u>, 578 F. Supp. 2d at 574. Counsel's failure to investigate, develop and present these challenges to the government's flawed ballistics testimony constituted prejudicially deficient performance.

2.    *DNA Expert Testimony*

253.    As described in Claim VII.B.2, the government presented false and exaggerated "scientific" evidence and argument that DNA evidence in this case matched Petitioner and argued falsely to the jury that "the odds of another person on earth having the same DNA are 1 in 260 quadrillion."   Although the government expected to present unreliable expert DNA testimony, following its recurrent theme of 'the prosecution can have its cake but the defense must have none,' the government moved pretrial to preclude the defense DNA expert testimony, relying on <u>Daubert</u>.

254.    Not only did counsel fail to raise any challenge to the government's inherently unreliable expert testimony, but, counsel also ultimately elected not to present the defense expert. Also as noted in Claim VII.B.2, the government expert testimony far exceeded that which is scientifically reliable and, as a result, the expert conclusions should have been barred for a number of reasons and the admission of that testimony violated Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights. Counsel's failure to challenge the admission of that evidence constitutes prejudicially deficient performance. Relief is required.

IX.    **COUNSEL'S FAILURE TO INVESTIGATE, DEVELOP, AND PRESENT MITIGATING EVIDENCE, VIOLATED MR. BOLDEN'S FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS.**

255.    The claims, factual and legal allegations and exhibits set forth in the *2255 Motion*, (including Doc. 2 at ¶¶385-625), and those contained throughout this *Revised Amended Motion*, are incorporated herein as if fully stated. <u>See</u> Fed.R.Civ.P. 10(c); Fed.R.Civ.P. 15(a). Mr. Bolden alleges the following facts, among others to be presented after full discovery, approval to travel to Canada, access to this Court's subpoena power, and an evidentiary hearing.

A.      **Introduction**

256.    Prior to conducting the constitutionally mandated mitigation investigation, counsel narrowed their focus to Mr. Bolden's diabetes. Although they obtained volumes of medical records (none of which were admitted) to support their diabetes theory, counsel failed to obtain <u>any</u> records on Mr. Bolden's extended maternal and paternal families, obtained only one record on Mr. Bolden's mother, and obtained only <u>two pages</u> of records regarding Mr. Bolden's father. These records would have shown that Mr. Bolden's mother had a psychiatric illness and that her alcoholism nearly killed her; that alcoholism runs in the maternal family; that Mr. Bolden's father was a heroin addict; and that the paternal family had a history of addiction, drug dealing, and criminal violence. Counsel also failed to interview critical witnesses, such as other residents of the four-family flat in which Mr. Bolden grew up, who would have given vivid descriptions of domestic violence Mr. Bolden witnessed growing up, between his mother and father, and also the aunt and uncle who raised him.

257.    As a result of their narrow focus on Mr. Bolden's diabetes, counsel failed to provide their mental health experts with all reasonably available collateral information. Counsel also failed to share their experts' conclusions with their other experts. Remarkably, counsel failed to follow up with one expert, Dr. Ruben Gur, and, as a result, did not learn that his results demonstrated brain damage. Finally, despite having favorable reports from experts, documenting brain damage and mental illness, and giving context and psychological relevance to the limited lay testimony presented at the hearing, counsel failed to present any mental health evidence at the penalty hearing. At the last minute, without Mr. Bolden's knowledge, counsel attempted to develop evidence of Mr. Bolden's remorse. Their evidentiary presentation on this theme was flawed and ineffective.

258.    As a result of counsel's woeful lack of preparedness, the jury that sentenced Mr. Bolden to death did so after hearing only a truncated and biased account of his childhood and evidence that Mr. Bolden had experienced a religious conversion, but no evidence regarding a

substantial portion of his life (including the time frame in which two of the offenses alleged as aggravation occurred), no evidence about the generational patterns of addiction and dysfunction, no evidence to rebut the government's evidence in aggravation, and no mental health evidence.

**B.     The Legal Standard**

259.     The importance of mitigating evidence in capital sentencing proceedings is fundamental. A capital defendant has "a right – indeed, a constitutionally protected right," to present mitigation to the sentencing jury. Williams, 529 U.S. at 393. This evidence is critical to the reliability of the sentencing proceeding, and without it the jury cannot render the individualized decision that the Eighth Amendment requires. Gregg, 428 U.S. at 153.

260.     Sixth Amendment ineffective assistance of counsel claims are evaluated under the two-prong, (deficient performance/prejudice) test of Strickland, 466 U.S. 668 (1984)[33]. A Petitioner must show that counsel's deficient performance, (that his attorney's performance fell below "an objective standard of reasonableness" id. at 688); resulted in prejudice, (that confidence in the result of the original sentencing proceeding is undermined due to counsel's deficiencies id. at 694). As described more fully below, Petitioner more than meets the federal standard and relief is required.

**C.     Deficient Performance**.

261.     Both the caselaw and the professional norms recognize that capital counsel have an "obligation to conduct a thorough investigation of the defendant's background" for mitigating evidence. Williams, 529 U.S. at 396 (citing STANDARD 4-4.1, commentary, at 4-55 (2d ed. 1980)), quoted in Wiggins v. Smith, 539 U.S. 510, 522 (2003). Counsel's duty to thoroughly investigate and present all reasonable mitigating evidence has several distinct components, including an obligation to:  collect all reasonably available institutional records; interview all witnesses; prepare all witnesses

---

[33]See also Williams, 529 U.S. 362 (2000); Wiggins, 539 U.S. 510 (2003); Rompilla, 545 U.S. 374 (2005).

to testify; and, present a closing argument that actually informs the jury how it can give effect to the available mitigating evidence to spare the defendant's life. See also Doc. 2 ¶¶ 393-94.    2 6 2 .

Counsel ignored their obligation to conduct a broad-based investigation into Mr. Bolden's background, instead deciding – prematurely and without any preliminary investigation to inform their decision – to limit the focus of their investigation to the impact of Mr. Bolden's diabetes. Counsel was ineffective. See Doc. 2  ¶395.

1.      **The Scope of Counsel's Penalty Phase Investigation**.

263.     Counsel retained the services of a mitigation specialist, Caryn Platt Tatelli, who provided two affidavits to this Court outlining counsels' duties under the ABA Guidelines regarding the extent and nature of a mitigation investigation. Doc. 107; Doc. 176. Unfortunately, although Ms. Tatelli and counsel recognized the need to conduct an extensive background investigation, a lot of this work was simply never done and the investigation focused on Mr. Bolden's diabetes throughout the entire pre-trial period. See Doc. 2 ¶396.

264.     From the start, counsel's mitigation investigation focused on Mr. Bolden's diabetes. Counsel gathered Mr. Bolden's medical records and spoke to witnesses to learn how Mr. Bolden's diabetes affected his life. The small amount of information about Mr. Bolden's broader social history that was gleaned in this process was ancillary to the diabetes investigation. Expert testimony that did not vehemently support this theory was rejected out of hand. See Doc. 2 ¶ 397.

2.      **Evidence Presented in Mitigation at the Penalty Hearing**.

265.     Before the penalty hearing, counsel had discounted the presentation of any expert mental health testimonym (Tr. 3319), despite the fact that they had in their possession reports from experts demonstrating that Mr. Bolden suffered brain damage consistent with diabetes; that Mr. Bolden suffered from dysthymia (an Axis I psychiatric disorder) and cocaine, alcohol, and turpentine dependence, all of which were a product of his dysfunctional upbringing; and that Mr. Bolden had

adjusted well to incarceration. Additionally they failed to follow up with one of their experts to obtain the test results indicating Mr. Bolden suffered brain damage. Doc. 2  ¶ 398.

266.    Instead of this wealth of compelling mental health evidence, counsel presented a defense revolving around four narrow themes:  three momentous events in Mr. Bolden's life – being diagnosed with diabetes, learning his mother was white, and learning Lavale Bolden was not his biological father;[34] lay testimony about Mr. Bolden's apparent depression and drug abuse;[35] evidence that Mr. Bolden was a loving father to his children;[36] evidence that Mr. Bolden had undergone a religious conversion while in jail;[37] and, purported remorse evidence. This Court severely curtailed the remorse evidence,(Tr. 3752; Tr. 4/11-4/13/06 at 52-53); because counsel unreasonably limited their investigation, they were left with very little to present. See Doc. 2 ¶¶ 399-423.

### 3.    Failure to Develop Evidence Regarding Mr. Bolden's Paternal Family.

267.    The jury learned very little about Mr. Bolden's paternal family. They learned that Ethel Clark was good woman, Elmer Clark was a bad man, and Lavale Bolden did not act like an actual parent toward his putative son. With the narrow exception of two pages of Lavale Bolden's military records,[38] counsel failed to obtain any records on Lavale, the extended Bolden family, and the Clarks. See Doc. ¶¶ 424-442.

268.    Counsel relied almost entirely on Sandra Stittum for family history information. As

---

[34]See generally, Tr. 3679-3733 (testimony of Sandra Stittum); Tr. 3755-75 (Candace Stittum); Tr. 3775-94 (Mona Muhammad); Doc. 2 ¶¶ 404-423.

[35]See generally, Tr. 3679-3733 (testimony of Sandra Stittum); Tr. 3755-75 (Candace Stittum); Tr. 3775-94 (Mona Muhammad); see also Doc. 2 ¶¶ 404-423.

[36]See generally, Tr. 3794-3807 (Ariel and Robert, Jr.); Tr. 3775-94 (Mona Muhammad) Doc. 2 ¶¶ 401-3; 421-423.

[37]See generally Tr. at 3808-81 (testimony of Messrs. Dake, Gruber, and Hipps); Tr. 3679-3733 (testimony of Sandra Stittum);Doc. 2 ¶¶402; 415.

[38] Counsel's last minute effort to obtain Lavale's military records without proper releases resulted in the release of two "public" pages of the records. Exh. 34.  Undersigned counsel obtained Lavale Bolden's 97page personnel file. Exh. 35.

she was only nine years older than Robert, there was a wealth of information she could not tell counsel about the family and Robert's childhood.[39] There were, however, individuals of Robert's father's generation, including William Bolden, Jr., (Robert Bolden's uncle), and Cedric Rainey,[40] who could have provided counsel with a much fuller picture of the Bolden family than Ms. Stittum, including a history of dysfunction, mental illness, and drug and alcohol abuse/addiction. Counsel did not uncover this history because they failed to locate and interview these individuals, although their locations were readily available. Exh. 89. Doc. 2 ¶¶ 424-442 .

269.    Record and witness evidence not investigated by counsel demonstrates that Lavale (Robert's putative father), was the sixth child born to William Bolden, Sr., and LuBirtha Lacy Bolden. His siblings were William Jr., Wardell, Otis, Betty, Dorie, (Lavale), Eli, Michael, Rosemary, Joseph, and Sandra. In addition there were two brothers who died at birth.

270.    The family moved the family from Mississippi to Saint Louis in the 1940s, looking for opportunity. William Sr. was an unskilled laborer who went from job to job. He generally remained employed but there were long stretches of unemployment around 1953-54. William Sr. eventually worked for Chevrolet, but experienced periodic lay-offs. See also Doc. 2 ¶¶ 424-442. The family lived in a low-rise public housing project and then moved to the infamous Pruitt-Igoe high-rise project plagued with crime and structural problems. Exhs. 36, 37 and 38. The family moved to Palm Street in the 1950s.  The Clarks owned the home on Palm Street and were one of the first black families in the neighborhood. Around 1964, William Sr. and the family moved again from Palm Street to a house on DeGiverville Avenue. William Jr. and others would have testified that the older

---

[39] Additionally, it is patently unreasonably to rely on one member of the family to provide the entire family social history.

[40] Cedric Rainey is a few years older than Robert Bolden. Cedric's mother, Naomi Rainey, rented one of the apartments in the four-family flat at 5538 Palm Street. Despite the fact that Naomi and Cedric Rainey lived in the same building as Robert Bolden for much of his childhood, counsel failed to interview either of them.

siblings in the family were exposed to strong women who provided structure and discipline. Doc. 2 ¶¶ 424-442 .

271.    William, Jr. and others would have testified that his younger siblings – and he includes his nephew Robert Bolden in this category – missed out on the positive influence of these maternal family members, and, as a result, suffered from dysfunction, drug addiction, violence and criminal involvement. Doc. 2 ¶¶ 424-442.

272.    Contrary to Sandra Stittum's testimony, Lavale had the same types of problems as his siblings. He was a drug addict. His school records indicated that he was a poor student with low-average intelligence who was held back at least once and was sixteen when he entered the ninth grade[41]. He was permanently suspended and entered the Air Force. Exh. 35. Doc. 2 ¶¶ 424-442. He enlisted in the Air Force to try to pull himself together. Instead of fixing all that was wrong in his life, the Air Force led Lavale to S.D.,[42] a schizophrenic, major depressive, bipolar alcoholic. Lavale was still using heroin when he returned to St. Louis and also abused alcohol and marijuana

273.    Lavale was sent to Harmon Air Force Base in Stephenville, Newfoundland in March 1963. Exh. 35. It is clear from the records that Robert definitely was not Lavale Bolden's biological son, unless he was born extremely prematurely. His Canadian birth certificate indicates that he was born on June 18, 1963, (Exh. 40), although family and caretakers also indicated his birth date was August 18, 1963. Had counsel obtained the complete military records, they would have been able to dispute the prosecution accusations while  cross-examining Sandra Stittum that she really had no proof that Lavale was not Robert's biological father. Tr. 3698.

---

[41] Lavale unsuccessfully attempted to obtain his GED while he was in the Air Force.  He completed only two of the five sections, and scored in the first and fourth percentiles.  Exh. 35.

[42] In compliance with the protective order issued by agreement with Metropolitan Psychiatric Center Mr. Bolden's mother is referenced by initials, as opposed to her name. Doc. 14. Petitioner has provided, under seal, the full name(s). Mr. Bolden's mother was known at various times in her life as S.D., S.B., and S.C. She will be referred to as S.D. here.

**4.      Failure to Develop Evidence Regarding Mr. Bolden's Extended Maternal Family, Mother, and Life in Canada**.

274.     The jury that sentenced Mr. Bolden to die heard nothing about his birth and early years in Canada, the identity of Mr. Bolden's biological father, his mother's life in Canada, or his extended maternal family. Counsel knew that Mr. Bolden was born in Canada, but failed to investigate the circumstances of his birth and early years in Canada, his mother's life in Canada, his biological father, and his maternal family history. Counsel obtained just one record from Canada – his birth certificate[43]. Counsel failed to seek consular assistance, (see Claim I); hire a Canadian investigator; or travel to Canada themselves. Competent counsel would have investigated, developed, and presented the following evidence – among other facts to be presented after full discovery, access to this Court's subpoena power, approval to travel to Canada, and an evidentiary hearing – regarding Mr. Bolden's birth and early years in Canada, Mr. Bolden's mother's life in Canada, and Mr. Bolden's maternal family history.

275.     Robert Bolden's mother was born S.D. in Ship Cove, Newfoundland in 1939. The Decker family's history of interpersonal violence, verbal abuse, mental illness, addiction, and diabetes  – none of which was explored by counsel – is the genetic[44] and psychosocial cornerstone of Robert Bolden's life story.

276.     In addition to S.D.'s psychiatric illness, alcoholism, and heroin addiction, other

---

[43] Counsel also attempted to obtain S.D's birth certificate but was told that the information counsel provided did not match the vital records.  Exh. 41. Had counsel had obtained S.D.'s medical records in Saint Louis, they would have learned her real birthdate and would have been able to obtain the records.

[44] Counsel should have been aware that many of the difficulties that plagued Mr. Bolden throughout his life, including mental illness, addiction, and diabetes, have a genetic component. Moreover, counsel had no idea who Mr. Bolden's biological father was. Given this, competent counsel would have investigated Mr. Bolden's maternal family – the only blood relatives of which they were aware – to determine if there was a genetic component to his mental illness, addiction, and diabetes.

members of the immediate Decker family suffer from mental illness and addiction. For example, S.D.'s sister, Patti Decker, is "fragile" and has mental health issues that have required professional psychiatric treatment. At least one of S.D.'s brothers is an alcoholic. S.D.'s brother, Bruce, spent time in prison following his arrest for what was, at the time, the largest marijuana seizure in Newfoundland. Several of Robert's maternal cousins suffer mental illness, including bi-polar disorder, and several have had issues with drugs. In addition to S.D.'s verbally abusive nature, the entire Decker family is known for having bad tempers. There is a history of verbal and physical abuse in the family. It was typical for the men in the family to physically abuse their spouses and their children. In addition to Robert's status as a brittle, Type 1 diabetic, S.D.'s brother, Rex, has suffered severely from diabetes, requiring extreme medical intervention.

277.    Compounding their failure to investigate, develop, and present evidence regarding the familial traits described above, counsel also failed to investigate, develop, and present the jury with a coherent story explaining how Robert's mother, S.D., was affected by these traits, and how she in turn passed them along to her son, not only through genetics, but due to her wholesale inability to be an adequate parent to Robert arising from her own dysfunctional upbringing.

278.    Robert's mother was the sixth of nine children born to Ralph and Ida Decker. Ship Cove was a small fishing village of about 400 -500 people. Fishing villages at that time were just that – fishing villages. The primary income came from the men working the fishery. The community was very isolated, there were no roads. The primary access was by boat, but only in the warmer months. The town was snowed in from late autumn through May/June and the only access was by dog sled. The Decker children were mostly left to fend for themselves.

279.    The social and economic conditions in Newfoundland at the time S.D. was born were horrendous, both in the city and the fishing villages. Quite simply, everyone in Newfoundland was poor, whether they lived in the city or the rural areas. Basic infrastructure, like water and sewer

systems, did not exist until the Americans came and constructed several military bases in the 1940s. When Newfoundland joined Canada in 1949, conditions improved somewhat, as there were more jobs and public assistance from the government. However, it has only been in the last twenty years that Newfoundland has seen any real economic prosperity.

280.    S.D.'s father, Ralph Decker, was a fisherman. Ralph died young – when he was about 37 or 38 years old – from a botched operation to repair a strained kidney. When Ralph died, all nine of his children were still at home, ranging in age from 18 months to 15 years. Ida Decker never remarried. Because work in the fishing village was male-dominated, Ida had to rely on help from family members and public assistance to support her family. Ida resented the burden she was left with when Ralph died. She was a contrarian and very hard to be around. She would play on people's emotions to manipulate them to do what she wanted. For example, she would pretend to be sick to get attention. She would also get very upset and throw a tantrum whenever anyone said anything bad about S.D..

281.    In 1955, Ida moved the family from rural Newfoundland to the outskirts of the city of St. John's. Like many single, rural Newfoundland women, Ida made the move for work and basic survival. She was able to obtain a job in the hospital laundry in St. John's. S.D. was about sixteen years old when the family moved to the city. S.D. dropped out of school around the time of the move. It was very difficult to be a young woman of S.D.'s generation in St. John's. Families were large and housing in the city was inadequate. In the family home, people slept six to a bed. Children got married young to get out of the family house. Education was discouraged for women – the commonly held belief was that girls would just get married and have lots of babies.

282.    All of the Decker children started working as soon as they could to help support the family. When they were old enough, they moved out on their own. The family splintered both

emotionally and geographically. They scattered across Canada and the United States,[45] and had limited contact with each other over the years. Many of the Deckers experienced decades-long estrangements from one another.

283.    S.D.'s older brother, Graham Decker, was a police officer in St. John's for a few years, until he quit the force and left the province around 1962. Graham had contact with S.D. in his capacity as a police officer, and knew that his sister was a prostitute who hung out in bars that were, by reputation, the places where "loose women" hung out with the men from the nearby U.S. military base (Fort Pepperrell). S.D. was not a full-time prostitute, but she fell back on it when she needed money. In addition, S.D. would often go missing for two to three days at a time.

284.    S.D. was an embarrassment to her brother Graham because she would get arrested by his peers. The other police officers would be sure to tell Graham about his sister's arrests. The embarrassment was so great, that most believed he left the force because of her. Graham's last contact with S.D. was in 1958, when she was arrested for prostitution.

285.    S.D.'s attraction to the American servicemen to whom she prostituted herself was an attraction that many young Newfoundland women shared. The young women of Newfoundland perceived the United States and mainland Canada as having streets of gold. American servicemen were one way to escape the dismal future Newfoundland offered. Newfoundland men, in particular, did not like the fact that so many Newfoundland women married American servicemen and felt that the Americans were stealing their women.

---

[45] Patience "Patti" Decker married an American serviceman and moved to California; two other siblings moved over 3,500 miles away to Alberta; others went to Nova Scotia. Only John and Graham lived their entire lives in Newfoundland, and even they were geographically isolated from one another. The only family members that really maintained contact with one another were Doug and his wife Ruby, John, Graham, and Ida. Even family members from the subsequent (Robert's) generation have splintered from the family; for example, S.D.'s sister Betty Mosdell's daughters left home at a young age because they had difficulty getting along with their mother.

286.    Alcoholism was highly prevalent in St. John's. Everyone – men and women – drank to escape the reality of life. It was difficult even for the men to find paying jobs. On Fridays, the men who were fortunate enough to have jobs, would take their pay to the taverns, not home to the families. Violence – physical and sexual – against women and children was common. Some, but not all, of the violence was fueled by alcohol.

287.    S.D., like many of her peers and some of her family members, was an alcoholic and began drinking at a young age. Betty Jackson, an acquaintance of S.D.'s, from about 1960 to 1962. recalled seeing S.D. two to three times per week, late at night or in the early morning hours, going in and out of the restaurants in the bad part of downtown St. John's, where the bootleggers and the brothels were located. Betty never saw S.D. completely sober. S.D. always had "some drink in her," and about half the time, she was very, very drunk. S.D. was always with a different men; she didn't have a steady boyfriend.

288.    There is much anecdotal evidence about the severity of S.D.'s alcoholism. Betty recalls one time when S.D. came into one of the downtown restaurants and was sitting at the counter crying. S.D.'s makeup was running and her hair was messed up. She was so drunk that she kept pulling at an empty napkin dispenser to get a napkin to dry her eyes. It was something that Betty, as a teenager, thought was funny, but in retrospect, recognizes that it was sad. Another time, S.D. was in another restaurant that was well known for its stew. S.D. was so drunk that she did not have sufficient coordination to use utensils to eat the stew. Betty described S.D. as pretty, nice, boisterous, and comical. She was comical because you never knew what would come out of her mouth. S.D. had been pregnant, and Betty asked her what childbirth was like. S.D. responded it was like "s—ting a watermelon".

289.    S.D. had at least one child prior to Robert Bolden[46]. The child's father was believed to be an American serviceman. Betty recalled S.D. coming into the restaurant sometime during the 1960-1962 time frame, very obviously pregnant, and also very obviously drunk. Some family members believed that this child was adopted out; however, church records indicate otherwise. A death notice maintained by the United Church of Canada indicates that S.D. had a son, Phillip Leon Decker, born on March 29, 1960, who died when he was just 16 months old.[47]

290.    Sometime following Philip's death, S.D. left St. John's with a serviceman she met at Fort Pepperrell and went to Earnest Harmon Air Force Base in Stephenville, Newfoundland. Stephenville is located on the western coast of Newfoundland, and its transformation exemplifies the changes, good and bad, that resulted when the Americans began building bases in Newfoundland. In 1935, Stephenville was a primarily agrarian community, with only 1,000 residents, who mostly spoke French. Steven High, BASE COLONIES IN THE WESTERN HEMISPHERE 137 (2008). During World War II, the U.S. Army decided to build an emergency landing field in Stephenville. Id. at 138. Construction began in 1941. As the Harmon base was built and entered operations, the population of Stephenville exploded. Slum developments sprung up to handle the increased population. Sanitation was poor to non-existent and several wells used for drinking water were contaminated. Venereal disease was rampant. Id. This is the town where S.D. conceived Robert Bolden, and subsequently met a young, drug addicted serviceman named Lavale Bolden.

---

[46]If counsel had obtained S.D.'s medical and psychiatric records from Connect Care, Barnes Jewish Hospital, and/or Malcolm Bliss Psychiatric Center they would have been aware that S.D. had given birth to four children.  The Malcolm Bliss records in particular would have informed counsel that one of these children was born before Robert and died at age 16 months. Exh.s 42, 48, and 67.

[47]The fact that the child was buried with his apparent birth name "Phillip Leon Decker" tends to indicate that he was never formally adopted.  Undersigned counsel believe that the circumstances of Phillip's life and death are relevant to developing a full mitigation picture in this case, as it is reasonable to suspect that Phillip's death was a result of S.D.'s alcoholism and/or abuse and neglect.

291.    Robert Bolden's birth certificate indicates that he was born in Stephenville on June 18, 1963, to S.D., and named "Lavalle Bolden Decker."  No father's name is given. Exh. 40. Sometime after giving birth to Robert, S.D. returned to St. John's. S.D. and Robert stayed with John and Jean Decker for about three months when Robert was about two years old. Jean recalled that Robert was a small baby, but that all babies were small back then, "not like today."  Jean also recalled that S.D. kept Robert clean, and "really that was all you could do." John and Jean never met Robert's father, and did not believe that S.D. ever married Lavale Bolden. It  was hard for S.D. having a biracial baby because Newfoundland was predominantly white. She was an outcast, and it was "like she had to leave."  It is not surprising, therefore, that Robert believed, when he was growing up, that he had been rejected by his maternal family because he was black.

292.    The Deckers had limited contact with S.D. after she moved to the United States. She only called when she needed money. Graham offered to pay her way to return to Canada, but she ultimately decided she was not going to return.

293.    S.D. used to tell her daughter, Marquitta Patterson, that two of her brothers had raped her in Canada, and that was one of the reasons she had left her family. As a result of this interfamilial sexual violence, S.D. did not maintain contact with her family and S.D.'s children never had any real connection with thier mother's family in Canada.

