UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT BOLDEN, Sr., | ) | |
| | ) | |
| Movant, | ) | No. 4:10 CV 2288 CEJ |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | **THIS IS A CAPITAL CASE** |
| | ) | |
| Respondent. | ) | |

**GOVERNMENT'S RESPONSE TO PETITIONER'S AMENDED MOTION
TO VACATE, SET ASIDE, OR CORRECT THE JUDGMENT AND SENTENCE
PURSUANT TO 28 U.S.C. § 2255 AND MEMORANDUM IN SUPPORT**

RICHARD G. CALLAHAN
United States Attorney

*/s/ D. John Sauer*
STEVEN E. HOLTSHOUSER, #24277
MICHAEL A. REILLY, #43908MO
D. JOHN SAUER, #58721MO
Assistant United States Attorneys
111 South 10th Street, 20th Floor
St. Louis, MO 63101
(314) 539-2200

Counsel for the United States of America

May 21, 2012

## TABLE OF CONTENTS

STATEMENT OF FACTS...................................................................................................1

I.      BOLDEN'S CLAIMS THAT THE FAILURE TO PRESERVE HIS RIGHTS
        UNDER THE VIENNA CONVENTION VIOLATED THE FIFTH, SIXTH,
        EIGHTH, AND FOURTEENTH AMENDMENTS AND ARTICLE VI SHOULD
        BE DISMISSED WITHOUT A HEARING. ..................................................................5

II.     BOLDEN'S CLAIMS THAT THE CHARGING DECISION WAS INFLUENCED
        BY INAPPROPRIATE FACTORS ARE PROCEDURALLY BARRED,
        DEFAULTED, AND FACIALLY IMPLAUSIBLE........................................................25

III.    BOLDEN'S CLAIM THAT THE PROSECUTORS IMPERMISSIBLY ENGAGED
        IN RACE-BASED PEREMPTORY STRIKES ARE PROCEDURALLY BARRED,
        PROCEDURALLY DEFAULTED, AND FACIALLY MERITLESS..........................41

IV.     BOLDEN'S CLAIM THAT HE WAS DENIED A JURY POOL CONSISTING OF
        A FAIR CROSS-SECTION OF THE COMMUNITY IS PROCEDURALLY
        DEFAULTED AND FACIALLY MERITLESS...............................................................48

V.      BOLDEN'S CLAIM THAT COUNSEL WERE INEFFECTIVE IN FAILING TO
        INVESTIGATE AND PRESENT EVIDENCE TO CHALLENGE THE CAPITAL
        AUTHORIZATION IS FACIALLY MERITLESS..........................................................51

VI.     BOLDEN'S CLAIMS OF PROSECUTORIAL MISCONDUCT AND
        INEFFECTIVE ASSISTANCE DURING VOIR DIRE HAVE NO MERIT...................56

VII.    BOLDEN'S CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL
        DURING THE GUILT PHASE HAVE NO MERIT........................................................65

VIII.   BOLDEN'S CLAIMS OF PROSECUTORIAL MISCONDUCT
        AND INEFFECTIVE ASSISTANCE OF COUNSEL DURING
        PRETRIAL PROCEEDINGS HAVE NO MERIT..........................................................87

IX.     BOLDEN'S CLAIMS THAT HIS COUNSEL FAILED TO INVESTIGATE,
        DEVELOP, AND PRESENT MITIGATING EVIDENCE HAVE NO MERIT..............94

X.      THERE WAS NO ERROR IN THE GOVERNMENT'S USE OF VICTIM
        IMPACT EVIDENCE DURING THE SENTENCING PHASE...................................159

XI.     BOLDEN'S CHALLENGE TO THE PECUNIARY GAIN AGGRAVATOR IS
        PROCEDURALLY BARRED AND FACIALLY MERITLESS...................................163

XII.    BOLDEN'S CLAIMS THAT THE PENALTY-PHASE JURY INSTRUCTIONS
        VIOLATED HIS CONSTITUTIONAL RIGHTS HAVE NO MERIT.........................168

XIII.   BOLDEN'S CLAIMS OF PROSECUTORIAL MISCONDUCT ARE
        PROCEDURALLY DEFAULTED AND HAVE NO MERIT.....................................174

XIV.    BOLDEN'S CLAIM THAT HE WAS PROVIDED INADEQUATE CARE FOR
        DIABETES DURING TRIAL IS PROCEDURALLY BARRED AND MERITLESS..187

XV.     BOLDEN'S CLAIMS OF INEFFECTIVE ASSISTANCE ON APPEAL AND
        LACK OF MEANINGFUL APPELLATE REVIEW HAVE NO MERIT...................191

XVI.    THIS COURT LACKS JURISDICTION TO CONSIDER BOLDEN'S
        CHALLENGE TO THE CONDITIONS OF HIS CONFINEMENT ON DEATH
        ROW IN THE FEDERAL PRISON IN TERRE HAUTE, INDIANA...........................193

XVII.   BOLDEN'S CLAIM OF CUMULATIVE ERROR HAS NO MERIT.........................195

CONCLUSION.................................................................................................................196

**STATEMENT OF FACTS**

On October 7, 2002, Bolden, age 39, attempted to rob the Bank of America ("BOA"), 9075 Goodfellow, St. Louis, Missouri, with Dominic Price ("Price"), age 18, and Corteze Edwards ("Edwards"), age 19.  During the attempt, Bolden shot security guard Nathan Ley ("Nathan" or "Ley"), age 25, in his face, fracturing Nathan's jaw and causing severe bleeding. As Nathan collapsed, Bolden stepped back, aimed his revolver at the top of Nathan's head, and deliberately fired a second shot into his head.  As Nathan bled on the sidewalk, Bolden, realizing his accomplices had fled, also fled to a nearby car.  Soon thereafter, Nathan died of his wounds.

At trial, four eyewitnesses, including Price, positively identified Bolden as the shooter. Bolden's DNA was on a black skull cap at the crime scene.  One eyewitness identified the getaway car, titled to Bolden, parked at Bolden's home, 1157 Howell.  The murder weapon, confirmed by ballistics, was eventually found in Bolden's backyard.  Ammunition matching that in the murder weapon was found in Bolden's bedroom night stand.

Bolden knew Price and Edwards from facilitating their crack sales through the use of his house.  In return, Bolden received crack.  Bolden occasionally sold crack, as well.  Tr. 2174-84.

On October 7, 2002, Bolden told Price he needed $2,000 to avoid eviction and wanted Price's help to rob BOA.  Price initially refused.  Tr. 2200-01.  Bolden ridiculed Price as "soft and a pussy."   Bolden persuaded Price to at least "scope" the bank.  Tr. 2202-05.  The pair cased BOA in Bolden's black Toyota Celica, with Bolden driving.  Bolden's plan was to disarm the guard on the parking lot side at gunpoint, give the guard's gun to Price, walk him back into the bank, rob the bank, and flee.  Tr. 2206-08.  Bolden rejected entering the bank through the front entrance.  Bolden argued the guard would give up his gun to save his life.  Tr. 2210-11.

After casing BOA, Price was still reluctant, but after learning Edwards had been contacted and planned to participate, Price agreed.  Tr. 2214-15.  Price and Edwards dressed in

1

black clothing, acquired masks, and met at Bolden's house.  Tr. 2214-2224.  Bolden reviewed

his plan: park the car nearby out of sight, approach the bank, disarm Ley by threatening him with

Bolden's gun, take his gun, give his gun to Price, enter the bank, force the customers to the floor,

fill a bag with cash, and flee to the car.  Tr. 2225-26.  Again, Bolden refused to bypass the guard

through the bank's side entrance.  Tr. 2227-28, 2380.

Bolden, with the revolver in his waistband, drove Price (front passenger)  and Edwards

(rear passenger) to the bank and parked at a nearby restaurant.  Fingerprint evidence

corroborated these positions.  Tr. 2125, 2128-32.  The trio approached the bank, and waited at a

bus stop for Ley to exit BOA.  Price and Edward carried masks, but Bolden did not have one.

Tr. 2231-37.

Nathan, armed and in uniform, exited BOA to take a position near the parking lot door.

Bolden crossed the lot with Price and Edwards following 15-20 feet behind.  As Bolden neared

the door, he wheeled to his right, pulled his gun, and pointed it at Nathan's stomach.  Bolden

spoke to Nathan and Bolden's face became angry and stern.  Nathan reached for Bolden's gun,

in Bolden's right hand, and the men "tussled" for 10-20 seconds.  Tr. 2237-42.  Bolden lost his

head coverings – i.e., black skull cap and a "doo rag,"  Tr. 2222 – from which his DNA was later

recovered, during the struggle.  Tr. 2248, 2939-43, 2973, 2993.  Bolden then freed himself from

Nathan.  While separated by a short distance, Bolden fired a shot that struck Nathan's jaw.

Nathan was obviously incapacitated by the first shot, bleeding and "going down."  Bolden then

stepped back further, took deliberate aim, and shot Nathan in the head a second time.  Tr. 2244-

45.  At the time of the second shot, nothing prevented Bolden from backing up further or

retreating.  There were approximately 3-5 seconds between shots.  Tr. 2246, 2351, 2354.

Besides Price, three independent eyewitness positively identified Bolden as the shooter in

live line-ups hours later, at pretrial motions hearings, and at trial.  Tr. 2414, 2558, 3021.  Jeanne

2

Coser ("Coser") and Henry Wines ("Wines") were on BOA's lot and Ericka Ruffin ("Ruffin") was across Goodfellow Blvd. from BOA.  Coser watched the events from her vehicle.  T2996-3024.  Wines was standing outside his vehicle, first encountered a masked Edwards, and then turned to observe the incident.  Tr. 2395-2414.  Ruffin was entering her vehicle and was drawn to the incident by the first shot.  Tr. 2538-58.  All three agreed that before the second shot, Bolden separated himself from Nathan and took careful aim at a defenseless Ley.  They had numerous opportunities to observe Bolden, and Ruffin observed Bolden enter the getaway car alone.

Price and Edwards fled the scene after the shooting.  Tr. 2247.  Price ran in the opposite direction of the getaway vehicle towards Sundown Drive and an eyewitness identified Price as being on Sundown after the shooting.  Tr. 2530.  Price discarded his clothes to avoid detection and returned to Bolden's residence.  Tr. 2247-51, 2106-08, 2138-39, 2942-45.  Bolden was angry, because Price and Edwards did not help him with Ley and because they had not stayed to complete the bank robbery.  Tr. 2255. Bolden described Ley as "stupid," a "hero" who "save[d] the day" protecting Government money, and a "brick wall"; and the endeavor as a "wasted trip." Tr. 2255.  He described his confrontation with the guard and explained that he initially shot the guard because "it was either shoot the guard or spend the rest of his life in jail."  Tr. 2256-57.

Bolden told Price he had wiped the murder weapon of fingerprints, put it in a bag, and placed the bag under the gutter beside his house.  Tr. 2259-60.  Bolden told Price (and Edwards, by telephone) that he would "fuck [them] up" if they talked.  Tr. 2261.  Bolden also told Edwards, who had distinctive braids, to wash his hair out to change his appearance.  Tr. 2262.

Meanwhile, Nathan was dying in the parking lot.  Initially, he responded to a bystander by squeezing her hand, but his ability to squeeze faded.   Those assisting him could not stop the bleeding.  While on the ground, Nathan was attempting to remove his gun, which had never left

his holster.  Tr. 2004-07, 2013-15.  When paramedics arrived, Nathan, who lost much blood, was unconscious and in shock.  Nathan sustained a fracture and massive damage to the left side of his face, which was "mushy."  Nathan was "gurgling" blood at the scene and paramedics could not open Nathan's airway via suction due to his jaw injuries.  Tr. 2017, 2021-27, 2029-31, 2037.

At the hospital, Nathan died at 5:19 p.m.  Tr. 2796, 2799-02.  His family was present, beheld his hideous wounds, and watched him die.  The gunshot wound to the left side of Nathan's face shattered his jaw and caused bleeding, swelling and destruction.  Tr. 2793, 96.  The blood in Nathan's lungs effectively caused him to drown in his own blood.  Tr. 2802.  The constellation of Nathan's injuries - a head injury causing significant brain injury, and a jaw injury causing blood loss, low oxygen delivery, and low blood pressure - made him "unsalvageable."  Tr. 2799-2801.  Autopsy confirmed that the second shot, to the top of his head, caused his death.  Tr. 2714-17, 2722-23, 2735,2740, 2751.

Bolden was arrested on the evening of October 7, 2002.  After being advised of and waiving his rights, he stated he had not driven his car that day, had only left the house to walk to a store, "didn't do a motherfucking thing," and asked officers who was snitching on him.  He declined to take a gunshot residue test, stating that he had recently fired a .38 caliber weapon in his garage, but did submit a DNA sample.  Tr. 2448-55, 2476-82, 2630-34.  On October 8, 2002, Bolden consented to a search of his residence, where officers located a box of .22 caliber ammunition, consistent with the bullets that struck Nathan Ley.  Tr. 2666-2671.  On January 16, 2003, Price disclosed where Bolden had hidden the murder weapon.  This gun, a loaded .22-caliber 9-shot revolver with three spent shell casings, was discovered wrapped in plastic bags beneath guttering in the yard at 1157 Howell.  Forensic tests confirmed this gun fired at least one of the shots that killed Nathan.  Tr. 2238-45, 62-63.

Penalty phase evidence showed, prior to October 7, 2002, Bolden was convicted of three felonies in Michigan: resisting/obstructing a police officer (February 1993), attempted possession with intent to deliver cocaine (September 1993), and delivery of cocaine (August 1995). Tr. 3387-91, 3372-95, 3398-3417. The Government presented victim-impact from Nathan's family and friends, including his girlfriend, co-workers/employers, a pastor, and a witness to his death. This testimony established Nathan's unique qualities, his aspiration to become a police officer, his exceptional gift of helping others, the excruciating pain he suffered after Bolden shot him twice in the head, and the catastrophic impact of his death on his family. Tr. 3455, 3523-28, 3369-71, 3673-76, 3453-54, 3458-61, 3497-3502, 3506, 3510-18, 3534-37, 3544, 3558-66, 3631-31, 3632-41, 3589-91, 3660.

The defense presented eight mitigation witnesses who testified to Bolden's family and childhood hardships, severe diabetes, illegal drug usage, parenting efforts, and pretrial Bible studies, conversion, and accountability. Bolden's aunt, a cousin, two of his four children, a former girlfriend and three conversion witnesses testified. See infra.

The jury found Bolden guilty and sentenced him to death on Counts II and III.

I.     **BOLDEN'S CLAIMS THAT THE FAILURE TO PRESERVE HIS RIGHTS UNDER THE VIENNA CONVENTION VIOLATED THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS AND ARTICLE VI SHOULD BE DISMISSED WITHOUT A HEARING.**

In Claim I of his Petition (Doc. 54, hereinafter "Pet."), Bolden contends that his Vienna Convention right to consular notification was violated. Pet. 1-5. This claim is meritless.

The Vienna Convention "is an international treaty that governs relations between individual nations and foreign consular officials." Sanchez-Llamas v. Oregon, 548 U.S. 331, 336 (2006). Article 36 of the Vienna Convention provides:

If [National of the sending State] so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular

> district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner.  Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay.  The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph.

Vienna Convention, Article 36(1)(b) 21 U.S. T. 77 (Dec. 14, 1969).  Additionally, Article 36 provides consular officers with the right to visit a national of the sending State to converse and correspond with him, to arrange legal representation, and to visit in pursuance of a judgment. Vienna Convention, Article 36(1)(c), 21 U.S. T. 77 (Dec. 14, 1969).  The rights conferred in Article 36 "shall be exercised in conformity with the laws and regulations of the receiving State." Vienna Convention, Article 36(2), 21 U.S. T. 77 (Dec. 14, 1969).  Though there is a split of authority on this issue, the better view of the law is that Article 36 of the Vienna Convention does not create individually enforceable rights.  See Alcantara v. United States, 99 CR. 1254 DC, 2003 WL 102873, at *3 (S.D.N.Y. Jan. 10, 2003) ("Article 36 of the Vienna Convention does not create any fundamental rights for a foreign national." (citing United States v. De La Pava, 268 F.3d 157, 165-66 (2d Cir. 2001) (internal quotations omitted))); Medellin v. Dretke, 371 F.3d 270, 280 (5th Cir. 2004); but see Osagiede v. United States, 543 F.3d 399, 410 n.8 (7th Cir. 2008) ("Article 36 does confer individual rights.").  Both the Supreme Court and the Eighth Circuit have declined to reach this issue.  Sanchez-Llamas, 548 U.S. at 343, 347 (stating that there is "reason to doubt" this); United States v. Santos, 235 F.3d 1105, 1108 (8th Cir. 2000).

In Claim I of his Petition, Doc. 54 ("Pet."), Bolden makes five distinct allegations in regards to the Vienna Convention.  The first two claims allege that the Government violated his Fifth, Sixth, Eighth, and Fourteenth Amendment Rights and Article VI by (1) failing to notify Bolden of his right to consular assistance and by (2) failing to notify the Canadian Consulate of Bolden's detention.  The last three claims allege ineffective assistance of counsel for (3) failing to notify

Bolden of his right to consular assistance, (4) failing to contact the Canadian Consulate for

assistance, and (5) failing to litigate the Government's failure to abide by its Vienna Convention

obligations under Article 36.  Even if the Vienna Convention creates individually enforceable

rights, all of Bolden's VCCR claims lack merit.

**A) Bolden's Allegations that the Government Violated His Fifth, Sixth, Eighth, Fourteenth Amendment Rights and Article VI by Failing to Notify Him of His Right to Consular Assistance and by Failing to Notify the Canadian Consulate of His Detention Are Procedurally Defaulted and Meritless.**

Bolden's first two contentions allege that the Government violated his Fifth, Sixth, Eighth,

Fourteenth Amendment Rights as well as Article VI for failing to notify him of his right to

consular assistance and notify the Canadian Consulate of his arrest under Article 36 of the

Vienna Convention.  These contentions are procedurally defaulted and meritless.

*1) Bolden's Allegations against the Government are procedurally defaulted.*

Both of these contentions, which allege substantive violations of due process, right to a fair

trial, and right to present mitigating evidence arising from the Government's failure to inform

Bolden of his right to consular notification and failure to inform the Canadian Consulate of his

detention, are procedurally defaulted.  As stated above, if a claim could have been raised on

direct appeal, but was not, it cannot be raised in a Section 2255 motion unless Bolden can show

both (1) a "cause" that excuses the default and (2) "actual prejudice" resulting from the errors of

which he complains. See e.g., United States v. Frady, 456 U.S. 152, 168 (1982); Matthews v.

United States, 114 F.3d 112, 113 (8th Cir. 1997).  Violations of the Vienna Convention are

subject to procedural default rules and thus are barred from being raised in a Section 2255 when

the claims were not raised in district court nor raised on direct appeal.  Sanchez-Llamas, 548

U.S. at  3359-60 ("[C]laims under Article 36 of the Vienna Convention may be subjected to the

same procedural default rules that apply generally to other federal-law claims."). Bolden fails to make any argument showing "cause" or "actual prejudice."

(a)  *Bolden cannot establish "cause" to excuse his failure to raise the claims.*

First, the Government's failure to notify Bolden of his right to consular notification under Article 36 of the Vienna Convention alone does not constitute "cause" for failure to raise a Vienna Convention claim in district court or on direct appeal. See Murphy v. Netherland, 116 F.3d 97 (4th Cir. 1997) ("Nor can the [Government]'s failure to notify [Petitioner] of any rights he may have had under the Vienna Convention constitute cause for failure to raise his Vienna Convention claim in state court."). Bolden was aware that the Government had not notified him of his right to consular notification; therefore, he could have raised the claim in trial or on direct appeal. Even if Bolden did not understand the legal significance of the lack of notification, this failure to understand cannot be considered "cause." See Sanchez-Llamas, 548 U.S. at 359 ("A defendant is well aware of the fact that he was not informed of his Article 36 rights, even if the *legal* significance of that fact eludes him.").

Insofar as Bolden alleges bad faith on the part of the Government as "cause" for excusing his failure to raise the Vienna Convention violation during trial and on direct appeal, his allegations are facially implausible. Bolden has not produced any evidence of bad faith. To the contrary, Bolden's own exhibits demonstrate the opposite. Bolden alleges the documents contained in his Exhibits 25, 55, 58, and 66, indicate he is a Canadian citizen. The documents, however, only indicate that Bolden was born in Canada, see Exhibit 25, 55, 58, and birth does not necessarily equate to citizenship. Notably, the information Bolden provided to the U.S. Marshals Service indicated that he is a United States citizen. See Exhibit 66 ("Citizen Code: US"). These documents show that the Government did not act in bad faith. First, the documents prove that

8

the Government had every reason to believe that Bolden was a United States citizen.[1] See id. The U.S. Marshal Service's booking sheet establishes that the Government did not act in bad faith by failing to notify Bolden of his right to consular notification rights under Article 36 of the Vienna Convention.  Second, the Government turned over documents that – according to Bolden – indicated he is a Canadian citizen, establishing that the Government did not hide any documents relating to his citizenship status.  Therefore, "[n]othing the [Government] did or omitted to do here precluded counsel from . . . raising the question of a violation of the Vienna Convention in the initial trial." Sanchez-Llamas, 548 U.S. at 364 (Ginsburg, J., concurring in the judgment).  Under no standard of bad faith, can the Government's actions be considered as such.

Second, Bolden cannot show cause in regards to the Government's failure to notify the Canadian Consulate because the Government's failure to notify the consulate did not amount to a violation of the Vienna Convention.  The Vienna Convention only requires the Government to notify a consulate, when the national has not requested notification, in the cases of "mandatory notification countries."  *U.S. Department of State, Consular Notification and Access,* at 3-5 (Sept. 2010) (travel.state.gov/pdf/cna/CNA_Manual_3d_Edition.pdf ).  Canada is not a "mandatory notification country."  Id. at 5.  Thus, the Vienna Convention required the Government to notify the Canadian Consulate of Bolden's arrest only at Bolden's request. Bolden never requested that the Canadian Consulate be notified, and therefore, there was no failure of the Government's obligations under Article 36.

Insofar as Bolden alleges the Government's failure to follow the Department of Justice's Statement of Policy for notification of the Canadian Consulate, see 28 C.F.R. §50.5(a)(1), is

---

[1]  Bolden's citizenship status on both the Marshal's report, Exhibit 66, and the Pre-trial Service Report, is listed as United States.  Moreover, Bolden never objected to the information in the Pre-trial Service Report.  See United States v. Bolden, 4:02-CR-557-CEJ, Doc. 18 (E.D. Mo. Nov. 20, 2004).

itself violation of the Vienna Convention and amounts to "cause" for excusing his failure to raise

the claim on direct appeal, his claim cannot be supported.  Failure to follow internal DOJ

guidelines cannot be asserted as failure to abide by the Government's treaty obligations nor can

it be asserted as "cause."  As described above, the Government did not fail to follow its

obligations under the Vienna Convention with respect to Canadian Consulate notification.  In

regards to the Government's failure to follow the statement of policy as "cause," a defendant

does not have enforceable rights in regards to the Department of Justice's Statement of Policy.

See Iowa Power and Light Co. v. Burlington Northern, Inc., 647 F.2d 796, 811 (8th Cir. 1981)

("[A policy statement] does not establish a 'binding norm,' but instead announces the agency's

tentative intentions for the future."); American Bus Association v. United States, 627 F.2d 525,

529 (D.C. Cir. 1980) ("[A] 'general statement of policy' is one that does not impose any rights

and obligations." (citation omitted)); Gas & Elec. Co. v. Federal Power Commission, 506 F.2d

33, 38 (D.C. Cir. 1974);  Texaco, Inc. v. Federal Power Commission, 412 F.2d 740, 744 (3d Cir.

1969).

> *(b)   Bolden has wholly failed to establish "actual prejudice" resulting from the Government's failure to notify him of his right to consular notification or from its failure to notify the Canadian Consulate of his arrest and detention.*

Bolden alleges he was prejudiced by the Government's failure to notify the Canadian

consulate because he was deprived of "vital" consular assistance.  This is untrue and contrary to

the record.  "[Bolden's] assertions of prejudice are speculative and trumped by the record and by

applicable precedent."  Gomez v. United States, 100 F.Supp.2d 1038, 1049 (D.S.D., 2000).

First, Bolden cannot establish "actual prejudice" because an experienced capital defense

team represented him throughout pretrial, trial, and post-trial proceedings and because he was

more than familiar with the American legal system. The primary objectives of consular

notification are to ensure that the foreign national knows his rights as a defendant and to explain the differences between the foreign national's home State and the arresting State's legal systems. "Consular notification generally serves to ensure that a foreign national charged with a violation of American law is visited by an official representative of his native country who can explain to him his rights as a criminal defendant in the United States, most notably his right to legal counsel and his right to remain silent." Francis v. United States, No. 02 CV 0468(RJD), 2010 WL 1260158, at *12 (E.D.N.Y. March 31, 2010) (citing United States v. Arango, No. 99 Civ. 3728, 1999 WL 1495422, at *3 (E.D.N.Y. Dec. 29, 1999)); Osagiede, 543 F.3d at 403 ("The consulate can provide . . . an explanation of how that system differs from the sending state's system."). Throughout the proceedings, Bolden was represented by a seasoned capital defense team, who not only hired investigators but also employed experienced experts; hence, he cannot demonstrate "actual prejudice," because the purposes of consular notification were satisfied. See e.g., Castro-Carlozama v. United States, No. 07 Civ. 464(BSJ), 2010 WL 2594317, at *4 (S.D.N.Y. June 16, 2010) (finding no prejudice where "[defendant] was represented by able counsel and assisted by interpreters throughout the course of the proceedings"); Ramdeo v. Phillips, No. 04-CV-1157, 2007 WL 1989468, at *31 (E.D.N.Y. July 9, 2007) ("[A] represented defendant will have already received all of the benefits that . . . consular notification would have provided."). Cf. Baires v. United States, 707 F. Supp. 2d 656, 665 (E.D.Va. 2010) (finding no prejudice because "petitioner was provided with two experienced criminal defense attorneys as well as translators and investigators pursuant to the Criminal Justice Act"); Alcantara, 2003 WL 102873, at *3 ("Because [Petitioner] was represented by able counsel at both his plea and sentencing, there is no showing of prejudice due to counsel's failure to inform [Petitioner] of his consular notification rights."). See also United States v. Gaona-Lopez, No. 8:03CR547, 2007 WL 1290129, at *2 (D. Neb. March 12, 2007) ("[T]he Defendant was afforded competent

11

counsel at trial and on appeal. As in *Gomez*, had consular notification been given, [the Petitioner] 'would have been able to talk to someone who could do no more (and probably far less) to protect his rights than trial counsel." (citing <u>Gomez</u>, 100 F.Supp.2d at 1049)).

With respect to the other primary objective of consular notification, Bolden had no need for an explanation of the differences between the Canadian and American legal systems. He has spent his entire life in the United States, arriving at the age of one, has been convicted of both felonies and misdemeanors, and has been arrested numerous times. It makes no sense to say that Bolden was deprived of a "cultural bridge" between the Canadian and American legal systems. <u>See</u> <u>United States v. Tull</u>, No. 4:06CR3023-2, 2010 WL 2540790, at *2 (D. Neb. June 15, 2010) ("Given the fact that [Petitioner] lived in the United States for 20 years and was permanent resident alien, it would be absurd to believe that [Petitioner] was in need of the "cultural bridge" that the consulate allegedly would have extended to [Petitioner] by providing an explanation of the American legal system.").

Second, in regards to Bolden's assertion that he was prejudiced by the deprivation of services the consul provides beyond the primary objectives of consular notification, Bolden has not made a showing of "actual prejudice." For the reasons discussed below, Bolden's list of game-changing services that the Canadian consul would allegedly have provided is speculative to the point of being fantastical. <u>See</u> Pet. 5-8. Bolden's connection to Canada is more than tenuous: he only lived outside of the United States for approximately one year of his life and has no close relatives or friends living in Canada. This tenuous connection establishes that he cannot make a showing of prejudice because the consulate could not have helped with investigation of his "life in Canada." <u>See</u> <u>Leal v. Quarterman</u>, No. SA-07-CA-214-RF, 2007 WL 4521519, at *7 (W.D. Tex. Dec. 17, 2007) ("Because of his tenuous connection with Mexico, there was little the Mexican government could have done to aid petitioner's trial counsel during the punishment

12

phase of petitioner's 1995 capital trial. In view of the fact the petitioner has lived virtually his entire life in the United States, the foregoing is hardly surprising."), vacated in part on other grounds *sub nom.* <u>Leal Garcia v. Quarterman</u>, 573 F. 3d 214, 224–225 (2009) (cited in <u>Leal v. Texas</u>, 564 U.S. __ , *4 (2011).

Furthermore, Bolden had no need of any "special services" he alleges the consulate would have provided; his current counsel were able to locate documents and do extensive social history research on the town in which Bolden's extended family lived.  <u>See</u> <u>Choiniere v. United States</u>, No. 3:05-CR-56, 2009 WL 112585, at *9 (N.D.Ind. 2009) (finding no prejudice where the Petitioner did not have any need for special services within the power of the consulate, including translating documents, locating witnesses, or understanding the American legal system, and because he was able to hire his own defense team and an investigator).  Any help the Canadian Consulate could have provided was not necessary and would have been cumulative.  Therefore, Bolden cannot establish "actual prejudice."  <u>See</u> <u>e.g.</u>, <u>Murphy</u>, 116 F.3d at 101 ("[Petitioner]'s assertion that the Mexican consulate could have helped him obtain character testimony from his relatives in Mexico does not establish prejudice because [Petitioner] has failed to show how assistance from the consulate was necessary to obtain such testimony and because such character testimony would have been largely duplicative of the character testimony that was actually presented at the sentencing hearing."); <u>Faulder v. Johnson</u>, 81 F.3d 515, 520 (5th Cir. 1996) ("[T]he district court correctly concluded that [Petitioner] or [Petitioner]'s attorney had access to all of the information that could have been obtained by the Canadian government. . . . [T]he evidence that would have been obtained by the Canadian authorities is merely the same as or cumulative of evidence defense counsel had or could have obtained.").  Insofar as Bolden was prejudiced because Canada would have asked for clemency, no prejudice exists because the Canadian Consulate has the ability to seek clemency at any time if it so chooses.

13

Every case that Bolden cites in support of his showing of prejudice either supports the Government's position or is clearly distinguishable. See Wiggins v. Smith, 539 U.S. 510 (2003) (in a case not involving the Vienna Convention, counsel did not expand their investigation beyond the PSI and the DSS reports); Osagiede v. United States, 543 F.3d 399 (7th Cir. 2008) (the Petitioner needed help analyzing tapes that contained different Nigerian dialects and also locating a witness that was mistaken for the Petitioner); Murphy v. Netherland, 116 F.3d 97 (4th Cir. 1997) (finding no prejudice despite claims that consulate would have helped obtain mitigation evidence); Faulder v. Johnson, 81 F.3d 515 (5th Cir. 1996) (unlike Bolden, petitioner had family and friends living in Canada and had lived in Canada for a significant period of time; the court, however, found no prejudice despite allegations that petitioner was deprived of a means for obtaining significant mitigating evidence); Marquez-Burrola v. State, 157 P.3d 749 (Okla. Crim. App. 2007) (petitioner spoke very little English, counsel did not have an interpreter during all of the proceedings, no substantive mitigation work had been done, and counsel *did not accept* assistance offered by the Mexican Consulate); Torres v. Oklahoma, 120 P.3d 1184, 1188 (Okla. Crim. App. 2005) (the Mexican Consulate provides significant funds, and Mexico hired counsel to assist Torres's trial counsel, hired two investigators, hired two gang experts, and hired a bilingual neuropsychologist, nothing remotely similar to the alleged assistance of the Canadian Consulate); Valdez v. Oklahoma, 46 P.3d 703, 710 (Okla. Crim. App. 2002) ([Petitioner]'s counsel had never tried a capital case and had insufficient funds because the attorney did not request capital funds; also, [Petitioner] needed a translator to communicate, see Valdez v. Oklahoma, 900 P.2d 363, 372-73 (Okla. Crim. App. 1995), again none of which are present here); Ledezma v. Iowa, 626 N.W.2d 134, 138 (Iowa 2001) (defendant spoke very little English, lived in the U.S. for only four years, and counsel failed to conduct even a minimal investigation, none present here).

14

Bolden has not identified any area where the consul would have assisted that would have "significantly affected the manner in which his defense was conducted," and thus, he simply cannot establish "actual prejudice" from the government's failure to notify him of his consular notification rights under Article 36. See Castro-Carlozama, 2010 WL 2594317, at *4.

> **2)  Bolden's allegations against the Government are substantively meritless.**

Even if Bolden's allegations were not procedurally defaulted, he would be unable to demonstrate such violations because his claims are substantively meritless.

> *(a)  Failure to notify Bolden or the Canadian Consulate under Article 36 of the Vienna convention is not a Constitutional violation, and Bolden has not demonstrated any action or omission of the Government that could possibly "shock the conscience of the court."*

A violation of Article 36 does not rise to the level of a Constitutional violation. Therefore, the Government's putative failure to inform Bolden of his right to consular assistance and failure to notify the Canadian consulate of Bolden's detention does not implicate Bolden's Constitutional rights. See Sanchez-Llamas, 548 U.S. at 348 (contrasting treaty-created Article 36 rights, for which there is no suppression remedy, with "constitutional violations" for which there is a suppression remedy.); cf. Leal Garcia v. Texas, 564 U.S. __, *2 (2011) (rejecting the petitioner's due process claim, which was based on pending legislation that would implement his Article 36 rights).  Notably, Article 36 of the Vienna Convention does not create a right to have consulate intervene. See 548 U.S. at 349 ("The provision secures only a right of foreign nationals to have their consulate *informed* of their arrest or detention—not to have their consulate intervene.").  If the Vienna Convention, the treaty that governs consular relations, does not secure any sort of right to consulate intervention, it follows that the Constitution does not protect a right of Canadian Consulate intervention in Bolden's case. Therefore, notwithstanding the foregoing analysis, Bolden cannot establish that his rights to due process, to fair trial, and to

15

present mitigating evidence were implicated, let alone violated, because of the Government's

failure to notify him and the Canadian Consulate under Article 36.

 To the extent that Bolden bootstraps the Government's failure to notify him of his right to

consular assistance and failure to notify the Canadian Consulate into a Constitutional violation of

due process and right to a fair trial, he must demonstrate that the Government's actions were so

outrageous that the actions would "shock the conscience of the court." United States v. Pardue,

983 F.2d 843, 847 (8th Cir. 1993) (reversing the district court's acquittal because the

Government did not engage, "in such outrageous conduct that under principles of due process

[the district court] was obligated to acquit the defendant. . . . The level of outrageousness needed

to prove a due process violation is 'quite high,' and the government's conduct must 'shock the

conscience of the court.'" (citing United States v. Jacobson, 916 F.2d 467, 469 (8th Cir., 1990),

*rev'd on other grounds,* 503 U.S. 540)). See also United States v. Russell, 411 U.S. 423, 432

(1973) ("The law enforcement conduct here stops far short of violating that 'fundamental

fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the

Fifth Amendment." (citation omitted)). Bolden has not demonstrated any such egregious action

and no evidence of such action exists. The Government's failure to notify Bolden of his consular

notification rights under Article 36 and failure to notify the Canadian Consulate of Bolden's

arrest do not overcome the "cause" standard in order to excuse Bolden's failure to raise the claim

on appeal. See supra, Part I(A)(1)(a). A good faith mistake made in reliance on Bolden's own

representation to the Marshal's Office, cannot rise to the level of "shocking the universal sense

of justice." Clearly, the violation in Sanchez-Llamas did not "shock the conscience" of the

Supreme Court. See 548 U.S. at 347-50, 356-360.

 *(b)  The Constitutional violations alleged are not only meritless but also
 unsubstantiated.*

16

Even if the Government's failure to notify Bolden of his right to consular notification or the Canadian Consulate of Bolden's detention were to "shock the conscience of the court," Bolden's due process right, right to fair trial, and right to present mitigating evidence claims are baseless and not supported by evidence or the record.  First, Bolden alleges that the Government deprived him of the "unique and pivotal role" of the Canadian Consulate, violating his due process right and right to a fair trial.  This claim is facially implausible.  The "unique and pivotal role" the consulate plays is to inform a foreign national of his rights as a defendant in the United States and explain the differences in the American legal system.  See Francis, 2010 WL 1260158, at *12; United States v. Arango, No. 99 Civ. 3728, 1999 WL 1495422, at *3 (E.D.N.Y., Dec. 29, 1999); Osagiede, 543 F.3d at 403.  Once Bolden was represented by able counsel, the purpose and function of Article 36 of the Vienna Convention disappears.  See Francis, 2010 WL 1260158, at *12 ("Of course, once defense counsel enters a notice of appearance, he assumes full responsibility for safeguarding these and any other legal rights for a defendant.") (internal citation omitted)).  See also Ramdeo v. Phillips, 2007 WL 1989469, at *31 (" [A] represented defendant will have already received *all* of the benefits that . . . consular notification would have provided." (internal citation and quotation omitted) (emphasis added)).

Bolden claims he was denied a "cultural bridge," which he contends is part of the "unique and pivotal role" of the consulate.  See Osagiede, 543 F.3d at 403.  In Ledzma v. Iowa, 626 N.W.2d 134 (Iowa 2001), the court elaborated on the services consulate could provide, stating that the services are: explaining "the differences between the American and Mexican criminal justice systems, as well as the severity of the charges;" providing a greater understanding of the charges, maximum sentences, and plea offers; and being "available to address the general obstacles presented by cultural barriers."  See id. 151.  Bolden had no need for a "cultural

17

bridge" or any of the <u>Ledezma</u> listed services before or after his counsel was appointed, because

no cultural differences were present and because he was very familiar with our legal system.

Bolden had been convicted of three prior felonies and has been arrested numerous times; he was

very familiar with the American legal system and does not claim, nor could he, a lack of

understanding of the American legal system.  <u>See</u> <u>Tull</u>, 2010 WL 2540790, at *2 ("[G]iven the

fact that [petitioner] lived in the United States for 20 years . . . it would be absurd to believe that

[petitioner] was in need of the "cultural bridge" that the consulate allegedly would have extended

to [petitioner] by providing an explanation of the American legal system."); <u>cf.</u> <u>Leal Garcia v.</u>

<u>Texas</u>, 564 U.S. __, *1 (2011).

    Bolden also alleges he was deprived of fundamental services aimed at preserving the

integrity of his trial because the consulate could have (1) helped appoint qualified local counsel,

(2) could have sought a remedy for the Vienna Convention violation, (3) negotiated pleas, (4)

provided financial assistance, (5) obtained social history documents, and (6) contacted family

and friends.   All of the claims of deprivation of the listed assistance are baseless,

unsubstantiated, and do not amount to any Constitutional violation.  First, the consulate could

not have helped to appoint more qualified local counsel because Bolden was appointed not only

adequate but excellent, seasoned capital defense attorneys.  <u>See</u> <u>United States v. Bolden</u>, 4:02-

CR-557, Doc. 18 (E.D.Mo. Nov. 20, 2002).  Second, the argument that the Canadian Consulate

could and would have sought a remedy for the Government's failure to notify Bolden or the

Canadian Consulate under Article 36 is self-contradictory.  Therefore, the Canadian Consulate, if

notified, would not have been able to seek a remedy for the non-notification of the Canadian

Consulate.  Additionally, Bolden does not allege a particular remedy that the Canadian

Consulate could have or would have sought, nor does there appear to be any substantial remedy

that the Canadian Consulate could have been sought.  See Sanchez-Llamas, 548 U.S. at 349

("Suppression would be a vastly disproportionate remedy for an Article 36 violation."); Baires,

707 F. Supp. 2d at  665 ("[N]o court has held . . . that automatic dismissal of the indictment

should result from a Vienna Convention violation.").

   Third, the Canadian Consulate could not have assisted in pleas or negotiations.  The

Canadian Manual of Consular Instructions is clear on what type of assistance consuls can and

cannot provide; negotiation of plea bargains is not a type of assistance that can be provided.  See

Exhibit 1, at Vol. 1 ch. 1.02 ("Consuls *must not* give legal advice on foreign law. . . . [C]onsuls

should avoid acting as intermediaries between detains and counsel." (emphasis added)).  The

Government also would not have negotiated with the Canadian Consulate nor would have the

Government offered any sort of plea in Bolden's capital case.  See Exhibit 22 ("The Defendant's

offer to plead guilty to life sentence has been rejected, and the Government shall continue to

seek the death penalty.").  Fourth, Bolden had more than adequate funds available for his defense

and mitigation investigation under the CJA, and the Canadian Consulate would not have made

public funds available, see Exhibit 1, at Vol. 1, Ch. 1.02 ("Consuls *must avoid* the impression

that public funds can be made available to pay legal fees.").  Fifth, nothing prevented counsel

from obtaining social history records or documents from Canada.  The role of the consulate is

not to investigate the social history, which can be readily done by counsel.  See id. at Ch.

2.4.4(2).  Bolden's habeas counsel were able to obtain unsupported information about Bolden's

mother and other social history records from Canada without the help of the Canadian Consulate.

See e.g., Doc. 24, at 197-209.  Importantly, most of the mitigation evidence that Bolden alleges

the consul could have provided are merely unsupported and speculative allegations, and thus do

not warrant an evidentiary hearing.  See United States v. Woods, 567 F.2d 861, 863 (8th Cir.

19

1978) (finding that allegations "based solely on speculation" do not warrant an evidentiary hearing, because "merely stating unsupported conclusions will not suffice").   Sixth, the Canadian Consulate could not have located family and friends of Bolden living in Canada because his immediate family and all of his friends were living in the United States.   As demonstrated by the record, Bolden and his parents lived in the United States for practically his entire life, <u>see</u> Tr. at 3680, and all of his friends and close relatives live in the United States.

Notably, the cases Bolden cites are easily distinguishable and demonstrate that the purpose and function of consular notification were satisfied in Bolden's case.   In <u>Ledezma</u>, the defendant did not speak English and had been living in the United States for only four years.  626 N.W.3d at 138.  The petitioner in <u>Osagiede</u> claimed to not understand the United States legal system and that Nigerian system varies considerably.  <u>See</u> <u>Osagiede v. United States</u>, No 07-1131, 2008 WL 214724, at *19-20 (7th Cir. 2008) (Brief of Appellant).  In <u>Valdez</u>, the petitioner needed a translator to communicate with his attorneys.  <u>Valdez v. Oklahoma</u>, 900 P.2d 363, 373-72 (Okla. Crim. App. 1995).  Moreover, in <u>Valdez</u> the counsel had never previously worked on a capital case, and his counsel did not have adequate financial resources because of his inexperience did not know capital litigation funds were available.  46 P.3d at 710.

Second, Bolden alleges the Government's failure to notify him of his right to consular notification and failure to notify the Canadian Consulate of his arrest violated his right to present mitigating evidence.   Once again, this claim is facially implausible.  The Government did not prevent counsel from presenting mitigating evidence; Bolden and his counsel knew he was born in Canada, <u>see</u> Pet. Exhibit 25, 55, 58, 66, and Bolden's present counsel were able to obtain the records without the assistance of the Canadian Consulate, <u>see</u> Doc. 24, at 197-209.  Nothing the Government did or did not do prevented counsel from obtaining mitigation evidence in Canada

or from seeking the assistance of the Canadian Consulate. <u>Faulder v. Johnson</u>, 81 F.3d 515 (5th Cir., 1996), a case Bolden cites in support of his claim, further establishes that this claim is meritless. In <u>Faulder</u>, the petitioner argued that he was deprived of a means for obtaining significant mitigating evidence, like Bolden. <u>See Faulder v. Scott</u> No. 95-40512, 1995 WL 17116959, at *9-10. (5th Cir. Sept 5, 1995). Despite the petitioner's claims and the fact that the petitioner in <u>Faulder</u>, unlike Bolden, had family and friends living in Canada and had lived in Canada for a significant period of time, <u>see Faulder v. Scott</u>, No. 95-40512, 1995 WL 17116961, at *21, *45, the court held that "the district court correctly concluded that [Petitioner] or [Petitioner's] attorney had access to all of the information that could have been obtained by the Canadian government. . . . [and that] the evidence that would have been obtained by the Canadian authorities is merely the same as or cumulative of evidence defense counsel . . . *could have* obtained." <u>Faulder</u>, 81 F.3d at 520 (emphasis added). The claim that there was a "wealth" of family, medical, and social history in Canada is simply inaccurate. <u>See infra</u> Part IX.

## B. Bolden's Claims That His Trial Counsel Were Ineffective In Their Handling Of The Issue of Consular Notification Under The Vienna Convention Are Meritless.

Bolden argues his trial counsel were ineffective for three distinct reasons: (1) his counsel were ineffective for failing to notify him of his right to notify the consul; (2) his counsel were ineffective for failing to notify contact the Canadian Consulate; and (3) his counsel were ineffective for failing to raise and litigate the consulate issues before the District Court.

### (1) Strickland Performance

#### (a) Bolden's trial counsel were not deficient for failing to notify Bolden of his right to Consular Notification.

Considering all circumstances in the case, it is clear that Bolden's trial counsel were not deficient and that their performance did not fall below an objective standard of reasonableness.

Once the court appointed Bolden's defense counsel, any need for Bolden to be notified of his Article 36 right to consular notification disappeared.  See Francis, 2010 WL 1260158, at *12 ("Of course, once defense counsel enters a notice of appearance, he assumes full responsibility for safeguarding these and any other legal rights for a defendant.") (citing United States v. Arango, No. 99 Civ. 3728, 1999 WL 1495422, at *3 (E.D.N.Y. Dec. 29, 1999));  Ramdeo, 2007 WL 1989469, at *31 ("[A] represented defendant will have already received *all* of the benefits that . . . consular notification would have provided." (internal citation and quotation omitted) (emphasis added)).  As explained above, Bolden had extensive familiarity with the American legal system, see supra Part I(A)(1)(b), Part I(A)(2)(b), further diminishing any need for his attorney to notify him that his consulate could explain the differences between the Canadian and American legal system.  Therefore, the failure to notify Bolden of his consular notification rights could not have been deficient performance under *Strickland.*  See, e.g., Francis, 2010 WL 1260158 at *12 ("[A] defense attorney cannot be labeled ineffective for failing to advise his client of the right to speak to a diplomatic official who could do no more to protect his rights than counsel himself." (citing Arango, 1999 WL 1495422, at *3)); Blumenberg v. United States, No. 01 Cr. 571, 2008 WL 1944012, at *6 (S.D.N.Y. April 30, 2008) ("The alleged failure to advise a defendant of his consular-notification rights . . . does not constitute ineffective assistance of counsel.").

Furthermore, the counsel's putative failure to follow the ABA Guideline obligation to advise Bolden of his right to consular notification does not establish his trial counsel were deficient and that their performance was objectively unreasonable.  It appears that Bolden's trial counsel were unaware of his Canadian citizenship status and were under the impression that he was a United States citizen.  There was no indication that this information was inaccurate; Bolden had lived in the United States his entire life and represented to the U.S. Marshal's service that he was a U.S.

citizen.  Even if Bolden's counsel had attempted to obtain immigration records for Robert

Bolden, Sr., none would have existed.  The immigrations records were under a different name,

Robert Decker.  Thus, Bolden cannot establish that his trial counsel's performance was

objectively unreasonable for failing to inform him of his right to contact the Canadian Consulate,

when they were under a reasonable impression he was not entitled to notification.

     *(b)   Bolden's trial counsel were not deficient for failing to contact the Canadian
     Consulate.*

    For the aforementioned reasons, the performance of Bolden's trial counsel was not

objectively unreasonable because his counsel failed to contact the Canadian Consulate regarding

their client's detention.  See Part(2)(1)(a).  The Canadian Consulate "could [have done] no more

(and probably far less) to protect [Bolden's] rights than trial counsel."  Gaona-Lopez, 2007 WL

1290129, at *2 (citing Gomez, 100 F.Supp.2d at 1049).  Moreover, it was not objectively

unreasonable because the consulate would have little or no information regarding Bolden

because he spent approximately one year of his life there.  Leal v. Quarterman, 2007 WL

4521519, at *17 ("In view of the fact the petitioner has lived virtually his entire life in the United

States, the foregoing is hardly surprising."), vacated in part on other grounds *sub nom*. Leal

Garcia v. Quarterman, 573 F.3d 214, 224-25 (2009) (cited in Leal Garcia v. Texas, 564 U.S. __,

*4 (2011).

     *(c)   Bolden's trial counsel were not deficient for failing to raise and litigate the
     Government's failure to honor its treaty.*

    "[A] violation of the Vienna Convention does not provide a defendant in a criminal case with

the right to any relief unless the defendant can establish prejudice as a result of the violation."

Blumenberg, 2008 WL 1944012, at *5.  Bolden cannot establish that he was prejudiced by the

Vienna Convention violation.  See supra Part I(A)(1)(b); infra Part I(B)(2).  Therefore, Bolden's

trial counsel cannot have performed deficiently for failing to raise and litigate a claim that had zero chance of success. See e.g., Francis, 2010 WL 1260158, at *12 ("[Petitioner] cannot show that [his attorney's] performance fell below an objective standard of reasonableness for failing to preserve a [violation of Article 36] claim that had almost no chance of success."); Blumenberg, 2008 WL 1944012, at *6 ("[T]he failure to raise the alleged violation of Article 36 did not fall below an objective standard of reasonableness."). Notably, an Article 36 violation does not trigger any substantial remedial rights, see Sanchez-Llamas, 548 U.S. at 349 ("Suppression would be a vastly disproportionate remedy for an Article 36 violation."); Baires, 707 F. Supp. 2d at 665 ("[N]o court has held . . . that automatic dismissal of the indictment should result from a Vienna Convention violation."), and the Supreme Court and the 8th Circuit have never found that the Vienna Convention creates individually enforceable rights.

For the foregoing reasons Bolden has failed to satisfy the first-prong of the *Strickland* test for all three of his allegations of ineffective assistance of counsel.

### *(2)   Strickland Prejudice*

#### *(a)   Bolden did not experience prejudice for trial counsel's failure to inform Bolden of his right to consular notification or for their failure to contact the Canadian Consulate.*

Given the preceding discussion of prejudice, Bolden has wholly failed to demonstrate prejudice, stemming from his trial counsel's failure to notify him of his right to consular assistance and failure to contact the Canadian Consulate, which would satisfy the *Strickland* standard. See Gomez, 100 F. Supp. 2d at 1049 n.9.

#### *(b)   Bolden did not experience prejudice for trial counsel's failure to raise and litigate the Article 36 violation.*

Any attempt of Bolden's trial counsel to raise and litigate an Article 36 violation would have been futile because Bolden could not have established any prejudice resulting from the violation,

see supra Part I(A)(1)(b); Part I(A)(2)(b); Part I(B)(2)(a).  Moreover, Bolden has not alleged any

prejudice as a result of his counsel's failure to raise and litigate the claim.  Therefore, Bolden has

failed to demonstrate prejudice under *Strickland*.  See Blumenberg, 2008 WL 1944012, at *6

("[T]he petitioner was not prejudiced by the failure to notify the German consulate, and therefore

his counsel was not deficient for failing to seek such relief. Under *Strickland,* the defendant

cannot rely on the failure to raise a meritless argument as a basis for a claim of ineffective

assistance of counsel."). See generally Baires, 707 F. Supp. 2d at 664 (E.D.Va. 2010) ("If there

is no "reasonable probability" that the underlying Vienna Convention claim would have affected

the outcome of the trial, petitioner cannot show that he was prejudiced.").

## II.     BOLDEN'S CLAIMS THAT THE CHARGING DECISION WAS INFLUENCED BY INAPPROPRIATE FACTORS HAVE NO MERIT.

In Claim II of his Amended Petition, Bolden claims that the Government's charging

decision in his case was invalid because it was putatively influenced by improper factors.  Doc.

54 ("Pet."), at 15-25.  These claims are both procedurally barred and facially meritless.  They do

not warrant either discovery or an evidentiary hearing.

### A.     Bolden's Allegations That Mr. Holtshouser Labored Under Conflicts of Interest Are Procedurally Defaulted and Meritless.

First, Bolden contends that the participation of AUSA Steven Holtshouser in his

prosecution was improper because Mr. Holtshouser suffered from two putative conflicts of

interest: (1) Mr. Holtshouser had a supposed personal relationship with the father of Nathan Ley,

the murder victim; and (2) Mr. Holtshouser was a member of the Department of Justice's Capital

Case Review Committee.  Pet. 16.  These contentions have no merit.

First, both of these contentions, which allege substantive violations of due process and

equal protection arising from supposed misconduct of Mr. Holtshouser, are procedurally

defaulted.  Procedural default bars the petitioner from raising claims of prosecutorial misconduct

that could have been, but were not, raised on direct appeal.  <u>Thompson v. United States</u>, 7 F.3d 1377, 1379 (8th Cir. 1993).  Bolden fails to make any showing of cause and prejudice to excuse the failure to raise these claims.

Notably, in Part II of his Petition, Bolden does not allege that his trial and appellate counsel were constitutionally ineffective in failing to seek to disqualify Mr. Holtshouser on the basis of the alleged conflicts.  But even if he did, such an argument would have no merit.  For the reasons stated below, there was no disqualifying conflict of interest on Mr. Holtshouser's part, so any attempt to raise the issue by prior counsel would have been futile and vexatious.  <u>See Dodge v. Robinson</u>, 625 F.3d 1014, 1019 (8th Cir. 2010) ("Counsel's failure to raise ... meritless issues does not constitute ineffective assistance.").  Moreover, even if any plausible factual basis had been available, any such motion would nevertheless have been viewed with great disfavor.  Disqualifying government counsel is a "drastic measure" that courts generally eschew – both to discourage defendants from filing strategic motions to disqualify able prosecutors, and out of concerns for the constitutionally mandated separation of powers.  <u>United States v. Bolden</u>, 353 F.3d 870, 878-79 (10th Cir. 2003).  And Bolden's prior counsel would have had no prospect of showing "actual prejudice" from the participation of Mr. Holtshouser, instead of some other AUSA, in the proceedings against him.  <u>See United States v. Heldt</u>, 668 F.2d 1238, 1277 (D.C. Cir. 1981) (no prejudice where "the Government had ... acquired ... very substantial evidence of monstrous criminal offenses which no responsible U.S. Attorney could refuse to prosecute").

**1. *Mr. Holtshouser's "relationship" with Thomas Ley.*** In any event, even if Bolden had not procedurally defaulted these claims, both are plainly meritless and warrant no factual development.  First, as to Mr. Holtshouser's putative personal relationship with Nathan Ley's father, Bolden does not even directly allege that such a relationship existed – only that Mr. Holtshouser "appears to have a conflict of interest," allegedly "went to the same high school as

26

the victim's father," and "may have attended church" with the victim's family.  Pet. 16.  No specific, verified factual allegations support the claim.  Rather, these hypothetical allegations are based solely on speculation.  In fact, Mr. Holtshouser had no personal relationship of any kind with Nathan Ley's family prior to the <u>Bolden</u> prosecution.  Allegations "based solely on speculation" do not warrant an evidentiary hearing, because "merely stating unsupported conclusions will not suffice."  <u>Woods v. United States</u>, 567 F.2d 861, 863 (8th Cir. 1978).

Moreover, even had there been some casual prior acquaintance between Mr. Holtshouser and Mr. Ley – and there was not – it is very unlikely that any such relationship could have been disqualifying.  Bolden's petition contains no argument, and cites no authority, to this effect; he merely assumes it.  In fact, his petition fails to identify any statute or specific ethical rule that was putatively violated by Mr. Holtshouser's participation in the case, other than the general prohibition against conflicts of interest.  <u>Compare</u> <u>United States v. Lilly</u>, 983 F.2d 300, 309 (1st Cir. 1992) ("Although appellant rails against [the AUSA]'s putative conflict of interest, he does not argue that the challenged conduct violates any specific statute or disciplinary rule.").  The commonplace fact that the prosecutor lives in the same community as victims and criminals alike raises no inference of disqualification.  <u>See</u> <u>id.</u> ("Prosecutors do not need to be empty vessels, completely devoid of any non-case-related contact with, or information about, criminal defendants.").  Even if Bolden's allegation of a casual prior acquaintance were true, the putative relationship would have been far less significant than other prosecutorial relationships that federal courts have found to be not disqualifying.  <u>See</u>, <u>e.g.</u>, <u>id.</u>

**2. *Mr. Holtshouser's membership on the Capital Crimes Review Committee.***  Second, Bolden complains that Mr. Holtshouser's participation on the Department of Justice's Capital Crimes Review Committee created a conflict of interest.  Pet. 16-17.  This claim is procedurally

27

defaulted, for the reasons stated above.  It is also substantively meritless, for at least three distinct reasons: (1) Bolden has no judicially enforceable rights in the operation of the Department of Justice's internal procedures; (2) the participation of a prosecutor on a committee designed to exercise prosecutorial discretion could raise no conceivable "conflict of interest"; and (3) Mr. Holtshouser did not participate in the reviewing committee's consideration of the Bolden case.

First, this particular claim consists entirely of a complaint that DOJ violated due process in the conduct of its internal procedures.  But, as discussed further below, Bolden has no judicially enforceable rights, of due process or otherwise, in the internal DOJ procedures described in the U.S. Attorney's Manual.  See infra, Part II.C; see also U.S. Attorney's Manual § 1-1.100 ("The Manual ... is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal."); United States v. Lee, 274 F.3d 485, 493 (8th Cir. 2001) (quoting this disclaimer in section 1.1-100 of the Manual, observing that "[f]ederal courts have held this disclaimer to be effective," and holding that "[t]he disclaimer ... puts criminal suspects and defendants on notice that they lack enforceable rights in DOJ policies and procedures"); see also In re United States, 197 F.3d 310, 315 (8th Cir. 1999) (observing that "[c]ourts that have directly addressed whether the death penalty protocol contained in the [U.S. Attorney's] Manual creates any substantive or procedural rights enforceable by a defendant have held almost uniformly that it does not").

Second, Bolden cites no authority to support his counterintuitive proposition that it is improper for the case's prosecutor to participate in the charging decision, and the Government is aware of none.  In fact, as above, Bolden cites no statute or ethical precept that was putatively violated by Mr. Holtshouser's alleged participation in the committee, other than the general rule

28

against conflicts of interest.  See Lilly, 983 F.2d at 309 (holding that the defendant alleging that the prosecutor labored under a conflict of interest must show that the alleged conflict violated "fundamental fairness" and is "shocking to the universal sense of justice").  The practice of permitting the prosecutor on the case to participate in the charging decision "does not shock [the] collective conscience."  Id.  On the contrary, it is routine practice in virtually every case in virtually every prosecutor's office in the Nation, and for obvious reasons – the prosecutor who will conduct the case is best suited to provide informed input on the charging decision.

In any event, Bolden's description of Mr. Holtshouser as "a member of the Department of Justice's Capital Case Review Committee," Pet. 16, is misleading.  As a matter of fact, Mr. Holtshouser did not participate as a member of the particular committee that authorized the capital prosecution of Mr. Bolden – only as a member of other committees that reviewed the capital authorization decisions for other, unrelated cases.  Bolden's contention that Mr. Holtshouser's participation on other capital-authorization committees, in unrelated cases, "skewed the reliability of the determination to federally prosecute" Bolden, is meritless.  Pet. 17.

**B.    Bolden's Claim That the Charging Decision Was Motivated By Invidious Racial Discrimination Is Procedurally Defaulted and Meritless.**

Next, Bolden contends that the charging decision in his case was motivated by invidious racial discrimination, both at the district and the national level.  Pet. 17-22.  These claims are both procedurally defaulted and facially meritless.

As an initial matter, these claims of invidious racial discrimination in the charging decision are procedurally defaulted, because they were not raised in the trial court or on direct appeal.  United States v. Wilson, 997 F.2d 429, 431 (8th Cir. 1993).  Bolden does not contend that his prior counsel could not have discovered the factual bases for his claims through the

29

exercise of reasonable diligence.  See Hatcher v. Hopkins, 256 F.3d 761, 764 (8th Cir. 2001)

(affirming the dismissal of a procedurally defaulted habeas claim where the petitioner, a state

prisoner, "did not present any argument ... that a factual predicate underlying his claim could not

be discovered despite the exercise of due diligence").  On the contrary, the statistical and

anecdotal evidence he presents is culled mostly from sources that were publicly available at the

time of Bolden's prosecution, including numerous local news stories that antedate Bolden's

prosecution, and a subsequent law review article whose analysis is based heavily on the

preexisting data in the Department of Justice's 2000 report entitled "The Federal Death Penalty

System: A Statistical Survey (1988-2000)," id. at 40-41.  Accordingly, the claim should be

dismissed as procedurally defaulted.

Moreover, even if the claim had not been defaulted, Bolden's allegations of invidious

racial discrimination are meritless on their face and do not warrant an evidentiary hearing.  First,

Bolden fails to cite the governing standards for selective prosecution claims.  In order to make

out a claim of selective prosecution, "the claimant must demonstrate that the federal

prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory

purpose."  United States v. Armstrong, 517 U.S. 456, 465 (1996).  "To establish a discriminatory

effect in a race case, the claimant must show that similarly situated individuals of a different race

were not prosecuted."  Id.  These standards are exacting, because the Supreme Court's "cases

delineating the necessary elements to prove a claim of selective prosecution have taken great

pains to explain that the standard is a demanding one."  Id. at 463.  Mere allegations and

conjecture are insufficient to warrant even discovery on a selective prosecution claim, since the

Supreme Court's "cases afford a 'background presumption' that the showing necessary to obtain

discovery should itself be a significant barrier to the litigation of insubstantial claims."  Id. at

30

463-64 (citation omitted).  Because of the "broad discretion" afforded the Executive Branch and its agents to enforce the Nation's laws, "the presumption of regularity supports their prosecutorial decisions, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."  Id. at 464 (alterations and quotation marks omitted).  Thus, "[i]n order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present 'clear evidence to the contrary'."  Id. at 465.  These "demanding" standards also extend to defendants' requests for discovery on selective-prosecution claims, which are not lightly granted.  "The justifications for a rigorous standard for the elements of a selective-prosecution claim ... require a correspondingly rigorous standard for discovery in aid of such a claim."  Id. at 468.  This requires, at bare minimum, something more than bare allegations and conjecture – it requires "some evidence tending to show the existence of the essential elements of the offenses," including "some evidence that similarly situated defendants of other races could have been prosecuted, but were not."  Id.  See also United States v. Parham, 16 F.3d 844, 846 (8th Cir. 1994) (holding that "the defendant's burden is a heavy one, and because we afford broad discretion to prosecuting authorities, we require a showing of intentional and purposeful discrimination").  "Absent this prima facie showing [of intentional and purposeful discrimination], the prosecution is presumed to have been undertaken in good faith."  Parham, 16 F.3d at 846.

In addition, the Supreme Court has specifically addressed the question whether statistical evidence of putative racial discrimination, taken alone, can be sufficient to create a prima facie case of intentional discrimination in the imposition of the death penalty.  In McCleskey v. Kemp, 481 U.S. 279 (1987), the petitioner was a black defendant who had received a capital sentence in Georgia state court for the murder of a white victim (a public safety officer, like Nathan Ley).

31

Id. at 283.  The petitioner submitted statistical evidence in the form of "two sophisticated statistical studies that examine over 2,000 murder cases that occurred in Georgia" (collectively described as "the Baldus study").  Id. at 286.  These studies were proffered as tending to show that the imposition of the death penalty in Georgia had a significant disparate impact on black murderers who killed white victims, and that this disparity raised an inference of systemic discrimination.  Id. at 286-87, 291.  The petitioner contended that this study showed that the administration of the death penalty in Georgia in his case violated the Eighth and Fourteenth Amendments.  Id. at 289.  The Supreme Court rejected this claim, holding that the petitioner's submission of such statistical evidence did not raise a sufficient inference of intentional discrimination in his case, sufficient to create a prima facie case of a constitutional violation.  Id. at 297.  The Court emphasized "the basic principle that a defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination'," as well as the "corollary" that the defendant must also "prove that the purposeful discrimination 'had a discriminatory effect' on him."  Id. at 292.  "Thus, to prevail under the Equal Protection Clause, [the defendant] must prove that the decisionmakers in *his* case acted with discriminatory purpose."  Id. (emphasis in original).  The Court noted that the petitioner "offer[ed] no evidence specific to his own case that would support an inference that racial considerations played a part in his sentence," but instead "relie[d] solely on the Baldus study."  Id. at 292-93.

Noting that the use of statistics to prove discrimination is accepted only in "certain limited contexts," id. at 293, the Court stated that a capital prosecution is not one of those contexts, because it is "fundamentally different" from the contexts in which such inferences may reliably be drawn.  Id. at 294.  The Court also stated that the fact that the defendant committed a capital crime is alone sufficient to rebut any dubious inference of invidious discrimination drawn

from statistical evidence: "[A]bsent far stronger proof, it is unnecessary to seek such a rebuttal, because a legitimate and unchallenged explanation for the decision is apparent from the record: McCleskey committed an act for which the United States Constitution and Georgia laws permit imposition of the death penalty." Id. at 296-97.  The McCleskey Court then concluded that such statistical evidence was "clearly insufficient to support an inference that any of the decisionmakers in McCleskey's case acted with a discriminatory purpose." Id. at 297.  The Court also went on to reject the argument that the statistical evidence raised any inference that the State of Georgia as a whole acted with a discriminatory purpose in enacting the death penalty legislation that resulted in the putative disparities reflected in the defendant's statistical evidence. Id. at 298-99 ("[W]e will not infer a discriminatory purpose on the part of the State of Georgia.").

After Armstrong and McCleskey, the Supreme Court has had occasion to consider the propriety of granting discovery on alleged racial bias in the administration of the federal death penalty on the basis of the very same survey on which Bolden principally relies.  In United States v. Bass, 536 U.S. 862 (2002) (per curiam), the Supreme Court summarily reversed a Sixth Circuit opinion that affirmed a district court order directing the Government to provide the capital defendant with discovery relating to a selective prosecution claim identical to Bolden's. The defendant had claimed that the DOJ's 2000 survey of death-penalty practices, "The Federal Death Penalty System: A Statistical Survey," raised sufficient concerns about racial inequities in the administration of the federal death penalty to warrant discovery into the DOJ's capital charging practices. Id.  The district court and the Sixth Circuit concluded that discovery was warranted, but the Supreme Court summarily reversed, holding that "[t]he Sixth Circuit's decision is contrary to Armstrong and threatens 'the performance of core executive functions'." Id.  In so holding, the Court noted that "raw statistics regarding overall charges say nothing

about charges brought against *similarly situated defendants*," id. (emphasis in original), and concluded that "because respondent failed to present relevant evidence that similarly situated persons were treated differently, he was not entitled to discovery." Id.

Likewise, the federal Courts of Appeals have uniformly rejected claims of selective prosecution in death penalty cases based on just the sort of statistical evidence that Bolden proffers in Claim II. See, e.g., McCleskey, 481 U.S. at 292 ("We agree with the Court of Appeals, and every other court that has considered such a challenge [to the administration of the death penalty based on statistical evidence of racial disparities], that such a claim must fail.") (citing appellate decisions from the Fourth, Fifth, and Eleventh Circuits). For example, in United States v. Rodriguez, 581 F.3d 775, 815 (8th Cir. 2009), the Eighth Circuit affirmed the dismissal of a capital defendant's claim that the nationwide administration of the federal death penalty involved a pattern of racial discrimination: "Rodriguez argues that the death penalty, as applied in federal cases, is unconstitutional because the government seeks death in a higher percentage of cases involving white victims than minority victims." Id. at 815. The Eighth Circuit rejected this claim out of hand, holding that putative evidence of discrimination in the "nationwide administration" of the death penalty was *per se* insufficient, under McCleskey, to make the required showing of invidious discrimination by the individual prosecutor's in Rodriguez's case. Id. Other Courts of Appeals have come to the same conclusion. See, e.g., United States v. Jones, 287 F.3d 325, 332-35 (5th Cir. 2002) (holding that the defendant's claim of selective prosecution, which relied on the 2000 DOJ study, failed to establish a prima facie case of selective prosecution, and holding that "[t]hese statistics cannot of themselves meet the threshold requirement of establishing that Jones was singled out for prosecution under the FDPA, whether for an interracial homicide or otherwise, but that others similarly situated were not"); United States v. Webster, 162 F.3d 308, 333-35 (5th Cir. 1998).

Viewed in light of <u>McCleskey</u>, <u>Rodriguez</u>, <u>Jones</u>, <u>Webster</u>, and similar cases, Bolden's allegations of racial discrimination fall far short of the requirements necessary to warrant discovery or an evidentiary hearing.  Bolden alleges three forms of racial discrimination: (1) use of "the federal charging decision to alter the venire's composition" on the basis of race, Pet. 17-18; (2) "the Eastern District United States Attorney's charging determinations demonstrate discriminatory intent," Pet. 19; and (3) "national decisions to seek death in 2003 signify a discriminatory trend," Pet. 22.  In each case, the evidence of putative discrimination that Bolden cites is admittedly "statistical and anecdotal" in nature, Pet. 21, and in each case, the evidence is far less compelling than the Baldus study of Georgia capital crimes that the Supreme Court found, in <u>McCleskey</u>, to be *per se* insufficient to establish a prima facie case.

     **1.** ***Allegations of Racially Motivated Venire Selection.***  First, Bolden alleges that he was selected by prosecutors for federal, rather than state-level, capital prosecution, in a deliberate attempt to dilute the numbers of African-Americans in the prospective jury pool by transferring the venue from the City of St. Louis to the Eastern District of Missouri.  Pet. 17-18.  This claim is entirely speculative and does not warrant an evidentiary hearing.  Bolden fails to provide any specific information of any kind tending to show that the venire selection was motivated by racial considerations in his individual case.  Rather, Bolden's sole authority for this claim is a law review article that discusses charging decisions in the Eastern District of Missouri and other districts in similar terms, and speculates without any direct evidence that venire selection may be one motivating factor in selecting certain defendants for federal capital prosecution.  Pet. 18 (citing G. Ben Cohen & Robert J. Smith, "The Racial Geography of the Federal Death Penalty," 2010 Wash. L. Rev. 425 (2010)).  This law review article, in turn, relies for its data on the Department of Justice's 2000 report entitled "The Federal Death Penalty System: A Statistical Survey (1988-2000)," as well as supplemental analysis of that report conducted by DOJ.  Cohen

& Smith, 2010 Wash. L. Rev., at 433-36 & nn. 44, 48.  None of these materials contains any specific information or allegations about Bolden's particular case, and none attempts to analyze the venire-dilution theory against the myriad of other factors calling for the exercise of federal prosecution of Bolden's crime – such as the obvious fact that Bolden committed the brutal murder of a security guard in the course of the robbery of a federally insured institution, which has been a quintessential area of federal criminal law enforcement since the time of the New Deal.  As in McCleskey, Bolden "offers no evidence specific to his own case that would support an inference that racial considerations played a part" in the venue selection but instead "relies solely on" the Cohen & Smith article.  481 U.S. at 292-93.  Accordingly, he fails to make any preliminary showing of discriminatory purpose.  Id. at 292.

**2. *Putative intentional discrimination in the capital charging decisions of the Eastern District of Missouri.***  Next, Bolden contends that the Eastern District of Missouri's capital charging decisions evince a pattern of selecting black defendants, especially those who have murdered white victims, for capital prosecution.  Pet.19.  Again, his allegations are devoid of any specific or direct evidence of intentional racial discrimination by the prosecutors in his case, and he relies entirely on "anecdotal" arguments about the selection of certain individuals for capital prosecution in unrelated cases.  Pet. 21.

Among other problems, Bolden fails to identify similarly situated defendants to support his theory of selective prosecution.  First, Bolden argues that "any crime of violence committed with a gun that turns into a homicide can be charged federally."  Pet. 19 (citing 18 U.S.C. § 924(j)).  Thus, Bolden's class of "similarly situated offenders" is based on Bolden's erroneous premise that any crime of violence committed with a gun that turns into a homicide – including street robberies – can be charged federally.  This argument is based on a elementary misreading of 18 U.S.C. § 924(j) – an error which Bolden lifts uncritically from the Cohen & Smith article,

which contains the same error.  Section 924(j) provides the death penalty for murder committed "in the course of a violation of subsection (c)" of section 924.  18 U.S.C. § 924(j). "Subsection (c)," in turn, provides criminal penalties for "any person who, during and in relation to a crime of violence or drug trafficking crime ... <u>for which a person may be prosecuted in a court of the United States</u>, uses or carries a firearm."  18 U.S.C. § 924(c) (emphasis added).  In other words, in order for murder committed in the course of a "crime of violence" to be eligible for federal charging, the underlying "crime of violence" must be independently chargeable in federal court. <u>See</u> <u>United States v. Robinson</u>, 119 F.3d 1205, 1216 (5th Cir. 1997) ("A conviction of 18 U.S.C. § 924(c)(1) must be premised on the use or carrying of a firearm in connection with a crime subject to federal jurisdiction.").  In short, the federal death penalty applies under § 924(j) only where the defendant murders his victim in the course of a separate and independent "crime of violence" <u>that violates federal criminal law</u> – such as bank robbery, carjacking, or interstate kidnapping.  This is a much narrower class than "any murder committed with a firearm."

Though he discusses violent crimes committed in the City of St. Louis and St. Louis County, Pet. 20, Bolden provides no argument to show that there was federal jurisdiction of the underlying crime during which each victim was killed.  Thus, his presumption that these state-level crimes could have been charged federally under § 924(j) is unsupported and erroneous. Bolden's discussion of similarly situated comparators is therefore entirely beside the point.  The fact that certain other killers were not charged federally raises no inference of discriminatory federal selection, when there was no apparent basis of federal jurisdiction for their crimes.

When these specious comparators are eliminated, Bolden identifies only a statistically insignificant handful of capital murder cases with a clear basis for federal jurisdiction – his own case, the Holder and Allen case (another murder of security guards during a bank robbery), the Hyles and Cannon case (interstate travel to commit a murder-for-hire), the Henry Rehmert case

37

(racketeering), and the David Ray Martin case (interstate child molestation resulting in death).

See Pet. 21.  Bolden does not argue that these cases create any inference of invidious venire

selection (since all were charged federally) – rather, he argues that they support an invidious

trend among federally charged cases of seeking the death penalty only against black defendants.

See Pet. 21 ("A white defendant has never faced a capital trial in the Eastern District.").  In

virtually the same breath, however, Bolden effectively concedes this tiny sample of cases is not

even "statistical" evidence – it is "anecdotal," at best.  Id.  In McCleskey, the Supreme Court

found that "two sophistical statistical studies that examine over 2,000 murder cases that occurred

in Georgia" was insufficient to raise a prima facie inference of intentional discrimination in the

individual case.  481 U.S. at 286.  Here, Bolden offers only six murder cases.  In McCleskey, the

Supreme Court held that capital sentencing decisions were not amenable to facile statistical

analysis, because of the immensely complex, many-factored nature of the decisions.  Id. at 294-

95.  The same is true of capital charging decisions.  Bolden's miniscule sample of capital

charging decisions in the Eastern District of Missouri is manifestly insufficient to create a prima

facie case that the decision to seek death in his case arose from "intentional and purposeful

discrimination."  Parham, 16 F.3d at 846.  In fact, it is not even in the ballpark.  Compare also,

e.g., United States v. Taylor, 608 F. Supp. 2d 1263, (D.N.M. 2009).

     **3.  *Putative "nationwide trend" of racial discrimination in death authorizations*.**

Finally, Bolden contends that "[i]n 2003, the year Mr. Bolden's authorization procedure took

place, authorizations throughout the United States took a decidedly discriminatory turn."  Pet.

22.  This contention is easily dispatched.  As discussed above, the Eighth Circuit in Rodriguez

considered and rejected an indistinguishable claim of racial discrimination in the "nationwide

administration" of the federal death penalty, holding that McCleskey foreclosed the capital

defendant's attempt to rely on statistics to create an inference of purposeful discrimination in his

own federal authorization.  United States v. Rodriguez, 581 F.3d 775, 815 (8th Cir. 2009).

     **4.  *Bolden's Request For Discovery Seeks Privileged Materials.***  Moreover, Bolden's

request for discovery into the DOJ's capital authorization procedures runs afoul of the

deliberative process privilege and attorney work-product privilege.  See United States v. Taylor,

608 F. Supp. 2d 1263, 1269 (D.N.M. 2009) ("Because the death penalty procedures do not create

enforceable substantive or procedural rights for [the defendant], the refusal to disclose the

information is a matter of prosecutorial discretion unreviewable by the courts, and the

information is protected by the deliberative process and work product privileges....").

     **C.  Bolden's Claims That DOJ Violated Due Process In the Implementation Of
Its Internal Authorization Procedures Are Defaulted And Have No Merit.**

     Third, Bolden claims that the Government violated his due process rights in the

implementation of its internal procedures relating to the capital authorization decision.  Pet. 22-

25.  These claims are procedurally defaulted, and none has any substantive merit.

     In alleging due process violations in DOJ's internal capital authorization procedures,

Bolden fails to state any judicially cognizable claim for relief.  Here, Bolden's claims are based

exclusively on allegations that the Department of Justice maladministered its own internal

authorization procedure, in violation of the guidelines set forth in section 9-10.000 et seq. of the

then-current U.S. Attorneys' Manual.  Pet. 22-25.  But it is well settled that the U.S. Attorneys'

Manual does not create any judicially enforceable procedural or substantive rights for any

criminal defendant.  The very first section of the Manual is explicit on this point: "The Manual

provides only internal Department of Justice guidance.  It is not intended to, does not, and may

not be relied upon to create any rights, substantive or procedural, enforceable at law by any party

in any matter civil or criminal."  U.S. Attorneys' Manual, § 1-1.100.  This language was in effect

at the time the committee authorized capital proceedings against Bolden.  Relying on this very

language, the Eighth Circuit has explicitly held that capital defendants have no enforceable

rights in the capital authorization procedures set forth in the U.S. Attorneys' Manual – the very

procedures that Bolden now seeks to enforce.  United States v. Lee, 274 F.3d 485, 493 (8th Cir.

2001) ("We agree with those courts which have concluded that the death penalty protocol is

unenforceable by individuals."); see also United States v. Lopez-Matias, 522 F.3d 150, 155-56

(1st Cir. 2008); Nichols v. Reno, 124 F.3d 1376 (10th Cir. 1997); United States v. Busher, 817

F.2d 1409, 1411-12 (9th Cir. 1987); cf. United States v. Craveiro, 907 F.2d 260, 264 (1st

Cir.1990) (holding that the DOJ Handbook on the Comprehensive Crime Control Act of 1984

does "not confer substantive rights on any party").

      Moreover, Bolden's putative identifications of error in the authorization process are

facially meritless.  First, Bolden alleges that DOJ failed to identify a sufficiently substantial

federal interest in authorizing the capital prosecution.  But preventing the robbery of federally

insured institutions, and the murder of security officers therein, has been recognized for decades

as a core concern of federal law enforcement.

      Second, Bolden contends that the Government erred by considering the law enforcement

status of the victim's father in the authorization process.  But Bolden does not specifically allege

facts tending to show that the decision was based, in whole or in part, on this alleged status –

only that one member of the committee raised the issue during deliberations – so his claim

should be dismissed as based entirely on speculation.  Woods, 567 F.2d at 863.

      Third, Bolden alleges that the committee erred by failing to consider proffered evidence

of racial bias in the administration of the death penalty.  Pet. 25.  This line of argument has no

merit for the reasons stated above, namely that Bolden's statistical evidence raises no plausible

inference of invidious discrimination.  See supra, Part II.B.  In any event, because Bolden's sole

40

evidence for his allegation that the committee declined to consider such evidence is the fact that the committee actually authorized a capital prosecution in his case, his argument plainly begs the question.  He simply overlooks the possibilities that the committee might have considered his supposed "evidence" of racial discrimination and found it unconvincing, or that the committee might have considered his evidence and found that the heinous nature of his crime and federal interest in prosecution outweighed any weight that they might have assigned to it.

III.    **BOLDEN'S CLAIM THAT THE PROSECUTORS IMPERMISSIBLY ENGAGED IN RACE-BASED PEREMPTORY STRIKES ARE PROCEDURALLY BARRED, PROCEDURALLY DEFAULTED, AND  FACIALLY MERITLESS.**

In Claim III of his petition, Bolden claims that the prosecutors improperly removed minority jurors from the venire by engaging in racially motivated peremptory strikes, in violation of Batson v. Kentucky, 476 U.S. 79 (1986).  Pet. 25-31.  These claims are procedurally barred, procedurally defaulted, and without merit.  They do not warrant a hearing.

A.    **Bolden's Substantive Claims Are Procedurally Barred and Defaulted.**

Except insofar as he alleges ineffective assistance of counsel, Bolden's claims under Batson are procedurally barred and/or defaulted.  Bolden raises Batson claims relating to five minority jurors stricken by the prosecution: Juror 40, Juror 44, Juror 60, Juror 126, and Juror 136.  Pet. 28-30.  At trial, the defense raised Batson challenges to the prosecution's exercise of peremptory strikes as to each of these five jurors, and in each case the challenge was overruled and the prosecution was allowed to strike the juror.  Tr. 1874-79.  On direct appeal, Bolden raised and litigated his Batson claim as to Juror 44, but declined to press his Batson claims as to the other four minority jurors.  See Brief of Defendant-Appellant in No. 06-3264 ("Def. App. Br."), at 61-65; United States v. Bolden, 545 F.3d 609, 613-14 (8th Cir. 2008).  The Eighth Circuit rejected his Batson challenge as to Juror 44.  Bolden, 545 F.3d at 613-14.  On collateral review, Bolden is procedurally barred from relitigating his Batson challenge as to Juror 44.  See

41

United States v. Davis, 406 F.3d 505 (8th Cir. 2005) ("Claims which were raised and decided on direct appeal cannot be relitigated on a motion to vacate pursuant to 28 U.S.C. § 2255.") (quoting Dall v. United States, 957 F.2d 571, 572 (8th Cir.1992)).  Likewise, Bolden has procedurally defaulted his Batson claims as to Jurors 40, 60, 126, and 136, because he could have raised these claims on direct appeal, but did not.  See, e.g., Troupe v. Groose, 72 F.3d 75, 76 (8th Cir. 1995).  As in Troupe, Bolden "has not asserted cause or prejudice to excuse the default, or that [the] failure to review the claim would result in a fundamental miscarriage of justice."  Id.

### B.  Bolden's Claims of Ineffective Assistance In Litigating *Batson* Are Meritless.

Bolden claims that both trial and appellate counsel were ineffective in failing to properly litigate the Batson claims.  Pet. 27.  These claims have no merit and do not warrant a hearing.

**1.** *Counsel's Performance Was Not Deficient.*  Bolden contends that trial and appellate counsel were ineffective in failing "to develop systemic evidence of the government's bad-faith and racial biases."  Pet. 30.  The evidence of "bad-faith and racial biases" alleged in Bolden's petition, however, is Bolden's fanciful claim that the prosecutor's partial reliance on "demeanor" arguments to justify some of its peremptory strikes "involve[d] racial stereotypes demonstrat[ing] that the reasons were pretextual."  Pet. 28.  This claim is facially meritless.  Bolden argues that the prosecutor's observations that one juror was sleeping during portions of voir dire, that another juror seemed to take offense when asked to speak up by the court reporter, and that another juror "suffered from depression and gave conflicting answers" on her juror questionnaire, were all statements that "involved racial stereotypes," presumably revealing that the Government attorney was an invidious racist.  Pet. 28.  Because the Government is unaware of any "racial stereotypes" indicating that minorities tend to be sleepier, more subject to depression, or more easily offended than people of other races, the Government is at a loss as to

42

how to respond to this allegation.  Counsel were not ineffective in failing to advance this meritless argument.

Next, Bolden faults his appellate counsel for raising only on one of the five challenged peremptory strikes, namely that to Juror 44, without raising the other four strikes.  Pet. 31.

In order to establish ineffective assistance of counsel in appellate counsel's presentation of Bolden's Batson claims to the Court of Appeals, Bolden must establish both prongs of the familiar Strickland test: deficient performance and prejudice.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  The same two-prong standard applies to claims of ineffective assistance of counsel on appeal.  United States v. Brown, 528 F.3d 1030, 1032-33 (8th Cir. 2008).  Bolden has no prospect of making any of these "rigorous" showings.

Bolden principally contends that appellate counsel should have raised his Batson challenges to the removal of all five jurors on direct appeal, instead of focusing only on Juror 44.  Pet. 30.  Bolden concedes, however, that his appellate counsel explicitly referred to all five Batson claims, but deliberately focused on only one of them.  Pet. 30.  In other words, appellate counsel deliberately selected one claim to focus on.  This is just the sort of "strategic choice" that Strickland held to be "virtually unchallengeable" on collateral review.  Strickland, 466 U.S. at 690.  As the Eighth Circuit has emphasized, the decision to select only certain claims to raise on appeal is a quintessential example of such an unchallengeable strategic choice: "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal.  Therefore, absent contrary evidence, we assume that appellate counsel's failure to raise a claim was an exercise of sound appellate strategy."  Brown, 528 F.3d at 1033 (citations and quotation marks omitted). Bolden makes no argument that the Batson claims as to Jurors 40, 60, 126, and 136 were somehow more likely to succeed than the voluminous claims

43

that his appellate counsel <u>did</u> raise on direct appeal – including both his <u>Batson</u> claim as to Juror 44 and numerous other claims.

Moreover, it is axiomatic that appellate counsel's failure to raise meritless claims does not constitute defective performance.  For the reasons stated immediately below, Bolden's <u>Batson</u> challenges to Jurors 40, 60, 126, and 136 have no merit.  In fact, on the substance of the arguments, Bolden's petition does not charge that his trial counsel made improper arguments in support of his <u>Batson</u> claims – on the contrary, Bolden's § 2255 petition parrots the exact same arguments made by his trial counsel to the District Court, which this Court rejected.

**2. *Bolden Cannot Show Prejudice.*** Even if Bolden could make any showing of defective performance on the part of appellate counsel, he would have no prospect of establishing that "the result of the proceeding would have been different" had his appellate counsel raised the other four <u>Batson</u> claims on direct appeal.  <u>Brown</u>, 528 F.3d at 1033.

Appellate review of the district court's rulings on <u>Batson</u> challenges is highly deferential, and is reviewed only for clear error.  <u>United States v. Elliott</u>, 89 F.3d 1360, 1365 (8th Cir. 1996).  Moreover, in reviewing <u>Batson</u> claims, the Eighth Circuit is "mindful of the fact that evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province."  <u>Id</u>.  Therefore, "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal."  <u>Hernandez v. New York</u>, 500 U.S. 352, 364 (1991).  In this case, the trial court denied all of Bolden's challenges to the prosecution's use of peremptory strikes, and these rulings would have been "accorded great deference on appeal."  <u>Id</u>.

**a. *Juror 40.*** As to Juror 40, Bolden contends that his counsel were ineffective in failing to advance the argument that "the government ... moved to strike Juror 40 on the basis that he was an insulin dependent diabetic," but "the government did not move to strike similarly situated

white Jurors 32 and 85 who had a diabetic aunt and mother, respectively." Pet. 29-30. At trial, this Court considered and rejected this precise argument, which was advanced by Bolden's trial counsel. This Court held that Jurors 32 and 85 were not similarly situated comparators, because Juror 40 was the only member of the venire panel who personally suffered from diabetes. Tr. 1874 ("[N]umber 40 ... was the only member of the panel who himself was a diabetic, an insulin-dependent diabetic. Yes, there were other members of the panel who mentioned that they had relatives who were insulin-dependent diabetics, but [Juror 40] was himself suffering from that condition."). Thus, this Court correctly concluded that the defense had failed to show that the Government's race-neutral explanation was pretextual.

b. *Juror 44.* Bolden also challenges trial and appellate counsel's litigation of the peremptory strike of Juror 44 – the <u>Batson</u> claim that was raised on appeal. Doc. 54, at 29. As noted above, this claim is procedurally barred. Moreover, the Eighth Circuit explicitly affirmed this Court's prior ruling on this issue on direct appeal, and this determination would be controlling if there were any occasion to reach the issue again. <u>See</u> <u>Bolden</u>, 545 F.3d at 613-14. In addition, Bolden's petition does not raise any new argument in favor of his claim regarding Juror 44, but merely rehashes the arguments made by prior counsel. Pet. 29; Tr. 1876.

c. *Juror 60.* As to Juror 60, Bolden contends that "the government moved to strike Juror 60 because she was a nurse and 'her work as a nurse gives her knowledge of medical issues,'" but the Government "did not move to strike Juror 218, a similarly situated white prisoner [*sic*] who was also nurse." Pet. 29. Again, this argument parrots the argument made by Bolden's trial counsel, which this Court correctly rejected. Tr. 1876-77. Bolden's petition fails to note that the Government struck Juror 60 because she was a <u>psychiatric</u> nurse – unlike Juror 218 – and there was a likelihood that psychiatric evidence would be presented during the sentencing phase. <u>Id.</u> Accordingly, this Court held that Juror 218 was not a similarly situated comparator to Juror 60:

45

"[A]side from the fact that [Juror 218] wasn't even within the pool to be struck from, I don't believe that the work she did was in the psychiatric field, as was [Juror 60]'s work. Again, there may be some issues regarding psychiatric treatment or testimony from experts that might come up in this case. So I believe that the government's stated reasons for striking number 60 are race neutral and not pretextual." Tr. 1877. Bolden had no prospect of prevailing on appeal here.

d. *Juror 126.* With regard to Juror 126, Bolden's petition complains that "the government moved to strike Juror 126 based upon demeanor related evidence, arguing that she suffered from depression and gave conflicting answers." Pet. 28. This statement dramatically understates the Government's bases for striking Juror 126, which this Court credited as race-neutral. The Government moved to strike Juror 126 for cause, because the inconsistencies between her statements during voir dire and her written questionnaire responses raised the concerns that the psychiatric medications she was taking were affecting her mental competency. Tr. 1798-1801. For example, on the written questionnaire she attested that she had been the victim of a "home invasion," but she could not remember this answer during oral voir dire, and instead stated that she had witnessed two murders (including a stabbing death that occurred right in front of her), neither of which had she mentioned in the questionnaires. Id. Because she also stated that she was taking psychiatric medications that affected her memory and concentration, the Government raised the concern that "she may have something wrong with her thought process," and argued that Juror 126 should be excused for cause due to these concerns about her mental fitness. Tr. 1805. After a lengthy colloquy, Tr. 1798-1809, the Court concluded that Juror 126 should not be excused for cause. The Government then exercised a peremptory strike against Juror 126 for the same reasons – that her admitted use of mind-affecting medications, combined with her inconsistent and rather bizarre answers to questions about witnessing very serious crimes, raised concerns about her mental fitness to serve as a juror. Tr. 1857-58. In

46

raising a Batson challenge to this peremptory, defense counsel frankly admitted that "the government made an extensive cause motion which I believe the Court looked at and took seriously," conceded that "if we look at nonpretextual reasons ... she did cite that she was on medication," and stated that "I think maybe this is the Government's best case is what I'm saying." Tr. 1872. The Court agreed, finding that the Government's race-neutral reasons for striking Juror 126 were not pretextual: "the Government had some concerns about her competence, and she is taking medicine.... I don't believe that there are any other members of this panel who testified that they were taking psychiatric medication at the present time. So I don't believe that the Government's stated reason for striking [Juror 126] was pretextual." Tr. 1878. Bolden's petition identifies no similarly situated comparators overlooked by trial counsel.

e. *Juror 136.* Finally, Bolden contends that the Government's strike against Juror 136 was motived by racial discrimination. Pet. 29. Juror 136 stated in her written questionnaire responses that criminal justice system "is biased against minorities, that minorities are punished more severely than the majority, that people with money versus people without money are treated differently, and that the solution to this problem is more minority judges, lawyers, and jurors." Tr. 1858-59. The prosecution struck Juror 136 because of the risk that these views of systematic unfairness against minorities might influence her perception and judgment in a criminal case involving a minority defendant and a largely non-minority prosecution team. Tr. 1859. Bolden's petition parrots the argument made by his trial counsel, that Juror 136 was similarly situated to white Juror 98, who was removed for cause on the defendant's motion because he violated the Court's instructions by reading a newspaper article about the case during a weekend break. Tr. 1829-30. Bolden's trial counsel argued that Juror 98 had stated that he thought everybody had racial bias, and therefore was similarly situated to Juror 136 – even though Juror 136's stated presuppositions were ran one-sidedly against the Government, unlike

47

those of Juror 98.  Tr. 1873.  This Court correctly rejected this argument that Juror 98 was a similarly situated comparator, because Juror 98 had been removed for cause on unrelated grounds prior to the Government's exercise of any peremptory strikes.  Tr. 1879 ("So [Juror 98] wasn't even part of the pool at the time the peremptory strikes were made.  Whether the Government would have struck him peremptorily, I don't know.").  As a result, the Court concluded that Juror 136 "did express in her questionnaire her belief that there was inherent bias in the justice system," and that she "was the only one who expressed that belief in her questionnaire.  So that sets her apart from other members of the panel."  Tr. 1878-79.  The Court thus concluded that there was no showing of pretext.  Bolden had no prospect of overturning this ruling on appeal.

In sum, none of Bolden's claims regarding the Government's exercise of peremptory strikes during voir dire has any merit, and all should be dismissed without a hearing.

## IV.    BOLDEN'S CLAIM THAT HE WAS DENIED A JURY POOL CONSISTING OF A FAIR CROSS-SECTION OF THE COMMUNITY IS PROCEDURALLY DEFAULTED AND FACIALLY MERITLESS.

In Claim IV, Bolden contends that "[t]he government's determination to prosecute Petitioner federally violated the Sixth Amendment right to a jury pool consisting of a fair cross section of the community."  Doc. 54, at 31.  Rehashing an argument from Claim II, Bolden also contends that his selection for federal, rather than state-level, prosecution was invidiously motivated by an improper desire to dilute the number of minorities in his venire pool.  Pet. 33. He contends that his counsel were ineffective in failing to raise these claims.  Pet. 34.

First, all of Bolden's substantive claims in Claim IV are procedurally defaulted.  He could have, but did not, raise these claims in the district court or on direct appeal.

Second, Bolden's ineffective assistance claims are facially meritless and do not warrant an evidentiary hearing.  Bolden's underlying claim that the Sixth Amendment requires, in federal

criminal trials, a jury drawn from a fair cross-section of the city or county of residence, rather than the federal judicial district or division or residence, has been rejected whenever considered by the federal courts.  For example, in United States v. Brady, 579 F.2d 1121 (9th Cir. 1978), the defendant advanced a statutory fair cross-section claim that he was entitled to a jury pool whose Native American representation was proportional to that in the particular county of his offense, rather than to the 15-county division from which the jury pool was drawn.  Id. at 1133-34.  The Ninth Circuit rejected this argument: "[A] fair cross section of the community must be achieved within the division as a whole rather than any of the division's component counties....  Surely it was not the intention of Congress that each petit or grand jury represent a fair cross section of each county or community in all of Montana."  Id.  Likewise, in Savage v. United States, 547 F.2d 212, 215 (3d Cir. 1976), the defendant claimed that his jury pool did not reflect a fair cross-section of the community because it was drawn from the Eastern District of Pennsylvania as a whole, rather than from the City of Philadelphia where he resided and committed his crime.  Id. at 215.  The Third Circuit rejected this argument out of hand: "Insofar as petitioner contends that the petit jury list should contain a larger percentage of prospective jurors from Philadelphia and its black population, so as to give him a more representative background of his peers to judge him ... , we reject such contention."  Id. at 215 n.8.  And, as noted in Brady, the United States Congress has adopted the judicial "district or division" as the relevant geographical boundary for application of the "fair cross section" requirement.  See 28 U.S.C. § 1861.  See also United States v. Green, 389 F. Supp. 2d 29, 41-42 (D. Mass. 2005), rev'd on other grounds sub nom. In re United States, 426 F.3d 1 (1st Cir. 2005) ("By choosing federal court and thereby expanding the jury district to include the more racially homogenous suburbs, the government invariably dilutes minority – and even urban – representation in the pool from which defendants' juries will be selected.  While the Sixth Amendment demands representativeness, it does not require courts

49

to second-guess the boundaries of the judicial district.  Thus, when the government federalizes

local crime ... , it homogenizes the decisionmaker.  And the law allows it to do so.").

In addition, federal courts have also invariably rejected other attempts by criminal

defendants redraw the geographical boundaries of the relevant "community," for Sixth

Amendment purposes, to something other than the federal judicial district or division – such as

defendants who claimed that their venire pool should be drawn from the district as a whole, or a

different division, rather than the division in which they are tried.  See, e.g., United States v.

McGrady, 173 F.3d 426 (4th Cir. 1999) (table op.) ("Thus, under appellant's view, a 'fair cross-

section of the community' refers to a 'fair cross-section of the *division* in which a defendant was

indicted.'  Appellants cite no legal authority for this argument.  The Sixth Amendment grants the

'right to a speedy and public trial, by an impartial jury *of the State and district wherein the crime*

*shall have been committed.*'  U.S. Const. amend. VI.  Thus, it gives no comparable right to trial

in the *division* where the crime was committed." (emphases added by McGrady court)); United

States v. Cannady, 54 F.3d 544, 547-48 (9th Cir. 1995) (rejecting the defendant's fair cross-

section claim that he was entitled to a jury venire pool drawn from the district as a whole, rather

than a particular division of the district with greater minority representation) ("[T]he Supreme

Court and ... other circuits ... have held that, unless gerrymandering has occurred, demographic

differences between divisions do not render division-based jury selection invalid....  Only in

those cases where the use of a division instead of the entire district constitutes gerrymandering,

resulting in the systematic exclusion of a 'distinctive group' from participation in any jury

selection system, is there a potential violation...."); United States v. Kenny, 883 F. Supp. 869,

875 (E.D.N.Y. 1995) ("[C]ourts have consistently held that, so long as a division is not

'gerrymandered,' it will withstand constitutional scrutiny, even if the division differs from the

district as a whole in terms of its racial or socio-economic composition." (citing cases)); United

States v. Traficant, 209 F. Supp. 2d 764, 779 (N.D. Ohio 2002).  Bolden makes no allegation that

the Eastern Division of the Eastern District of Missouri has been overtly "gerrymandered" to

dilute minority representation on jury panels.  Accordingly, he has no constitutional right to

conduct his own "gerrymander" of the district, to redefine the geographical boundaries of his

"community" to fit his own perceived interests in jury selection.

Bolden rehashes his claim that he was selected for federal prosecution to dilute the

number of blacks on his jury pool.  Pet. 33-34.  This claim has no merit.  See supra Part II.

## V.   BOLDEN'S CLAIM THAT COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT EVIDENCE TO CHALLENGE THE CAPITAL AUTHORIZATION IS FACIALLY MERITLESS.

Next, Bolden claims that his trial counsel were ineffective in failing to "investigate,

develop, and present evidence challenging a capital authorization" in his case.  Pet. 34.  He

contends that his counsel should have done a better job of discovering evidence of putative racial

bias and of mitigating factors, and presented this evidence to the Department of Justice during

the DOJ's internal capital authorization procedures set forth in the U.S. Attorney's Manual.  Pet.

34-36.  This claim has no merit and should be dismissed without a hearing.

### A.   DOJ's Death Penalty Protocol Is Not a "Critical Stage" At Which The Sixth Amendment Right To Counsel Attaches.

As an initial matter, the Sixth Amendment right to counsel does not attach during the

DOJ's internal capital authorization procedures, so Bolden's claim that he was deprived of the

Sixth Amendment right to counsel at that proceeding fails to get off the starting blocks.  As

discussed above, see supra Part II, it is well established that the so-called "death penalty

protocol" of the U.S. Attorneys' Manual does not create substantive or procedural rights of any

defendant.  See United States v. Lee, 274 F.3d 485, 493 (8th Cir. 2001); U.S.A.M. §1-1.100.

It is axiomatic that the Sixth Amendment right to counsel attaches only at the so-called "critical stages" of criminal proceedings, i.e. those "critical confrontations of the accused by the prosecution at pretrial proceedings where the results might well settle the accused's fate and reduce the trial itself to a mere formality." United States v. Wade, 388 U.S. 218, 224 (1967). Not every stage of a criminal proceeding meets this definition of "critical stage." See, e.g., Gerstein v. Pugh, 420 U.S. 103, 122 (1975) ("Because of its limited function and its nonadversary character, the probable cause determination is not a 'critical stage' in the prosecution that would require appointed counsel."). "The [Supreme] Court has identified as 'critical stages' those pretrial procedures that would impair defense on the merits if the accused is required to proceed without counsel." Id. Thus, there are three reasons to conclude that the capital authorization process of the death penalty protocol is not a "critical stage." First, the Manual setting forth the protocol expressly specifies that the death penalty protocol is not intended to create any enforceable procedural rights for the criminal defendant. Second, the authorization proceeding is not an adversarial judicial proceeding involving any "critical confrontation[] of the accused by the prosecution," Wade, 388 U.S. at 224, but an internal DOJ proceeding involving a quintessential exercise of prosecutorial discretion, which is judicially non-reviewable under separation of powers doctrine. Third, as noted in Gerstein and Wade, the non-participation of the defendant in the authorization process does not in any way impair the defendant's ability to present his defenses at both the guilt and capital sentencing phases of trial.

Federal district courts that have considered this issue are in accord with this analysis. For example, in United States v. Boyd, 931 F. Supp. 968 (D.R.I. 1996), the capital defendant claimed that he was deprived of his Sixth Amendment right to counsel in the implementation of the DOJ's death penalty protocol, on the ground that the DOJ's policy against pre-authorization discovery prevented his counsel from effectively rebutting the U.S. Attorney's submission to the

Attorney General during capital authorization procedures, thus interfering with counsel's ability to function as counsel.  Id. at 969-70.  The court rejected this claim, holding that the death penalty protocol did not constitute a "critical stage" of adversarial proceedings at which the Sixth Amendment right to counsel attaches: "The DOJ capital penalty authorization procedure does not encompass a pretrial confrontation or hearing where 'counsel's absence might derogate from the accused's right to a fair trial.'  This court finds that the invitation extended to [the defendant] to present mitigating factors [to the Attorney General during the authorization procedure] does not constitute a critical stage of the proceedings."  Id. at 973.  Because it is not a critical stage, the Sixth Amendment right to counsel does not attach.  Id.

Likewise, in United States v. Shakir, 113 F. Supp. 2d 1182 (M.D. Tenn. 2000), the court rejected the capital defendants' claim that "because the death penalty certification process is a 'critical stage' of a criminal proceeding, they are entitled to pre-authorization discovery."  Id. at 1188.  Rejecting the attempt to analogize the authorization process to "a sentencing hearing" and to "an adult certification hearing in which a court determines to try a juvenile as an adult," the court observed that "both of these proceedings are judicial proceedings presided over by a judge, as opposed to the administrative, discretionary decision-making process of whether to seek the death penalty."  Id.  The court also reasoned that, under the U.S. Attorneys' Manual, "a defendant does not possess any 'substantial rights' in the discretionary decision-making process of an executive agency."  Id.  For both these reasons, the Shakir court concluded that the death penalty authorization process was not a "critical stage" of criminal proceedings, at which the right to counsel would attach.[2]  An opinion from the Central District of California, moreover,

_____

[2] As discussed in Shakir, district courts in the District of Puerto Rico have come to conflicting conclusions on this issue.  Compare United States v. Pena-Gonzalez, 62 F. Supp. 2d 358, 363 (D.P.R. 1999) (holding that "the right to counsel attaches at death penalty certification hearings" because "a capital punishment certification hearing is a 'critical stage' of a criminal

came to the same conclusion as <u>Boyd</u> and <u>Shakir</u>.  <u>United States v. Furrow</u>, 100 F. Supp. 2d

1170, 1177 (C.D. Cal. 2000) ("Following the framework laid out by the Ninth Circuit..., the

Court finds that the death penalty authorization process is not a constitutionally critical stage:

where a proceeding does not affect any of a defendant's substantial rights and does not reach the

merits of the case, the proceeding is not a 'critical' stage under the Sixth Amendment.").  <u>See</u>

<u>also</u> <u>United States v. McVeigh</u>, 944 F. Supp. 1478, 1483 (D. Colo. 1996) ("[T]he [Death

Penalty] Protocol did not create any individual right or entitlement subject to the due process

protections applicable to an adjudicative or quasi-adjudicative governmental action").

   Like the defendants in <u>Boyd</u>, <u>Shakir</u>, and <u>Furrow</u>, Bolden had no Sixth Amendment right

to counsel arising from the death penalty protocol's "invitation extended to [the defendant] to

present mitigating factors" to the Attorney General during the capital authorization phase.  <u>Boyd</u>,

931 F. Supp. at 973.  Since Bolden had no right to counsel at all, it follows <u>a fortiori</u> that he had

no right to the effective assistance of counsel.  In <u>United States v. Edelmann</u>, 458 F.3d 791 (8th

Cir. 2006), the defendant urged that her counsel had acted ineffectively in advising her to engage

in pre-indictment meetings with Government agents, during which she made incriminating

statements, without first receiving use immunity from the Government regarding those

statements.  The Eighth Circuit held that, because the Sixth Amendment right to counsel does

not attach during pre-indictment interviews with Government agents, the defendant could not

claim ineffective assistance of counsel arising from the allegedly incompetent advice of her

_____

proceeding") <u>with</u> <u>United States v. Torres Gomez</u>, 62 F. Supp. 2d 402, (D.P.R. 1999) (criticizing
the reasoning of <u>Pena-Gonzalez</u>, rejecting its "unsustainable premise that the DOJ's death
penalty hearing is a critical stage," and holding that there is no right to counsel in the DOJ's
capital authorization procedures).  Both <u>Torres Gomez</u> and <u>Shakir</u> correctly criticize and reject
the erroneous reasoning and holding of <u>Pena-Gonzalez</u>.  An opinion from the Ninth Circuit has
expressly declined to reach this issue.  <u>United States v. Fernandez</u>, 231 F.3d 1240, 1248 (9th Cir.
2000) ( "We need not decide whether the death penalty authorization process created by the
USAM is a 'critical stage' of the proceedings.").

54

attorney.  See Edelmann, 458 F.3d at 804 ("Thus, if the right to counsel has not attached, the defendant has no right to the effective assistance of counsel.").

### B.    The Performance of Bolden's Counsel Was Not Deficient In Any Event.

Moreover, even if Bolden's right to counsel had attached during the authorization procedures, he alleges no plausible claim of ineffective assistance.  Bolden identifies two putative deficiencies in counsel's performance: (1) the failure to collect "statistical data and other evidence demonstrating that the government's decision to federally and capitally prosecute Mr. Bolden was the product of, and resulted in, racial bias"; and (2) the failure to "provide any evidence of statutory or non-statutory mitigating factors other than to argue that the defense 'will be able to establish numerous mitigating factors'."   Pet. 35-36.  These claims have no merit.

As to the first, Bolden concedes that, during the authorization procedures, his counsel "argued that federal capital punishment, in general, is plagued by racial bias and cited the DOJ study."  Pet. 35.  He contends that counsel were ineffective, however, in failing to make a series of additional arguments that he presents in his § 2255 petition, such as the putative evidence of racial bias specific to the Eastern District of Missouri, and the putative conflicts of interest as to Mr. Holtshouser alleged in Claim II.  Pet. 35.  Each of these additional claims is facially meritless for the reasons previously stated.  See supra, Parts II, III, IV.

As to Bolden's second alleged ground of ineffective assistance, his sole allegation is the general claim that counsel did not provide sufficient mitigating evidence to the committee in the attempt to convince them not to authorize the death penalty.  Pet. 36.  This claim has no merit.  As discussed in Boyd, any capital defense counsel who voluntarily participates in a capital authorization proceedings is faced with a tough strategic decision – the "Hobson's choice" of whether to reveal defense theories and mitigation strategies early in the attempt to prevent the capital authorization, or to reserve those theories and strategies for the actual trial, to avoid

55

giving the prosecution the advantage of early disclosure.  See Boyd, 931 F. Supp. at 970.  Such

strategic decisions of counsel are "virtually unchallengeable" on collateral review.  Strickland,

466 U.S. at 690.  Moreover, the very nature of Bolden's claim makes it clear that his complaint

is based entirely on hindsight.  If Bolden's counsel had presented its mitigation evidence at the

authorization stage, Bolden would now be complaining that such early disclosure prejudiced his

defense at trial.  As the Eighth Circuit has stated, "[w]e will presume attorneys provide effective

assistance and will not second guess strategic decisions or exploit the benefits of hindsight."

Henderson v. Norris, 118 F.3d 1283, 1287 (8th Cir. 1997).  And since Bolden's mitigation case

did not convince the penalty phase jury, it is unlikely to have swayed the Capital Review

Committee.  Bolden can show neither deficient performance nor prejudice.

## VI.   BOLDEN'S CLAIMS OF PROSECUTORIAL MISCONDUCT AND INEFFECTIVE ASSISTANCE DURING VOIR DIRE HAVE NO MERIT.

Bolden claims that restrictions on certain lines of inquiry at voir dire violated his

constitutional rights.  Doc. 54, at 36-52.  These claims have no merit.  All substantive claims in

this section are procedurally defaulted.  Bolden failed to raise them on direct appeal.

Bolden can make no showing that his counsel were ineffective as to any of these claims,

for the simple reason that each claim is facially meritless.  See Dodge v. Robinson, 625 F.3d

1014, 1019 (8th Cir. 2010) ("Counsel's failure to raise ... meritless issues does not constitute

ineffective assistance.").  The strategic winnowing of claims by Bolden's appellate counsel is

presumptively reasonable.  Brown, 528 F.3d at 1033.

### A.   "Consider" vs. "Listen To" Mitigating Evidence.

First, Bolden complains that the District Court restricted his ability to ask jurors whether

they would "consider" mitigating evidence during their penalty phase, preferring the formulation

that jurors would "listen to" mitigating evidence.  Pet. 38-40.  Bolden argues that the difference

56

between "consider" and "listen to" was "not one of semantics," id. at 40, but the record reveals otherwise.  The objection arose when defense counsel questioned a potential juror by asking of mitigation evidence, "Will you consider that type of evidence in making your punishment decision?"  Tr. 780.  The prosecution objected, pointing out that the way the question was phrased was asking for a commitment from the juror that she would give actual weight to mitigation evidence in the weighing decision.  Tr. 780.  As discussed further below, see infra Part XII, the penalty-phase jurors have the freedom to decline to find that proffered defense evidence is mitigating – i.e. to credit its truth but to assign it no weight at all in the weighing process – so long as they are not required to discount it "as a matter of law."  Eddings v. Oklahoma, 455 U.S. 104, 114-15 (1982) ("The sentencer ... may determine the weight to be given relevant mitigating evidence."); see also United States v. Rodriguez, 581 F.3d 775, 812 (8th Cir. 2009); Ortiz v. Stewart, 149 F.3d 923, 943 (9th Cir. 1998) ("While it is true that a sentencer may not refuse to consider, as a matter of law, any relevant mitigating evidence, a sentencer is free to assess how much weight to assign such evidence."); Pizzuto v. Arave, 280 F.3d 949, 972 (9th Cir. 2002) ("Having *considered* all the evidence, the [sentencing] judge was not obliged to *find it mitigating*." (emphasis in original)); 18 U.S.C. § 3593(d).

In the ensuing colloquy, the District Court concluded that the phrasing of defense counsel's questions raised the risk that the jury would misconstrue the questions as asking for a commitment to assign weight to mitigating factors, contrary to the rule that the jurors were "not obliged to *find it mitigating*," Pizzuto, 280 F.3d at 972.  The Court stated: "I think the hang-up is over the word 'consider.'  I'm not sure that the juror understand the word in the same way that lawyers do, and that may be the difficulty."  Tr. 782.  At that point, defense counsel voluntarily

rephrased the question using the phrase "listen to" instead of "consider."  Id. ("Is that evidence

that you can listen to as part of your making your punishment decision?" (emphasis added)).

Plainly, the District Court did not abuse its discretion in preferring the formulation "listen

to" over "consider" for the purposes of voir dire.  The Supreme Court itself has used a similar

formulation to describe the sentencer's action toward mitigating evidence.  Eddings, 455 U.S. at

115 n.10 (stating that, when it comes to mitigating evidence, "Lockett requires the sentencer to

listen").  The District Court correctly stated the law: "The real question is whether she would be

open to considering evidence regarding mitigation factors or would she be willing to listen to

evidence, because 'consideration' implies that the jurors don't have any choice in assessing

weight in the evidence.  And that's not [the law]."  Tr. 781.  This phrase "listen to" was applied

evenly to both mitigation and aggravation evidence.  Tr. 786 ("The question should be whether

any member of this panel is willing to listen to evidence of mitigation and aggravation....").  And

the record indubitably shows that the jurors were not misled, as the next juror used both "hear"

and "consider" in her response to the same question, reflecting a correct understanding of her

duty to assess mitigating evidence.  Tr. 787 ("I want to hear everything, and I will consider

everything.  I will hear his life – I would like to hear what brought him to this stage....  I would

consider everything.").  Defense counsel then admitted on the record that the District Court's

formulation of the question was correct and eliminated the confusion.  Id.  ("That was much

easier.  I probably should have just asked it that way.").  Bolden has no prospect of showing that

there was any error, far less any prejudicial error, in counsel's performance.

### B. Fact-Specific Defense Voir Dire.

Bolden contends that the District Court erred in preventing Bolden's counsel from posing

fact-specific questions during voir dire.  Pet. 40-52.  This contention has no merit.

As an initial matter, as noted above, Bolden failed to raise this claim on direct appeal, and it is procedurally defaulted.  Bolden's ineffective-assistance claims are particularly unconvincing, moreover, because his § 2255 petition merely rehashes the arguments made by his trial counsel, which this Court has already rejected.  Bolden cannot claim that trial counsel was ineffective merely by repeating what trial counsel already said.  In any event, the District Court's ruling on the fact-specific questions was correct.  Prior to voir dire, the Court engaged in a lengthy colloquy with counsel (which Bolden's petition unaccountably fails to cite) in which the Court laid out its ground rules for fact-specific questions.  Tr. 30-39.  The Court correctly drew a distinction between questions seeking a commitment from jurors on an issue in dispute, and those which permissibly inquire into preexisting biases of jurors.  For example, the Court distinguished between asking whether Bolden's diabetes might affect the fairness of any juror, which was permissible; and asking whether the jurors would consider that Bolden's diabetes was a mitigating factor, which was not permissible.  Tr. 34.  The Court stated, "I don't believe it's appropriate for either of you to ask the jury to commit to a view of specific evidence as a mitigating or an aggravating factor."  Tr. 35.  The Court expressly permitted the defense counsel to ask case-specific questions that did not seek an improper commitment: "you can ask the jurors about issues that are specific to this case."  Tr. 39.  But the Court directed the parties not to ask questions inquiring whether any juror would find any particular factor aggravating or mitigating: "[T]o ask the jurors whether they will consider specific types of evidence either in determining guilt or in determining punishment, I don't think that's appropriate."  Tr. 39.

This guidance was both clear and correct.  In <u>McVeigh</u>, the Tenth Circuit exhaustively surveyed and summarized the law governing fact-specific questions during capital voir dire:

> [T]he question was predicated on the assumption that the juror had heard the evidence and was asked, given that evidence and a finding of guilt, how she would vote on the

59

question of penalty.  Since the juror had not yet heard the evidence, the question improperly called for speculation and sought a precommitment from the juror.  Numerous courts have held Morgan-type questions objectionable when the question was predicated on facts specific to the case at issue or upon speculation as to what facts may or may not be proven at trial....  When a defendant seeks to ask a juror to speculate or precommit on how that juror might vote based on any particular facts, the question strays beyond the purpose and protection of Morgan.

... Morgan does not require courts to allow questions regarding the evidence expected to be presented during the guilt phase of the trial.  Further, ... Morgan does not require a court to allow questions regarding how a juror would vote during the penalty phase if presented with specific mitigating factors.  Other courts have issued similar rulings, holding that Morgan does not require questioning about specific mitigating or aggravating factors.  In fact, some of these courts have held that such questions not only are not required by Morgan, but are also simply improper.

United States v. McVeigh, 153 F.3d 1166, 1207-08 (10th Cir. 1998) (numerous citations

omitted).  See also, e.g., Evans v. State, 637 A.2d 117, 124 (Md. 1994) ("By presenting an

important aggravating factor in his *voir dire* question, Evans has stepped beyond a standard bias

inquiry and essentially asked that the prospective jurors provide advance clues as to how they

would vote based on the facts of this case.").  If anything, the District Court's guidance in

Bolden's case went beyond constitutional requirements in Bolden's favor, since the Court told

Bolden's counsel "you can ask the jurors about issues that are specific to this case."  Tr. 39.

Bolden fails to identify any instance during the lengthy voir dire in which this Court

failed to apply this standard correctly.  First, Bolden complains of questions from the defense

proposed voir dire that were excluded, but each of these excluded questions would have

improperly sought a commitment from jurors that they would view particular facts as mitigating.

Pet. 40-41 (citing Doc. 353, at 4-5).  Questions such as "Can you consider the conditions of

someone's upbringing as a mitigating factor?" and "Can you consider someone's health

problems as a mitigating factor?", Pet. 40, run afoul of McVeigh's statement that "Morgan does

60

not require a court to allow questions regarding how a juror would vote during the penalty phase if presented with specific mitigating factors."  153 F.3d at 1208.

Bolden's challenges to the Court's rulings on specific questions posed during voir dire fare no better.  For example, Bolden complains that his attorney was "precluded from ascertaining" whether Juror 118 believed that premeditated murder warranted the death penalty. Pet. 47 (citing Tr. 760-65).  This is incorrect.  At that point, under the guise of exploring the juror's concept of "premeditation," Bolden's trial counsel posed an improper question specifically describing the facts of Bolden's case, and asked for the juror's precommitment: "If you found Mr. Bolden guilty of planning a bank robbery.  Going to the bank lot and trying to rob the bank and shooting Mr. Ley twice in the attempted bank robbery, in your mind ... does that fall under your category or premeditated murder?"  Tr. 760.  This question clearly ran afoul of the rule that "Morgan does not require courts to allow questions regarding the evidence expected to be presented during the guilt phase of the trial."  McVeigh, 153 F.3d at 1208.  This was a clear "stake-out" question, seeking an improper pre-commitment from the juror as to how he would vote, and the Court correctly excluded the question.  Tr. 64 ("I think he's already explained to you what he meant by 'premeditation.'  And that's as far as you can go on that.").

Bolden complains at length that the prosecution and the Court conspired to mislead Alternate Juror 178 about the facts of the case.  Pet. 47 (citing Tr. 1787-92).  Bolden's argument on this point clearly misstates the record.  Far from being misled about shooting twice, the Court explicitly advised Juror 178 that there might well be evidence that Nathan Ley had been shot twice: "Let me ask you this: Knowing that there may be evidence that Mr. Ley was shot twice – regardless of who fired the shot – but just knowing that this is a victim who was shot twice, is that something alone that upsets you?"  Tr. 1789-90.  The prosecutor, likewise, clarified that the

number of times the victim was shot was not an element of the offenses with which Bolden was charged.  Tr. 1793 ("And there is no order in the charge of the elements of the offense that he was shot once, twice, or ten times.  It is not an element of the offense.").  The prosecutor went on to make clear, echoing the District Court, that the evidence would likely show that Bolden had fired twice.  Tr. 1794 ("But if you were to ... hear evidence ... that there were two shots fired, do you think you'll be able to consider the evidence objectively...?"); see also, e.g., Tr. 1430 (prosecutor summarizing the facts of the case by saying, "there was an attempted bank robbery of the Bank of America, and in that in the course of that, Mr. Bolden shot Mr. Ley twice; and that Mr. Ley died as a result").  Defense counsel, moreover, referred to the fact that Bolden shot the guard twice numerous times during voir dire.

Bolden claims that the defense voir dire of Juror 78 was improperly limited, but his claim here is difficult to fathom.  Pet. 48 (citing Tr. 587-92).  To be sure, the Government objected to the phrasing of a question asking how the juror was likely to vote given a guilty verdict in the guilt phase, but the Court overruled the objection and permitted defense counsel to inquire.  Tr. 589.  Defense counsel also quickly reformulated the question to determine whether that juror had preconceived notions about what evidence s/he expected to hear in mitigation: "I just want to get an idea: Are there things that you are expecting to hear if you get to that second stage [i.e. the penalty phase] or things you want to hear to make a decision?"  Tr. 590.  The juror's responses indicated that the juror was not predisposed against considering mitigation evidence, and s/he was open to hearing all the evidence in the penalty phase: "I don't really have any thoughts as to [whether I expect to hear specific evidence in the penalty phase] – I don't know what the story is."  Tr. 590; see also Tr. 589 (Juror 78 stating that the appropriate punishment at the penalty phase "would depend on all of the facts that were presented before I could make that decision.").

Next, Bolden complains that Juror 41 gave answers indicating that he would not consider mitigation evidence in cases of heinous murders, and that his "sentencing determination would focus solely on the crime." Pet. 49 (citing Tr. 327-28). Again, this claim cannot bear scrutiny. The only evidence Bolden provides for this conclusion is a very brief exchange between defense counsel and Juror 41, in which Juror 41 asserted the non-controversial proposition that he would "probably" consider a particularly heinous crime to be an aggravating circumstance. See Tr. 328 ("I guess I'm like [another juror]. Some things like, you know, people butcher people. Now, after I heard everything, I would think they probably deserve the death penalty.... I mean we're talking about severity. Something that's, you know, way beyond the normal thing."). Even in this brief exchange, Juror 41's answer indicated that he planned to "hear[] everything" before making a decision, and only that he would "probably" find the death penalty appropriate for particularly shocking, heinous murders, such as "butcher[y]."

Similarly, Bolden's petition claims that Juror 58 "was incapable of giving meaningful consideration to mitigation evidence." Pet. 49. Once again, there is not a scintilla of support for this claim in the record. Quite the contrary, Juror 58 indicated that he was "generally opposed" to the death penalty. Tr. 302. Upon questioning by the prosecutor, Juror 58 stated that his "mind [was] open to being willing to consider what those circumstances might be" where death was appropriate. Tr. 302. The prosecutor was concerned, not that Juror 58 would be unable to consider mitigating evidence, but that Juror 58 would be unable to consider evidence in aggravation. Juror 58 was a strong juror for the defense, and defense counsel skillfully avoiding questioning him further, to avoid creating grounds of removal for cause. There is no basis to conclude that Juror 58 had a closed mind with respect to mitigation evidence.

Bolden next claims that seated Juror 118 was an "automatic death juror." Pet. 50 (citing Tr. 679, 759-70). This claim cannot be taken seriously. Under questioning by the prosecutor, Juror 118 avowed that he "would have an open mind and consider the case," and agreed that he "would be able to consider on a case-by-case basis, depending on the circumstances." Tr. 679. Under questioning by defense counsel, Juror 118 stated that he believed that life without parole would be "an adequate punishment as well ... under the appropriate circumstances." Tr. 759. He said that he had no "preconceived concepts" and no "exclusive list" of when the death penalty and when life without parole were appropriate. Tr. 759. When specifically asked by defense counsel, in a lengthy and clearly phrased question, whether he would have a presumption in favor of death after finding Bolden guilty beyond a reasonable doubt of killing the bank guard, Juror 118 replied that, going into the penalty phase, "I'm at a point where I would consider the death penalty or life imprisonment. I guess I would follow the instructions of the judge and make that determination, but I wouldn't be predetermined after a verdict of guilty to go one way or another." Tr. 768. Defense counsel then asked, "Based on those facts, you wouldn't be predisposed one way or another?" to which Juror 118 replied, "Correct." Tr. 768. Defense counsel continued to press the question, but Juror 118 again stated that he would not be "determined or ... leaning toward one option or another" going into the penalty phase. Tr. 770. Defense counsel again asked whether Juror 118 would be predisposed against Bolden as a "previously convicted individual" going into the penalty phase, and Juror 118 again responded, "No." Tr. 771. In sum, the record flatly contradicts Bolden's contention that Juror 118 was an "automatic death juror." Pet. 50.

Finally, Bolden contends that Juror 186 was also an "automatic death juror." Pet. 51 (citing Tr. 1370). Again, this contention is plainly meritless. Juror 186 served as an alternate,

and Bolden does not allege that Juror 186 actually participated in jury deliberations.  In any event, Juror 186 expressed an openness to listen to and consider all the evidence at the sentencing hearing: "I think you have to think clearly on what all the evidence has been brought forth before you can make a decision."  Tr. 1370-71.  Juror 186 denied that she would have "determined ... that the death penalty is appropriate and justified" going into the penalty phase. Tr. 1372.  Juror 186 went on to explain, correctly, that during the penalty phase, "you have to have all the evidence in and all the facts and participation of the jury to weigh these facts that you have in hand before making a decision."  Tr. 1372.

## VII.   BOLDEN'S CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE GUILT PHASE HAVE NO MERIT.

Bolden claims that the guilt phase of his trial was bedeviled by numerous errors of prosecutorial misconduct and ineffective assistance of counsel.  Pet. 52-82.  These claims have no merit.  To the extent that Bolden attempts to allege any substantive claims in this section, they are all procedurally defaulted for failure to raise on direct appeal.

### A.   The Eyewitness Evidence of Bolden's Guilt Was Highly Credible And Adequately Tested by Defense Counsel at Trial.

First, Bolden brings a series of claims challenging the credibility of eyewitnesses, and that his trial attorneys were ineffective in failing to challenge their testimony.  Pet. 55-69.  These claims are uniformly meritless and do not warrant an evidentiary hearing.

**1.  Putative Inconsistencies Between Eyewitness Accounts.**  Bolden's first complaint is that there were putative minor inconsistencies among the eyewitness accounts against him, such as the witnesses' descriptions of the shading of his hooded sweatshirt, and their characterization of his skin color.  Pet. 55-56.  As Bolden effectively concedes through his citations, his trial

counsel effectively elicited these putative inconsistencies on cross-examination, and yet the jury chose to credit these witnesses.  Bolden provides no clear account of what his trial counsel could have done better, so he fails to make any specific allegation of ineffective performance.

Bolden also alleges, briefly and without support, that "Petitioner also expects to present neighborhood witnesses demonstrating that, contrary to the eyewitnesses' and Mr. Price's testimony, Petitioner was in a completely different location" at the time of the murder.  Pet. 56.  Petitioner fails to provide any specific support for this conclusory allegation, such as the name of such alibi witnesses or their anticipated testimony, nor does he allege that his trial counsel could have located these witnesses through reasonable efforts or otherwise failed to reasonably investigate.  Moreover, Bolden cannot make any plausible allegation of prejudice, because the evidence of his guilt was overwhelming.  See infra, Part VII.E.  For all these reasons, the claim does not warrant any discovery or an evidentiary hearing.  "[C]onclusory allegations unsupported by specifics or allegations that, in the face of the record, are wholly incredible ... [are] insufficient to overcome the barrier to an evidentiary hearing on a section 2255 motion."  Voytik v. United States, 778 F.2d 1306, 1308 (8th Cir. 1985) (citations, quotation marks, and alterations omitted).

**2.  The Testimony of Erica Ruffin.**  Next, Bolden levies a long series of attacks against the testimony of Erica Ruffin.  Pet. 56-64.  These claims have no merit.  First, Bolden alleges that Ruffin was too far away from the scene of the crime to perceive details about which she testified, rendering her testimony suspect and unreliable.  Pet. 59.  As Bolden concedes, however, Bolden's trial counsel "cross-examined Ms. Ruffin extensively regarding her position and ability to observe."  Pet. 59 (citing Tr. 2573-80).  Bolden's claim of deficient performance is based on his fanciful suggestion that trial counsel should have retained a "forensic expert" to

"measure[] the distances" between Ms. Ruffin's car and the scene of the murder.  Pet. 59.

Because a lay person can easily "measure the distances" with a tape measure, this would not

have been a proper basis for expert testimony.  See Fed. R. Evid. 702(a).

Second, Bolden alleges that the Government improperly bolstered Ruffin's credibility by

touting her credentials as a security officer, and that defense counsel were ineffective in failing

to "obtain Ms. Ruffin's employment information" to challenge this line of inquiry.  Pet. 60.  This

claim has no merit.  In response to the question, "Why were you paying close attention to these

events?" Ruffin briefly replied, "as a security officer, I was trying to do that."  Tr. 2562.  That

was the extent of her testimony on this issue.  Ruffin never testified as to how long she worked

as a security officer, and there was no reference to the length or degree of her training.  Bolden

cites no such evidence in the trial record; quite the contrary, Bolden admits that Ruffin "did not

provide specific dates for her employment at Pinkerton."  Pet. 60.  Bolden's counsel were not

ineffective in failing to procure records to rebut this fleeting reference to Ruffin's employment.

Third, Bolden contends that his counsel were ineffective in failing to procure records to

challenge Ruffin's account of her sobriety at the time she witnessed the offense.  Pet. 61-62.  At

trial, the Government repeatedly elicited testimony from Ruffin about her prior heroin usage and

treatment.  Tr. 2546-47, 2559, 2561-62, 2595-96, 2600.  Defense counsel also cross-examined

Ruffin very thoroughly about her use of heroin and treatment for heroin addiction.  Tr. 2563,

2565-70.  Bolden now faults his defense counsel for failing to make use of treatment records

from May 2003 during cross-examination, which would allegedly have shown that Ruffin's

struggle with heroin addiction was "longstanding and chronic."  Pet. 61.  On cross-examination,

however, Bolden's attorney elicited that Ruffin had struggled with heroin addiction for "close to

nine years," Tr. 2565, and that Ruffin had sought treatment for addiction and then relapsed on

67

numerous occasions, at least "four to five times," Tr. 2566.  The record thus flatly contradicts Bolden's allegation that the jury failed to hear that Ruffin's heroin problem was "longstanding and chronic."  Bolden contends that defense counsel should have used the treatment records to impeach Ruffin's claim that she had been sober for "close to six months," Tr. 2567, prior to witnessing the murder.  Pet. 61.  Bolden concedes, however, that the records indicate that Ruffin had periods of sobriety of at least three to four months, Pet. 61, so any inconsistency would have been minor and immaterial.  Bolden also contends that his counsel should have impeached Ruffin by pointing out that she entered the DART treatment program in December 2002.  Pet. 61.  But Ruffin admitted on the stand that she had relapsed into heroin use not long after witnessing the murder on October 7, 2002, testifying that this relapse took place "maybe about a little over a month, maybe a month or two" after the murder.  Tr. 2562.  Ruffin's testimony thus indicated that she relapsed into heroin usage sometime around November 2002, which was perfectly consistent with her seeking treatment for heroin addiction at DART in December 2002.  Bolden's counsel's cross-examination of Ruffin about her heroin usage was fully effective.

Bolden also speculates that the Government may have possessed, and withheld from the defense, DART or other records relating to Ruffin's heroin use.  Pet. 62.  This speculation is wholly without foundation and false.  It is yet another "conclusory allegation unsupported by specifics" that does not warrant an evidentiary hearing.  Voytik, 778 F.2d at 1308.

Fourth, Ruffin testified that the Government put her up in a hotel room so that she could be contacted while she was awaiting admission to a heroin treatment program, Tr. 2564-65.  Bolden alleges that "Petitioner will demonstrate at an evidentiary hearing that, while at the hotel, Ms. Ruffin called one of her prostitution 'customers'," and speculates that the purpose of this putative phone call was to arrange a meretricious encounter.  Pet. 63.  This speculative claim is

68

yet another "conclusory allegation unsupported by specifics." Voytik, 778 F.2d at 1308.  In any event, Bolden fails to allege that the prosecution monitored Ruffin's phone calls or was otherwise aware of this supposed contact, or that defense counsel could have discovered this contact by reasonable means.  Thus he states no claim, either of prosecutorial misconduct or of ineffective assistance, even if the putative contact had taken place.

Fifth, Bolden alleges that "counsel has been told by at least one witness who has known Ms. Ruffin for a number of years that, at the time of Petitioner's trial, Ms. Ruffin had obtained various favors from the police." Pet. 63.  Once again, the "favors" are unspecified, relegating this claim to the category of "conclusory allegations unsupported by specifics" that do not warrant an evidentiary hearing.  Because Bolden provides no specifics, it is impossible to assess whether any such putatively undisclosed "favors" would have been material in impeaching Ruffin's testimony, triggering an obligation to disclose them under Giglio.

Finally, Bolden "avers and expects to present evidence during an evidentiary hearing that the school records for Ms. Ruffin's nephew do not substantiate her claim that she was there for the purpose of picking up her nephew from school." Pet. 64.  Once again, this allegation is entirely conclusory and speculative.  Bolden identifies no factual support for it.  Likewise, Bolden does not allege that the Government suppressed any school records, or that his trial counsel could reasonably have found anything relevant through due diligence.  Furthermore, Ms. Ruffin's reason for being at the bank that day was wholly collateral to the matters as to which she testified, so any such school records would have been inadmissible as extrinsic evidence used to impeach a witness on a collateral matter.  See United States v. Cowling, 648 F.3d 690, 697 (8th Cir. 2011).  This claim does not warrant discovery or a hearing.

**3. Testimony of Henry Wines.** As to the testimony of eyewitness Henry Wines, Bolden alleges that his counsel were ineffective in failing to subpoena Wines's employment records from his employment as a corrections officer. Pet. 65. Bolden speculates that the jury's assessment of Wines's credibility as an eyewitness was likely affected by Wines's testimony that he had a lengthy career as a corrections and security officer. Pet. 65 (citing Tr. 2395-96). This speculation cannot be squared with the record. Wines testified that he saw the shooter before the shooting as Wines was coming out of the bank, that he observed the shooting from fairly close range, and that after the shooting Bolden "[c]ame right up back across in front of my truck. I was looking at him. He was looking at me..." Tr. 2405. Wines thus observed Bolden's face from very close range right after the murder, and Wines focused closely "on his face and his eyes" as Bolden passed by Wines, Tr. 2430, because Wines feared that Bolden might shoot him too. Wines positively identified Bolden in a police line-up soon after the murder, and he had no doubt of the identification. Tr. 2413 ("I was positive."). In short, Wines's identification of Bolden as the shooter was highly credible, regardless of Wines's employment history as a security officer. Bolden's claim that Wines's training was a determinative factor for the jury in accepting the reliability of Wines's identification is another of Bolden's "allegations that, in the face of the record, are wholly incredible" and thus do not warrant discovery or an evidentiary hearing. Voytik, 778 F.2d at 1308. Moreover, Bolden's complaint that counsel were ineffective in failing to subpoena Wines's employment records is supported only by speculation – not by citing any specific factual support regarding the content of such records. Pet. 65. It was not constitutionally defective performance for Bolden's trial counsel to decline to pursue this far-fetched angle for impeachment, and Bolden's speculation that he might have been prejudiced by counsel's failure to discover whatever might be in Wines's employment records is another "conclusory allegation unsupported by specifics" that does not warrant a hearing. Id.

70

    4. **Testimony of Jeanne Coser.**  Regarding the testimony of Jeanne Coser, Bolden rehashes the claim that his counsel were ineffective in failing to subpoena her employment records in order to "disput[e] the government's theory that Ms. Coser's employment rendered her a better identification witness."  Pet. 66.  The claim has no merit.  As Bolden admits, government counsel asked only one question about Coser's job training, whereupon defense counsel objected, and the prosecutor stated he had no further questions on this issue.  Tr. 2997. The entirety of Coser's testimony as to job training, therefore, was her statement that, as a "sorter and bagger" for UPS, "you have to take sort tests.  You have to learn ZIP codes in cities and towns where they go into, which bins and stuff."  Tr. 2997.  This stray statement was the only reference to her training in her entire testimony.  The notion that this statement had any material influence on Coser's credibility as an eyewitness is not convincing.  Coser's credibility as an eyewitness arose from the facts that she was "twenty, twenty-five feet at the most" away from the murder when she saw Bolden kill Nathan Ley, Tr. 3032; that she was able to give a detailed description of the course of events during the killing, Tr. 3006; that Bolden was facing her during most of the struggle, and that she was able to get "to get different angled views of [Bolden's] face" while she watched the struggle, Tr. 3008; that she gave the struggle her "full attention," Tr. 3010; that she "couldn't count how many" chances she had to see the shooter's face, because they were "too many too count," Tr. 3021; that the shooter was her "primary focus," Tr. 3021; that she had "seen his face so many times I couldn't forget it," Tr. 3021; and that she identified Bolden as the shooter from a police line-up later the same night, "immediately" and without hesitation, Tr. 3023; among other factors.  Moreover, Bolden does not specify what, if anything, might have been garnered from Coser's UPS employment records to undermine her credibility as an eyewitness, so his allegation is speculative and unsupported by specifics.

Bolden contends that his counsel were ineffective in failing to present evidence that Bolden is right-handed, after Coser testified on direct examination that Bolden held the gun in his left hand. Doc. 54, at 67. This claim is meritless. As became clear during Coser's cross-examination and redirect, her statement on direct that the gun was in the left hand referred to the hand that was on <u>her</u> left, i.e. the shooter's <u>right</u> hand, because the shooter was facing her. Tr. 3029 ("It was in his right hand....  It was in his right hand when he shot him."); Tr. 3030 ("Q: Which hand held the weapon?  Right or left?  A: Right hand."); Tr. 3043-45. When pressed for clarification, Coser repeatedly clarified that the gun was in the shooter's right hand, i.e. the hand that was on her left, because the shooter was facing her.

Bolden claims that counsel were ineffective in failing to cross-examine Coser about the position of the sun. At trial, Coser did not testify about the specific position of the sun; she merely testified that the sun did not interfere with her ability to view the murder. Tr. 3009. Bolden does not allege that he would be able to prove that the sun was in Coser's eyes such that it would have been impossible to view the murder.  Rather, he faults defense counsel for failing to attempt to impeach a statement about the position of the sun that Coser made during a pre-trial hearing. Pet. 67. This claim is meritless. Counsel were not ineffective in failing to impeach a statement of Coser that Coser did not make at trial. And since Bolden does not allege that the sun actually obstructed Coser's view of the murder, the issue is collateral and immaterial.

Bolden contends that Coser should not have been allowed to offer "emotionally charged" testimony about tending the wounded victim while waiting for ambulance personnel to arrive, and about having blood on her clothes and weeping when she returned home afterward. Pet. 67-68. Bolden contends that his counsel were ineffective in failing to object to exclude this evidence. Pet. 68. This claim has no merit. Notably absent from Bolden's petition is any legal

72

argument that the proffered testimony was, in fact, inadmissible.  The emotional state of the witness was relevant and admissible to support the reliability of Coser's identification of the defendant.  Thus, the prosecutor elicited testimony from Coser that she was understandably emotionally shaken by the incident, but that she was nevertheless confident that she had a clear recollection of Bolden's face.  Tr. 3021.  Coser testified that, though she "started crying" when she got home after the incident, she "s[a]t down and tr[ied] to pull herself together" at home, before returning to the murder scene to identify Bolden.  Tr. 3020.  Having established the emotional impact on Coser, the prosecutor then asked a series of questions about Coser's confidence in her identification of Bolden, notwithstanding the emotional trauma she had suffered from the incident.  Tr. 3021-22.  Moreover, Coser's emotional state after she returned home was particularly relevant because she returned to the police station later that same night to view a line-up and identify Bolden.  Tr. 3023.  If the prosecutor had not defused the issue of the crime's emotional impact on Coser during direct, defense counsel undoubtedly would have attacked the reliability of her identification under such distress on cross-examination.  In fact, Bolden's petition goes on to attack Coser's credibility on this very basis, i.e. that she had suffered emotional trauma in the course of viewing the crime and its aftermath.  Pet. 69-70.  It is hard to see how Bolden can fault the prosecutor for covering an issue on direct examination which Bolden himself now contends was highly relevant to Coser's credibility.

Bolden also contends that his defense counsel were ineffective in failing to object when "the prosecutor asked a question clearly designed to elicit testimony about Ms. Coser's attendance at a memorial service."  Pet. 68.  This characterization of the record is misleading.  The prosecutor asked a question about Coser's decision to return to the scene of the crime on the same day as the murder, to defuse an anticipated line of cross-examination about the witness's

potential bias.  Tr. 3025-26.  Coser mentioned that there was an impromptu "memorial service"

occurring at the bank, whereupon defense counsel objected.  Tr. 3025.  The objection was

sustained.  Tr. 3026.  No further testimony on this issue ensued.  It is difficult to see how

counsel's performance was defective, or how Bolden was prejudiced, through his counsel's

successful attempt to foreclose this line of inquiry through a timely objection.

### B.    <u>Counsel's Putative Failure To Call An Eyewitness Identification Expert</u>.

Next, Bolden claims that his counsel were ineffective in failing to call Dr. Lieppe, a

proffered expert in the area of eyewitness identifications, to testify about the putative

unreliability of eyewitness identifications.  Pet. 69-70.  This claim has no merit.  Regardless of

the reasons for counsel's decision not to call Dr. Lieppe, the record leaves no doubt that Bolden

cannot make any plausible showing of prejudice from this decision, because the independent

strength and mutual corroboration of the three eyewitness identifications rendered this testimony

virtually unassailable.  Each of the eyewitnesses testified that he or she had a clear view of

Bolden during the crime.  Tr. 2555-56 (Erica Ruffin); Tr. 2405, 2430 (Henry Wines); Tr. 3008,

3010, 3021, 3032 (Jeanne Coser).  Each of the eyewitnesses positively identified Bolden as the

shooter, both in a police lineup and in open court, and each identification was made with a high

degree of confidence.  Tr. 2413 (Erica Ruffin); Tr. 2557-58 (Henry Wines); Tr. 3023 (Jeanne

Coser).  The cumulative effect of these independent, consistent, and mutually reinforcing

eyewitness identifications was compelling.  The likelihood that any expert witness could have

effectively debunked all three of these independent identifications is beyond remote.  Moreover,

not only did all three eyewitness and line-up identifications corroborate each other, but they were

also corroborated by extensive independent evidence – including the DNA evidence, the

presence of Bolden's car at the crime scene, the testimony of Bolden's co-conspirator, and the

discovery of the murder weapon and ammunition at Bolden's residence.  As the magistrate judge

observed, "the other evidence presented [of Bolden's guilt] makes the case of mistaken

identification extremely remote."  Doc. 241 in No. 4:02 CR 557 CEJ, at 61.

### C.    The Government's Forensic Experts.

Bolden challenges the Government's use of forensic experts at trial, and his counsel's

response to it.  Pet. 70-78.  None of the claims has any merit or warrants an evidentiary hearing.

**1.  The defense's failure to call forensic pathologist Dr. DiMaio.**  First, Bolden claims

his trial counsel were ineffective in failing to call forensic pathologist Dr. DiMaio to testify

about the presence of "stippling" around Nathan Lay's entry wounds.  Pet. 70-71.  Bolden

contends that defense counsel should have called Dr. DiMaio "to demonstrate that at least one of

the wounds was fired close-range (consistent with being fired in the course of a struggle)."  Pet.

71.  This contention has no merit, because Dr. DiMaio's testimony about the presence of

stippling around the face wound would have been fully consistent with the Government's

evidence, which showed that the first shot (to the victim's face) was fired from close range, in

the course of a struggle.  The Court's pretrial ruling correctly determined that Dr. DiMaio would

be allowed to testify that there appeared to be stippling around the chin wound, consistent with

the shot being fired from close range, but that Dr. DiMaio would not be allowed to opine that the

shot was fired during a struggle.  April 18, 2006 Transcript of Daubert Hearing, at 146.  The

Government's expert witness testified multiple times that there were marks around the chin-area

entry wound that could be stippling, and stated that stippling usually occurs when the weapon is

within 2-3 feet of the victim.  Tr. 2743-46.  The testimony of Dr. DiMaio, who opined that the

red marks around the entry wound probably were stippling, would have added nothing material

to the trial evidence, because the Government's eyewitnesses all testified that the first shot was

fired from close range, during a struggle between Bolden and the victim.  See supra.  In fact, Bolden's petition fails to articulate any clear theory of how evidence of stippling around the wound would have been inconsistent with any portion of the Government's case.  Bolden's counsel were not ineffective in failing to call Dr. DiMaio, and Bolden suffered no prejudice from this omission.

      2.  **The prosecution's use of DNA evidence.**  Bolden contends that the prosecution used "false and exaggerated 'scientific' evidence and argument that DNA evidence in this case matched Petitioner."  Pet. 71.  Bolden's principal argument is that "the prosecution's evidence and argument ... falsely equated a **random match** probability with a **source** probability."  Pet. 72 (bold in original).  This assertion is simply incorrect.  Albeit without using the same terminology, the prosecution's expert witness, Ms. Kwiatowksi, correctly distinguished between random match probability (the chance that any randomly selected individual from the population would match the DNA profile) and source probability (the probability that Bolden was the source of the DNA on the head scarf seized from the scene of the crime).  Ms. Kwiatowski described the analysis of DNA samples in great detail.  Tr. 2899-2955.  She recounted, with detailed clarity, the process of "statistical analysis" required to do a source determination, including the use of statistically representative comparator databases to calculate random match probabilities.  Tr. 2930-36.  She explained that, to make a source determination to a reasonable degree of scientific certainty, it was required to have a random match probability with a denominator 1000 times greater than the current population of the United States (then about 285 million).  Tr. 2935-36.  In other words, Ms. Kwiatowski testified that, when the "random match probability" is staggeringly low (1 in 285 billion or more), the "source probability" is established to a reasonable degree of scientific certitude.  Tr. 2935-36.  Nothing in Bolden's petition casts

any doubt upon these scientific standards, which were universally accepted in Ms. Kwiatowski's field.

The rationale for this scientific standard is not difficult to discern.  For example, consider two random match probabilities identified by Ms. Kwiatowski as applicable to two different DNA samples, i.e. 1 in 60,000, and 1 in 600 quadrillion, as well as the threshold for identification, 1 in 285 billion.  A random match probability of 1 in 60,000 meant that there were probably 285,000,000 / 60,000 = about 4,750 people in the United States that match the given profile.  Under such circumstances, scientists refuse to say that a given person who matches the profile is the source, because statistics indicate that there are thousands of other persons in the United States who are also possible sources.  But a random match probability of 1 in 285 billion means that there is only one chance in a thousand that there is any other person in the United States who matches the relevant DNA sample.  In other words, when the random match probability is 1 in 285 billion, it is 99.9 percent likely that there is no other human being in the United States (excluding identical twins) who matches the DNA sample.  At that point, scientists conclude that the identified match was the source of the relevant DNA, to a reasonable degree of scientific certainty.  In the case of Bolden's DNA on the black stocking cap, the random match probability was infinitesimally lower than 1 in 285 billion, the acknowledged threshold for scientific certainty.  In his case, the random match probability was 1 in 600 quadrillion, or 1 in 600 million billion.  Tr. 2954.  This implied that the chance that there was another individual in the United States (besides Bolden or his identical twin) with a genotype that matched the DNA on the black stocking cap was 285 million / 600 quadrillion = 0.000000000475.  To say the same thing another way, it was 99.9999999525 percent likely that there was no other individual in the United States whose DNA matched that on the stocking cap.  Thus, Ms. Kwiatowski was

overwhelmingly justified when she testified that "it is very, very improbable that the DNA found in the cap could have come from another source than Robert Bolden." Tr. 2955. See also Tr. 2940 ("Q: So on that black cap to a reasonable degree of scientific certainty, you have DNA from Robert Bolden and Nathan Ley? A: Yes. From two different areas on the same cap.").

Ms. Kwiatowski consistently adhered to these correctly articulated standards throughout her testimony, including her discussion of the DNA samples from the crime scene. She consistently refused to conflate random match probability with source probability, testifying that no source could be identified to a reasonable degree of scientific certitude whenever the random match probability was greater than 1 in 285 billion. For example, there were hairs from a sweater that Ms. Kwiatowski testified were "attributed to Nathan Ley." Tr. 2938. Because the random match probability for that sample was 1 in 90 million, Ms. Kwiatowski declined to conclude that Nathan Ley was the source for those hairs. Tr. 2938. Again, a random match probability of 1 in 90 million means that, statistically, there were probably about 3 people in the United States whose DNA profile would match what was extracted from the sweater, i.e. 285 million / 90 million = about three. So the scientist could not say that Ley was the sole source of the DNA to a reasonable degree of certainty. Notably, as to the sample from the black-and-turquoise hair wrap that was found the parking lot after the murder, Ms. Kwiatowski merely concluded that "Robert Bolden can be a contributor to the mixture" taken from that sample. Tr. 2940. There, the random match probability was 1 in 60,000 (which, as noted above, means that statistics predicted that there would be about 4,750 persons in the United States who matched that profile). Tr. 2940. When the random match probability was that high, Ms. Kwiatowski expressly declined to come to a scientific conclusion that Bolden was the source of that DNA. Tr. 2941 ("Q: 1 in 60,000 is not to a reasonable degree of scientific certainty? A: No, it is not.").

78

But when the random match probability was as low as 1 in 600 quadrillion, as for the stocking cap, Ms. Kwiatowski correctly concluded that Mr. Bolden was the source of the DNA, to a reasonable degree of scientific certitude, as discussed above.

The prosecutor's description of the DNA evidence in closing argument was likewise correct. Each time Mr. Holtshouser referred to the DNA evidence in closing, he provided a fair and accurate description of Ms. Kwiatowski's testimony and conclusions. First, he stated that "this man's [i.e. Bolden's] DNA is found on this cap at the crime scene, which also contains Nathan Ley's blood." Tr. 3087. This statement correctly recounted Ms. Kwiatowski's conclusion, to a reasonable degree of scientific certainty, that Bolden and Nathan Ley were the source of DNA samples taken from the stocking cap. Tr. 2939-40 ("Q: So on that black cap to a reasonable degree of scientific certainty, you have DNA from Robert Bolden and Nathan Ley? A: Yes. From two different areas of the cap."). Later, Mr. Holtshouser referred to "the DNA on the black cap found at the scene. And you know that Mr. Bolden is the major contributor to the mixture in that DNA." Tr. 3108. Again, this statement correctly reported the expert's scientific conclusions. <u>See</u> Tr. 2939-40. The prosecutor went on to state, still referring to the DNA sample from the black stocking cap, "you've heard that the odds of another person on earth having the same DNA are 1 in 260 quadrillion.[3] Under all of these facts to suggest there is reasonable doubt is laughable, ladies and gentlemen." Tr. 3108-09. Again, the prosecutor correctly described the 1 in 600 quadrillion figure as a random match probability, not a source probability. He went on to argue that "under all these facts" – i.e., not just the DNA evidence,

---

[3] In fact, as Ms. Kwiatowski testified, the chances were actually 1 in 600 quadrillion. The prosecutor actually understated the probability, in Bolden's favor. But under either figure, it was overwhelmingly likely that Mr. Bolden was the source of the DNA, for the reasons stated above.

but all the other evidence of guilt he had just recounted – there was no reasonable doubt of Bolden's guilt. Tr. 3108. The prosecutor's next statement merely recounted the expert's conclusion that Bolden was the source of the DNA on the cap to a reasonable degree of scientific certitude. Tr. 3112 ("If Mr. Bolden is not the shooter, how did his DNA end up on this black cap that also contained Nathan Ley's blood and was found next to the his body? Think about that."). In rebuttal, the prosecutor correctly pointed out that the statistical analysis used by the DNA expert was universally accepted in the scientific community. Tr. 3146 ("The use of those statistics are accepted worldwide in the scientific and forensic community."). Nothing in the prosecutor's description of the DNA evidence during closing argument was in any way improper.

   **3. The prosecution's use of a ballistics expert.** Next, Bolden attacks the prosecution's use of ballistics evidence at trial, provided by expert firearms and toolmark examiner Frank Stubits. Pet. 76-78. In the main, Bolden does not attempt to identify any specific deficiency in Mr. Stubits' qualifications, methodology, or analysis, but rather rests his case on a blanket challenge to the entire field of ballistics analysis. Pet. 77. Bolden cites a 2009 National Research Council Report to suggest that the entire field of ballistics is generally flawed. Pet. 77. Because this report did not exist during Bolden's trial, neither the prosecutors nor Bolden's defense counsel acted improperly in failing to rely on it. Moreover, the reliability and admissibility of ballistics evidence have been repeatedly reaffirmed by the courts of appeals, both before and after the 2009 National Research Council report on which Bolden relies. See, e.g., United States v. Bowers, 638 F.3d 616 (8th Cir. 2011) (FBI ballistics expert testified that metal shards at the crime scene were bullet fragments); United States v. Barnes, 411 Fed. Appx. 365, 370 (2d Cir. 2011) ("Barnes's objections, which go to the reliability of ballistics evidence in

general, do not persuade us that it was plain error, or indeed error at all, for the district court to allow the testimony."); United States v. Mikos, 539 F.3d 706, 710-11 (7th Cir. 2008) (holding that the district court did not abuse its discretion in permitting an FBI ballistics expert to testify); United States v. Williams, 506 F.3d 151, 161-62 (2d Cir. 2007) (holding that the district court did not abuse its discretion in admitting evidence of a ballistics expert).  Bolden fails to identify any putative individual deficiency in Mr. Stubits's methodology as applied in his case, so he fails to allege any plausible claim of prosecutorial misconduct or ineffective assistance.

Next, Bolden claims that Mr. Stubits wrongfully implied that the ballistics analysis indicated that the second bullet that struck Nathan Ley was also fired from the firearm found in Bolden's residence.  Pet. 77-78.  This claim cannot be squared with the record.  Mr. Stubits repeatedly and consistently testified that the ballistics analysis of the second bullet was inconclusive – that it could neither be excluded nor confirmed as having been fired from Bolden's gun.  Tr. 2843 ("QF2 is the severely mutilated bullet.... the striational pattern is not there, as far as my test-bullets.  So I cannot exclude it from being fired from this firearm, but I cannot say that it was definitively fired from this firearm.  Q: So in other words, it's inconclusive?  A: The results are inconclusive.  Yes. ... An 'inconclusive' means that it could be fired from the same firearm but it lacks identification parts that I can say positive."); see also Tr. 2850, 2852 (Mr. Stubits, on cross-examination, agreeing that "the results [for QF2] are inconclusive due to the severe mutilation and lack of identifiable striations on the specimen" during his first examination of QF2, and again that "it was inconclusive due to the severe mutilation and lack of identifiable striations on that specimen" during his second examination of QF2).  There was no prosecutorial misconduct in the presentation of Mr. Stubits' testimony.

Finally, Bolden faults his trial counsel for failing to call their own "expert" witness in ballistics, John Cayton. Pet. 78. This claim is hard to square with Bolden's immediately previous claim, namely that the entire field of ballistics is inherently "unreliable." Pet. 76. In any event, this claim has no merit. Prior to trial, Mr. Cayton prepared a report that addressed two areas: a traditional ballistics examination, and a speculative account as to how certain factors in the murder might have been consistent with an accidental shooting. On the issue of ballistics examination, Mr. Cayton's conclusions were "essentially the same as Mr. Stubits'," and the prosecution did not oppose his ability to testify as an expert in this area. April 18, 2006 Transcript of Daubert Hearing ("4/18/06 Tr."), at 130. Bolden's petition gives no explanation of how it would have helped his case for his trial counsel to call Mr. Cayton to parrot Mr. Stubits' conclusions. Pet. 78. On the issue of Mr. Cayton's opining on the possibility of accidental discharge, the District Court correctly excluded this testimony in limine. After reviewing the many problems with Mr. Cayton's testimony on this issue, the Court ruled: "Most of which [Mr. Cayton] testified about doesn't have much bearing on the case.... I believe the government's motion in limine is well-taken as to Mr. Cayton, at least to the extent of any testimony regarding the mental state of the defendant and as to all the other issues I've already addressed." 4/18/06 Tr. 120-21; see also id. 118 ("The Court: ... And [Mr. Cayton] said, 'It is common sense.' If it's common sense, we don't need an expert."); id. ("His conclusion basically is that, 'It could have happened this way. It could have been an accident.' That's speculation. It is not a scientific conclusion."); id. 119 ("There's no evidence that Mr. Cayton considered about Mr. Bolden's physical or mental status at all."); id. 120 ("I don't think it's appropriate to have this witness come in and tell the jury that he looked at all these facts, and the only thing he can say about them is that, you know, 'This is a stressful situation or a situation that was likely to produce stress'."). Bolden now faults his trial counsel for failing to call Mr. Cayton to provide testimony

82

to support the theory of an accidental shooting.  Pet. 78.  But this is exactly the testimony that the Court excluded at the <u>Daubert</u> hearing, in a ruling that Bolden does not challenge.

### D.    Defense Counsel Were Not Ineffective In <u>Challenging the Testimony of Dominick Price.</u>

Bolden claims that his trial counsel were ineffective in challenging the testimony of Dominick Price, the cooperating witness for the Government.  Pet. 78-80.  Here, Bolden claims that his counsel should have called witnesses to advance the alternate factual theory that: (1) Price came to the robbery scene armed, as well as Bolden; (2) Bolden fired the first shot accidentally, during the struggle with Nathan Ley; and then (3) Price stepped in and fired the second shot deliberately, killing Nathan Ley.  Pet. 80.  In support of this theory, Bolden contends, his counsel should have called two witnesses, James Crawford and Audrey Brown, who (he alleges) stated that they had seen a young man fleeing the bank possibly armed, and his counsel should have obtained telephone records to "dispute[] Price's contentions regarding purported phone calls between himself, [and] allegedly Mr. Bolden and Mr. Edwards."  Pet. 79.

The principal problem for this claim is that it is directly contrary to the eyewitness evidence presented at trial.  All three eyewitnesses described the man who struggled with Nathan Ley as the one who fired both shots – and, as discussed above, all three identified the shooter as Bolden.  Erica Ruffin described looking up at the sound of the first shot and seeing Bolden fire the second shot.  <u>See</u> Tr. 2540-41 ("I saw the security guard.  I saw the security guard bent over with his hand in front of him like with his palm out, and I saw the – I saw the guy who had the gun.  He had the gun pointed at his head...  He fired the gun."); <u>id.</u> at 2543-44, 2558-59 (Ms. Ruffin describing her close view of the shooter, and identifying Bolden as the man who shot Nathan Ley).  Henry Wines described seeing Bolden fire both shots after Wines confronted

another robber, who hid behind a truck and was not seen again.  Tr. 2403-05 (testimony of Henry Wines) (describing "the shooter" shooting two shots, and describing "the person [who] turned around and come directly back towards me" after the murder as "the person that did the shooting"); Tr. 2412-14 (Mr. Wines positively identifying Bolden as the shooter).  And Jeanne Coser described the struggle in detail, identifying the man who was struggling with Nathan Ley as the one who fired the second shot, and further identified that shooter as Bolden.  Tr. 3006 ("When I looked up I saw two men – the guard and the other man – struggling and holding onto each other and then I had noticed a gun in the other man's hand.... and then I heard a gunshot go off.... And then the other man broke away from [the guard] and like stood back a little and pointed the gun at him and shot him the second time and then Nathan Ley fell to the ground"); Tr. 3012 ("Q: And then after [the first shot], there was more struggle?  A: Yes.  Q: And you said that at some point the man with the gun broke free?  A: Yes. ...  Q: And then what did he do with the gun?  A: Raised it and shot him."); Tr. 3023-25 (Ms. Coser positively identifying Bolden as "the man ... that you saw shoot and kill Nathan Ley").

In the face of this evidence, Bolden's argument that the jury might have been convinced that Dominick Price, not Bolden, had fired the second shot, cannot be taken seriously.  No one disputed that Bolden, the man struggling with Nathan Ley, had fired the second shot.  In fact, there was not a scrap of evidence to support Bolden's "two-shooters" theory.  Bolden's petition does not purport to identify any direct evidence of a second shooter.  Rather, he suggests that his counsel should have put on indirect evidence tending to indicate that Dominick Price had come to the scene of the robbery armed.  Pet. 79.  Even if this evidence existed and were credible, it would have done nothing to contradict the three eyewitness accounts of Bolden murdering the guard, since Bolden does not allege that any of these witnesses saw Price fire his weapon at any

84

time.  Likewise, Bolden argues that further ballistics evidence might have somehow linked the bullet fragment from the second shot to Price, but this allegation is wholly speculative and conclusory, and unsupported by specifics.  See Voytik, 778 F.2d at 1308.  And, needless to say, this allegation is inconsistent with Mr. Stubits' repeated testimony that the second bullet fragment was too "severely mutilated" to support any forensic analysis, Tr. 2843.

Similarly, Bolden provides no factual support for his allegation that his counsel should have subpoenaed telephone records regarding phone conversations between Price and Bolden. Pet. 79.  Bolden does not identify what those phone records would putatively have revealed, or how it would have been relevant to any material issue in dispute at trial.  Id.  This is yet another "conclusory allegation unsupported by specifics" that does not warrant a hearing.

Bolden argues that his counsel should have called the other bank robbery conspirator, Corteze Edwards, to testify in order to rebut Dominick Price's testimony that Bolden had coerced Price and Edwards into participating in the bank robbery.  Pet. 80.  This claim has no merit.  Bolden does not allege that Edwards would have testified that Bolden did not coerce Price – only that Edwards would have testified that Bolden did not coerce Edwards.  Pet. 80 ("According to him, Petitioner did not threaten him and he (Edwards) was never in fear of Petitioner.").  So the alleged content of Edwards' testimony would have addressed an issue collateral to Price's description of Bolden's actions and Bolden's statements to Price.  Such testimony would have been inadmissible as an impermissible attempt to impeach Price on a collateral matter through the use of extrinsic evidence.  See, e.g., United States v. Cowling, 648 F.3d 690, 697 (8th Cir. 2011) (restating the rule that "[e]xtrinsic evidence of a collateral matter is not admissible" to impeach).  For the same reasons, because Bolden's statements to Edwards were not a significant issue in the trial, the value of any such impeachment would have been

highly attenuated.  So Bolden cannot plausibly allege prejudice on the basis of counsel's failure to call Edwards – especially since Edwards' testimony would have also implicated Bolden in the murder.

Finally, Bolden speculates that Edwards might have made unspecified statements to the Government during proffer sessions that were not disclosed to the defense, in violation of <u>Brady</u>. Pet. 80-81.  Because this allegation is supported only by vague, unsupported speculation, it is just the sort of "conclusory allegations unsupported by specifics" that does not warrant an evidentiary hearing.  <u>Voytik</u>, 778 F.2d at 1308.

### E.   <u>Defense Counsel Presented An Adequate And Effective Defense</u>.

Bolden claims that his counsel were ineffective in failing to present "a coherent, viable theory to the jury and articulating that theory to the jury in argument." Pet. 81.  Once again, this is merely a conclusory allegation unsupported by specifics.  Bolden does not identify what "coherent, viable theory" his counsel should have pursued, in the face of the overwhelming evidence of Bolden's guilt.  This claim is vague and conclusory, and does not warrant a hearing.

### F.   <u>The Cumulative Evidence Of Bolden's Guilt Was Overwhelming</u>.

Finally, it is worth noting that, even if there had been any particular individual error in the course of the guilt phase of the trial, Bolden cannot plausibly claim prejudice, because the cumulative weight of the evidence of Bolden's guilt was overwhelming.  This was not a case where there was any plausible residual doubt of Bolden's innocence.  In brief summary, the evidence against Bolden included: (1) three eyewitnesses who each independently provided a confident and highly credible identification of Bolden as the murderer; (2) Bolden's DNA on the black stocking cap identified as worn by the shooter, found at the scene of the crime, with the victim's blood on the cap as well; (3) a positive identification of Bolden's automobile at the

scene of the crime; (4) the testimony of a co-conspirator who implicated Bolden; (5) the murder

weapon found at Bolden's house, forensically linked to one of the bullets; and (6) statements by

Bolden himself exhibiting knowledge of guilt.  Short of a videotaped confession, it is hard to

imagine a stronger case for Bolden's guilt.  Even if Bolden had succeeded in identifying any

constitutional deficiency in his trial counsel's performance, Bolden cannot plausibly claim

prejudice, in light of the overwhelming nature of the evidence against him.

## VIII.  BOLDEN'S CLAIMS OF PROSECUTORIAL MISCONDUCT AND INEFFECTIVE ASSISTANCE OF COUNSEL DURING PRETRIAL PROCEEDINGS HAVE NO MERIT.

Bolden claims various grounds of prosecutorial misconduct and ineffective assistance

during the pretrial motions and hearings on suppression issues.  These claims have no merit.  All

substantive claims are procedurally defaulted or procedurally barred.  Bolden's claim that the

murder weapon should have been suppressed because it was discovered in a supposedly illegal

search of his home is procedurally barred, because it was raised and rejected on direct appeal.

United States v. Bolden, 545 F.3d 609, 619-20 (8th Cir. 2008).  All other substantive claims are

procedurally defaulted, because they could have been raised on direct appeal, but were not.  This

includes all claims of prosecutorial misconduct in this section.  Thompson, 7 F.3d at 1378-79.

### A.    Bolden's Appellate Counsel Were Not Constitutionally Ineffective.

Bolden claims that his appellate counsel were constitutionally ineffective for failing to

raise any suppression issues on appeal other than their challenge to the search of Bolden's home.

Pet. 82-83.  This contention is meritless.  The Eighth Circuit has emphasized that the decision to

select certain claims on appeal, to the exclusion of others, is a core area of strategic judgment in

appellate advocacy.  United States v. Brown, 528 F.3d 1030, 1033 (8th Cir. 2008).  Appellate

counsel's decision to focus on the suppression issue relating to the search of Bolden's home is therefore presumptively reasonable.  Moreover, Bolden's claims are all substantively meritless.

### B.      Motion To Suppress Eyewitness Identification Evidence.

Bolden contends that his trial counsel were ineffective in litigating his motion to suppress the eyewitness identification evidence, on the basis that the identifications were tainted by unduly suggestive procedures.  These contentions have no merit and do not warrant a hearing.

First, Bolden contends that the prosecution committed misconduct by eliciting "materially misleading and ... false" testimony about the background and professional training of eyewitnesses to bolster their credibility during the pretrial hearing.  Pet. 84.  This claim is procedurally defaulted, because Bolden does not plead that his failure to raise it on direct appeal can be excused by "cause and prejudice."   In any event, Bolden's arguments here rehash his claims about the prosecution's eliciting similar testimony during the guilt phase of trial, which are meritless for the reasons discussed above.  See supra, Part VII.A.  The prosecution's offer of testimony about the eyewitnesses' training in observation was neither misconduct nor error, because courts have routinely recognized that such testimony is admissible and relevant to the reliability of an eyewitness identification.  See, e.g., United States v. Lynch, 214 Fed. Appx. 248, 252 (3d Cir. 2007) (officer's training in observation was a relevant factor in finding low risk of misidentification); United States v. Stevens, 935 F.2d 1380, 1391 (3d Cir. 1991) (holding that robbery and sexual assault victims' identification of the defendant was reliable in part because they were "military police officers trained in observation"); United States v. Rich, 842 F.2d 1295 (9th Cir. 1988) (table op), at *4 (holding that bank employees' eyewitness identification was reliable in part because they were "trained in observation techniques in bank robberies").  Bolden contends that the testimony as to the eyewitnesses' training was false and misleading, but

his sole basis for this allegation is his unsupported speculation that the employment records for these witnesses might have contained some information to impeach their characterization of their training, see Pet. 84, so this is yet another "conclusory allegation unsupported by specifics" that does not warrant any further factual development.  Voytik, 778 F.2d at 1308; supra Part VII.A.

Bolden alleges that the prosecution may have withheld evidence "disputing the reliability of these witnesses" in violation of Brady, and that his counsel were ineffective in failing "to marshal a wealth of evidence disputing the reliability and credibility of the identification witnesses," but provides no further specific factual support for these two claims.  Pet. 84.  Again, these are "conclusory allegations unsupported by specifics" that do not warrant a hearing.

Bolden rehashes his claim from Part VII that eyewitness Erica Ruffin "suffered from a longstanding and chronic heroin addiction that directly impacted her reliability and credibility." Pet. 84.  This claim has no merit, for the reasons stated above.  See Part VII.A.2.  Ms. Ruffin testified extensively about her problems with heroin addiction at trial.  Bolden now alleges that the Government withheld evidence of Ruffin's heroin addiction at the time of the motions hearing, and did not disclose it until May 5, 2006, prior to trial.  Bolden does not allege, however, that the Government was aware of this issue at the time of the motions hearing, so his claim consists of another conclusory allegation supported only by speculation.  In any event, to the extent that Bolden seeks to advance a claim of prosecutorial misconduct, the claim is procedurally defaulted because Bolden's counsel could have raised it when they received discovery of Ms. Ruffin's heroin addiction prior to trial, but did not.  See Thompson, 7 F.3d at 1378-79.  Bolden speculates that Ms. Ruffin may have been under the influence of heroin at the time she testified during the pretrial motions hearing, Pet. 85, but this allegation is again conclusory and based solely on speculation.

Bolden contends that his counsel were ineffective in failing to call an expert on eyewitness identification.  Pet. 85-86.  This claim is meritless.  See supra, Part VII.B.

Bolden contends that his counsel were ineffective during pretrial motions in failing to argue that the police lineups were unduly suggestive due to two additional factors: (1) the color of Bolden's clothing, and (2) the length of Bolden's hair.  Pet. 86-87.  Bolden contends that his trial counsel were ineffective because "counsel failed to argue any of these obvious constitutional flaws" (i.e. clothing color and hair length).  Pet. 87.  Bolden's claim that his counsel failed to present these arguments is flatly contradicted by the record.  The magistrate judge stated in her report and recommendation affirming the legality of the lineups: "As the defendant notes in his brief, the defendant's hair length is longer than that of the other foils and his clothing does stand out more than the clothing of the others, in that his shirt is very busy and he is wearing white pants."  Doc. 241 in No. 4:02 CR 557 CEJ, at 56.  In other words, defense counsel presented exactly the same arguments to the District Court that the petitioner now relies upon.  The magistrate judge considered and rejected these same arguments: "But these differences are not sufficient to make the lineups themselves unduly suggestive.  While the defendant's clothing was different from that of the other foils, his shirt was quite different than what the shooter was wearing at the time of the incident.  In addition, the witnesses credibly testified that they paid no attention to the clothing.  Overall, the Court finds the composition of the two lineups to be fair and reasonable."  Id. (citation omitted).  The magistrate judge also found that the lineups were not suggestive because the police officers "selected other individuals whose height, skin color, complexion, facial hair, and build were similar to the defendant's," id. at 55, and that "the detectives also employed other procedures designed to minimize any unfair influences," id. at 56.  And the magistrate judge held that, even if the lineups had been unduly

suggestive, each of the three eyewitness identifications was independently reliable and admissible.  Id. at 59.

A review of the photographs of the lineups shows that the magistrate judge was indubitably correct in rejecting the proffered bases for challenging the lineups.  Photographs of the police line-ups are in the record as Government's Trial Exhibits 50 and 52.  As for the color of the clothing, the four individuals in the line-ups have a range of different clothing colors.  One man is in all dark clothes, with a zipped-up navy blue jacket and navy blue pants.  One man is in mixed navy and white clothes, with an unzipped navy jacket and a baggy white shirt underneath.  One man is in a light grey top and light-colored pants (Bolden, position #3 in Gov. Ex. 52).  And one man is in a top that is mostly light grey, but with navy blue sleeves and shoulders.  Each man's clothing is different, with a range from mostly very dark (position #2 in Gov. Ex. 52) through mostly light (position #3 in Gov. Ex. 52), and with two individuals with different mixes of dark and light clothing.  Moreover, as the magistrate judge observed, the clothes Bolden wore in the lineup were totally different from the clothes he wore when committing the murder.  Similarly, there is a range of hair lengths among the four individuals in the lineup, from uniformly shorter (position #4 in Gov. Ex. 52), to unevenly shorter (position #1), to slightly longer (position #2), to medium length (position #3).  Bolden's statement that he stood out "like a sore thumb" because of clothes and hair length is plainly incorrect.

### C.   Motion To Suppress Statements From October 8, 2002 Interview.

Bolden contends that the statements he made and the consent to search that he granted during his interview on October 8, 2002, should have been suppressed because he was suffering from blood sugar problems relating to his diabetes at the time of the interview. Pet. 88.  Bolden contends that "Petitioner will present evidence demonstrating that the denial of insulin impacted

Petitioner's comprehension, concentration and cognitive functioning and, as a result, he lacked capacity to knowingly, intelligently and voluntarily waive his rights," and that his trial counsel were ineffective in failing to present this theory. Pet. 88. This contention has no merit. Once again, Bolden's contention that his counsel failed to present this theory to the District Court is flatly incorrect. As the magistrate judge noted in her report and recommendation on this issue, "Defendant asserts that the consent was involuntary because the defendant was diabetic and had requested food, but was not furnished food before he signed the consent form." Doc. 241 in No. 4:02 CR 557 CEJ, at 64. In other words, Bolden raised this exact issue in the District Court. The magistrate judge rejected this argument on several grounds. She found that "the defendant at no time suggested to the officers that he required food because of any medical need, as opposed to merely desiring something to eat. Indeed, from the evidence it appears that the defendant would have had both breakfast and lunch available to him in the holdover prior to meeting with the detectives." Id. at 65. In addition, the magistrate judge found that "[n]or was there anything about the defendant's appearance or behavior that suggested that he was in a state of medical distress. To the contrary, his ability to understand what was occurring and to respond intelligently is illustrated by the fact that the defendant advised the detectives that his only concern was that the door of the residence not be broken, and his subsequent identification of the house key for the detectives." Id. The magistrate judge also observed that, under the law, it is the appearance of consent to a reasonable observer, not actual consent, that really matters: "[T]he precise question is not whether the defendant consented subjectively, but whether his conduct would have caused a reasonable person to believe he had consented." Id. at 64 (alterations omitted) (quoting United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2002)).

Thus, none of the allegations in Bolden's petition casts any doubt upon the magistrate judge's conclusion that "the defendant's consent to search was both voluntary and intelligent." Id. at 65.  In fact, Bolden again fails to identify any new argument that his trial counsel should have raised, but did not.  Bolden's claim is procedurally barred and substantively meritless.

> **D.      Failure To Exclude Ballistics Evidence.**

Next, Bolden faults his trial counsel for failing to move to exclude ballistics evidence as inherently unreliable.  Pet. 88-90.  This contention rehashes Bolden's claim in Point VII that the Government used unreliable ballistics testimony at trial, and it is meritless for the reasons stated above.  See supra, Part VII.C.3.  Bolden's trial counsel were not ineffective in failing to rely upon the 2009 National Academy of Sciences report, which did not yet exist.  Bolden identifies only two cases decided prior to Bolden's trial which he contends should have alerted his counsel to file a motion challenging the reliability of ballistics; both are from the District of Massachusetts.  Pet. 89, citing United States v. Green, 405 F. Supp. 2d 104 (D. Mass. 2005), and United States v. Montiero, 407 F. Supp. 2d 351, 357 (D. Mass. 2006).  The problem for Bolden is that both of these district court decisions ultimately deemed ballistics evidence to be admissible.  Montiero held that "[b]ased on the factors outlined in Daubert and Kumho Tire, the Court concludes that the methodology of firearms identification is sufficiently reliable. Therefore, a qualified examiner ... may testify ... that cartridge case matches a particular firearm to a reasonable degree of ballistic certainty," with the qualification that a ballistics "expert may not assert any degree of statistical certainty, 100 percent or otherwise, as to a match."  407 F. Supp. 2d at 372-73.  In Green, the district judge expressed serious concerns about ballistics methodology, as well as the individual qualifications and certain exaggerated conclusions of the particular ballistics examiner before her, but she ruled that the ballistics expert was permitted to

testify about his observations matching the bullets to the firearm, though not to opine as to the ultimate conclusion.  <u>Green</u>, 405 F. Supp. 2d at 109.  Both <u>Green</u> and <u>Montiero</u>, moreover, observed that the law overwhelmingly favored the admissibility of expert testimony on ballistic analysis.  <u>Green</u>, 405 F. Supp. 2d at 109 ("I reluctantly come to the above conclusion because of my confidence that any other decision will be rejected by appellate courts, in light of precedents across the country, regardless of the findings I have made.... Th[e] precedent plainly points *in favor of* admissibility." (italics in original)); <u>Montiero</u>, 407 F. Supp. 2d at 364 (noting that "no federal court has yet deemed [ballistics evidence] to be inadmissible").  It was not ineffective assistance for Bolden's trial counsel to fail to take a position that had been universally rejected by every appellate court to consider it.

### E.    Failure To Exclude DNA Evidence.

Finally, Bolden claims that his counsel were ineffective in failing to exclude the Government's DNA expert testimony.  Pet. 90.  This contention is the same as Bolden advances in the previous Claim, it is meritless for the reasons stated above.  <u>See</u> <u>supra</u>, Part VII.C.2.

## IX.    BOLDEN'S CLAIMS THAT HIS COUNSEL FAILED TO INVESTIGATE, DEVELOP, AND PRESENT MITIGATING EVIDENCE HAVE NO MERIT.

Bolden claims that his constitutional rights were violated because counsel failed to investigate, develop, and present mitigating evidence.  Doc. 54, pp. 90-133.  These claims have no merit and do not warrant a hearing.  To the extent Bolden attempts to allege any substantive claims in this section, they are all procedurally defaulted for failure to raise them on direct appeal. This Court is limited to reviewing any claims of ineffective assistance of counsel.

### A.  Introduction.

The record reveals that Bolden's seasoned capital counsel thoroughly investigated

Bolden's case for three and one half years.  Counsel employed a forensic social worker – a death

penalty mitigation specialist – and vigorously investigated and litigated mitigation and mental

health issues.  Counsel presented a robust mitigation case tailored to address an overwhelming

guilt case and a powerful aggravation case.  From its very inception, this case was treated as a

capital case by Bolden's counsel and the Court.[4]

Counsel recognized their duty to investigate mitigation issues, including mental health

issues, and conducted a thorough investigation.  Thereafter, counsel made an intelligent clear

choice on the record not to present mental health evidence.  Counsel presented evidence on many

of the same issues Bolden now proffers, and was able to do so without contradicting one of the

primary themes of his mitigation case, *i.e.,* acceptance of responsibility, and avoided the negative

aspects of expert mental health evidence.

While counsel's performance was reasonable and effective, none of Bolden's proffered

evidence is of any value in a predictive weighing analysis.  The entirety of the record establishes

that none of Bolden's proffered evidence or arguments detract from the powerful aggravation

case.  Bolden's claims may be dismissed without an evidentiary hearing based upon those

portions of the record currently known to the Government.  Should the Court see fit to grant the

Government's pending motions to unseal materials that the Government contends are relevant to

---

[4] On November 7, 2002, the Grand Jury indicted Bolden.  Counsel immediately sought a second capital-qualified counsel and enlisted Caryn Platt Tatelli, a forensic social worker and death penalty mitigation specialist.  Docs. 1, 39, 41, 107.  On September 15, 2003, the Government filed the Superseding Indictment alleging aggravating factors, and on October 7, 2003, it filed the Notice of Intent to Seek the Death Penalty.  Doc. 147, 164.  Trial commenced in the underlying matter on April 24, 2006, the jury returned verdicts of guilty on May 11, 2006. Doc. 377, 408, 411.  The penalty phase began on May 15, 2006, and the jury returned verdicts of death on May 23, 2006. Doc. 415, 427, 439, 442.

Bolden's claims, the Government believes its position will be strengthened.  The Government may request leave to supplement its response pending the Court's rulings on the motions.  <u>See</u> Docs. 68, 72, 74, 85, 86, 89.

**B.  <u>The Penalty Phase</u>**.

Defense counsel presented a robust and carefully tailored mitigation case of eight witnesses at the penalty phase, which resulted in 32 mitigating circumstances being presented for the jury's consideration.  Bolden's current subjective characterization of the mitigation case presented at trial mischaracterizes the totality of the record, and disregards defense counsel's strategic decisions, particularly the decision not to present mental health evidence.  Doc. 54, at 93-94. Defense counsel's performance is to be measured by "an objective standard of reasonableness." <u>Strickland</u>, 466 U.S. 668, 688.  Counsel's strategic decisions, in the face of an overwhelming guilt case, a powerful aggravation case, and an intelligent and functional client, were reasonable when measured by this objective standard.

**1.  The United States Presented Overwhelming Aggravating Evidence**

The Government relied upon the guilt phase evidence to prove the statutory aggravating factor that Bolden committed the murder of Nathan Ley, as charged in Counts II and III of the indictment, in the expectation of the receipt of anything pecuniary value.  Penalty phase evidence showed that prior to October 7, 2002, Bolden was convicted of three felonies in Michigan, which included convictions for attempted possession with the intent to deliver cocaine (September 1993), and delivery of cocaine (August 1995). Tr. 3372-95, 3398-3417.  This evidence was offered in support of the second statutory aggravating factor, that Bolden had been previously convicted of two felony offenses involving the distribution of a controlled substance.

The Government relied on guilt phase evidence to establish the non-statutory aggravating factor that Bolden obstructed justice in the following respects: (1) by killing Nathan Ley, in part, so he would not identify Bolden; (2) hiding the firearm; (3) destroying fingerprint evidence; and (4) lying to the police.  In support the non-statutory aggravating factor of other criminal activity, the Government offered: (1) Bolden's previous felony conviction for resisting and obstructing a police officer; and (2) the jury's findings that Bolden committed the offenses of conspiracy and felon in possession of a firearm in the present case.  Tr. 3387-91, 3943, Docs. 442-443.  To support the final non-statutory aggravating factor, the Government presented victim-impact evidence from Nathan Ley's family and friends, including his girlfriend, co-workers/employers, a pastor, and a witness to his death.  The testimony established Nathan's unique qualities, his aspiration to become a police officer, his exceptional gift of helping others, the excruciating pain he suffered after Bolden shot him in the head twice, and the catastrophic impact of his death upon his family. Tr. 3455, 3523-28, 3369-71, 3673-76, 3453-54, 3458-61, 3497-3502, 3506, 3510-18, 3534-37, 3544, 3558-66, 3631-31, 3632-41, 3589-91, 3660.

## 2.  Counsel Presented Robust and Carefully Tailored Mitigation Evidence

Defense counsel presented multiple witnesses to develop evidence of Bolden's difficult background as a child and young adult, including being abandoned by his alcoholic mother and rejected by the man he thought was his biological father, his battle with diabetes, his positive qualities as a father, his downward spiral before the crime, and his conversion, acceptance of responsibility, and remorse after the crime.  Sandra Stittum, a credible witness with a stable work history, who witnessed Bolden grow up as a child, provided much background testimony.  Tr. 3679, 3685-86.

### a.  Bolden Was Abandoned By His Alcoholic Mother, Rejected By His Father, and Struggled With Severe Diabetes and Other Challenges

Defense counsel presented a mitigation case that portrayed Bolden's childhood as one in which he witnessed his parents' volatile relationship before they separated, felt rejected because he learned his father, Lavale Bolden, was not biological his father, was teased because his mother was white, felt rejected by his family, was abandoned by his alcoholic mother, rejected by his father's new wife, suffered tremendously from diabetes, and was depressed and withdrawn.

Lavale Bolden and Stella Decker ("S.D."), Bolden's parents, had a very volatile relationship, they frequently fought and argued.  Tr. 3681.  During Bolden's high school years, Lavale and S.D. got into a fight and it was revealed Lavale was not Robert's biological father.  The identity of his biological father was not revealed.  Upon learning Lavale was not his father, Bolden felt everything he had been told was a lie, pulled away further, became more distant, felt the family did not love him, and felt rejected. Tr. 3681, 3689-90, 3757.

Bolden was abandoned, in many ways, including the absence of his alcoholic mother and the absence of a male role model.  Lavale worked long, hard hours and S.D. would go out drinking, in high heels and a miniskirt.  S.D. also drank to excess in front of Robert.  Tr. 3682-83.  S.D. was always drunk, an alcoholic, confrontational, and talked down to Bolden.  Tr. 3756.

Bolden's aunt, Ethel Clark, who was married to Elmer Clark, was responsible for caring for Bolden when S.D. left him.  Bolden was seven or eight when Lavale and S.D. split up, at which time he went to live with the Clarks.  Due to her advancing age, Ethel requested that S.D. become more involved in raising Bolden, but S.D. became less involved.  Tr. 3684-86.  Lavale became more distant from the family after he split from S.D. and married Althea, who did not

accept Robert Bolden and would not allow a relationship between Lavale and Robert Bolden.

Sandra Stittum tried to help facilitate the connection between Robert and Lavale Bolden, but was

unsuccessful.  Tr. 3686-87.  Lavale Bolden never acted as a father to Bolden.  Tr. 3728.  Sandra

Stittum, in characterizing Elmer and Ethel Clark's relationship, explained that Elmer Clark was a

very angry individual, talked about his famous temper, and displayed it quite often, "[there was a

great deal of violence.  Mr. Elmer was violent."  Tr. 3730-31.  Elmer Clark was ornery,

prejudiced, a drunk, an alcoholic, not a nice person, and was raised in a house of ill repute.  Tr.

3757, 3685.

Bolden was traumatized, screaming, crying, and upset, when he was teased at school and

found out that his mother was white; the teasing impacted him.  This caused him to become more

withdrawn.  Because of his diabetes and learning his mother was white, Bolden felt he was

different and that he was living a lie.  Tr. 3687-89, 3703.  Sandra Stittum also explained that

having seen Bolden grow up, she witnessed depression, depressive episodes, and withdrawal in

Bolden.  Tr. 3691-92.

### b.  Bolden Was Severely Affected by Diabetes

Bolden suffered from severe diabetic episodes throughout his life.   As a child, while

S.D. was "... on one of her nights out while Lavale was at work," Bolden became desperately ill

and had to be taken to the emergency room, where he was diagnosed with juvenile diabetes.

Ethel Clark learned all she could to help Bolden manage his diabetes – diet, shots, and insulin.

Tr. 3683-84.  Bolden was in a diabetic coma when he was two or three years old.  Tr. 3734.

Because the medical profession knew less about juvenile diabetes at the time, it was difficult to

manage Bolden's diabetes as a child, even at the emergency room. Tr. 3729-31.  He sometimes

needed two or three shots a day; he spoke of how difficult it was to manage his diabetes.  Tr.

3688.  As a child, during the episodes he would move his head from side to side and go faint, and at times would act as if he was drunk or intoxicated.  Tr. 3692-93.

As an adult, Bolden had diabetic episodes, including one occasion when he became disoriented at the grocery store and the police were called to check on him.  Tr. 3692-93, 3722-23.  Candice Stittum, a nurse and Bolden's cousin, testified that Bolden's diabetes, ever since he was young, was "always out of control."  Tr. 3759.  Robert Bolden, Jr. testified that he witnessed his father have diabetic episodes more than two dozen times.  Tr. 3803.  Bolden's friend and former girlfriend, Mona Muhammad ("Muhammad"), witnessed 8-10 diabetic episodes in which Bolden became disoriented and slurred his words.  Tr. 3779.

### c.  Bolden Was a Good Father

Multiple witnesses testified that Bolden was a good father, before and after the crime.  Bolden's daughter, A.B., who was 15 at the time of trial, testified that he took the children to movies, amusement parks, fishing, that he was interested in her grades, and that she had a great relationship with her father when they moved from Michigan to St. Louis.  A.B. testified about guidance provided by her father, that they discussed the Bible, and she wanted to continue to have him in her life. Tr. 3795-99.

Bolden's son, Robert Bolden, Jr., was twenty at the time of trial, and testified that he had a happy life when his parents were married in Michigan, that he participated in many activities with his father, including fishing, bike riding, basketball, and video games.  Bolden was stringent about the children's grades, taught them right from wrong, and taught them to treat people the way they wanted to be treated.  Bolden, Jr. testified that Bolden made him go to church, and he could take his problems to Bolden, Sr.  Bolden, Sr. encouraged him to stay in school and keep his job.  Bolden, Sr. was a big influence and Bolden, Jr. remained in school and received his

diploma because of Bolden, Sr. and his desire to make his father proud.  Bolden, Jr. explained that while incarcerated, Bolden, Sr. continued to give him advice and that he would keep in contact with his father if he received a sentence of life imprisonment.  Tr. 3801-07.

Sandra Stittum testified that Bolden talked about how well his children did in school, and he was proud of them.  Tr. 3694.  Muhammad testified that Bolden spent his time at work with his children.  He played board games and computer games with his children.  Tr. 3778.

### d.  Bolden Spiraled Downward in 2002

According to defense witnesses, Bolden's diabetes, depression, and drug use caused him to spiral downward in 2002.  Bolden's cousin, Candice Stittum, a nurse, testified that she knew the signs of depression, and Bolden was in a depressed state in the late spring and early summer of 2002.  Tr. 3759-61.  Candice Stittum explained that she witnessed the following symptoms: Bolden was withdrawn, suffered crying spells, and was gloomy.  She saw symptoms in February or March, which only became worse. The more depressed he was, the sicker he got because when his depression level was high, then his episodes with diabetes became more frequent. Candice Stittum observed Bolden as  hyper- and hypoglycemic, passing out, sweating, and using drugs with greater frequency.  She explained that his overall appearance and everything had declined.  In the days preceding October 7, 2002, Candice Stittum observed Bolden was "not himself ... totally depressed... sick... looked awful ... crying."  She could not make any sense of what he was saying, and he was high on drugs.  She explained, "I had just not seen him like that, and I just knew it was bad."  Tr. 3759-61.

Muhammad watched Bolden's children when he received two weeks of drug treatment in 2002, prior to the murder of Nathan Ley.  Muhammad testified that within the month before

October 7, 2002, she had spoken with Bolden, and he was "depressed ... he really did not care about anything."  Tr. 3782-83.

### e.  Bolden Converted and Is Accountable

Norman Dake ("Dake"), a pastor and former chaplain at the St. Louis County Jail, knew Bolden and explained, "... I observed a young man who was interested in changing his life; becoming more spiritually aware and growing in his faith; and who was committed to baptism and all of the things that go with growing in the Christian faith."  Tr. 3809-10.  Bolden participated in a Bible studies correspondence course through Set Free Ministries ("Set Free") in St. Louis.  The program entailed students working through lessons at their own speed, completing lessons, sending the lessons in to be graded, and then receiving comments and corrections.  Dake met with Bolden once a week, and believed that he devoted time, effort, and energy to the Bible correspondence course.  Tr. 3811-12.  Bolden was baptized, and became a regular and faithful recipient of communion.  Tr. 3813-15.  Bolden got along well with the other inmates and was a good influence – he was honest, conscientious, sincere, had wise things to share with them, and would encourage them or challenge them when necessary.  Tr. 3815-16. Dake found it rewarding to work with Bolden.  Tr. 3820.

Defense counsel next called Randy Gruber ("Gruber"), the director of the Bible correspondence school, Set Free Ministries, who unequivocally credited Bolden as being a very good and honest student, despite challenging course work.  Tr. 3840-42.  Gruber explained the goal of Set Free Ministries is to "...bring knowledge of the Scripture to men making disciples of them; that they might be followers of the Lord Jesus Christ."  Tr. 3827-28.  The program consists of 100 courses, and takes five years to complete.  Tr. 3830.  The courses, written mostly by college professors, are an introduction to Christ, followed by growth, doctrinal, and book

102

courses, which start at a fifth grade level, progress through the twelfth grade reading level, and become progressively more difficult.  Gruber explained that because the courses become progressively more difficult, Set Free typically loses quite a few students after they take about 20 units.  Tr. 3831.  The course work consist of objective and subjective parts, which allow instructors to "really ... get to know" students.  Instructors personally respond to the questions and comments of students.  Tr. 3833.  Students are required to read the Bible twice, to search out the scripture and find course answers in the scripture.  Tr. 3835, 3838-39.  Bolden went through significant number of courses in the order they were given, from 2003 through 2005, distinguishing himself as a very good student.  Tr. 3836, 3840.

Gruber explained that Bolden was a very good student, and different than many of the students.  Tr. 3840.  Although there are approximately between 2500 and 3,000 students who enroll in the courses every year, there are generally 1800 active students at a given time.  Tr. 3829.  Bolden was different than many of the students because many students drop out when courses meet and exceed the 10th through 12th grade level, but he continued, receiving scores in the 90's and better.  Tr. 3839-40.  In March 2003, Bolden scored a 99 on one of the initial courses.  Tr. 3837.  Gruber characterized Bolden as a good, sincere, honest student, who was taking responsibility for himself, and crediting God for working in his life.[5]  Tr. 3841-43.

Finally, Gruber emphasized that inmates who participate in his Bible studies and programs behave well in prison.  Gruber pointed to a high security facility in the Missouri state

---

[5]  Gruber provided examples of Bolden's sincerity and insightfulness, including the following: (1) In assessing the importance of the Bible in his life, Bolden wrote, "It is important to me because I want to please God.  What better way to please God than following his instructions on how to live.  There is no other way than to believe in the son of God, which the Bible instructs us to do."  (2) In an example of judging himself in a course on "The Lord's Supper," Bolden wrote, "It's taught me that before I partake in the Lord's supper, I need to examine myself so that I won't partake unworthily and bring judgment on myself."

system, in which 19 of 20 inmates who were recognized for good behavior participated in Set Free programs.  Tr. 3844.

Defense counsel called Paul Hipps ("Hipps"), a third witness relative to  Bolden's conversion, accountability, and remorse.  Hipps, an ordained minister, became involved in jail ministry through Set Free Ministries at the St. Louis County Justice Center, where he worked with Bolden, and the Missouri Department of Corrections, where he works mostly with "lifers," and a some inmates sentenced to death under Missouri law at Potosi.  Tr. 3855-57.  Hipps was familiar with Bolden, a regular attendee of Bible study class, and provided Bolden with a Bible.

Hipps testified that in one of the classes, Bolden explained to the other inmates that although he grew up in the Church and called himself a Christian, his life never changed because he was only mouthing the words – that he was not genuine in his faith.  Bolden explained, "Since I came in here and I have listened to the bible studies, I put my personal faith and trust in Jesus Christ.  And now my attitude has changed.  My life has changed.  I am guilty for what I did.  I acknowledge my guilt before God, and he has forgiven me."  Tr. 3858-61.  Hipps further explained that Bolden approached him after Bible study class one night, and asked to speak to Hipps.  Bolden was upset, he was under great tension and pressure, and stated to Hipps, "I have blood on my hands, and I can't sleep at night."  Tr. 3871-73.  Hipps explained that he directed Bolden to a particular Bible passage, which after several readings, provided Bolden some relief.  Tr. 3872-73.

Hipps explained that conversion requires admitting transgressions not only to God's law, but also admitting transgressions to man's law.  Tr. 3873-75.  Hipps testified that Bolden, while addressing his Bible study group, admitted his guilt to the crime and that he was taking responsibility for the crime.  Tr. 3874, 3878-79.  Hipps viewed Bolden's conversion as sincere

because Bolden said he told his lawyer to plead him guilty in exchange for life, but the government rejected his offer.  Tr. 3875, 3881.  Hipps also testified that Bolden led by example and his statement, referring to his acceptance of responsibility.  Hipps characterized Bolden as reserved, but that he influenced other inmates by accepting responsibility, thereby making other inmates more inclined to take responsibility themselves.  Tr. 3874-75.

Moreover, counsel adduced testimony from lay witnesses pertaining to his positive changes and religious influence since he was incarcerated, including directing his daughter to Bible verses.  Tr. 3694-95, Sandra Stittum, Tr. 3799, A.B.

### 3. The Jury's Special Findings

As to each Count II and Count III, the United States submitted two statutory aggravating factors and three non-statutory aggravating factors to the jury.  The jury's findings, set forth in Special Verdict Forms to Counts Two and Three (Docs. 442, 443), are as follows:

The statutory aggravating factors that the jury found were:

1.  That the defendant committed the murder of Nathan Ley as charged in Counts II and III of the indictment in the expectation of the receipt of anything pecuniary value.
2.  That the defendant had previously been convicted of two State offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance.

The non-statutory aggravating factors that the jury found were:

1.  That the defendant obstructed justice in connection with the offense in Count II and that fact tends to support imposition of the death penalty;
2.  That the defendant has committed crimes other than the two (2) alleged State offenses which are the subject of the second statutory aggravator and the commission of said crimes tends to support imposition of the death penalty.
3.  That Nathan Ley possessed positive personal characteristics as an individual human being, that Nathan Ley's death has had a negative impact upon his family and that the victim impact in this case tends to support imposition of the death penalty.

The mitigating factors, and the number of jurors so finding in parenthesis, were:

1.  Another defendant or defendants, equally culpable in the crime, will not be punished by death and that facts tends to mitigate against imposition of the death penalty.  (0)

2.  Robert Bolden, while incarcerated, maintains a supportive and positive role in his family and that fact tends to mitigate against imposition of the death penalty. (4)

3.  Robert Bolden will be able to continue and develop his relationship with his daughter Ariel and his son Robert Bolden, Jr. and that fact tends to mitigate against imposition of the death penalty. (8)

4.  The fact that Dominick Price will not receive a sentence of death nor a sentence of life imprisonment without the possibility of release is a circumstance which weighs against a sentence of death for Robert Bolden and that fact tends to mitigate against imposition of the death penalty. (0)

5.  The fact that Corteze Edwards will not receive a sentence of death nor a sentence of life imprisonment without the possibility of release is a circumstance which weighs against a sentence of death for Robert Bolden and that fact tends to mitigate against imposition of the death penalty.  (0)

6.  The children and family of Robert Bolden love him and that fact tends to mitigate against imposition of the death penalty.  (8)

7.  Robert Bolden remains involved in and positively contributes to the lives of his children, friends and family and that fact tends to mitigate against imposition of the death penalty.  (2)

8.  Robert Bolden has demonstrated the ability to make a positive adjustment to incarceration and that fact tends to mitigate against imposition of the death penalty. (1)

9.  Robert Bolden has demonstrated the ability to make a positive contribution to others while incarcerated and that fact tends to mitigate against imposition of the death penalty. (0)

10.  Robert Bolden has been a positive role model to other inmates while incarcerated and that fact tends to mitigate against imposition of the death penalty.  (0)

11.  The presence of mental or emotional difficulties, while not extreme, related to Robert Bolden's character and background and that fact tends to mitigate against imposition of the death penalty. (1)

12.  Robert Bolden has shown sincere remorse about Nathan Ley's death and that fact tends to mitigate against imposition of the death penalty. (0)

13.  Robert Bolden was a loving father to his children and that fact tends to mitigate against imposition of the death penalty. (0)

14.  Robert Bolden, as a child, witnessed acts of domestic violence between Ethel and Elmer Clark and that fact tends to mitigate against imposition of the death penalty. (2)

15.  Robert Bolden's biological mother was an alcoholic and verbally abusive to him and that fact tends to mitigate against imposition of the death penalty. (0)

16.  Robert Bolden's biological mother abandoned him and that fact tends to mitigate against imposition of the death penalty.  (5)

17.  Lavelle Bolden refused to accept Robert Bolden as his son when he was a teenager and that fact tends to mitigate against imposition of the death penalty.  (1)

18.  Robert Bolden felt isolated from the Bolden family because he was not biologically related to them and that fact tends to mitigate against imposition of the death penalty. (1)

19.  Leading up to the day of the offense, Robert Bolden suffered from a drug addiction and appeared depressed and that fact tends to mitigate against imposition of the death penalty. (3)

20.  From infancy, Robert Bolden suffered numerous diabetic episodes causing disruptions in his life and that fact tends to mitigate against imposition of the death penalty. (8)

21.  Robert Bolden was usually gainfully employed and that fact tends to mitigate against imposition of the death penalty. (0)

22.  Robert Bolden was interested and involved in his children's lives and that fact tends to mitigate against imposition of the death penalty.  (2)

23.  Robert Bolden, Jr. relies on his father for advice and counsel and that fact tends to mitigate against imposition of the death penalty. (8)

24.  Robert Bolden lacked a positive male role model during his childhood and that fact tends to mitigate against imposition of the death penalty. (3)

25.  Robert Bolden tried to shield his children from his crack addiction and that fact tends to mitigate against imposition of the death penalty. (0)

26.  Robert Bolden was baptized in the St. Louis County Correctional Institution and that fact tends to mitigate against imposition of the death penalty.  (10)

27.  Robert Bolden sought communion while incarcerated and that fact tends to mitigate against imposition of the death penalty. (8)

28.  Robert Bolden participates in group studies of the Bible with other inmates and that fact tends to mitigate against imposition of the death penalty.  (11)

29.  Jail ministers found it rewarding to work with Robert Bolden and that fact tends to mitigate against imposition of the death penalty.  (11)

30.  Robert Bolden has been a serious student in his Bible studies related to the Set Free Ministries Bible Study Program and that fact tends to mitigate against imposition of the death penalty. (4)

31.  Robert Bolden has experienced spiritual growth while incarcerated and that fact tends to mitigate against imposition of the death penalty. (1)

32.  Robert Bolden is a spiritual leader in the St. Louis County Correctional Institution and that fact tends to mitigate against imposition of the death penalty.  (0)

As the findings indicate, and consistent with the thrust of counsel's presentation of evidence in the mitigation case, the jury attached significant weight to the following mitigating factors: (1) Factors related to Bolden's relationship with his children; (2) That Bolden's biological mother abandoned him; (3) Bolden's diabetes caused disruptions in his life since infancy; and (4) Bolden's religious activities, including baptism, communion, and participation in bible studies.  Only three jurors found evidence of Bolden's drug addiction and that he appeared depressed to be mitigating.  See 19.

### C.  Bolden's Claims of Ineffective Assistance of Counsel

Bolden claims that his constitutional rights were violated because counsel failed to investigate, develop, and present mitigating evidence fail because counsel's performance was not deficient, nor was Bolden prejudiced.

### 1.  Bolden's Claims For Failure to Investigate, Develop, Or Present Family Or Social History

Bolden makes multiple claims that can be characterized as failure to develop family or social history.  Doc. 54, points IX.C.3 (Failure to Develop Evidence Regarding Mr. Bolden's Paternal Family); 4 (Failure to Develop Evidence Regarding Mr. Bolden's Extended Maternal Family, Mother, and Life in Canada); 5 (Failure to Develop Evidence About Mr. Bolden's Childhood in St. Louis); 6 (Failure to Develop Evidence Regarding Young Adulthood and Life in Michigan); 7 (Failure to Develop Mitigating Evidence Regarding Mr. Bolden's Life in St. Louis, after Grand Rapids).  See Doc. 54, pp. 94-119.  These claims are without merit.

### a.  Performance:  The Analytical Framework

The first prong of the <u>Strickland</u> test requires a showing that counsel's performance fell below an objective standard of reasonableness.  <u>Strickland</u>, 466 U.S. at 687-88 (explaining

petitioner must show counsel's representation was unreasonable "under prevailing professional norms . . . considering all of the circumstances"). Judicial scrutiny of counsel's performance must be highly deferential. Id. at 688. Courts must indulge the strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment. Id. at 688-89 (noting that courts must avoid second-guessing counsel's performance). Thus, counsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken might be considered sound trial strategy. Darden v. Wainwright, 477 U.S. 168, 178 (1986). Given the strong presumption in favor of competence, the petitioner's burden of persuasion – though the presumption is not insurmountable – is a heavy one. Kimmelman v. Morrison, 477 U.S. 365, 375 (1986). Further, when courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger. Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000), citing Burger v. Kemp, 483 U.S. 776, 780 (1987) (reciting counsel's impressive credentials in opinion finding that counsel rendered effective assistance.).

"A reasonable investigation is not ... the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct." Thomas v. Gilmore, 144 F.3d 513, 515 (7th Cir. 1998)(citing Walters v. Thomas, 46 F.3d 1506, 1514 (11th Cir. 1995)). Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Id. Decisions about what to do with the results of investigation are strategic decisions that are virtually immune to second-guessing by habeas courts. Marcrum v. Luebbers, 509 F.3d 489, 506 (8th Cir. 2007), citing Wiggins v. Smith, 539 U.S. 510, 522-23, 527-28 (2003).

Although the Supreme Court has looked to sources such as the ABA Capital Sentencing Guidelines in assessing the reasonableness of counsel's performance, no particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.  Id.  See also Bobby v. Van Hook, 130 S. Ct. 13, 17 (2009).

In Ortiz v. United States, 664 F.3d 1151 (8th Cir. 2011), the Eighth Circuit held that trial counsel's investigation into the movant's background was not deficient.  At the outset, the court noted that its focus was on whether the investigation was reasonable.  664 F.3d at 1169.  Ortiz claimed his counsel was deficient for failing to investigate his family and social history in Columbia, his country of birth, and failing to obtain a mental health examination.  Id.  Contrary to Ortiz's claim, the Eighth Circuit found that Ortiz's counsel "expended significant time and resources in conducting their penalty phase investigation."  Id. at 1170 (noting that counsel traveled to several cities to interview Ortiz's family and friends).  Likewise, in this case, Bolden's counsel also expended significant time and resources to investigate Bolden's background.  This is evident not only from the retention of a mitigation expert at the beginning of the case and the mitigation case presented by Bolden's counsel, but also from the exhaustive materials presented by counsel to Bolden's potential expert, Robert Smith, Ph.D ("Smith").  See Bolden's Exhibit 18, Psychological Summary, Sources of Material, which includes exhaustive materials relied on by Smith, and ten social history witnesses interviewed by Smith.

In Holder v. United States, 2009 WL 5030785, *9-*10 (E.D. Mo. 2009), the district court denied an ineffective assistance claim based on trial counsel's failure to identify, interview, and present testimony from a jailhouse witness who purportedly would have supported the defendant's claim that he was remorseful.  The court found that trial counsel did not completely

fail to investigate the witness at issue and did, in fact, present other evidence to support the mitigating factor of remorse.  Accordingly, the court found that trial counsel made a reasonable tactical decision not to present the additional witness.  See also Van Hook, 130 S. Ct. at 19-20 (rejecting claim that petitioner's trial counsel should have done more investigation and presented more evidence of the defendant's family and social history; and explaining that "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive of more important duties").

Bolden relies heavily on three Supreme Court cases decided after Strickland that have further defined the contours of counsel's duty to investigate at the penalty phase: Wiggins v. Smith, 539 U.S. 510 (2003), Rompilla v. Beard, 545 U.S. 374 (2005), and Williams v. Taylor, 529 U.S. 362 (2000).  Bolden's trial counsel's performance is clearly distinguishable from the deficient performance provided by the trial attorneys in those cases.

In Williams, trial counsel did not begin to prepare for the penalty phase until one week before trial.  529 U.S. at 395.  Counsel failed to introduce any evidence of Williams's exemplary prison behavior, his role in helping to break up a prison drug ring, or his borderline mental retardation.  Id. at 396.  Furthermore, counsel neglected to uncover extensive records describing Williams's "nightmarish" childhood, not because of a strategic decision but because counsel incorrectly thought state law barred access to such records.  Id. at 395.

As outlined above, Bolden's situation is entirely distinguishable from Williams.  The record in this case demonstrates, beyond any doubt, that Bolden's counsel wisely embarked on a mitigation strategy and investigation from the outset.  Counsel uncovered or considered evidence regarding Bolden's childhood, physical health, mental health, education, family relationships,

employment, religious conversion and acceptance of responsibility.  Rather than being deficient, Bolden's counsel represent a text book example of best practices.

In Wiggins, trial counsel failed to introduce *any* personal history as mitigation information.  539 U.S. at 523.  Wiggins's counsel made this decision after obtaining only a one-page pre-sentence report and city social service records documenting the defendant's placement in state foster care system.  Id. at 523.  The Court determined that counsel's failure to expand their search "after requiring only rudimentary knowledge of [Wiggins's] history from a *narrow set of sources*" fell below an objective standard of reasonableness.  Id. at 524. Here, the record shows Bolden's counsel cast a wide net.  There can be no credible assertion that counsel investigated a narrow set of facts or ignored any plausible mitigation angle.

Finally, in Rompilla, the petitioner argued that trial counsel had been constitutionally ineffective at the penalty phase for failing to investigate his school records, juvenile records, evidence of alcohol dependence, and – most significantly – the court file of his previous conviction.  See 545 U.S. at 382-83.  With regard to the school and juvenile records, and alcoholism evidence, the Court acknowledged that "there is room for debate about trial counsel's obligation to follow at least some of those potential lines of enquiry."  Id. at 383.  "Reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."  Id.  The Court elaborated on how its view of trial counsel's duty applied in mitigation investigations: "[q]uestioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there. [citation omitted]" Id. at 389.  However, the Court determined that counsel had performed deficiently in failing to examine the easily accessible court file on Rompilla's prior conviction because they were fully aware of the prosecution's plan to introduce

evidence of the conviction at the penalty phase.  Entries in the file, the Court observed, "would have destroyed the benign conception of Rompilla's upbringing and mental capacity" that Rompilla's trial counsel and mental health experts had entertained.  Id. at 391.

Here, Bolden's counsel had no "benign conception" of Bolden's background, and they thoroughly presented his background at trial.  Likewise, Bolden's counsel was not surprised by any of the Government's aggravation evidence at trial, but successfully prevailed upon the Court to exclude or narrow aspects of Bolden's criminal history presented by the Government.

### b.  Prejudice: The Analytical Framework

Bolden's trial counsel performed reasonably in investigating and presenting family and social history information.  Moreover, Bolden was not prejudiced by counsel's performance.

If the deficient performance prong is established, the Supreme Court has also given specific guidance on how to apply the Strickland prejudice analysis in the context of a sub-par mitigation investigation.  Recently, in Sears v. Upton, 130 S.Ct. 3259 (2010), the Court required a "probing and fact-specific" inquiry.  Id. at 3266.  The standard requires a District Court to "assess the probability of a different outcome" viewing "the totality" of the trial and alleged habeas mitigation evidence and then to "reweigh it against the" aggravation evidence.  Id.  This analysis necessitates that a District Court "'speculate' as to the effect of the new evidence."  Id. This contention requires a "predictive judgment" about how jurors would have weighed the totality of the evidence, including the evidence that Bolden now cites.  See Paul v. United States, 534 F.3d 832, 839 (8th Cir. 2008) quoting Williams v. Taylor, 529 U.S. 362, 397-98 (2000).  This Court should evaluate this prejudice claim in the context of the trial record as a whole.  Id. at 842 (comparing aggravating factors and mitigating factors found by the jury and denying defendant's ineffective assistance claim on habeas review); see also McGehee v. Norris, 588 F.3d 1185, 1198

(8th Cir. 2009) (noting in the context of ineffective assistance of counsel claims that, in death penalty cases involving particularly heinous circumstances, the aggravating circumstances of the crime may outweigh any prejudice caused when a lawyer fails to present mitigating evidence).

Following this totality-of-the-circumstances approach, the Eighth Circuit found no prejudice in Paul.  The defendant suggested that his trial counsel should have investigated additional background witnesses and presented testimony from friends and relatives regarding Paul's medical, mental, and physical history.  See id. at 841.  The court found that the proposed new evidence was "largely duplicative," and could have caused "negative repercussions" for Paul's case.  Id. at 842.  The court also noted that, even if more detail about Paul's background may have caused the jury to give more weight to mitigating factors, the court must consider the "incremental benefit of the proffered evidence in the context of the entire record."  Id. at 843.  The court concluded that nothing Paul offered detracted from the government's strong case in aggravation.  Id.  See also Winfield v. Roper, 460 F.3d 1026, 1033-34 (8th Cir. 2006) (denying capital habeas petitioner's claim that his counsel was constitutionally ineffective for failing to introduce social history witnesses where the testimony would have been cumulative and where some of the witnesses could have been impeached with criminal records); McGehee, 588 F.3d at 1197-98 (holding habeas petitioner was not prejudiced by trial court's exclusion of purported mitigation evidence where the evidence lacked gravity, was cumulative, and paled in comparison to aggravation evidence indicating petitioner was ringleader and inflicted fatal wounds); Marcum v. Luebbers, 509 F.3d 489 (8th Cir. 2009) (holding that, even though trial counsel was deficient in failing to introduce evidence of defendant's pattern of failing to take prescription medications and falling into violent psychosis, petitioner was not prejudiced by counsel's errors because of the failure to introduce this evidence.).

114

A review of the totality of the evidence reveals that much of Bolden's purportedly new evidence is cumulative and pales in comparison to the strong aggravating evidence presented at trial.  Additional evidence on Bolden's family and social histories "would have offered insignificant benefit, if any at all."  <u>McGehee v. Norris</u>, 588 F.3d 1185, 1197 (8th Cir. 2009), (per curiam) <u>quoting</u> <u>Wong v. Belmontes</u>, 130 S. Ct. 383, 388 (2009).

In <u>Tinajero-Ortiz vs. United States</u>, 635 F.3d 1100, 1105 (8th Cir. 2011) the Court stated:

> A § 2255 motion can be dismissed without a hearing if "(1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the records, inherently incredible, or conclusions rather than statements of fact."

635 F.3d at 1105 (citation omitted).  The Court determined that both prongs supported the district court's decision to deny a hearing and credited the fact that the District Court presided over the underlying proceedings.  <u>Id.</u> at 1106.

### c.  Bolden's Claims Are Without Merit

### 1.  Bolden's Paternal Family

Bolden's claims that counsel were ineffective for failing to develop evidence regarding Bolden's paternal family fail on multiple grounds.  First, counsel did investigate and present evidence of Bolden's paternal family.  As outlined herein, counsel's investigation resulted in the presentation of evidence to the jury to support multiple mitigating circumstances related to Bolden's paternal family, including rejection by his father, Bolden's exposure to Elmer Clark's dysfunctional personality, and the resulting lack of a positive male role model for Bolden.

The record reflects that Sandra Stittum did provide the jury a comprehensive view of  the most immediate aspects of Bolden's paternal family – counsel conducted a reasonable

investigation and adopted a reasonable trial strategy.  It was sound strategy to call Sandra

Stittum – she grew up in a four-family flat with Bolden and the Clarks, assisted in Bolden's care,

and witnessed him grow up.  Sandra Stittum was credible with a stable work history, having

retired after working 24 years for one employer, and apparently not impeachable with drug usage

or criminal convictions.  Tr. 3679, 3685-86.  See Paul v. United States, 534 F.3d 832, 839-844

(8th Cir. 2008) (Where the mitigation case relied on the testimony of Paul's mother, Paul

contended in his post-conviction relief motion that counsel should have investigated additional

witnesses, and presented testimony from friends and relatives regarding Paul's medical, mental,

and physical history.  The court concluded that in view of the record as a whole, the jury would

nonetheless have returned a sentence of death.).  Sandra Stittum's testimony standing alone

would have been sufficient, but here counsel presented additional witnesses to testify to Bolden's

medical, mental, and physical history.

Bolden's current claim that counsel should have presented social history from the 1940-

50's of Lavale Bolden's family, for events occurring years before Bolden was born, is without

merit and has no value in terms of a predictive weighing analysis.  See Doc. 54, pp. 94-96,

referencing Doc. 2, paragraphs 424-442. See Upton, 130 S.Ct. at 3266; Paul, 534 F.3d at 839-40.

Bolden claims that counsel was ineffective for failing to call William Bolden, Jr., and

Cedric Rainey to provide a fuller picture of Bolden's family than provided by Ms. Sittum,

including a history of dysfunction, mental illness, and drug and alcohol abuse/addiction.  These

claims fail for multiple reasons.[6]  See Doc. 54, pp. 95-96, referencing Doc. 2, paragraphs 424-

---

[6]  Bolden asserts counsel should have called William Bolden, Jr., and Cedric Rainey
because they were from Bolden's father's generation, and Sandra Stittum was only 9 years older
than Bolden.  Doc. 54, pp. 94-95.  However, Cedric Rainey was also only "a few years older
than Robert Bolden."  Doc. 54, p. 95, note 40.

442.  Trial counsel provided the jury with the evidence previously set out, including that Lavale Bolden rejected Robert Bolden, leaving him to be raised by Ethel and Elmer Clark, subject to all of Elmer Clark's dysfunction.  Bolden's proffered evidence is of no value.  Further diminishing the value of Bolden's claims is evidence at trial was that Lavale Bolden was not Robert Bolden's biological father, that he rejected and abandoned him, and disregarded Sandra Stittum's efforts to foster a relationship between Lavale and Bolden.  Therefore, additional, ancient evidence relative to Lavale Bolden's family's background was more remote and less probative than the evidence presented by counsel, and inconsistent with the trial strategy of developing mitigation based upon rejection and abandonment.  See Upton, 130 S.Ct. at 3266; Paul, 534 F.3d at 839-44.

Bolden's assertion that counsel should have presented additional evidence that Bolden missed out on positive maternal family members on Lavale Bolden's side of the family is plainly contrary to the record, because Bolden was raised by Ethel Clark, who was by all accounts a positive influence.[7]  Moreover, additional evidence on this point fails in a predictive weighing analysis because the jury was aware Bolden's own mother abandoned him, but also knew he had the benefit of being raised by Ethel Clark. Doc. 54, paragraph 271.

Bolden claims that counsel should have presented additional evidence that Lavale Bolden was a drug and alcohol abuser of low intelligence who performed poorly in school, enlisted in the Air Force because he was permanently suspended from school, and continued to abuse drugs and alcohol when he returned to St. Louis.  Doc. 54, p. 96, paragraph 272.  Bolden's point is without merit because counsel chose to pursue  more immediate evidence of mitigation, Lavale

---

[7]  Sandra Stittum testified Ethel Clark was a good woman, did her best to raise Bolden, treated him as if he were her own, and attempted to instill spiritual and religious values in Bolden.  Tr. 3700, 3706-07.  Mona Muhammad stated she knew Bolden in high school and knew Ethel Clark.  Ms. Muhammad described Ethel Clark as a good and decent woman, and that Bolden had a good upbringing with her.  Tr. 3787.

117

learned he was not Bolden's biological father, and then rejected and abandoned Bolden.  The proffered evidence is less relevant and of no weight in view of the whole of the trial record.  At best, evidence of Lavale Bolden's background would have been cumulative.  At worst, it would have been counter-productive and distracted the jury from the far more pressing fact that Bolden had been abandoned by the man he thought was his father.

Bolden's contentions that counsel should have introduced other evidence of Bolden's family criminal history, including drug dealing and drug usage, burglary, and weapons violations, would have been poor strategy, where counsel's overall strategy was to limit the amount of damaging criminal activity that the jury would hear in the penalty phase.  Additional evidence opening the door to more criminal activity would have been at best meaningless, and likely even counterproductive in a predictive weighing analysis.[8]  See Doc. 2, pp. 191-93.

Bolden claims counsel was ineffective for failing to obtain complete military records to bolster that testimony of Sandra Stittum that Lavale Bolden was not the biological father of Bolden.  Doc. 54, p. 96, paragraph 273.  Bolden's claim is without merit.  First, the record as a whole reflects that counsel conducted a reasonable investigation.  Moreover, such evidence would have been cumulative because Sandra Stittum testified that S.D. stated Lavale Bolden was not Bolden's biological father, and that he never acted as a father.  Candice Stittum also testified Lavale Bolden was not Bolden's biological father, and this caused Bolden to feel rejected.  Tr. 3681, 3689-90, 3738, 3757.  Finally, not only is the evidence cumulative, but in view of trial

---

[8]  One of the statutory aggravators in this case relates to Bolden's convictions for offenses involving the distribution of controlled substances, so it defies logic as to how counsel can be ineffective for failing to highlight the drug distribution activities of other family members, including that Michael Bolden was a "major drug dealer," who was "assassinated." Doc. 2, paragraph 435.

record as a whole, it bears no weight in a predictive weighing analysis.  See Upton, 130 S.Ct. at 3266; Paul, 534 F.3d at 839-40.

### 2.  Extended Maternal Family, Mother, and Life In Canada

Bolden raises multiple claims of ineffective assistance of counsel for failure to investigate and present evidence related to Bolden's birth, early years in Canada, his biological father, his mother's life in Canada, and his extended maternal family.  Doc. 54, pp. 97-104.  All of these claims are without merit because counsel conducted a reasonable investigation, and in view of the record as a whole, none of the claims carry any weight in a predictive weighing analysis.

Bolden contends counsel should have presented evidence of the Decker family history of "interpersonal violence, verbal abuse, mental illness, addiction, and diabetes," because it is the genetic and psychosocial cornerstone of Bolden's life story.  Doc. 54, paragraph 275.  Bolden alleges S.D. took Bolden to St. John for three months when Bolden was about two years old.  Doc. 54, p. 103, paragraph 291.  Bolden came to St. Louis when he was one and had limited, if any, exposure to the Decker family, other than his mother.  Tr. 3680.  Consequently, the allegations related to Bolden's maternal family history in Canada carry no weight in mitigating why Bolden shot Nathan Ley in the head two times while he was attempting to rob a bank for money on October 7, 2002, in St. Louis, Missouri.  Moreover, much of the evidence is cumulative because counsel presented undisputed and more probative evidence of the following: (1) S.D. and Lavale Bolden had a very volatile relationship, they often fought and argued; (2) S.D. was an alcoholic; (3) Bolden battled drug addiction; and (4) Bolden had a life long battle with diabetes, which affected him severely.  The evidence presented by counsel was more probative and potentially less prejudicial to Bolden.

Bolden alleges that counsel should have presented the following: (1) S.D.'s sister was "fragile," and has mental health issues; (2) one of S.D. Decker's brothers was an alcoholic; (3) another brother spent time in prison for what was the largest marihuana seizure in Newfoundland; (4) Bolden's cousins suffered from mental illness; (5) In addition to S.D. Decker's verbally abusive nature, the entire Decker family is known for having bad tempers; (6) it was typical for men in the family to abuse their spouses and children verbally; and (7) Bolden's uncle suffered from diabetes, requiring extreme medical intervention.  Doc. 54, paragraph 276, pp. 97-98.  Each of these claims is plainly without merit for the following reasons:

That Bolden's distant relatives may have suffered from mental illness carries no weight in a predictive weighing analysis.  First, counsel conducted a reasonable investigation of *Bolden's* mental health condition and decided not to present such evidence.  Tr. 3319-21. Counsel presented uncontroverted evidence that *Bolden's mother* was an alcoholic; additional evidence that his uncle was an alcoholic adds nothing new to the predictive weighing analysis. Counsel presented uncontroverted evidence from four witnesses relative to *Bolden's* severe diabetes throughout his lifetime; additional evidence that Bolden's maternal uncle had diabetes yields nothing in a predictive weighing analysis.  Evidence of additional criminal activity of family members, including drug distribution, physical abuse, spousal and child abuse, would not tend to mitigate against the death penalty, and would likely be counterproductive.  There is no evidence Bolden witnessed or was aware of these events.  Finally, evidence that the entire Decker family is known for bad tempers, if true, would not be mitigating, and could be damaging to the defense.  Trial counsel's reasonable strategy was to minimize any evidence that Bolden had a bad temper.  Tr. 3732.  It is unlikely that reasonable trial counsel would introduce evidence

120

of a familial history of bad tempers and then ask the jury to find that a genetic predisposition to bad tempers mitigates against the death penalty – such evidence would be viewed as aggravating as to the charged murder, and would be inconsistent with evidence of a positive adjustment to confinement and lack of future dangerousness.  In view of the strength of the Government's case and the record as a whole, counsel's strategy was to pursue other mitigation theories, including conversion and accountability.

Contrary to Bolden's allegation that counsel failed to investigate, develop, and present evidence about how S.D. was affected by the above-mentioned traits, including S.D.'s alcoholism, counsel did so skillfully through the testimony of Sandra and Candice Stittum, who established S.D. was a dysfunctional parent who abandoned Bolden.[9]  Doc. 54, p. 98, paragraphs 277, 283-88.  The proposed additional evidence would have been cumulative, more remote, and potentially damaging to Bolden for the reasons set forth above.  Counsel was effective, and the proposed additional evidence is of no value in a predictive weighing analysis.

Bolden's allegations relative to social conditions in Newfoundland and the Decker family history all pertain to places, conditions, or events remote from Bolden and the murder of Nathan Ley, and have no value in a predictive weighing analysis.  Doc. 54, paragraphs 278-82.  This information only would have distracted the jury from the more pertinent mitigation evidence.

Bolden claims counsel should have developed and adduced evidence of the following: (1) The conception, birth, and death of a child prior to Bolden; (2) changes in the Stephenville, Newfoundland, community as a result of an American Air Force base; (3)  Bolden's birth size,

---

[9]  Lavale Bolden and S.D. Decker, Bolden's parents, had a volatile relationship, they frequently fought and argued.  Tr. 3681.  S.D. would go out drinking, in high heels and a miniskirt.  S.D. drank to excess in front of Robert.  Tr. 3682-83.  S.D. was always drunk, an alcoholic, confrontational, and talked down to Bolden.  Tr. 3756.

which apparently was not unique for the time; (4) S.D.'s status as a result of having a biracial baby; (5) that S.D. was alleged to have been a victim of sexual abuse by her brothers; and (6) S.D.'s immigration status and limited contact with her family after moving to the United States. These claims are equally unavailing, attenuated, and bear no weight in a predictive weighing analysis. Doc. 54, pp. 102-04, paragraphs 289-96.

Specifically, Bolden's allegations related to the social and economic backdrop in which S.D. developed alcoholism and resorted to prostitution carry no weight in a predictive weighing analysis; it was uncontroverted that S.D. was an alcoholic and a dysfunctional parent who abandoned her son. Remote and speculative evidence as to why she was an alcoholic, and allegations that she was a prostitute prior to Bolden's birth are unavailing in a predictive weighing analysis. Doc. 54, paragraphs 290, 296. The jury attached no weight to the fact that S.D. was an alcoholic who was verbally abusive toward Bolden; they did attach weight to the fact that she abandoned Bolden. Thus, it is fairly certain that more attenuated evidence would have served no useful purpose.

Bolden's allegations related to the birth and death of a son prior to Bolden are speculative as to the nature of the child's death and unavailing because while tragic, the child's death does nothing to detract from the strength of the aggravation case. Moreover, Bolden's suggestion that S.D. abused alcohol during *his* pregnancy are speculative at best, and even if assumed to be true, are unavailing in a predictive weighing analysis. Doc. 54, paragraphs 289, 296. Bolden alleges that Jean Decker recalled that Bolden "was a small baby, but that all babies were small back then, not like today," and that S.D. kept Bolden clean. Doc. 54, paragraph 291. These allegations, which on their face conclude that Bolden was not abnormally small for the time, carry no weight in a predictive weighing analysis.

Bolden alleges S.D.'s reasons for leaving Canada were apparently two fold: (1) having a biracial baby in predominantly white Newfoundland made her an outcast; and (2) she was raped by two of her brothers.  Doc. 54, paragraphs 291, 293.  First, Bolden's trial counsel presented uncontroverted evidence that he felt rejected because he was biracial.  Tr. 3688-89.  However, there is no evidence in the record to support that Bolden felt rejected by his maternal family because he was black, or that he even had contact with the Decker family.  Doc. 54, paragraph 291.  Moreover, neither factor bears any significant weight in a predictive weighing analysis – in view of the totality of the evidence, S.D.'s putative reasons for leaving Canada while Bolden was a toddler would not tend to detract from the strength of the aggravation case.

### 3.  Evidence About Bolden's Childhood in Saint Louis

Bolden claims counsel should have provided a broader presentation regarding Bolden's young life in St. Louis, rather than just presenting the testimony of Sandra Stittum.  Doc. 54, pp. 104-112.  Bolden's claims fail for the reasons previously stated herein, and because the information he proffers is either cumulative or was not offered for strategic reasons, and is of no value in a predictive weighing analysis in view of the whole of the record.

### 3(a).  Medical Records

Bolden's claim that counsel should have introduced medical records fails on multiple grounds.  Doc. 54, pp. 104-106.  First, the proffered evidence is cumulative. Counsel presented extensive and undisputed evidence that Bolden's consistently suffered severe diabetic incidents throughout his lifetime, his diabetes was uncontrolled, and aspects of his young family life were dysfunctional; consequently, the evidence is cumulative.  Clearly, counsel possessed the records,

but chose not to introduce them; therefore, this is presumed to be a strategic decision.[10]  Counsel effectively presented evidence of Bolden's diabetes – eight jurors found it to be mitigating that from infancy, Bolden suffered numerous diabetic episodes, causing disruptions in his life.  Docs. 442, 443, Special Verdict, V(20).  Bolden also claims trial counsel should have called Doug Dobnyes to testify that diabetes affected Bolden's relationships with his peers, and he needed help managing his diabetes.  Doc. 54, paragraph 304.  Bolden's proposed evidence is cumulative because counsel presented evidence that Bolden's severe diabetes  affected him throughout his life.   Bolden's proffered evidence is unavailing in a predictive weighing analysis.

### 3(b).  Life with the Clarks.

Bolden's claims that counsel should have introduced additional evidence related to life with the Clarks are equally meritless.  Doc. 54, pp. 106-08.  First, as set out above, counsel presented significant evidence related to Bolden's life with the Clarks.  Bolden asserts that counsel should have presented evidence that: (1) Lavale did not bring Bolden or S.D. home with him, that they just appeared on the doorstep; (2) Lavale struggled with drug and alcohol addiction; (3) S.D. was a mentally ill, alcoholic, heroin-addicted prostitute who dumped Bolden on relatives so she could participate in her dysfunctional lifestyle; (4) violence was pervasive in the relationship of every caretaker in Bolden's life; (5) Lavale Bolden and S.D.  experienced violence in their relationship; and (6) drug and alcohol abuse were pervasive in the home while Bolden was growing up, and evidence that Elmer Clark was an alcoholic was understated – he was physically and verbally abusive, including to Bolden.  Doc. 54, pp. 106-08, paragraphs 306-

---

[10]  Counsel possessed the records: See Doc. 54, pp. 104-05, note 48; Doc. 2, exhibit 18, report of Robert Smith, Ph.D., in which Dr. Smith, in his psychological summary, indicates counsel provided him with a voluminous listing of medical records.

08. All of these claims are without merit because they either raise cumulative matters, or in view of the whole of the trial record, bear no weight in a predictive weighing analysis.[11]

Evidence that S.D. and Bolden just appeared on the doorstep is inconsistent with evidence presented at trial, that it was a joyous occasion when Lavale Bolden returned with S.D. and Bolden, and equally tragic when it was revealed during a fight that Lavale Bolden was not Bolden's father, and thereafter abandoned by his parents. Tr. 3680-85. Moreover, counsel developed and presented significant evidence of abandonment, *supra*, making this evidence cumulative. Evidence that Lavale Bolden was a drug addict would have carried little weight in a predictive weighing analysis, because the evidence at trial was that Lavale Bolden worked long hours, abandoned Bolden, and rejected Sandra Stittum's efforts to foster a relationship between Lavale and Robert Bolden. Tr. 3682-83, 3686-87, 3728.

Additional evidence that S.D. was dysfunctional would have been cumulative, and is inconsequential in a predictive weighing analysis. Counsel presented compelling evidence S.D. was so dysfunctional that she abandoned Bolden, and left it to Ethel Clark to raise him.[12] There is no evidence or suggestion that Bolden witnessed S.D. use drugs or prostitute herself.

---

[11] Neither counsel has chosen to highlight that Bolden had the benefit of being raised by Ethel Clark, a positive, caring influence. Sandra Stittum testified Ethel Clark was a good woman, did her best to raise Bolden, treated him as if he were her own, and attempted to instill spiritual and religious values in Bolden. Tr. 3700, 3706-07. Mona Muhammad stated she knew Bolden in high school and knew Ethel Clark. Ms. Muhammad described Ethel Clark as a good and decent woman, and that Bolden had a good upbringing with her. Tr. 3787.

[12] Lavale Bolden and S.D., Bolden's parents, had a very volatile relationship, they frequently fought and argued. Tr. 3681. While Lavale worked long, hard hours, S.D. would go out drinking, in high heels and a miniskirt. S.D. also drank to excess in front of Robert. Tr. 3682-83. S.D. was always drunk, an alcoholic, confrontational, and talked down to Bolden. Tr. 3756. Bolden was seven or eight when Lavale and S.D. split up, at which time he went to live with Aunt Ethel and Elmer Clark. Tr. 3685, 3706-07. Ethel told S.D. she was going to have to get more involved in raising Robert because Ethel was getting older, but S.D. became less involved. Tr. 3684-86.

Bolden's contention that counsel did not adequately develop and present evidence of violence in Bolden's life is meritless, and fails a predictive weighing analysis.  Counsel presented evidence that Lavale Bolden and S.D., Bolden's parents, had a very volatile relationship, they frequently fought and argued; Elmer Clark was ornery, prejudiced, a drunk, an alcoholic, not a nice person, and was raised in a house of ill repute.  Tr. 3681, 3757, 3685.  Sandra Stittum, in characterizing Elmer and Ethel Clark's relationship, explained that Elmer Clark was a very angry individual, talked about his famous temper, and displayed it quite often, "there was a great deal of violence.  Mr. Elmer was violent."  Tr. 3730-31.  Counsel submitted, and 2 jurors found that Bolden, as a child, witnessed acts of domestic violence between Ethel and Elmer Clark.  Docs. 442, 443, Special Verdict, V(14).

Counsel provided the jury with evidence of the challenges in Bolden's early life; additional evidence would have been cumulative and not outcome determinative.  Moreover, Bolden's proffered evidence that Lavale Bolden partied at the Clark home every weekend would be inconsistent with the theme of abandonment of Bolden by Lavale Bolden.  Bolden's proposed testimony of Michael Mahone, Exh. 13, to support his claims would be disastrous.  It is inconsistent with the evidence presented, portrays S.D. to be  "really nice," and injects significant additional criminal activity, including Mahone's four trips to the penitentiary, and Bolden's introduction to crack use.

Counsel is not ineffective for failing to present additional evidence related to problems Bolden experienced because of his biracial heritage.  This would have been cumulative to the undisputed evidence presented at trial, and insignificant in a predictive weighing analysis.  Doc. 54, p. 108, paragraph 309.

126

Counsel was not ineffective for failing to submit Bolden's school records, which counsel possessed, and evidently chose not to offer for strategic reasons.  Bolden baldly asserts, "Clearly he was cognitively impaired."  A petition which consists of only "conclusory allegations, unsupported by specifics [or] ... allegations that, in the face of the record, are wholly incredible," is insufficient to overcome the barrier to an evidentiary hearing on a section 2255 motion. Voytik v. United States, 778 F.2d 1306, 1308 (8th Cir. 1985), quoting Blackledge v. Allison, 431 U.S. 63, 73.  Bolden's school records would not have carried any weight in a predictive weighing analysis, particularly in view of the fact that he graduated from high school, and attended some community college.  Doc. 54, p. 108, paragraph 310; Tr. 3768.

### 3(c).  Mother's Mental Illness, Addictions, Impairments

Bolden claims counsel were ineffective for failing to conduct an adequate investigation and for failing to give the jury more than a superficial view of S.D.'s alcoholism, and for not presenting evidence of S.D.'s heroin addiction, mental illness, social and psychological impairments, and prostitution.  Doc. 54, pp. 108-111, paragraphs 311-323.  Bolden badly mischaracterizes counsel's presentation of evidence that S.D. was simply a "character."  Doc. 54, p. 108, paragraph 312.  Movant's allegations fail because counsel did present compelling and uncontested evidence that portrayed S.D. as a dysfunctional and verbally abusive alcoholic who her chronically ill child, supra.  Bolden's proposed evidence is remote and of no value.  In terms of weighing, the jury attached no weight to the fact Bolden's mother was an alcoholic and verbally abusive to him; however, 5 jurors found it to be a mitigating factor that she abandoned him.  Docs. 442, 443, Special Verdict, V(15, 16). Counsel's investigation and strategy were reasonable, as the jury attached little weight to S.D.'s dysfunction, other than to the extent that

127

she abandoned Bolden. More evidence of S.D's addictions and problems is of no value in a predictive weighing analysis.

The evidence Bolden proposes in paragraphs 311-321 is easily dismissed because the proffered evidence that is not cumulative pertains to S.D., not Bolden, counsel would not have called Marquita Patterson ("Patterson") for strategic reasons because she would have hurt the mitigation case, supra, and the proffered information is of no value.  Bolden's proffered statements of Patterson, whom Bolden acknowledges testified before the grand jury and was interviewed by counsel, is cumulative as it relates to S.D.'s alcoholism.  Patterson's statements as they relate to S.D.'s verbal abuse of *Patterson* does not tend to mitigate *Bolden's* murder of Nathan Ley.  Doc. 54, p. 111, paragraph 322.  As Bolden admits, counsel had the grand jury testimony of Patterson, and therefore was aware if they called her as a witness, she would provide much information that was potentially inconsistent with their mitigation case: (1) Bolden had a great childhood and everything he could possibly need or want; (2) Bolden was very intelligent; and (3) Bolden and Patterson were involved in a domestic violence incident; Bolden is hot headed, rash, and frequently loses his temper.

To the extent Bolden proffers statements of Patterson and Doug Dobynes that S.D. would scream and yell at Bolden, the proposed evidence is cumulative and of no value in terms of predictive weighing.  Doc. 54, paragraphs 322, 323.  Counsel presented evidence S.D. was always drunk, an alcoholic, confrontational, and talked down to Bolden.  Tr. 3756.  The proffered information is of no value in a predictive weighing analysis.

### 3(d).  Lack of a Positive Male Role Model

Counsel did present evidence Bolden lacked a positive male role model; Bolden's claims that counsel was ineffective in this regard are easily dismissed.  Doc. 54, pp. 111, 112.  Bolden

was seven or eight when Lavale and S.D. split up, at which time he went to live with the Clarks. Tr. 3684-86.  Lavale became more distant from the family after he split from S.D. and married Althea, who did not accept Robert Bolden and would not allow a relationship between Lavale and Robert Bolden.  Lavale Bolden did not respond to Sandra Stittum's efforts to foster a relationship between her brother and Bolden.  Tr. 3686-87.  Lavale Bolden never acted as a father to Bolden.  Tr. 3728.  Sandra Stittum, in characterizing Elmer and Ethel Clark's relationship, explained that Elmer Clark was a very angry individual, talked about his famous temper, and displayed it quite often, "there was a great deal of violence.  Mr. Elmer was violent." Tr. 3730-31.   Elmer Clark was ornery, prejudiced, a drunk, an alcoholic, not a nice person, and was raised in a house of ill repute.  Tr. 3757, 3685. Upon learning Lavale was not his father, Bolden felt everything he had been told was a lie, pulled away further, became more distant, felt the family did not love him, and felt rejected.  Tr. 3681, 3689-90, 3757.  Three jurors found the lack of a positive male role model to be a mitigating factor.  Docs. 442, 443, Special Verdict, V(24).  Bolden's proposed evidence is at best cumulative to the significant evidence presented by counsel and of no value in a predictive weighing analysis.  His point is without merit.

### 4.  Bolden's Young Adulthood and Life in Michigan

Bolden raises a host of points that counsel failed to develop and present evidence about Bolden's young adulthood in Saint Louis, his life in Michigan, and his medical records related to drug treatment and diabetes.  Doc. 54, pp. 112-116, paragraphs 325-334.  Bolden's allegations are without merit because they raise issues that are cumulative and insignificant in a predictive weighing analysis.

### 4(a).  Young Adulthood in St. Louis

Bolden proffers information related to Antoinette Harris's mother's drug addiction, Michael Mahone's drug usage, and Bolden's drug usage, including the use of PCP, and his drug usage with Tannan.  Doc. 54, pp. 112-13, paragraphs 326-27.  Counsel was not ineffective for failing to present this evidence.  Evidence that Bolden was addicted to controlled substances is cumulative – the jury heard evidence of his drug usage in the guilt trial.  Counsel presented evidence in the penalty phase  that he received drug treatment, but continued to struggle with a crack addiction prior to the murder of Nathan Ley.  Evidence of additional criminal activity by Bolden, including more extensive historical drug use and his use of PCP, beyond evidence of drug usage related to his downward spiral, would have been inconsistent with counsel's trial strategy: that, in the face of overwhelming evidence, Bolden was a good father, accountable, and remorseful.  Moreover, additional evidence of historical drug usage would not tend to mitigate why he shot Nathan Ley in the head twice while attempting to rob a bank for money, and likely would have been viewed negatively by the jury, who attached no weight to Bolden's crack addiction as a mitigating factor.

Bolden's proposed evidence that S.D. would arrive at the Clark residence intoxicated and that Bolden could not stand to be around her after all she had done to him as a child does not add anything to the evidence presented by counsel, and is of no value in a predictive weighing analysis.  Doc. 54, paragraph 328.

Bolden's proposed evidence related to the death of Ethel Clark, and S.D.'s subsequent relationship with Elmer Clark is of no value in a predictive weighing analysis.  Everyone is affected by the death of loved ones, so Ethel Clark's death when Bolden was a young adult does not mitigate against the death penalty.  Moreover, Bolden's allegations are internally inconsistent, and inconsistent with the evidence.  Bolden asserted he could not stand to be

around his mother after his childhood, but that it was difficult for him to see his mother become involved with Elmer Clark.  When viewed together, the allegations make little sense because if Bolden could not stand to be around his mother, the reasonable inference would be that he would not care who his mother became involved with.  Doc. 54, paragraphs 329-29.  Moreover, to the extent Bolden asserts Elmer Clark degraded S.D. with derogatory terms like "white bitch," this is inconsistent with the testimony of Candice Stittum, who stated, "If you weren't light complected, he didn't have a lot to do with you."  Tr. 3757.  Bolden's claim is without merit.

### 4(b).  Life in Grand Rapids, Michigan

Bolden claims counsel should have presented additional evidence of Bolden's life in Michigan, which would in large part have consisted of evidence from drug associates, and opened the door for the Government to elicit additional evidence from Bolden's proposed witnesses about his drug distribution activities.  Doc. 54, p. 114-15, paragraphs 330-331.  Bolden's claim is meritless because counsel presented the best evidence they could from Michigan, which was limited, without further highlighting Bolden's extensive drug distribution activities.  Moreover, the evidence Bolden now proposes is, at best, of no positive value in a predictive weighing analysis.

Counsel chose to pursue a different strategy, capitalizing on evidence that Bolden was a good father, and minimizing negative evidence about Bolden's drug usage and distribution. Counsel adduced evidence from A.B. that Bolden took the children to movies, fishing, swimming, and to "Michigan Adventures.  Basically, he took us everywhere."  Counsel also established Bolden was interested in the children's school work, an involved parent.  Tr. 3795-96.  Robert Bolden, Jr. left the jury with the impression that Bolden was a good father, and that their activities together included fishing, basketball, video games, and that Bolden taught him

131

how to ride a bike.  Bolden, Jr. testified that even after his parents separated, his father spent as much time as possible with him and they maintained a close relationship.  Tr. 3801-02. Counsel's strategy was to minimize the negative evidence, Bolden's drug distribution activities, and emphasize the positive.  This was sound strategy considering one of the statutory aggravating factors was related to Bolden's drug distribution convictions.  Counsel astutely and effectively prevailed on the Court to exercise its discretion to limit the amount of evidence the jury would hear in the penalty phase related to Bolden's drug distribution activities and the criminal behavior that commonly accompanies drug distribution.  4:02CR 557 CEJ, Doc. 405, 406; Tr. 3323-43, 3397-98, 3402-03, 3410-14.

Bolden's current proffered evidence, relying on drug associates, would be disastrous. Willie Tannan, referring to Bolden, stated, "[W]e also used to steal and sell drugs to support our habits."  Bolden's Exhibit 86(10).  Bolden's proffered testimony of Hassan Abdul Shamshid-Deen ("Shamshid-Deen"), is that Shamshid-Deen got his drugs from Bolden.  Doc. 54, paragraph 331.  Shamshid-Deen was with Bolden on June 8, 1994, when police arrested Bolden after Bolden delivered drugs to McDowell.  After the undercover transaction, police conducted a car stop of Bolden, Shamshid-Deen, and Delores James, and determined Bolden was in possession of $1,100.00, the buy money that Bolden received from McDowell for the illegal narcotics, and an additional $3,665.00 in United States currency.  Bolden then lied to the police and told them he received the buy money at an auto auction; the police witnessed him leave the drug deal.  Tr. 3413-16, see Government's exhibit 1-1.  Shamshid-Deen would have been subject to cross-examination on a specific event counsel was attempting to minimize.  Moreover, Shamshid-Deen would have been subject to cross-examination on Bolden's drug distribution to him, and his knowledge of Bolden's drug distribution activities.  This would have highlighted

Bolden's disregard for others by a pattern of drug distribution, and that Shamshid-Deen and

Bolden, "got together every day getting drunk and high." Doc. 54, paragraph 331.   Such

evidence would have severely undercut the testimony of Bolden's children that he was a good

parent in Michigan, and undoubtedly damaged the defense mitigation case.

Bolden's proposed evidence from Michael Mahone and Marquita Patterson is

nonspecific. A petition which consists of only "conclusory allegations, unsupported by specifics

[or] ... allegations that, in the face of the record, are wholly incredible," is insufficient to

overcome the barrier to an evidentiary hearing on a section 2255 motion.  Voytik v. United

States, 778 F.2d 1306, 1308 (8th cir. 1985), quoting Blackledge v. Allison, 431 U.S. 63, 73.

Moreover, the prospect of calling Michael Mahone and Marquita Patterson as witnesses, are

subject to the negative strategic considerations previously set forth.  Bolden's claims are without

merit; none of the proffered evidence has value in a predictive weighing analysis.

### 4(c). Adult Medical Records

Bolden's claim that counsel should have presented adult medical records is without

merit, because the proffered evidence is cumulative, and would have no bearing on a predictive

weighing analysis. Doc. 54, pp. 115-116, paragraphs 332-34.  As set forth, *supra*, the jury heard

substantial evidence Bolden was severely affected by diabetes throughout his life. The jury also

heard evidence that Bolden was a drug user who received drug treatment on at least two

occasions.  Tr. 3386, 3791.  Counsel was in possession of extensive medical records and drug

treatment records, and chose not to introduce the evidence. See Bolden's exhibit 18, report of

Robert L. Smith, Ph.D., referring to materials provided by counsel.   Counsel conducted a

reasonable investigation and  made a strategic decision not to use the records.  The proffered

evidence would not have detracted from the Government's overwhelming aggravation case, and bears no weight in a predictive weighing analysis.

### 5. Bolden's Life in St. Louis, After Grand Rapids

Bolden raises a host of claims that counsel should have presented evidence in relation to Boldens' life in St. Louis when he returned from Grand Rapids in the late 1990's.  Doc. 54, pp. 116-19, paragraphs 335-44.  Bolden's claims are without merit because they disregard the evidence that was presented, refer to cumulative matters, deal with witnesses or subjects that counsel avoided for strategic reasons, and are uniformly unavailing in a predictive weighing analysis.

Bolden claims counsel should have called Marquita Patterson ("Patterson"), to say Bolden suffered from symptoms consistent with mental illness and "does not think, just acts. He's very rash."  As Bolden previously acknowledged in his petition, counsel had Patterson's grand jury testimony.  Counsel, for good reason, chose not to call Patterson – she would have offered evidence inconsistent with and damaging to the mitigation case.[13]  Counsel carefully avoided any effort to show Bolden was hot headed, rash, and unable to control his temper, and wisely would not have called a witness to do so.  Tr. 3715, 3732.  Counsel carefully tailored the evidence presented to the jury, and presented evidence Bolden suffered from diabetes, depression, and crack addiction.  They chose not to present evidence that Bolden acted rash, or could not control his temper, because that would have hurt the mitigation case and bolstered the

---

[13]  As Bolden asserts, counsel had the grand jury testimony of Patterson, and was aware if they called her as a witness, she would provide much information that was potentially inconsistent with their mitigation case: (1) Bolden had a great childhood and everything he could possibly need or want; (2) Bolden was very intelligent; and (3) Bolden and Patterson were involved in a domestic violence incident; Bolden is hot headed, rash, and frequently loses his temper.  See Government's exhibit 4 (filed under seal).

Government's aggravation case.  Instead, counsel chose to call Mona Muhammad, who could emphasize Bolden's struggles with diabetes and drug addiction, and his qualities as a father in this time frame – his normal routine was going to work and coming home to take care of his children.  Tr. 3778-84.  Muhammad allowed counsel to present important evidence for its mitigation case without raising the pitfalls presented by Patterson.

Bolden's claims that counsel should have presented medical records, rehabilitation records, and employments records to show the extent of Bolden's diabetes and that Bolden was not well in this time frame are without merit.  Doc. 54, paragraphs 336, 337, 341-444.  The evidence is cumulative because counsel presented significant evidence as to Bolden's struggles with diabetes, drug addiction, the fact that he sought drug treatment, and his downward spiral, supra.  Tr. 3683-84, 3688, 3692-93, 3734, 3759-61, 3779, 3782-83, 3803.   As previously stated, counsel possessed the records, including the records of Dr. Joseph Thompson and treatment records from Bridgeway Counseling Services, Inc., but for strategic reasons, chose not to present them.  Counsel also provided the records to Dr. Smith, but for strategic records, elected not to present mental health evidence, including mental health evidence related to Bolden's drug and alcohol abuse, infra.  See Psychological Summary, Smith, Bolden's exhibit 18.  Moreover, the proposed evidence would have been accorded no weight in a predictive weighing analysis.

Bolden claims that counsel was ineffective for failing to investigate and present evidence about Bolden's efforts to attend the Lacy family reunion in Chicago.  Doc. 54, paragraph 338.  The totality of the record reflects counsel conducted a reasonable investigation, and the proffered evidence is of no value in a predictive weighing analysis.  If anything, the evidence would have demonstrated that Bolden remained functional despite his diabetes and depression, thereby undercutting pillars of his mitigation strategy.

Bolden proposes that counsel should have called Beverly Granberry, Bolden's landlord, to testify that Bolden used his carpentry skills to improve the rental property at 1157 Howell, and that the neighborhood was bad.  Bolden's claim ignores the totality of the record – counsel succeeded in excluding Granberry's testimony as a Government witness in the penalty phase, and as a matter of trial strategy, never would have called Granberry as a defense witness.  Tr. 3272-99.  Initially, Granberry allowed Bolden to perform carpentry work in lieu of paying rent for a few months, but thereafter, Bolden stopped paying rent, and Granberry sent her handyman to see Bolden on October 6, 2007, the day before the attempted robbery and murder, to advise Bolden  that she was going to begin eviction proceedings.  See Transcript of Evidentiary Hearing, December 5, 2003, 7-18, 30-37; Tr. 3272-99.  Bolden's proffered evidence would have opened the door to damaging testimony that  counsel sought desperately to exclude.  In the Government's view, Granberry's testimony was relevant to motive and the statutory aggravator of pecuniary gain.  The point is without merit because the proffered evidence would have hurt Bolden, not helped, in a predictive weighing analysis.

Bolden claims counsel should have presented employment records from H & G, provided to counsel in discovery, to show Bolden had a good job, but experienced financial difficulties because of his diabetes, depression, and addiction.  Doc. 54, paragraph 340, Bolden's exhibit 61.  Such evidence would be cumulative at best.  Counsel made a strategic decision not to present the records, but did present evidence that Bolden spent his time at work and taking care of his children.[14]  Tr. 3778-84.  The record reveals Bolden was employed at H & G Sales, was capable

---

[14]  Had counsel introduced the records proffered by Bolden, the jury would have learned Bolden's wages were garnished in the amount of $1,604.44 as a result of Bolden receiving unemployment benefits from the Missouri Division of Employment Security while he was employed.  Exhibit 61, TC-Disco-658-78, Bates range # 789-809.

of skilled labor, and made a good salary.  Tr. 3768-69, 3785.  The jury also heard that Bolden generally kept a job, despite his diabetes.  Tr. 3710-11.

Contrary to Bolden's assertions, the employment records do not show *why* Bolden experienced financial difficulties.  This allegation is wholly speculative, conclusory, and unsupported by specifics.  See Voytik, 778 F.2d at 1308.  His financial difficulties may well have stemmed solely from choice to use crack.  Among other things, the records show Bolden was being paid approximately $16.00 per hour, did have a legitimate source of income, had he chosen to work, and that his employer attempted to help him work through his drug addiction, and assisted in the payment of his mother's funeral expenses.  Exhibit 61, Bates range TC-Disco-639, #770; TC-Disco-611-620, #742-51.  The employment records would have been of no additional value in a predictive weighing analysis.

### 6.  Failure to Develop Evidence that Incarceration is Difficult for Bolden Due to his Diabetes

Bolden claims counsel was ineffective failure to investigate and present evidence to demonstrate that the Government failed to medically manage Bolden's diabetes during his incarceration.  Doc. 54, p. 119.  Bolden's point may be dismissed outright because his claim is refuted by the record.  See Voytik, 778 F.2d at 1308; see infra, Part XIV, incorporated herein by reference.  Bolden presented significant evidence pertaining to the severe effects of his chronic diabetes, which counsel emphasized in the penalty phase.  Bolden also presented evidence inconsistent with this claim, including evidence of his adjustment to confinement, his ability to form relationships with other inmates, and his ability to excel in a rigorous academic Bible studies program while incarcerated.  Tr. 3815-16, 3836-41, 3844, 3874-75.  Moreover,  Bolden's proffered evidence bears no weight in a predictive weighing analysis.

137

### 2.  Counsel Investigated and Developed Mental Health Evidence, But Made a Clear Strategic Choice Not To Present Mental Health Evidence.

Bolden makes a number of claims of ineffective assistance of counsel alleging a failure to investigate and provide experts with the required background and collateral data, failure to consult with experts, and a failure to present expert evidence that would support and corroborate the chosen mitigation defense arising from Bolden's diabetes.  Doc. 54, pp. 93-94, 119-130. Bolden asserts counsel had discounted the presentation of any expert mental health testimony before the penalty hearing.  Id.

Consistent with his other allegations, Bolden's claims are without merit and lack any credible analysis of the record.  The entirety of the record, including the lengthy procedural history, the factual record developed at the guilt and penalty phase, and counsel's direct statements establish counsel's strategy was not to use expert mental health evidence. The record is clear that counsel recognized their duty, and a substantial mental health investigation was undertaken.  After the guilt phase, and before the penalty phase, counsel stated on the record that after reviewing the evidence, they were not going to present expert mental health evidence.  Tr. 3319-21.  Counsel presented well developed mitigation evidence on many of the same issues Bolden now proffers, was able to do so without contradicting one of the primary themes of his mitigation case, acceptance of responsibility, and avoided the negative aspects of expert mental health evidence.  Counsel's strategic decision should be afforded a strong presumption of professional competence.

Bolden's allegation that counsel discounted presenting any mental health expert testimony before the penalty phase is disingenuous.  Doc. 54, p. 93, citing Tr. 3319.  Counsel waited until the last moment procedurally possible to give notice – fire-wall procedures

mandated that following a guilty verdict, counsel immediately notify the Government fire-wall attorneys of their intent to present expert testimony in the penalty phase.  See Stipulation of the Parties Regarding Discovery and Scheduling ("Stipulation"), Doc. 306, paragraph 10(j); Rule 12.2(c)(2), Federal Rules of Criminal Procedure. The record establishes that counsel put Bolden in the best position possible – they investigated, prepared, and litigated mental health issues to Bolden's strategic advantage for three and one half years.  Counsel waited until after the Government's guilt phase case to make a final decision, and used fire-wall procedures to their tactical advantage by keeping the Government's attorneys in the dark as to whether expert mental health evidence would be presented.

### a.  Performance:  The Analytical Framework

Bolden claims that counsel were constitutionally ineffective for failing to present testimony from mental health experts, allegedly failing to obtain records from Ruben Gur, Ph. D., a neuropsychologist specializing in organic brain damage, for failing to present expert evidence of related to Bolden's alleged brain damage, psychiatric illness and addiction, and fetal alcohol syndrome.  These claims should not be analyzed under the rubric that Bolden's trial counsel failed to adequately investigate mental health issues.  The record and Bolden's petition and supporting documents make clear that trial counsel consulted multiple mental health professionals, but elected not to call a mental health expert.  Thus, the decision not to present certain mental health evidence must be afforded the strong presumption of competent performance.  See Marcrum, 509 F.3d at 506 (explaining that Supreme Court precedent shows that "decisions about what to do with the results of investigation are strategic decisions that are virtually immune to second-guessing by habeas courts").

Counsel's decisions to not present the mental health experts, not to pursue or present alleged brain damage findings, psychiatric illness and addiction, and fetal alcohol syndrome as theories of mitigation are comparable to the decisions made by trial counsel in <u>Ringo v. Roper</u>, 472 F.3d 1001, 1003 (8th Cir. 2006), a capital case in which the Eighth Circuit affirmed a finding that trial counsel was not constitutionally ineffective.  In <u>Ringo</u>, the defendant/petitioner claimed that his trial counsel was ineffective in failing to investigate and to present testimony at both the guilt and penalty phases of his trial that he suffered from post-traumatic stress disorder ("PTSD").  <u>Id.</u>.  Ringo's PTSD was diagnosed after trial by Dr. Robert Smith, one of the expert's used by Bolden's trial counsel in this case.  Prior to trial, Ringo's counsel consulted with another expert who noted positive findings for PTSD, but did not make a diagnosis of that condition.  <u>Id.</u> at 1006.  The expert also advised trial counsel to consult a clinical psychologist, which trial counsel did not do.  The Eighth Circuit found that the Missouri Supreme Court did not unreasonably apply <u>Strickland</u> in rejecting Ringo's claim that trial counsel's performance was deficient based on these facts.  As noted by the Eighth Circuit, the Missouri Supreme Court concluded, "[w]here trial counsel has, as here, made reasonable efforts to investigate the mental status of defendant and has concluded there is no basis in pursuing a particular line of defense, counsel should not be held ineffective for not shopping for another expert to testify in a particular way."  <u>Id.</u> at 1004, <u>quoting</u> <u>Ringo v. State</u>, 120 S.W.3d 743, 749 (Mo. 2003).

Likewise, in <u>Ortiz</u>, <u>supra</u>, a capital case, the Eighth Circuit found Ortiz's trial counsel was not constitutionally deficient because counsel did not obtain a mental health examination of Ortiz.  664 F.3d at 1171.  Ortiz's trial counsel testified at an evidentiary hearing that nothing led them to believe Ortiz had mental health problems.  <u>Id.</u>  The court noted that there is no *per se* rule requiring defense counsel in capital cases to have their clients evaluated by a mental health

professional.  See id. citing Jones v. Delo, 258 F.3d 893, 902 (8th Cir. 2001); Nooner v. Norris,

402 F.3d 801, 809 (8th Cir. 2005) (concluding "trial counsel's judgment not to pursue psychiatric

testing for purpose of mitigation" was reasonable, in part, because there was no indication

petitioner had "any mental or psychological problems").  The court agreed with district court

findings that a mental health examination was "not obviously necessary," and that counsel's

decision not to pursue that line of investigation was a reasonable professional judgment under

the circumstances.  Id.

Further, in Winfield v. Roper, supra, the Eighth Circuit denied habeas relief on a claim

that trial counsel was deficient for failing to introduce mental health testimony at trial after a

mental health professional provided affidavits during habeas review indicating that he diagnosed

Winfield with Adjustment Disorder.  See 460 F.3d at 1040.  The Eighth Circuit found that the

district court properly denied this claim because trial counsel had conducted a thorough

investigation of Winfield's mental condition prior to trial – including having Winfield examined

by two mental health experts – and made an informed decision not to introduce the mental health

evidence at trial.  See id. at 1040-41 (noting mental health experts concluded Winfield was not

suffering from mental or emotional illness at the time of the crimes).

### b.  Prejudice:  The Analytical Framework

Bolden also fails to adequately establish a reasonable probability that the outcome of his

penalty phase would have been different had his trial counsel pursued the mental health evidence

outlined in his 2255 motion and its supporting documents.  See Jones v. Delo, 258 F.3d 893, 901,

903-04 (8th Cir. 2001) (holding petitioner failed to establish prejudice to satisfy ineffective

assistance claim based on counsel failure to present expert testimony of mental health diagnosis

and brain damage; concluding that despite alleged defects, Jones functioned in society at a

substantial level of competence); <u>Landrum v. Mitchell</u>, 625 F.3d 905, 928-33 (6th Cir. 2010)

(finding no prejudice to support ineffective assistance claim based on, among other things,

counsel's failure to present mental health expert testimony when habeas counsel presented

clinical psychologist who diagnosed dysthymic disorder and substance dependence – the same

deficiencies found for Bolden by Dr. Smith in this case; and noting that the evidence that was

presented "gave the jury an overall view of Landrum's background, some insight into his

troubled youth, and accounts of his substance abuse"); <u>id.</u> at 930, 933 (The petitioner must

present new evidence that differs both in strength and subject matter from the evidence actually

presented at sentencing, not just cumulative mitigation evidence.) (citations omitted).

**c.  Counsel Recognized Their Duty To Investigate
Bolden's Mental Health Background**

The portion of the record currently known to the Government reveals that potential

mental health evidence and the implementation of Rule 12.2 of the Federal Rules of Criminal

Procedure were the focus of substantial resources as a procedural and substantive matter.  During

the exchange of motions outlined below, defense counsel vigorously litigated issues related to

mental health evidence in the penalty phase.  Counsel demonstrated a sophisticated

understanding of Rule 12.2, related cases, the practical realities of investigating and presenting

mental health evidence, and the need to seek every possible strategic advantage potentially

available to Bolden:

> Government's Motion for Discovery of Mental Health Evidence and Other Relief
> (Government's Motion for Discovery), Doc. 199, January 16, 2004, <u>see</u> Government's
> exhibit 2-1;
>
> Defendant's Objections to Government's Proposed Disclosure of Expert Mental Health
> Witnesses and Examination, Doc. 214, February 27, 2004 <u>see</u> Government's exhibit 2-2;

142

Government's Reply to Defendant's Objections to Government's Motion for Discovery of Mental Health Evidence and Other Relief, Doc. 216, March 8, 2004, <u>see</u> Government's exhibit 2-3;

Order of United States Magistrate Judge on Motion for Discovery of Mental Health Evidence, Doc. 242, September 2, 2004, <u>see</u> Government's exhibit 2-4;

Government's Reply to Defendant's Objections to Magistrate's Order as to Government's Motion for Discovery of Mental Health Evidence and Other Relief, Doc. 261, October 27, 2004, <u>see</u> Government's exhibit 2-6;

Defendant's Supplemental Objections to Magistrate's Order Regarding Disclosure of Mental Health Witnesses and Examination and Incorporated Memorandum, Doc. 269, December 10, 2004, <u>see</u> Government's exhibit 2-7;

Defendant's Response to Government's Reply to Defendant's Objections to Magistrate's Order Regarding Disclosure of Expert Mental Health Witnesses and Examination, Doc. 270, December 10, 2004, <u>see</u> Government's exhibit 2-8;

Government's Response to Defendant's Supplemental Objections to Magistrate's Order Re Mental Health Expert Discovery, Doc. 271, December 17, 2004, <u>see</u> Government's exhibit 2-9;

Government's Rebuttal To Defendant's Response To The Government's Reply To Defendant's Objections To The Magistrate's Order Concerning Mental Health Discovery, Doc. 273, December 17, 2004, <u>see</u> Government's exhibit 2-10.

The record conclusively shows that counsel understood their duties and pursued a substantial and detailed mental health investigation.  In response to the government's Motion for Discovery, for example, counsel identified at least twelve detailed steps it was undertaking with regard to a mental health investigation.  These steps included obtaining and reviewing records to identify potential areas of expert assistance, contacting/consulting with experts, obtaining

143

funding for experts, and obtaining and analyzing expert reports.  Counsel stated, "All of these events must occur before counsel can make any sort of informed assessment of whether the defendant should use expert testimony at either the guilt or penalty phase of the trial." Defendant's Objections, Doc. 214, pp. 4-5.  Counsel fairly characterized a decision to use expert evidence as "a complex and demanding undertaking."  Doc. 249, p.6.

On January 14, 2006, the parties and the Court entered into the Stipulation. Doc. 306, <u>see</u> paragraphs 10-15; Government's exhibit 2-11.  Consistent with the Court's rulings on Rule 12.2 procedures, the parties stipulated to the timing and content of their mutual disclosures. Included in the Stipulation were fire-wall procedures and the provision that Bolden was to provide the Government notice of his intent to introduce expert evidence related to a mental disease or defect or other mental condition bearing upon capital punishment.  Under the Stipulation, by February 24, 2006, Bolden was to provide fire-wall counsel discovery, including a summary of the anticipated testimony of any experts sufficient to allow the Government to obtain rebuttal experts.  Bolden was also required to provide all medical records, third party documents or reports of interviews or other memoranda, including those related to an interview of examination of Bolden, upon which the expert relied or which would be the subject of the anticipated expert testimony.  The Stipulation included procedures for the attorneys to attempt to agree on procedures for an examination of Bolden by the Government's expert(s).  The Stipulation further provided that fire-wall counsel was to provide Bolden's counsel with the identity, background, reports, and summary of the testimony of any rebuttal mental health expert the Government intended to use.  Consistent with Rule 12.2(c)(2), the Stipulation required that, immediately after a guilty verdict, counsel notify Government fire-wall counsel of their intention to use expert evidence in the penalty phase.  If counsel declined to use such evidence, the Government fire-

wall counsel were to seal the evidence, and not disclose it the Government trial counsel. Doc.

306, 11(j).

Significantly, counsel consulted with Bolden as to the Stipulation – he was fully aware of

and consented to the Stipulation:

> The contents of this stipulation have been discussed with the defendant and
> he consents to the entry into this stipulation by his attorneys.  The parties are
> entering into this stipulation because the parties believe that the terms of this
> stipulation fairly and adequately compromise the positions of the parties in
> connection with the posture of the mental health and other expert evidence
> discovery motions pending before the Court.
> Doc. 306, Stipulation, p. 7.

Thereafter, subject to certain delays in the notice and production requirements, the parties

complied with the firewall procedures set forth in the Stipulation, seeking Court intervention

when necessary.

### d.  Counsel Competently Performed Their Duty to Investigate

The record known to the Government confirms counsel conducted an exhaustive expert

mental health investigation.  On March 22, 2006, counsel provided correspondence to the

Government's firewall counsel that identified Bolden's experts, Robert Smith, Ph.D., and Dr.

Brad Fisher.  Counsel disclosed the general subjects upon which the experts might testify, and

their curriculum vitae. See Government's exhibit 2-12. On March 31, 2006, counsel provided

correspondence to firewall counsel disclosing the report of Dr. Smith, and a letter summarizing

the findings of Dr. Fisher.   See Government's exhibit 2-13. On April 12, 2006, the Government

fire-wall counsel and defense counsel appeared before the Court relative to counsel's failure to

comply with the Stipulation regarding Bolden's production of "all medical records, third party

documents or reports or other memoranda including those related to an interview of examination

145

of the defendant...." See Doc. 306, paragraph 11(h)(v), Doc. 367, paragraphs 3-4, see

Government's exhibit 2-14.  The Court ordered production of all such items by April 14, 2006.

In accord with the Court's order, counsel provided correspondence to fire-wall counsel

disclosing raw testing data from Dr. Smith and notes of Dr. Smith's interviews of the following

persons: Willie Tannan, Antoinette Harris, Rosemary Banner, Gary Stittum, Candice Stittum,

Hassan Shamsid-Dean, Robbie Bolden, and Delores James.  See Government's exhibit 2-15.

Contrary to Bolden's assertions, the record shows that counsel conducted a broad-based

investigation of Bolden's background, and thoroughly investigating his history of diabetes, but

not to the exclusion of other relevant mitigation theories.  Doc. 54, p. 93.  Smith interviewed

Bolden on three separate occasions for a psychological and chemical dependency assessment.

Smith also interviewed ten relatives and friends.  See Doc. 24, Ex. 18, at 2.  Counsel disclosed

voluminous records to Smith, including:  Bolden's high school and college records, his extensive

medical records, chemical dependency treatment records, employment records, correctional

records, criminal history, legal documents, and life event exhibits.  See Doc. 24, Ex. 18 at 2-4.

Smith had a substantial, well-rounded, and complete background of Bolden.

Dr. Smith diagnosed Bolden as suffering from the following conditions at the time of the

offense:

| Axis I | Dysthymic Disorder (DSM IV Code 300.4) |
|---|---|
| | Alcohol Dependence (DSM IV Code 303.90) |
| | Cocaine Dependence (DSM IV Code 304.20) |
| | Inhalant Abuse (DSM IV Code 305.90) |
| Axis II | None |
| Axis III | Medical history of Juvenile-Onset Diabetes |

Dr. Smith further reported,

146

> It is my professional opinion, with a reasonable degree of psychological certainty
> that Mr. Bolden has suffered from two basic psychological disorders.  These
> disorders include Dysthymic Disorder and Substance Related Disorders (ie.,
> Inhalant Abuse, Cocaine Dependence and Alcohol Dependence).  In addition, Mr.
> Bolden has suffered a significant lifelong medical condition, Juvenile-Onset
> Diabetes.  Smith, Psychological Summary, p. 6.

Dr. Smith outlined his reasons for diagnosing Bolden with Dysthymia, a mild form of

depression,  the causes of Dysthymia and the effects of Dysthymia on his mental health, and

noted:

> Each of Mr. Bolden's disorders, Dysthymia, Alcohol Dependence and Cocaine
> Dependence was sufficient to significantly impair his perceptions and behavior.
> In combination, these disorders had a synergistic effect.  Each disorder
> exacerbated the effects of the other.  Mr. Bolden's depressive symptoms were
> magnified by his abuse of alcohol and cocaine, causing him to be desperate,
> impulsive, aggressive, emotionally labile and illogical. As the depression
> increased, his abuse of alcohol and cocaine increased as he attempted to self-
> medicate his symptoms of depression.  Smith, Psychological Summary, p. 9.

Among his findings, Dr. Smith determined that Bolden suffered abandonment issues and

suffered from diabetes that was difficult to manage.  Essentially, this report is highly reflective

of counsel's penalty phase strategy.

Counsel also enlisted the aid of additional experts: In or about April 2005, Robert

Fucetola, Ph.D, a board certified neuropsychologist and Assistant Professor of Neurology at

Washington University School of Medicine, personally evaluated Bolden over two testing

sessions.  Doc. 24, Ex. 16, at 2.  The neurological evaluation included measures of intelligence,

memory, attention, spatial and other cognitive abilities.  Dr. Fucetola found that "Bolden

performed normally on tests of basic attention, spatial ability, primary language skill, academic

ability, and problem-solving (executive control)."  Doc. 24, Ex. 16, at 2.  He also found that

147

Bolden's basic attention, long term memory, and spatial abilities were normal.  Doc. 24, Ex. 16, at 3.  Dr. Fucetola concluded with a reasonable degree of neuropsychological certainty that the cognitive impairments he observed were consistent with Bolden's chronic history of Type 1 diabetes.  He also noted the harmful effects of hypoglycemia and hyperglycemia on the brain can be compounded by seizures and alcohol and drug use.  Doc. 24, Ex. 16, at 3.

Bolden now alleges that counsel also contacted Ruben Gur, Ph.D, a psychologist.  Bolden also alleges counsel consulted John Rabun, M.D., a psychiatrist.  Dr. Gur's MRI results demonstrated that Bolden's brain abnormalities are consistent with organic causes, such as Type I diabetes.  See Doc. 24, Ex. 17 at 5.   The MRI also demonstrated that Bolden's temporal lobe volume was in normal limits.  See Doc. 24, Ex. 17, at 6.  The Government cannot now dispute Bolden's allegation that counsel consulted with additional experts because the Government has not been given access to such evidence.  The Government has requested access to those records but has not yet been granted such access.  Accordingly, the Government may seek leave to supplement this answer, as necessary, if the Government is given access to sealed records.

On April 20, 2006, consistent with Rule 12.2 and the Stipulation, the Government filed its Motion To Conduct A Mental Health Examination of the Defendant and Request For a Hearing ("Government's Motion for Examination").  Counsel objected to the Government's proposed testing procedures.  Docs. 367, 368, 371; see Government's exhibits 2-14, 2-16.  On April 21, 2006, the Government's filed its Surreply to Defendant's Response to Government's Motion to Conduct a Mental Health Examination of the Defendant and Request for a Hearing.  Doc. 375, see Government's exhibit 2-16.

The preceding procedural history, including counsel's delay in producing Dr. Smith's interview notes and counsel's objections to the Government's proposed testing, are indicative of

counsel's sophistication and efforts to obtain every strategic advantage for Bolden.  Docs. 367, 368, 371, 375, see Government's exhibit 2-16, and 383, see Government's exhibit 2-17.  This record reflects that counsel litigated the issues to put Bolden in the best position possible, *i.e.*, not disclose or delay the production of Dr. Smith's interview notes of Bolden, which impeached Smith and damaged Bolden.  Smith's notes contained information contrary to the mitigation case, such as Smith's notation that there was  "no evidence of thought disorder ... above average/average intellect, fair insight and judgment;" and also contained admissions by Bolden to extensive drug distribution.  See infra.  Counsel also attempted to obtain a strategic advantage by seeking to narrow the focus of the Government's proposed testing to limit the impact of potential rebuttal testimony by Dr. Richard Wetzel, Ph.D. ("Dr. Wetzel"), a board certified neuropsychologist.

Counsel's skilled and calculated handling of the above mentioned issues related to expert mental health evidence on the eve of trial is indicative of their level of effectiveness in representing Bolden.  This shows that counsel tried to keep Bolden's options open – counsel was putting themselves in a position to view the Government's guilt phase case, assess the strength of the Government's guilt evidence, and make a decision as to whether to present penalty phase mental health evidence at the close of the guilt phase case.  It is no coincidence that Bolden's skilled counsel carefully avoided making admissions in the guilt case.  Counsel's strategy had the collateral, if not intentional, benefit of concealing their trial strategy and requiring the Government to continue to expend resources to meet an unknown mitigation case, including potential expert mental health evidence.

Government fire-wall counsel continued to pursue the procedures mandated by Rule 12.2 and set forth in the Stipulation not only on the eve of trial, but during trial.  On April 27, 2006,

the Court entered its Order, allowing Dr. Wetzel access to Bolden for the purposes of conducting psychological testing on April 29 and 30, 2006.  Doc. 383, see Government's exhibit 2-18. Bolden's counsel was aware that Dr. Wetzel conducted a psychological examination of Bolden pursuant to the Court's order, and was available to testify in rebuttal.

### e.  Counsel Made A Clear Strategic Choice During Trial

The entirety of the record, including the lengthy procedural history, the factual record developed at the guilt and penalty phase, and counsel's direct statements, establish that counsel made a strategic decision not to use expert mental health evidence.  Following the guilty verdicts on May 11, 2006, counsel notified Government fire-wall counsel that they were not going to present mental health evidence in the penalty phase. Tr. 3319-23.   On Monday, May 15, 2006, counsel confirmed on the record that they were electing not to present mental health evidence in the penalty phase. Tr. 3319.  The Government requested that a record be made.  The Government cited the significance of this strategic decision and asserted that counsel's decision would likely be reviewed in subsequent proceedings.  Tr. 3320-21.  Bolden's experienced capital counsel responded:

> Judge, we don't see any reason to make a record with Mr. Bolden on this.  *I've discussed it with him.*  We gave notice to the government on Friday after *we* discussed it. *And, you know, it was a decision we made after reviewing the evidence and what we had for this part of the hearing and deciding not to use it.*  I don't think there is any reason to make a record ... Tr. 3320 (emphases added).[15]

_____

[15]  The Government further argued, "This was not a casual strategy decision.  You know that there was substantial expenditures and resources devoted to this effort that perhaps you know more about it than I do.  But the decision to basically drop all of it at this stage is a significant penalty phase decision and one which I think that the Court has a right to inquire and make sure it is done knowledgeably and voluntarily by the defendant."  Bolden's skilled capital counsel did not waiver, and insisted that there was no need to make a further inquiry.  Tr. 3321.

The record reflects that counsel and Bolden discussed the totality of the evidence for the penalty hearing and made a strategic decision not to use mental health evidence.  Tr.  3319-21.  See Marcrum, 509 F.3d at 506 (explaining that Supreme Court precedent shows that "decisions about what to do with the results of investigation are strategic decisions that are virtually immune to second-guessing by habeas courts").

An analysis of the existing record currently known to the Government reveals that counsel made a reasonable strategy decision, and plainly refutes Bolden's current allegations.

### f.  Bolden's Current Allegations

### 1.  Brain Damage Allegation

Bolden alleges had counsel should have: (1) presented Dr. Fucetola's findings to the jury; (2) shared Fucetola's results with other experts; (3) contacted Dr. Gur to learn the results of MRI and PET scans that show organic brain damage; and (4) provided the results to Drs. Rabun, Smith, and Fucetola.  Bolden alleges these deficits caused Bolden "reduced impulse control and diminished ability to plan and place behavior in context.  In addition, elevated metabolism ... would lead Mr. Bolden to experience symptoms of hypervigilance and difficulties interpreting what he sees."  Doc. 54, pp. 120-23.

### 2.  Psychiatric Illness and Addiction Allegation

Bolden alleges counsel should have: (1) presented Dr. Smith to testify to the contents of his report, particularly in relation to Dysthymia and to provide psychological relevance to the lay testimony and the causes of Dysthymia; (2) presented Dr. Smith to testify that S.D.'s alcoholism made it more likely Bolden would develop an addiction, and present related testimony about the dysfunctional environment in which Bolden grew up; (3) developed and presented related

testimony of Smith that he diagnosed Bolden with an additional Cognitive Disorder Not

Otherwise Specified, essentially alleging that because Bolden's depression was not addressed in

treatment he was unable to sustain his sobriety.  Notably, Bolden alleges "Further complicating

treatment, Mr. Bolden's brain damage would have caused difficulty with attention,

concentration, comprehension and implementing the lifestyle changes necessary for recovery

from his addiction;"  (4) presented Smith to testify to the "synergistic" effect of these disorders

and that they were exacerbated by brain damage, and this pre-existing brain damage was

magnified by Bolden's depression, drug abuse, and diabetes causing him to be desperate,

impulsive, aggressive, emotionally labile and illogical (Doc. 54, p. 124-25); and (5) presented

the testimony of Dr. Richard Dudley, M.D., a psychiatrist, to testify Bolden was spiraling out of

control because of the stressors in his life.  Bolden makes this last allegation despite his

acknowledgment that counsel had Bolden evaluated by a psychiatrist, John Rabun, M.D.  Doc.

54, pp. 123-26.

### 3.  Fetal Alcohol Spectrum Disorder Allegation

Bolden claims counsel was ineffective for failing to investigate, develop and present

methal health evidence that Bolden suffered from Fetal Alcohol Spectrum Disorder ("FASD").

Doc. 54, pp. 126-128.

### g.  Counsel's Strategic Decisions Do Not Constitute Deficient Performance

Each of Bolden's preceding allegations fail because counsel investigated, developed, and

litigated expert mental health evidence, and made a reasonable strategic decision not to present

this evidence to the jury.  Counsel, faced with an overwhelming guilt phase case, a powerful

aggravation case, and a client with a significant history of being functional, attempted to offer

explanations and background, but not excuses.  This allowed counsel to maintain credibility with the jury to credibly deliver the mitigation case, and avoid pitfalls associated with mental health evidence.  Counsel made reasonable efforts to investigate Bolden's mental status, and elected not to pursue that line of defense with expert evidence.  See Ringo v. Roper, 472 F.3d 1001, 1003-1006.  Nor was Counsel was not obligated to present mental health evidence to bolster its lay witnesses.   See Landrum v. Mitchell, 625 F.3d at 928-33 (rejecting claim that psychologist could have given context to lay testimony regarding Landrum's depression and substance abuse.).  Counsel's strategy was reasonable.  The use of lay testimony allowed the defense to present their primary theme of acceptance of responsibility, and emphasize Bolden's challenges and downward spiral without offering excuses or engaging in a "battle of the experts."  Expert testimony would have at best bolstered the lay testimony, but likely undercut counsel's emphasis on acceptance of responsibility.

Counsel's mitigation case emphasized Bolden's hardships as a youth, his battle with severe diabetes, his qualities as a father, his downward spiral, conversion, remorse and accountability, and that Bolden supposedly did not plan to shoot Nathan Ley.  See e.g., Tr. 3756 ("His mother abandoned him ... his father rejects him."); Tr. 3956-59, 3967 (Emphasizing chronic effects of severe diabetes, and downward spiral); Tr. 3955 ("Robert Bolden ... lived a pretty normal life ... You know, he went to school, got a high school diploma; tried college. Sandra Stittum said that he was always employed; took care of his kids."); Tr. 3960 ("The plan was no one was to get hurt.  It's unrefuted").

Bolden was highly functioning, and the trial counsel's strategy was not to make futile attempts to make excuses for his behavior.  Tr. at 3954 ("This isn't excuse evidence, and I made clear to you from the very get-go; from the very time and the first time I spoke to you this isn't

153

about excuses.  It is not about excuses.").  Counsel emphasized accountability and remorse.  Tr. 3972 (Counsel, referring to the offer to plead guilty, stated  "Because he realized the pain he's caused.  He realized his responsibility.  He realizes, 'I have blood on my hands,' he said, 'I am crying every night.  I can't sleep.'  Is this the words of a cold calculated killer?").

The record reflected that Bolden was functional, and there was significant evidence to refute permanent brain damage that affected Bolden's ability to function in any significant way that would provide meaningful mitigation.  Evidence of the crime, Bolden's exceptional performance in Bible studies, his work history, and academic history demonstrate his functional intelligence.

The record of the crime itself also reflected Bolden's street smart approach to robbing the bank and concealing his involvement thereafter.  Bolden persuaded Price to "scope" the bank, and later developed a specific plan to disarm the guard on the parking lot side at gunpoint, give the guard's gun to Price, walk him back into the bank, rob the bank, and flee.  Tr. 2202-08, 2225-26.  Bolden twice rejected entering the bank through the front entrance and avoiding contact with the guard.  Bolden argued that the guard would give up his gun to save his life.  Tr. 2210-11, 2227-28, 2380.

After Bolden shot Nathan Ley, he was angry because Price and Edwards did not help him with Ley and because they had not stayed to complete the bank robbery.  Tr. 2255.  He described his confrontation with the guard and explained that he initially shot the guard because "it was either shoot the guard or spend the rest of his life in jail."  Tr. 2256-57.  Bolden told Price he had wiped the murder weapon of fingerprints, put it in a bag, and placed the bag under some guttering beside his house.  Tr. 2259-60.  Bolden told Price that he would "fuck [them] up" if they talked.  Tr. 2261.  Bolden also told Edwards, who had distinctive braids, to wash his hair

out to change his appearance.  Tr. 2262.  After being arrested and advised of and waiving his rights, Bolden falsely stated he had not driven his car that day, had only left the house to walk to a store, "didn't do a motherfucking thing," and asked officers who was snitching on him.  He also declined to take a gunshot residue test, stating that he had recently fired a .38 caliber weapon in his garage, but did submit a DNA sample.  Tr. 2448-55, 2476-82, 2630-34.

The arguments Bolden currently asserts as to the significance of his alleged brain damage are also refuted by his exceptional Bible school achievements, and would have undercut important pillars of his mitigation case.  Tr. 3836-40.  Bolden's proposed evidence, and his allegation that his behavior was impaired, either as alleged in Dr. Smith's original report, or as set forth in Bolden's current allegations of brain damage, is inconsistent not only with his academic performance in Bible studies, but also with the theme of acceptance of responsibility and his sincere acknowledgment of guilt.  Tr. 3858-81, 3972.  If counsel chose to present expert mental health evidence, they would have been put in the position of presenting inconsistent evidence, which would have destroyed their credibility with the jury.  Moreover, Bolden's employment history demonstrates his functional ability.  Tr. 3769-69, 3785, 3954, 3972.  Bolden graduated from high school, attended some community college, and was described by his own witness as very intelligent.  Tr. 3768.

It is reasonable to infer Bolden's skilled counsel were also aware of the potential downsides of presenting mental health evidence.  Counsel for the Government would be allowed to cross examine Bolden's expert(s) and present rebuttal testimony.  Counsel provided Dr. Smith's notes to the Government fire-wall as mandated by the Court's order.  Dr. Smith's notes of his interviews with Bolden contained damaging materials omitted from his report.  Smith notes described Bolden as having "no evidence of thought disorder ... above average/average

155

intellect, fair insight and judgment." This is inconsistent with significant impairment. Smith also reported that Bolden "stopped using drugs for 4 yrs, but he continued to abuse hard liquor & he sold drugs. 1996 – Mr. B smoking a quarter ounce every night – he had unlimited supply because he was selling it." Smith, Notes, pp. 6, 13. <u>See</u> Government's exhibit 3-1.

Smith also received and relied on a police report for events pertaining to assault with a deadly weapon for which Bolden was arrested on June 20, 1997. See Exhibit 18, Psychological Summary, p. 5. <u>See</u> Government's exhibit 1-2. Part of counsel's strategy was to be able to argue that Bolden had no violence in his history. <u>See</u> Tr. 3959. If Bolden's arrest for shooting a man in the head with a shotgun were to be raised during mental health evidence, part of counsel's strategy would have been eviscerated.

Bolden's claims regarding failure to investigate and present evidence of FASD are without merit. Counsel made a reasonable decision not to present mental health evidence and pursued the trial strategy outlined herein. Counsel's decision not to pursue FASD falls within the same analytical rubric as Bolden's other mental health claims. Moreover, Bolden's speculative claim of FASD would not have altered the outcome in view of the entire record. <u>See</u> <u>United States v. Purkey</u>, 428 F.3d 738, 758 (8th Cir. 2008)(erroneous exclusion of FASD evidence was harmless error when looking at the entirety of the record); <u>Francis v. Dugger</u>, 980 F.2d 696, 702-04 (11th Cir. 1990).

Counsel pursued the mitigation case outlined herein, and with good reason. The same reasons upon which experienced counsel would choose such a strategy provide the basis to conclude Bolden's proffered evidence is of no value in a predictive weighing analysis.

> **h. Bolden's Allegations Regarding a Diabetes Expert, Future Dangerous Expert, and Environmental Toxins Expert**

Bolden's remaining allegations are equally without merit.  Bolden's claims counsel was ineffective for failing to present a diabetes expert.  Doc. 54, p. 128.  Bolden's allegation is non-specific, and may be flatly dismissed because it is wholly speculative, conclusory, and unsupported by specifics.  See Voytik, 778 F.2d at 1308. Bolden's argument is without merit because counsel was well versed Bolden's diabetes.  Bolden concedes counsel consulted with several diabetes experts before trial.  Doc. 54, p. 129.  Counsel made a strategic decision not to present diabetes related expert testimony.  Further, the proposed testimony would have been cumulative, and of no value in a predictive weighing analysis.  See Infra, Part XIV.

Bolden concedes counsel retained the services of Dr. Brad Fisher and that Dr. Fisher prepared a favorable report detailing Bolden's positive adjustment to confinement, but alleges counsel was ineffective for failing to present Dr. Fisher's testimony.  Doc. 54, p. 129.  Counsel's professional judgment should be afforded a strong presumption of competence.  See Marcrum, 509 F.3d at 506.  The proffered evidence is cumulative because counsel, through conversion witnesses, did present evidence of Bolden's adjustment to confinement.  Tr. 3815-16, 3844, 3874-75.  Moreover, Dr. Fisher's proffered testimony, would have directly injected the issue of future dangerousness, which was not asserted by the Government.  This would have made relevant Bolden's prior acts of violence, including his prior 1997 arrest for assault with a deadly weapon, and undercut his overall trial strategy.

Bolden's claim that counsel was ineffective for failing to investigate and present an environmental toxins expert may be dismissed because it is wholly speculative, conclusory, and unsupported by specifics.  See Voytik, 778 F.2d at 1308.  Doc. 54, p. 130.

### 3.  Counsel Competently Challenged the Aggravating Circumstances

Bolden asserts counsel was ineffective for failing to challenge the aggravating circumstance that Bolden had been convicted of drug distribution offenses, and for failing to challenge aspects of the victim impact evidence.  Doc. 54, p. 130-33.  Bolden's claims are plainly without merit.  Bolden correctly concedes that counsel "expended significant effort fighting this (drug distribution offenses) aggravating circumstance on legal grounds."  Bolden's claims may be dismissed outright because they are wholly speculative, conclusory, unsupported by specifics, and refuted by the record.  See Voytik, 778 F.2d at 1308.  The evidence was that Bolden was not at the bottom of the drug distribution chain – he received $1,100.00 in buy money from McDowell and was in possession of an additional $3,665.00.  This evidence supported the conclusion Bolden was McDowell's supplier.  Tr. 3413-16.  The jury heard evidence Bolden received drug treatment in relation to one of his convictions.  Tr. 3386, 3392.  While counsel did argue to the jury that Bolden not receive significant punishment for the drug distribution offenses, counsel could not credibly contend the offenses did not involve distribution of narcotics, because Bolden made judicial admissions in each case, and the surrounding facts and circumstances established that the offenses involved drug distribution.  Tr. 3372-95, 3398-3417, 3964-65, 3943; see also Government's exhibit 1-3 (Sentencing hearing transcript, p.9).  Counsel was not ineffective, but adopted a sound trial strategy.

Bolden alleges the Government violated the parameters of Payne v. Tennessee, 501 U.S. 808 (1991), during the penalty phase.  Bolden also alleges counsel failed to investigate and develop evidence to impeach Nathan Ley's family members and that counsel should have moved in limine to preclude the Government's witnesses from testifying to their employment backgrounds.  Doc. 54, pp. 131-32.  Bolden's claim is plainly without merit, and unsupported by fact or law.  See Infra, Parts X, XIII.  Evidence was presented in the penalty phase that Nathan

Ley had a law enforcement background, and was going to continue to pursue a law enforcement career, which was further evidenced by his pending application with the O'Fallon, Missouri, Police Department.  Tr. 3490-96.  As such, this was relevant to his background and characteristics, including his desire to help other people.  The employment backgrounds of Nathan Ley's father and uncle were relevant, because their experience contributed to Nathan's desire to be a law enforcement officer, and allowed them to give insights into Nathan's reflections on his desire to be a law enforcement officer and the loss to the community.  Tr. 3642-60, 3556-59  Counsel has no duty to make meritless objections.  Moreover, Bolden's proffered speculative evidence is of no value in a predictive weighing analysis.

### D.  CONCLUSION

For the foregoing reasons, each of Bolden's claims raised in Part IX should be dismissed without an evidentiary hearing.

### X.    THERE WAS NO ERROR IN THE GOVERNMENT'S USE OF VICTIM IMPACT EVIDENCE DURING THE SENTENCING PHASE.

Bolden contends that the prosecutors violated his constitutional rights by presenting excessive victim-impact evidence during the sentencing phase.  Pet. 133-140.  This claim is procedurally barred and has no merit.

The vast majority of Bolden's argument in this section is procedurally barred.  Bolden's counsel vigorously challenged the prosecution's use of victim-impact evidence on direct appeal, raising the same arguments that Bolden raises in section X.D of his petition.  Pet. 136-39; Def. App. Br. 119-35.  The Eighth Circuit considered these very arguments in detail on direct appeal, and rejected them.  United States v. Bolden, 545 F.3d 609, 625-27 (8th Cir. 2008).  The Court of Appeals concluded that the victim-impact testimony from Nathan Ley's friends and co-workers

was "highly relevant" and was "not so cumulative as to confuse the issues or create unfair prejudice." Id. at 626.  The Court held that the audiotape of the victim's girlfriend calling 911, and the photographs from the memorial service, were also relevant and admissible, and "not so unduly prejudicial as to render the trial fundamentally unfair."  Id.  Likewise, the Court concluded that the victim-impact testimony of a co-worker who rushed to assist the victim was "clearly admissible as the most probative evidence of the effect of Bolden's crime on his victim."  Id.  In short, the Court of Appeals conducted a detailed review of the victim-impact testimony, and concluded that it was all relevant, admissible, and not unduly prejudicial.

In his petition, Bolden adds a handful of new contentions of prosecutorial misconduct. These are all procedurally defaulted, because they could have been raised on direct appeal but were not.  See Thompson, 7 F.3d at 1378-79.  In any event, they are plainly meritless.  First, Bolden alleges that the prosecution "buried defense counsel in nearly 300 pages of discovery related to victim impact" in fulfilling its Jencks obligations.  Pet. 133-34.  The catch-22 inherent in this claim is immediately obvious.  If the prosecution had not made full and complete Jencks disclosures, Bolden would be complaining of discovery violations.  Bolden does not even allege that his trial counsel were prejudiced by not having enough time to cull through the 300 pages of discovery.  This claim should be dismissed out of hand.

Bolden next alleges that the prosecution duped the District Court into delaying ruling on the defense motion in limine to keep out victim-impact evidence by falsely representing to the Court that the victim-impact evidence would remain within the strictures of Payne.  Pet. 134. Because the Eighth Circuit has determined that the victim-impact evidence did, in fact, comply with Payne, the prosecution's representation was correct, and this claim has no merit.

Bolden contends that the prosecutor failed to "instruct his witnesses on proper courtroom demeanor and checked displays of emotion," and "participated in, and encouraged graphic displays of emotion."  Pet. 134.  Like the other claims of prosecutorial misconduct, this claim is procedurally barred, because Bolden's counsel had every opportunity to raise it on appeal but did not.  In any event, Bolden cites no legal support for his implausible proposition that the family and friends of a murder victim must suppress all visible shows of emotion when providing emotionally wrenching testimony about the victim's death.  And Bolden's factual claim that there was an inappropriate atmosphere in the courtroom during the victim-impact presentation is contrary to the record.  The District Court observed the entire presentation and described the victim-impact evidence as "consistent," "reserved," and "restrained."  Tr. 3597-3601; see also Bolden, 545 F.3d at 626 n.13 ("The [district] court observed near the end of the victim impact testimony that the witnesses had been 'restrained' and had done their best to control their emotions.").  Allegations that are directly contradicted by the record do not warrant an evidentiary hearing.  Voytik, 778 F.2d at 1308.

In a related contention, Bolden argues that his trial counsel were ineffective in failing to make a better record on how putatively inflammatory the courtroom atmosphere had been during victim-impact testimony.  Pet. 135-36.  This claim has no factual basis and is contradicted by the record.  Specifically, after observing the bulk of the victim-impact testimony, the District Court made the following observations: "[Q]uite honestly, the testimony has been – I am not sure what word to use – but rather 'reserved' in my view.  Clearly, there are witnesses who have shown a great deal of emotion, but that's to be expected under the circumstances."  Tr. 3597.  Bolden's trial counsel promptly responded to this statement, putting his concerns about the courtroom atmosphere on the record in explicit detail:

161

> Mr. Curran:  Just when you said it's 'reserved.'  I may agree in the sense that it seems the witnesses are making the best attempt to testify in a nonemotional fashion.  But I think if you've noticed, that's not been successful with some of the witnesses.  And also the atmosphere in the courtroom, there are many people.  And there is open sobbing.  We can hear from parts of the courtroom there's been reactions to the witnesses' testimony.  And I just want to make sure that was in there, because I was worried when you said 'reserved,' in my mind, it doesn't accurately reflect the tenor of a lot of the testimony....

Tr. 3599-3600.  In other words, Bolden's counsel sought to make exactly the sort of record that Bolden now faults his counsel for not making.  The problem for Bolden's claims is that the inflammatory, circus-like atmosphere described by Bolden's petition simply did not exist.  The District Court's immediately following comments made this clear: "[T]here has been some sobbing, tears, sniffling.  You know, I hear all of that, and I see it.  So maybe 'reserved' is not the right word.  Perhaps 'restrained' or I'm not sure exactly.  But I agree with you that some of the witnesses have done their best to hold back."  Tr. 3600-01.  In short, the record reveals – both through the District Court's observations and Bolden's counsel's own admissions – that the atmosphere was understandably emotionally charged, but not inappropriately so.  Bolden's claim of ineffective assistance on this point is therefore contrary to the record and should be dismissed without a hearing.  Voytik, 778 F.2d at 1308.

Bolden contends that "these errors were compounded by the prosecutorial overreaching and conflict at the authorization phase, demonstrated in Claim II."  Pet. 135.  For the reasons stated above, none of the claims in Bolden's Part II has any merit.  See supra, Part II.

Bolden contends that the Eighth Circuit misapplied Payne on appeal.  Pet. 139.  The proper forum for this claim is a petition for rehearing to the Eighth Circuit, not a §2255 petition.

Finally, Bolden contends that the prosecutor engaged in a closing argument that was "so broad and standardless that it would apply in every homicide case."  Pet. 139.  He argues that "the prosecution's argument was utterly standardless and overbroad and served no legitimate

162

penological function."  Pet. 140.  This claim is procedurally barred and/or defaulted, since

Bolden's counsel raised a battery of challenges to the prosecution's penalty-phase closing

argument on direct appeal, all of which were rejected or deemed harmless by the Court of

Appeals.  Bolden, 545 F.3d at 630; Def. App. Br. 148-54.  In any event, the claim is incoherent,

because it confuses the constitutional standards that apply to the statutory eligibility factors with

the standards for proper prosecutorial argument.  The case on which Bolden relies, Godfrey v.

Georgia, 446 U.S. 420 (1980), holds that a statutory "capital sentencing scheme" must rationally

narrow the class of death-eligible offenders – not that a prosecutor's closing argument must

rationally narrow the class of death-eligible offenders.  Id. at 428.  It is the death penalty statute

which must "define the crimes for which death may be the sentence in a way that obviates

standardless sentencing discretion."  Id.  Bolden's attempt to transplant this doctrine to a critique

of the prosecutor's closing arguments leads to absurd conclusions.  Bolden contends that the

prosecutor's closing argument was improper because it "would apply to every murder – no

matter how long any defendant lives in jail, the victim will 'lie in a cold grave'."  Pet. 140.  But

every closing argument in a capital murder case will have some portions that would apply also in

other capital murder cases.  Bolden's suggestion that the prosecutor's closing argument must be

so individualized and uniquely applicable to the defendant that no argument would apply in any

other capital murder case is an absurd conclusion.

## XI.    BOLDEN'S CHALLENGE TO THE PECUNIARY GAIN AGGRAVATOR IS PROCEDURALLY BARRED AND FACIALLY MERITLESS.

Bolden contends that his counsel were ineffective in failing to properly litigate his

challenge to the pecuniary gain aggravating circumstance.  Pet. 140-144.  This contention has no

merit.  Bolden vigorously contested the application of the pecuniary gain aggravating factor, 18

163

U.S.C. § 3592(c)(8), on direct appeal.  See Bolden, 545 F.3d at 615-16; Def. App. Br. 24-37.

Thus, to the extent that he purports to bring any substantive challenge to the application of that

factor in his section 2255 petition, his claim is procedurally barred.  To the extent that he raises

new substantive grounds not raised on direct appeal, his claims are procedurally defaulted.

Bolden claims that his counsel were ineffective in the district court and on direct appeal

for failing adequately to advance three challenges to the application of the pecuniary gain

aggravating factor: (1) he claims that "the plain language of the pecuniary gain statute

establishes that it was intended to apply solely to 'hitmen' in contract killings, not to all

homicides in which there was a financial motive," Pet. 141; (2) "the pecuniary gain aggravating

circumstance violates due process and the Eighth Amendment on vagueness grounds," because it

is "so vague that ordinary people cannot understand the precise conduct it seeks to cover," Pet.

141-42; and (3) the pecuniary gain aggravating factor "fails to narrow the class of death-eligible

defendants" because it is "duplicative of [an] essential element of the underlying homicide

offense," namely that "the homicide occurred during the course of an attempted robbery," Pet.

143.  These have no merit.

**1. *The Pecuniary Gain Aggravator Is Not Limited To Murder-For-Hire*.**  First,

Bolden's contention that the pecuniary gain aggravating factor applies only to "hitman" or

murder-for-hire scenarios, when the murderer expects pecuniary gain as consideration for the

murder, was raised on direct appeal, and the Eighth Circuit squarely rejected it:

> At least five circuits other circuits agree that § 3592(c)(8) applies, not only to murder-for-
> hire, but also when the murder itself, and not just an underlying offense such as robbery,
> was committed with the expectation of pecuniary gain.  As the Eleventh Circuit
> explained, "The 'consideration' and 'expectation' clauses are two separate ways by
> which the pecuniary gain factor may be satisfied, and they both must have meaning."
> Though we have never addressed the issue, our prior decisions are consistent with these
> cases.  There was no plain error.

Bolden, 545 F.3d at 615 (citations omitted), quoting United States v. Brown, 441 F.3d 1330,

1370 (11th Cir. 2006); accord United States v. Mitchell, 502 F.3d 931, 974-75 (9th Cir. 2007);

United States v. Barnette, 390 F.3d 775, 784-85 (4th Cir. 2004), vacated on other grounds, 546

U.S. 803 (2005); United States v. Bernard, 299 F.3d 467, 483-84 (5th Cir. 2002); United States

v. Chanthadara, 230 F.3d 1237, 1263-64 (10th Cir. 2000).  Bolden now contends that his trial

counsel were ineffective in failing to raise this issue before the District Court, causing him to

face plain-error review of this issue on appeal, Pet. 141.  Given the wide array of authority

against this claim, however, there was no reasonable prospect of the issue being decided

differently by the Eighth Circuit under any standard of review, and the Eighth Circuit's decision

on this issue, quoted above, provides the definitive interpretation of § 3592(c)(8).

    **2.** ***The Pecuniary Gain Aggravator Is Not Void For Vagueness.***  Second, Bolden claims

that his counsel were ineffective in failing to argue that § 3592(c)(8) is void for vagueness in the

district court and on direct appeal.  Pet. 141-43.  This claim has no merit.  In order to establish

that § 3592(c)(8) is void for vagueness, defendant's trial and appellate counsel would have had

to show that the statutory language is so vague that "men of common intelligence must

necessarily guess at its meaning and differ as to its application," such that "one could not

reasonably understand that his contemplated conduct is proscribed."  United States v. Mabie, 663

F.3d 322, 333 (8th Cir. 2011) (citations omitted).  Scientific precision in defining aggravating

factors is not required; "[s]o long as the sentencer is capable of understanding the core meaning

of the challenged factors, the vagueness challenge will fail."  Moore v. Kinney, 320 F.3d 767,

773 (8th Cir. 2003).  Bolden's counsel had no reasonable prospect of making any such showing,

and certainly "men of reasonable intelligence" would easily have understood that Bolden's

conduct – murdering a bank guard in the course of a botched bank robbery – was against the law.

Both the Supreme Court and the Eighth Circuit have rejected vagueness challenges to aggravating factors with phrasing far less precise than that of § 3592(c)(8).  See, e.g., Lewis v. Jeffers, 497 U.S. 764, 777-78 (1990) (upholding the Arizona death penalty statute's use of "especially heinous, cruel, or depraved" as an aggravating factor); Moore v. Kinney, 320 F.3d 767, 772-74 (8th Cir. 2003) (rejecting a challenge to the Nebraska death penalty statute's use of "exceptional depravity," defined as involving "cold, calculated planning," as an aggravating factor).  Bolden's only argument in support of his vagueness claim is his contention that § 3592(c)(8) is "subject to multiple interpretations" – namely, (1) his spurious interpretation, which was flatly rejected by the Eighth Circuit, and (2) the correct interpretation adopted by the Eighth Circuit, as quoted above.  Pet. 142.  In other words, Bolden contends that the statutory factor is unconstitutionally vague solely because he has thought of a rival interpretation, which the Eighth Circuit and four other circuits have already rejected.  See Bolden, 545 F.3d at 615.

**3.** ***The Aggravator Narrows The Class Of Death-Eligible Defendants.***  Third, Bolden claims that the pecuniary gain aggravator does not rationally narrow the class of death-eligible defendants, because "Counts II and III of the indictment both require the government to prove the homicide occurred during the course of an attempted robbery," and "the pecuniary gain aggravating circumstance is duplicative of this essential element of the underlying homicide offense."  Pet. 143.  As a substantive claim, this is procedurally defaulted.  Moreover, Bolden's counsel were not ineffective in failing to raise it, because it is meritless for at least three reasons.  First, as the Supreme Court and the Eighth Circuit have made clear, the State may narrow the class of death-eligible murders either by selecting certain substantive crimes for death-eligibility (such as murders in the course of a robbery), or by requiring aggravating factors to shown at sentencing (such as pecuniary gain).  Thus, with specific reference to robbery-murders, the

"narrowing" required by <u>Zant</u> is equally satisfied by including robbery as an element of the substantive offense, and by including "pecuniary gain" as an aggravating factor at sentencing, as the Eighth Circuit has explicitly and repeatedly held.  <u>See</u> <u>Perry v. Lockhart</u>, 871 F.2d 1384, 1392-94 (8th Cir. 1989); <u>Williams v. Norris</u>, 576 F.3d 850, 870 (8th Cir. 2009) (rejecting the claim that Arkansas's pecuniary gain aggravator "unconstitutionally fails to narrow the class of death-eligible offenders because it merely duplicates an element of the underlying crime of felony murder during the course of a robbery"); <u>Wainwright v. Lockhart</u>, 80 F.3d 1226, 1232 (8th Cir. 1996).  The fact that Bolden was charged with murder in the course of armed bank robbery provided sufficient narrowing to satisfy <u>Zant</u>; the additional narrowing provided by the pecuniary gain aggravator went beyond the requirements of <u>Zant</u>.

Second, even if further narrowing were required, the federal pecuniary gain aggravator does, in fact, narrow the class of defendants from those guilty of murder during a robbery.  As the Eighth Circuit specifically noted in <u>Bolden</u>, "the pecuniary gain factor applies to a killing during the course of a bank robbery only 'where pecuniary gain is expected to follow as a direct result of the murder'," not when the murder was committed for some other purpose, such as killing a witness or eliminating an obstacle to escape.  <u>Bolden</u>, 545 F.3d at 615-16.  Thus, even though further narrowing is not constitutionally required by <u>Zant</u>, § 3592(c)(8) does narrow the class of death-eligible murders committed during bank robberies, by narrowing them to only those defendants who perpetrate the <u>killing</u> (not just the underlying robbery) in direct expectation of pecuniary gain.  <u>Id.</u>  This additional narrowing was not an element of the substantive crimes charged in Counts Two and Three of the indictment, under 18 U.S.C. §§ 924(c) and 2113.

Third, even if there had been any impropriety in the inclusion of the pecuniary gain aggravator, the jury in Bolden's case also found another aggravator beyond a reasonable doubt, i.e. Bolden's prior drug crimes.  Therefore, any error in the use of the pecuniary gain aggravator would have been harmless beyond a reasonable doubt in any event.  United States v. Paul, 217 F.3d 989, 1001 (8th Cir. 2000) ("[T]he jury found two other aggravators beyond a reasonable doubt, either of which would have made Paul death eligible.  Thus, any error in the use of 'pecuniary gain' as a statutory aggravator was harmless.").

## XII.   BOLDEN'S CLAIMS THAT THE PENALTY-PHASE JURY INSTRUCTIONS VIOLATED HIS CONSTITUTIONAL RIGHTS HAVE NO MERIT.

In Claim XII, Bolden argues that the jury instructions in the penalty phase of his trial suffered from four putative deficiencies: (1) they failed to include a "presumption of life" instruction, modeled after the "presumption of innocence" instruction included in the guilt phase, Pet. 145; (2) they skewed the jury's consideration toward the death penalty by repeatedly identifying the possible penalties as "death or life imprisonment," rather than "life imprisonment or death," Pet. 145-46; (3) they instructed the jury that it must find both that the defendant's mitigating factors were true, and that they were mitigating, prior to considering them in the sentencing determination, Pet. 149; and (4) they failed to instruct the jury not to consider evidence of the defendant's prior drug crimes, offered as non-statutory aggravating factors, in determining whether the Government had proved the statutory drug-crime aggravating factor, Pet. 150.  None of these contentions has any merit.

### A.   All Substantive Claims Are Procedurally Defaulted.

In his direct appeal, Bolden raised multiple challenges to the penalty-phase instructions, which were rejected by the Eighth Circuit.  Bolden, 545 F.3d at 629.  He did not, however, raise

168

the particular claims raised in his § 2255 petition.  Because these claims could have been raised

on direct appeal, but were not, they are procedurally defaulted.  Bolden's only attempt to show

"cause and prejudice" for failure to raise these claims is his argument that his previous trial and

appellate counsel were ineffective for failing to raise them, which has no merit.

        **B.**      **Bolden Was Not Entitled To a "Presumption of Life" Instruction.**

As to the "presumption of life" instruction, Bolden contends that his counsel's "failure to

request appropriate instructions and counsel's failure to raise and litigate these constitutional

errors at trial, during post-trial proceedings and on appeal constituted prejudicially deficient

performance."  Pet. 150.  This claim has no merit, because Bolden was not entitled to a

"presumption of life" instruction, and the instructions given provided the functional equivalent

of such an instruction in any event.

Multiple courts have rejected the premise of Bolden's claim, namely that a capital

defendant is entitled to an explicit "presumption of life" instruction during the penalty phase.

For example, in rejecting a capital habeas petitioner's claim that the state court erred by refusing

"petitioner's request for a separate 'presumption of life' instruction," the Tenth Circuit observed

that "petitioner has failed to cite any judicial authority, and our independent research revealed

none, that the Constitution mandates a 'presumption of life' instruction."  Smallwood v. Gibson,

191 F.3d 1257, 1271 (10th Cir. 1999).  District courts considering identical claims have routinely

rejected them.  See, e.g., Davie v. Mitchell, 291 F. Supp. 2d 573, 622 (N.D. Ohio 2003), aff'd,

547 F.3d 297 (6th Cir. 2008) ("Petitioner's conflation of the right to a charge on the presumption

of innocence with his presumption of life charge, and his reliance on Taylor v. Kentucky, 436

U.S. 478 (1978),] in making this claim, are misplaced."); Slaughter v. Parker, 187 F. Supp. 2d

755, 815 (W.D. Ky. 2001), aff'd in part, rev'd in part on other grounds, 450 F.3d 224 (6th Cir.

2006) ("As one can see, the facts and the holding of Taylor simply do not support the proposition that a defendant in a capital trial is entitled to a presumption-of-life-imprisonment instruction during the penalty phase of trial."); Turner v. Williams, 812 F. Supp. 1400, 1436 (E.D. Va. 1993), aff'd, 35 F.3d 872 (4th Cir. 1994) (rejecting the defendant's claim that he was entitled to a "presumption of life" instruction on the ground that the instruction provided "says essentially the same thing – that the Commonwealth bore the burden of proving beyond a reasonable doubt that the death penalty was proper"); cf. Burch v. Kavanaugh, 2000 WL 34458950 (D. Md. 2000) (holding that the state court's rejection of a presumption-of-life instruction was not contrary too, nor an unreasonable application of, federal law, and refusing to overturn the state court's holding that "there is no presumption in favor of life imprisonment" at capital sentencing).

Like the defendants in the cited cases, Bolden contends that the right to a "presumption of life" instruction at the penalty phase arises from the well-established right to a "presumption of innocence" instruction at the guilt phase.  Doc. Pet. 145.  This same argument was considered and rejected in both Slaughter and Davie.  See supra.  Moreover, the Supreme Court has made clear that, once the eligibility factors are proved beyond a reasonable doubt, the Constitution does not require the defendant to be given a presumption of life in weighing decision, and the State may constitutionally require the defendant to overcome a presumption in favor of the death penalty in the weighing decision.  See Kansas v. Marsh, 548 U.S. 163, 170-71 (2006) (upholding Kansas's sentencing scheme in which the jury was permitted to impose the death penalty upon a weighing determination that the aggravating and mitigating factors were in equipoise, and rejecting the contention that this scheme created "an unconstitutional presumption in favor of death"); Walton v. Arizona, 497 U.S. 639, 650 (1990) (holding that it does not violate the Constitution to require the capital defendant to prove that the proffered mitigating factors

outweigh the aggravating factors).  Bolden also contends that the "presumption of life" instruction is mandated by <u>Ring v. Arizona</u>, 536 U.S. 584, 609 (2002), which held that the Government must charge and prove the aggravating eligibility factors beyond a reasonable doubt.  Pet. 146.  This contention is plainly meritless, however, because <u>Ring</u> is satisfied by the instruction that the jury must find the statutory aggravating factors that make the defendant death-eligible beyond a reasonable doubt – an instruction that was given repeatedly in this case, Tr. 4001, 4004, 4006 – not by an additional instruction that the defendant is entitled to a "presumption of life."  Once the defendant is established to be death-eligible by the proof beyond a reasonable doubt of the statutory aggravating factors, that defendant is no longer constitutionally entitled to any "presumption of life" in the weighing decision – as <u>Marsh</u> and <u>Walton</u> unambiguously hold.

Moreover, to the extent that Bolden contends that his penalty-phase jury was not instructed to hold the Government to its burden of proof as both statutory and non-statutory aggravating factors, his contention is plainly without merit.  In <u>Turner v. Williams</u>, the district court held that the trial court had provided the functional equivalent of a "presumption of life" instruction by clearly and unambiguously instructing the jury that the Government must prove "each and every fact required for imposition of the death penalty ... by evidence so strong, so clear, and so conclusive that there is left in the minds of the jury no reasonable doubt."  812 F. Supp. at 1436.  The court held that this instruction was "the same thing as saying a life sentence is presumed."  <u>Id.</u>  Likewise, in this case, the jury was provided with repeated, abundantly clear instructions that the Government must establish each fact required for imposition of the death penalty – both eligibility and weighing aggravators – beyond a reasonable doubt.  <u>See</u> Tr. 3998; Tr. 4000; Tr. 4001; Tr. 4002; Tr. 4004; Tr. 4006; Tr. 4008.  As to the weighing process, the

Court specifically instructed the jury that, in order to justify the sentence of death, they must determine that the aggravating factors "sufficiently outweigh" any mitigating factors found to exist.  Tr. 4016.  As in <u>Turner</u>, this Court's clear and unambiguous instructions on the Government's burden of proof during the penalty phase, combined with its clear instructions on the weighing process, were "essentially the same thing" as stating that the defendant was entitled to a presumption of life imprisonment.  812 F. Supp. at 1436.

### C.  <u>**"Death or Life Imprisonment" Is The Same As "Life Imprisonment or Death."**</u>

Bolden also contends that "the court's description of the sentencing options as 'death or life imprisonment,' erected a presumption of death that pervaded the entire penalty phase and impermissibly shifted the parties' burden of persuasion."  Pet. 145.  This claim is meritless. There is no functional difference between "death or life imprisonment" and "life imprisonment or death."  In fact, had the district court stated "life imprisonment or death," Bolden would undoubtedly be complaining herein that the district court "gave primacy to the sentence of death over the life-sentencing option," Pet. 146, by giving it undue emphasis in placing it <u>last</u>, in the place of finality.  As discussed above, the penalty phase instructions provided a careful, detailed, and correct description of the jury's role in assessing the penalty options.  Bolden's quibble on the order of this phrase should not be taken seriously.

### D.  <u>**The Instructions On Consideration of Mitigating Evidence Were Correct**</u>.

Next, Bolden contends that the district court erred by instructing the jury "that it had to both find a mitigating fact as true and also find that the fact is mitigating prior to considering the mitigation in reaching its sentencing determination."  Pet. 149.  Bolden contends that these instructions impermissibly fettered the jury's ability "to give meaningful effect to any mitigating evidence providing a basis for a sentence of life rather than death."  Pet. 149.  This claim has no

172

merit.  Surely Bolden does not contend that the jury may consider, as mitigating, an alleged fact that they do not believe to be true.  And surely the jury cannot weigh, as mitigating, a fact that none of them believes to be mitigating.  Bolden's contention, therefore, makes little sense.  It is also contrary to law, which makes clear that a juror must both find a proffered mitigating factor to be true by a preponderance, and then consider whether that fact is mitigating.  Eddings v. Oklahoma, 455 U.S. 104, 114-15 (1982) ("The sentencer ... may determine the weight to be given relevant mitigating evidence."); see also United States v. Paul, 217 F.3d 989, 999 (8th Cir. 2000) ("Neither the FDPA nor *Lockett* and *Eddings* require a capital jury to give mitigating effect or weight to any particular evidence."); United States v. Rodriguez, 581 F.3d 775, 812 (8th Cir. 2009); Ortiz v. Stewart, 149 F.3d 923, 943 (9th Cir. 1998) ("While it is true that a sentencer may not refuse to consider, as a matter of law, any relevant mitigating evidence, a sentencer is free to assess how much weight to assign such evidence."); Pizzuto v. Arave, 280 F.3d 949, 972 (9th Cir. 2002) ("Having *considered* all the evidence, the [sentencing] judge was not obliged to *find it mitigating*." (emphasis in original)); 18 U.S.C. § 3593(d).  As noted, the jurors were free to find that a fact was true, yet decline to "find it mitigating."

In fact, Bolden's petition does not cite or quote any specific language that he claims was erroneous, but merely provides a blanket citation of five full pages of penalty-phase instructions, Doc. 54, at 149 (citing "Tr. 4010-14"), so it is difficult to discern a reasonably specific claim here.  At all events, the penalty-phase instructions clearly and correctly advised the jury that they need not find the mitigating factors unanimously, and that their discretion to consider any mitigating factor was essentially unfettered.  Tr. 4014 ("You are permitted to consider anything else about the commission of the crime or about the defendant's background or character that would mitigate against the imposition of the death penalty.  If there are any such mitigating

factors whether or not specifically argued by defense counsel which are established by a preponderance of the evidence, you are free to consider them in your deliberations."). Bolden's contention to the contrary has no merit.

**E.  The Jury Was Correctly Instructed On Non-Statutory Aggravators.**

Finally, Bolden contends that the jury instructions created a risk that jury might consider evidence of prior crimes as a non-statutory aggravating factor, in evaluating the existence of the statutory aggravating factor of prior drug convictions.  Pet. 150.  This contention is also meritless.  The jury instructions explicitly distinguished the non-statutory aggravating factors from the statutory aggravating factors, specifying that the "other crimes" in the non-statutory aggravator were distinct from the crimes specified in the statutory aggravator.  See Tr. 4008 (instructing the jury to consider, in assessing the non-statutory aggravating factors, whether "the defendant has committed crimes other than the two alleged state offenses which are the subject of the second statutory aggravating factor" (emphasis added)).  The instructions were thus perfectly clear on this issue, and the risk of confusion that Bolden postulates is entirely chimerical.  Moreover, the statutory aggravating factor of prior drug crimes was proved by overwhelming evidence, so even if there had been any risk of confusion, such risk would have been harmless beyond any reasonable doubt.

For all these reasons, Bolden's claims that his counsel were ineffective in failing to raise these meritless claims, and that he was prejudiced by the putatively deficient performance, are plainly meritless.  This claim should be dismissed without a hearing.

**XIII.   BOLDEN'S CLAIMS OF PROSECUTORIAL MISCONDUCT ARE PROCEDURALLY DEFAULTED AND HAVE NO MERIT.**

Bolden contends that the prosecutors in his case committed systematic misconduct throughout all stages of the criminal proceedings.  Pet. 151-171.  These claims are procedurally barred, and the underlying allegations are false, baseless, and meritless.

As an initial matter, all claims of prosecutorial misconduct are procedurally barred or defaulted, because Bolden either raised them on direct appeal, or could have done so but did not.  Thompson, 7 F.3d at 1378-79.  In this case, Bolden's claims of prosecutorial misconduct all involve allegations that the prosecutors engaged in putatively improper behaviors that occurred in the direct observation of his trial counsel.  Bolden makes no showing of cause for his failure to raise these claims on direct appeal, and he certainly cannot show prejudice, because these claims are uniformly meritless in any event for the reasons stated below.  For similar reasons, Bolden cannot show that it was either deficient performance or prejudicial for his counsel to fail to raise these meritless claims, so he has no valid claim of ineffective assistance.

### A.    There Was No Misconduct During Pretrial Proceedings.

First, Bolden rehashes his meritless claim that Mr. Holtshouser was laboring under a conflict of interest.  Pet. 152.  This claim was fully addressed and refuted above.  Supra Part II.

Bolden also faults the Government for failing to contact the Canadian Consulate on behalf of Bolden.  Pet. 152.  This claim has no merit for the reasons stated above.  Supra Part I.

Bolden claims that the Government presented "materially false and/or misleading testimony during the pretrial motions hearing."  Pet. 152.  This claim is refuted above.  Supra Part VIII.  Bolden reiterates his meritless claim that the Government failed to disclose evidence of the drug problems of eyewitness Erica Ruffin.  Pet. 153.  This claim is also meritless for the reasons stated above.  Supra Part VII.A.2; Part VIII.B.

Bolden accuses the Government of "engag[ing] in a pattern of moving to preclude every defense witness, particularly expert witnesses." Pet. 153. The Government's motions in limine were largely upheld by the Court, and it is hard to see how the filing of meritorious evidentiary motions constitutes misconduct. Bolden provides no further specifics for this allegation.

**B.** **There Was No Misconduct During the Guilt Phase of Trial.**

Bolden revisits his claim of misconduct in the exercise of peremptory strikes. Pet. 153. This claim has no merit for the reasons stated above. Supra Part III.

Bolden rehashes his claim that the prosecutor made misleading statements about the use of mitigation evidence during voir dire. Pet. 153. This claim is meritless. Supra Part VI.

Bolden alleges that the prosecutor "elicited and presented patently false and misleading testimony and argument" during the guilt phase of trial. Pet. 154. This claim has no merit for the reasons stated above. Supra Part VII.

Bolden adds new allegations charging that the prosecutor made improper statements referring to the victim in sympathetic terms during opening statement. Pet. 154-55. Notably absent from Bolden's petition is the citation of any authority supporting his counterintuitive proposition that it is improper to refer to the crime's impact on its victim in opening statement. On the contrary, it is appropriate for a prosecutor to refer to the victims in sympathetic terms in opening statement. See, e.g., United States v. Stephens, 571 F.3d 401, 409 (5th Cir. 2009) (holding that it was not improper for the prosecutor to refer to the devastating effects of Hurricane Katrina on its victims, in a prosecution for fraudulently soliciting donations to assist Hurricane Katrina victims). The prosecutor's references to Nathan Ley during opening statement encompassed only two paragraphs of a 15-page opening statement. They were restrained, correct, and well within the bounds of propriety. See Tr. 1904-05. Even if there had

been any minor impropriety, moreover, Bolden would not have been entitled to any relief, even if his lawyers had timely objected or raised the issue on direct appeal.  See, e.g., United States v. Bentley, 561 F.3d 803, (8th Cir. 2009) (holding that no relief was required for allegedly improper comments during opening statement because "the evidence of [the defendant's] guilt was strong, and there is no reasonable probability that the verdict would have changed without those remarks").  There is no reasonable probability that these remarks influenced the jury's verdict.

Bolden complains that the prosecutor "elicited a lengthy history of his law enforcement experience" with respect to Mr. Dutton, an employee for Wackenhut Security.  Pet. 155.  On the contrary, the prosecutor asked only two questions about Mr. Dutton's background in law enforcement.  Tr. 1938-39.  This information was relevant and admissible to explain Mr. Dutton's qualifications and his knowledge of the security procedures he went on to testify about.

Bolden contends that the evidence of "Mr. Ley's employment application, references, and work history" was "obviously intended to inject improper victim impact evidence."  Pet. 155.  On the contrary, this evidence was indubitably relevant and material to explain the victim's presence and duties at the bank, as well as his training and qualifications to serve as an armed security guard at Bank of America.  In any event, the notion that the jury's verdict would have been any different without this preliminary, background information is insupportable.

Bolden objects that the prosecutor elicited "emotionally charged testimony about the aftermath of the shooting; Mr. Ley's condition while they waited for the medical personnel to arrive; and, the chaotic circumstances inside the bank."  Pet. 156.  He also objects that the prosecutor "elicited graphic, emotionally charged testimony about Mr. Ley's condition at the time the medical personnel arrived."  Pet. 156.  This claim has no merit.  Evidence of the impact

of the shooting on Nathan Ley was clearly relevant and admissible to show the cause and manner of the victim's death.  Testimony that is even more "emotionally charged" than this evidence is commonly admitted in murder cases.  See, e.g., Clayton v. Gibson, 199 F.3d 1162, 1174 (10th Cir. 1999) (holding, in a prosecution for stabbing a woman to death, that it was not improper for the prosecution to admit "graphic testimony about the victim's 'sucking chest wound' and that 'sham' resuscitation efforts were attempted because the victim's husband was outside the apartment" where she died, and testimony that the victim "died while looking into the crib at her baby," because such evidence "accurately depicted the victim's wounds and was relevant to establish the cause and manner of death").

Bolden contends that the prosecutor wrongly "injected testimony about Mr. Ley's character."  Pet. 156 (citing Tr. 1998-99).  His only support is a statement in the testimony of Sandra Price stating that Mr. Ley "would speak to the customer.  And if they have questions, he would assist them.  Things like that," Tr. 1998, and stating that Mr. Ley was "very friendly ... a good officer."  Tr. 1999.  These brief and accurate remarks were relevant and admissible to explain Mr. Ley's presence and function at the front door of the bank.

Bolden next rehashes his claim that the prosecution improperly sought to bolster the credibility of eyewitness identifications by eliciting testimony about the eyewitnesses' memory training.  Pet. 156.  This claim has no merit for the reasons stated above.  Supra Part VII.

Bolden claims that the prosecutor committed misconduct during his closing argument for the guilt phase by trying to "inject impermissible victim impact argument."  Pet. 156.  This claim is procedurally barred and meritless.  The prosecutor's brief references to seeking justice for the victim, and to the impact of the shooting on the victim, were not improper.  See, e.g., Bedford v. Collins, 567 F.3d 225, 234 (6th Cir. 2009) ("Neither did the prosecutor overstep by urging the

178

jury to do justice for [the murder victims].  Nothing prevents the government from appealing to the jurors' sense of justice, or from connecting the point to the victims in the case." (citations omitted)).  Bolden also contends that the prosecutor committed misconduct during the guilt phase closing argument by relying on "scientifically unreliable DNA and ballistics testimony," Pet. 156, but this claim is wholly meritless for the reasons stated above, <u>supra</u> Part VII.

### C.   <u>There Was No Misconduct During the Penalty Phase of Trial</u>.

Next, Bolden contends that the prosecutor committed misconduct in his presentation of victim impact evidence, by putatively failing to provide prompt discovery, misleading the Court about the nature of the victim impact witnesses, and creating an emotionally charged atmosphere in Court.  Pet. 157.  These are the same claims advanced in section X of Bolden's petition.  They are meritless for the reasons stated above, <u>supra</u> Part X.  Bolden also revisits his meritless claim that Mr. Holtshouser had a conflict of interest, which is addressed above, <u>supra</u> Part II.

Bolden contends that the prosecutor "committed misconduct when he deliberately elicited testimony from Donald McDowell regarding uncharged drug sales allegedly committed by Mr. Bolden."  Pet. 157.  This complaint rests on a single question by the prosecutor, "Did you purchase from him roughly once a week?" to which McDowell responded, "Yes."  Tr. 3397. (Bolden does not dispute the truth of this answer.)  Defense counsel objected to the question, and the prosecutor voluntarily withdrew it.  Tr. 3397-98.  The Court instructed the jury to disregard the question at defense counsel's request.  Tr. 3398 ("The jury is instructed to disregard Mr. Reilly's last question and the witness' answer.  You're not to consider either the question or the answer in any way.").  Even if there had been any error in this question, any such error was indubitably harmless, as jurors are presumed to follow the Court's instructions to disregard testimony.  "Admission of a prejudicial statement is normally cured by striking the testimony

and instructing the jury to disregard the remark."  United States v. Lockett, 601 F.3d 837, 841

(8th Cir. 2010) (holding that the district court's curative instructions sufficed to cure any

prejudice from the prosecutor's question whether the witness feared for his safety in testifying).

Bolden contends that the prosecutor committed misconduct by questioning defense

mitigation witness Mona Mohammed about the fact that her son was convicted of first-degree

murder in the City of St. Louis after an investigation by one of the Government case agents.  Pet.

159.  The prosecutor offered the question to show the witness's bias, and the District Court

permitted it.  Tr. 3792.  This ruling was indubitably correct and the question was not improper,

since "cross-examination regarding potential bias of witness is proper."  United States v. Purkey,

428 F.3d 738, 760 (8th Cir. 2005).  Bolden raised this precise claim on direct appeal, Def. App.

Br. at 137, and the Eighth Circuit did not accept it.  It is procedurally barred and meritless.

Bolden contends that the prosecutor asked an improper question of mitigation witness

Sandra Sittum, when he asked if Ms. Sittum was aware that Bolden had offered the mother of his

children, Antoinette Bolden, to sell her daughters back to her for $5,000.  Tr. 3719.  Defense

counsel objected before the witness responded to the question.  Tr. 3719.  The prosecutor had a

strong factual basis to ask the question, as Antoinette Bolden had reported in a written interview

that, in 2002, Bolden had offered to sell her daughters back to her for $5,000.  Tr. 3719.  The

Court nevertheless sustained the objection and instructed the jury to disregard the question.  Tr.

3721 ("Members of the jury, you are instructed to disregard the last question to this witness.

You are not to consider that question in any way or speculate about what the answer might have

been.").  Again, this curative instruction sufficed to cure any potential prejudice from this single

question.  See Lockett, 601 F.3d at 841.  Bolden raised this same issue on direct appeal, Def.

App. Br. at 140, and the Eighth Circuit did not accept it.  It is procedurally barred and meritless.

Bolden contends that the prosecutor committed misconduct and "violated Mr. Bolden's right to priest-penitent privilege when he cross-examined Dr. Paul Hipps on his failure to come forward earlier and provide the prosecution with Mr. Bolden's alleged admission of guilt."  Pet. 160.  This contention is puzzling, because Dr. Hipps testified openly on direct examination about the admission of guilt that Bolden made in Hipps's presence, so it is difficult to fathom how this cross-examination could have violated any privilege.  In any event, the admission of guilt in question was plainly not subject to any privilege, because it was made in the presence of numerous other witnesses besides Dr. Hipps, and Dr. Hipps later repeated it in front of large audiences, according to Dr. Hipps's own account.  Tr. 3878 (Dr. Hipps agreeing that Bolden "had admitted his guilt in front of a group of people," and testifying that "Everybody in the room heard it, and I told my wife.  In fact, I think I mentioned it in a couple of churches where I preach that how excited I was to hear this kind of response from someone who had done such an awful deed.").  There was obviously no privilege to violate.

Bolden claims that the prosecutor committed misconduct in his penalty phase opening statement by stating that "you're going to hear additional evidence in our continuing search for justice for Nathan Ley."  Pet. 160.  As noted above, it was wholly proper for the prosecutor to frame his comments as a request for justice for the murder victim.  Bedford v. Collins, 567 F.3d 225, 234 (6th Cir. 2009) ("Neither did the prosecutor overstep by urging the jury to do justice for [the murder victims].  Nothing prevents the government from appealing to the jurors' sense of justice, or from connecting the point to the victims in the case." (citations omitted)).

Next, Bolden launches into a battery of criticisms of the prosecutor's closing argument during the penalty phase.  Pet. 161-70.  These claims are all procedurally barred, because Bolden brought a extensive challenge to the prosecutor's penalty-phase closing argument on direct

appeal, criticizing at least eight different lines of argument.  Def. App. Br., at 148-54.  The

Eighth Circuit, after "careful review of all the challenged comments," found that "most of the

arguments Bolden challenges were not improper," and that any impropriety was "isolated and

insubstantial in context and far less egregious than statements we have deemed harmless in other

capital cases."  Bolden, 545 F.3d at 630.  In fact, the only statement that the Eighth Circuit found

to be improper was the prosecutor's asking for the death penalty "on behalf of the Ley family,"

but a curative instruction was given on that comment.  Id.  The Eighth Circuit's holistic review

and approval of the penalty-phase summation is controlling in this case.  Bolden's latest claims

of error in the closing argument are thus addressed only briefly.

Bolden contends that the prosecutor committed misconduct during closing argument by

employing a picture of the victim's face.  Pet. 161.  Such use of the photograph of the victim

during closing argument has frequently been held proper, though it has sometimes been held to

be improper if used in a particularly inflammatory manner.  See, e.g., Frazier v. Hoffman, 343

F.3d 780, 792 (6th Cir. 2003) (holding that the state court's approval of the use of the

photograph of the murder victim during closing argument was not contrary to, nor an

unreasonable application of, clearly established federal law), citing Nefstad v. Baldwin, No.

94–35714, 1995 WL 520050, at *2–*3 (9th Cir. Sept.1, 1995) (finding no error by the trial court

in permitting a "closing argument [wherein] the prosecutor asked the jury to compare a

photograph of the victim before the murder with an autopsy photograph of the victim"); Lowe v.

Abrahamson, No. 92–2020, 1995 WL 150585, at *1–*2 (7th Cir. Apr.6, 1995) (order) (finding

"nothing improper" about "the presentation at trial of a photograph of the murdered victim

wearing a hat from his son's Little League baseball team"); but see United States v. Berrios, 676

F.3d 118, 135 (3d Cir. 2012) (holding that the use of the victim's photograph in the form of a

182

jigsaw "puzzle of the victim's face," couple with a "commemorative poem" about the victim's life, in closing argument were improper, but finding the error to be harmless).  In this case, the prosecution's use of the photograph was no different than in cases where the use was found to be proper.

Bolden contends that it was prosecutorial misconduct for the prosecutor to refer to the jury's "duty" in asking for the death sentence.  Pet. 161.  Bolden contends that this argument was improper under <u>Weaver v. Bowersox</u>, 438 F.3d 832, 840 (8th Cir. 2006).  Pet. 161.  Bolden raised this precise claim on direct appeal, relying on <u>Weaver v. Bowersox</u> then as well.  Def. App. Br. 153-54.  The Eighth Circuit rejected it.  <u>Bolden</u>, 545 F.3d at 630.  It is thus barred.

Bolden contends that it was improper for the prosecutor to rely on Bolden's status as an armed, uniformed security guard in closing argument.  Pet. 162-63.  Again, Bolden raised this claim on appeal, Def. App. Br. 153, and the Eighth Circuit rejected it.  <u>Bolden</u>, 545 F.3d at 630.

Bolden contends that the prosecutor "misstated the law on aggravation and weighing" by telling the jury that there were "four things in this case that independently justify a sentence of death."  Pet. 163 (citing Tr. 4984).  Bolden's claim appears to be that this misstated the law, because the "four things ... that independently justify a sentence of death" were not the statutory aggravators.  Pet. 163.  This claim has no merit.  The statement was made in the context of rebuttal argument regarding the jury's <u>weighing</u> decision, not whether the jury should find the statutory eligibility factors, as the context makes clear.  <u>See</u> Tr. 3980 (addressing the defense argument that "Robert Bolden wants to you to give weight to the mitigating factors in his life"); Tr. 3982 (identifying the standard he is arguing as the weighing standard: "the standard is ... do the aggravators sufficiently outweigh the mitigators such that a sentence of death is justified?"); Tr. 3984 (describing the weighing decision as "a moral question; a moral question where the

consequences of the actions have to be controlling"); Tr. 3980-84 (arguing that the various mitigating factors should be given little or no weight in the weighing decision).  Read in its proper context, the prosecutor's statement that there were "four things in this case that independently justify a sentence of death" plainly meant that each of these "four things" independently outweighed the proffered mitigating evidence, which was proper argument.

Bolden contends that is was improper for the prosecutor to argue that Bolden lacked remorse, because the prosecution had not listed lack of remorse as a non-statutory aggravating factor.  Pet. 164.  This claim has no merit.  Bolden placed his own remorse at issue by presenting evidence of supposed remorse in mitigation, including his putative religious conversion, as a central part of the mitigation case.  See, e.g., Tr. 3970-73 (defense counsel arguing extensively that Bolden should receive a sentence of life because of his remorse and conversion after the murder, including attributing to Bolden "the realization – the judgment, the insight – of what he's done and how sorry he is for it and how remorseful he is for it; and that he himself is feeling physical pain from it").  By the opposite token, the prosecutor was allowed to argue that the evidence actually showed no such remorse.  Tr. 3950.  Bolden cannot seriously contend that he was allowed to argue that the evidence showed remorse as a key mitigating factor, while the prosecution was not allowed to argue that the evidence showed lack of remorse.

Bolden contends that it was improper for the prosecutor, in opening statement, to remark of the victim-impact evidence that "You're going to have to see it; hear it; and in some cases, you may feel it yourself."  Pet. 164 (citing Tr. 3363).  Bolden's complaint about this comment is hard to fathom.  It is not improper for the prosecution to predict that the victim-impact evidence may have an emotional impact on the jury, and Bolden cites no authority to the contrary.

184

Bolden claims that the prosecutor misstated the law on mitigation by arguing that "to be mitigating for this offense there needs to be some meaningful connection between the alleged mitigator and the offense." Pet. 164 (citing Tr. 3947-48).  Bolden argues at some length that the prosecution thereby improperly instructed the jury not to consider relevant mitigating evidence. Pet. 164-67.  This claim is procedurally barred, because Bolden raised a very similar claim on direct appeal, Def. App. Br. 149-51, which the Eighth Circuit rejected.  Bolden, 545 F.3d at 630. In any event, the prosecutor's argument was wholly proper.  This argument was made in the context of the weighing decision, and the prosecutor was arguing that various proffered mitigators should be assigned little or no weight in the weighing decision.  See Tr. 3947 ("What is mitigating in this case is up to you.  The Court won't tell you what is or is not mitigating.  And I suggest to you that to be mitigating for this offense there needs to be some meaningful connection between the alleged mitigator and the offense that was committed here.  Anything else is an excuse, and that connection is missing with all of these mitigators.").  For the reasons discussed above, supra Part XII, the jury was free to find that a proffered mitigator was proven, yet decline to find that it had any mitigating weight.  See United States v. Paul, 217 F.3d 989, 999 (8th Cir. 2000); Ortiz v. Stewart, 149 F.3d 923, 943 (9th Cir. 1998); Pizzuto v. Arave, 280 F.3d 949, 972 (9th Cir. 2002).  It was not improper for the prosecutor to argue that certain evidence should not be assigned mitigating weight.

Bolden also contends that the prosecutor's argument on his lack of remorse violated his Fifth and Sixth Amendment rights by improperly commenting on his exercise of his right to remain silent, and by improperly commenting on Bolden's decision not to plead guilty.  Pet. 167-68.  As to the right to remain silent, Bolden's claim is hard to fathom, because no such comment is discernible in the transcript.  The prosecutor commented on what Bolden *did* say after he was

185

arrested, not on what he did *not* say.  Tr. 3950 (arguing that Bolden's statement to police upon arrest, "Who is snitching on me?" displayed "not one iota of remorse").  As to the guilty plea, these comments were made in fair response to the defense's mitigation case, where mitigation witness Dr. Hipps had improperly blurted on the stand that Bolden had offered to plead guilty to life in prison after three years of confinement awaiting trial.  Tr. 3930-31.

Bolden revisits his argument that it was improper for the prosecutor to ask for the death penalty "on behalf of" the victim and his family.  Pet. 168.  Bolden raised this issue on appeal, Def. App. Br. 151, and the Eighth Circuit found the error harmless.  Bolden, 545 F.3d at 630.

Bolden contends that "the prosecutor improperly asked the jury to weigh the value of Mr. Bolden's life against the value of Nathan Ley's."  Pet. 168 (citing Tr. 3950, 3980).  The cited comments from the closing argument, however, do not have any such import.  The prosecutor did not ask the jury to compare the value of the two men's lives.  Rather, the prosecutor commented that the jury should not give mitigating weight to factors in Bolden's life, because Bolden did not give weight to the mitigating factors in the defendant's life.  Tr. 3950, 3980.

Bolden contends that the prosecution engaged in "childish name calling and repeatedly disparaged the defense witnesses and the defendant by describing them in inflammatory language," such as "cold-blooded murderer," "self-righteous do-gooders," and "evil person." Pet. 169.  Bolden raised this same claim on direct appeal, Def. App. Br. 151, and the Eighth Circuit rejected it.  Bolden, 545 F.3d at 630.  Prosecutors are "free to use colorful and forceful language in their arguments to the jury."  Clayton v. Roper, 515 F.3d 784, 792 (8th Cir. 2008).

Bolden complains that the prosecutor's references in closing argument to the victim's "blood" and to Nathan Ley's "cold grave" were improper.  Pet. 170.  Bolden also claims that it was improper to argue that a sentence of life in prison would allow the defendant to "break

186

even" and give him a "freebie." Pet. 170. Bolden raised these precise claims on direct appeal, Def. App. Br. 151-53, and the Eighth Circuit rejected them. Bolden, 545 F.3d at 630.

In sum, Bolden's contention that there was "systemic prosecutorial misconduct that permeated all aspects of Petitioner's capital prosecution," Pet. 171, is procedurally defaulted, contradicted by the record, and substantively meritless. It does not warrant any further factual development or hearing.

## XIV.   BOLDEN'S CLAIM THAT HE WAS PROVIDED INADEQUATE CARE FOR DIABETES DURING TRIAL IS PROCEDURALLY BARRED AND MERITLESS.

Bolden contends that the Government interfered with his ability to communicate with his counsel to assist in his own defense, and his ability to maintain an appropriate demeanor in front of the jury, by mismanaging the care provided for his diabetes before and during trial. Pet. 171-83. He also contends that is counsel were ineffective in failing to raise these issues at the appropriate time before the District Court. Pet. 182. Bolden's substantive claims and claims of Government misconduct are procedurally defaulted because they were not raised on direct appeal. All his claims are meritless and should be denied without a hearing.

Bolden complains of two errors arising the putative mismanagement of his medical care: (1) his ability to confer with his counsel and assist in his own defense was adversely affected by his diabetes, and (2) his diabetes caused him to have a hypoglycemic episode before the jury during the penalty phase on May 16, 2006. Pet. 177. Both of these claims are contrary to the record and should be dismissed without a hearing. Voytik, 778 F.2d at 1308.

First, as to his ability to confer with counsel, the record clearly shows that Bolden's counsel experienced no difficulty in conferring with him about his case as a result of his diabetes. When Bolden had a hypoglycemic episode before the jury on May 16, 2006, his

187

counsel reacted as follows: "I don't know what is going on.  Mr. Bolden is having some sort of

reaction.  I don't know whether it's low blood sugar.  I waited as long as I could."  Tr. 3635.

This reaction clearly indicated that Bolden had not been suffering similar episodes during his

prior meetings with defense counsel, contradicting the notion that Bolden's diabetes rendered

him so mentally incompetent that he could not meaningfully confer with counsel about his case.

In fact, a single hypoglycemic episode, or even a series of such episodes, is a far cry from raising

the inference that the defendant is incompetent to assist in his own defense.  See, e.g., United

States v. Turner, 644 F.3d 713, 725 (8th Cir. 2011) ("[N]ot every manifestation of mental illness

demonstrates incompetency to stand trial.  Neither low intelligence, mental deficiency, nor

'bizarre, volatile, and irrational behavior' compels a finding of incompetency.").  The record is

wholly devoid of any evidence that Bolden was anywhere near the standard for being incapable

to assist in his own defense.  Bolden fails to cite a single incident anywhere in the record where

either Bolden or his counsel raised any issue about any difficulty in communicating due to his

diabetes.  In fact, so unexpected was the May 16 episode that Bolden's own defense attorney felt

the need to address, on the record, any suspicions that the episode might be self-induced or that

Bolden might be feigning the episode, in order to play for sympathy with the jury and to disrupt

a powerful portion of the Government's case in aggravation, namely the testimony of Katie

Rhodes.  Tr. 3635 ("Mr. Curran: I don't think it's planned.").  Likewise, Bolden himself never

complained on the record of any mental difficulties arising from his diabetes.  On the contrary,

the day after the hypoglycemic episode, he represented to the Court that he felt fine and was

ready to proceed.  Tr. 3636 ("The Defendant: I am fine.  Thank you, ma'am.").  The day before

the hypoglycemic episode, moreover, Bolden's counsel clearly indicated on the record that he

had successfully conferred with Bolden about the strategic decision not to use the mental-health

evidence in mitigation.  Tr. 3320 ("Mr. Curran: Judge, I don't see any need to make a record

with Mr. Bolden on this.  I've discussed it with him.... And, you know, it was a decision we made after reviewing the evidence and reviewing what we had for this part of the hearing and deciding not to use it.").  Other evidence in the record also corroborates that Bolden was receiving adequate food and medical care in prison.  See, e.g., Tr. 3821 (Norman Dake testifying that Bolden received three meals per day and medical care in prison).  In short, Bolden's claim that his diabetes so affected his mental functioning as to substantially interfere with his ability to assist in his own defense cannot be squared with the record.  Bolden's trial counsel were therefore not ineffective in failing to raise a non-existent issue.  This claim should be dismissed without a hearing.

Second, Bolden contends that the "extremely prejudicial hypoglycemic episode" on May 16, 2006, adversely affected his case before the jury.  Pet. 178.  This claim has no merit.  Even if Bolden could establish that this episode was triggered by Government misconduct (which he cannot), Bolden's theory of prejudice is entirely speculative, and in fact is directly contradicted by the record.  The record contains not a shred of support for the notion that Bolden suffered any prejudice from this episode before the jury.  On the contrary, Bolden's case in mitigation emphasized his diabetes as a *mitigating* factor.  Defense counsel repeatedly elicited testimony about Bolden's diabetes and susceptibility to diabetic seizures during the mitigation case, including several detailed descriptions of his diabetic episodes.  See, e.g., Tr. 3684 (testimony of Sandra Sittum) (Bolden diagnosed with juvenile diabetes); Tr. 3688 (Bolden felt different as a child due to diabetes); Tr. 3693-94 (describing Bolden's diabetic episodes in detail), Tr. 3729-30 (Bolden's diabetic episodes as a child and adult, and his attempts to manage his diabetes); Tr. 3730 (Bolden going to the emergency room as a child due to diabetes, and having difficulty managing diabetes); Tr. 3734 (Bolden experienced a diabetic coma as a small child).  See also

Tr. 3759 (testimony of Candice Sittum) (describing Bolden's diabetic episodes); Tr. 3760-61 (describing Bolden's diabetes worsening with his depression); Tr. 3774-75 (Bolden missed work because of his diabetes).  See also Tr. 3779 (testimony of Mona Mohammed) (describing Bolden's diabetic episodes); Tr. 3780-81 (Bolden not taking diabetic medicines during depressive periods).  See also Tr. 3803-04 (testimony of Robert Bolden, Jr.) (describing Bolden's diabetic episodes in detail).  See also Tr. 3815 (testimony of Norman Dake) (Bolden discussing diabetes with his spiritual adviser).

In addition, defense counsel made Bolden's diabetes a key part of the closing argument in the penalty phase, adverting to the issue repeatedly.  See Tr. 3956 ("At two years old, he is a juvenile diabetic for the rest of his life.  Constantly in hospitals, constantly passing out.  Now, these kinds of things form you.  These things scar you."); Tr. 3956-57 ("The idea about the diabetes, again, it isn't an excuse.  But ... we all know people who are chronically ill get depressed.  It is hard to wake up with the same illness day after day, and that's what he had to do...."); Tr. 3957 ("Now, let's put it all together.  The diabetes.  No question that he had the diabetes.  Unrefuted that all these witnesses that all these witnesses talked about the chronic episodes, the hospitalizations.  They could never really get it under control."); Tr. 3957-58 ("When we were having was the diabetes keeping him from working; causing him more stress.... The crack makes his diabetes worse, which means he misses more work.  This is the cycle.  This is how it spirals out of control.").  In other words, defense counsel presented Bolden's diabetes as a critical catalyst explaining his drug addiction and crimes, and a critical mitigating and explanatory factor as to how Bolden "end[ed] up on that parking lot."  Tr. 3959.

In light of the pervasive emphasis that Bolden's counsel placed on Bolden's diabetic episodes during the penalty phase, both during the presentation of testimony and closing

190

argument, it is hard to make any sense at all out of Bolden's allegation that he was prejudiced when the jury viewed him having a diabetic episode. The penalty phase testimony included several detailed descriptions of Bolden's diabetic episodes. The occurrence of such an episode before the jury served only to bolster the credibility of the defense witnesses who testified about Bolden's diabetes, and generate sympathy for Bolden among the members of the jury. In fact, the timing of the episode was surprisingly fortuitous as to Bolden, because it interrupted the emotionally powerful testimony of Nathan Ley's fiancee, Katie Rhodes, and forced her to resume mid-way the next day. Tr. 3636-37. Because Bolden's claim that he suffered prejudice from this episode is flatly inconsistent with the record, this claim should be dismissed without a hearing.

## XV.    BOLDEN'S CLAIMS OF INEFFECTIVE ASSISTANCE ON APPEAL AND LACK OF MEANINGFUL APPELLATE REVIEW HAVE NO MERIT.

In Section XV, Bolden contends that he received ineffective assistance of counsel on appeal, and that the Court of Appeals denied him effective appellate review by misconstruing the standard of review for certain of his appellate claims. Pet. 184-86.

First, Bolden contends that the U.S. Court of Appeals for the Eighth Circuit denied him his "right to meaningful appellate review" by supposedly misidentifying the standard of review applicable to four of his appellate claims. Pet. 185. The District Court has no jurisdiction to correct putative errors committed by the Court of Appeals. The proper forum for this claim was in a motion for panel rehearing or en banc consideration in the Court of Appeals, or in a petition for writ of certiorari to the Supreme Court. Moreover, though Bolden alleges that he preserved the four claims that were subject to plain-error review, he fails to cite the place in the record where he preserved any of them.

Bolden also claims that his appellate counsel were ineffective in failing to raise two claims on appeal: (1) putative failing to challenge the prosecution's admission of extrinsic evidence relating to Bolden's 1995 drug conviction, and (2) failing to challenge the district court's order permitting the Government to call Sgt. Sinnema as an expert witness in drug distribution.  Pet. 185-86.  These claims have no merit.  The decision of Bolden's appellate counsel to focus on certain claims on appeal, to the exclusion of others, is presumed to be a valid exercise of strategic judgment.  "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal.  Therefore, absent contrary evidence, we assume that appellate counsel's failure to raise a claim was an exercise of sound appellate strategy."  United States v. Brown, 528 F.3d 1030, 1033 (8th Cir. 2008) (citations and quotation marks omitted).  Bolden fails to give any account of how the claims that he now faults appellate counsel for failing to raise were clearly more meritorious than the numerous claims that appellate counsel did raise on appeal.  For this reason, his allegation fall short of stating a cognizable claim, and the claims should be dismissed without a hearing.

In any event, both of these claims are demonstratively meritless.  As to the first, Bolden's appellate counsel did, in fact, raise this claim on appeal, going into some detail about the allegedly impermissible extrinsic evidence relating to the 1994 conviction, as well as the 1993 conviction.  See Def. App. Br. 44-45 ("The court enhanced the error by allowing a mini-trial of Bolden's 1994 conviction for delivering cocaine, T3396-3418.  The government had no need to go beyond the Michigan judgment and sentence in that case ....  It nevertheless produced Donald McDowell's testimony that he sold an undercover agent $1,100 worth of crack ....  Then Michigan Trooper Oliver testified .... [etc.]").  Bolden does not identify any substantive argument that he should have made, but did not, to advance this claim.  The Court of Appeals

rejection of the claim with respect to the 1993 conviction was equally applicable to the 1994

conviction.  Bolden, 545 F.3d at 617 ("There was no abuse of discretion in admitting this

evidence.").

As to the second claim, Bolden's failure to challenge the admissibility of Sgt. Sinnema's

testimony on appeal on the basis that only 9 days advance notice was provided, Bolden's petition

fails to cite any authority indicating that the District Court's decision to permit this testimony

was in error, so there is no basis to conclude that counsel had any effective argument for keeping

the evidence out.  In addition, Bolden fails to articulate any theory of prejudice as to the putative

late notice, and the record makes clear that no prejudice occurred.  Sgt. Sinnema's testimony was

limited and non-controversial.  It was based on rudimentary narcotics distribution methods of

operation – lack of user paraphernalia, presence of a pager, and short face-to-face meetings with

customers as consistent with the intent to distribute) – all positions that were well known and

familiar to Bolden's counsel.   Sinnema's positions disclosed in the investigative reports

provided to Bolden at the beginning of the case.  See Tr. 3325 (Sinnema, in his report, stated that

the pattern of two-three minute meetings with customers was, "[b]ased on my training or

experience ... consistent with drug distribution").  This was clearly relevant to a contested issue

(that the offense involved drug distribution, since Bolden pled to the amended charge of attempt

possession with intent), and within the District Court's discretion to admit.  Tr. 3331-35.

## XVI.  THIS COURT LACKS JURISDICTION TO CONSIDER BOLDEN'S CHALLENGE TO THE CONDITIONS OF HIS CONFINEMENT ON DEATH ROW IN THE FEDERAL PRISON IN TERRE HAUTE, INDIANA.

Bolden brings a lengthy challenge to the conditions of his confinement at the Federal

Bureau of Prisons Facility in Terre Haute, Indiana, contending that he is receiving inadequate

193

medical care for his diabetes and inadequate dental care.  Pet. 186-199.  There is no jurisdiction

over these claims in this case, because they are asserted using the wrong vehicle, and in the

wrong forum.  As this Court recently ruled, the proper vehicle for these claims is a petition for

habeas corpus under § 2241(a), and the proper forum for these claims is the judicial district

where Bolden is confined.  In ruling on the Petitioner's previously filed Motion For Expedited

Review of these claims, this Court stated:

> It is well-established that a challenge to the execution of a sentence is not cognizable in a
> motion to vacate under 28 U.S.C. §2255.  It is evident from the relief Bolden requests
> (*i.e.*, compliance with BOP's treatment guidelines, coordination of insulin and meals,
> transfer to a medical facility) that his motion presents a challenge to the execution of his
> sentence, not a challenge to the validity of his sentence.  Neither the allegation of denial
> of access to the courts nor the requests for a hearing and discovery will suffice to make
> the claims in his motion cognizable under §2255.
>
> The proper vehicle for challenging the execution of a sentence is a petition for
> habeas corpus pursuant to 28 U.S.C. §2241(a).  If Bolden wishes to pursue his medical
> care claims in a habeas proceeding, he must file the petition in the Indiana judicial district
> where he is incarcerated.
>
> This Court lacks jurisdiction to consider the claims raised in Bolden's motion for
> expedited review.

March 9, 2012 Memorandum and Order, Doc. 80 in No. 4:10 CV 2288 CEJ (citations omitted).

The Court's ruling on these issues is correct and controlling as to the allegations in Claim XVI.

Bolden also contends that his death sentence is unconstitutional due to "inordinate delay"

in imposing the death penalty.  Pet. 196.  Because this claim piggybacks upon Bolden's

complaints about the administration of medical care, it should be viewed as another improper

challenge to his conditions of confinement, which must be raised in a §2241 petition in the

Southern District of Indiana.  Furthermore, it is worth noting that such claims of inordinate delay

in the administration of the death penalty – so-called "Lackey" claims – have been rejected by

every court to consider them, including the Eighth Circuit.  See, e.g., Chambers v. Bowersox,

157 F.3d 560, 570 (8th Cir. 1998) (stating that a delay of 15 years on death row, and three trials of the same defendant, did not "even begin[] to approach a constitutional violation"); <u>Reed v. Quarterman</u>, 504 F.3d 465, 488 (5th Cir. 2007) ("Reed points to no decisions of the Supreme Court or of other federal courts holding that execution after a significant delay may violate the Eighth Amendment."); <u>Allen v. Ornoski</u>, 435 F.3d 946 (9th Cir. 2006) ("The Supreme Court has never held that execution after a long tenure on death row is cruel and unusual punishment."); <u>Knight v. Florida</u>, 528 U.S. 990 (1999) (Thomas, J., concurring in denial of certiorari) ("I am unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed.").

## XVII.  BOLDEN'S CLAIM OF CUMULATIVE ERROR HAS NO MERIT.

Finally, Bolden contends that he is entitled to relief due to the "cumulative effect of the errors described in this motion."  Pet. 199.  Because Bolden has failed to identify any prejudicial error in his motion, <u>see</u> <u>supra</u> Parts I-XVI, he is not entitled to relief on this claim.

## CONCLUSION

For the reasons stated herein, the Government respectfully requests that this Court deny Petitioner's Amended Motion To Vacate, Set Aside Or Correct The Judgment And Sentence Pursuant To 28 U.S.C. § 2255 And Memorandum In Support, Doc. 54, and dismiss all claims therein without discovery or an evidentiary hearing.

Respectfully submitted,

RICHARD G. CALLAHAN
United States Attorney

*/s/ D. John Sauer*
STEVEN E. HOLTSHOUSER, #24277
MICHAEL A. REILLY, #43908MO
D. JOHN SAUER, #58721MO
Assistant United States Attorneys
111 South 10th Street, 20th Floor
St. Louis, MO 63101
(314) 539-6894

Maureen Mathis, student law intern for the U.S. Attorney's Office, contributed substantially to the preparation of this Response.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 21, 2012, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon:

Anne L. Saunders

Attorney at Law

100 Chestnut Street, Suite 300

Harrisburg, PA 17101


Kelly Miller

Attorney at Law

100 Chestnut Street

Harrisburg, PA 17101


Jennifer Merrigan

Death Penalty Litigation Clinic

6155 Oak Street, Suite C

Kansas City, MO 64113


*/s/ D. John Sauer*

D. JOHN SAUER

Assistant U.S. Attorney

197