UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


ROBERT BOLDEN, SR.,                    )
                                       )
                Movant,                )
                                       )
        v.                             )  No.  4:10-CV-2288 (CEJ)
                                       )
UNITED STATES OF AMERICA,              )  **CAPITAL CASE**
                                       )
                Respondent.            )

**MEMORANDUM**

        This matter is before the court upon the revised amended motion of Robert

Bolden, Sr., to vacate, set aside, or correct sentence, pursuant to 28 U.S.C. § 2255.

The United States has filed its opposition to the motion, and the issues are fully

briefed.

## I.  Background

        In the afternoon of October 7, 2002, Bolden, Dominick Price and Corteze

Edwards attempted to rob a Bank of America branch in St. Louis, Missouri.  Bolden had

had concocted a plan for the robbery which he discussed with Price earlier that day.

 According to the plan, Bolden would use a handgun to disarm the bank's security

guard and then he and Price would hold the guard hostage, get the money, and drive

drive away in Bolden's car.  At some point during the day Bolden recruited Edwards to

to assist in the robbery.

        Bolden, Price, and Edwards drove to a parking lot near the bank and got out of

of the car.  Although Bolden had purchased a nylon stocking cap to conceal his identity,

identity, he did not wear a mask.  When the security guard, Nathan Ley, came outside, Bolden approached, with Price and Edwards following 15 to 20 feet behind him.  Bolden stopped a few feet away from Mr. Ley and the two men exchanged words. words.  Bolden then pointed his handgun at Mr. Ley.  A brief struggle ensued after Mr. Mr. Ley reached for the gun, but Bolden was able to fire it, shooting Mr. Ley in the jaw. jaw.  As Mr. Ley fell, Bolden stepped backward and fired another shot, this time into into Mr. Ley's head.  Mr. Ley died from the second gunshot.

Bolden, Price, and Edwards fled from the scene.  However, several bystanders witnessed the incident and were able to provide a description of Bolden and his vehicle to the police.  Also, the police gathered DNA evidence from clothing found at and near the scene that they linked to Bolden and his accomplices.  Bolden was arrested that evening.

In a superseding indictment, Bolden was charged with conspiring to commit the the armed robbery of Bank of America by force and violence, in violation of 18 U.S.C. U.S.C. §§ 2113(a) and (f), and in so doing, killing Mr. Ley (Count I); attempting to rob rob Bank of America, and in doing so, killing Mr. Ley, in violation of 18 U.S.C. §§ 2113 2113 (a) and (e) and 2 (Count II); using and carrying a firearm during and in relation relation to the attempted bank robbery charged in Count II, in violation of 18 U.S.C. §§ §§ 924(c)(1), (j)(1) and 2, and in doing so committing murder as defined in 18 U.S.C. § U.S.C. § 1111 (Count III); and being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count IV).  On May 23, 2006, after a month-long month-long trial, a jury found Bolden guilty of all four charges and sentenced him to

death on Counts II and III. The judgment was affirmed on appeal. United States v.

v. Bolden, 545 F3d 609 (8th Cir. 2008), *cert. denied*, 558 U.S. 1077 (2009).

## II. Procedural Default

The government correctly points out that many of the claims Bolden asserts in

the instant motion are procedurally defaulted, as they could have been raised on direct

appeal but were not. Bolden counters that he is not barred from asserting these claims

because the failure to present them on appeal was the result of ineffective assistance

of counsel.

A motion to vacate is not a substitute for a direct appeal. See Boyer v. United

States, 988 F.2d 56, 57 (8th Cir. 1993); Reid v. United States, 976 F.2d 446, 447 (8th

Cir. 1992), *cert. denied*, 507 U.S. 945 (1993) [*citing* United States v. Frady, 456 U.S.

152 (1982)]. Absent a showing of cause and prejudice, a movant cannot assert a

claim in a § 2255 proceeding that could have been asserted on appeal. Id. In order to

show cause, the movant must establish that "some objective factor external to the

defense" impeded his ability to present his claim on appeal. McCleskey v. Zant, 499

U.S. 467, 493 (1991)[*quoting* Murray v. Carrier, 477 U.S. 478, 488 (1986)].

Ineffective assistance of counsel or a showing of actual innocence may constitute cause

sufficient to exempt a movant from the procedural bar. Id. at 494.


## III. Ineffective Assistance of Counsel

Bolden claims that he was denied effective assistance of counsel at trial and on

on appeal. He asserts ineffective assistance both as an independent claim and as

cause for his procedural default. To prevail on an ineffective assistance claim, a

movant must show that his attorney's performance fell below an objective standard of

of reasonableness and that he was prejudiced thereby.  Strickland v. Washington, 466

466 U.S. 668, 688 (1984).  With respect to the first Strickland prong, there exists a

strong presumption that counsel's conduct falls within the wide range of professionally

professionally reasonable assistance.  Id. at 689.  In Strickland, the Court described

described the standard for determining an ineffective assistance claim:

> [A] court deciding an actual ineffectiveness claim must
> judge the reasonableness of counsel's challenged conduct
> on the facts of the particular case, viewed as of the time of
> counsel's conduct.  A convicted defendant making a claim of
> ineffective assistance must identify the acts or omissions of
> counsel that are alleged not to have been the result of
> reasonable professional judgment.  The court must then
> determine whether, in light of all the circumstances, the
> identified acts or omissions were outside the wide range of
> professionally competent assistance.  In making that
> determination, the court should keep in mind that counsel's
> function, as elaborated in prevailing professional norms, is
> to make the adversarial testing process work in the
> particular case.  At the same time, the court should
> recognize that counsel is strongly presumed to have
> rendered adequate assistance and made all significant
> decisions in the exercise of reasonable professional
> judgment.

Strickland, 466 U.S. at 690.

To establish the "prejudice" prong, the movant must show "that there is a reasonable

reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different.  A reasonable probability is a probability

sufficient to undermine confidence in the outcome."  Id. at 694.  The failure to show

show prejudice is dispositive, and a court need not address the reasonableness of

counsel's performance in the absence of prejudice.  <u>United States v. Apfel</u>, 97 F.3d 1074, 1076 (8th Cir. 1996).

**IV.  <u>Grounds for Relief</u>**

**Ground 1: <u>Failure to Give Notice of Vienna Convention
Rights and Provide Consular Notification</u>**

Bolden was born in Canada and lived there until he was one year old.  He was then brought to the United States and lived here continuously thereafter. Correspondence and other documents from the U.S. Immigration and Naturalization Service establish that Bolden, his attorneys, and the government were aware of Bolden's Canadian citizenship before trial. [Doc. # 113-4, pp. 15-100 and # 113-5, pp. 1-55].   However, the government did not give Bolden notice of any rights he had under the Vienna Convention, nor did it notify the Canadian Consulate of the criminal proceedings against Bolden.  Bolden claims that these omissions resulted in the denial of his constitutional rights.  Bolden could have presented this claim on direct appeal, but he failed to do so.  Therefore, the claim is procedurally barred unless cause and prejudice are shown.  For the reasons discussed below, even if Bolden could establish cause for the default, he cannot establish that he was prejudiced.

The Vienna Convention is an international treaty of which the United States and and Canada are among the member countries.  The Convention stipulates consular protocol between member nations.  Article 36 of the Vienna Convention on Consular Consular Relations and Optional Protocol on Disputes applies to communication between the consular officers of a country (the "sending State") and its nationals in a

a country (the "receiving State") where a consular post of the sending State has been been established.  The Article provides, in relevant part:

> 1.  With a view to facilitating the exercise of consular functions relating to nationals of the sending State:
>
> (a) consular officers shall be free to communicate with nationals of the sending State and to have access to them.  Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;
>
> (b) if he so requests, the competent authorities of the receiving state shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner.  Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded b the said authorities without delay.  The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;
>
> (c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation.

While the Supreme Court has not directly addressed whether the Convention confers individually enforceable rights, the Court has held that a treaty is not binding domestic law unless Congress has enacted statutes implementing it, or the treaty itself conveys an intention that it be self-executing.  *Medellin v. Texas*, 552 U.S. 491, 505 (2008) (citing *Igartua-De La Rosa v. United States*, 417 F.3d 145, 152 (1st Cir. 2005)). In the absence of a statute establishing the Convention is binding, the circuit courts of appeals have split on whether it is self-executing.

The Eighth Circuit has not had occasion to decide whether the Convention conveys individually enforceable rights.  The Seventh Circuit has held that the

Convention grants private rights to individuals.  <u>Jogi v. Voges</u>, 480 F.3d 822, 835 (7th (7th Cir. 2007).  However, the Seventh Circuit's decision in <u>Jogi</u> is in tension with other other circuits that have established a precedent that the Convention does not confer a a private right of action in the criminal context.  The Fifth and Sixth Circuits have held held that the Convention does not create rights that are privately enforceable.  *See* <u>United States v. Emuegbunam</u>, 268 F.3d 377, 390 (6th Cir. 2001) (noting that "[a]bsent express language in a treaty providing for particular judicial remedies, the federal courts will not vindicate private rights . . . ."); *See also* <u>United States v. Jimenez-Nava</u>, 243 F.3d 192, 196 (5th Cir. 2001) (highlighting the presumption that that treaties do not confer a private right of action in federal courts).

The State Department's position is that the Convention does not create individually enforceable rights.  Courts give great weight to an agency's interpretation interpretation of a treaty that agency is charged with implementing.  <u>Emuegbunam</u>, <u>Emuegbunam</u>, 268 F.3d at 392.  According to the State Department's interpretation, interpretation, the Convention is not to be drawn on as a source of actionable rights by by individuals, but rather to serve as a source of guidance for diplomats in their dealings with one another.  Brief for United States as *Amicus Curiae,* p. 824, in <u>Jogi</u>, <u>Jogi</u>, 480 F.3d at 826.  To support its position in <u>Jogi</u>, the United States relied on the the Convention's plain text intention to "ensure efficient performance of functions by by consular posts on behalf of their respective States" – but "not to benefit individuals." <u>Id</u>.  (citing Vienna Convention on Consular Relations, Apr. 24, 1963, 21 21 U.S.T. 77, 100-101, T.I.A.S. No. 6820).  Absent controlling authority on the question from the Eighth Circuit, the court finds the reasoning in <u>Emuegbunam</u>,

<u>Jimenez-Nava</u>, and by the State Department persuasive, and agrees that the Convention does not confer individually enforceable rights.

Article 36 imposes a duty on the government to notify a foreign national's consulate of his detention only when the national "so requests." Here, it is undisputed that Bolden made no such request. In bilateral conventions between the United States and certain countries, the consular notification duty arises upon the foreign national's arrest and must be made within a certain time period or, in some cases, immediately upon a foreign national's arrest. <u>See</u>, <u>e.g.</u>, Article 35, Convention, With Exchange of Notes, 33 U.S.T. 2973, 1982 WL 590897 (bilateral convention with China requiring consular notification "immediately, but no later than within four days" of arrest or detention). In these bilateral conventions with "mandatory notification" countries the obligation to notify the consulate of a foreign national's detention arises regardless of whether he made a request. Canada, however, is not a mandatory notification country. Thus, the prosecution was not required to notify the Canadian consulate of Bolden's detention.

Bolden contends, however, that the prosecution was obligated to advise him of of his right to consular assistance and, as a result of its failure to do so, he was unable unable to make the request. Because this claim is procedurally defaulted, Bolden must must demonstrate cause and actual prejudice. <u>Matthews. v. United States</u>, 114 F.3d F.3d 112, 113 (8th Cir. 1997). In this context, Bolden must demonstrate that he did did not know of his right to contact consul under the Convention, he would have availed himself of that right had he known it, and that consular contact likely would have assisted him. <u>United States v. Rivas-Cristales</u>, No. 98-3835, 2000 WL 640942, at

640942, at *1 (8th Cir. 2000) (*citing* <u>United States v. Esparza–Ponce</u>, 193 F.3d 1133, 1133, 1138–39 (9th Cir. 1999)). Although Bolden states that the Canadian consulate consulate found that he met its criteria for assistance, he falls short of showing that he he would have sought out such assistance.