294.    The Deckers believed that S.D. was in the States illegally. S.D.'s mother received a letter from U.S. immigration authorities, stating that they were looking for S.D., and asking if Ida knew where she was. Graham believed that it was S.D.'s fear of being apprehended by immigration authorities that prevented her from accepting his offer to pay for her transport back to Canada.

295.    After S.D. moved to the States, she failed to keep the family apprised of where she was living or how to contact her. S.D. often moved without telling her Canadian family members about her change of address. The Deckers would not hear from her for long periods of time, and then

103

she would just call, out of the blue, and talk as if they had just talked yesterday. As a result of this distance, S.D. did not even find out her mother died until years later. Robert had no contact with any of his Canadian family as a child, even his grandmother.

296.    Because counsel unreasonably failed to investigate Mr. Bolden and his mother's life in Canada, the jury that sentenced Mr. Bolden to death failed to hear the above information, and the mental health experts that evaluated him were never provided with this crucial information about Robert's family history and first two years of life. The jurors and mental health professionals never heard about the extensive  Decker family history of mental illness, addiction, violence, and verbal abuse, nor did they hear about the social and economic backdrop against which S.D. developed alcoholism and was forced to resort to prostitution to support herself. The jurors and mental health experts were wholly deprived of any context to Robert's conception, gestation, and birth – the child of an unknown American serviceman and an alcoholic prostitute who drank to the point of drunkenness during pregnancy. Relief is required.

### 5.    Failure to Develop Evidence About Mr. Bolden's Childhood in Saint Louis.

297.    The sole witness presented by counsel to establish the horrors that Robert Bolden experienced in childhood was Sandra Stittum. Competent counsel would have given a broader presentation of Mr. Bolden's young life in Saint Louis.

#### (a)    Evidence from Robert Bolden's Medical Records.

298.    Counsel had in their possession most of the childhood medical records regarding Mr. Bolden that are still in existence. Counsel's mitigation specialist organized those records into a chronological record of his medical encounters. Despite this, counsel failed to introduce a single medical record to support their juvenile diabetes mitigation theory.[48]

---

[48]Counsel also possessed, and failed to introduce a single page from, Mr. Bolden's medical records from:  Barnes-Jewish Hospital, Exh. 43; Blodgett Hospital, Exh. 45; Butterworth

299.    Medical records from Robert's childhood would have independently documented the family dysfunction, abuse and neglect; his severe medical issues arising from his diabetes and his caretakers' inability to provide appropriate medical and dietary care; the significant impact of his health problems on his emotional stability; and, the impact of the racial issues arising from his biracial parentage. See Exhs. 56 and 57; Doc. 2 ¶¶ 448-464.

300.    These records would have demonstrated that Mr. Bolden was hospitalized at least eighteen times between the ages of two and one-half and eighteen with had at least forty-five clinical visits[49]. Exhs. 56 and 57. Beginning in July, 1966, just shy of his third birthday, the records document a lengthy history of hospitalizations and trips to the ER arising from the failure to properly control his diabetes. See Exhs. 56&57. See also Doc. 2 ¶¶ 448-463. From the beginning, medical staff were concerned that the family would not be able to provide proper medical and dietary care. Exhs. 56&57. See also Doc. 2 ¶¶ 448-464. Social services assistance provided following his diagnosis for diabetes indicated three visits to teach Ethel how to care for Robert; noting that despite her cooperation, she had difficulties complying because she lacked "basic math skills."  Exhs. 56&57; Doc. 2 ¶¶ 448-464. These records demonstrate that, as a result of the family dysfunction, Mr. Bolden's dietary and medical care was, at best, erratic.  Exhs. 56&57. See also Doc. 2 ¶¶ 448-464.

301.    The records of the social services intervention also documented the family dysfunction, abuse, and  violence arising from S.D.'s alcohol abuse, mental illness, her inability to

---

Hospital, Exh. 46; Christian Hospital, Exh. 47; DePaul Hospital, Exh. 49; Saint Louis Children's Hospital, Exh. 56; Saint Mary's Hospital (Grand Rapids), Exh. 50; Dr. Christy Richardson, Exh. 51; Dr. Joseph Thompson, Exh. 52; the Kent County Jail, Exh. 54; Correctional Medical Services (St. Louis City Jail), Exh. 54; and the Sainte Genevieve County Jail, Exh. 55. Competent counsel would have introduced these voluminous medical records at Mr. Bolden's penalty hearing to demonstrate the true severity of his diabetes; that Mr. Bolden had lifelong difficulty managing his diabetes; and that these difficulties were caused, in part, by his own poverty and limited access to healthcare and his fear of hypoglycemic events.

[49] In addition, there are indications in the Children's Hospital records that he was also receiving care through other providers whose records have not yet been located and/or produced.

serve as a caretaker and the violent relationship between S.D. and Lavale. Exhs. 56&57. See also Doc. 2 ¶¶ 448-464.

302.    The significant and frightening emotional impact on Mr. Bolden arising from the circumstances leading up to and the results of his diabetes diagnosis is also well-documented in these records. Exhs. 56 and 57. See also Doc. 2 ¶¶ 448-464.

303.    At thirteen, Robert participated in the Washington University School of Medicine Diabetes Protocol, conducted at Children's Hospital. While the program may have provided him access to free treatment and medicine, it also took a toll on his ability to function as a normal child. He was out of school for substantial periods of time for hospitalizations and was subjected to muscle biopsies and nerve conduction studies, which involved administering electrical shocks to various parts of the body. Exhs. 56 & 57; Doc. 2 ¶¶ 448-464.

304.    Doug Dobynes and others would have testified that Mr. Bolden's diabetes affected his relationships with his peers and that Robert needed help to effectively manage his health. Mr. Dobynes remembers ambulances coming to pick Robert up when he would get sick in class. When he got sick, Robert's whole demeanor would change. When his blood sugar dropped, he looked like he was going to pass out. See also Doc. 2 ¶¶ 448-464.

**(b)    Life with the Clarks.**

305.    While counsel provided the jury with a glimpse of life with the Clarks while Robert was growing up, it was a very brief glimpse, hampered by counsel's failure to interview more than one or two witnesses with knowledge of this part of Robert's life. Had counsel interieweed witnesses such as William Jr., Cedric Rainey, Duane McCoy, Doug Dobynes and Michael Mahone, the jury would have heard substantial evidence regarding the dysfunction in the Clark home during the time in which Robert was raised.

306.    The jury would have learned that Lavale did not bring S.D. and baby Robert with him

when he was discharged from active duty and returned to St. Louis. Instead, S.D. and Robert appeared on the doorstep one day. The jury would have learned that Lavale, like many of his siblings, struggled with alcohol and drug addiction, including heroin addiction, during this time period. His criminal history reflected his drug addiction as well as his medical records. See Exh. 12 (court records); Exh. 44 (medical records). Each of these records confirmed his IV drug use and his death from complications from Hepatitis C. Exh. 44. Doc. 2 ¶¶ 464-465. Likewise, had counsel interviewed witnesses and obtained records, the jury would have learned that S.D. was a mentally ill, alcoholic heroin addict who "dumped" her son on relatives on multiple occasions so that she could continue to participate in her lifestyle of heroin addiction and prostitution. On one occasions, she left Robert with the Clarks for one and a half years while she traveled to Chicago. Exh. 67. Robert did not really have parents and became Aunt Ethel's "child." See also Doc. 2 ¶¶ 464-66.

307.    Had counsel interviewed the above-listed witnesses and collected the family records, the jury would have learned that violence was pervasive in the relationship of every caretaker in Robert's life. Exhs. 13, 86, 88, 89; see also Doc. 2 ¶¶ 467-73. The Lavale/S.D. relationship fared no better. Exhs. 13, 86, 88, 89; see also Doc. 2 ¶¶ 467-73.

308.    Contrary to the superficial testimony presented by counsel, alcohol and drug abuse was also pervasive in the home while Robert was growing up. The Stittums' testimony that Elmer was an alcoholic was an understatement. See Doc. 2 ¶¶ 467-73. Had counsel merely asked their own witness, Sandra Stittum, the jury would have learned that he also had a criminal record and had served time in prison. Elmer was not alone. The rest of the family, including Lavale, partied at the home just about every weekend from Friday morning to Sunday night. They drank and smoked marijuana. Exhs. 13, 86, 88, 89; see also Doc. 2 ¶¶ 467-73. Had counsel acted effectively, the jury would have heard that when Elmer got drunk, he got both physically and verbally abusive. Robert was not immune to this abuse. Exhs. 13, 86, 88, 89; see also Doc. 2 ¶¶ 467-73.

107

309.    Witnesses, including Doug Dobynes and Duane McCoy would have testified that the problems Robert had because of his biracial heritage were not limited to one event, as Ms. Stittums' trial testimony implied.  Exhs. 13, 86, 88, 89; see also Doc. 2 ¶¶ 467-73.

310.    In this environment, it is not surprising that Robert Bolden did not excel at school. Counsel had Robert's school records but failed to admit them at the penalty hearing. In high school, he was a "C" student. Exh. 58. He was clearly cognitively impaired. Nevertheless, because counsel failed to present this evidence, the prosecution cross-examined defense witnesses about how smart Robert was and then used that to portray Mr. Bolden as a master manipulator who was so smart he repeatedly pretended to be things that he was not to fool Nathan Ley, to fool his co-defendants, and to fool the jury. Tr. 3936. Doc. 2 ¶473.

### (c)    Mother's Mental Illness, Addictions and Impairments.

311.    Counsel's failure to conduct an adequate witness and records investigation also resulted in the jury getting no more than a superficial view of S.D. that did not provide the jury with the substantial evidence demonstrating her alcoholism, heroin addiction, mental illness,  social and psychological impairments, and prostitution. William Tannan and others would have testified that S.D., like Lavale, was addicted to heroin when Robert little and that she obtained the money to buy heroin through prostitution. Sandra Stittum was prepared to testify that S.D. was a prostitute, but was never asked. Exhs. 13, 86, 88, 89; see also Doc. 2 ¶¶ 474-505.

312.    Counsel obtained no records on S.D.  The medical records Petitioner has obtained to date reveal that S.D. was not simply a "character", as noted at the penalty hearing. She was a severely mentally ill woman, diagnosed at different times in her life with schizophrenia, major depression with anxiety, and bipolar disorder. S.D.'s medical records also demonstrate that the superficial references to her as an alcoholic were a far cry from the truth about the nature and extent of her addiction. Exh. 42; see also Doc. 2 ¶¶ 474-505.

313.     It appears S.D. received most of her medical care in the 1960s and 1970s at Homer

G. Philips Hospital. This is where Robert Bolden was initially taken (and mis-diagnosed) for his

diabetes, and is also where Marquita Decker Patterson was born in 1968. Exh. 48. Naomi Rainey and

others could have testified about the debilitating extent of S.D.'s alcoholism and resulting hospital

visits. Ms. Rainey worked at Homer Philips, and recalled S.D. coming into the hospital sick from

alcohol. She had cirrhosis of the liver on several occasions. Following the closure of Homer Philips

in 1979, S.D. was seen in various other emergency rooms across the city[50]. In November 1980, S.D.

required blood transfusions for a gastrointestinal bleed related to her alcoholism.  Exh. 42.  On

September 10, 1981, she was admitted to Barnes after presenting with abdominal pain and vomiting

and appearing "cachectic".  Id.  The September 23, 1981 discharge summary provides a clear picture

of S.D.'s longstanding alcoholism and the medical effect.  Id. See also Doc. 2 ¶ 478.

314.     Subsequent hospitalizations confirm the pervasive alcohol abuse and its impact on

her health and functioning. Exh. 42. See also Doc. 2 ¶¶ 479-81.

315.     On May 14, 1988, police officers observed S.D. standing on a street corner, singing

very loudly "I found the Lord."  She was transported to the Malcolm Bliss Psychiatric Center

emergency department. She was "euphoric, disoriented, and unable to give any coherent history and

was felt to be easy prey for probable criminal behavior, since she could not adequately care for

herself." Exh. 67. S.D. told the doctors that she drinks all day long, that she drinks about one-fifth

of vodka per day, and that she has morning shakes. Her mental status examination stated:

> She had increased psychomotor activity, continually clapping her hands and danced
> during the interview and was singing out very loudly. She ignored the interviewer and
> repeatedly sang religious phrases and talked to God. She was very evasive and
> uncooperative with the mental status examination. She exhibited a very inappropriate

---

[50] S.D.'s medicaid records indicate hospitalizations at Barnes-Jewish Hospital; Des Peres Hospital; Forest Park Hospital; St. Louis University Hospital; St. John's Mercy; SSM St. Mary's; and Washington University.

> affect and a very elevated mood. . . . The client refused to answer questions and stated that she heard voices of God and Satan advising her in various situations. She says she sees people who have died and she sees steam coming out of the walls. The client had no insight and no judgment . . . .

Exh. 67. Doctors administered an intramuscular Haldol injection in the emergency room and admitted her. She was diagnosed with Alcoholism Withdrawal Delirium; Rule out Adjustment Disorder with Depressed Mood, and kept in the psychiatric hospital for one week. At discharge, she intended to apply for Social Security Disability Income (to which the psychiatrist believed she was entitled). The psychiatrist and social worker recommended she participate in an outpatient drug and alcohol counseling program, and gave her contact information for "NASCO". Exh. 67.

316.    S.D. did not maintain her brief sobriety. See Exh. 42. See also Doc. 2 ¶¶ 482-91.

317.    It appears that S.D. stopped drinking sometime around 1995, possibly began to receive psychiatric help, but also began attempts to replace alcohol with prescribed narcotics. She remained a frequent visitor to local hospitals and emergency rooms, but now for her asthma, COPD, and various bodily pains that required narcotics and reflecting symptomotology and behavior consistent with addiction. See also Doc. 2 ¶¶ 492-96.

318.    In March 2001, S.D. was admitted for several days for her COPD. This hospitalization included psychiatric treatment and review, indicating a history of depression with concerns that her depression was complicated with psychotic or bipolar features. Doc. 2 ¶497.

319.    S.D.'s medical records also demonstrate that she lived in poverty. See Exh. 42. See also Exh. 67 (noting sporadic work history; interest in applying for Social Security Disability Income; fact that she was dissatisfied with being Elmer Clark's live-in caretaker as he "drinks and 'makes advances toward me.'"). See also Doc. 2 ¶498.

320.    Medical records indicated that, contrary to the penalty hearing testimony, S.D. actually given birth to four children, not two children. All four were natural, spontaneous deliveries.

Exh. 48. The oldest died in the hospital at 16 months; the youngest reportedly died at only two months, from pneumonia. Exh. 67. As noted above, United Church of Canada records identified Phillip Leon Decker, born on March 29, 1960, and died at 16 months old. See also Doc. 2 ¶499.

321.   S.D.'s medical records also provide information about Mr. Bolden's extended maternal family. Exh. 42 (August-September, 1988 admission: notes that one of her brothers was also an alcoholic); id. (April 1982 and August 31, 1999 notes documenting that S.D.'s father died at age 36 or 37 from polio); id. (April 1982; August 31, 1999:  notations that S.D.'s mother was alive, seventy six years old, with congestive heart failure; she eventually died 12 years later from heart disease). See also Doc. 2 ¶500.

322.   Mr. Bolden's younger sister, Marquita Patterson had testified before the Grand Jury and was interviewed by counsel, but not presented. Because of S.D.'s psychiatric illnesses and alcoholism, Ms. Patterson was forced to take on the role of mother. She had very vivid memories of having to dump and clean up her mother's "vomit buckets."  Doctors would tell S.D. not to drink, and she would drink anyway. S.D. was verbally abusive to Ms. Patterson. Ms. Patterson did not have a name growing up. She was always "bitch" or "ho". Doc. 2 ¶¶ 501-03. Ms. Patterson would have testified that her and Robert's childhood situation had a lasting and permanent impact and always prevented them from having a normal brother-sister relationship. Doc. 2 ¶ 504.

323.   Doug Dobynes and others would have testified that S.D. lived in Wellston, which was the slum of all slums. Mr. Dobynes recalled going there with Robert to visit his mom and little sister. Mr. Dobynes recalled that S.D.'s method of "parenting" Robert was to scream and yell at him. Doc. 2 ¶ 505.

### (d)   Lack of Positive Male Role Model in a Dysfunctional Neighborhood.

324.   Ruby Stevens and others would have testified that, even though Lavale would never say who Robert's real father was, Lavale also never claimed Robert as his own. See Exh. 87. Mr.

Dobynes and others would have testified that, growing up, Robert continued to seek love from his father Lavale even after his father essentially abandoned him. Robert was hurt and felt he was not good enough. Although Lavale did visit occasionally, Robert could never really rely on him. Robert had no positive male role models in his family. Doc. 2 ¶¶ 506-08.

### 6. Failure to Develop Evidence Regarding Young Adulthood and Life in Michigan.

### (a) Young Adulthood in Saint Louis.

325.    Counsel's mitigation presentation contained several glaring time-gaps. The testimony completely skipped the years after Mr. Bolden had returned to Saint Louis from Michigan. Competent counsel would have developed and presented this evidence, including the following:

326.    Michael Mahone, Doug Dobynes, Duane McCoy. Willie Tannan, Marquita Patterson and others would have testified that, when Mr. Bolden was about seventeen, he started dating Mr. Mahone's niece, Antoinette Harris. They met Antoinette because her aunt lived in the neighborhood. Antoinette's mother struggled with addiction and dysfunction[51] like Robert's mother, giving the couple a common bond. They married young and moved into the Palm Street building. Around the time that Mr. Bolden and Antoinette married, in the early 1980s, crack cocaine entered the neighborhood around Palm. It "ruined" the neighborhood, making it one of the most dangerous neighborhoods in the city. Unfortunately, at that time, no one really knew how powerful it was, or how dangerous. Mr. Mahone started using crack early on, when Mr. Bolden was about 16 or 17. Mr. Mahone believes that Robert was influenced by his use of crack because Robert looked up to him. Robert, like Mr. Mahone, got hooked quickly, a reaction to the loneliness and despair. Others indicated that Robert started young and was well-into the habit by his twenties. Mr. Bolden's drug

---

[51]Court records, not obtained by trial counsel, indicate that Antoinette's mother had a criminal history dating back to at least 1966. Exh. 14. Marquita Patterson would have testified that Antoinette's mother was a prostitute, like S.D.

addiction was severe from the beginning, he would forget to eat; lose touch; his personality changed. Mr. Bolden used marijuana and cocaine together on a daily basis and also used PCP. Witnesses would have testified that PCP appeared to calm Mr. Bolden down. See also Doc. 2 ¶¶ 509-14.

327.     Mr. Tannan and others would have testified that Robert was not like most addicts. His family came first. Even though Robert was into drugs, he still took care of his family. He was faithful to Antoinette he used at home, and Antoinette accepted his drug abuse. He wanted to give Antoinette everything that she wanted. Robert and Mr. Tannan both always held a job. This made them different than the other men in the neighborhood. Holding a legitimate job was not the norm. Everyone was interested in fast money; there weren't a lot of guys punching the clock.

328.     Although S.D. had stopped using heroin by the time Robert was a young adult, she was still drinking heavily and this caused difficulties for Robert. Robert and Antoinnette were living at the house on Palm Street. S.D. would call Robert up, absolutely drunk, and scream at him. S.D. would also show up to the house, even though she was not living there at the time, drunk, staggering in the middle of the street. Aunt Ethel Clark would allow her in to stay the night because she was too drunk to get home. As a young adult, Robert simply could not stand to be around his mother, after all she had done to him as a child and continued to do as an adult, and he eventually had to leave the house on Palm Street to get away from her.

329.     Ethel died in 1985. Shortly before her death, S.D. had moved into the flat. Rosemary Banner,  William Jr., and others would have testified that S.D. and Elmer Clark – both alcoholics – would sit around the flat and drink. After Ethel's death, Elmer and S.D. married, some time in the 1990s, after Elmer had suffered a stroke. Elmer received a monthly social security check, something that S.D. would lose after Elmer's death unless she married him. Ethel's passing was very hard on Robert. S.D. and Elmer's relationship was even more devastating to him. It was difficult to watch his mother take on the shoes of his Aunt, it was also difficult to see his mother become involved with

113

the man who had degraded her with names like "white bitch."  Doc. 2 ¶¶ 515-16.

**(b)**     **Life in Grand Rapids, Michigan.**

330.     A significant part of the prosecution's case in aggravation was based on events that occurred when Mr. Bolden lived in Grand Rapids, Michigan. Despite this, the only evidence that counsel presented about Mr. Bolden's life in Michigan, was his son's testimony that "it was a good life. Happy. Good times." (Robert Jr., was all of three years old when they moved.)

331.     In fact, Mr. Bolden did move to Michigan in an attempt to make a better life. Willie Tannan Michael Mahone, Hassan Abdul Shamshid-Deen, Marquita Patterson and others would have testified about Robert's struggles in Michigan. See also Doc. 2 ¶¶ 517-19. Mr. Bolden was clean when he went to Michigan. He went to an NA meeting shortly before moving. Mr. Bolden moved to Grand Rapids to get away from the drugs. A simple change in geography was not enough. Things were very difficult for Robert there. He began smoking marijuana and crack, and abusing alcohol. Mr. Shamshid-Deen was also using crack, and sometimes he got his drugs from Mr. Bolden. There were a few years in Grand Rapids when Mr. Bolden and Mr. Shamshid-Deen got together every day, getting drunk and getting high. Mr. Bolden always tried to impress people by talking big, and acting like he was tough, but Mr. Shamshid-Deen never saw him do anything violent. Mr. Shamshid-Deen also knew Mr. Bolden's wife, Antoinette, and their children. Antoinette also used alcohol and drugs.[52] According to Mr. Shamshid-Deen, Mr. Bolden always appeared depressed, discouraged, and sad, as if he felt helpless and did not care what would happen to him. The drug use had a deleterious effect on Mr. Bolden and Antoinette's relationship. They were not getting along at all. Antoinette kicked Mr. Bolden out when she got tired of the drugs. After they split, Mr. Bolden was concerned

---

[52] In addition to being a drug addict, Antoinette also had a co-morbid psychiatric disorder. Antoinette's criminal court records – in counsel's possession – indicate that, in 1987, she was hospitalized for five weeks for depression. Exh.15.

that Antoinette was not adequately taking care of the children. He talked about his children all of the time, and would get upset when Antoinette would not allow him to visit them.

### (c)    Adult Medical Records.

332.    Counsel failed to present medical records documenting the stressors he was enduring arising from the failed marriage and loss of his children as well as his attempt to obtain drug treatment. Exh. 46. Nor did counsel present medical records demonstrating his on-going battle with diabetes and alcohol addiction. See Exh. 50 ("The patient has a history of insulin-dependent diabetes mellitus, alcohol abuse (acute and chronic) and occasional back pain."): id. ("The patient was . . . drinking brandy. . . . he slumped forward onto the table and fell out of his chair. . . . he had some jerking movements after he hit the ground. She describes tonic/clonic activity occurring for approximately one minute. It then resolved and he was combative. Paramedics found his glucose was 70 and brought him in for treatment").   Exh. 50.

333.    The records also show that, to the extent Mr. Bolden's uncontrolled diabetes was caused by so-called "non-compliance", this non-compliance was motivated by a fear of low blood sugar levels. Exh. 43 ("poor control with fear of hypoglycemia"). This fear was quite understandable given the numerous hypoglycemic episodes – frequently characterized by convulsive activity and loss of consciousness – he suffered as a child. The seizures continued throughout adulthood. Id. (November 1982: treated for hypoglycemia, and EMS reported "questionable seizure-like activity" that responded to dextrose); Exh. 43 (suffered loss of consciousness at work and had to be taken to the emergency room); Exh. 46. (August 1994: became lethargic at work and presented at the ER with a blood glucose of 31); Exh. 50(July 1995: seizure-like activity); Exh. 46 (August 1995: became increasingly unresponsive at home); Exh. 50 (September 1995: found unresponsive in his jail cell and taken to ER); Exh. 46 (October 1996: diagnosed with hypoglycemic insulin reaction); Exh. 50 (August 1998: fell due to low blood sugar).

334.    Mr. Bolden's adult medical records reflect someone living in poverty, without means to access primary care, getting most of his medical treatment through the emergency room.  Records in counsel's possession showed that Mr. Bolden had at least fifty-two hospitalizations and visits to emergency rooms from age eighteen to the time of the offense. Over thirty-five of these hospitalizations and emergency room visits were related to his diabetes.  Exhs 45, 46 and 50.  Mr. Bolden's ability to obtain medical care was directly affected by his poverty.  Exhs 56 & 57; Exh. 46 See also Doc. 2 ¶¶ 520-24.

**7.    Failure to Develop Mitigating Evidence Regarding Mr. Bolden's Life in Saint Louis, after Grand Rapids.**

335.    Mr. Bolden returned to Saint Louis in the late 1990s. When Mr. Bolden first returned from Grand Rapids, he stayed with Ms. Patterson. Unfortunately, their relationship remained strained from their childhood horrors. Ms. Patterson believed her brother had some kind of mental illness, although she had never known him to be treated for it. She testified at the Grand Jury that her brother was angry because of their respective relationships with their mother and that once around 1999-2000, they argued about their mother. She described symptomotology consistent with mental illness, including impulsivity and depression. GJT at 58-59. Ms. Patterson would have testified that, in her experience, her brother "does not think, just acts. He's very rash."  When Mr. Bolden and his children were staying with Doug Dobynes, he was still using crack cocaine. Ultimately, Mr. Bolden and his children had to leave the Dobynes' because of issues surrounding the children's school. See also Doc. 2 ¶525-26.

336.    Mr. Bolden's diabetes continued to plague him. Medical records in counsels' possession indicated that Mr. Bolden was brought to the ER at Christian Hospital after he was found unconscious, shaking, and drooling with a blood sugar level of 29. Exh. 47. See also Doc. 2 ¶527-28.