"Even were [a movant's] Vienna Convention claim properly raised and proved, it is extremely doubtful that the violation should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial." <u>Breard</u>, 523 U.S. at 377 (*citing* <u>Arizona v. Fulminante</u>, 499 U.S. 279 (1991)). Here, Bolden fails to show that the alleged Convention violations affected his conviction and sentence. Throughout the pendency of the case, Bolden was represented by experienced defense attorneys who were able to gather evidence and secure witnesses to present in mitigation. Even if the consulate had been informed of Bolden's arrest, his conviction does not merit reversal if Canadian officials would not have been able to obtain any information that his defense counsel did not have. <u>Faulder v. Johnson</u>, 81 F. 3d 515, 520 (5th Cir. 1996) (death sentence imposed on Canadian citizen did not merit reversal because his defense counsel had all the same information that the Canadian consulate would have been able to obtain).

Nothing in the record demonstrates that the Canadian consulate would have gathered or been able to gather any relevant information beyond that acquired by defense counsel. Bolden alleges that there was "a wealth of multi-generational family, family, medical, and social mitigation history available in Canada" that defense counsel counsel could have obtained from the consulate. However, as more fully discussed

below, the court finds that the omission of this information was not prejudicial. *See*
*See* Ground 9.

In addressing a defendant's objections to the death penalty in a case where a
Convention violation was acknowledged to have occurred, the Eighth Circuit wrote that
the violation was "a disembodied fact." United States v. Ortiz, 315 F.3d 873, 887 (8th
Cir. 2002). "There is no causal or logical connection at all between the penalty
imposed on defendants and violation of the Vienna Convention. The death penalty is
provided by statute. It comes into the case, of course, only after defendants are
convicted . . . . The Convention itself says nothing about the appropriateness of
penalties, and certainly does not provide that the death penalty is excluded if the
Convention is violated." Id. As more fully discussed below, the prosecution met its
burden of proving Bolden's guilt and presenting evidence sufficient to support
imposition of the death penalty. There is no reason to believe that consular notification
would have changed the outcome of the case.

Bolden is not entitled to relief on Ground 1.

### Ground 2: Improper Influence on Prosecutorial Decisions

#### A. Conflict of interest

Bolden first claims that the Assistant United States Attorney who made the
decision to prosecute him in a federal court and to seek the death penalty was laboring
laboring under a conflict of interest. According to Bolden, the AUSA knew the victim's
victim's father, who worked for the St. Louis Police Department, and had attended high
high school and grown up in the same neighborhood with him. Bolden argues that
these factors mandated recusal by the AUSA. He also argues that recusal was

warranted by the AUSA's membership on the Department of Justice's Capital Case Review Committee which was responsible for making decisions about whether or not to seek the death penalty in federal criminal cases. It is undisputed that the AUSA did not participate in the Committee's decision in Bolden's case. Nevertheless, Bolden contends that the AUSA's membership created an appearance of impropriety.

Bolden does not contend that there was a familial relationship between the AUSA and the victim's father or that the AUSA had any personal or financial interest in the prosecution. Further, there is no reasonable basis for belief that the AUSA's independent decisionmaking process was impeded or affected in any way by any acquaintance he may have had with the Ley family or his service on the Committee. Bolden has not shown that the AUSA's participation in the case resulted in a violation of "fundamental fairness, shocking to the universal sense of justice." <u>Kinsella v. United States ex. rel. Singleton</u>, 361 U.S. 234, 246 (1960); <u>see</u> <u>United States v. Lilly</u>, 983 F.2d 300, 310 (1st Cir. 1992) ("Prosecutors need not be empty vessels, completely devoid of any non-case-related contact with, or information about, criminal defendants.").

Additionally, Bolden does not show any likelihood that the court would have disqualified the AUSA from the case if his attorneys had presented this information at trial.

### B. Failure to follow death penalty protocol

Bolden contends that he was denied due process, because the government failed to conform to its own guidelines for seeking a death penalty prosecution at the

the federal level as set forth in Section 9-10.010 of the 2001 United States Attorneys'

Attorneys' Manual.  Bolden asserts that the government disregarded the authorization

authorization process in three ways:  (1) the DOJ committee ignored the requirement

requirement that the interest in prosecuting the crime federally outweigh the state

interest;  (2) the committee improperly considered the status of the victim's family as

as law enforcement;  and (3) the committee disregarded evidence of discriminatory

application of the death penalty in the Eastern District of Missouri and throughout the

the country.

Bolden, has no judicially enforceable rights in the internal Department of Justice

procedures described in the United States Attorneys' Manual.  "Courts have generally

refrained from judicial review of asserted violations of DOJ policies or regulations

because of the unique nature of prosecution and the 'broad discretion' granted the

Attorney General and federal prosecutors in their enforcement of the laws of the United

States."  In re United States, 197 F.3d 310, 315 (8th Cir. 1999) (citing Armstrong, 517

U.S. at 464).  "While some administrative regulations do create rights in third parties,

see United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 267 (1954), those

governing prosecutors enjoy greater flexibility because the exercise of prosecutorial

discretion is a 'core executive constitutional function.'"  United States v. Lopez-Matias,

522 F.3d 150, 156 (1st Cir. 2008) (quoting Armstrong, 517 U.S. at 465).


The death penalty protocol contained in the United States Attorneys' Manual is

is an internal DOJ policy directing the exercise of prosecutorial discretion.  The manual

manual expressly states that "[i]t is not intended to, does not, and may not be relied

~ 12 ~

relied upon to create any rights, substantive or procedural, enforceable at law by any any party in any matter civil or criminal." <u>United States v. Lee</u>, 274 F.3d 485, 493 (8th (8th Cir. 2001) (quoting United States Attorneys' Manual at § 1–1.100). Federal courts, including the Eighth Circuit, have held this disclaimer to be effective. <u>See</u> <u>id.</u> <u>id.</u> ("We agree with those courts which have concluded that the death penalty protocol protocol is unenforceable by individuals."); <u>Nichols v. Reno</u>, 124 F.3d 1376, 1376 (10th (10th Cir. 1997) (rejecting the plaintiff's premise that the United States Attorneys' Manual provided him a protectable interest); <u>United States v. Myers</u>, 123 F.3d 350, 355–56 (6th Cir. 1997) (finding that a violation by the government of the DOJ manual, manual, by itself, did not create a basis for suppressing grand jury testimony); <u>United</u> <u>United States v. Busher</u>, 817 F.2d 1409, 1411–12 (9th Cir. 1987) (citing the manual's manual's waiver and concluding that the plaintiff "therefore is not entitled to rely on it"); <u>cf.</u> <u>United States v. Craveiro</u>, 907 F.2d 260, 264 (1st Cir. 1990) (holding that similar DOJ guidelines, "not mandated by statute or the constitution, do not confer substantive rights on any party").

In light of the uniform federal circuit court case law, including controlling Eighth Circuit precedent, Bolden cannot demonstrate any likelihood that the outcome of the case would have been different if defense counsel had presented this argument at trial or on appeal. Therefore, he has not shown prejudice to overcome the procedural default.

### C. Racial bias

Bolden also claims that the decision to prosecute him in a federal court was motivated by racial bias. Bolden, who is African-American, asserts that the choice of a

of a federal forum was made to ensure that he would face a majority-white jury that,

that, statistically, would be more likely to impose the death penalty. This claim is

procedurally-barred because it could have been raised on direct appeal but was not.

Thus, the court need not consider the merits of the claim absent a showing of cause

cause and prejudice. Bolden's reliance on ineffective assistance of counsel as cause for

cause for the procedural default fails, because defense counsel would not have been

successful in asserting a race discrimination claim.

The government's decision to prosecute "may not be based on 'an unjustifiable

unjustifiable standard such as race, religion, or other arbitrary classification.'" <u>United</u>

<u>United States v. Armstrong</u>, 517 U.S. 456, 464 (1996) (quoting <u>Oyler v. Boles</u>, 368

U.S. 448, 456 (1962)). To establish a selective prosecution claim, a claimant "must

"must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and

and that it was motivated by a discriminatory purpose.'" <u>Id.</u> (quoting <u>Wayte v. United</u>

<u>United States</u>, 470 U.S. 598, 608 (1985)); <u>see</u> <u>Martin v. City of Brentwood, Mo.</u>, 200

200 F.3d 1205, 1206 (8th Cir. 2000) ("Unequal treatment is not enough absent proof

proof 'of an unlawful intent to discriminate against the plaintiff for an invalid reason.'")

reason.'") (quoting <u>Batra v. Board of Regents of the Univ. of Neb.</u>, 79 F.3d 717, 721

(8th Cir. 1996)). In order to have prevailed on a selective prosecution claim, Bolden

Bolden would have had to show that "(1) he was singled out for prosecution while

others similarly situated were not prosecuted for similar conduct, and (2) the decision

decision to prosecute him was based on an impermissible motive such as race, religion,

religion, or an attempt by the defendant to secure other constitutional rights." <u>United</u>

<u>United States v. Scott</u>, 610 F.3d 1009, 1017 (8th Cir. 2010) (internal quotations

omitted).

Furthermore, Bolden would have had the burden of proving "that the decisionmakers in *his* case acted with discriminatory purpose." <u>McCleskey v. Kemp</u>, 481 U.S. 279, 292 (1987) (emphasis in original). Proving discriminatory purpose for an equal protection claim "is no simple task." <u>Villanueva v. City of Scottsbluff</u>, 779 F.3d 507, 511 (8th Cir. 2015). It requires a showing that the conduct or practice in question was "implemented at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." <u>Id.</u> (quoting <u>Ricketts v. City of Columbia, Mo.</u>, 36 F.3d 775, 781 (8th Cir. 1994)); <u>see also</u> <u>Personnel Administrator of Mass. v. Feeney</u>, 442 U.S. 256, 279 (1979) ("Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.") (internal quotations and citations omitted).

A finding of intentional discrimination must be based on a totality of the circumstances, including direct and circumstantial evidence of intent as may be available. <u>Rogers v. Lodge</u>, 458 U.S. 613, 618 (1982). An inference of discriminatory discriminatory intent in a specific decision in a capital trial and sentencing, however, cannot be drawn simply from general statistics. <u>McCleskey</u>, 481 U.S. at 294–96; <u>see see also</u> <u>United States v. Bass</u>, 536 U.S. 862, 863–64 (2002) (stating that "a nationwide showing" of "raw statistics regarding overall charges [of death-eligible offenses] say nothing about charges brought against *similarly situated defendants*")

(emphasis in original); <u>United States v. Rodriguez</u>, 581 F.3d 775, 815 (8th Cir. 2009) 2009) (finding that alleged discrimination in the nationwide administration of the death death penalty insufficient under <u>McCleskey</u> to demonstrate that the decisionmakers in in the petitioner's case acted with discriminatory purpose). "This is not to say that evidence of disproportionate impact, or statistical evidence in particular, is unimportant." <u>Inmates of Neb. Penal & Corr. Compex v. Greenholtz</u>, 567 F.2d 1368, 1368, 1375 (8th Cir. 1977). To raise an inference of discriminatory purpose through through the use of statistical deviations, however, a plaintiff must provide "exceptionally clear proof" of discrimination. <u>Fuller v. Georgia State Bd. of Pardons & & Paroles</u>, 851 F.2d 1307, 1310 (11th Cir. 1988); <u>see</u> <u>McCleskey</u>, 481 U.S. at 297 ("Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused."); abused."); <u>see also</u> <u>Greenholtz</u>, 567 F.2d at 1375 ("[T]he statistical disparity shown may occasionally be so gross or stark or dramatic that it alone will constitute prima facie proof of purposeful discrimination. We are only cautioned that such extreme disparities are rare, that statistical evidence, like any other kind of evidence, may be be rebutted, and that the probative worth of statistical evidence depends on all of the the surrounding facts and circumstances.") (internal quotations and citations omitted). omitted).

In his motion, Bolden supports his claim of racially discriminatory prosecution by by reference to statistical and anecdotal information. Citing a law review article, Bolden states that eight of the 94 federal districts in the United States, including the Eastern District of Missouri, encompass a majority-black urban area and a majority-

~ 16 ~

majority-white population.  These districts have produced approximately 50% of the

the current death sentences.  Also, Bolden cites to statistics suggesting that white

juries are more prone to levy death sentences than juries with minority participation,

participation, as demonstrated by the 19 defendants currently on Missouri's death row

row sentenced by juries in St. Louis County in contrast to the four defendants

sentenced by juries in the City of St. Louis.  As such, Bolden contends, the decision to

to charge a black defendant from the City of St. Louis at the federal, rather than the

state, level greatly reduces the presence of black venirepersons on the jury panel and

and greatly increases the chance of receiving a death sentence.