337.    Mr. Bolden's mother died in August 2001. S.D.'s medical records show that Mr.

Bolden and his sister were both involved in caring for her leading up to her death. Exh. 60 and 42. After S.D.'s death, things became even worse for Mr. Bolden. See also Doc. 2 ¶¶529-36.

338.    Mr. Bolden continued his quest to have a relationship with the Bolden family. Ruby Stevens and others would have testified that Mr. Bolden and his children attended the Lacy family reunion in Chicago in August 2002, but some of the family didn't even know who they were because he had never been to one before. (As discussed above, Lacy was Ethel Clark's maiden name.)  Ms. Stevens believed that Mr. Bolden was trying to connect with his remaining family after his mother's death, but many would not talk to him because they did not know who he was. See Exh. 87.

339.    Mr. Bolden met Beverly Grandberry when her funeral home buried his mother. Ms. Grandberry offered Mr. Bolden a place to live at 1157 Howell. Originally, she allowed him to use his carpentry skills to fix up the house in lieu of rent. The neighborhood was very bad. Doc. 2 ¶¶ 531-32.

340.    Mr. Bolden's employment records from H & G Sales – which were provided to counsel in discovery – indicated that he had a good job at H & G Sales, but still experienced financial difficulties because of his diabetes, his depression, and his addiction. Exh. 61. His employment records reflect that, when he was well, he went to work and earned a living to support his family. When he was not well, he missed work and lost pay.

341.    Mr. Bolden's medical, rehabilitation, and employment records demonstrated that he often was not well in the time frame leading up to the offense.  Exh. 43 Exh. 61 Exh. 47 Doc. 2 ¶¶ 530; 534-535.

342.    Mr. Bolden went to Bridgeway for two weeks of in-patient drug treatment in April 2002, with a diagnosis of Cocaine Dependency. Exh.s 47 and 62. Counsel had the records from

Bridgeway Counseling Services, but failed to introduce them[53].  Mr. Bolden's counselor rated Mr. Bolden's need for drug treatment at 7 (the top of "Considerable problem, treatment necessary"). The counselor also believed that Mr. Bolden had "moderate" psychiatric problems, and that mental health treatment was "probably necessary." Exh. 62. See also Doc. 2 ¶ 537.

343.    In May 2002, Mr. Bolden saw Dr. Joseph Thompson, his endocrinologist, for the first time in two years, having received loans from his employer to cover the co-pays on his prescriptions. Exh. 52. In the months leading up to the incident, he continued to struggle with controlling his diabetes. Exh. 49;Exh. 52; Exh. 61. Mr. Bolden was out sick from work again the last week in September. On October 1, 2002, he called H & G Sales and requested a 30-day medical leave of absence, and stated his intent to come in to pick up the paperwork. He was out sick from work from October 1 through October 4, 2002. Exh. 61. See also Doc. 2 ¶¶ 537-39.

344.    The witnesses who testified at the penalty hearing described Mr. Bolden's days leading up to the October 7, 2002, as "not too good" and said "he was depressed . . . it was bad." This evidence demonstrates that it was more than "bad" leading up to October 7, 2002. Mr. Bolden's entire world was caving in. He was sick because of his diabetes and addiction; his blood sugar was so out of control, he developed cellulitis and risked losing his feet, and possibly legs; as a result, he often could not work and did not have money to put food on the table, let alone pay the rent; the house he had to pay the rent on was in a horrible neighborhood, where young men like Dominick Price and Cortez Edwards sold drugs on the street, where people would kick your door in and steal your belongings if you dared leave your home, and where you had to befriend those "neighbors" to keep your home secure; his ex-wife had taken his daughters to Michigan, where he knew they were

---

[53]The Bridgeway Counseling records also indicated that Mr. Bolden reported a family history of problems with alcohol and drugs, in a grandparent, parent, uncle, and his sister.  These records should have prompted counsel to investigate these issues in the family.

being molested by his ex-wife's live-in boyfriend; he had received two-weeks of inpatient drug rehabilitation, but never received the mental health services that his counselor believed he needed; and was trying to get help – having called work just a few days earlier to request a medical leave of absence that would further exacerbate his financial situation.

> **8.     Failure to Develop Evidence that Incarceration is Difficult for Mr. Bolden Due to his Diabetes.**

345.    The prosecution developed facts on cross-examination of Mr. Bolden's penalty phase witnesses that life in prison would be a decent life for Mr. Bolden. See Tr. 3724-26, 3788-89, 3821-23. Counsel had most of Mr. Bolden's jail medical records from his Kent County, Michigan incarcerations and from his pre-trial detention in this case, but failed to present them to the jury. Exh.s 53, 63, 54 and 55. Counsel also failed to obtain Mr. Bolden's medical records from the city holding cell and all of Mr. Bolden's medical records from the Saint Louis County Jail. As demonstrated at length in Claim XIV, the medical records demonstrate that the government failed to medically manage Mr. Bolden's diabetes during pre-trial detention and that life was, and is, difficult for Mr. Bolden arising from the constant hyper and hypo-glycemic events and fear that he could die because of the government's failure to manage his disease. Doc. 2 ¶ 541.

> **9.     Failure to Develop Expert Testimony Including Mental Health Evidence.**

346.    Counsel failed to present any expert testimony despite the availability of substantial expert evidence (1) supporting and corroborating the chosen mitigation defense arising from Mr. Bolden's diabetes; and, (2) providing the jury with a plethora of additional mitigators. Counsel's failures were, in part, due to counsels' failure to conduct the full investigation necessary to provide their experts with the required background and collateral data; in part, because counsel failed to adequately consult with the experts hired; and, in part because counsel failed to even obtain the results of testing conducted by experts retained. Counsel's failures constituted prejudicially deficient

119

performance. See also Doc. 2 ¶¶ 542-45.

347.    The presentation of this mental health evidence would have, inter alia, provided a nexus between the lay testimony regarding Mr. Bolden's childhood and the adult upon whom the jury was to impose sentence. A major theme of the prosecutor's cross-examination of defense witnesses and (improper) closing argument was to violate Mr. Bolden's Eighth Amendment rights and exploit counsel's failure to present this evidence to the jury. See Tr. 3703-04; 3947-49; 3983.

### (a)    Brain Damage.

348.    Counsel hired Dr. Robert Fucetola, a neuropsychologist, to evaluate Mr. Bolden, specifically focusing on the cognitive and intellectual effects of Mr. Bolden's diabetes. All of the background materials provided to Dr. Fucetola were about Mr. Bolden's diabetes. In May 2005, a year before trial, Dr. Fucetola prepared a report for counsel. After recounting Mr. Bolden's history of diabetes-induced seizures contained in the medical records discussed above, Dr. Fucetola concluded to a reasonable degree of neuropsychological certainty that Mr. Bolden suffers cognitive impairment consistent with his history of Type I diabetes. Exh. 16. In fact, the diabetes literature demonstrates that slowing of mental speed and diminished mental flexibility are two of the hallmarks of cognitive impairment caused by Type 1 diabetes. See also Doc. 2 ¶¶ 546-47.

349.    Despite the fact that Dr. Fucetola's testing directly supported their diabetes theory of mitigation, counsel never presented this evidence to the jury. Counsel also failed to share Dr. Fucetola's results with all of their other experts. For example, Dr. Robert Smith (discussed further below) stated that neuropsychological testing showing organic brain damage is something he would have considered in reaching his conclusions, had it been available to him. See also Doc. 2 ¶¶ 548.

350.    In February 2006, counsel hired Dr. Ruben Gur, also a neuropsychologist, to evaluate Mr. Bolden. Dr. Gur ordered a high resolution volumetric Magnetic Resonance Imaging (MRI) study and a Positron Emission Tomography (PET) study of Mr. Bolden's cerebral metabolic rates. These

120

studies were conducted at Barnes Jewish Hospital in March and April 2006.

351.    Counsel never contacted Dr. Gur to learn the results of the MRI and PET studies. Dr. Gur has informed undersigned counsel that the MRI and PET studies showed that Mr. Bolden has organic brain damage. Exh. 17. The test results indicated deficits in the frontal, parietal and occipital lobes bilaterally. The frontal lobe is associated with judgment and impulse modulation, the "brakes" of the brain. Damage to the frontal lobe directly impacts an individual's decision-making, ability to regulate emotions, and appropriately react to external stimuli. The parietal region is associated with the individual's sense of self. Damage to the frontal and parietal areas has also been associated with deficits in the regulation of emotions, specifically depression and suicidality. Damage to the occipital lobe is associated with vision problems and difficulties interpreting what one sees. The testing further indicated that Mr. Bolden's amygdala and  insula show reduced brain volume bilaterally, with reduced brain volume also noted in the left hippocampal formation. These portions of the brain play a major role in understanding emotions and controlling emotions, especially threat-related emotions such as fear and anger. The etiology of Mr. Bolden's brain abnormalities is consistent with organic causes, such as pre-natal alcohol exposure or juvenile (Type 1) diabetes, as well as external causes, such as abuse and neglect. See also Doc. 2 ¶¶ 549-556.

352.    Inadequate brain development, such as that suffered by Mr. Bolden, results in life-long impairments, including difficulties with impulse modulation and impaired social interactions. The abnormalities observed in Mr. Bolden can have severe behavioral consequences  because frontal activation is needed to modulate limbic stimulation. Lack of such modulation leads to reduced impulse control and diminished ability to plan and place behavior in its context. In addition, elevated metabolism in the frontal, parietal, and occipital lobes would lead Mr. Bolden to experience symptoms of hypervigilance and difficulties interpreting what he sees. Dr. Gur's explanation of Mr. Bolden's brain damage and the resultant deficits would have been particularly

relevant to the jury's sentencing determination in this case because it directly impacted Mr. Bolden's ability to act with the four alleged mental states. See also Doc. 2 ¶¶ 549-556.

353.    Because counsel failed to obtain the testing results from Dr. Gur, they could not make a decision (strategic or otherwise) about whether to present his findings to the jury. Nor did counsel provide these results to their other experts. Dr. Fucetola as well as Dr. John Rabun (a psychiatrist retained by trial counsel) and Dr. Robert Smith, (a psychologist retained by counsel),would have found these results significant to their own evaluations. See also Doc. 2 ¶¶ 549-556.

### (b)      Psychiatric Illness and Addiction.

354.    Counsel also hired Dr. Robert Smith, a clinical psychologist and addiction specialist, to evaluate Mr. Bolden in late 2005. The bulk of the materials provided by counsel to Dr. Smith were related to Mr. Bolden's diabetes. Exh. 18. Dr. Smith did conduct his own source interviews to obtain additional information. He prepared a report indicating that he diagnosed Mr. Bolden with four Axis I disorders: Dysthymic Disorder, Alcohol Dependence, Cocaine Dependence, and Inhalant Abuse; and, on Axis III, the significance of Mr. Bolden's history of juvenile-onset diabetes  Id.

355.    Dr. Smith would have explained to the jury that Dysthymia is a form of chronic depression. Symptoms include sad affect, feelings of hopelessness, lack of energy, lack of initiative and motivation, disrupted sleep patterns, low self-esteem, and difficulty making decisions. Dr. Smith would have provided psychological relevance to the lay testimony by explaining that the causes of Dysthymic Disorder involve biological and environmental factors. Biological factors included Mr. Bolden's history of family dysfunction, abandonment and neglect by critical caretakers, the pervasive familial alcohol abuse  as well as the prejudice he suffered arising from his biracial heritage. Environmental stressors included his diabetes, which caused numerous hospitalizations and near-death episodes; the death of his "pseudo-mother" Ethel Clark; the death of his "pseudo-father" Elmer Clark; death of his biological mother; the lack of a relationship with his half-sister, his failed

marriage; other failed relationships; and addiction to alcohol and drugs. <u>See also</u> Doc. 2 ¶¶ 557-564.

356.   Dr. Smith also would have explained that S.D.'s alcoholism made it five to seven times more likely that Mr. Bolden would develop an addiction. The environment where he grew up, where alcohol and drug use was accepted, also made him more susceptible to experimentation and addiction. His exposure to a dysfunctional family environment placed him at increased risk for substance abuse. Children who grow up in the type of chaotic home environment like Mr. Bolden's often resort to substance abuse as a means of attempting to cope with the emotional pain. Mr. Bolden's substance use became circular:   using cocaine to create a sense of euphoria and alcohol to counter the effects of the cocaine. When he could not afford cocaine and alcohol, Mr. Bolden inhaled the fumes from turpentine to experience a "high." <u>See also</u> Doc. 2 ¶¶ 557-564.

357.   Undersigned counsel provided Dr. Smith with additional collateral information not developed by counsel, including the results of Dr. Gur's testing. Dr. Smith has reviewed this information and stated that, had he been provided all of this information pre-trial, he would have incorporated the additional diagnosis of Cognitive Disorder Not Otherwise Specified into his opinion. Dr. Smith would have been able to explain to the jury that any drug treatment program that did not account for and treat Mr. Bolden's depression and neuropsychological impairment – such as the brief, two-week program offered at Bridgeway Counseling Services – would have failed to "cure" Mr. Bolden's addiction. Quite simply, because Mr. Bolden's depression was not addressed in treatment, he was unable to sustain his sobriety. Further complicating treatment, Mr. Bolden's brain damage would cause difficulty with attention, concentration, comprehension and implementing the lifestyle changes necessary for recovery from his addiction.

358.   Dr. Smith also could have explained to the jury the negative impact Mr. Bolden's brain damage had on his ability to manage his diabetes. Dr. Smith would have told the jury that the brain damage interfered with his ability to understand his diabetes and how to manage his blood

sugar levels. Dr. Smith could have given the jury psychological context for the voluminous medical record that should have been presented by explaining that Mr. Bolden's uncontrolled juvenile diabetes resulted in a significant history of negative physical, emotional and cognitive symptoms.

359.    Dr, Smith would have testified that each of Mr. Bolden's disorders – Dysthymia, Alcohol, Cocaine, and Turpentine Dependence, Cognitive Disorder NOS, and Diabetes – was sufficient to significantly impair his perceptions and behavior at the time of the offense. Dr. Smith would have further explained that there is a synergistic effect, not just between the depression and drug dependency (as was explained in his original report for counsel), but between the cognitive disorder, the depression, and the drug dependency. Dr. Smith would have explained that the cognitive impairments associated with Mr. Bolden's depression were exacerbated by his brain damage, which, independently of the depression, caused reduced impulse control and diminished ability to plan and place behavior in its context. Abuse of alcohol, cocaine and turpentine can impair the functioning of the central nervous system, resulting in mood swings, poor impulse control, difficulty with attention and concentration, disrupted processing of information and sensory input, poor judgment, difficulty with decision-making, aggressive behavior and distorted perception and memory. Mr. Bolden already suffered many of these symptoms associated with drug abuse (reduced impulse control and diminished ability to plan and place behavior in its context) as a result of his depression and brain damage.

360.    Dr. Smith would have told the jury that Mr. Bolden's pre-existing brain damage with its symptoms of reduced impulse control and diminished ability to plan and place behavior in its context was magnified by his depression, abuse of alcohol and cocaine, and diabetes, causing him to be desperate, impulsive, aggressive, emotionally labile and illogical. As the depression increased and his diabetes was out of control, he became discouraged and desperate, leading him to further abuse alcohol and cocaine as he attempted to self-medicate his symptoms of depression and despair.

361.    Counsel failed to present this highly compelling mitigating evidence to the jury. The lay witnesses' testimony about Mr. Bolden's depressive symptoms and counsel's closing argument that "Is it that much of a leap to see how that leads to addiction?",  Tr. 3957, were no substitute for the expert opinion of a clinical psychologist.

362.    Dr. Richard Dudley, a psychiatrist,[54] evaluated Mr. Bolden after reviewing all of the relevant social history information developed during undersigned counsel's investigation. Dr. Dudley would have testified that Mr. Bolden suffers from a trauma related anxiety disorder and borderline personality disorder arising from the trauma he suffered as a child, including the domestic violence he witnessed between his mother and father and his aunt and uncle as well as his medical problems that included frequent diabetic episodes resulting in his constant fear that he could die; as well as the lifelong abandonment and rejection by caretakers from birth to adulthood.

363.    A psychiatrist would have explained that these mental illness impacted and impaired every aspect of his functioning and that the alcohol and drug dependance are co-morbid with the above-described disorders. Because of his co-morbid psychiatric and substance abuse disorders, Mr. Bolden clearly required substance abuse treatment that included mental health treatment. In fact, none of his psychiatric issues were ever addressed in the drug treatment context or otherwise. As a result, the substance abuse treatment he received was meaningless and could not be expected to work. See also Doc. 2 ¶¶ 565-570.

364.    A psychiatrist such as Dr. Dudley would have explained to the jury that as a result of his mental illness and numerous life stressors, Mr. Bolden's life was spiraling out of control at the time of the offense. His mother – who was essentially his sole remaining family following Aunt Ethel

---

[54] Counsel had Mr. Bolden evaluated by a psychiatrist, Dr. John Rabun, but failed to provide him with all of the relevant collateral information and the testing results of all of the other experts. Dr. Rabun has reviewed this additional information and found it significant.

125

Clark's death – passed away, he moved in with Mona Muhammad without knowing that she was about to lose her house, Ms. Muhammad cheated on him, and his diabetes was out of control. In the face of such stressors, Mr. Bolden's psychiatric condition would deteriorate and he would experience some paranoia.

365.     A psychiatrist like Dr. Dudley would have explained that, even in the absence of psychiatric illness, Mr. Bolden's decision making ability was compromised due to his organic brain damage, reflected in Dr. Gur's testing and report. However, Mr. Bolden's underlying psychiatric disorders (anxiety disorder and borderline personality disorder) and his out-of-control diabetes, which only served to increase his feelings of agitation, would have further impaired his ability to make reasonable decisions, especially quick decisions.

366.     As a result of counsel's failure to have Mr. Bolden evaluated by a psychiatrist who was provided with all reasonable available collateral information and the testing results of the other experts, the jury never heard the above evidence.

(c)     **Fetal Alcohol Spectrum Disorder.**

367.     Competent counsel also would have investigated, developed and presented mental health evidence that Mr. Bolden suffers from Fetal Alcohol Spectrum Disorder (FASD). Counsel were aware of several red flags that indicated the need to explore FASD in this case, including S.D.'s life-long alcoholism and resistence to treatment. The medical records contain several indicators that Mr. Bolden was small for his age and had a small head circumference. Counsel had in their possession neuropsychological testing showing deficits in academic fluency, language processing, attention and memory. If counsel had obtained Dr. Gur's report, they would have also learned that Mr. Bolden has a shrunken corpus callosum, indicative of FASD. See also Doc. 2 ¶571.

368.     In addition, as demonstrated above, competent counsel would have investigated S.D. and Mr. Bolden's life in Canada. Had they done so, counsel would have learned that S.D. engaged

126

in prostitution (an activity that is commonly associated with the consumption of alcohol or other drugs); was already an alcoholic years before she conceived Mr. Bolden; had a child named Phillip who survived for only 16 months; and drank excessively during her pregnancy with Phillip.

369.    Based on the information in counsel's possession even without investigating in Canada, competent counsel would have consulted a mental health or medical professional with specific expertise regarding FASD. Such an expert would have further elaborated that Mr. Bolden's MRI indicates thinning of the isthmus of the corpus callosum which is a hallmark of FASD. In addition, there is reason to suspect Mr. Bolden suffers from FASD simply by looking at him – Mr. Bolden has a markedly thinned upper lip, which is one of the emblematic facial features of FASD.

370.    A mental health professional with expertise in FASD would have testified that FASD is a permanent birth defect caused by maternal consumption of alcohol during pregnancy. Alcohol is a teratogen that inhibits and disrupts fetal development by causing structural and functional damage to developing organs and systems, including the brain and central nervous system. The damage begins at the cellular level, where alcohol can induce excessive cell death and disrupt cell responses to molecules that regulate neuron proliferation, migration and differentiation. Because alcohol causes widespread damage throughout the developing fetus, there is a broad array of physical anomalies and neurobehavioral defects. Hence, the condition is referred to as a "syndrome." Although the effects of prenatal alcohol exposure may range from subtle to serious, the negative consequences are lifelong. The most serious and pervasive damage occurs in the central nervous system (CNS). Prenatal alcohol exposure causes significant malformation in structures throughout the brain (e.g., corpus callosum, basal ganglia, cerebellum) that are necessary for normal development and functioning.

371.    Fetal Alcohol Syndrome (FAS) is a severe manifestation of prenatal alcohol exposure, and is only one of several identifiable disorders associated with maternal alcohol abuse. Id.  See also

127

Doc. 2 ¶¶ 572-75. Research demonstrates that the brain and central nervous system are formed throughout the full nine months of pregnancy. Thus, alcohol consumption at any point during gestation can cause life long damage to this system. See Doc. 2 ¶ 576.

372.   Disabilities stemming from FASD have been categorized in two forms. Primary disabilities are those disabilities which directly stem from central nervous system malfunction. Secondary disabilities are behavioral disabilities that are mediated by environmental influences. Secondary disabilities include mental health problems, disrupted school experience, trouble with the law, confinement, inappropriate sexual behavior, alcohol/drug problems, dependent living, and problems with employment. Doc. 2   ¶ 577.

373.   A large number of individuals with fetal alcohol impairment display secondary disabilities including criminal involvement. The most prevalent secondary disability is mental health problems. Criminal behavior in individuals with FASD stems in large part from impaired executive functioning. See also Doc. 2 ¶¶ 576-583.

374.   Secondary disabilities associated with fetal alcohol impairment are not just modifiable but preventable if an individual is diagnosed early and receives appropriate intervention. Mr. Bolden did not receive the nurturing environment or clinical intervention necessary to mitigate the primary and secondary effects of the fetal alcohol spectrum disorder that ensued as a result of S.D.'s drinking during pregnancy. Poor parenting and childhood abuse and neglect exacerbated these problems.

375.   Because counsel ignored the evidence in their possession indicating the possibility of FASD and failed to obtain Dr. Gur's test results which also indicated FASD, the jury that sentenced Mr. Bolden to die never heard the above-evidence regarding the long-lasting negative impact his mother's alcoholism had on him.

**(d)    Diabetes Expert.**

376.   Counsel's main investigative focus was Mr. Bolden's diabetes. Counsel's evidentiary

presentation at the penalty phase contained lay testimony about Mr. Bolden's diabetes. Counsel also consulted with several diabetes experts prior to trial. Despite this, counsel failed to develop and present expert testimony from a diabetes expert to explain to the jury what diabetes is and to give medical context and relevance to the lay testimony that was introduced at trial and the medical records that should have been admitted regarding Mr. Bolden's life-long struggle with diabetes.

377.    A diabetes expert would have testified about Type-1 diabetes and it's necessary treatment. Failure to properly dose and time insulin injections leads to hyperglycemia (high blood sugar) or hypoglycemia (low blood sugar). See, Infra, Claim XIV. See also Doc. 2 ¶ 587-593. A diabetes expert also would have explained the synergistic effect between Mr. Bolden's life circumstances and mental illness and his ability to control his diabetes.. See also Doc. 2 ¶¶ 591-597. Finally, a diabetes expert would have explained to the jury why Mr. Bolden had an outburst during the government's presentation of Katie Rhodes' call to 911. See also Doc. 2 ¶¶ 598-99.

(e)     Ability to Adjust to Confinement.

378.    Counsel retained the services of Dr. Brad Fisher, a psychologist with expertise in correctional classifications.  Dr. Fisher evaluated Mr. Bolden in 2004 and prepared a favorable report, detailing Mr. Bolden's positive adjustment to incarceration.  He was not called to testify. Doc. 2 ¶ 600-01.

379.    One of the non-statutory mitigating circumstances submitted to the jury was positive prison adjustment. Only one juror found this mitigating circumstance. There is a reasonable probability that this testimony would have tipped the scales in Mr. Bolden's favor with more jurors regarding the presence of this mitigator and the weight it should be afforded. This testimony also would have supported the basis for counsel's requested instruction that "The sentence of life in prison without the possibility of release is an adequate harsh alternative punishment that will protect society from further risk of criminal conduct by Robert Bolden." Tr. 3917. See Doc. 2 ¶¶ 600-02.

129

(f)       **Environmental Toxins Expert.**

380.    Records indicate that the area around the Palm Street home was heavily industrially developed prior to Mr. Bolden's childhood. Industries operating in the area included an ammunitions plant as well as manufacturing in: chemicals; electronics; paint; industrial lubricants; and ink. Counsel failed to investigate, develop, and present evidence of the potential toxins that Mr. Bolden was exposed to growing up as a result of this heavy industry or retain an environmental toxin expert to assist them in that investigation, determine Mr. Bolden's toxin exposure, and explain to the jury that exposure to these chemicals and toxins had negative effects on Mr. Bolden's developing brain, potentially resulting in, inter alia, neuro-cognitive impairment. See Doc. 2 ¶ 603.

**10.    Failure to Challenge the government's Aggravating Circumstances.**

381.    One of the statutory aggravating circumstances alleged by the government was that Mr. Bolden had "previously been convicted of 2 or more State or Federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance."  18 U.S.C. (c)(10). Counsel expended significant effort fighting this aggravating circumstance on legal grounds. Once this Court ruled that the 1993 conviction was legally sufficient and that the government could go beyond the face of the judgments to prove that "attempted possession with intent to deliver cocaine" was an offense "involving the distribution of a controlled substance" and to give the jury context on the 1995 conviction, competent counsel would have investigated, developed, and presented evidence to counter the government's assertions.

382.    Each of the convictions involved drug distribution charges. See Doc. 2 ¶¶ 604-07. Counsel failed to investigate, develop, and present evidence that Mr. Bolden was a severe, long term crack-addict at the time of the offenses and that he actually sought help during this time period See also Doc. 2 ¶608.