As in McCleskey, the information and sources relied upon by Bolden do not

contain any specific information or allegations regarding the charging determinations in

determinations in Bolden's case.  481 U.S. at 292–93 ("He offers no evidence specific

specific to his own case that would support an inference that racial considerations

played a part in his sentence.").  In response, the government asserts that many other

other factors called for the exercise of federal prosecution of Bolden's crimes, such as

as the fact that Bolden murdered a security guard in the course of the robbery of a

federally-insured institution.  Id. at 297 "([A] legitimate and unchallenged explanation

explanation for the decision is apparent from the record:  McCleskey committed an act

act for which the United States Constitution and Georgia laws permit imposition of the

the death penalty.").   The general statistical evidence related to federal jury

composition would have been insufficient to support an inference that the

decisionmakers in Bolden's case acted with discriminatory purpose, and defense

counsel would not have succeeded on a discrimination claim based on this evidence.

~ 17 ~

Nationwide statistical evidence of federal prosecutors' decisions to seek the death penalty in 2003 likewise would have been insufficient to demonstrate discriminatory purpose in the authorization in Bolden's case. See Bass, 536 U.S. at 863–64 ("Even assuming that the Armstrong requirement [of discriminatory purpose for a selective prosecution claim] can be satisfied by a nationwide showing (as opposed to a showing regarding the record of the decisionmakers in [the defendant's] case, raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants.*) (emphasis in original); Rodriguez, 581 F.3d at 815.

As to local statistics, Bolden contends that the venue and capital charging decisions made by the United States Attorney's Office in this district demonstrate a pattern of selectively prosecuting black defendants who commit crimes against white white victims in the City of St. Louis. Bolden points to six defendants, including himself, for whom federal prosecutors in the Eastern District of Missouri have sought sought the death penalty upon authorization from the United States Attorney General. General. Two of these defendants committed crimes against a minority victim outside outside the City. United States v. Tyrese D. Hyles & Amesheo D. Cannon, 1:01-CR-73 1:01-CR-73 (HEA) (E.D. Mo. filed Oct. 18, 2001). The other four defendants, including including Bolden, were black and committed crimes against white victims within the City. United States v. Norris G. Holder & Billie Jerome Allen, No. 4:97-CR-141 (ERW) (ERW) (E.D. Mo. filed Mar. 17, 1997); United States v. Andre Bonds, No. 4:95-CR-332 4:95-CR-332 (CAS) (E.D. Mo. filed Oct. 19, 1995). This anecdotal sample of defendants is too statistically insignificant to support an inference of discriminatory

purpose in the decision to federally and capitally prosecute Bolden for his crimes, particularly where one-third of the cases involved crimes against minority victims outside the City, one defendant never faced a capital trial, and one-half of the cases did not result in the imposition of the death penalty. See McCleskey, 481 U.S. at 292, 292, 297. Had defense counsel relied on this information, either at trial or on appeal, appeal, the claim of discriminatory prosecution would not have succeeded.

Next, in an attempt to demonstrate that he was unfairly singled out for capital capital prosecution, Bolden submits an exhibit listing seven defendants prosecuted in a in a Missouri state court for homicide offenses. [Doc. #71-1] He asserts that these defendants could have been prosecuted federally but were not. This assertion, however, is based on the assumption that federal jurisdiction existed because the crimes involved the use of firearms. Of course, not every crime of violence committed committed with a firearm that results in a homicide can be charged federally. Section Section 924(j) of Chapter 18 of the United States Code allows capital prosecution for for "[a] person who, in the course of a violation of subsection (c), causes the death of a of a person through the use of a firearm . . . if the killing is a murder." In turn, subsection (c) permits federal imprisonment of "any person who, during and in relation relation to any crime of violence . . . *for which the person may be prosecuted in a court court of the United States*, uses or carries a firearm, or who, in furtherance of any such such crime, possesses a firearm." 18 U.S.C. § 924(c) (emphasis added). Bolden has has not shown that the seven defendants used firearms during the commission of a "crime of violence" subjecting them to prosecution under federal law. Thus, they are are not similarly situated.

~ 19 ~

Bolden's list also identifies two white defendants who committed homicide and were federally prosecuted but did not face capital trials. *See* <u>United States v. Henry George Rehmert, Sr.</u>, No. 4:03-CR-311 (CDP) (E.D. Mo. filed May 16, 2003); <u>United States v. David Ray Martin</u>, No. 4:98-CR-352 (SNL) (E.D. Mo. filed Aug. 3, 1998). In one case, federal prosecutors sought and were granted authorization to pursue the death penalty. <u>See</u> <u>Martin</u>, No. 4:98-CR-352 [Doc. #182] (amended notice of intent to seek the death penalty filed on Oct. 21, 1999). That defendant ultimately pled guilty prior to trial, and the Attorney General in office at the time exercised her discretionary authority to accept the defendant's request to plead guilty. These two cases do not independently provide "exceptionally clear proof" of discrimination, and would not have successfully supported a claim of racially-biased prosecution. <u>See</u> <u>McCleskey</u>, 481 U.S. at 297.

The decision to prosecute capitally is a complex decision involving many factors, including the relationship between the defendant and the victim, the manner and circumstances of the death, the strength of victim impact evidence, and the nature of aggravating and mitigating evidence. <u>Cf.</u> <u>id.</u> at 294 ("[T]he Constitution requires that [a jury's] decision [to impose the death penalty] rest on consideration of innumerable factors that vary according to the characteristics of the individual defendant and the facts of the particular capital offense."). The government has cited to at least two factors present in Bolden's case that played a role in the decision to capitally prosecute—Bolden robbed a federally-insured bank and murdered a stranger during the attempted robbery. <u>See</u> <u>id.</u> at 296–97 ("[A]bsent far stronger proof, it is unnecessary to seek [] a rebuttal [from the

~ 20 ~

prosecutors to explain the statistical disparity], because a legitimate and unchallenged unchallenged explanation for the decision is apparent from the record:  McCleskey committed an act for which the United States Constitution and Georgia laws permit imposition of the death penalty."). The fact that the white defendants noted above did did not face capital trials in the Eastern District of Missouri is insufficient to raise an inference that the prosecutors' charging decisions in Bolden's case were made with discriminatory purpose.

For all the reasons discussed above, Bolden is not entitled to relief on Ground 2.


### Ground 3:  <u>Discriminatory Use of Peremptory Challenges</u>

Bolden's third claim is that the prosecution exercised its peremptory challenges challenges in a racially discriminatory manner prohibited by <u>Batson v. Kentucky</u>, 476 476 U.S. 79 (1986). Specifically, Bolden alleges that five of the seven African-American African-American members of the venire—Juror 40, Juror 44, Juror 60, Juror 126, and and Juror 136—were struck by the prosecution because of their race.  On direct appeal, appeal, Bolden argued that the government struck Juror 44 because of her race.  The The court of appeals rejected the argument and, as such, Bolden cannot relitigate the the issue in this § 2255 proceeding.  <u>Bear Stops v. United States</u>, 339 F.3d 777, 780 780 (8th Cir. 2003); <u>United States v. Holtzen</u>, 718 F2d 876, 878 (8th Cir. 1983). Bolden did not challenge the government's exercise of peremptory strikes to remove remove the other four African-American jurors. Consequently, his <u>Batson</u> claim is procedurally defaulted.  To excuse his default, Bolden claims that counsel was

ineffective for failing to address all five peremptory challenges in the argument on appeal.

In <u>Batson</u>, the Supreme Court held that a prosecutor's use of peremptory challenges to strike prospective jurors solely on the basis of race constitutes a violation of the Equal Protection Clause. <u>Id</u>. at 89. To establish a <u>Batson</u> claim, the defendant must first make a prima facie case of purposeful discrimination. <u>Id</u>. at 96. It then becomes the prosecution's burden to articulate a race-neutral reason for exercising the peremptory strike to remove a black juror. If the reason given is determined by the court to be pretextual, then the strike must be voided. <u>Id</u>. at 97-98. However, "[a]s in any equal protection case, the 'burden is, of course,' on the defendant who alleges discriminatory selection of the venire 'to prove the existence of purposeful discrimination.'" <u>Id</u>. at 93 [*quoting* <u>Whitus v. Georgia</u>, 385 U.S. 545, 550 (1967)].


At trial, the court denied Bolden's <u>Batson</u> challenges after finding that the prosecutor's race-neutral reasons for striking Jurors 40, 60, 126, and 136 were not pretextual. The challenges he made at trial with respect to Jurors 40, 60, and 136 are are identical to those he asserts in his § 2255 motion. These challenges do not establish purposeful discrimination any more now than they did at trial. Further, it is is important to note that the court denied the government's cause challenge to Juror Juror 126 that was based on concerns about the juror's competency. It was only then then that the government exercised a peremptory strike to remove Juror 126 for the the same reasons it articulated in support of the cause challenge. Bolden has not shown that any other juror presented with similar characteristics (*i.e.*, use of

psychiatric medications and inconsistencies between questionnaire and voir dire answers) such that it could be inferred that the government's stated concern about her her mental competence was pretextual.

Finally, Bolden has not shown that he was denied effective assistance of counsel by his attorney's decision not to raise the <u>Batson</u> issue on appeal with respect to all five African American jurors who were struck. Bolden has not shown that counsel's strategic decision to pursue only one <u>Batson</u> claim on appeal was unreasonable, particularly in light of the weakness of the other four claims. Further, he makes no showing that, but for the omission of the other claims, the result of the appeal would have been different.

Bolden is not entitled to relief on the claim asserted in Ground 3.

**Ground 4:** <u>**Denial of Jury Pool Composed of a Fair Cross-Section of the Community**</u>

Bolden claims that the decision to prosecute him federally resulted in a deprivation of his right to a jury pool drawn from a fair cross-section of the community. Specifically, he alleges that there was an underrepresentation of African-Americans in the jury venire as a direct result of the jurors being drawn from the entire Eastern Division of the Eastern District of Missouri instead of from only one segment of the Division (the City of St. Louis) which has a larger African-American population. Further, he contends that the decision to prosecute him federally was made with the intention of diluting African-American representation in the venire. Bolden could have raised this claim on direct appeal, but he failed to do so. Thus, the claim is procedurally defaulted.

In relevant part, the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. The Supreme Court has held that the requirement of a jury in a criminal trial being chosen from a fair cross section of the community is "fundamental to the jury trial guaranteed by the Sixth Amendment." Taylor v. Louisiana, 419 U.S. 522, 530 (1975). Therefore, "jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." Id. at 538.

Congress has adopted the judicial "district or division" as the relevant geographical boundary for application of the "fair cross section" requirement in federal courts. See 28 U.S.C. § 1861 ("It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."). This policy is implemented by the additional requirement that "[n]o citizen shall be excluded from service as a grand or petit juror in the district courts of the United States . . . on account of race, color, religion, sex, national origin, or economic status." 28 U.S.C. § 1862.

To establish a prima facie violation of the fair cross-section requirement, "the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such

persons in the community; and (3) that this underrepresentation is due to systematic systematic exclusion of the group in the jury-selection process." Duren v. Missouri, 439 U.S. 357, 364 (1979).

Other courts that have considered claims analogous to Bolden's have rejected them. E.g., United States v. Brady, 579 F.2d 1121, 1133 (9th Cir. 1978) ("[A] fair cross section of the community must be achieved within the division as a whole rather rather than any of the division's component counties."); Savage v. United States, 547 547 F.2d 212, 216 n.8 (3d Cir. 1976) ("Insofar as petitioner contends that the petit jury list should contain a larger percentage of prospective jurors from Philadelphia and and its black population, so as to give him a more representative background of his peers to judge him . . . , we reject such contention."); United States v. Green, 389 F. F. Supp. 2d 29, 41–42 (D. Mass. 2005), rev'd on other grounds sub nom. In re United United States, 426 F.3d 1 (1st Cir. 2005) ("By choosing federal court and thereby expanding the jury district to include the more racially homogenous suburbs, the government invariably dilutes minority—and even urban—representation in the pool from which defendants' juries will be selected.  While the Sixth Amendment demands demands representativeness, it does not require courts to second-guess the boundaries boundaries of the judicial district.  Thus, when the government federalizes local crime crime in the more diverse cities . . . it homogenizes the decisionmaker.  And the law law allows it to do so.") (footnote omitted); cf. United States v. Davis, 27 F. App'x 592, 592, 597 (6th Cir. 2001) (holding that "there is no constitutional or statutory requirement that a defendant's trial take place in a specific courtroom or division within within a federal district" and that the jury pool need not include anyone from the

division in which the crime occurred); <u>Zicarelli v. Dietz</u>, 633 F.2d 312, 318 (3d Cir. 1980) ("[T]here is no constitutional right to a jury chosen from the division where the the offense was committed or from the entire district which includes that division."); <u>United States v. Young</u>, 618 F.2d 1281, 1288 (8th Cir. 1980) (holding that the exclusion of prospective jurors from either the area where the crime was committed or or where the defendant resided does not violate the Sixth Amendment).