383.     Counsel failed to develop evidence that Mr. Bolden was at the bottom of any drug distribution chain in which he may have been involved. Doc. 2 ¶¶ 609-10. Counsel also failed to request discovery to identify the confidential informant(s) that originally identified Mr. McDowell and/or Mr. Bolden to the police, although that information would have provided evidence challenging the government's portrayal of Mr. Bolden's purported drug activities and supported mitigation about Mr. Bolden's drug use and addiction. Doc. 2 ¶ 611.

384.     Finally, counsel failed to make any cogent argument to the jury that the 1993 conviction was not a conviction "involving the distribution", although counsel was well-aware such arguments, having made them to the court earlier in the proceedings. Counsel's failure to do so was deficient. Doc. 2 ¶ 612.

385.     Counsel's deficient performance precluded the jury from hearing compelling evidence challenging the basis for this aggravation. Counsel's failure to develop and present this evidence was especially prejudicial given that the prosecutor's theory on the instant offense was that Mr. Bolden was the mastermind who manipulated two younger, more naive, less criminally savvy people into helping him rob the bank. The prosecutor repeatedly argued to the jury that Mr. Bolden was "smart" and "very intelligent" and even "evil". The government's unrebutted presentation of Mr. Bolden as a mastermind drug dealer in Michigan dovetailed with its theory of the instant offense, bolstered the credibility of Dominick Price's testimony that Mr. Bolden was a hardened criminal who killed Nathan Ley to avoid jail and who stated it was Nathan Ley's fault that he got killed, and further eviscerated Mr. Bolden's remorse theory of defense. See Doc. 2 ¶¶ 612-13.

### (b)    Victim Impact Evidence.

386.     As demonstrated, infra, the government violated Payne v. Tennessee, 501 U.S. 808 (1991) with an overwrought, over-emotional, cumulative victim impact presentation filled with irrelevant, speculative, and highly prejudicial testimony. Counsel failed to investigate the factual

basis of the government's victim impact presentation and failed to develop and present evidence to counter that presentation and impeach the witnesses, including but not limited to the following:

387.    The government bolstered the testimony of various victim family members and other witnesses through presentation of false and/or misleading testimony regarding their employment. Doc. 2 ¶¶ 616-18. Competent counsel would have moved in limine for a ruling prohibiting the government from eliciting testimony from <u>any</u> of its witnesses regarding their employment backgrounds and would have sought discovery of the employment records of all of the government witnesses. At each phase, the government relied heavily on its witnesses' employment backgrounds to bolster their credibility. At sentencing, the government relied on employment backgrounds to develop an atmosphere of law enforcement and duty, which it directly relied upon in imploring the jury to find death. <u>See</u> Tr. 3937-39, 3982, 3986-90. <u>See</u> Doc. 2 ¶ 618.

**D.    Prejudice**.

388.    When the paltry penalty phase presentation is compared with the compelling available evidence described above, there is no question that Mr. Bolden has demonstrated prejudice. Prejudice occurs whenever the Petitioner presents evidence not  presented by counsel that is sufficient to establish a mitigating factor the jury did not find; when the Petitioner presents evidence supporting mitigating factors not presented to the jury; or, when the Petitioner demonstrates that the evidence that could have been presented was reasonably sufficient to change the jury's balancing of aggravating and mitigating circumstances. Here, Mr. Bolden has demonstrated each type of prejudice. The extensive evidence presented above is sufficient to establish two additional statutory mitigating circumstances 18 U.S.C. §   3592(a)(1) and (a)(6). It is also more than sufficient to establish numerous types of personal background and mental health mitigating factors under 18 U.S.C. § 3592(a)(8). Moreover, it is reasonably likely that this evidence would have changed the balance of aggravating and mitigating circumstances. Had the jury learned of the powerful mitigation evidence

132

described above, there is more than a reasonable likelihood that at least one juror would have found that this evidence more than offset the prosecution's evidence in aggravation.

Relief is required. Doc. 2 ¶¶ 619-24.

389.    To the extent that counsel should have and could have raised the above-described claims and presented the above described facts on direct appeal under controlling precedent and procedure, counsel's failure to do so constitutes ineffective assistance of counsel in violation of the Fifth, Sixth, and Eighth Amendments.

## X.    THE PROSECUTOR'S INTRODUCTION OF IMPERMISSIBLE VICTIM IMPACT EVIDENCE; COUNSEL'S INEFFECTIVENESS; AND THE EIGHTH CIRCUIT'S MISAPPREHENSION OF THE CONTROLLING LAW VIOLATED THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

390.    The claims, factual and legal allegations and exhibits set forth in the *2255 Motion*, (including Doc. 2 at ¶¶626-695), and those contained throughout this *Revised Amended Motion*, are incorporated herein as if fully stated. See Fed.R.Civ.P. 10(c); Fed.R.Civ.P. 15(a). Mr. Bolden alleges the following facts, among others to be presented after full discovery, approval to travel to Canada, access to this Court's subpoena power, and an evidentiary hearing.

### A.    The Legal Standard.

391.    Although the Eighth Amendment does not require a per se rule prohibiting relevant evidence about a victim's characteristics and the impact of the murder on the victim's family, Payne, 501 U.S. at 827, admission of such evidence violates due process protections when it is so unduly prejudicial that it renders the sentence fundamentally unfair. Id. at 825.  Victim impact evidence is admissible to give the jury "a glimpse of the life" of the victim. Payne, 501 U.S. at 822. However, this testimony should constitute a "quick" glimpse. Payne, 501 U.S. at 830 (O'Connor, J., with whom White and Kennedy, JJ., join, concurring). Doc. 2 ¶¶ 626-630.

### B.    Prosecutorial Misconduct and Conflict of Interest.

392.    Prior to trial, the government buried defense counsel in nearly 300 pages of discovery

related to victim impact. Although the prosecutor assured this Court that these were "basically Jencks materials of the witnesses," Tr. 3204, the obvious intent and practical effect was to give counsel no notice of what the prosecution actually intended to present as victim-impact evidence. See Tr. 3209-10.

393.    After counsel filed a motion in limine and the government filed an updated witness and exhibit list for the penalty hearing, the government assured the Court the majority of those witnesses would be brief, "five- to ten-minutes-type witness" and that only a "handful" would be longer. Tr. 3203.  See also Tr. 3206-07. The Court expressed its concern that it was unable to rule on the motion in limine without knowing what the witnesses would say. Tr. 3213. As a result, the Court ruled that the defense would have to make contemporaneous objections. Tr. 3238-39. See also Tr. 3304-05. The Court reached this conclusion on the basis of the government's assurances that the testimony would be within the bounds of Payne. Tr. 3237-38. Doc. 2 ¶¶ 611-634. In fact, as the record demonstrates, the witnesses were not brief, nor was there a strict compliance with the confines of Payne. Doc. 2 ¶ 635.

.   394.    Not only did the prosecutor not instruct his witnesses on proper courtroom demeanor and checked displays of emotion, but the prosecutor actually participated in, and encouraged graphic displays of emotion. Witnesses were shaking the prosecutor's hand after leaving the witness stand; greeting the victim's family, seated prominently in the courtroom;  and, in at least one case, hugging the victim's family in the well of the courtroom on display for the jurors. Exh. 21.

395.    The prosecutor's intentional failure to provide relevant discovery and the government's misrepresentations to the Court regarding the nature and extent of the testimony constituted prosecutorial misconduct and violated Mr. Bolden's Fifth, Sixth, Eighth and Fourteenth Amendment rights. That the prosecutor participated in, and encouraged, the prejudicial conduct demonstrates intentional misconduct in violation of the Fifth and Sixth Amendments.

396.    These errors were compounded by the prosecutorial overreaching and conflict of interest at the authorization phase, demonstrated in Claim II. As this Court recognized, "[t]his isn't a situation where, you know, you have their deposition testimony and so you know what they're going to say in court." Tr. 3213. Had this been prosecuted as a state case, as it should have been, the defense would have had the right to depose the victim impact witnesses and would have been in a better position to challenge their testimony. Similarly, as demonstrated in Claim II, Mr. Holtshouser was laboring under a conflict of interest arising from his relationship with the victim's family. Cumulatively, these factors demonstrate the violation of the Fifth, Sixth, Eight and Fourteenth Amendments. Doc. 2 ¶¶ 635-38.

## C.    Counsel's Failure to Make a Record.

397.    Counsel's performance fell below objective standards of reasonableness when counsel failed to make an adequate record of the trial proceedings to protect Mr. Bolden's rights to appellate and post-conviction review. The full extent of prejudice from victim impact testimony cannot be read from a cold record. Following each witness's testimony, counsel should have, but failed to, make a record regarding the witness's demeanor, the courtroom observers' demeanor, the prosecutors' demeanor, and the jurors' reactions to the witness's testimony and demeanor.Doc. 2 ¶ 639.

398.    Counsel's failure to make such a record has already hindered Mr. Bolden's ability to receive full and fair appellate review of his sentence. In affirming Mr. Bolden's sentence, the Eighth Circuit relied on one comment from the trial court, taken out of context, to find that the testimony had been "restrained." Bolden, 545 F.3d at 626. The witnesses were in no way restrained.  Doc. 2 ¶ 640.

399.    Mr. Bolden was prejudiced. Counsel's too little, too late attempt to make a record

was insufficient for purposes of appellate and post-conviction review[55]. The descriptions by the court and counsel clearly do not tell the whole story[56]. Exh. 21. Doc. 2 ¶¶ 639-42.

### D.  Irrelevant, Inflammatory, and Unduly Prejudicial Evidence Created an Impermissible Risk of a Verdict Based on Passion and Emotion.

400.   In opening the door to the admission of victim impact testimony, the Court approved admission of the first category of evidence previously rejected in <u>Booth v. Maryland</u>, 482 U.S. 496, 502 (1987) –"personal characteristics of the victims and the emotional impact of the crimes on the family."  The volume and emotion characterizing the victim impact evidence in this case was so unduly inflammatory and prejudicial that it rendered Mr. Bolden's penalty hearing fundamentally unfair and compromised the reliability of the jury's sentencing verdict.  Doc. 2 ¶ 643-46.

401.   Of the government's twenty witnesses in the penalty hearing, sixteen were victim impact witnesses. The government opened with the contention that the penalty hearing was essentially all about Mr. Ley, (it was not), and that the jury would hear evidence in the government's "continuing search for justice for Nathan Ley."  Tr. 3353;3358. Doc. 2 ¶ 647.

402.   The testimony effectively recreated a memorial service for the victim. The witnesses read statements they had written for a memorial book put together for the victim's mother. Gov't Trial Ex. 167A-E. The government displayed a , a two feet by three feet collage of photographs and a program from the candlelight memorial service and had one witness describe how and why it was made. Tr. 3523. Pastor Fitz spoke of their religious beliefs and then gave the eulogy, followed by what was essentially a tour of the cemetary. Tr. 3509-14; 3517-18. One witness described how she

---

[55] In light of the absence of a proper record, counsel has requested permission to interview the jurors.

[56] Counsel's performance also fell below objective standards of reasonableness when counsel failed to make an adequate record of the gallery's demeanor during the entire trial proceedings.  <u>See</u> Tr. 3754-55 (court admonishing counsel to admonish members of the gallery who were engaging in eye-rolling and other prejudicial behavior during Mr. Bolden's case in mitigation).

prayed to the victim for strength after she had a miscarriage followed by reading her memorial statement characterizing the victim as an angel. Tr. 3466. Multiple witnesses provided graphic descriptions of the victim's condition after the shooting. Tr. 3504-05; 3669-71.

403.    Twelve witnesses testified about the victim's desire to be a police officer to follow what his family did and so that he could protect and help people. Tr. 3423, 3438, 3447, 3462, 3472, 3483, 3499, 3538, 3558, 3572, 3611, 3647. At least four of testified that they had specifically discussed the "danger factor" of a security or law enforcement job with Nathan Ley. Tr. 3447-48, 3462-63, 3474, 3559. Another witness, Jerry Schulte of the O'Fallon Police Department, testified about a potential job the victim may have obtained in law enforcement and speculated that he would have been a good police officer. Tr. 3495, 3496. Eight witnesses testified that they themselves were involved in law enforcement or the military. Tr. 3428-29, 3448-49, 3468-70, 3490, 3497, 3556-57, 3642-46, 3663-66. Many gave extensive testimony about their own law enforcement and military careers, as a set up for the prosecutor's improper closing argument that Nathan Ley represented "every policeman, every fireman, and every security guard."  Tr. 3987. Eleven witnesses testified about the victim's relationship with his girlfriend and his plans to get married. Tr. 3424, 3439, 3451, 3462, 3473, 3484-88, 3514, 3540, 3591, 3619-21, 3658-59. Seven witnesses testified about the effect of Nathan Ley's death on his parents, Tom and Linda Ley. Tr. 3425, 3506, 3517, 3543-44, 3563-65, 3570, 3594, 3661-62. Doc. 2 ¶ 648-667.

404.    Witness, after witness, after witness, after witness cried, hugged family members, shook the hand of the prosecutor and the emotional displays spread from the witness stand to the courtroom observers. The government played the 911 call of the victim's girlfriend during her testimony, creating a highly emotional reaction to the predictably hysterical phone call. Tr. 3596-3600, 3630-31. Doc. 2 ¶ 648-667

405.    In short, on multiple occasions, the testimony went well beyond that contemplated

137

under Payne and the sheer number and degree of charged emotions displayed by these sixteen witnesses as well as the family members in the audience manifestly unduly inflammatory and created an atmosphere that forced the jury to sentence Mr. Bolden on the basis of the loss of the victim alone as opposed to the constitutionally required considerations. See Doc. 2 ¶¶ 647-667.

406.    In Payne, the victim impact evidence was one witness responding to one question about how the victim's child had been affected by the murders of his mother and sister. Payne, 501 U.S. at 814. In McVeigh, 153 F.3d at 1216, thirty-eight victim impact witnesses testified, about 168 victims. See also United States v. Johnson, 495 F.3d 951, 976-77 (8th Cir. 2007)(six victim impact witnesses testified about five victims); United States v. Nelson, 347 F.3d 701, 712-13 (8th Cir. 2003) (six victim impact witnesses); United States v. Barnette, 211 F.3d 803, 818 (4th Cir. 2000) (seven witnesses testified about two victims).

407.    Not only did the quantity of testimony here far exceed Payne and later cases, but also the quality of the testimony was drastically different than contemplated in Payne. The recreation of the funeral and memorial service at the bank and readings from the memorial book for the victim's mother created a funeral-like atmosphere in the courtroom. This atmosphere was exacerbated by the number of government witnesses present in the courtroom for the majority of the penalty phase, similar to a gathering for a memorial. In addition, the witnesses were clearly a presence in the courtroom, as noted by the Court, as they rolled their eyes and heads and talked among themselves during the defense penalty phase evidence. Tr. 3754-55. See Doc. 2 ¶¶ 668-81.

408.    Since the reinstatement of the death penalty, the Supreme Court has consistently reiterated the fact that the Eighth Amendment requires a "reasoned moral response," free of "arbitrary and capricious action." Penry, at 319; Zant v. Stephens, 462 U.S. 862, 874 (1983). Such "reasoned moral response" is impossible for a jury exposed to a parade of emotionally charged evidence like that presented here. The government's victim impact presentation dwarfed Mr. Bolden's mitigation

evidence, consisting of half the number of witnesses called by the government on the victim impact

issue. The overwhelming nature of the victim impact evidence here had the effect of prohibiting the

jury from being "able to consider and give effect to" the mitigating evidence presented by Mr.

Bolden. See Penry v. Lynaugh, 492 U.S. at 319. Relief is required See Doc. 2 ¶¶ 668-81.

> **E.      Erroneous Application of Payne on Appeal.**

409.    In denying Mr. Bolden's challenge to the cumulative and unfairly prejudicial nature

of the government's victim impact presentation, the Eighth Circuit held that Mr. Bolden "cannot

challenge the victim impact testimony by Ley's parents and relatives."  Bolden, 545 F.3d at 626.

Payne does not hold that the prosecutor has carte blanche to present any victim impact evidence he

desires, so long as the vehicle is a parent or relative of the victim. The appellate court's

misapprehension of the controlling law violated Mr. Bolden's right to an appeal and right to effective

assistance of counsel on appeal. Evitts, 469 U.S. 387 (1985); see also Gregg, 428 U.S. at 195. The

appropriate remedy for this violation is re-instatement of Mr. Bolden's appeal.

> **F.      Standardless Victim Impact Argument.**

410.    Mr. Bolden's death sentence also must be reversed because the combination of the

prosecution's closing argument and the verdict slip demonstrate that jury was urged to find victim-

impact aggravation in a clearly unconstitutional manner and that the aggravator was unconstitutional

as applied in this case. The prosecution argued victim-impact evidence in a manner that was so broad

and standardless that it would apply in every homicide case. As such, the aggravator was

unconstitutionally broad as applied and failed to provide a principled basis to distinguish between

those defendants who were sufficiently morally culpable to justify imposition and death and other

defendants who lacked that degree or moral culpability. E.g., Godfrey, 446 U.S. 420 (1980) (death

penalty must "genuinely narrow" the class of defendants upon whom the death penalty may be

imposed and provided a principled, objective basis for distinguishing between those defendants who

should live and those who may be sentenced to die); <u>Clemons</u>, 494 U.S. 738 (1990). Thus, even if victim impact was not admitted for purposes of determining Mr. Bolden's death-eligibility, the near-universality of its application rendered it an inappropriate factor to consider in the selection stage.

411.    Mr. Holtshouser falsely employed victim-impact to urge the jury to categorically reject a life sentence in this case, irrespective of the presence of mitigating evidence. Tr. 3935. Later, in arguing that victim-impact evidence was "the most important factor . . . in this case," Tr. 3961, Mr. Holtshouser improperly asserted that "the victim impact" was "so compelling and so great that it is [sic] alone justifies a sentence of death."  Tr. 3961[57]

412.    This argument would apply to every murder – no matter how long any defendant lives in jail, the victim "will lie in a cold grave."  No matter what relationship he is able to have with his family, it is "so much better than what the [victim's] family [and loved ones] are left with."  No matter what case it is, the parents "will never get to speak to their son again" or hold grandchildren never conceived. The prosecution's argument was utterly standardless and overbroad and served no legitimate penological function. It was calculated solely to inflame and violated the Eighth Amendment. <u>Maynard v. Cartwright</u>, 486 U.S. 356, 362 (1988)

413.    To the extent that counsel could have and should have raised this issue at trial, and to the extent that appellate counsel could have and should have raised the above-described errors on direct appeal under controlling precedent and procedure, counsel's failure to do so constitutes ineffective assistance of counsel in violation of the Fifth, Sixth, and Eighth Amendments.

## XI.   THE JURY'S CONSIDERATION OF THE INAPPLICABLE, DUPLICATIVE, AND INVALID PECUNIARY GAIN AGGRAVATING CIRCUMSTANCE VIOLATED MR. BOLDEN'S FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS

---

[57]<u>See also id.</u> ("How is a sentence of life in prison a just punishment when Tom and Linda Ley will never get to speak to their son again or hold his children?"); <u>id.</u> ("How is a sentence of life imprisonment just punishment when Katie Rhodes will never get to speak to him and have him hold her or have his children?").

414.    The claims, factual and legal allegations and exhibits set forth in the *2255 Motion*, (including Doc. 2 at ¶¶696-711), and those contained throughout this *Revised Amended Motion*, are incorporated herein as if fully stated. See Fed.R.Civ.P. 10(c); Fed.R.Civ.P. 15(a). In support of this claim, Mr. Bolden alleges the following facts, among others to be presented after full discovery, and an evidentiary hearing.

415.    The jury's consideration of the inapplicable, duplicative, and invalid pecuniary gain aggravating circumstance violated Mr. Bolden's Fifth, Sixth, and Eighth Amendment Rights. To the extent that counsel failed to raise these issues in the trial court, and to the extent that these issues could have been, but were not, raised on direct appeal, Mr. Bolden was denied the right to the effective assistance of counsel.

**A.      Plain Language and Comparison with Murder for Hire Statute.**

416.    The plain language of the pecuniary gain statute establishes that it was intended to apply solely to "hitmen" in contract killings, not to all homicides in which there was a financial motive. Doc. 2 ¶ 698.

417.    The superceding indictment, Doc. 147, asserted that the offense was committed both "as consideration for the receipt, and in the expectation of the receipt" of anything of pecuniary value. Although the government ultimately elected to proceed only on an "expectation of receipt" theory, this aggravating circumstance still did not apply to Mr. Bolden's case.

418.    Mr. Bolden was denied the right to effective assistance of counsel when counsel failed to challenge the pecuniary gain aggravating circumstance on the above-stated grounds that it must be read in conjunction with the murder-for-hire aggravator. See Bolden, 545 F.3d at 615 (holding that this issue was not presented in the trial court).

**B.      Void for Vagueness / Failure to Channel Discretion.**

419.    The pecuniary gain aggravating circumstance violates due process and the Eighth

Amendment on vagueness grounds.  Kolender v. Lawson, 461 U.S. 352, 356 (1983).  citing Smith v. Goguen, 415 U.S. 566, 574 (1974)).   Doc. 2 ¶ 700.

420.    When a statute is subject to multiple interpretations, the due process-based rule of lenity requires that the statute be interpreted narrowly, and in favor of the defendant.  The rule of lenity is "not merely a convenient maxim of statutory construction.  Rather, it is rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited." Dunn v. United States, 442 U.S. 100, 112 (1979) (citations omitted); accord United States v. Lanier, 520 U.S. 259, 266 (1997) United States v. Bass, 404 U.S. 336, 348 (1971) Busic v. United States., 446 U.S. 398, 406 (1980); Simpson v. United States, 435 U.S. 6, 14-15 (1977); United State v. Kozminski, 487 U.S. 931, 952 (1988).  In the capital sentencing context, the Eighth Amendment requires clear standards to channel the exercise of discretion at all stages of the process.  To be constitutional a capital sentencing scheme "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."  Zant, 462 U.S. at 877. Doc. 2 ¶ 701-02.

421.    The wording of the pecuniary gain aggravating circumstance is so vague that ordinary people cannot understand the precise conduct it seeks to cover.  See The multiple interpretations that can be given to this aggravating circumstance are further demonstrated by the magistrate's order recommending that the pecuniary gain aggravating circumstance be stricken in Mr. Bolden's case. See Doc. 240 at 39-40.  Finally, as demonstrated above, when interpreted in conjunction with the murder-for-hire statute, it is clear that the pecuniary gain aggravating circumstance only applies to "hitmen." As a result of this vagueness, the aggravator is applied differently to similarly situated defendants.  Compare Allen, supra. with Bolden, supra. Doc. 2 ¶ 703-06.

422.    Moreover, as demonstrated in Claim II regarding constitutional violations that

occurred during the authorization process due to the prosecution's overreaching and conflict of interest, the language of the pecuniary gain statute has in fact maximized the risk of arbitrary enforcement. Because the statute is subject to multiple interpretations, it must be construed in accordance with the rule of lenity and in favor of Mr. Bolden to apply only in "hitman" situations. The pecuniary gain aggravator is invalid, and should not have been submitted to the jury.  Doc. 2 ¶ 706.

### C.      Fails to Narrow the Class of Death-Eligible Defendants.

423.    It has long been held by the United States Supreme Court that, to pass Constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty". Zant v. Stephens, 462 U.S. 862, 877 (1983).  Counts II and III of the indictment both require the government prove the homicide occurred during the course of an attempted robbery. See Doc. 147; Tr. 3174-80.  The pecuniary gain aggravating circumstance is duplicative of this essential element of the underlying homicide offense.  See Doc. 325; Tr. 4005-06.  If the pecuniary gain aggravating circumstance is interpreted broadly to apply in cases like Mr. Bolden's, it fails to narrow the class of death-eligible defendants because all homicides committed in the course of an attempted bank robbery would also satisfy the broad definition of pecuniary gain.  This aggravating circumstance cannot apply in Mr. Bolden's case, and should not have been submitted to the jury. Doc. 2 ¶ 707.

### D.      Mr. Bolden's Death Sentences Must Be Vacated.

424.    Because the jury found mitigation, and consequently was entitled to return a life sentence at its discretion, this Court cannot say that the jury's improper consideration of an invalid aggravating factor did not tip the scales toward death. Doc. 2 ¶ 708-09.

### E.      All Prior Counsel Were Ineffective.

425.    Mr. Bolden was denied his right to the effective assistance of counsel. Strickland v.

Washington, 466 U.S. 668 (1984). Counsel's failure to raise the above challenges to the pecuniary

gain aggravating circumstance in the trial court, by a motion in limine or otherwise, fell below an

objective standard of reasonableness, and there is no strategic reason for this failure. Mr. Bolden was

prejudiced. As demonstrated above, the jury was erroneously permitted to consider an invalid

statutory aggravating circumstance that may have tipped the scales in favor of death. To the extent

that direct appellate counsel could have raised the above errors on direct appeal but failed to do so,

direct appellate counsel's performance also fell below an objective standard of reasonableness, and

there was no strategic reason for this failure. Doc. 2 ¶ 710

426.    Direct appeal counsel was precluded from raising the above-described claims of

ineffective assistance of counsel on direct appeal. See, e.g., United States v. Lee, 374 F.3d 637, 654

(8th Cir. 2004). To the extent that counsel should have and could have raised the above-described

claims and presented the above described facts on direct appeal under controlling precedent and

procedure, counsel's failure to do so constitutes ineffective assistance of counsel in violation of the

Fifth, Sixth, and Eighth Amendments. Doc. 2 ¶ 711.

## XII.    THE JURY INSTRUCTIONS VIOLATED PETITIONER'S FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. COUNSEL WAS INEFFECTIVE

427.    The claims, factual and legal allegations and exhibits set forth in the *2255 Motion*,

(including Doc. 2 at ¶¶712-741), and those contained throughout this *Revised Amended Motion*, are

incorporated herein as if fully stated. See Fed.R.Civ.P. 10(c); Fed.R.Civ.P. 15(a).