With respect to division-based jury selection, courts have consistently held that, as long as a division is not "gerrymandered," demographic difference in terms of racial or socioeconomic composition in the district's divisions will withstand constitutional scrutiny. <u>United States v. Cannady</u>, 54 F.3d 544, 547 (9th Cir. 1995) ("Only in those cases where the use of a division instead of the entire district constitutes gerrymandering, resulting in the systematic exclusion of a 'distinctive group' from participation in any jury selection system, is there a potential violation."); <u>United States v. Test</u>, 550 F..2d 577, 594 (10th Cir. 1976) ("[T]he partitioning of a district into jury divisions is sanctioned by the statute (28 U.S.C. §§ 1863(a)( and 1869(c)), and is clearly not unconstitutional, absent evidence that some cognizable group has been systematically excluded by 'gerrymandering' the division lines."); <u>United States v. Gottfried</u>, 165 F.2d 360, 364 (2d Cir. 1948) ("There are probably no districts in the Union, which can be divided without disclosing in the sections different racial, religious, political, social or economic percentages.  To demand that they shall not, would be a fantastic pedantry which would serve no purpose . . . .").

Bolden has made no allegation of "gerrymandering" of district or division lines to

to dilute black representation on federal jury panels.  Also, the authority cited by Bolden does not support the argument that a prosecution in the Eastern Division of the the Eastern District of Missouri results in the systematic exclusion of distinctive minorities from participation as jurors.  In <u>Hardin v. City of Gasden</u>, 837 F. Supp. 1113 1113 (N.D. Ala. 1993), the district court found that the use of a district-wide jury wheel wheel resulted in black citizens disproportionately being denied the opportunity to participate in the jury selection system at all.  "Potential jurors[, however,] have no right . . . to participate in a jury selection plan in the division or district of their choice." choice."  <u>Cannady</u>, 54 F.3d at 548.  "Their constitutional right is simply to be included included in the jury selection plan of a district or division."  <u>Id.</u>  Bolden has not alleged alleged that African-American citizens in the Eastern Division are systematically excluded from participation in the jury selection process.  If Bolden prevailed on his argument, it would follow that the federal government could not prosecute black defendants for crimes committed in the City of St. Louis or a procedure would have to to be devised to allow for the selection of potential jurors from particular counties or municipalities within the division to mirror the demographic composition of the City of of St. Louis.  Neither result is required by the Constitution.

Reiterating his earlier allegations, Bolden asserts that the prosecution's charging charging decisions were motivated by discriminatory intent.  For the reasons discussed discussed above, the court finds that Bolden has failed to demonstrate that the decisions to federally and capitally prosecute him raise an inference of discriminatory discriminatory purpose as required for an equal protection challenge.  <u>See</u> <u>McCleskey</u>, <u>McCleskey</u>, 481 U.S. at 294–96.

Bolden is not entitled to relief on Ground 4.

**Ground 5:  Failure to Challenge Capital Authorization**

Bolden claims that he was denied effective assistance of counsel by his attorneys' failure to present certain evidence to the Capital Case Review Committee. Bolden acknowledges that his attorneys did present evidence of racial bias in the capital punishment scheme, but he contends that this was not enough.

As the government correctly points out, there is no Sixth Amendment right to counsel in connection with the Department of Justice's capital authorization procedure. *See* United States v. Lee, 274 F.3d 485, 493 (8th Cir. 2001) (DOJ's death penalty protocol does not create individual rights that may be enforced).  The fact that the procedure allows defense counsel to present mitigating information to the Committee does not convert it into a critical stage of the criminal case at which the Sixth Amendment right to counsel attaches.  United States v. Boyd, 931 F. Supp. 968, 973 (D. R.I. 1996).  Bolden cannot assert that he was denied effective assistance of counsel at a time when he did not have a Sixth Amendment right to counsel.  Moreover, Bolden makes no showing that but for the omission of the additional information, the decision of the Committee would have been different.  Thus, he has not demonstrated prejudice.

Bolden is not entitled to relief on this claim.

**Ground 6:  Denial of Rights During Jury Selection**

Bolden claims that his right to an impartial jury was denied as a result of statements made by the prosecutor, restrictions imposed by the court, and ineffective ineffective assistance of defense counsel during the voir dire examination of

prospective jurors.  On direct appeal, he did not challenge the prosecutor's statements

statements or the court's rulings with respect to jury selection although he could have

have done so.  However, regardless of the procedural default, his claims are without

without merit.

In <u>Morgan v.</u> <u>Illinois</u>, 504 U.S. 719 (1992), the Supreme Court wrote:

> A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do.  Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror.  Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any such prospective juror who maintains such views.  If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.

<u>Id</u>. at 729.

The Supreme Court in <u>Morgan</u> recognized that "part of the guarantee of a defendant's

right to an impartial jury is an adequate voir dire to identify unqualified jurors."  <u>Id</u>.

Thus, it is the obligation of the trial court to "ensure that prospective jurors are asked

sufficient questions to allow the court and parties to determine whether, should the

defendant be convicted, the jurors have already decided to apply the death penalty, or

whether they would truly weigh any mitigating and aggravating factors found at the

penalty phase of the trial."  <u>United States v. McVeigh</u>, 153 F.3d 1116, 1206 (10th Cir.

1998).

Morgan, however, does not require a court to allow counsel to ask potential jurors about evidence expected to be presented during the guilt phase of the trial. McVeigh, 153 F.3d at 1207. Further, a court is not required to allow counsel to ask "how a juror would vote during the penalty phase if presented with specific mitigating factors." Id. at 1208. Thus, at Bolden's trial it was appropriate to preclude defense counsel from asking the jurors whether they would consider specific evidence (e.g., Bolden's health, upbringing, and criminal record) as mitigating or aggravating factors. Additionally, "[w]hen a defendant seeks to ask a juror to speculate or precommit on how that juror might vote based on any particular facts, the question strays beyond the purpose and protection of Morgan." Id. at 1207. Thus, when defense counsel sought to ask potential jurors whether they would "consider" certain evidence that was equivalent to seeking their commitment to take the evidence into account in determining guilt or punishment. Such questioning was impermissible, because it negated the province of jurors to determine the weight, if any, to be given to evidence that is presented to them. Restricting counsel to asking the jurors whether they would "listen to" (as opposed to "consider") certain evidence avoided the risk of the jurors mistakenly believing they had to commit to giving weight to the evidence.

Bolden's challenges to the court's rulings with respect to individual jurors are also unavailing. Defense counsel's question to Juror 118 ["If you found Mr. Bolden guilty of planning a bank robbery. Going to the bank lot and trying to rob the bank and and shooting Mr. Ley twice in the attempted bank robbery, in your mind . . . does that that fall under your category of 'premeditated murder?'" (Tr. 760)] was an attempt to

~ 30 ~

to obtain the juror's commitment to make a penalty decision before any evidence was was presented. As such, it strayed beyond the purpose and protection of <u>Morgan</u>.

Also, Bolden mischaracterizes the exchange between the court, counsel, and Juror 178. There was no effort by the government and the court to mislead the juror juror about the charges against Bolden or as to the circumstances of the shooting. The The court specifically informed the juror that Bolden was charged with attempted bank bank robbery and that in the course of the robbery Mr. Ley was killed. In response to to Juror 178's concern about whether Bolden was charged with shooting Mr. Ley twice, twice, the court informed her that "the jury will have to determine whether Mr. Bolden Bolden fired either shot. And that, I can't say one way or the other." (Tr. 1788) Any Any response that would have confirmed or denied that Bolden fired the shots would would have been inappropriate. The court continued to probe the juror's concern by by asking whether it would be "upsetting to [her] if there was evidence that Mr. Bolden Bolden fired both shots?" (Tr. 1790) Further, the court allowed defense counsel to ask to ask Juror 178 if she would make up her mind about punishment based solely on a a finding that Bolden shot Mr. Ley twice. The juror's response was "no." Thereafter, Thereafter, counsel for the government asked Juror 178 whether she would "start the the [penalty] stage with an open mind about what the punishment should be and wait wait until you've heard everything and consider all of the evidence which may include include the circumstances of how the first or second shot was fired and who fired them." (Tr. 1794) The juror's response was "yes." There is nothing in the record of of the exchange with Juror 178 that indicates that she was confused or predisposed to to voting for the death penalty.

Bolden next complains of objections the government made to questions his attorney asked of Juror 78. None of the objections was sustained, and the court did not impose any restrictions on the questions. Bolden's allegation that his examination of Juror 78 was improperly limited is belied by the record. Tr. 587-592). Further, the juror's statement that his decision about punishment "would depend on all the facts that were presented" clearly evinced that he was not predisposed to the death penalty. (Tr. 589)

Likewise, the record does not support Bolden's allegations with respect to Juror 58 and Juror 118. Both jurors stated that they would remain open-minded. Juror 58 expressed that he was "generally opposed" to the death penalty, but that he was willing to consider the circumstances in which the penalty was appropriate. Juror 118 stated that if the penalty stage were reached he would consider the death penalty and life imprisonment, and that he "wouldn't be predetermined after a verdict of guilty to go one way or another." (Tr. 768) Nothing in either jurors' statements indicate that they were not open to considering mitigation evidence or that they would automatically vote for the death penalty upon a finding of Bolden's guilt.

Bolden next contends that Juror 31 was unqualified to sit on the jury because she wrote in her questionnaire that she favored the death penalty in cases where there there was "overwhelming evidence of guilt." (Tr. 177) He also complains that his attorneys did not question her about this in voir dire. What Bolden neglects to mention mention is that Juror 31 was questioned at length by counsel for the government and, and, if anything, her responses suggested an inclination toward the defense (*e.g.,* "I

would—would weigh the mitigators—I would tend to favor the mitigators, to be honest." (Tr. 177); "I would say that my predisposition would be against the death penalty." (Tr. 180)). Certainly, Bolden was not prejudiced by his attorneys' failure to failure to ask questions of Juror 31.

Bolden makes a similar claim with respect to Juror 41, who wrote in his questionnaire that imposing the penalty of life without parole would "depend[] on the crime and if found guilty." When questioned about this at trial, Juror 41 stated that he believed the death penalty was "probably" appropriate in cases where "people butcher people . . .[s]omething that's, you know, way beyond the normal thing." (Tr. 328) In response to defense counsel's question, Juror 41 expressed the view that the death penalty was appropriate for crimes that are "particularly heinous and vicious." Id. Nothing in Juror 41's responses supports the claim that he was predisposed to the death penalty or that he would not consider mitigation evidence in Bolden's case.

Finally, Bolden alleges that Juror 186 was an "automatic death juror" based on statements she made in voir dire. Juror 186 was an alternate juror who did not participate in the deliberations during either the guilt or penalty phase of the trial. Apart from that, however, she stated that she would not make a decision about the death penalty before hearing and weighing all the evidence. (Tr. 1372)

For the foregoing reasons, Bolden is not entitled to relief on Ground 6.

**Ground 7: <u>Evidence During Guilt Phase</u>**

**A. Eyewitness and co-defendant testimony**

Bolden contends that his attorneys insufficiently attacked the credibility of the testimony of the three eyewitnesses and co-defendant Price during the guilt phase of the trial. He also accuses the government of withholding information about the witnesses that should have been disclosed under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and asserts that the government elicited improper testimony from the witnesses. His allegations of prosecutorial misconduct were not raised on direct appeal and are procedurally defaulted.

During the guilt phase, the jury heard testimony from three witnesses—Erica Ruffin, Henry Wines, and Jeanne Coser—each of whom identified Bolden as the person who shot Mr. Ley. Initially, Bolden asserts that the testimony of the eyewitnesses contained a number of inconsistencies so as to render it unreliable. The inconsistencies he points out, however, were evident in the witnesses' testimony and could have been considered by the jury. He does not explain what his attorneys could have done to make the inconsistencies more apparent than they already were.