428.    As described more fully below, the Court's instructions skewed the jury's mitigation

determination, shifted the burden to Petitioner, and failed to instruct the jury that it should not

consider any of the uncharged drug "offense" non-statutory aggravation in support of the statutory

aggravator involving two prior convictions involving a controlled substance.

A.    **The Penalty-Phase Instructions Violated the Presumption of Life, Shifted the Penalty-Phase Burden of Persuasion, and Diminished theGovernment's Burden of Proof; Prior Counsel Were Ineffective.**

429.    Petitioner is entitled to a new sentencing hearing because the penalty-phase instructions provided to the jury by the trial court erroneously erected a presumption of death that shifted the burden of persuasion at sentencing.

430.    These instructional errors, individually and in combination, together with counsel's failure to object and to offer constitutionally correct alternative instructions, rendered the resulting death sentence imposed in this case arbitrary and unreliable in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

1.    **The Instructions**

431.    During the jury instructions in the guilt-phase of this trial, the Court instructed the jury on the presumption of innocence. Tr. 1893. See also Doc. 2 ¶ 716. The Court did not, however, instruct the jury at any time during the penalty phase that Petitioner also enjoyed a statutory and constitutional presumption of life. Instead, the very first words the Court spoke to the jury at the outset of the penalty phase suggested to the jury that the presumption of innocence had been extinguished. Tr. 3345. Doc. 2 ¶ 716. Having been told that Petitioner was presumed innocent "unless and until" proven guilty, and that the penalty phase was being conducted only after "you have found the defendant guilty of first degree murder," the jury was reasonably likely to believe that there was no penalty-phase equivalent to the guilt-phase presumption of innocence[58].

432.    In addition, the court's description of the sentencing options as "death or life imprisonment," erected a presumption of death that pervaded the entire penalty phase and impermissibly shifted the parties' burdens of persuasion. See Tr. 3345 ("If you determine that the

_____

[58]This was exacerbated by the prosecution's argument.

defendant should be sentenced *to death or to life imprisonment*"). After telling the jury its choice was between "death or life," the trial court attempted to provide a structure for the jury's consideration of evidence in the penalty phase but once again started with factors for death before discussing factors for life. The Court then briefly explained the burdens of proof, first for aggravating and then for mitigating circumstances. Tr. 3347. Next, it explained what the jury would hear in the way of aggravating and mitigating evidence, describing the aggravating circumstances – reasons for death – first. Tr. 3347-52.

433.   The Court's closing instructions exhibited a similar structural preference for death, including describing the aggravating circumstances – reasons for death – first. Tr. 4007-09. Every time the court described the jury's sentencing options, it gave primacy to the sentence of death over the life-sentencing option, despite the constitutionally required presumption of life. E.g., Tr. 4017 ("If you do not return a punishment of death or life imprisonment"); id. ("if you unanimously determine that the defendant should be sentenced to death or to life imprisonment"); id. aty 4017-18 ("if you cannot unanimously agree whether the defendant should be sentenced to death or sentenced to life imprisonment"); id. at 4018 (if you cannot unanimously agree whether the defendant should be sentenced to death or sentenced to life imprisonment").

434.   As in its opening instructions, the court explained the burdens of proof applicable to the penalty-phase sentencing factors. It did so by referring to death first. Tr. 4007 (aggravating circumstances); id. at 4008 (mitigating circumstances).

**2.      The Court's Instructions Shifted the Sentencing-Stage Burden of Persuasion from the government to the Defendant, and Violated the Presumption of Life Afforded Defendants in Capital Sentencing Proceedings.**

435.   The presumption of life upon which Petitioner relies is constitutionally compelled. In Ring, 536 U.S. 584, 609 (2002), the Court held that death penalty aggravating circumstances "operate as 'the functional equivalent of an element of a greater offense.'" See also Sattazahn, 537

U.S. at 112 ("'murder plus one or more aggravating circumstances' is a separate offense from 'murder' *simpliciter*"). Thus, the Sixth and Fourteenth Amendments compel a presumption of life in the penalty phase. See also Doc. 2 ¶ 717-18. The combination of the trial court's failure to instruct on the presumption of life and structurally misleading instructions suggesting the primacy of and/or a preference for the death-sentencing option led the jury to believe that it must first reject death if it was to impose life. The erection of this false presumption of death violated due process of law as guaranteed by the Fifth Amendment.

436.    The Supreme Court has acknowledged that a jury instruction that shifts the burden of persuasion to the defendant or implies a presumptive conclusion is constitutional error. Sandstrom v. Montana, 442 U.S. 510 (1979). In this case, the false presumption of death "'conflict[s] with the overriding presumption of innocence[59] with which the law endows the accused and which extends to every element of the crime,' and would 'invade [the] factfinding function' which in a criminal case the law assigns solely to the jury." Id. at 523. In addition, if a presumption is not conclusive but has the effect of shifting the burden of persuasion to the defendant, it also violates the constitution. Id. at 524. The court's instructions in this case shifted the burden of persuasion to the defendant to show why he should not be sentenced to death. Because the jury "may have interpreted the judge's instruction as constituting either a burden-shifting presumption . . . or a conclusive presumption," the instruction violated Petitioner's right to due process of law. Id.

437.    Furthermore, Petitioner was denied his Sixth Amendment right to a jury determination of his sentence beyond a reasonable doubt. In United States v. Gaudin, 515 U.S. 506, 522-23 (1995), the Supreme Court held that the "Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is

---

[59]Here, the "presumption of life."

147

charged." See also Apprendi v. New Jersey, 530 U.S. 466, 477 (2000). In Ring, 536 U.S. at 609, the Court held that "[t]he right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death." See Sattazahn, 537 U.S. at 111; Walton v. Arizona, 497 U.S. 639, 709 (1990).

438.    The Court has further declared that "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact -- no matter how the State labels it – must be found by a jury beyond a reasonable doubt." Ring, 536 U.S. at 603. Because any jury verdict requires a predicate finding of fact, this Sixth Amendment right and the accompanying presumption of life applies in this case. By failing to provide a presumption of life instruction and instead implying that the jury should consider death first, prefer the death option to the life option, or reject death before considering life, the court's instructions denied Petitioner the jury determination to which he was entitled.

439.    This also violated Petitioner's right to an impartial capital sentencing jury as guaranteed by the Sixth and Fourteenth Amendments. "[T]he decision whether a man deserves to live or die must be made on scales that are not deliberately tipped toward death." Witherspoon, 391 U.S. at 523. Indeed, deliberate or not, a juror's views that substantially impair his or her ability to follow the law and to return a life verdict render the juror partial to the State. Morgan, 504 U.S. at 739; Ross, 487 U.S. at 85; Adams, 448 U.S. at 47. Here, the trial court's instruction misdirected the jury to consider death first, prefer the death option to the life option, or reject death before considering life. This false impression could clearly have tipped the scales toward death in contravention of the law, and in violation federal impartial juror guarantees.

440.    Finally, in a capital case, the sentencer may not be precluded from giving full effect to mitigating evidence offered by the defendant as a reason to spare his life. Mills, 486 U.S. at 374-

75;  Lockett, 438 U.S. 586 (1978). This Court's instructions prevented the jury from giving full mitigating effect to the evidence presented in this case by creating a presumption of death that the evidence must overcome. This "barrier to the sentencer's consideration of all mitigating evidence," Mills, 486 U.S. at 375, violated Petitioner's Eighth and Fourteenth Amendment rights.

441.    Because this Court cannot rule out the possibility that the jury imposed a presumption of death where statutorily there is none, and shifted the burden of persuasion from the prosecution to the defense, it must reverse Petitioner's death sentence.

442.    Counsel's failure to object to these instructions and to the prosecution's argument diminishing the presumption of life was objectively unreasonable. That failure also was prejudicial, for all the reasons set forth above. Counsel was ineffective in violation of the Sixth Amendment. For this reason as well, Petitioner is entitled to relief.

**B.     The Court's Instruction and the Verdict Form Requiring that the Jury Must Both Decide A Mitigation Fact as True and Also Decide Whether or Not That Mitigation Fact is Mitigating Violated the Fifth, Sixth, Eighth and Fourteenth Amendments.**

443.    Throughout its Charge, the Court instructed the jury that it had to both find a mitigating fact as true and also find that the fact is mitigating prior to considering the mitigation in reaching its sentencing determination. Tr. 4010-14. This instruction precluded the jury from considering relevant mitigation and, as a result violated the Fifth, Sixth, Eighth and Fourteenth Amendments. As noted previously,  "the Constitution requires that 'the sentencer in capital cases must be permitted to *consider* any relevant mitigating factor.'" Porter v. McCollum, 130 S. Ct. 447, 454-55 (2009); Abdul-Kabir, 550 U.S. at 259. The Court's instructions and the verdict form violated "[the Supreme Court's] entire line of cases establishing the importance of allowing juries to give meaningful effect to any mitigating evidence providing a basis for a sentence of life rather than death." Abdul-Kabir, 530 U.S. at 259. This was reversible error.

**C.     The Court's Failure to Provide a Limiting Instruction Regarding Non-Statutory**

**Aggravation Violated the Fifth, Sixth, Eighth and Fourteenth Amendments.**

444.     The government relied on three non-statutory aggravators in support of its case for death: victim impact, government obstruction, and prior uncharged criminal acts, including drug offenses. The jury found each of the non-statutory aggravators. The Court provided a clear limiting instruction regarding the victim impact evidence directing that the jury could not consider any evidence regarding victim impact prior to reaching its determination regarding the eligibility requirements and statutory aggravators. Tr. 4006. The Court did not, however, provide a similar instruction with regard to the obstruction and other offenses non-statutory aggravation evidence.

445.     The Court's failure to provide a limiting instruction with regard to the evidence purporting to support the other non-statutory aggravators, particularly where the Court did provide a limiting instruction with regard to victim impact evidence violated Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights. As a result, there is a reasonable likelihood that the jury considered the non-statutory aggravation evidence in reaching its eligibility determination and its determination of the existence of statutory aggravation. Indeed, the government presented evidence purporting to support statutory aggravation arising from Petitioner's felony drug convictions in addition to the non-statutory aggravation regarding uncharged drug offenses. Where, as here, the jury heard a limiting instruction as to one non-statutory aggravator but none as to the drug offense non-statutory aggravation, there is a reasonable probability that the jury considered that evidence in reaching its determination that the government met its burden as to the statutory aggravator.

**D.     Counsel was Ineffective**

446.     Counsel's failure to request appropriate instructions and counsel's failure to raise and litigate these constitutional errors at trial, during post-trial proceedings and on appeal constituted prejudicially deficient performance in violation of Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights. Relief is required.

XIII.  NUMEROUS INSTANCES OF PROSECUTORIAL MISCONDUCT, INDIVIDUALLY AND COLLECTIVELY VIOLATED THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

447.     The claims, factual and legal allegations and exhibits set forth in the *2255 Motion*, (including Doc. 2 at ¶¶742-811), and those contained throughout this *Revised Amended Motion*, are incorporated herein as if fully stated. See Fed.R.Civ.P. 10(c); Fed.R.Civ.P. 15(a).

448.     The government's interest "in a criminal prosecution, therefore, is not that it shall win a case, but that justice shall be done." Berger, 235 U.S. at 88. As part of his duty to see that justice is done, the prosecutor has a special duty to avoid improper argument to the jury. Because of the prosecutor's prominent courtroom role as representative of the Commonwealth -- and the mantle of respect and authority this role creates in the eyes of the jury -- the jurors are predisposed to give great deference to the prosecutor's words, and improper prosecutorial arguments "are apt to carry much weight against the accused when he should properly carry none."  Berger, 295 U.S. at 88

449.     Likewise, fundamental Due Process does not tolerate government action intentionally designed to mislead opposing counsel or the factfinder regarding material issues. E.g. Mooney, 294 U.S. at 112("deliberate deception of court and jury . . . is inconsistent with rudimentary demands of justice"); see also Napue, 360 U.S. at  264 ("implicit in the concept of ordered liberty" is the due process requirement that the state not premise its case on the veracity of a particular witness who testifies falsely, while thwarting the defense's effort to challenge the witness' credibility).

450.     Prosecutors have a heightened duty to avoid conduct designed to inflame the jury's passions and prejudices. When the prosecutor's argument infects the trial with unfairness, due process is violated. Donnelly, 416 U.S. 637 (1974). Even where individual remarks by themselves do not create a due process violation, their cumulative effect may.

451.     These principles are even more compelling in light of the heightened safeguards required in capital cases. Beck, 447 U.S. 625 (1980); Caldwell, 472 U.S. 320 (1985). The very nature

151

of a capital case demands heightened scrutiny. <u>Woodson</u>, 428 U.S. at 305 (1976). The prosecutor's obligations and the court's scrutiny are never greater than in capital proceedings.

452.    As described below and elsewhere, from charging, through and including, pretrial proceedings; trial; the penalty hearing; and, post-trial proceedings, the prosecution engaged in a pattern of misconduct specifically designed to deprive Petitioner of his fundamental rights. These actions, both individually and collectively, violated Petitioner's constitutional rights.

**A.**    **Pretrial Proceedings**.

453.    As described in Claims II and VII, the government's campaign of non-disclosure, improper conduct and arbitrariness infected the authorization process. The misconduct violated Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

454.    The lead prosecutor in this case, Mr. Holtshouser, was laboring under multiple conflicts of interest that biased and impacted the determination to federally charge Petitioner and to authorize Petitioner's case as a capital prosecution. <u>See</u> Claim II. These conflicts also impacted all other aspects of the government's conduct pretrial, at trial and during post-trial proceedings. Where, as here, Petitioner has demonstrated the existence of an actual conflict of interest, recusal was required and Mr. Holtshouer's determination to continue to prosecute Petitioner and seek the death sentence violated Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

455.    The prosecution also failed to contact the Canadian Consulate. This is so despite the fact the government had in its possession numerous records showing that Mr. Bolden was born in Canada. Claim I. As described elsewhere the government presented materially false and/or misleading testimony during the pretrial motions hearing that compromised the reliability of those proceedings in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. <u>See</u> Claim VIII.

456.    Also as described elsewhere the government engaged in a pattern of failing to disclose relevant, material and exculpatory information in violation of Petitioner's Fifth, Sixth, Eighth and

Fourteenth Amendment rights. For example, the government failed to disclose to counsel information and materials regarding the nature and extent of Ms. Ruffin's drug addiction, including materials demonstrating the clear probability that, contrary to the government's protestations, Ms. Ruffin was using drugs at the time of the offense. The government failed to disclose Ms. Ruffin's criminal activities, even those that occurred while Ms. Ruffin was staying in a hotel at the expense of the government and also failed to disclose Ms. Ruffin's longstanding relationship with Saint Louis police and her history of receiving benefits as a result of those relationships, despite the fact that the government knew or should have known of this information, in violation of Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights. Claim VII.

457.    The government engaged in a pattern of moving to preclude every defense witness, particularly expert witnesses, while at the same time proffering and presenting expert testimony that was inherently and scientifically unreliable in violation of Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights. At every step in the pretrial process, the government engaged in a pattern of obstructing the defense from obtaining relevant and material evidence, interfering with defense counsel's ability to interview government witnesses, presenting irrelevant, emotionally charged evidence while at the same time objecting to the defense's attempt to present competent evidence, all in violation of Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

**B.    Trial.**

458.    The prosecutor exercised his peremptory challenges in a manner to exclude five of seven African-Americans who remained on the final venire. The government used these demeanor-based claims in support of striking *four* of these black jurors. Claim III. The prosecution offered stereotypical demeanor explanations, observed by no one else in the courtroom, and pretextual bases for the exclusions. Claim III. As described in Claim VI, the prosecution  repeatedly misinformed the jury regarding the nature of mitigation and what the jury was required to consider before reaching

a death determination. The prosecution's misstatements of law were clearly designed to preclude the jury from giving full effect to mitigation evidence in violation of Petitioner's constitutional rights. Throughout the evidentiary presentation and argument in this case, the prosecutor elicited and presented patently false and misleading testimony and argument while at the same time withholding critical information from the jury that could have resulted in an acquittal, or, at a minimum, a conviction of lesser offenses. Claim VII.

459.    As described elsewhere, the prosecution's misconduct began with jury selection, engaging in a pattern of instructing the jury in a manner designed to preclude the jury from giving full and fair consideration of mitigation; designed to skew the jury's consideration of mitigation found; and, designed to ensure a jury that would automatically impose death in violation of Petitioner's Fifth, Sixth, Eight and Fourteenth Amendment rights.

460.    The pattern of misconduct continued from the opening statement and throughout the trial. During his opening statement, the prosecutor repeatedly focused the jury on the victim and his background in an obvious attempt to obtain a verdict based on passion and emotion as opposed to whether or not the government had met its legal burden of demonstrating Petitioner's guilt. His first statement compared their "civic duty" in agreeing to serve as jurors to Mr. Ley's discharging his "civic duty" on the date of the shooting, contending that Mr. Ley shielded customers and employees from harm[60]. Thus, from the beginning, the prosecutor told the jury that they should convict Petitioner – not because of any competent evidence – but, instead, because Mr. Ley was a hero. The prosecutor followed this with the theme he used throughout the trial: that t "[t]his case is going to be about *who Mr. Ley was* . . ."  He then followed with a lengthy description of Mr. Ley's employment, his prior employment, and his youth, emphasizing throughout Mr. Ley's law

---

[60]There was no evidence of this presented, and the prosecutor knew there would be none.

enforcement background. Tr. 1904-05. He followed that by "role playing" the part of Mr. Ley, obviously once again intending to steer the jury away from the actual guilt determination and ensure a conviction based on Mr. Ley's death alone. Tr. 1908-09.[61] Of course, none of that was even remotely relevant to the guilt determination and it was clearly improper and inadmissible victim impact argument in violation of Petitioner's Fifth, Sixth, Eight and Fourteenth Amendment rights. When he got to the description of the witnesses, he carried his theme of focusing the jury's attention on the frightening, emotional nature of the shooting rather than competent reliable evidence. E.g., Tr. 1914-15 (arguing that Ms. Coser "knew that she was watching a life and death struggle"). He also carried the theme of law enforcement – and the obvious inference that the jury must convict because the victim and witnesses were members of law enforcement – throughout his argument. E.g. Tr. 1915 (indicating that Ms. Ruffin worked for Pinkerton, that her sister was a police officer and her experience as a security guard).

461.   The prosecution's theme of victim impact and "the witness must be believed because he or she is in law enforcement" carried over to the presentation of the witnesses. Once again right out of the box, with the first witness, Mr. Dutton, the prosecution elicited a lengthy history of his law enforcement experience, although his sole purpose was to testify as a records custodian and that Mr. Ley was working as a security guard at the Bank of America at the time of the shooting. Tr. 1937-38. This was followed by another lengthy description of Mr. Ley's employment application, references, and work history, once again, obviously intended to inject improper victim impact evidence. Tr. 1944–53; id. at 1957-59. He elicited testimony about how the Bank of America was memorializing Mr. Ley. Tr. 1962[62].

_____

[61] When counsel objected, the prosecutor contended that there would be evidence presented demonstrating that Mr. Ley said "This isn't real?"  Tr. 1908.  There was not.

[62] Although counsel objected, the evidence was in and counsel failed to either move for a mistrial or a curative instruction.

462.    He followed that with emotionally charged testimony about the aftermath of the shooting; Mr. Ley's condition while they waited for the medical personnel to arrive; and, the chaotic circumstances inside the bank. Tr. 1987-91. See also Tr. 2004-2007 (descriptions of the blood, Mr. Ley's condition, and that the witness said a prayer for Mr. Ley); [other witnesses]   He repeatedly injected testimony about Mr. Ley's character. E.g. Tr. 1998-99 (Sandra Price);        . He elicited graphic, emotionally charged testimony about Mr. Ley's condition at the time the medical personnel arrived for no purpose other than to prey on the sympathies of the jury. Tr. 2022-27; 2029-37. None of this testimony was relevant. All of it was designed to inject victim impact and emotionally graphic depictions in order to prey on the jury's sympathy and obtain a conviction on the basis of passion and prejudice as opposed to competent, reliable evidence in violation of Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

463.    As described elsewhere in this *Motion,* with each eyewitness, the prosecution engaged in a lengthy description of that witness' employment in an obvious attempt to bolster their identification and, at every opportunity, elicited graphic details about the aftermath of the shooting. See Claims VII. Each of these errors also violated Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

464.    During closing, Mr. Holtshouser continued his theme that the case was about Mr. Ley and who he was, as opposed to the jury's actual determination of whether or not Petitioner committed the shooting. Tr. 3085. He argued that the jury should convict because "Mr. Ley deserves justice because what he did was put his life at risk in order to protect others."  Id. He argued that Mr. Ley was a "hero."  Id. He asked the jury to recall the "terror in [Mr. Ley's] mind" after he was shot and speculated that Mr. Ley must have thought "What have I done to you to deserve this?" again in an obvious attempt to inject impermissible victim impact argument. Tr. 3015. Finally, as described elsewhere, he relied on, and argued scientifically unreliable DNA and ballistics testimony. See Claim

VII. Each of these constitutional errors violated Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights. Relief is required.

### C.      Penalty Hearing

465.    The prosecutor committed extensive misconduct in regard to the victim impact presentation. The prosecutor intentionally failed to provide relevant discovery regarding the intended victim impact presentation, making it impossible for the court to make a reasoned pretrial decision on its admissibility. The prosecutor also misrepresented to the court that his witnesses would be "brief" and "unique" and that the Court could rely upon him to ensure his witnesses remained within the bounds of Payne. The prosecutor also engaged in improper conduct in the courtroom (shaking his victim impact witnesses' hands after they left the stand), and failed to admonish his own witnesses on appropriate courtroom demeanor. The prosecutor's misconduct regarding the victim impact was compounded by his overreaching at the authorization stage. Had this been prosecuted as a state case, the defense would have been able depose the victim impact witnesses to learn the extent of their testimony. Finally,  it is obvious that the prosecutor's violations of Payne were motivated by his conflict of interest arising from his relationship with the Ley family discussed above. See Claim II.

466.    The prosecutor committed misconduct when he deliberately elicited testimony from Donald McDowell regarding uncharged drug sales allegedly committed by Mr. Bolden. The government called Mr. McDowell to testify about the June 8, 1994 cocaine delivery for which Mr. Bolden was convicted. Tr. 3396-3403. Mr. McDowell testified he was a crack user then, and the prosecutor asked if he had a relationship with Mr. Bolden. Tr. 3396. Mr. Bolden objected that the question was overbroad and speculative, in response to which the prosecutor elicited Mr. McDowell's testimony that Mr. Bolden sold him drugs and did so once a week. Id. The court sustained Mr. Bolden's objection, that this testimony went beyond the government's notice of

aggravating factors and told the jury to disregard the testimony, but denied a mistrial. Tr. 3397. The prosecutor's next question established that Mr. McDowell's knew Mr. Bolden for a year prior to June 8, 1994. Id. Thus, the prosecutor elicited evidence of approximately fifty-two weekly sales of cocaine to Mr. McDowell in the penalty phase. The prosecutor intentionally elicited this testimony, despite the fact that it was clear from the court's prior ruling that this testimony was inadmissible. The length of their acquaintance served no purpose other than to quantify to the number of weekly sales Mr. McDowell had just alleged. It is unrealistic to suppose no jurors thought to themselves Mr. Bolden must have distributed drugs on September 9, 1993, given Mr. McDowell's unmistakable claim he bought cocaine from Mr. Bolden once a week at that time. See also Tr. 3415 (elicitation of testimony from Gary Oliver that Mr. Bolden had, in addition to the marked bills associated with the cocaine delivery offense for which was convicted, an additional $3,665 dollars on his person at the time of arrest). The prosecutor elicited this testimony despite the fact that he failed to give notice to Mr. Bolden that he intended to use this evidence of uncharged prior conduct against him.

467.    The prosecutor's surprise evidence caused extreme prejudice to the jury's view of Mr. Bolden's character generally, and specifically infected its assessment of the second statutory aggravator. Mr. McDowell's statement unmistakably inculpated Mr. Bolden in dozens of uncharged and unadjudicated cocaine sales. The key to deciding the second statutory aggravating factor was whether Mr. Bolden had a second conviction "involving the distribution of a controlled substance" required by §3592(c)(10). The elements of Mr. Bolden's conviction for delivering cocaine on June 8, 1994, fit the statutory definition, Tr. 3415-3416, but his 1993 conviction for attempted possession of a controlled substance did not.

468.    Evidence of uncharged crimes carries sharp prejudice, which intensifies when the unadjudicated conduct shares the same character as that alleged in the charge. Old Chief v. United States, 519 U.S. 172, 185 (1997). Such proof entices jurors to dispense with doubts in the

defendant's guilt of the element charged and rely on his apparent propensity to commit such acts. Id. Notice of the issues to be resolved by the adversary process is fundamental to the fairness due process compels. Lankford v. Idaho, 500 U.S. 110, 126 & n2 (1991). Further, the lack of notice of aggravating evidence in a capital case increases the risk of error in deciding issues for which the Eighth Amendment compels greater care and reliability. Lankford, at 126. That risk is unacceptable for cases wherein reasonable judges could disagree about the propriety of capital punishment. Id. Mr. Bolden's prosecution is precisely such a case.

469.    The maxim that jurors presumably follow limiting instructions does not save the government's misconduct. That truism, rooted more in pragmatism than certitude that it is true, Richardson v. Marsh, 481 U.S. 200, 211 (1987), is misplaced when the risk is great jurors will not be able to follow the instruction "and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.'" Simmons, 512 U.S. at 157. Statements of confessing federates incriminating the defendant on trial comprise one type of declaration that limiting instructions cannot "wipe from the brains of jurors. See Bruton v. United States, 391 U.S. 123, 129 (1968). The prosecutor gave Mr. McDowell's claim of weekly drug sales an echo immediately after the court's admonition by eliciting Mr. McDowell's statement that he knew Mr. Bolden for a year prior to their arrests on June 8, 1994. Tr. 3398.