### (1) Erica Ruffin

In assessing the value of identification testimony given by an eyewitness, it is is appropriate for the jury to consider the circumstances attendant to the witness's observations. <u>See</u> <u>United States v. Grey Bear</u>, 883 F.2d 1382, 1388 (8th Cir. 1989) 1989) (jury was properly instructed that in evaluating identification testimony, it should consider whether the witness had both an adequate ability and opportunity to to observe the person in question). In the instant case, Erica Ruffin testified that she she was walking toward her car across the street from the bank when she heard the

sound of a gunshot coming from the direction of the bank. When she looked over, she saw the security guard "bent over with his hand in front of him like with his palm out, and [she] saw the—the guy who had the gun." (Tr. 2540) Ruffin identified Bolden as the man with the gun and further testified that she saw Bolden shoot the security guard in the head. After the shooting, Ruffin watched Bolden flee from the scene and was able to describe his vehicle. She testified that she was paying close attention to the events because she, too, was a security guard. (Tr. 2562) The jury heard testimony about the distance and vantage point from which Ruffin made her observations and, thus, could have assessed her ability to have seen what she testified about. Further, the reference to Ruffin's work as a security guard was not an attempt to "bolster" her testimony. Instead, it was relevant to the reason for her attentiveness to what was happening outside the bank.

In response to questioning by the government, Ruffin testified that she had used heroin prior to the date of the bank robbery and that she had been in an inpatient drug treatment program just two weeks before the trial. Although she testified that she had not used heroin on the day of the crime, she admitted that she relapsed and used heroin again "[m]aybe a month or two" later. On cross-examination, Ruffin testified that she had a nine-year history of drug abuse and that she had relapsed multiple times. (Tr. 2565, 2566) Bolden faults his attorneys for failing to use Ruffin's substance abuse treatment records for impeachment, but these records would have been cumulative of the testimony Ruffin gave about her addiction.

Bolden's suggestion that the government withheld evidence relating to Ruffin's drug usage and treatment and withheld information that could have been used for impeachment is no more than speculation. Likewise, the suggestion that Ruffin engaged in prostitution while being housed by the government during the trial is pure speculation. Bolden's counsel cannot be faulted for failing to make unsupported, speculative claims at trial.

### (2) Henry Wines

Witness Henry Wines testified that he had exited the bank and was approaching his truck when a man wearing a mask appeared. When Wines asked the man what he was doing, the man fell to the ground near his truck. Wines then heard a loud voice saying, "give it up, give it up," coming from the direction of the bank. When he turned, he saw Bolden shoot Mr. Ley. As Mr. Ley was falling, Wines saw Bolden shoot him a second time. Wines testified that Bolden then walked in front of his truck and the two men looked at each other. He testified that he kept his eyes on Bolden because he was concerned that he might get shot, too. (Tr. 2399-2406)

In response to questions about his occupation, Wines testified that he had worked as a corrections officer for 23 years and as a security guard for six months. (Tr. 2395-96) He did not testify about any training he received or any expertise he acquired from that work. Bolden argues that his attorneys should have obtained Wines' employment records in order to rebut the government's assertion that he had had acquired "special skills" as a result of his work as a corrections officer and as a security guard. In its closing argument, the government briefly referred to Wines as

as "the retired lieutenant at the city workhouse jail," but made no attempt to use Wines' prior employment to buttress his identification of Bolden. (Tr. 3097) Instead, Instead, the emphasis was placed on Wines' close proximity to the shooting and his focus on Bolden. Moreover, Bolden has not identified anything in the record to support support his claim that the government sought to persuade the jury that Wines' past work enhanced his reliability as a witness. Also, Bolden has not shown that the employment records contained information that his attorneys could have used to discredit Wines or to minimize the impact of his testimony.

### (3) Jeanne Coser

Jeanne Coser testified that she had worked for UPS as a sorter and bagger, which required her to take "sort tests" and to learn ZIP codes for various cities. Although defense counsel objected, Bolden asserts that he didn't do it soon enough. The testimony about Coser's work can best be described as fleeting. (Tr. 2997, lines 3-8) The bulk of her testimony consisted of her eyewitness account of the struggle between Bolden and Mr. Ley culminating in Mr. Ley being shot twice. Also, Bolden's claim that defense counsel should have obtained Coser's employment records is without merit, as he only speculates about the content of the records.

Bolden's claim that his attorneys failed to challenge Coser's reliability as a witness is not supported by the record. Coser testified that Bolden and Mr. Ley were in were in the shade of the bank building during the struggle and that the sun did not have any impact on ability to see the events. (Tr. 3009) Questioning Coser about the the position of the sun would have been fruitless, and defense counsel can't be faulted faulted for not doing so. In describing the struggle, Coser alternately testified that the

the gun was in Bolden's left hand and his right hand. (Tr. 3009, 3010, 3029, 3030, 3043-45) Bolden argues that his counsel should have presented evidence that he is is right-handed. However, it is difficult to see how such evidence would have been helpful given the fact that the jury already heard the inconsistency in Coser's testimony.

Next, Bolden complains of defense counsel's failure to prevent the government from eliciting testimony from Coser about her efforts to comfort Mr. Ley as he lay bleeding on the sidewalk and about her blood-stained clothing and her emotional reaction after the shooting. He does not, however, show that this testimony was inadmissible or that an objection to it would likely be sustained. Indeed, it was appropriate for the jury to consider the traumatic nature of the incident Coser witnessed and her emotional state in assessing the reliability of her identification of Bolden as the shooter.

Finally, Bolden alleges that defense counsel failed to object when the prosecution elicited testimony about Coser's attendance at a memorial service for Mr. Ley. Contrary to this assertion, the record shows that defense counsel did make a timely objection to the testimony and the objection was sustained. (Tr. 3025, 3026) Bolden has not shown that he was prejudiced by defense counsel's actions.

### (4) Dominick Price

Bolden's next claim is that defense counsel were deficient in failing to develop and present evidence to challenge co-defendant Dominick Price's testimony. First, he he asserts that there were two potential witnesses—James Crawford and Audrey

Brown—whose testimony would have contradicted Price's testimony that he was not armed with a gun and would have advanced the theory that it was Price who fired the the second shot that killed Mr. Ley.

Under the <u>Strickland</u> standard, the court must determine whether the defendant was prejudiced by defense counsel's actions. In the context of an ineffective assistance claim based on failure to call witnesses, the court, in determining prejudice, considers "(1) the credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses, (2) the interplay of the uncalled witnesses with the actual defense witnesses called, and (3) the strength of the evidence actually presented by the prosecution." <u>McCauley-Bey v. Delo</u>, 97 F.3d 1104, 1106 (8th Cir. 1996), <u>cert</u>. <u>denied</u>, 520 U.S. 1178 (1997).

As discussed above, three independent eyewitnesses testified that they saw Bolden point the gun at Mr. Ley and fire the second, fatal shot. Bolden does not contend that Crawford or Brown could have testified that the man they saw was actually carrying a gun or that he fired a gunshot. Instead, he states that Crawford saw the man "carrying what he believed to be a weapon" and Brown saw the man "hunched over as if he was carrying something." *Amd. Mot. To Vacate*, Doc. # 54, p. p. 79. If the testimony of these potential witnesses would have been as vague and imprecise as Bolden describes it, defense counsel cannot be faulted for not presenting presenting it. Further, the jury was aware that Price sold drugs and, as Bolden's counsel argued, could have found it ludicrous that he was unarmed. Bolden has not not shown that he was prejudiced by counsel's decision not to call Brown and Crawford Crawford to testify.

Bolden's second argument is that the theory of Price as the second shooter could have been supported had defense counsel adequately challenged the government's ballistics evidence. The government's expert witness testified that the first bullet that struck Mr. Ley came from the gun that was found at Bolden's home and the second bullet was too mutilated to be analyzed. Thus, even if there had been evidence that Price possessed a gun, the fatal bullet could not be linked to it. Bolden does not explain what further actions counsel should have taken to challenge the expert's testimony.

As his third argument, Bolden contends that defense counsel should have obtained telephone records to impeach Price's testimony about phone conversations between the three defendants. He fails to make any showing that telephone records containing impeachment information actually existed, and his argument is based on speculation.

Finally, Bolden contends that defense counsel should have called co-defendant co-defendant Corteze Edwards to testify and that government knew that Edwards could could provide exculpatory testimony but failed to disclose it. According to Bolden, Edwards could have testified that Bolden did not threaten him, thus contradicting Price's testimony that Bolden coerced Edwards and Price into participating in the bank bank robbery. There is some illogic in Bolden's argument: he faults his attorneys for for not presenting evidence that he alleges the government deliberately withheld from from them. Apart from that, however, Bolden makes no showing (1) that Edwards would, in fact, have testified, (2) that Edwards' purported testimony would have been been admissible, or (3) that the testimony would have changed the outcome of the

case.  Further, if Edwards had testified, he would have further implicated Bolden in the the crime.  When this potential harm is balanced against the potential value of the testimony (*i.e.*, impeachment on a minor, collateral issue), counsel's decision not to call Edwards was reasonable trial strategy.

### B.  Eyewitness identification expert

Defense counsel retained Michael R. Lieppe, Ph.D., as an expert on eyewitness identification.  Dr. Lieppe prepared a report in which he demonstrated the unreliability of eyewitness identification, but defense counsel did not call him as a witness at trial.  Bolden asserts that counsel's failure to present this evidence constituted ineffective assistance.

The three eyewitnesses who testified for the government were unwavering in their identification of Bolden as the man who shot Mr. Ley.  They were subjected to extensive cross-examination in an effort to cast doubt on the reliability of their testimony.  Moreover, their testimony was corroborated by other evidence— notably, the discovery of the murder weapon in Bolden's home and the testimony of co-defendant Price.  In the face of this substantial evidence, it cannot be said that Bolden was prejudiced by the omission of Dr. Lieppe's testimony.

### C.  Forensic pathologist

The defense retained a forensic pathologist, Vincent J.M. DiMaio, M.D., who opined that the stippling around the entrance wound indicated that the first shot was was fired at close range, consistent with a struggle.  Bolden argues that defense counsel could have presented Dr. DiMaio's testimony to dispute the testimony of the government's forensic expert, Jane Turner, M.D.  Dr. Turner testified that she found

found marks on the skin area around the non-fatal (first) gunshot wound "that could be could be considered 'stippling'." (Tr. 2743) She also agreed that the presence of stippling generally indicates that the weapon was as close as a half-inch to as far as three feet from the body. (Tr. 2747-48) Thus, the record shows that Dr. Turner's testimony was not inconsistent with the opinion of Dr. DiMaio. Bolden was not prejudiced by counsel's decision not to call an expert witness to testify on an issue that that was not in dispute.

### D.  DNA evidence

Bolden claims that the government presented "false and exaggerated" evidence and argument to the jury with respect to the DNA evidence that was used to identify him as the shooter. *Amd. Mot. To Vacate*, Doc. #54, p. 71. This claim is procedurally defaulted, as Bolden could have raised it on appeal but failed to do so. Nevertheless, a review of the transcript demonstrates that this claim has no merit.

Ann Kwiatkowski, a DNA analyst, testified as an expert witness for the government. (Tr. 2899-2995) She explained in detail the structure of DNA, individual individual genotype, and the process of forensic DNA analysis. She also described in in detail the DNA analysis she conducted on several items gathered by the police in the the investigation, including a black stocking cap that was found at the crime scene and and a Buccal swab taken from Bolden. She concluded that the DNA on the band of the the cap belonged to Bolden and that DNA on a different area of the cap belonged to Mr. Mr. Ley. Kwiatkowski further described the statistical analysis on which her conclusion conclusion was based, explaining the process of determining a random match

probability and a source probability. Contrary to Bolden's assertion, Kwiatkowski did did not equate the two probabilities, but instead distinguished them and explained how how they related to each other in her analysis.

In closing argument, the attorney for the government mistakenly stated that the odds of the DNA on the cap belonging to someone other than Bolden was "1 in 260 quadrillion" when Kwiatkowski's testimony was that the chances were 1 in 600 quadrillion. Because the misstatement decreased the odds and thus favored Bolden, it was not prejudicial. In all other respects, the prosecutor accurately summarized Kwiatkowski's testimony.