470.    Mona Muhammad testified in mitigation about changes in Mr. Bolden's health, mood, and family relations when they lived together in 2001-2002. Tr. 3776-80. Ms. Muhammad directly answered each question put to her on cross-examination. Her testimony did not contradict or relate to testimony from any police officer. Nevertheless, the prosecutor elicited testimony from Ms. Muhammad, over defense objection, that her son was convicted of first degree murder in 2003, after an investigation by the case agents sitting at the prosecutor's table. Tr. 3792. The prosecution's claim that it needed to show Ms. Muhammad's bias toward city detectives was a ruse by which it

denigrated Mr. Bolden's character and Ms. Muhammad's by mere association with her son's crime.

See United States v. Roark, 924 F.3d 1426, 1430-32 (8th Cir. 1991); United States v. McBride, 962

F.2d 1316, 1319 (8th Cir. 1988).

471.   Sandra Stittum testified to Mr. Bolden's upbringing and his caring for his children

when he moved them from Michigan to Saint Louis. Tr. 3679-3694. The prosecutor then asked on

cross-examination if she knew Mr. Bolden had offered to sell his daughters back to their mother in

Michigan. Tr. 3719. The prosecutor claimed he had a good faith basis for the question, but when

pressed by the court, he admitted he had no witness coming in to prove the validity of his claim.

Attempts to impeach witnesses by showing mere accusations of misconduct is uniformly prohibited.

See United States v. Madden, 482 F.2d 850, 852 (8th Cir. 1973). The prosecutor knew his question

was improper, and it was designed solely to place the unfounded idea into the jurors' heads that Mr.

Bolden had offered to sell his children.

472.   The prosecutor committed misconduct and violated Mr. Bolden's right to priest-

penitent privilege when he cross-examined Dr. Paul Hipps on his failure to come forward earlier and

provide the prosecution with Mr. Bolden's alleged admission of guilt. Tr. 3878-79. Mo. Rev. Stat.

§ 491.060(4) precluded Dr. Hipps from testifying unless the priest-penitent privilege was waived by

Mr. Bolden. This cross-examination was akin to an improper comment on Mr. Bolden's exercise of

his right to silence. See Griffin v. California, 380 U.S. 609 (1965).

473.   In addition to the constitutional errors as described previously, the prosecution's

opening statement and closing argument were rife with constitutional error and misconduct. At the

outset of his opening statement in the penalty phase, the prosecutor informed the jury:  "In this

second phase of the trial, you're going to hear additional evidence in our continuing search for justice

for Nathan Ley." Tr. 3354. This statement was improper and constituted prosecutorial misconduct

because it improperly aligned the prosecutor with the jury and with the victim, making the jury's task

not a search for justice, as an abstract principle, but a search for justice for the victim.

474.     In closing argument, the prosecutor was much less subtle on this point, directly telling the jury that the Ley family wanted a death sentence and asking the jury to return a death verdict on the family's behalf. Tr. 3933; Tr. 3990. The prosecutor also admonished the jury:  "Don't tell the Ley family that their son died because [Mr. Bolden] had some childhood issues". Tr. 3983. This improper prosecutorial argument violated the well-established rule that the prosecutor cannot inform the jury of the family's wishes and cannot implore the jury to return a death verdict based on the victim's family's wishes. The Eighth Circuit so found but found the error was harmless. In light of the cumulative impact of all the misconduct described herein, relief is required.

475.     The prosecutor also repeatedly implored the jury to answer the call of duty and impose a death sentence, like Nathan Ley would have done. Tr. 3939; 3982; 3988. The prosecutor showed the jury a photograph of Nathan Ley, and implored the jury to "look into those eyes and deny what the appropriate punishment is;" and that "It was obvious then to Nathan Ley, even as he lay dying on the ground what Mr. Bolden deserved for what he had done. Nathan Ley was too injured to do it. Mr. Bolden at the time was driving back home. But if the correct choice was so obvious to Nathan Ley as he lay dying on the ground, it shouldn't be hard for you to see either."  Tr. 3989; see also  Tr. 3990; Doc. 2 ¶¶ 774-75.

476.     The prosecutor's argument in this case is factually indistinguishable from the arguments held to be error in Weaver v. Bowersox, 438 F.3d 832, 840 (8th Cir. 2006) (prosecutor told jury they had a duty to kill, like a soldier).  The prosecutor's argument that the jurors were like law enforcement officers with a duty eviscerates the concept of discretion afforded to a jury as required by the Eighth Amendment. See Zant, 462 U.S. at 879. Not only was the main thrust of the prosecutor's argument diametrically opposed to the requirement that capital sentencing be at the jury's discretion, it also diminished the jury's sense of responsibility for imposing the death sentence

in violation of the Eighth Amendment under <u>Caldwell</u>, 472 U.S. 320 (1985).

477.    A jury never has to impose a death sentence. The jury's "duty" is to consider the evidence and render a verdict in accordance with the court's instructions. This argument was also error because, for the fourth time, the prosecutor asked the jurors to return a death verdict on behalf of the victim, telling them that Nathan Ley would have acted as Mr. Bolden's judge, jury, and executioner of Mr. Bolden on the spot. The prosecutor asked the jurors to put themselves in Nathan Ley's shoes as he lay dying, and pull the trigger for him. Finally, by arguing that mercy and forgiveness were at odds with "duty", the prosecutor dared the jury not to disappoint "our hero" by returning a life verdict, but to rise to the challenge like Nathan Ley and put Mr. Bolden to death.

478.    The prosecutor also committed blatant misconduct when he argued that a death verdict was warranted because of Nathan Ley's status as an armed, uniformed security guard. Tr. 3986-87. The court sustained defense counsel's objection to this argument and instructed the jury to disregard the prosecutor's "last comments" (counsel did not move for a mistrial), but the bell could not be unrung.

479.    In fact, the prosecutor continued in the same vein, immediately following the court's instruction to disregard, arguing: "The only sentence in this case, ladies and gentlemen, that honors Mr. Ley's sacrifice is a sentence of death. Mr. Ley himself said it: 'If you don't stand up for something, you'll fall for anything.'"  Tr. 3988. Mr. Ley's "sacrifice" in this context was clearly not just his death, but his decision to protect the community by taking a law enforcement job where he was placed in harm's way. The jury heard extensive evidence from the victim impact witnesses about the Ley family's involvement in law enforcement; Nathan Ley's friends' involvement in law enforcement; and Nathan Ley's self-sacrificing motivations for pursuing a career in law enforcement. The "something" that Nathan Ley stood up for was his duty as a law enforcement officer. Moreover, despite the court's ruling, the prosecutor continued to urge death because "Nathan Ley was a special

162

man, and his killer deserves special punishment," and "because of who Nathan Ley was". Tr. 3989-90. Although the prosecutor did not utter the phrase "law enforcement" at this juncture, there could be no doubt in the jury's mind what the prosecutor meant when he argued that Nathan Ley was a "special man". These arguments violated the prohibition against arguing for the death penalty based on the victim's superior worth or who the victim was. See Gray v. Bowersox, 281 F.3d 749, 755 (8th Cir. 2002). In addition, it was improper for the prosecutor to ask the jury to impose death based on a factor that was not alleged as an aggravating circumstance.

480.   The prosecutor misstated the law on aggravation and weighing when he repeatedly told the jury it was justified in returning a death verdict based on factors that, standing alone, would not actually support a death verdict under law. The prosecutor argued to the jury that there "are four things in this case that independently justify a sentence of death in this case. The first thing is that he killed this guard because it was either kill him or spend the rest of his life in prison. . . . The second thing is the second shot. . . .the second shot makes this a death penalty case. The third thing is Nathan Ley was an armed, uniformed security guard. . . . The fourth thing in this case is that warrants a penalty of death is the victim impact, and that's entitled in this case to the greatest weight of all." Tr. 3984-88. See also Tr. 3949 (again arguing that the "second shot alone justified a sentence of death"); Tr. 3951 ("But the most important factor again is the victim impact in this case, and I submit to you that the victim impact in this case is so compelling and so great that it is alone justifies a sentence of death."); Tr. 3952 ("Based on the victim impact evidence in this case, ladies and gentlemen, the only just punishment is a sentence of death."). None of these things, alone, justified a sentence of death. Nathan Ley's status as a security guard was not even a proper consideration and was not alleged as an aggravating circumstance. The second shot could not have, alone, justified a death sentence. At most, all the second shot established was a premeditated homicide. Premeditated homicide, standing alone, does not and cannot justify a death sentence.

481.    The prosecutor committed further misconduct when he argued that Mr. Bolden's lack of remorse justified a death sentence:  "Is there any doubt that the highest possible punishment is warranted for somebody who is not sorry for what they did?"  Tr. 3950. The government had the opportunity to allege lack of remorse as a non-statutory aggravating circumstance, and chose not to. Having abandoned lack of remorse as a non-statutory aggravator, the prosecutor could not then argue lack of remorse as a reason to impose a death sentence.

482.    The prosecutor committed misconduct and violated Mr. Bolden's Fifth Amendment right to due process and Eighth Amendment right to a reliable capital sentencing determination when he stated to the jury in penalty phase opening:  "The impact that his death had on those who loved him has been catastrophic, as you'll heard. And words are unsatisfactory to describe it. You're going to have to see it; hear it; and in some cases, you may feel it yourself."  Tr. 3363. This argument clearly violated Payne. By telling the jury it would have to "see" and "hear" the impact of Nathan Ley's death upon the witnesses, the prosecutor called special attention to the improper displays of emotion he knew were imminent. See Tr. 4/11/06 at 54 (defense counsel discussing emotional outburst during pretrial motions). Moreover, the prosecutor explicitly implored the jury to put itself in the victims' shoes, when he stated "you may feel it yourself."  Hawthorne v. United States, 476 A.2d 164, 172 (D.C. 1984).

483.    The prosecution's penalty-phase closing grossly and improperly misstated the law of mitigating evidence in a manner that was clearly prejudicial to Petitioner and clearly impaired the jury's ability to consider and to give the full mitigating effect to this evidence that the law and the constitution requires. In his closing argument, Mr. Holtshouser argued that "to be mitigating for this offense there needs to be some meaningful connection between the alleged mitigator and the offense." Tr. 3947. Mr. Holtshouser then argued this false standard with respect to the entire range of mitigating evidence Petitioner presented. Tr. 3947-48. Then, without objection from the defense

164

or correction from this Court, Mr. Holtshouser set forth a materially false "bottom line" that "*even if you believe that there is something to them factually they're not mitigating of punishment for the murder of Nathan Ley, because they have nothing to do with why he killed him*."  The prosecution's requirement that mitigation have "some meaningful connection [to] the offense that was committed," Tr. 3947, and are entitled to no weight "because they have nothing to do with why" the killing was committed, id. at 3948, he killed is plainly false.  Indeed, the United States Supreme Court had unambiguously said so more than two years prior to Mr. Bolden's trial. Tennard, 542 U.S. at 287

484.    Far from permitting any nexus requirement, the Supreme Court has "consistently required that a jury at the penalty phase be allowed to consider a wide range of information concerning the background of the defendant. . . . Evidence extraneous to the crime itself is deemed relevant and indeed, constitutionally so . . . ."  South Carolina v. Gathers, 490 U.S. 805, 817-18 (1989) (O'Connor, J.);Tennard, 542 U.S. at 285; Porter, 130 S. Ct. at 448, 450-51.

485.    One of the most fundamental requirements of capital sentencing is that the jury must undertake an exhaustive review of both the criminal offense *and the offender*. The jury must be able to consider *and give effect to* the character, background, and record of the defendant himself. E.g., Tennard, Penry v. Lynaugh. At its essence, the Eighth Amendment constitutionally mandates *individualized* capital sentencing. Woodson; Sumner v. Shuman, 483 U.S. 66, 75-76 (1987). This requires a reasoned moral response to the personal culpability and the unique personal circumstances of the defendant.

486.    While the circumstances of the offense are unquestionably relevant in determining whether a defendant should live or be sentenced to die, that does not alter the fundamental fact that *evidence need not have any causal connection to the crime for it to be mitigating*, and that exclusion of such evidence violates the Eighth Amendment. The Eighth Amendment requires the jury to consider and give full mitigating effect to any relevant mitigating evidence relating to the particular

circumstances of the offense, *or any aspect of the defendant's character, background, or record that could justify imposing a lesser sentence*, and a capital sentencing scheme survives constitutional scrutiny only so long as the jury is "able to consider and give effect to *any mitigating evidence relevant to a defendant's background and character* [as well as to] the circumstances of the crime." Blystone v. Pennsylvania, 494 U.S. 299, 305 (1990).

487.    The prejudice is established by Mr. Holtshouser's own words. The prosecution told the jury: "even if you believe that there is something to them factually they're not mitigating . . . because they have nothing to do with why he killed" Nathan Ley. Tr. 3948. The evidence presented in the penalty phase shows that there was in fact "something to" each of the mitigating circumstances burdened by the prosecution's argument. Yet the verdict slips in this case demonstrate that the jury did not unanimously find *any* of the mitigating circumstances that Petitioner presented. There is thus a reasonable likelihood that one or more jurors held the unconstitutional belief that they could not consider Mr. Bolden's evidence to be mitigating unless it had a direct causal relationship to the offense. Mills, 486 U.S. 367 (1988); McKoy v. North Carolina, 494 U.S. 433 (1990). The prosecution's false argument impaired the jury's consideration of mitigating evidence and violated the Eighth Amendment. This error requires reversal of Mr. Bolden's death sentence.

488.    Moreover, the prosecution's argument violated the Eighth Amendment and requires reversal even if it did not impair the jury's determination of mitigating circumstances because it improperly impaired the jury's ability to properly *weigh* that mitigating evidence in accordance with the law. In addition to arguing a nexus requirement for *finding* mitigation, Mr. Holtshouser improperly told the jury – again without objection or correction – that "the only mitigating factors that [are] entitled to any weight are those that have something to do with why this crime occurred." Tr. 3949. Where, as here, some of the mitigating evidence relating to Mr. Bolden's character, background, and record had some relation to the offense, but other mitigating evidence did not, the

jury's "ability to consider and give effect to [Petitioner's] mitigating evidence . . . was 'shackled and confined,'" Penry v. Johnson, 532 U.S. 782, 798 (2001) (Penry II), by the false suggestion that its weight was dependent upon its nexus to the killing. Under the prosecution's argument, "[a] reasonable juror could well have believed that there was no vehicle for expressing the view that [Petitioner] did not deserve to be sentenced to death based upon his mitigating evidence" that was not directly related to the offense. Id. at 804 (quoting Penry I, 492 U.S. at 326).

489.    The patently erroneous prosecution argument directing the jury's mitigation inquiry to the circumstances of the offense – rather than to the uniquely individual human characteristics of the defendant – uncured by counsel's failure to object and the court's failure to *sua sponte* offer a corrective instruction – impaired the jury's ability to make a reasoned determination of the defendants' moral culpability and to give full effect to mitigating evidence, in violation of the Fifth and Eighth Amendments.

490.    The prosecutor also committed misconduct and violated Mr. Bolden's rights under at least three constitutional amendments with his extensive argument that Mr. Bolden had not shown remorse. Tr. 3930-35, 3977.  From the time he was taken into custody in this case, Mr. Bolden was protected from self-incrimination by the Fifth Amendment. At no time was Mr. Bolden required to admit guilt or express remorse to the government in this case. The prosecutor's arguments regarding lack of remorse constituted improper comment on his exercise of his Fifth Amendment rights. Griffin v. California, 380 U.S. 609 (1965).

491.    This argument also improperly implied that Mr. Bolden deserved a death sentence because he exercised his Sixth Amendment rights to counsel and a jury trial, and should have pled guilty as charged without any deal on the table if he was truly remorseful. The Fifth and Sixth Amendments guarantee Mr. Bolden the right to enter a not guilty plea, have a jury trial, and hold the government to its burden of proof.  By insisting on his right to a jury trial, Mr. Bolden was not

shifting the blame onto anyone, but merely exercising his constitutional rights. Moreover, the prosecutor's comments on the timing of the offer to plead guilty violated Mr. Bolden's right to counsel. The Sixth Amendment guaranteed Mr. Bolden counsel who would investigate all reasonable avenues of defense. It is patently unreasonable to believe that counsel in a capital case would have pled their client guilty without having seen all of the government's evidence; yet, according to the government's argument, this is the only scenario under which an offer to plead guilty could be an expression of true remorse. E.g. Tr. 3931. This argument also violated Mr. Bolden's Eighth Amendment right to a reliable capital sentencing determination and to present all relevant mitigating evidence.

492.   These errors were compounded by the prosecutor's juxtaposition of the unconstitutional remorse argument with his equally unconstitutional argument that the jury should impose a death sentence because it was what the Ley family wanted and what Nathan Ley would have imposed as judge, jury, and executioner in the bank parking lot. After repeatedly telling the jury that it should not give Mr. Bolden what he wanted (a life sentence), the prosecutor told the jury that, instead, they should impose the sentence that Nathan Ley and the Ley family wanted (death). Compare Tr. 3931 ("But the offer is basically, 'I accept if you give me what I want, and [what] I want is a life sentence."); Tr. 3990 ("How is it punishment to give him what he wants?")  with Tr. 3933, 3990, 3983 (prosecutor asking the jury to return a death sentence on behalf of the Ley family); Tr. 3937-39, 3982, 3988-90 (prosecutor arguing jury should not hesitate to fulfill its duty, like Nathan Ley fulfilled his duty by reaching for his gun to kill Mr. Bolden). Moreover, the prosecutor improperly asked the jury to weigh the value of Mr. Bolden's life against the value of Nathan Ley's: "And how ironic that Robert Bolden give so little weight to the mitigating circumstances in Nathan Ley's life but wants you to give weight to his."  Tr. 3950. "Now, ladies and gentlemen, Robert Bolden wants you to give weight to the mitigating factors in his life. But what weight did he give to

the mitigating factors in Nathan Ley's life?"  Tr. 3980.

493.    The prosecutor committed further misconduct when he invited the jury to speculate on the "coincidence" of the timing of Mr. Hipps' testimony. Tr. 3931. This argument suggested that the defense sandbagged the prosecution with Mr. Hipps' testimony regarding Mr. Bolden's offer to plead guilty, and that there was some unknown evidence the government would have presented if only Mr. Hipps had not been the last witness, on the last day, and the government had the opportunity for further cross-examination. Quite simply, it suggests that the offer to plead may not have even happened. Of course, none of this was true.

494.    The prosecutor committed further misconduct when he engaged in childish name calling and repeatedly disparaged the defense witnesses and the defendant by describing them in inflammatory language. See Tr. 3931 (arguing that Dr. Hipps was trying to shove his agenda down the jurors' throats); Tr. 3932 ("And to that extent, Dr. Hipps and Mr. Bolden are peas in a pod too, because Mr. Bolden said, 'It's the stupid guard's fault . . .'"); Tr. 3934 (dismissing Mr. Bolden's evidence of conversion as "this Bible business"; telling the jury "you should be offended by this"; calling the "Bible witnesses" "self-righteous do-gooders"; stating that the religious testimony "borders only blasphemy"). The prosecutor further implied that "the Bible witnesses" were lacking in character, and could stand to learn from Nathan Ley's quote book: "If you don't stand for something, you'll fall for anything." Tr. 3946. Finally, the prosecutor referred to Mr. Bolden as "this cold-blooded murderer," "a cold-blooded killer," and an "evil person" who does not deserve mercy. Tr. 3934, 3950, 3982. Name calling "simply does not further the aims of justice or aid in the search for truth, and is likely to inflame bias in the jury and to result in a verdict based on something other than the evidence." United States v. Cannon, 88 F.3d 1495, 1502 (8th Cir. 1996) (referring to defendants as "bad people" was highly improper); United States v. Rodriguez-Cardona, 924 F.2d 1148, 1153-54 (1st Cir. 1991) (improper to reference defendant's "evilness").

495.     The prosecutor committed misconduct with his repeated arguments referencing the victim's blood. The prosecutor accused Mr. Bolden of using the Bible "to literally wash the blood of Nathan Ley off his hands," Tr. 3934, 3935, and questioned, "why can't Sandra Price get the blood off of her skin? Why can't Cliff Waddy get the smell of it out of his nose every time he closes his eyes?" Tr. 3935. In rebuttal, the emotional appeal continued, with the government arguing that the case was not about the defense's mitigating evidence, but "about the blood of Nathan Ley that he spilled on the sidewalk that day." Tr. 3981. Finally, the government admonished the jury: "Don't let mercy be the water that washes Nathan Ley's blood off of his hands." Tr. 3982. This argument could serve no purpose other than to encourage the jury to decide the appropriate sentence based on caprice and emotion, a basis expressly prohibited by Gardner, 430 U.S. at 358. The prosecutor went further "over the line" by comparing the victim's plight to Mr. Bolden's life in jail. Tr. 3935 ("No matter how long Mr. Bolden lives in jail, Nathan Ley will lie in a cold grave. . . ."). See United States v. Johnson, 495 F.3d 951 (8th Cir. 2007) (condemning such argument).

496.     The prosecutor committed misconduct when he repeatedly argued facts not in evidence. The prosecutor repeatedly argued to the jurors that they should not return a life verdict because Mr. Bolden would "break even" – he would have received a life sentence for the bank robbery alone and a life sentence was the "adult equivalent of time out." Tr. 3933, 3937. The prosecutor claimed that life would mean that "the murder of Nathan Ley is a freebie," because Mr. Bolden would have received life for attempted bank robbery alone. Tr. 3985-86. This argument went beyond the record – there was absolutely no evidence in the record that Mr. Bolden would have received a life sentence for bank robbery – and misled the jury about the severity of a life sentence.

497.     The prosecutor committed misconduct when he argued facts he knew to be false, see Giglio, 405 U.S. 150 (1972); Napue, 360 U.S. 264 (1959), in an attempt to highlight the severity of Mr. Bolden's two prior drug convictions: "The two drug aggravators does [sic] not depend on

170

Dominick Price. He spent two separate years in jail for those crimes." In fact, court and jail records indicate that Mr. Bolden did not serve a year in jail for the 1993 offense.

### D. Cumulative Error

498. Each of the above-described errors individually require relief. As the errors described above go to the very heart of Petitioner's right to a fair trial, even if individual errors do not require relief, and they do, Petitioner is nevertheless entitled to relief on the basis of the cumulative impact of the systemic prosecutorial misconduct that permeated all aspects of Petitioner's capital prosecution. For this reason as well, relief is required.

499. Counsel's failure to raise these claims of prosecutorial misconduct during pretrial, trial and appellate proceedings constitutes prejudicially deficient performance. Counsel could have no strategic reason for failing to object and raise these claims at trial. Nor could counsel have a reasonable basis for failing to request a mistrial and/or a curative instruction.

500. Moreover, the same standards apply to claims of appellate ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness). Appellate counsel – who is presumed to know the law – was independently ineffective for failing to raise these issues. It has long been the standard of care in capital cases that appellate "counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious." GUIDELINE 10.15.1.(C). A defendant establishes prejudice from appellate counsel's ineffectiveness where he shows that, but for counsel's error, there was a reasonable probability that the outcome of the appeal would have been different. Mason, 97 F.3d at 893; Mayo, 13 F.3d at 534; Matire, 811 F.2d at 1439. Petitioner suffered prejudice because, if these issues had been raised, there is a reasonable probability that he would have prevailed.

### XIV. THE GOVERNMENT'S MISMANAGEMENT OF MR. BOLDEN'S DIABETES DEPRIVED HIM OF HIS FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS. COUNSEL WAS INEFFECTIVE.

501.     The claims, factual and legal allegations, and supporting exhibits set forth in the *2255 Motion*, (including Doc. 2 at ¶¶ 812-855), and those set forth in all other sections of this *Revised Amended Motion* are incorporated herein as if fully stated. See Fed.R.Civ.P. 10(c); Fed.R.Civ.P. 15(a), *Commentary*. In support of this claim, Mr. Bolden alleges the following facts, among others to be presented after full discovery, access to this Court's subpoena power, permission to interview the jurors, and an evidentiary hearing:

A.     **Introduction**.

502.     Mr. Bolden is a Type 1, "brittle" diabetic, diagnosed early in childhood. He requires insulin, regular monitoring of his blood sugar, regular exercise, and a controlled diabetic diet to manage this chronic disease. His glycemic control is fragile, and who requires the aid of a doctor monitoring his insulin dosages to help attain normal blood glucose range.

503.     Mr. Bolden was taken into federal custody on November 15, 2002, where he has remained. As an inmate, Mr. Bolden relied on the government to provide the necessary medical care to manage his diabetes. The government failed and, as result, Mr. Bolden suffered the negative cognitive and psychological effects of wide swings in blood sugar and frequent hyper- and hypoglycemic events. These events interfered with his ability to communicate with counsel to prepare his defense and to properly modulate his behavior in court during trial, depriving him his rights to a fair trial, to confront witnesses, to the effective assistance of counsel, to participate in his own defense, and to reliable and individualized sentencing determination as guaranteed by the Fifth, Sixth, and Eighth Amendments.

B.     **Diabetes is a Chronic Illness.**

504.     As noted previously, (see Claim IX. C.9.(d)), Type-I diabetes is a chronic disease in which the pancreas produces no insulin. Failure to properly dose and time insulin injections leads to hyperglycemia (high blood sugar) or hypoglycemia (low blood sugar). Both hyper- and

172

hypoglycemia have extensively documented cognitive effects. Without proper daily and routine treatment, type-1 diabetes is fatal.

505.    Also as noted previously, failure to properly manage the underlying disease seriously increases the diabetic's risk of death and disability due to associated long-term complications such as heart disease, stroke, high blood pressure, kidney disease and renal failure, circulatory problems, eye disorders including blindness, a severe form of gum disease known as periodonitis and a variety of other dental problems, nerve damage (neuropathy), and skin disorders. Also, because nutritional intake directly affects blood sugar, blood pressure, and cholesterol levels, a type-l diabetic's diet plays a critical role in his ability to survive with the disease.