### E. Ballistics evidence

During the guilt phase of the trial, the government presented testimony from a a firearms and toolmarks expert. Bolden initially asserts that this testimony was "unreliable" and "scientifically flawed," without pointing to any specific deficiency in the the witness' qualifications or methodology. However, he supports his argument with a with a 2009 report of the National Research Council of the National Academies which which challenges the reliability of toolmark identification and ballistics evidence. Because this report was issued after Bolden's trial, he cannot fault the government or or his attorneys for not knowing about it. Bolden also claims that the government's expert implied that the bullet that proved to be fatal was fired from Bolden's gun, even even though he acknowledged that it was too mutilated for analysis. There is nothing nothing in the record of the expert's testimony that supports Bolden's claim. Indeed, Indeed, the expert testified that he could neither conclude that the bullet came from Bolden's gun nor could he exclude that possibility. (Tr. 2838-39)

Bolden next argues that his attorneys were deficient in failing to object to the ballistics expert's testimony and in failing to present expert testimony to counter it. Again, without pointing to any specific deficiency in the testimony, it cannot be determined what objection Bolden believes defense counsel could have made. Moreover, Bolden has not shown that any objection to the testimony would have been successful. Additionally, defense counsel did retain a firearms expert, John C. Cayton, to testify on the issue of whether the gun could have been accidentally discharged during the encounter between Bolden and Mr. Ley. After a <u>Daubert</u> hearing, the Court determined that Cayton's opinion about whether the shooting was accidental was not scientifically-based, but was mere speculation. (Tr. 117-121) (Doc. # 401). Defense counsel cannot be faulted for not presenting testimony that the Court excluded.

Bolden is not entitled to relief on Ground 7.

**Ground 8:  <u>Pretrial Proceedings</u>**

Bolden's claims in Ground 8 are that he was denied effective assistance of counsel and the prosecution engaged in misconduct during the pretrial proceedings. Bolden did not assert any claims of prosecutorial misconduct on direct appeal, although he could have done so. Therefore, these claims are procedurally defaulted. defaulted. Bolden did challenge the warrantless search that led to the discovery of the the murder weapon, but the appellate court held that the motion to suppress this evidence was properly denied. <u>Bolden</u>, 545 F.3d at 619-20. Consequently, he cannot cannot relitigate the constitutionality of that search in this postconviction proceeding.

proceeding.  Bear Stops, 339 F.3d at 780; United States v. Holtzen, 718 F2d 876, 878 878 (8th Cir. 1983).

Bolden alleges that the government failed to disclose "a plethora of evidence" about its eyewitnesses that would have impeached their credibility and diminished the reliability of their identification of him as the shooter.  He does not, however, identify a single item of evidence that was wrongfully withheld.  Bolden asserts that the government did not disclose witness Erica Ruffin's drug addiction until after the suppression hearing, but he makes no claim that the government was aware of this information before the hearing.  Further, Bolden offers nothing more than speculation that Ruffin was under the influence of drugs at the time of her testimony.  In any event, evidence of Ruffin's addiction to heroin was presented at trial and the jury was free to consider it in deciding whether her identification of Bolden was reliable.

In support of his ineffective assistance claim, Bolden first attacks the sufficiency of his counsel's challenge to the identifications made by the eyewitnesses.  However, the arguments Bolden contends his attorneys should have made were in fact made. The record reveals that at the suppression hearing defense counsel thoroughly cross-examined witnesses about the line-up procedures. Additionally, counsel filed extensive post-hearing objections to the magistrate judge's report and recommendation, arguing that the witnesses' testimony was unreliable due to the suggestiveness of the line-up procedures and the traumatic impact of the events they observed.

Next, Bolden attacks defense counsel's handling of the motions to suppress statements and evidence obtained through a consent search of his home. He complains that counsel failed to explore the possibility that his diabetic condition precluded him from voluntarily making statements or consenting to the search. Although Bolden claims that he can now present evidence that lack of insulin impaired his comprehension and cognitive functioning at the time of the interrogation and search, he does not state that he told his lawyers that he was impaired at any time prior to the suppression hearing. Defense counsel cannot be faulted for Bolden's failure to provide this information to them.

The remainder of the arguments asserted in Ground 8 are repetitive of arguments the court has addressed above. Bolden is not entitled to relief on this ground.

**Ground 9:  Mitigating Evidence**

Bolden's ninth ground for relief is that his attorneys were ineffective by failing to investigate, develop, and present mitigating evidence in connection with the penalty phase of the trial. He argues that information about his family, his upbringing, and his struggles with diabetes and drug addiction was known to defense counsel but was not presented to the jury.

Establishing an ineffective assistance claim depends first on demonstrating that that counsel's performance was deficient, meaning that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by by the Sixth Amendment." Strickland, 466 U.S. at 687. *See also* Ortiz v. United States, 664 F.3d 1151, 1169 (8th Cir. 2011). In evaluating Bolden's claim that his

counsel did not adequately investigate or present mitigating evidence, the court must

must focus on the reasonableness of counsel's conduct. <u>Ortiz</u>, 664 F.3d at 1169. "This

"This is an objective review, measured against the prevailing professional norms at the

the time of the investigation." <u>Id</u>. The Supreme Court in <u>Strickland</u> recognized the ABA

ABA Standards for Criminal Justice as reflecting prevailing norms of practice and as a

a guide for determining what is reasonable. However, the Court further recognized

that it is only a guide. <u>Strickland</u>, 466 U.S. at 688. Thus, the Court wrote:

> No particular set of detailed rules for counsel's conduct can
> satisfactorily take    account of the variety of circumstances faced
> by defense counsel or the range   of legitimate decisions regarding
> how best to represent a criminal defendant. Any such set of rules
> would interfere with the constitutionally protected of counsel and
> restrict the wide latitude counsel must have in making tactical
> decisions.

<u>Id</u>. at 688-89.

    In his motion, Bolden discusses at length information not presented at trial

concerning his mother's life in Canada, including her alcoholism and her family history

of mental illness, and information about the circumstances surrounding his birth. He

also identifies expert witnesses retained by defense counsel who could have testified

about his psychiatric and cognitive impairments and the difficulties he has experienced

with diabetes, but who were not called to testify. The court has given careful

consideration to the information that was omitted from the trial and finds that defense

counsel's decision to omit this information did not fall outside "the wide range of

professionally competent assistance. <u>Id</u>. at 690.

First, it must be borne in mind that this is not a case in which counsel conducted only minimal investigation. *See e.g.,* <u>Wiggins v. Smith</u>, 539 U.S. 510, 524 (2003) (defense counsel's decision not to expand investigation of defendant's background beyond the contents of the presentence investigation report and state social services records fell below prevailing professional standards). Indeed, Bolden concedes that counsel interviewed witnesses, reviewed documents, and hired experts in the course of their investigation. Additionally, just a few months after the indictment was filed defense counsel retained a mitigation expert to assist them in marshalling helpful evidence in anticipation of a death penalty authorization. Also, as evidenced by the record in the penalty phase, defense counsel presented testimony about Bolden's unstable home life during his childhood, including his mother's alcohol abuse and his abandonment by both parents. They also presented testimony about Bolden's depression and drug addiction, and that he had become comatose and experienced frequent episodes of disorientation resulting from uncontrolled diabetes. Bolden's children testified about their positive relationship with and their love for him. Finally, defense counsel presented testimony from witnesses who described Bolden's religious commitment and spiritual growth, as well as the encouragement and guidance he provided to other jail inmates.

The omitted evidence Bolden contends his attorneys should have presented—his presented—his struggles with diabetes and drug addiction and his abandonment by his his mother and the man he believed to be his father—would have been merely cumulative of the evidence provided by the witnesses who testified about these facts in

facts in the penalty phase. It is sheer speculation that counsel would have found some some genetic link between Bolden's behavior and the mental illness, addiction, and verbal and physical abuse that characterized his mother's family. Also, given the fact fact that Bolden left Canada when he was one year old and had no contact with his mother's family, it is unlikely that he was directly affected by the dysfunction of his Canadian relatives.

Additionally, there were strategic reasons for not presenting certain evidence. While Bolden claims that his landlord would have testified favorably about his carpentry skills and the improvements he made to the house he rented, she also would have testified about his failure to pay rent and his imminent eviction. Defense counsel succeeded in preventing the government from calling the landlord to testify in the penalty phase, thereby averting more damaging evidence supporting the aggravating factor of pecuniary gain. Given these circumstances, not calling the landlord was a sound strategic decision. Similarly, the omitted employment records would have yielded unfavorable evidence that Bolden had improperly received unemployment benefits. By omitting Bolden's family history of violence and criminal activity the jury was prevented from imputing that same behavior to Bolden. Also, presenting evidence about Bolden's drug usage and drug dealing in Michigan would have placed additional focus on his prior convictions and would have highlighted one of the statutory aggravating factors.

The record reveals that Bolden was examined by several mental health experts, experts, but for strategic reasons counsel chose not to present any mental health evidence during the penalty phase. The omitted expert testimony about Bolden's

aggressive and impulsive behavior resulting from purported brain damage and his cognitive impairments possibly resulting from fetal alcohol spectral disorder would have have been inconsistent with defense counsel's strategy of portraying Bolden as an even-tempered person who had done well in school, held a job, and was able to care care for his children. Also, by not calling Dr. Robert Smith defense counsel were able able to keep out information in his examination notes (*i.e.,* that Bolden exhibited no thought disorder, that he was of average to above average intellect, and that he possessed fair insight and judgment) that was inconsistent with the mitigation theory theory and information that was harmful to the defense (*i.e.,* that Bolden admitted extensive involvement in drug trafficking). Further, it is mere speculation that an investigation by defense counsel would have yielded evidence that Bolden suffered a a neurological impairment resulting from his exposure to environmental toxins in the the neighborhood where he grew up.

Under the standard set forth in <u>Strickland</u>, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" <u>Strickland</u>, 466 U.S. at 689 [*quoting* <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955)]. For the reasons discussed above, the court finds that Bolden has not overcome this presumption.

In addition to establishing the deficient performance prong under <u>Strickland</u>, a a movant claiming ineffective assistance of counsel must also demonstrate prejudice. prejudice. "When a defendant challenges a death sentence . . . the question is

~ 50 ~

whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did did not warrant death." Strickland, 466 U.S. at 695. Recently, the Supreme Court clarified "the proper prejudice standard for evaluating a claim of ineffective representation in the context of a penalty phase mitigation investigation." Sears v. Upton, 561 U.S. 945, 956 (2010). Thus, in Porter v. McCollum, 558 U.S. 30 (2009)(*per curiam*), the Court explained:

> To assess [the reasonable probability that movant would have received a different sentence], we consider "the totality of the available mitigation mitigation evidence—both that adduced at trial, and the evidence adduced adduced in the habeas proceeding"—and "reweig[h] it against the evidence in aggravation."

Id. at 41 [*quoting* Williams v. Taylor, 529 U.S. 362, 397-98 (2000)].

At the conclusion of the penalty phase, the jurors were presented with 32 mitigating factors to consider and were asked to record the number of jurors who found the existence of each factor. A majority of jurors found the existence of only eight of the mitigating factors that were submitted:

> 3. Robert Bolden will be able to continue and develop his relationship with his daughter Ariel and son Robert Bolden, Jr. and that fact tends to mitigate against imposition of the death penalty. (8)

> 6. The children and family of Robert Bolden love him and that fact tends to mitigate against imposition of the death penalty. (8)

> 20. From infancy, Robert Bolden suffered numerous diabetic episodes causing disruptions in his life and that fact tends to mitigate against imposition of the death penalty. (8)

23.  Robert Bolden, Jr. relies on his father for advice and counsel and that fact tends to mitigate against imposition of the death penalty. (8)

26.  Robert Bolden was baptized in the St. Louis County Correctional Institution and that fact tends to mitigate against imposition of the death penalty. (10)

27.  Robert Bolden sought communion while incarcerated and that fact tends to mitigate against imposition of the death penalty. (8)

28.  Robert Bolden participates in group studies of the Bible with other inmates and that fact tends to mitigate against imposition of the death penalty. (11)

29.  Jail ministers found it rewarding to work with Robert Bolden and that fact tends to mitigate against imposition of the death penalty. (11)

The above findings show that defense counsel succeeded with their strategy to emphasize Bolden's relationship with his children, his religious commitment, and the impact that diabetes had had on his life.  Further, it is significant that the mitigating factors the jurors found least persuasive were based on evidence similar to the evidence Bolden claims his attorneys erred in omitting: *i.e.,* mental and emotional difficulties; drug addiction; exposure to domestic violence as a child; abuse and abandonment by his mother and her alcoholism; rejection by his father and lack of a positive male role model in his life.