506.    The American Diabetes Association ("ADA") has established national guidelines for the treatment of diabetes and has supplemented these guidelines with recommendations specific to correctional populations. The recommendations in place at the time Mr. Bolden was arrested stated that "[p]eople with diabetes in correctional facilities should be provided care equivalent to all patients with diabetes."    ADA, Position Statement, Diabetes Management in Correctional Institutions, Diabetes Care, S120 (Vol. 25, Supplement 1, January 2002).

**C.    The government Provided Deficient Medical Care and Violated Several of Mr. Bolden's Constitutional Rights When Mr. Bolden Could Not Communicate with Counsel or Properly Modulate His Behavior in Court.**

**(1)    Inadequate Medical Treatment.**

507.    Mr. Bolden's medical records from the Sainte Genevieve County Jail, Exh. 55; Saint Louis City Jail (Correctional Medical Services), Exh. 54; and Saint Louis County Jail (Saint Louis County Health Department), Exh.s 63 and 64; demonstrate that, during the entire pre-trial period and trial, the jail medical providers failed to provide Mr. Bolden care consistent with national standards. The jails failed to provide frequent-enough blood sugar checks and A1C testing, failed to provide an adequate diet, and failed to provide an adequate medical response to Mr. Bolden's diabetes.

508.     A type-1 diabetic's survival depends on "glycemic control," that is, bringing the level of glucose in the blood stream into the same range a healthy pancreas would produce by secreting insulin. According to the ADA normal blood glucose level is between 70 - 140 mg/dl, with a count of 100 being ideal. During his pre-trial detention, Mr. Bolden's blood sugar levels were wildly sporadic. At times his blood sugar ranged near 500. See, Exh. 55.  He experienced more than thirty-five episodes of unresponsiveness and / or loss of consciousness during pre-trial detention. At times, his blood sugar dipped far below a healthy range, even reaching levels so low the blood sugar meter could not even read. Mr. Bolden regularly experienced hypoglycemic episodes in all three of the jails. Id. At best, the hypoglycemic episodes caused him to become weak, dizzy, and slightly disoriented. At worst, they caused him to lose consciousness. As a result, two of the jails eventually ordered that he be celled with a roommate so that there would be someone able to call for help when Mr. Bolden lost consciousness. Mr. Bolden also spent extensive time in the infirmaries so that he could be monitored in the event of hypoglycemia.

509.     On April 23 and May 12, 2003, a doctor at the county jail requested an endrocrinology consult to have Mr. Bolden evaluated for an insulin pump. In July 2003, Mr. Bolden was finally seen at Barnes Jewish Endocrinology Clinic by Denise Teves, M.D., who recommended an insulin pump or Lantus insulin[63]. Exh. 63.

510.     In accordance with Dr. Teves' orders, the county jail doctor placed Mr. Bolden in the infirmary and changed his insulin to include an injection of Lantus at bedtime, while awaiting the arrival of his insulin pump. Exh. 43.

511.     On July 13, 2003, Mr. Bolden was transferred from the county jail to the city jail and

---

[63] An insulin pump offers similar benefits to Lantus insulin, allowing the patient to adjust his insulin dose based on factors such as caloric consumption, activity level, and stress, to prevent insulin peaks and blood sugar bottoming out.

never received his insulin pump and was taken off Lantus. For no valid medical reason, Dr. Susan Singer, the general practice physician at Saint Louis City Jail, refused to recommend the insulin pump that Dr. Teves, the endocrinologist, ordered. Because of his diabetes and tendency to experience hypoglycemia, Mr. Bolden was placed in an observation room at the city jail. On September 5, 2003, Dr. Singer charted: "Refused to eat (lunch) 'until moved out of room.' Therefore, will not recommend insulin pump until stops all self-destructive behavior, and seems to have better impulse control, which may never happen."  As noted above, belligerence and "self-destructive behavior" are themselves symptoms of poorly controlled diabetes and rapidly swinging blood sugar. Dr. Singer refused to give Mr. Bolden the necessary tools to manage his diabetes because he exhibited symptoms of poorly controlled diabetes and fluctuating blood sugar. Exh. 54.

512.    Additionally, in October 2003, Dr. Singer discontinued Mr. Bolden's long-acting Lantus insulin and put him back on 70/30 NPH insulin. Not surprisingly, Mr. Bolden experienced at least fifteen incidents of severe hypoglycemia at the city jail following this change in orders. See, Exh. 54. He also frequently experienced abnormally high blood sugars in the 200s and 300s.

513.    When Mr. Bolden was transferred back to the county jail in December 2004, the Saint Louis County Health department took over his care, but it did not improve. He was continued on 70/30 NPH insulin, and continued to experience wildly fluctuating blood sugar levels and severe hypoglycemic episodes[64]. From June 2005 through the time of trial in April and May 2006, Mr. Bolden experienced at least seventeen hypoglycemic events. During this same period, he frequently experienced abnormally high blood sugars in the 200s and 300s. Exh. 64.

---

[64] The ADA advises that "[a]ny episode of severe hypoglycemia or recurrent episodes of mild to moderate hypoglycemia require reevaluation of the diabetes management plan by the medical staff."  ADA, Position Statement, Diabetes Management in Correctional Institutions, S89 (January 2008).  It is pretty clear by this point in time that Mr. Bolden's insulin regimen was not working, yet no such re-evaluation occurred.

### (2)    Counsel Could Not Communicate with Their Client.

514.    The defense team could not communicate with Mr. Bolden  because of his diabetes, due to the cognitive effects of Mr. Bolden's uncontrolled diabetes and Mr. Bolden's own fixation on his medical condition. The only thing Mr. Bolden ever talked about with his trial team was taking care of his diabetes. Mr. Bolden constantly expressed concern to his attorneys about the facilities' management of his diabetes. He was so focused on his diabetes, that it would get in the way of their ability to do their jobs and discuss legal strategy. In addition to his preoccupation with his health, Mr. Bolden's mood swings and diabetes-related cognitive impairment also impaired counsel's ability to discuss the legal case with him.

### (3)    Mr. Bolden's Diabetes Was Especially Difficult to Manage During Trial, Resulting in a Hypoglycemic Episode in Front of the Jury.

515.    The records demonstrate that Mr. Bolden's diabetes proved especially difficult to manage during trial. In part, this was due to the change in Mr. Bolden's schedule: he was being fed and given insulin earlier than normal so that he could be transported to court. In the evenings, he did not arrive back to the jail until 8:00 p.m. Despite this, the jail did not send food with him to court. There is also no indication in the records that the jail medical staff took into account the fact that the stress of trial would impact Mr. Bolden's blood sugar levels. (It is well-established in the diabetes literature that stress impacts blood sugar.)  Exh. 64.

516.    Because his diabetes was out of control, the jail began waking Mr. Bolden up in the middle of the night for an additional blood sugar check:  On May 4, 2006, Mr. Bolden was found unresponsive in his cell at 1:45 a.m. His blood sugar was so low that it did not register on the glucometer. The nurse charted: "Pt speech slightly slow & slurred. Pt almost aspirated. Pt requested to call his Lawyer & not goto [sic] court to see the doctor."  (The following day was Friday and was no court scheduled. Mr. Bolden's confusion is indicative of cognitive effects of hypoglycemia.)  Mr.

176

Bolden saw the physician's assistant later that day. He charted: "Patients blood sugars are consistently decreasing at night...Problems are also contributed by him not getting back from court until after 8 sometimes."  The physician's assistant further ordered the nurses to start taking Mr. Bolden's blood sugar at 1:00 a.m. for the next five days. Mr. Bolden next awoke with a low blood sugar level of 53 on May 9. He again had abnormally low blood sugar in the middle of the night on May 10. Id.

517.    The government's inability to provide adequate medical care to manage Mr. Bolden's diabetes culminated in court on May 16, 2006, when Mr. Bolden suffered an especially prejudicial low blood sugar episode in front of the jury during the government's presentation of Katie Rhodes, Nathan Ley's girlfriend. The government played the emotional 911 tape of Ms. Rhodes. As the tape was playing, Mr. Bolden had a hypoglycemic reaction and began to reach forward in his chair and repeat the words on the tape in a high pitched voice[65]. Exh. 21.

518.    Defense attorney David Hemingway sat next to Mr. Bolden at counsel table during all of the penalty phase. Mr. Hemingway recalled, "The tape was, in my opinion, very emotional, the most emotional part being when Mr. Ley's girlfriend let out a truly awful wail."  Mr. Hemingway described Mr. Bolden's hypoglycemic episode as follows:

> As the tape began to play, Mr. Bolden began manifesting symptoms I perceived to be symptoms of a hypoglycemic reaction. He appeared as if he were mimicking the sound of the 911 operator saying "hello," while sweeping his arm out in front of him.

Id.; see also Tr. 3635-3636, 4056-57. Although a recess was ultimately taken, it is unclear what the jury saw or heard prior to that recess.

519.    Mr. Bolden's medical records from the County Health Department do not contain a

---

[65] This incident is strikingly similar to a hypoglycemic episode documented in Mr. Bolden's medical records.  On October 18, 2005, at the county jail, a "Code One" was called for Mr. Bolden.  The nurse charted: "Upon arrival patient was disoriented, unable to answer questions and laughing inappropriately.  Blood sugar registered 'low' on glucometer."

morning blood sugar reading for May 16, 2006. Although Mr. Bolden was brought back from court to the infirmary early on May 16 because of the hypoglycemic episode, no one even notified the morning nurse that the episode had occurred. On the morning of May 17, she charted "Blood sugar at 456...Pt also stated he passed out in court yesterday... This was not reported to this nurse by the evening staff. However pt will continue to get bkf early & his insulin early & we will send a sandwich and fruit."   Thus, it was only after Mr. Bolden suffered an extremely prejudicial hypoglycemic episode in front of the jury that the jail decided to send him to court with something to eat. Exh. 64.

520.   Perhaps most egregious is a note made in Mr. Bolden's chart by a physician's assistant on May 24, 2006 after trial had concluded. The physician's assistant charted: "If pt. ends up staying at the county as opposed to going to federal prison, will try to get tighter control of BS since he is finished with his court hearings." Id. The record concedes that the jail was not even trying to adequately manage Mr. Bolden's disease.

### (4)    The government Violated Mr. Bolden's Constitutional Rights.

521.   The government's improper management of Mr. Bolden's diabetes while he was in custody interfered with his right under the U.S. Constitution to a fair criminal trial. See, e.g., Estelle v. Williams, 425 U.S. 501, 503 (1976) ("The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment."); Brady, 373 U.S. at 87 ("[O]ur system of administration of justice suffers when any accused is treated unfairly."); In re Murchison, 349 U.S. 133, 136 (1955); ("[O]ur system of law has always endeavored to prevent even the probability of unfairness."). Mr. Bolden was denied his constitutional right to a fair trial because the government's improper management of his diabetes forced him to defend himself in a capital murder trial while suffering the cognitive and psychological effects of blood sugar levels swinging from hyper- to hypoglycemic states. Just as it would be unfair to force a criminal defendant to remain intoxicated throughout trial, or to appear

before a jury in prison clothing, see Williams, 452 U.S. at 504-05, or bound and gagged, see Illinois v. Allen, 379 U.S. 337, 344 (1970), it is fundamentally unfair to make a criminal defendant stand trial when the government's medically inadequate management of his diabetes alters his demeanor and detracts from his ability to follow the proceedings and participate in his own defense.

522.    A criminal defendant exhibiting the effects of an improperly managed medical condition such as diabetes risks severe prejudice at trial, just as one would if he or she were forced to face a jury while intoxicated, wearing prison clothing, or bound and gagged. The potential prejudice from an improperly managed medical condition with adverse cognitive and psychological effects – effects so severe that they may cause the defendant to have a highly prejudicial outburst in court – may be even higher than being forced to appear before a jury in prison clothes, see Williams, 452 U.S. at 504-05, or bound and gagged, see Allen 397 U.S. at 344, because a defendant with improperly managed diabetes may suffer from dulled cognitive abilities, hindering his ability to effectively marshal a defense, and an inability to control his actions before the jury.

523.    Because the government violated Mr. Bolden's right to due process by medically mismanaging his diabetes prior to and during trial, Mr. Bolden need not show actual prejudice. Cf. Riggins v. Nevada, 504 U.S. at 137-38 (in context of improper administration of anti-psychotic medication, finding due process violation even though the "precise consequences" of the medication were not evident from the trial transcript). However, although Mr. Bolden need not show "actual prejudice" in order to prevail here, Mr. Bolden was, in fact, prejudiced by the government's action. As demonstrated above, Mr. Bolden suffered one severe diabetic episode in front of the jury that made him behave in a manner prejudicial to his ability to receive a fair trial. Moreover, Mr. Bolden's legal team was unable to communicate with him to prepare a defense as a result of his poorly controlled diabetes.

524.    Additionally, the government's medical mismanagement of Mr. Bolden's diabetes

violated his right to confront witnesses against him under the Fifth and Sixth Amendments, by rendering him unable to confer with counsel, and, in some instances, unable to appropriately control his reactions to the testimony of witnesses. The Confrontation Clause of the Sixth Amendment confers upon a criminal defendant the right to be present at trial to insure a face-to-face encounter and an opportunity to cross-examine the government's witnesses. See Coy v. Iowa, 487 U.S. 1012, 1018 (1988). The defendant's physical presence and demeanor in the courtroom are essential to the exercise of his confrontation rights. See Riggins, 504 U.S. at 142 (Kennedy, J., concurring); see also Coy, 487 U.S. at 1016-20 (holding that the use of a screen to prevent the defendant and the witness from viewing one another during testimony violated the Confrontation Clause). "At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial."  Riggins, 504 U.S. at 142; see also Coy, 487 U.S. at 1020 ("[T]here is something deep in human nature that regards face-to-face confrontation between accused and accuser as essential to a fair trial in a criminal prosecution.") (citations omitted).

525.    The government's medical mismanagement also interfered with Mr. Bolden's Sixth Amendment rights to the effective assistance of counsel and to participate in his own defense. "government violates the right to effective assistance [of counsel] when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct a defense." Strickland, 466 U.S. at 686; Geders v. U.S., 425 U.S. 80, 88-89 (1976) ("'The right to be heard would be in many cases, of little avail if it did not comprehend the right [of the defendant] to be heard by counsel.'") (quoting Powell v. Alabama, 287 U.S. 45, 65-69 (1932)); see also Perry v. Leeke, 488 U.S. 272, 280 (1989); Herring, 422 U.S. at 857, 858. State action that prevents a defendant from communicating with his lawyer to strategize or make tactical decisions during the trial violates his right to effective counsel. Massiah v. United States, 377 U.S. 201, 204-06 (1964);

180

Geders, 425 U.S. at 88-89. The Sixth Amendment contemplates both the lawyer's "need to obtain from his client information made relevant by the day's testimony, or . . . to pursue inquiry along the lines not fully explored earlier" and the defendant's reciprocal need to "discuss with counsel the significance of the day's events [during trial]." Geders, 425 U.S. at 88.

526.   As demonstrated above, Mr. Bolden's improperly managed diabetes resulted in blood sugar levels that varied wildly from hyper- to hypoglycemic. In addition to being physically unpleasant and carrying the very real risk of death, both hyper- and hypoglycemia have adverse cognitive and psychological effects. This created a two-fold impediment to Mr. Bolden's ability to communicate with his counsel and prepare a defense:  First, the direct effects of the hyper- and hypoglycemic states impaired his cognition and altered his psychological state such that he could not communicate with counsel. Second, Mr. Bolden, as a life-long diabetic, was well-aware that the jails' mismanagement of his condition had the potential to result in serious bodily injury or even death. Thus, Mr. Bolden was, understandably, preoccupied with his medical condition and this preoccupation dominated his interactions with counsel. Cf. Riggins, 504 U.S. at 144 ("The effects of anti-psychotic drugs can hamper the attorney-client relationship, preventing effective communication and rendering the defendant less able or willing to take part in his defense.")  The actual or constructive denial by the government of the effective assistance of counsel is not subject to a showing of prejudice. Perry, 488 U.S. at 280. Therefore, Mr. Bolden is entitled to relief based on the government's violation of his Sixth Amendment right to the effective assistance of counsel through its medical mismanagement of his diabetes.

527.   Finally, the government's medical mismanagement of Mr. Bolden's diabetes violated his Eighth Amendment right to a reliable and individualized capital sentencing determination. A defendant's ability to draw upon all of his personal resources to convey to the jury his humanity during the penalty phase of a capital trial is essential. See Riggins, 504 U.S. at 144. The jurors'

ability to consider such evidence is critical in light of the finality of a sentence of death. See Woodson, 428 U.S. 305; Gregg, 428 U.S. at 190. The government's medical mismanagement of Mr. Bolden's diabetes rendered him unable to exhibit appropriate emotive responses to testimony or arguments by counsel. This severely prejudiced Mr. Bolden during the penalty phase by supplying the jury with compelling yet inaccurate information regarding his responses to the accusations of the government, and also by preventing him from taking an active role in his own defense.

528.    Counsel's performance fell below an objective standard of reasonableness when counsel failed to alert this Court of the difficulties they were having communicating with their client, failed to move this Court to order the government to provide adequate medical care to bring Mr. Bolden's diabetes under control, and failed to move this Court to continue the trial proceedings until Mr. Bolden's diabetes was controlled and counsel and client were able to have a constitutionally adequate attorney-client relationship. (If that control were not achieved, competent counsel would have moved this Court to find Mr. Bolden incompetent to proceed.)

529.    Counsel also failed to request discovery that would have been necessary to fully plead this issue to the trial court, including but not limited to Mr. Bolden's complete medical records from the Saint Louis city holding cell and the Saint Louis County Jail (including ConnectCare); medical records from United States Marshal's Service (USMS); the USMS policies and procedures for treating diabetics; the Sainte Genevieve County Jail, Saint Louis County Jail, and Saint Louis City Jail's ("the jails") policies and procedures on treating diabetics; and information on the medical staffing at the jails, including information on the training and disciplinary records of those actually making treatment decisions in Mr. Bolden's case.

530.    Counsel's performance also fell below an objective standard of reasonableness when counsel failed to immediately alert this Court to Mr. Bolden's hypoglycemic episode during the penalty hearing. Competent counsel would have immediately alerted the court when Mr. Bolden

began having a hypoglycemic episode during the penalty hearing on May 16, 2006, and moved for a recess so that the jury would not be exposed to the erratic, sometimes belligerent, inappropriate, and non-responsive behavior that characterizes these episodes for Mr. Bolden. Instead, counsel "waited as long as [he] could." Tr. 3635-36.

531.   Competent counsel also would have requested this Court poll the jurors, individually, to determine what the jurors heard and saw during the incident. Even without polling the jurors, competent counsel would have moved the Court to instruct the jury that Mr. Bolden had suffered a hypoglycemic episode due to his diabetes, that Mr. Bolden has experienced these episodes since he was a toddler, that these episodes were characterized by erratic, sometimes belligerent, inappropriate, and non-responsive behavior, and that the jury should disregard anything they saw Mr. Bolden do or heard him vocalize during this incident because his actions were not volitional. Counsel requested no such instruction, and no instruction was given. In the alternative, depending on exactly what the jurors heard and / or saw, and how prejudicial that was to the defense, competent counsel would have moved for a mistrial. To the extent that counsel could have and should have raised the above-described errors on direct appeal under controlling precedent and procedure, counsel's failure to do so constitutes ineffective assistance of counsel in violation of the Sixth, Eighth and Fourteenth Amendments.  Accordingly, for this reason as well, relief is required.

## XV.    AS A RESULT OF COURT ERROR AND INEFFECTIVE ASSISTANCE OF COUNSEL, PETITIONER WAS DENIED HIS RIGHT TO MEANINGFUL APPELLATE REVIEW IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS

532.   The claims, factual and legal allegations, and supporting exhibits set forth in the *2255 Motion*, (including Doc. 2 at ¶¶ 856-872), and those set forth elsewhere in this *Revised Amended Motion* are incorporated herein as if fully stated. See Fed.R.Civ.P. 10(c); Fed.R.Civ.P. 15(a).

## A.    The Law

533.   It is well-settled that the Fifth, Sixth and Fourteenth Amendments entitle individuals

to  meaningful appellate review of their conviction and sentence.  See Hardy v. United States, 375 U.S. 277 (1964); see also Griffin, 351 U.S. at 19; Mayer v. City of Chicago, 404 U.S. 189, 195 (1971). Further, a capital defendant is entitled to meaningful appellate review of his capital conviction and sentence as an indispensable component of the federal constitutional proscriptions against arbitrary and capricious capital sentencing. Parker, 498 U.S. at 321; Clemons 494 U.S. at 749; Gregg, 428 U.S. at 195.

534.    When, as here, the law provides for appellate review of a conviction and sentence as of right, the due process clause of the Fifth Amendment requires that the defendant be afforded the effective assistance of counsel on appeal. Evitts, 469 U.S. 387 (1985). The substantive standard for reviewing the effective assistance of appellate counsel is identical to the Sixth Amendment ineffectiveness inquiry.

535.    Counsel in a capital case can have no reasonable basis for failing to present a meritorious issue on direct appeal. As described more fully below, counsel's appellate performance was deficient when they failed to properly raise numerous meritorious issues that had been preserved for direct appeal or that were otherwise cognizable on appeal despite counsel's failure to preserve them. Prejudice is proven when there is a reasonable probability, but for counsel's errors or omissions, the outcome of the proceeding would have been different. Roe v. Flores-Ortega, 528 U.S. 470 (2000). On appeal, prejudice is demonstrated whenever a petitioner would have been entitled to relief had appellate counsel raised the claim or claims on direct appeal. Mr. Bolden is entitled to relief because his appellate counsel deficiently raised or deficiently failed to raise meritorious issues that, if properly presented, would have entitled him to relief on direct appeal.

**B.    The Court's Denial of Meaningful Appellate Review.**

536.    The Court of Appeals found that four claims Petitioner raised on direct appeal were no preserved in the trial court and, as a result, were subject to the plain error standard of review.

Bolden, 545 F.3d 609 (8th Cir. 2008). These claims included: Petitioner's claims arising from the government's submission of the pecuniary gain aggravating factor was not preserved, id. 545 F. 3d at 625; the Petitioner's claim that the failure to allow Petitioner to cross-examine Mr. Price regarding his relationship with Mr. Edwards after they were incarcerated impacted violated his constitutional rights during the penalty hearing, id. 545 F.3d at 621, n. 8; the failed to disclose notes taken by Agent McGinnis during Mr. Price's proffer, id. 545 F. 3d at 623; and, prosecutorial misconduct during closing argument, id. 545 F.3d at 630.

537.    Contrary to the Court's conclusion, Petitioner preserved three of these claims at trial: the claims arising from the pecuniary gain aggravating factor; the claim arising from the disclosure of Agent McGinnis' notes from Mr. Price's proffer; and, at least some aspects of the prosecutorial misconduct claim. Where, as here, Petitioner did preserve these claims, the Court's application of the plain error standard violated Petitioner's Fifth, Sixth and Eighth Amendment rights to meaningful appellate review and the heightened procedural safeguards required under the Fifth and Eighth Amendments in this capital case. Relief is required.

538.    To the extent counsel did not preserve the claims the Court found were not properly raised in the trial court, and they did, counsel's failure to properly preserve and litigate meritorious claims constituted prejudicially deficient performance. Moreover, as described more fully throughout this *Motion*, although counsel raised some facet of a number of issues on appeal, counsel failed to raise all constitutional violations arising from the errors.

539.    Although the issue was preserved in the trial court, Tr. 3410-13, appellate counsel failed to argue that it was error for the trial court to allow the government to go beyond the face of the judgment regarding Mr. Bolden's 1995 Michigan conviction. Appellate counsel explicitly challenged the trial court's ruling allowing the government to present extrinsic evidence regarding the 1993 conviction, but only argued that the extrinsic evidence regarding the 1995 conviction

185

"enhanced the error." Bolden 545 F.3d 609 (8th Cir. 2008), *Appellant's Brief*. The Eighth Circuit clearly did not interpret this argument to raise an appellate challenge to the extrinsic evidence regarding the 1995 conviction, as it ruled only on this issue as it relates to the 1993 conviction. See Bolden, at 617. In fact, it was error for the trial court to allow the government to present evidence beyond the face of the 1995 judgment, which, on its face, stated that Mr. Bolden had been convicted of "delivery of cocaine". See Tr. 3396-3418 (testimony of Donald McDowell and Gary Oliver). Unlike in the 1993 case (where the offense of conviction was merely an attempt), the government had absolutely no need to go beyond the 1995 judgment to prove its case. The error was prejudicial, as it allowed the government to introduce the testimony of Mr. McDowell regarding other drug sales that were not alleged as aggravating circumstances in this case.

540.    Although the issue was preserved in the trial court, Tr. 3323-40, appellate counsel failed to challenge the trial court's ruling denying counsel's motion to preclude Sgt. Sinnema's expert testimony on the grounds the government gave insufficient notice of this expert. The government sent the defense a letter on May 6, 2006, indicating its intent to call Sgt. Sinnema as an expert on drug trafficking. See id. This notice was clearly insufficient – the deadline for giving notice of expert witnesses had expired; the penalty phase commenced only nine calendar days later.

## XVI.   MR. BOLDEN'S DEATH SENTENCE VIOLATES THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS DUE TO THE CONDITIONS ON FEDERAL DEATH ROW.