During the trial, the jurors heard evidence that Bolden was prepared to kill the the bank guard if there was any resistance, that he had rejected an accomplice's suggestion that entry to the bank be made in such a way as to avoid confronting the the guard, and that he killed the guard to avoid being identified.  They also heard

evidence that Bolden hid the gun, allowed the police to initially consider his son as a suspect, and threatened to harm his accomplices if they snitched. Against this backdrop, the jurors were presented with statutory and non-statutory aggravating factors to consider. After deliberation, the jurors unanimously found the existence of of two statutory aggravating factors (*i.e.,* that Bolden committed the murder in expectation of receiving pecuniary gain and that he had two prior felony convictions for for drug distribution) and three non-statutory aggravating factors (*i.e.,* that Bolden obstructed justice, that he had committed crimes other than the two prior drug offenses, and that the victim possessed positive personal characteristics and his death death had a negative impact on his family). The evidence Bolden faults his attorneys attorneys for omitting would not have contradicted or undermined the strength of the the aggravating evidence.

The court rejects Bolden's assertion that defense counsel did not mount a sufficient challenge to the statutory aggravating factor of two prior felony drug distribution convictions. Indeed, Bolden concedes that counsel "expended significant significant effort fighting this aggravating circumstance on legal grounds." Doc. #54, #54, p. 130. Bolden's assertion that counsel could have persuasively argued that his his 1993 conviction did not involve distribution of drugs is completely without merit, given that Bolden admitted in his guilty plea that he intended to sell the drugs that were in his possession. Further, Bolden only speculates that defense counsel would have been able to obtain helpful evidence from the individuals Bolden obtained drugs drugs from or with whom he was involved in selling drugs. Bolden's drug addiction addiction was addressed in the penalty phase, but only three jurors found it to be a

mitigating factor.  It is unlikely that the jury would have given more weight to this mitigating factor had they heard testimony from the drug traffickers that Bolden associated with.

When all of the available mitigating evidence is weighed against the aggravating evidence, the court is left to conclude that Bolden was not prejudiced by the omission of certain evidence.

Bolden next argues that his attorneys erred in failing to uncover and use information to impeach the testimony of the victim's father, Thomas Ley, during the penalty phase.  According to Bolden, information contained in Ley's personnel file would have shown the reason he left the St. Louis County Police Department was "not to spend more time with his sickly son as the penalty hearing testimony implie[d]."  He also contends that his attorneys could have discovered that Ley had once misrepresented himself as a law enforcement officer in order to serve a search warrant.  Finally, Bolden speculates that further investigation might have uncovered court cases in which Ley was involved and disciplinary action taken against him.  Had defense counsel discovered this information, Bolden argues, they could have used it to prevent the government from bolstering Ley by emphasizing his law enforcement background.

The prosecutor conducted only a cursory examination of Thomas Ley's background in law enforcement.  Indeed, the bulk of his testimony was about Nathan Nathan Ley's lifelong dream of a career in law enforcement, his personality, and the devastating effect that his death had had on the Ley family.  Clearly the prosecutor was less interested in emphasizing Thomas Ley's credentials as police officer than in

having the jury hear testimony about the victim. Even if the information Bolden describes was available, it was sound strategy for defense counsel to refrain from using using it in cross-examining a witness already devastated by the murder of his youngest youngest son. Moreover, it is unlikely the omitted information would have had undermined the strength of the government's penalty phase evidence.

Bolden is not entitled to relief on Ground 9.

### Ground 10: <u>Victim Impact Evidence</u>

Bolden's claim in Ground 10 is that the government violated <u>Payne v. Tennessee</u>, 501 U.S. 808 (1991) in its presentation of victim impact evidence. In <u>Payne</u>, the Court held that "the Eighth Amendment erects no *per se* bar" to the admission of and prosecutorial argument on victim impact evidence. Id. at 827. Bolden raised this issue on direct appeal, and the appellate court found that the evidence "was not so cumulative as to confuse the issues or create unfair prejudice." <u>Bolden</u>, 545 F.3d at 626. As demonstrated by the court of appeals' detailed analysis, defense counsel's objections to the evidence would have been futile. Bolden is not entitled to relief on this claim.

### Ground 11: <u>Pecuniary Gain Factor</u>

At trial, the government sought to prove that Bolden committed the homicide "in "in the expectation of the receipt [ ] of anything of pecuniary value." 18 U.S.C. § 3592(c)(8). Bolden's argument that the statutory aggravating factor of pecuniary gain gain applies only in murder-for-hire cases was raised and rejected on direct appeal. <u>Bolden</u>, 545 F.3d at 614-616. He cannot re-litigate this issue in a postconviction proceeding.

In his motion, Bolden claims that his attorneys were deficient by failing to argue that the language of § 3592(c)(8) is unconstitutionally vague.  He cites no authority to support such an argument, nor does he make any showing that his counsel could have successfully established that the statute was so vague that individuals of common intelligence would have to "guess at its meaning and [would] differ as to its application."  United States v. Washam, 312 F.3d 926, 929 (8th Cir. 2002).

Equally without merit is Bolden's contention that his counsel should have argued argued that the pecuniary gain factor was duplicative of an element of the homicide offense and failed to narrow the class of death-eligible defendants.  See Zant v. Stephens, 462 U.S. 862, 877 (1983) (to be constitutional, "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty penalty and must reasonably justify the imposition of a more severe sentence on the the defendant compared to others found guilty of murder.")  Here, the government was was not required to prove pecuniary gain as an element of the offense under 18 U.S.C. U.S.C. § 2113 (a), as alleged in Count II.  See United State v. Brooks, 715 F.3d 1069, 1069, 1081 (8th Cir. 2013)(elements of bank robbery under § 2113(a)).  However, proof of a statutory aggravating factor was required for imposition of the death penalty penalty under § 2113 (e).  18 U.S.C. § 3593(c).  The requirement that the government prove beyond a reasonable doubt that a homicide was committed in expectation of receiving something of pecuniary value necessarily narrows the class of of death-eligible defendants.  See Williams v. Norris, 576 F.3d 850, 870 (8th Cir. 2009) 2009) (pecuniary gain factor under Arkansas death penalty scheme did not duplicate

duplicate an element of underlying crime of felony murder and, therefore, was not unconstitutional).

Even if Bolden could establish that his attorneys' performance fell below an objective standard of reasonableness, he cannot demonstrate prejudice. In addition to proving the pecuniary gain factor, the government also proved a second statutory aggravating factor: that Bolden had two prior felony drug offense convictions. <u>See</u> 18 U.S.C. § 3592(c)(10). Because proof of only one statutory aggravating factor was required, any error with respect to the pecuniary gain factor was harmless. Bolden is not entitled to relief on Ground 11.

### Ground 12: <u>Penalty Phase Jury Instructions</u>

Bolden asserts several instances in which the court erred in instructing the jury during the penalty phase. None of the assertions he makes here were raised on direct appeal, although they could have been. To avoid this procedural default, Bolden contends that he was denied effective assistance of counsel. For the reasons discussed below, none of Bolden's claims of instructional error have merit and he was not prejudiced by defense counsel's failure to raise them at trial or on appeal.

Bolden first argues that the court erred in failing to give an instruction on the the statutory and constitutional "presumption of life." No such instruction was proffered by the defense. However, the failure to do so did not constitute ineffective ineffective assistance by defense counsel and Bolden was not prejudiced. Bolden cites cites no authority supporting his claim of entitlement to a presumption of life instruction. Indeed, this claim has been rejected by several courts that have

considered the issue. <u>Smallwood v. Gibson</u>, 191 F.3d 1257, 1271 (10th Cir. 1999)("petitioner has failed to cite any judicial authority, and our independent research research revealed none, that the Constitution mandates a 'presumption of life' instruction."); <u>Davie v. Mitchell</u>, 291 F.Supp.2d 573, 622 (N.D. Ohio 2003); <u>Slaughter Slaughter v. Parker</u>, 187 F.Supp.2d 755, 815 (W.D. Ky. 2001), *aff'd in part, rev'd in part on other grounds*, 450 F.3d 224 (6th Cir. 2006).

Bolden next contends that the phrasing and format of the instructions evinced a "structural preference for death." [Doc. # 54, p. 146]. Specifically, he complains of instructions containing the phrase "death or life imprisonment" as opposed to "life imprisonment or death," instructions that called for the jury to consider the aggravating factors before considering the mitigating factors, and the fact that the burden of proof instruction on aggravating factors preceded the burden of proof instruction on mitigating factors. Bolden's contention is based on nothing more than his own opinion and speculation. The instructions were phrased and presented in a way that logically directed the jury to first consider whether the government had met its burden of proof. Bolden's nit-picking disagreement with the order in which the instructions were given does not negate the fact that the jury was properly instructed on all issues it was required to consider in determining punishment.

Bolden next asserts that it was error to instruct the jurors that they had to find find that a mitigating factor was both true and mitigating. The jury's authority to consider any relevant mitigating factor does not mean that the jury is required to consider evidence presented in mitigation that it does not believe or that it does not

deem to be mitigating. Bolden's argument is illogical and he cites no authority to support it.

Finally, Bolden argues that the court's failure to give a limiting instruction with respect to the evidence pertaining to the non-statutory aggravating factors of obstruction and prior uncharged criminal acts may have led the jury to improperly equate these factors with the statutory aggravating factor of his prior drug convictions. This argument is belied by the record which clearly shows that the jury was instructed that the crimes constituting the non-statutory aggravating factors were different from the crimes constituting the statutory aggravating factors. (Tr. 4008) (penalty phase Instruction No. 6).

Because none of Bolden's arguments have merit, he suffered no prejudice by defense counsel's failure to raise them at trial and on direct appeal. Bolden is not entitled to relief on Ground 12.

### Ground 13: **Prosecutorial Misconduct**

Some of Bolden's allegations of prosecutorial misconduct have been discussed elsewhere in this opinion and the court will not reconsider them here. Instead, the court will limit its analysis of Ground 13 to allegations not previously addressed.


A criminal conviction must be reversed when a prosecutor engages in conduct that "so infected the trial with unfairness as to make the resulting conviction a denial of denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (*quoting* Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). "To obtain a reversal for prosecutorial misconduct, the defendant must show that "(1) the prosecutor's remarks

remarks were improper, and (2) such remarks proof that prejudiced the defendant's rights in obtaining a fair trial." United States v. Crumley, 528 F.3d 1053, 1054 (8th (8th Cir. 2008) (citations omitted).  Even when a prosecutor's comments are determined to be improper, the court, in determining whether to reverse the conviction, must consider "the cumulative effect of the improprieties, the strength of of the evidence against the defendant, and whether the district court took any curative curative action."  Id.

### A.  Misconduct during guilt phase

Citing examples, Bolden first contends that during the guilt phase, the prosecutor made remarks in opening statement and closing argument that were designed to prey on the jury's sympathy.  He contends that, as a result of the prosecutor's conduct, the jury was encouraged to focus on the mere fact that Mr. Ley Ley was killed instead of on the issue of whether Bolden was the killer.  Upon review of review of the record, the court finds that the prosecutor's remarks did not exceed the the bounds of proper advocacy.  Moreover, when considering the remarks in the context of the entire record, it cannot be said that the remarks prejudiced Bolden's right to a fair trial.  The evidence of Bolden's guilt was overwhelming.  There is no basis for believing that the jury ignored this evidence and based its decision on sympathy for Mr. Ley or his family.  Further, the jury was instructed that the prosecutor's statements were not evidence, and there is no reason to believe that the the jury did not follow this instruction.  See United States v. Herbst, 668 F.3d 580, 587 587 (8th Cir. 2012) (in assessing claim of prosecutorial misconduct, court considered

considered strength of government's case and that jury was instructed orally and in writing that prosecutor's statements were not evidence).

### B. Misconduct during penalty phase

Bolden next claims that the prosecutor engaged in misconduct during the penalty phase. Initially, he challenges the prosecutor's opening statement, "In this second phase of the trial, you're going to hear additional evidence in our continuing search for justice for Nathan Ley," as improper. (Tr. 3353-54) He infers from the statement an attempt to align the jury with the prosecutor and with the victim. The court finds this an unreasonable inference to draw; in the context of the trial, a reasonable inference is that use of the word "our" was intended to refer to the prosecution team.

Additionally, there was nothing improper about the prosecutor's reference to the impact of Nathan Ley's death on his family and others. After all, victim impact was a non-statutory aggravating factor for the jury to consider. *See*, Jury Instructions 5 and 6 (Doc. #435). Further, there was nothing improper about the prosecutor's statement that "words are unsatisfactory to describe" the impact of Mr. Ley's death on his loved ones and that the jury would "have to see it; hear it; and in some cases, you may feel it yourself." (Tr. 3363) Bolden's contention that this statement encouraged the jurors to put themselves in the shoes of the victim-witnesses is based on a strained interpretation. When the statement is read in context it is clear that the jurors were being told that they might find themselves empathizing with the witnesses.