541.    The claims, factual and legal allegations, and supporting exhibits set forth in the *2255 Motion*, (Doc. 2 at ¶¶ 873-930), and those set forth elsewhere in this *Revised Amended Motion* are incorporated herein as if fully stated. See Fed.R.Civ.P. 10(c); Fed.R.Civ.P. 15(a). Mr. Bolden alleges the following facts, among others to be presented after full discovery, and a hearing:

### A.    Introduction.

542.    Mr. Bolden has been incarcerated in the Special Confinement Unit at USP - Terre

Haute (hereafter "USP-TH") since 2006. As demonstrated at length throughout this *Motion*, Mr. Bolden is a "brittle diabetic", having been diagnosed with Type 1, insulin-dependent diabetes when he was approximately three years old. See Claim XIV.

543.    This Court recognized that Mr. Bolden's medical condition presented special challenges for incarceration, and recommended at sentencing that Mr. Bolden be housed at a medical facility within the BOP. Tr. 4057. The BOP did not heed this Court's recommendation. During Mr. Bolden's incarceration on federal death row, officials have acted with deliberate indifference to his medical needs and have continuously denied him necessary medical care. The prison has ignored Mr. Bolden's medical needs to the point that his life is regularly jeopardized from prolonged hyperglycemia, leading to ketoacidosis, and from grave episodes of hypoglycemia, at times rendering him incoherent, unresponsive and comatose. The prison has failed to provide prompt and appropriate medical assistance, which has subjected Mr. Bolden to unnecessary pain and suffering.

544.    The imposition of a death sentence must have some legitimate purpose that a sentence of life imprisonment could not achieve. In Mr. Bolden's case, the inordinate delay between conviction and execution has negated any possibility that his execution would serve the purposes of retribution or deterrence. It is against this backdrop that Mr. Bolden sits confined in a solitary cell for most of his day, wondering when he will die and which will kill him sooner – complications of inadequately managed diabetes or lethal injection. The psychological stress alone constitutes cruel and unusual punishment. Mr. Bolden's death sentence must be vacated.

B.    **Inadequate Medical Care.**

1.    **Type-l Diabetes is a Life-Long, Life-Threatening Disease.**

545.    As discussed *supra* in Claim XIV, Type-1 diabetes is a chronic disease which can be life threatening if not maintained and monitored through daily insulin injections, coordinated with a stable, special diet, and routine medical exams. "Brittle diabetics" require extra care. See Claim

187

XIV. Failure to properly dose and time insulin injections leads to hyperglycemia (high blood sugar) or hypoglycemia (low blood sugar), which has lasting effects and can be fatal.

546.    The ADA has established national guidelines for the treatment of diabetes and has supplemented these guidelines with recommendations specific to correctional populations. See Claim XIV. The BOP has established clinical protocols that reflect the ADAs basic standards of care for diabetic prisoners. Federal Bureau of Prisons, *Management of Diabetes,* Clinical Practice Guideline, p. 29 (April 2009) ("CPG"). USP - USP-TH has failed to meet the BOP's own standards of care with respect to Mr. Bolden, and, as a result, has placed and continues to place him in danger of serious bodily injury, incapacitation, or death.

### 2.    USP-TH Has Refused to Properly Treat Mr. Bolden's Condition.

### (a)    Glycemic Control.

547.    Based on the BOP's own clinical criteria, Mr. Bolden has suffered from "severely uncontrolled diabetes" since his arrival at USP-TH in October 2006. CPG at p. 10 (e.g., blood glucose levels exceeding 250 mg/dl).

548.    A type-1 diabetic's survival depends on "glycemic control," that is, bringing the level of glucose in the blood stream into the same range a healthy pancreas would produce by secreting insulin. A normal blood glucose level is between 70 - 140 mg/dl, with a count of 100 being ideal. CPG, p. 38. The BOP's own clinical guidelines for treating diabetes recognize that proper glycemic control requires multiple daily blood sugar tests. Id. at 16. Diabetics typically measure their blood sugar using a handheld "glucometer," which measures a drop of blood from the patient's finger placed on a disposable strip.

549.    Mr. Bolden's repeated requests for regular, proper testing have been passed from nursing staff to hospital administrator to clinical directors to no avail, and his condition has, at best, been sporadically monitored, typically only in response to emergencies that proper care would have

prevented. In the first eight months after Mr. Bolden arrived at USP-TH (on October 3, 2006), the prison refused to authorize blood glucose tests more than once per week despite pleas from Mr. Bolden and his attorneys. The prison did not provide Mr. Bolden a glucometer for almost three years, during which time he suffered recurrent and gravely serious hypoglycemic episodes in which he became incoherent, unresponsive, and/or unconscious until someone noticed his condition and summoned medical help, which often arrived only 20-30 minutes or more later.

550.    BOP guidelines express a preference for issuing glucometers directly to patients like Mr. Bolden. CPG at p. 16.Yet, Dr. Thomas Webster, clinical director at USP-TH, did not agree to order glucometer tests four times a day until July 11, 2007, the day Mr. Bolden was to meet with an auditor sent by the American Correctional Association to review USP-TH's health services.

551.    In addition to consistent blood sugar monitoring, the timely administration of insulin and its coordination with meal delivery is a bedrock principle of basic diabetic care. BOP's clinical guidelines recognize that "[t]he consequences of insulin/food mismatch are, at best, suboptimal control of hyperglycemia; at worst, the result is frequent and potentially severe hypoglycemic episodes." CPG at p. 15. During his incarceration at USP-TH, Mr. Bolden's insulin has arrived hours after his meals, during which delay his blood sugar level rises because the insulin from his evening insulin injection had dissipated, producing hyperglycemia.

552.    Mr. Bolden's blood sugar levels frequently exceed 300-400 mg/dl, indicating severe hyperglycemia, and leading to incidents of ketoacidosis. The prison's failure to coordinate insulin and blood glucose testing with Mr. Bolden's meals has also produced recurrent episodes of hypoglycemia, frequently rendering him unresponsive, incoherent, and unconscious. As a result, Mr. Bolden lapses into unconsciousness on an almost regular basis. These episodes are life threatening.

553.    The prolonged periods of hyperglycemia and recurrent deadly episodes of hypoglycemia suffered by Mr. Bolden are a direct and predictable result of the prison's failure to

properly monitor his blood sugar levels and its failure to coordinate his meals and insulin delivery, as the BOP's Clinical Guidelines require. CPG at 15.

554.  Current habeas counsel have repeatedly written Warden Charles Lockett regarding the deficiencies in the medical treatment and diet afforded Mr. Bolden at USP-TH, and requested that USP-TH begin providing Mr. Bolden with sufficient care such that these emergency events will no longer occur, or transfer him to a facility that can. Warden Lockett has responded that Mr. Bolden is receiving adequate care, yet Mr. Bolden continues to suffer these emergency events. Exh. 73.[66]

### (b)    Lack of Diabetic Diet.

555.    Bureau of Prisons guidelines recognize that, for diabetics, "[n]utritional consistency is critical for maintaining adequate glycemic control."  CPG at 14. However, the prison has refused to provide Mr. Bolden with a diabetic diet employing stable daily caloric goals to facilitate his glycemic control. The prison, for years, has claimed that such a diet is simply not available, yet the Food Services Technical Reference Manual used at USP-TH devotes 32 pages to menus designed to do just that. Bureau of Prisons, Food Services, Technical Reference Manual, pp. 62-94 (August 21, 1998) ("TRM"). Exh. 78.

556.    Instead of providing Mr. Bolden with a diabetic diet, the prison brought in a dietician to advise Mr. Bolden to not eat all of the food on his tray. This consultation set no stable daily caloric intake and provided no means by which Mr. Bolden could measure the calories or portions he should take in at any given meal. By omitting food from his tray, Mr. Bolden requires less insulin, yet the dosage of his shot is not modified to reflect whatever appears on any particular tray.

557.    Mr. Bolden has been advised by nurses administering his insulin injections that he must take the full dosage prescribed by Dr. Webster, yet there is no coordination between that dosage

---

[66] See also Exh. 69 (letter from Warden Lockett to Canadian Consulate); Exh. 84 (Declaration of prior appellate counsel).

and the meals presented to him. Mr. Bolden is given meals on a take-it-or-leave-it basis - i.e., he cannot self select foods from a mainline or cafeteria style setting in the manner that regular prisoners can. In offering isolated consultation by a dietician, rather than a diabetic diet, the prison makes Mr. Bolden's glycemic control a matter of guess work, and deprives him of the careful balancing a type-1 diabetic requires between insulin doses and blood glucose levels and diet.

558.    Though, the prison recently indicated that they would provide Mr. Bolden with a diabetic diet for Mr. Bolden, they have thus far failed to do so. Instead, he is receiving a heart healthy menu, which varies greatly from the diabetic diet, in that it still contains the same amount of carbohydrates and sugars as the regular menu. The prison's refusal to provide Mr. Bolden a diabetic diet poses a substantial risk of harm by further obstructing his ability to attain glycemic control. It invites the recurrent and potentially deadly hypoglycemia reflected in his record at USP-TH.

(c)    <strong>Inadequate Emergency Response.</strong>

559.    The prison has put Mr. Bolden at an enhanced risk of death and serious physical disability by its casual response to his need for emergency medical attention. Inmates in cells neighboring Mr. Bolden's confirm that it often takes 20-30 minutes and more for medical personnel to arrive after being summoned by a guard who discovers that Mr. Bolden is unresponsive, or incoherent due to an apparent "diabetic episode."  See Exh.s 81, 82, and 83.

560.    The prison has also failed to hospitalize Mr. Bolden even when his condition required it under BOP Guidelines. The Guidelines, for example, call for hospitalization when blood sugar is above 300 mg/dl with an arterial pH of less than 7.30, an increased anion gap, and serum bicarbonate level of less than 15 mEq/L, along with moderate ketones in the urine or blood. CPG at 24. A blood sugar level above 300 mg/dl (hyperglycemia) is the first sign that a diabetic requires hospitalization to stem the onset of ketoacidosis.

561.    Mr. Bolden has suffered a pattern of hyperglycemic episodes that have been treated

in recklessly casual fashion by prison staff. In a typical instance, where Mr. Bolden followed the orders of personnel to submit an emergency message to see Dr. Webster because he was experiencing symptoms of ketoacidosis (including "headache, blurred vision, abdominal pain, leg pain, and frequent urination, and vomiting""), the physician's assistant simply gave him a shot of phenergan, a motion-sickness drug, to curb the vomiting, and had him returned to his cell. The appropriate response in this situation was hospitalization, urinalysis and blood work to check acid levels in the blood and, if deemed necessary, to administer intravenous administration of insulin. See, *infra.*

562.     The prison has also failed to hospitalize Mr. Bolden for deadly hypoglycemic episodes, even when he displayed symptoms of possible brain damage. For example, on October 27, 2007, Mr. Bolden was found unresponsive on the bed in his cell with "clonic/tonic movements." The BOP Clinical Guidelines call for hospitalization in the case of severe hypoglycemia involving a blood glucose count below 50 mg/dl and a mental status associated with neurologic deficits. CPG at 24. Mr. Bolden has never been seen by a physician at the prison as a follow-up to any of the deadly hypoglycemic episodes he has suffered. Against this backdrop of inadequate emergency response, USP-TH has also failed to ensure that Mr. Bolden always has emergency glucose packets in his cell in the event he feels a hypoglycemic episode coming on. Most recently, in April 2011, after using one of Mr. Bolden's glucose packets to revive him from a hypoglycemic episode, the prison nurse failed to immediately replace that packet. The prison's failure to respond adequately in these emergency situations, despite calls to do so from Mr. Bolden's counsel and from independent advocacy organizations, not only puts Mr. Bolden at a much greater risk for long term complications associated with diabetes, it may very well lead to his death.

     **(d)     Health Maintenance and Prevention of Diabetic Complications.**

563.     Mr. Bolden's blood sugar levels have fluctuated from the emergency hyperglycemic states described above to episodes in which he has fallen unconscious in his cell as a result of severe

192

hypoglycemia. Mr. Bolden's condition is out of control, in large part, because the prison has failed to provide him with periodic evaluations and screenings pursuant to BOP Guidelines. See CPG at 21, 25-27. The ADA advises that "[a]ny episode of severe hypoglycemia or recurrent episodes of mild to moderate hypoglycemia require reevaluation of the diabetes management plan by the medical staff."  ADA, Position Statement, Diabetes Management in Correctional Institutions, S89 (January 2008). No such reevaluation has occurred in response to Mr. Bolden's many severe and moderate hypoglycemic episodes.

564.    The prison has also failed to administer hemoglobin A1c tests of Mr. Bolden's blood sugar on a quarterly basis - as BOP Guidelines advise - to adjust his insulin dosage for better glycemic control. See CPG at 26-27. The importance of the A1c screening is enhanced when, as here, the doctor fails to review glucometer readings on a weekly, or even monthly, basis.

565.    Dr. Webster did not even meet with Mr. Bolden until February 26, 2007, almost five months after he arrived in Terre Haute, and even then continued to refuse to authorize glucometer checks of Mr. Bolden's blood sugar more than once a week. Such infrequent glucometer checks provide a virtually useless measure on which to base insulin dosages. Even then, there was no clear treatment plan in place.

566.    From his arrival at USP-TH, every laboratory analysis done on Mr. Bolden's blood has reported an elevated creatinine level, signaling advancing kidney disease. Dr. Webster initialed these lab reports, indicating that he reviewed them, but for over two years he took no action to address this harbinger, such as prescribing additional blood pressure medications, or counseling Mr. Bolden to adopt a low-protein diet to reduce the burden on his kidneys.

567.    Dr. Webster ordered a nephrologist's consultation in December 2008, only after an advocacy organization noted the elevated creatinine levels in a letter to BOP Director Lappin. See Exh. 72 (Mr. Bolden is "Inmate 1".). A nephrologist saw Mr. Bolden in January 2009, and reported

to Dr. Webster in February 2009 that Mr. Bolden's kidneys had deteriorated to Stage IV kidney disease. Dr. Webster did not disclose this report to Mr. Bolden (who found out about it months later from a physician's assistant). Mr. Bolden's kidney function continues to deteriorate as a result of the prison's failure to offer adequate medical care. At his most recent nephrology consult, Mr. Bolden was informed that his creatine levels have increased, and that if they continue to increase, it will be time to discuss the possibility of dialysis.

568.    The ADA advises that imprisoned diabetics should receive medical care from a "physician-coordinated team" including but not limited to nurses, dieticians, and mental health experts. ADA, at S88. The prison has failed to use such a coordinated team approach to improve Mr. Bolden's glycemic control and health, and, instead, largely reacts to preventable problems of poor glycemic control caused by their lack of coordinated care.

<h4 align="center">(e)    Dental Care.</h4>

569.    The prison has also denied Mr. Bolden dental care responsive to his needs as a type-l diabetic, and has forced him to live without any teeth or dentures for over a year, further impairing his ability to attain and maintain proper glycemic control. BOP Guidelines recognize that diabetic prisoners are at high risk for agingival inflammation, periodontal abscesses, and chronic periodontal disease. See CPG at 23. The prison has failed to provide Mr. Bolden with routine dental care and has been grossly inadequate in meeting BOP standards with regard to his special dental needs as a diabetic prisoner.

570.    Mr. Bolden arrived at USP- Terre Haute with less than half of his teeth, only three of which matched up with opposing teeth to enable him to chew his food. Mr. Bolden marked his Initial Intake Form to indicate that his teeth and gums hurt him. He followed instructions from prison employees to make "cop outs" requesting dental treatment.

571.    The dentist who first saw Mr. Bolden on December 14, 2006, two months after his

initial request, recommended that he be fitted for "partial dentures" and prophylaxis (cleaning) of his remaining teeth. As the pain in his teeth persisted, Mr. Bolden followed the instructions of prison employees to request placement on the "dental routine care list" no later than April 19, 2007. As time progressed, however, the pain in Mr. Bolden's teeth and gums persisted. He submitted repeated sick call requests for treatment of dental pain he experienced when eating and brushing his teeth, but was not seen by a dentist (September 12, 2007, September 28, 2007, October 15, 2007, and November 15, 2007).

572.    Due to the long delays between dental sessions and the resulting pain he had to endure, Mr. Bolden asked that all his teeth be removed. The dentist told Mr. Bolden he would not get dentures "any time soon" because he was the only dentist for several thousand inmates. The prison finally produced a set of dentures for Mr. Bolden on May 1, 2009, based on only two "fittings". The bottom set did not fit Mr. Bolden's mouth at all, and the top set fit only poorly.

573.    Mr. Bolden's toothless state impaired his ability to eat fresh fruits and vegetables. The soft diet with which the prison supplied Mr. Bolden after his teeth were all removed consisted of peanut butter blended with milk, meal after meal, except for two-to-three instances in which vegetables were pureed and served with ground meat. The unacceptable delay in providing Mr. Bolden with dentures contributed to the severe swings in his blood sugar levels.

### 3.    The Inadequate Medical Care Violates Eighth Amendment.

574.    Mr. Bolden's Type-l Diabetes is a serious medical condition that, absent proper medical treatment, will result in debilitating and potentially life-threatening consequences. Mr. Bolden experiences daily pain from his illness. The prison is aware that his diabetes requires timely, diligent, and proper medical monitoring and treatment, is aware of the gross deficiencies in the care provided to Mr. Bolden, and is aware of the numerous life-threatening episodes suffered by Mr. Bolden as a result of this gross lack of proper medical care. The prison has failed and continues to

fail to take reasonable steps to remedy the ongoing risk of serious harm faced by Mr. Bolden. As a result, the prison's actions in denying Mr. Bolden adequate medical care have already caused Mr. Bolden suffering, pain, and irreversible damage to his bodily systems and places him Mr. Bolden at a substantial risk of serious bodily harm and death. As long as Mr. Bolden is subjected to this inadequate medical care, he will continue to suffer pain and substantial risks of serious harm, including organ failure and death, unless injunctive relief is granted. The prison's actions in denying Mr. Bolden the medical care necessary to treat his type-l diabetes was intentional and knowing, and manifested deliberate indifference to the substantial risks Mr. Bolden faced, all in violation of his right to be free from cruel and unusual punishment, guaranteed by the Eighth Amendment.

### C.     Inordinate Delay

575.    In addition, Mr. Bolden's prolonged confinement in the restrictive conditions of the SCU violates the Eighth Amendment's prohibition of cruel and unusual punishments. Mr. Bolden has been, and will continue to be, subjected to extraordinary psychological stress, as well as the extreme physical and social restrictions that inhere in life on death row. In addition, a sufficient amount of time has elapsed since his conviction that his execution would violate the Eighth Amendment because the government's ability to exact retribution and to deter other serious offenses by actually carrying out Mr. Bolden's execution has been drastically diminished.

576.    The imposition of the death penalty (rather than life imprisonment) must serve some legitimate penological end that could not otherwise be accomplished. If "the punishment serves no penal purpose more effectively than a less severe punishment," Furman, 408 U.S. 238 (1972) (Brennan, J., concurring), then it is unnecessarily excessive within the meaning of the Eighth Amendment's prohibition of cruel and unusual punishment. The United States Supreme Court has defined the penological justifications that can support a legitimate application of the death penalty. Those justifications are twofold: "retribution and deterrence of capital crimes by prospective

196

offenders." <u>Gregg</u>, 428 U.S. at 183. When a proposed execution "ceases realistically to further these purposes . . ., its imposition would then be the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes . . . [and] would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment." <u>Furman</u>, 408 U.S. at 312-13 (White, J., concurring). In no uncertain terms, the Court has said that when the government proposes to kill a human being as a form of punishment for a criminal act, "the sanction cannot be so totally without penological justification that it results in the gratuitous infliction of suffering." <u>Gregg</u>, 428 U.S. at 183.

577.   The deterrent value of any punishment is directly related to the promptness with which it is inflicted. The deterrent value of carrying out an execution years after conviction is minimal, at best. Carrying out an execution at a removed date may have no deterrent value beyond the deterrent value of simply incarcerating the defendant for the years between conviction and execution.

578.   The principal social purposes of retribution and deterrence sought through the death penalty lose their compelling purpose by the passage of time. The acceptable government interest of retribution has been satisfied by the severe punishment already inflicted by forcing Mr. Bolden to live in spartan circumstances, suffering needlessly due to the prison's failure to provide adequate medical care, and cut off from normal social interaction. The United States Supreme Court has recognized the "painful character" of holding a prisoner in solitary confinement for only four weeks while awaiting execution. <u>In re Medley</u>, 134 U.S. 160, 171-72 (1890). This is due, not only to the isolating nature of solitary confinement, but also to the "horrible feeling" the prisoner must feel due to the knowledge he is to be executed and the "uncertainty" as to when. <u>Id.</u>

579.   The delay from Mr. Bolden's conviction to present is attributable to the ineffective assistance of Mr. Bolden's trial and appellate counsel, described throughout this *Motion*, and to the

prosecutorial misconduct and the government's violations of Brady v. Maryland, 373 U.S. 83, 87 (1963), and its progeny. Mr. Bolden cannot be held responsible for delays caused by his prior counsels' ineffectiveness and the government's misconduct.

580.    Inflicting the punishment of death upon Mr. Bolden, after the government has inflicted the torturous punishment of holding him in near-solitary confinement, without adequate medical care to manage potentially life-threatening chronic illness, would push his total punishment beyond what evolving standards of decency can tolerate. Accordingly, under dictate from the federal constitution, Mr. Bolden's death sentence must be vacated.

**D.    Personnel Changes at USP-TH Exacerbate Stress.**

581..    Beginning in Fall of 2010 with the retirement of Warden Helen Marberry, USP-TH and the Special Housing Unit have undergone several administrative and staff changes, the end result of which has been to exacerbate the psychological stress of residing on federal death row. The new Unit Manager of the SHU, Mr. Stevens, is also the Unit Manager of the Special Confinement Unit (SCU). The SCU is punitive and houses inmates who were removed from general population for disciplinary reasons.  The conditions of confinement on the SHU (death row) are not supposed to be punitive, yet Mr. Stevens treats inmates in the SCU and the SHU in a similar manner. See also Exh. 74. Consequently, inmates who have spent years on with spotless records are suddenly receiving multiple write-ups. Exhs. 71,75,80. This, in turn, exacerbates the psychological stress that Mr. Bolden experiences as a result of his prolonged confinement as it plays upon the constant fear of death that he has experienced since childhood. Counsel have repeatedly attempted to resolve the issues that have emerged under the new administration at USP-TH, to no avail. See Exh.s 70, 74.

582.    To the extent that counsel could have and should have raised this issue at trial, and to the extent that appellate counsel could have and should have raised the above-described errors on direct appeal under controlling precedent and procedure, counsel's failure to do so constitutes

ineffective assistance of counsel in violation of the Sixth, Eighth and Fourteenth Amendments.

**XVII.  PETITIONER IS ENTITLED TO RELIEF BECAUSE OF THE CUMULATIVE EFFECT OF THE ERRORS DESCRIBED IN THIS MOTION.**

583.    The claims, factual and legal allegations, and supporting exhibits set forth in  the *2255 Motion*, (including Doc. 2 at ¶¶ 931-39), and those set forth elsewhere in this *Revised Amended Motion* are incorporated herein as if fully stated. See Fed.R.Civ.P. 10(c); Fed.R.Civ.P. 15(a).

584.    Courts have long recognized that constitutional claims of error are to be considered cumulatively as well as individually, and that cumulative error or prejudice may provide a basis for relief whether or not the effect of individual errors warrants relief. See, e.g., Kyles, 514 U.S. at 437-38 (cumulative prejudice from state's failure to reveal multiple pieces of exculpatory evidence undermined fairness of trial and entitled defendant to relief)

585.    Viewing the entire picture of this case, and considering both the nature of the material presented to the jury that should not have been and the nature of the material not presented to the jury that should have been, the court cannot have much confidence in the jury's verdict. Petitioner has already demonstrated that prior counsel's failure to litigate these issues individually constituted deficient performance. To reach this claim, the court necessarily will have determined that the claims, while individually meritorious, were individually harmless. However, as set forth above, they were cumulatively prejudicial, establishing prejudice for purposes of an ineffectiveness inquiry. Counsel could have no reasonable basis for failing to litigate the cumulative prejudicial effect of meritorious claims, establishing deficient performance. Accordingly, counsel was ineffective for failing to raise a claim of cumulative prejudice at trial or in post-trial proceedings.

586.    To the extent that counsel should have and could have raised the above-described claims on direct appeal under controlling precedent and procedure, counsel's failure to do so constitutes ineffective assistance of counsel in violation of the Sixth, Eighth, and Fourteenth

Amendments. Petitioner is entitled to relief.

### REQUEST FOR RELIEF

WHEREFORE, based upon the foregoing, all other proceedings and submissions, Petitioner,

Robert Bolden, Sr., respectfully requests that the Court grant him the following relief:

A)    That Petitioner be granted such discovery as is necessary for full and fair resolution of the claims contained in this Motion;

B)    That leave to amend this Motion be granted;

C)    That an evidentiary hearing be conducted on all claims involving disputed issues of fact;

D)    That Respondents be Ordered to respond to this Motion; and

E)    That Petitioner's convictions and sentences be vacated.

Respectfully submitted,

ANNE L. SAUNDERS, ESQUIRE
Asst. Federal Public Defender
Attorney ID #PA 48458
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
Tel. No. (717) 782-3843
Fax No. (717) 782-3966
(anne_saunders@fd.org)

JENNIFER MERRIGAN
MO Bar #56733
Death Penalty Litigation Clinic
6155 Oak Street, Suite C
Kansas City, MO  64113
Tel. No. 816-363-2795
Fax No. 816-363-2799
(jmerrigan@dplclinic.net)

Counsel for Mr. Bolden

**CERTIFICATE OF SERVICE**

I, Anne L Saunders, hereby certify that on this date, I caused the foregoing to be served on the following persons at the location and in the manner indicated below:

Via ECF

Steven Holtshouser, Esquire
Assistant United States Attorney
United States Attorney for the Eastern District of Missouri
111 South 10th Street
St. Louis, MO. 63101

s/ Anne L. Saunders
ANNE L. SAUNDERS, ESQUIRE

Date: August 10, 2011