Bolden next claims that the prosecutor asked improper questions of four witnesses. With respect to the first witness, Donald McDowell, Bolden argues that the prosecutor improperly elicited evidence of uncharged criminal conduct by asking, "Did you purchase [drugs] from [Bolden] roughly once a week?" After defense counsel objected, the prosecutor withdrew the question. The court then instructed the jury to ignore the question and the witness' answer and not to consider them "in any way." (Tr. 3397-98) As to the second witness, Sandra Stittum, the prosecutor asked whether she was aware that Bolden had tried to sell his daughters back to their mother for $5,000. Defense counsel's objection to the question was sustained before the witness answered, and the jury was instructed to disregard the question. In both instances, the jury was given a curative instruction. No evidence or information has been presented to counter the presumption that jurors follow the instructions given by the court. *See* Richardson v. Marsh, 481 U.S. 200, 206 (1987) (there is an "almost invariable assumption of the law that jurors follow their instructions."); *see also* United States v. Harper, 466 F.3d 634, 647 (8th Cir. 2006), *cert. denied*, 549 U.S. 1273 (2007) ("[W]e presume juries to be composed of prudent, intelligent individuals, and we will not speculate whether jurors disregard the court's instructions of law or their oaths.").

As to the third witness, Bolden contends that the prosecutor committed misconduct in by asking mitigation witness Mona Muhammad about her son's murder murder conviction. Bolden presented an analogous issue on direct appeal, asserting asserting that the court erred in allowing this question. Bolden, 545 F3d at 628. The The appellate court ruled that the question was a proper means of establishing the

witness' bias, and held that "the inquiry did not create a risk of unfair prejudice, confuse the issues, or mislead the jury." *Id.* at 628-629 (citation omitted). Consequently, this allegation of misconduct fails.

As to the fourth witness, Dr. Paul Hipps, Bolden argues that the prosecutor violated the priest-penitent privilege by asking the witness why he failed to disclose Bolden's admission prior to the penalty phase. According to Bolden, Dr. Hipps was precluded from revealing this information, absent a waiver of the privilege, and the prosecutor's question was tantamount to a comment on Bolden's exercise of his right to remain silent. However, Dr. Hipps testified that in October 2005, Bolden admitted his guilt to a group of people and that he (Dr. Hipps) then repeated the admission during his sermons. (Tr. 3878-79) Clearly, then, the privilege was waived as early as six months before the trial and Dr. Hipps was free to disclose the admission to Bolden's attorneys or to the prosecution. Bolden's argument is simply not supported by the facts.

### C. Misconduct in closing argument

On direct appeal, Bolden argued that he was denied a fair trial by the prosecutor's "'incendiary' penalty phase closing argument." Bolden, 545 F.3d at 630. 630. After conducting a "careful review of all the challenged comments," the court of of appeals concluded that "they were isolated and insubstantial in context and far less less egregious than statements we have deemed harmless in other capital cases." Id. Id. (citations omitted). Some of the allegations of misconduct in the motion to vacate vacate are identical to the ones rejected on direct appeal, and for that reason the court court will not address them here. Bear Stops, 339 F.3d at 780(claims raised and

decided on direct appeal cannot be relitigated in a § 2255 proceeding); <u>United States States v. Shabazz</u>, 657 F2d 189, 190 (8th Cir. 1981).

Bolden's remaining allegations of prosecutorial misconduct during closing argument are procedurally defaulted, because he failed to present them on direct appeal. In an effort to establish cause for the default, Bolden contends that his attorneys were deficient. Even if the court were to find that defense counsel's performance fell below an objectively reasonable standard, Bolden has not demonstrated that he was prejudiced.

Bolden contends that the prosecutor's reference to his lack of remorse was improper, because lack of remorse was not listed as one of the non-statutory aggravating factors. This argument ignores the fact that Bolden himself raised the issue of his remorse through Dr. Hipps' testimony and through defense counsel's closing argument emphasizing Bolden's religious conversion in mitigation. (Tr. 3972-73) Further, Bolden does not cite any authority for the proposition that a prosecutor's argument is constrained by the aggravating factors that are submitted to the jury.


Equally unavailing is Bolden's criticism of the prosecutor's reference to the timing of Dr. Hipps' testimony that Bolden had expressed his willingness to plead guilty guilty to avoid the death penalty. (Tr. 3930-32) The prosecutor argued that the testimony was intended to demonstrate Bolden's acceptance of responsibility, but it couldn't be tested through further cross-examination because it was given during redirect examination. Suggesting to the jury that the timing of the testimony was strategic instead of coincidental was not an improper method of impeachment.

Finally, Bolden asserts that the prosecutor falsely stated that he had served two years in prison for the prior drug convictions. (Tr. 3979) Whether this misstatement was made accidentally or deliberately is unimportant. The jury was required to determine the fact of the prior drug convictions as a statutory aggravating factor----not whether a sentence of imprisonment was imposed. *Penalty Phase Instruction No. 4* (Doc. # 435, p. 5). Further, the jury was instructed that statements and arguments made by the attorneys were not evidence. *Guilt Phase Instruction No. 3* (Doc. # 409, p. 3). There is no reason to believe that the jury disobeyed the instruction.

Bolden is not entitled to relief on Ground 13.

**Ground 14: <u>Inadequate Medical Care</u>**

Bolden claims that the government's mismanagement of his diabetes care adversely affected his ability to confer with his counsel and to defend himself and caused him to suffer a hypoglycemic episode in the presence of the jury that was prejudicial. This claim could have been raised on appeal, but was not. Therefore, it is procedurally defaulted.

It is undisputed that Bolden's diabetic condition required insulin and regular monitoring of his blood sugar levels. Although he alleges that the medical treatment treatment he received while in jail was inadequate, he has no evidence attributing this this to the prosecution. Further, he submits no evidence supporting the allegation that his diabetic condition impeded defense counsel's ability to communicate with him. him. Everything in the record points to the diligence with which defense counsel sought to create reasonable doubt and to minimize the likelihood of a death sentence.

sentence.  Certainly, if Bolden were as impaired as he now claims he was, there would would have been no reason for defense counsel to withhold such important information information from the court.  The contention that defense counsel were unable to communicate with Bolden but never said or did anything about it is wholly inconsistent inconsistent with the record.

Additionally, the record belies Bolden's contention that he was impaired during the trial.  When the court examined Bolden about his decision not to testify during the guilt phase, he responded appropriately and did not voice any difficulties.  (Tr. 3064-67)  Also, after the hypoglycemic episode during the penalty phase, the court adjourned for the remainder of the day.  When the trial resumed, Bolden reported to the court that he felt fine and that he was able to continue. (Tr. 3635-37)

During the penalty phase, defense counsel presented extensive evidence of Bolden's diabetes and the severe effects the condition had on him.  Several witnesses testified to the difficulties Bolden experienced in managing his diabetes and to his diabetic episodes.  In addition, Bolden's diabetic condition and its effects were submitted as a mitigating factor for the jury to consider.  Given Bolden's reliance on his diabetes to dissuade the jury from imposing the death penalty, it is unlikely that he was prejudiced by the diabetic episode he experienced.

Bolden is not entitled to relief on Ground 14.

**Ground 15:  <u>Denial of Meaningful Appellate Review and Ineffective Assistance of Counsel on Appeal</u>**

Bolden's next claim is that the court of appeals applied an incorrect standard of review to his claims, thus denying him meaningful appellate review. The district court does not sit in review of an appellate court's rulings. The proper vehicle for asserting claims of error by the court of appeals is a motion for rehearing by the panel or *en banc* or a petition for a writ of certiorari to the Supreme Court.

Bolden also claims that he was denied effective assistance of counsel on appeal. While he correctly states that defense counsel failed to preserve certain claims in the trial court, these claims were nevertheless reviewed by the court of appeals for plain error. Bolden has not shown that the court of appeals' decision on these claims would have been different had the claims been properly preserved and reviewed under a different standard, and thus he has not demonstrated prejudice.

Next, Bolden asserts that appellate counsel failed challenge the trial court's admission of extrinsic evidence concerning his 1995 conviction. On appeal, appellate appellate counsel argued that the trial court erred by allowing extrinsic evidence pertaining to Bolden's 1993 conviction for attempted possession with intent to deliver deliver cocaine. Counsel further argued that the trial court "enhanced the error by by allowing a mini-trial of Bolden's [1995] conviction for delivering cocaine. <u>Bolden</u>, <u>Bolden</u>, 545 F.3d 609 (Appellant's Brief, p. 44). Counsel then described in detail the the objectionable testimony relating to the 1995 conviction. <u>Id</u>. at 44-45. Nevertheless, Bolden's counsel conceded on appeal that the government had established the 1995 conviction as an offense involving the distribution of a controlled

controlled substance, within the meaning of 18 U.S.C. § 3592(c)(10).[1]  Bolden, 545

F.3d at 616.  Because of this concession, the court of appeals was left to focus on the

the 1993 conviction and held that the admission of extrinsic evidence pertaining to that

that conviction was not an abuse of discretion.  Id. at 617.   In reaching this decision,

decision, the court noted that "[t]he FDPA 'erects very low barriers to the admission of

of evidence at capital sentencing hearings.'"  Id. [*quoting* United States v. Lee, 274 F.3d

F.3d 485, 494 (8th Cir. 2001), *cert. denied*, 537 U.S. 1000 (2002)].  The low barrier,

barrier, the court further noted, "is necessary to ensure that the death penalty phase

phase produces 'an *individualized* determination on the basis of the character of the

individual and the circumstances of the crime.'"  Id. [*quoting*, Zant v. Stephens, 462

462 U.S. 862, 879 (1983) (emphasis in original)].  Logically, the appellate court's

reasoning extends to the 1995 conviction.  Bolden cannot demonstrate that he was

prejudiced.

Finally, Bolden contends that appellate counsel should have challenged the

admission of the testimony of Douglas Sinnema, an expert witness, on grounds of

insufficient notice.  The record reveals that counsel received notice of Sinnema's

testimony nine days before he was called.  The record further reveals that counsel

demonstrated no difficulty in cross-examining Sinnema.  There was no support for a

claim of prejudice, and counsel had no obligation to raise a non-meritorious claim on

appeal.

Bolden is not entitled to relief on Ground 15.

---

[1]   Counsel did not make this concession at trial and, as a result, it was incumbent on the
prosecution to prove the 1995 conviction as an aggravating factor.

**Ground 16: <u>Conditions on Death Row</u>**

In this ground, Bolden claims that the conditions of his confinement in a special unit for death penalty inmates are unconstitutional. This court previously determined that Bolden's challenge to the execution of his sentence is not cognizable in a § 2255 proceeding. *Memorandum and Order, March 9, 2012* (Doc. # 80). Further, Bolden's claim of inordinate delay in carrying out his execution has been consistently rejected by courts that have considered the issue. *See* <u>Thompson v. Secretary for Dept. of Corrections</u>, 517 F.3d 1279, 1284 (11th Cir. 2008), *cert. denied*, 556 U.S. 1114 (2009)(noting "the total absence of Supreme Court precedent that a prolonged stay on death row violates the Eighth Amendment guarantee against cruel and unusual punishment," court held that execution after 31 years not unconstitutional); <u>Chambers v. Bowersox</u>, 157 F.3d 560, 570 (8th Cir. 1998)(execution of death sentence 15 years after imposition not unconstitutional); <u>White v. Johnson</u>, 79 F.3d 432, 439 (5th Cir. 1996)(17-year delay in execution of death sentence not cruel and unusual punishment).

Bolden is not entitled to relief on Ground 16.

**Ground 17: <u>Cumulative Effect of Errors</u>**

Bolden's final claim is that he is entitled to relief based on the cumulative effect of all the errors he alleges in his motion. The court has examined, individually, each of the grounds Bolden asserts and finds that none of them establish a basis for relief. Accordingly, he is not entitled to relief on Ground 17.

\* \* \* \* \*

For the reasons discussed above, the court concludes that motion and the files files and records of this case conclusively show that Bolden is not entitled to relief under 28 U.S.C. § 2255 based on any of the claims he asserts in the amended motion motion to vacate.  Therefore, the motion will be denied without a hearing. *See* Engelen Engelen v. United States, 68 F.3d  238, 240 (8th Cir. 1995).  Additionally, the court court finds that Bolden has not made a substantial showing of the denial of a constitutional right. Therefore, the court will not issue a certificate of appealability. *See* *See* 28 U.S.C. § 2253.

An order consistent with this memorandum opinion will be filed separately.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 21st day of March, 2016.